# EXHIBIT 3

# Deposition Transcript

Case Number: 2:24-cv-04070-GAW
Date: March 21, 2025

In the matter of:

## OCKLEY v TOWNSHIP OF RADNOR, PENNSYLVANIA, et al.

# Gregory Lingo



**CERTIFIED COPY**

Reported by:
KIMBERLY WENDT

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1              IN THE UNITED STATES COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                 CIVIL ACTION - LAW

 4                    -   -   -

 5  SIMONA OCKLEY          :   Case 2:24-cv-04070-GAW
                           :
 6             Plaintiff :
                           :
 7          vs.            :
                           :
 8  TOWNSHIP OF RADNOR,    :
    PENNSYLVANIA           :
 9          and           :
    JENNIFER COCCO in her  :
10  individual capacity    :
            and           :
11  JOSEPH PINTO in his    :
    individual capacity    :
12          and           :
    BRADY MCHALE in his    :
13  individual capacity    :
            and           :
14  BRIAN BROWN in his     :
    individual capacity    :
15          and           :
    JEFFREY BRYDZINSKI     :
16          and           :
    TYLER PRETE            :
17          and           :
    ROCKWELL-GLYNN, LP     :
18                         :
             Defendants :

19

20                    -   -   -

21          Friday, March 21, 2025

22                    -   -   -

23          Sworn videotaped deposition of GREGORY

24  LINGO was held at the offices of Schrom, Shaffer &

25  Botel, P.C., 4 West Front Street, Media,
```

Page 2

```
 1   Pennsylvania commencing at 1:36 p.m. on the above
 2   date before Kimberly Wendt, RPR, a Certified
 3   Shorthand Reporter and Notary Public in and for the
 4   State of Pennsylvania.
 5                        -  -  -
 6                       STENO
                  Concierge@Steno.com
 7                   888-707-8366
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4        SCHROM, SHAFFER & BOTEL, P.C.
          BY:  GERARD SCHROM, ESQUIRE
 5        4 West Front Street
          Media, PA 17543
 6        610-565-5050
          Gschrom@schromandshaffer.com
 7
 8   FOR THE DEFENDANTS:
 9        SPRUCE LAW GROUP
          BY:  TODD BARTOS, ESQUIRE
10        1622 Spruce Street
          Philadelphia, PA 19103
11        267-546-0600
          Tb@sprucelaw.com
12        Counsel for Jeffrey Brydzinski,
          Tyler Prete, Rockwell-Glynn, LP
13        and Gregory Lingo
14
          MARSHALL DENNEHEY
15        BY:  JOHN P. GONZALES, ESQUIRE
          2000 Market Street
16        Suite 3200
          Philadelphia, PA 19103
17        215-575-2871
          Jpgonzales@mdwcg.com
18        Counsel for Township of Radnor,
          Pennsylvania, Jennifer Cocco,
19        Joseph Pinto, Brady McHale and
          Brian Brown
20        (Attending via Zoom)
21
22   ALSO PRESENT:
23        Neil Botel, Esquire
24        Elizabeth Malloy
25        Alan Paller - Videographer
```

Page 4

```
 1                  I N D E X
 2
 3   WITNESS                                         PAGE
 4   GREGORY LINGO
 5
        By:  Mr. Schrom                               7
 6
        By:  Mr. Bartos                              86
 7
 8               E X H I B I T S
 9
     NUMBER          DESCRIPTION                     PAGE
10
11   P-1 Lingo    Agreement of Sale 10/20/21          26
                  Simona Ockley to Rockwell-Glynn
12
     P-2 Lingo    Notice of Condemnation              28
13
     P-3 Lingo    Amendment to Agreement of Sale      29
14
     P-4 Lingo    Complaint against Simona Ockley     32
15
     P-5 Lingo  Hearing Transcript - Judge Whelan     36
16
     P-6 Lingo       Order of Judge Whelan            47
17
     P-7 Lingo    Agreement of Sale 7/19/22           51
18                Rockwell-Glynn to Brydzinski
19   P-8 Lingo    Deed Conveying Property To          52
                  Brydzinski and Prete
20
     P-9 Lingo    Check Payable to Simona Ockley      54
21
     P-10 Lingo   8/5/22 Lingo Email Exchange         55
22
     P-11 Lingo   8/9/22 Ockley Emergency Letter      58
23                Petition to Judge Whelan
24   P-12 Lingo       Order of Judge Dozor            59
25   P-13 Lingo   8/9/22 Photos of Workers            60
```

Page 5

```
 1   P-14 Lingo    Ockley Locksmith Receipt            61
 2   P-15 Lingo    8/11/22 Lingo Email Exchange        61
 3   P-16 Lingo    8/12/22 Rockwell-Glynn Counsel      65
                   Letter to Judge Dozor
 4
     P-17 Lingo    Rockwell-Glynn Motion For           73
 5                 Reconsideration of Dozor Order
 6   P-18 Lingo    Rockwell-Glynn Counsel Letter       75
                   To Judges Dozor and Whelan
 7
     P-19 Lingo    Dismissal of All Charges            79
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

GREGORY LINGO                                          JOB NO. 1501919
MARCH 21, 2025

Page 6

```
 1              -  -  -
 2          VIDEOGRAPHER:  Good afternoon.
 3    We are now on the record at 1:36 p.m.
 4    Eastern Time on March 21, 2025 to begin
 5    the deposition of Greg Lingo in the matter
 6    of Simona Ockley versus the Township of
 7    Radnor, Pennsylvania, et al.  This case is
 8    venued in the United States District Court
 9    For The Eastern District of Pennsylvania,
10    case number 2:24-cv-04070.  This
11    deposition is taking place at the Law
12    Offices of Schrom, Shaffer and Botel
13    located at 4 West Front Street, Media,
14    Pennsylvania.
15              The legal videographer is
16    Alan Paller, and the court reporter is
17    Kim Wendt.  We're here on behalf of Steno
18    Court Reporting.  At this time would
19    counsel, please, identify yourselves and
20    state whom you represent.
21          MR. SCHROM:  Gerard Schrom,
22    S-C-H-R-O-M, on behalf of plaintiff Simona
23    Ockley.
24          MR. BARTOS:  Todd Bartos, Spruce
25    Law Group, on behalf of Rockwell-Glynn,
```

Page 7

```
 1    LP, Misters Prete and Brydzinski, and also
 2    the witness Gregory Lingo.
 3          MR. GONZALES:  John Gonzales on
 4    behalf of the Radnor Township defendants.
 5          VIDEOGRAPHER:  The court
 6    reporter will swear in the witness.
 7              -  -  -
 8          GREGORY LINGO, after having been
 9    duly sworn, was examined and testified as
10    follows:
11              -  -  -
12          MR. SCHROM:  Okay.  Is it
13    acceptable that we have the same
14    stipulations as in the prior depositions?
15          MR. BARTOS:  Yes.
16          MR. SCHROM:  John?
17          MR. GONZALES:  Yeah, that's fine
18    with me.
19  BY MR. SCHROM:
20    Q.    Okay.  Please, state your name and spell
21    the last?
22    A.    Gregory Lingo, L-I-N-G-O.
23    Q.    Okay.  And what is your address?
24    A.    200 Lansdowne Avenue, Wayne, Pennsylvania.
25    Q.    Okay.  And the cell number that was used
```

Page 8

```
 1    in matters relating to 416 South Ithan Avenue,
 2    Villanova?
 3    A.    I only have one cell phone.  302-367-6648.
 4    Q.    Okay.  And what's your date of birth?
 5    A.    1/29/72.
 6    Q.    Okay.  Did you review any documents or
 7    videos in preparation for today's deposition?
 8    A.    No.
 9    Q.    No?  Okay.  What's your educational
10    background?
11    A.    Went to Upper Darby High School, graduated
12    from Cornell University School of Engineering,
13    graduated from Villanova University, MBA.
14    Q.    And your just overall work experience?
15    A.    For 31 years I've been in real estate
16    development and home building.
17    Q.    Okay.  And can you tell us what your
18    experience is with Rockwell-Glynn?
19    A.    I'm the owner.
20    Q.    You're the owner?  When did you create
21    that?
22    A.    Probably six years ago, approximately.
23    Q.    Okay.  So in terms of your experience
24    relative to real estate development, how would you
25    characterize yourself, as extremely experienced,
```

Page 9

```
 1    very experienced, experienced, not so experienced?
 2          MR. BARTOS:  Objection to form.
 3    You can answer.
 4          THE WITNESS:  Experienced.  Was
 5          that one of your choices?
 6  BY MR. SCHROM:
 7    Q.    Yeah.
 8    A.    Yeah, okay.  This is all I've been doing,
 9    for the most part.  I have other businesses too, but
10    this is my primary business.
11    Q.    Okay.  What responsibilities do you have
12    with Rockwell-Glynn?
13    A.    Just really the owner of the entity, but
14    beyond that, then the entity then hires contractors
15    to build properties, basically.
16    Q.    So what are your day-to-day duties?
17    What does that involve?  Acquiring real estate, and
18    then developing it through subs, and then --
19    A.    Yeah, Rockwell-Glynn --
20    Q.    -- selling the properties?
21    A.    Rockwell-Glynn purchases properties,
22    develops new properties, sells them.
23    Q.    Okay.  And you're involved with all
24    phases?
25    A.    Not necessarily.  It varies.
```

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

Page 10

1 Q.      Okay.  So sometimes?  Can you explain
2 that?
3 A.      Sure.  I am definitely responsible for
4 identifying the properties and getting them
5 financed, and then we hire -- sometimes we'll hire
6 sales people to sell the properties when they're
7 done, sometimes we'll -- somebody will just call on
8 a sign, and we'll be able to sell it ourselves.
9 Does that answer your question?
10 Q.      Sure.  And then, you're talking about sell
11 it ourselves, that means after the property is fully
12 developed, or is it just sometimes they -- you have
13 a property that's undeveloped, and then you become
14 the contractors to develop it as well?
15 A.      So sometimes we'll purchase a property,
16 and then somebody buys it from us, and we build a
17 house for them on their property.
18 Q.      Okay.  So what happened in this case with
19 416 South Ithan Avenue, Villanova?
20 A.      So Simona Ockley reached out to me, called
21 me several times to see if my company would have
22 interest in purchasing her property.
23 Q.      Okay.
24 A.      I went over to the property, walked around
25 it.  I did not go inside the house before we

Page 11

1 purchased it.  I talked to her over a period of
2 probably six or eight months in negotiating a price
3 that worked for both of us.
4 Q.      Okay.
5 A.      Then, I submitted an offer to her in terms
6 of an agreement of sale, and then she had an
7 attorney that reviewed the agreement of sale.  I
8 only know that because she told me many times I'm
9 just waiting for my attorney, and then at some point
10 I think she might have said her attorney either no
11 longer was working for her or died or both.  She --
12 Q.      Well, it's hard to work for somebody after
13 you die, wouldn't that be, correct?
14 A.      Exactly.  Exactly.  So then --
15          MR. BARTOS:  I'll stipulate to
16          that.
17          THE WITNESS:  -- she had another
18          attorney that worked with her on the
19          agreement.
20 BY MR. SCHROM:
21 Q.      Okay?
22 A.      So then in the process with her, she
23 stopped paying her real estate taxes, so at some
24 point she was going to lose the property to a -- I
25 guess it's a sheriff's sale, I don't really know how

Page 12

1 that works.
2 Q.      Okay?
3 A.      So we stepped in and said, hey, so that
4 you don't lose this, we'd be willing to pay your
5 taxes for you in exchange for holding a deed in lieu
6 of -- so that that way she couldn't renege on
7 selling us the property after we did this favor for
8 her to save it, so she was fine with that.  And
9 then, we kind of worked towards trying to get to a
10 closing date.  She kept moving the closing date
11 back, kept saying that she was trying to sell all
12 the stuff inside her house.  I offered to purchase
13 the stuff inside her house for the number that she
14 was trying to sell it for, but that didn't work for
15 her.  So I was really just trying to be, you know,
16 amenable, understanding that this was a -- you know,
17 moving is a stressful time.  She told me that she
18 was eager to sell the house so that she could join
19 the Romanian Army.  She wanted to defend the
20 Romanian Army against the incursions of the
21 Russians.  She said she was from Romania, and that's
22 where she was going back to, she was eager to do
23 that.  And then, at some point along the way she
24 broke her leg.  She was taken out of the house --
25 Q.      If I said April of '22 --

Page 13

1 A.      That sounds about right, yeah, I remember
2 April, I wouldn't remember the year.  She was taken
3 out of the house.  I went to visit her -- I think
4 the first time I visited her in the healthcare
5 setting she was in Bryn Mawr Hospital, so I visited
6 her there, just happened to know the nurse that was
7 on her floor, asked kind of just check on her if you
8 could, and she was in tremendous pain from that.
9          And then, at some point she was moved over
10 to Broomall.  There was a -- like a skilled nursing
11 center there in Broomall, so went over there to
12 visit her, make sure she was okay there, didn't seem
13 like she had any family that she was relying upon at
14 the time, so just trying to see how I could help her
15 with, you know, the transaction, with helping her
16 with moving stuff, so we offered to move her stuff
17 for her to somewhere.  And then, ultimately we
18 purchased the property, paid -- borrowed money to
19 buy it for -- it was around a half million dollars.
20 Q.      If I said 550?
21 A.      Yeah, that sounds right.  Yeah, that
22 sounds right.  It was a big purchase for us.  And
23 then, she -- at some point I met the ultimate owner
24 of the property.  Jeff Brydzinski was -- worked for
25 a company that I had done a little bit of business

Page 14

1  with, but I had built a home for somebody that he
2  had -- one of his coworkers, so met him at the
3  property, and he was excited about it, so he ended
4  up purchasing the lot, and then hiring us to build
5  the house.
6  Q.      Okay.  And that transfer took place if I
7  said July 19th from you to Brydzinski and Prete,
8  does that sound right?
9  A.      I don't have any reason to refute that
10  date, yeah.
11  Q.      All right.  So then what transpired?
12  A.      At some point she moved back in after we
13  paid her for the house.  She broke the locks.  She
14  had a person driving her, so he helped her get into
15  the house.  We were dumbfounded that we just -- we
16  bought the house, and now you're trying to live in
17  the house, and the house was absolutely disgusting.
18  I wouldn't have an animal live in this house.  It
19  was -- there was defecation everywhere.  There was
20  piles and piles of stuff just all over the place,
21  clearly a hording situation, super unsafe for a
22  human to live in.  There were animals living in
23  there.  It was just really, really --
24  Q.      Animals as in pets or squirrels?
25  A.      No, like squirrels and there was -- yeah,

Page 15

1  it was clear there was feces from rodents, and it
2  was just absolutely disgusting.
3  Q.      Okay.  And so that was when you looked at
4  it in -- would that be August?
5  A.      I don't know the date, yeah.
6  Q.      Okay.  But she was out of -- would it be
7  fair to say she was out of the house since April?
8  A.      She kept trying to move back in the house,
9  I don't remember the exact dates.  She was in the
10  hospital for a period of time, but every chance that
11  she got out, she was trying to break back into the
12  house that she was paid for.
13  Q.      Okay.  If the --
14  A.      And she agreed to a price and called us to
15  buy it from her.
16  Q.      I understand.
17  A.      Yeah.
18  Q.      So if the records show that she was out of
19  the property from April 21st through August, would
20  you have any reason to dispute that she was --
21  A.      I don't know the dates that she was --
22  Q.      You don't know the dates?
23  A.      Yeah.
24  Q.      All right.  Continue?
25  A.      Then, at some point we went to Delaware

Page 16

1  County court, and we had some kind of an agreement
2  with her and the judge that she could get her stuff
3  out of the house by a certain date.  She then moved
4  back in the house and tried to get the -- I think
5  she was successful in changing the utilities back
6  into her name.  She clearly was moving back into the
7  house.  As I mentioned, the house was very unsafe.
8  At some point Radnor Township condemned the property
9  for habitation, which was absolutely the right move,
10  nobody should have been in that house.  It was
11  absolutely unsafe.  The floor boards weren't safe,
12  like I said, there was defecate everywhere, so
13  gross.
14  Q.      Human or animal?
15  A.      Both.
16  Q.      Both?
17  A.      Yeah.  Oh, yeah.  Yeah, she had a couch
18  that she was using as a bathroom.  It was absolutely
19  disgusting.
20  Q.      And that was as in -- you don't remember
21  whether you were in there in August or --
22  A.      I don't know the dates that she was in the
23  couch, using it as a bathroom, but it was gross.  So
24  then at some point we -- I don't remember
25  specifically the dates, but at some point she agreed

Page 17

1  through -- I believe it was with the judge that we
2  would move her stuff into like a pod, and then she
3  would have a period of time to get the stuff out of
4  the pod, so Luke who runs our custom home renovation
5  business, he was -- I think he hired some movers to
6  kind of move everything into a pod, I don't know if
7  it was one or two pods.  And then, we gave her and
8  her attorney the information on like here's the pod,
9  here's how you get the keys or whatever.  And then,
10  we ultimately at some point tore the house down,
11  built a new house for Mr. Brydzinski and his
12  husband.
13  Q.      Okay.  Do you remember what the sale price
14  of the house was to Brydzinski?
15  A.      No.  He purchased the lot, and then also
16  the house.  Off the top of my head, I have no idea.
17  Q.      Okay.  And how many other businesses do
18  you run at the same time, in addition to
19  Rockwell-Glynn?
20            MR. BARTOS:  In 2022?
21  BY MR. SCHROM:
22  Q.      Yeah, as of 2022?
23  A.      Our company builds homes in Pennsylvania,
24  a little bit in Delaware, a little bit in New Jersey
25  as well.  Our office is in Media, so we've -- we

Page 18

1  have various projects kind of in and around the
2  Philadelphia market I would say.
3  Q.      Okay.  And you said that Rockwell-Glynn is
4  one of the businesses?
5  A.      Um-hum.
6  Q.      What are the other businesses?
7  A.      We have other single purpose LLCs that we
8  manage.  I could give you a list, but the numbers --
9  at least probably 70 or so.
10  Q.      70?
11  A.      70 single purpose LLCs, probably,
12  approximately.  I don't know that they're all active
13  necessarily --
14  Q.      Okay.
15  A.      -- in 2022.
16  Q.      So what kind of LLCs are they?  Are they
17  just specific projects?
18  A.      Yeah, correct, projects.
19  Q.      Like 12 West Front Street will be a job,
20  and then --
21  A.      Yeah, so I'll give you an example.  In
22  Edgemont Township around this time we had a project,
23  so we had an LLC, Rockwell Edgemont, LLC that was
24  building houses in a certain location.
25  Q.      Okay.  Is that for liability purposes?

Page 19

1  A.      Oh, it's just the way that the company is
2  set up.  I don't know the reason for it, yeah.  They
3  also get loans, so banks won't lend to entities that
4  have multiple projects.  For what we do, they want a
5  loan specifically to a single purpose entity for
6  that specific property.
7  Q.      So for business reasons and possibly legal
8  reasons, that's what you --
9  A.      I don't know about legal, legally, but I
10  know I need to do that from a borrowing perspective.
11  Q.      Oh, okay.  And do you recall anything else
12  about that interaction regarding 416 South Ithan?
13  A.      Oh, well, I talked to her a lot.  In
14  addition to meeting her, you know, at the two
15  healthcare spots, we would frequently talk on the
16  phone and -- just kind of trying to understand what
17  it was that was -- why she was refusing to like
18  ultimately leave after we paid her.  It was baffling
19  to me.  I've never in my life -- I've been a part of
20  4,000 real estate transactions, and I've never once
21  paid somebody for something, and then they moved
22  back in, and then broke in and basically squatted on
23  the property that we sold them after paying
24  $550,000.00.  And we had to borrow that money in
25  order to buy it.  It wasn't like we just had that

Page 20

1  money sitting our under mattress.  It was a big
2  investment to make this purchase.  It was a price
3  that she agreed to.  She reached out to us in the
4  first place.  And then, for whatever reason she just
5  kept moving back into it.  It was crazy.
6  Q.      How many projects did you have kind of
7  going on at the same time that the 416 project was
8  going on?
9  A.      In 2022, our company probably sold 100 to
10  150 homes and/or lots to other builders,
11  approximately, in that range.
12  Q.      So that seems like a lot of balls in the
13  air.  Would you be familiar with all 100 to 150
14  transactions?
15  A.      I wouldn't know -- in a community where we
16  were building multiple houses, I definitely didn't
17  -- I didn't meet each individual person, but when
18  we -- I was absolutely familiar with every purchase
19  of property.  I purchase the properties, and then I
20  get them financed, so I intimately know all of those
21  deals, but not necessarily when we're building the
22  house and are ultimately selling it.  For instance,
23  after we started construction on Brydzinski's house,
24  I don't know that I ever went through it.
25  Q.      Okay.  So you just kind of subbed it out

Page 21

1  to -- who was running the job then?
2  A.      So we -- we hired a construction manager,
3  and then the construction manager hires
4  subcontractors to build the house.
5  Q.      Okay.  And then, you just step off
6  because you --
7              MR. BARTOS:  Objection.
8  BY MR. SCHROM:
9  Q.      -- you are making money consistent I guess
10  with the agreement that you have with the ultimate
11  homeowner, in this case it was Brydzinski?  Meaning
12  that you agreed to sell him the property, right, and
13  then you agreed to build a home?
14  A.      We did.
15              MR. BARTOS:  Objection.
16              Compound.  You can answer.
17  BY MR. SCHROM:
18  Q.      Is that correct?
19  A.      Yeah, so we sold Brydzinski the lot, and
20  then agreed to build the house for him.
21  Q.      Okay.
22  A.      Yeah.
23  Q.      And who was running that -- the building
24  of that house?
25  A.      I think the project manager at the time

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

Page 22

1 was Sean Timmons.  He worked -- he directly reports
2 to Luke Attanasi.  I think he was the project
3 manager for that specific house.
4 Q.        Okay.  At the same time you have 100 to
5 150 houses that you're selling and you said, what,
6 three to four lots?
7 A.        No, 100 to 150 homes and/or lots.
8 Q.        Oh, and/or lots.  Okay.  And at the same
9 time that you're also selling those, you're also
10 looking for new ones, correct?
11 A.        Yeah.  I focus on land acquisition, and
12 then financing the properties, for the most part.
13 Q.        Okay.  And how many people work for
14 Rockwell-Glynn?
15 A.        I don't know that any one other than me is
16 a -- yeah, just nobody that I know of.
17 Rockwell-Glynn simply owned the real estate.
18 Q.        And Luke is not an employee?
19 A.        Rockwell-Glynn hires a general contractor,
20 of which Luke is part of that company.
21 Q.        Okay.  And what's the name of the company
22 that he works for?
23 A.        Well, it does business as Rockwell Custom,
24 but I don't know specifically what the GC that was
25 hired for this was, but the tradename they use is

Page 23

1 Rockwell Custom.
2 Q.        Is that an entity that you own?
3 A.        Not anymore.
4 Q.        Not anymore?
5 A.        Um-um.
6 Q.        Okay.  Did you sell it to Luke?
7 A.        Yes.
8 Q.        Okay.  And when did that occur?
9 A.        We've had an agreement in place over the
10 last four or five years where he got additional,
11 like, ownership of the company over time, and that
12 company does generally custom home renovations,
13 custom homes and renovations.
14 Q.        Okay.  I'd like to just talk about -- I
15 mean, you mentioned certain issues with Simona like
16 staying in the property.  Regarding just certain
17 elements, like the utilities at some point were shut
18 off, correct?
19 A.        After we purchased it, absolutely we
20 shut -- we have to shut the utilities off, in order
21 to file for a demo permit.  There's a bunch of other
22 things we need to do in order to get a demo permit
23 as well.
24 Q.        So when you're talking about purchasing
25 it, when did you actually purchase it?  Do you

Page 24

1 remember the date?
2 A.        I don't have a date, no.  That should be
3 in your information though.
4 Q.        It looks as though you got the deed on
5 July 15th, does that sound about right, of '22?
6 A.        I don't know the date.
7 Q.        You don't know the date?
8 A.        Yeah.
9 Q.        Okay.  But after you purchased it, who
10 would be in charge of shutting off the utilities, or
11 who did that?
12 A.        I don't know who did it.
13 Q.        Was it you or --
14 A.        It wasn't me.  I don't know who did it,
15 who -- but that's definitely a step in the process
16 of getting permits.  You have to first make sure
17 that it's safe to demo the existing property, and it
18 wouldn't be safe if you left the utilities on.
19 Q.        You mean when you're knocking down the
20 house?
21 A.        Um-hum.
22 Q.        Right?
23          MR. BARTOS:  You just have to
24          give a verbal answer.
25          THE WITNESS:  Yes.  And then,

Page 25

1          also, we didn't need the utilities for --
2          the house was uninhabitable.
3 BY MR. SCHROM:
4 Q.        Okay.  So you're not certain as to when
5 the utilities got shut off, other than that they got
6 shut off after you purchased it?
7 A.        I don't know the answer to when they got
8 shut off.
9 Q.        Okay.  So you don't -- so it would be fair
10 to say that as of some time after July 15th, you're
11 not certain exactly when there were no lights on the
12 property?  Would that be fair?
13 A.        I don't know when they were shut off.
14          MR. BARTOS:  Objection.
15          THE WITNESS:  I have no idea.
16 BY MR. SCHROM:
17 Q.        Okay.  And you don't know when the water
18 was turned off either?
19 A.        Um-um.
20          MR. BARTOS:  You just have to
21          give a verbal.
22          THE WITNESS:  No, I don't.
23          MR. BARTOS:  That's the hardest
24          part of this process.
25 BY MR. SCHROM:

Page 26

1  Q.        Do you know when the property was boarded
2  up?
3  A.        I don't.  At some point, I don't know if
4  it was us that did that, or if the township did it
5  when they determined it was unsafe, but it was
6  absolutely unsafe, and at one point we had to
7  resecure it, because it had gotten broken into by
8  Simona and her driver.
9  Q.        Okay.  In terms of resecuring it, are you
10 talking about putting padlocks back on?
11 A.        Likely, yeah, I don't know exactly what
12 they did to secure it.
13 Q.        Okay.  I'd like to walk you through some
14 documents, so let's do that for a moment.  The first
15 is the agreement of sale dated 10/20/21.
16              (P-1 Lingo was introduced and
17         marked for identification.)
18              MR. SCHROM:  Thank you.
19 BY MR. SCHROM:
20 Q.        I'm showing you a document previously
21 marked P-1, and can you identify that document?
22 A.        Standard agreement of sale for real estate
23 between Rockwell-Glynn and Simona Ockley.  It has my
24 handwriting on it.
25 Q.        Okay.  And that's your signature?

Page 27

1  A.        Yep.
2  Q.        Okay.  So that's the agreement of sale
3  that you referenced earlier?
4  A.        That was the agreement of sale, correct.
5  Yep.
6              MR. BARTOS:  Counsel, just for
7         clarity, I don't believe the -- on page
8         two, the circle with the question mark was
9         on the original at the top on line one.
10             MR. SCHROM:  Circle with a
11        question mark?  Yeah, I see that.
12             MR. BARTOS:  And there's
13        handwriting at the bottom of page seven
14        and some circles, on the bottom of page
15        seven lines 372 to 377 I do not believe
16        were in the original either.
17             MR. SCHROM:  Yeah, I don't know.
18             THE WITNESS:  That's not my
19        writing on there.
20             MR. SCHROM:  Not your writing.
21        Okay.
22             THE WITNESS:  It says damages of
23        property by surveyor, but I didn't write
24        that.
25             MR. BARTOS:  And then, again

Page 28

1         line 703 again is just another question
2         mark I do not believe was on the original.
3             MR. SCHROM:  Okay.  That's fine.
4             MR. BARTOS:  Subject to those --
5             MR. SCHROM:  Noted.
6  BY MR. SCHROM:
7  Q.        Other than those comments, does it appear
8  to be a true and correct copy of the agreement that
9  was signed?
10 A.        Yes, sir.
11 Q.        Okay.  All right.  That's fine.  I don't
12 have anything else on that.  So the next one is the
13 notice of condemnation 4/26.
14             (P-2 Lingo was introduced and
15        marked for identification.)
16 BY MR. SCHROM:
17 Q.        I'm showing you a document that was
18 previously marked P-2 Lingo.  Can you identify that?
19 A.        It says notice of condemnation property
20 maintenance, and it's -- person responsible for
21 violation, it says Simona Ockley with a mailing
22 address of 416 Ithan Avenue, and the date of
23 issuance was April 20 -- looks like 26 of 2022, and
24 it was from Radnor Township to Simona Ockley.
25 Q.        Okay.  I believe that you referenced the

Page 29

1  condemnation notice, or suggested that the property
2  was condemned.  Does that appear to be the notice,
3  or one of the notices relative to the condemnation?
4  A.        So there is -- yeah, there was a notice
5  here it looks like on the 26th of April, and part of
6  this says on the 27th of April, it kind of outlines
7  what -- everything that's unsafe about the property
8  that -- in the terms of what Radnor Township deemed,
9  yeah.
10 Q.        Okay.  Very good.  Thank you.  Let's go to
11 the next one, amendment to the agreement of sale.
12             (P-3 Lingo was introduced and
13        marked for identification.)
14 BY MR. SCHROM:
15 Q.        I'm showing you a document previously
16 marked P-3 Lingo.  Can you identify that?
17 A.        So this is an amendment to the agreement
18 of sale between Rockwell-Glynn, LP and Simona
19 Ockley.
20 Q.        Okay.  Is that your signature?
21 A.        It is, yes.
22 Q.        Okay.  And can you tell us the history of
23 this amendment?
24 A.        It's -- so the background says "Seller and
25 buyer are parties to a certain agreement of sale for

Page 30

1  real estate having an effective date of October 20,
2  2021, which agreement of sale provides the sale and
3  purchase of 416 South Ithan Road, Villanova,
4  Township of Radnor, County of Delaware and
5  Commonwealth of Pennsylvania." Background continues
6  with "Seller and buyer do hereby desire to amend the
7  agreement of sale as set forth herein." Do you want
8  me to read the whole thing?
9  Q.      Sure. You can.
10  A.      Okay. And it says -- then, the next one
11  says agreement. "And now, therefore, in
12  consideration of the covenants and agreements set
13  forth herein seller and buyer agree as follows.
14  Section four, settlement and possessions of
15  agreement of sale, part A, settlement date is hereby
16  extended from January 31st to June 10, 2022." That
17  was an order to give her more time to move her
18  possessions out. She -- she was very stressed out
19  about moving, so we wanted to give her more time to
20  do that, and we were okay, we were comfortable with
21  that at the time, and so was she.
22  Q.      Okay. So did it make it easier for you
23  not having to start the job in the winter, or didn't
24  it matter to you?
25  A.      Not at all, no. We wanted to start right

Page 31

1  away. Once we start borrowing money, we need to --
2  we would like to get started after -- you know, and
3  once we have -- typically, we just -- people abide
4  by what they agree to, but in this case she wanted
5  extra time, and we were okay with that.
6  Q.      Okay. Do you know where she signed that
7  document?
8  A.      I don't know -- at some point she -- I
9  don't remember the dates of when she was at Bryn
10  Mawr, I think it was Bryn Mawr Hospital, or the
11  Broomall place, but I would think it was one of
12  those places.
13  Q.      Okay. Did you create that instrument, or
14  did somebody else?
15  A.      I personally didn't. It would have been
16  probably an attorney.
17  Q.      Okay.
18  A.      Yeah.
19  Q.      But did you present it to her in the
20  hospital?
21  A.      I believe so.
22  Q.      Okay. Do you know whether she was --
23  let's see, what's the date? April 17th. She
24  wasn't taken to the hospital until the 21st, so do
25  you know whether that -- the document was created

Page 32

1  and then signed afterwards?
2  A.      I'm not sure. She was thrilled with
3  having the extra time, I know that for sure.
4  Q.      Okay.
5  A.      She wanted the extra time and asked for
6  it.
7  Q.      Okay. Do you know whether or not at the
8  time that she was under any medications? Did you
9  know that at all?
10  A.      I have no idea, but she wasn't under
11  medication through the whole time we were talking
12  about the extension. She needed more time in order
13  to move her stuff out, so that's why we created the
14  amendment.
15  Q.      Okay. The next is the Complaint that was
16  filed.
17          (P-4 Lingo was introduced and
18      marked for identification.)
19              MR. BARTOS: Just note my
20          objection to the extent that it has
21          handwritten marks on it --
22              MR. SCHROM: Okay. Where at?
23              MR. BARTOS: -- that were not --
24          all throughout, that were just not part of
25          the original file with the court.

Page 33

1              MR. SCHROM: I understand.
2          Let's just look through that for a second.
3          I see. There's some underlining and some
4          other things. Okay. We'll note that
5          there's an objection to any handwritten
6          edits, underlining, that was not part of
7          the original.
8              MR. BARTOS: Appreciate it.
9              MR. SCHROM: Other than that,
10          anything else? No?
11              MR. BARTOS: No.
12  BY MR. SCHROM:
13  Q.      Okay. Can you take a moment to identify
14  that document?
15  A.      Sure. It says Supreme Court of
16  Pennsylvania, Court of Common Pleas, civil cover
17  sheet. It's a complaint with the plaintiff being
18  Rockwell-Glynn, LP and defendant Simona Ockley.
19  Q.      Okay. Do you recall the circumstance
20  surrounding that exhibit?
21  A.      I'd have to look through this again.
22  Yeah, this is just -- it was filed because she kept
23  missing the settlement dates to purchase the
24  property.
25  Q.      Okay.

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

Page 34

1  A.        She told me when we were signing the
2  agreement that -- and when we paid the -- I remember
3  specifically when we paid her real estate taxes for
4  her so that she could keep her property, she told me
5  specifically that she was a person of her word, and
6  I'd like to think that that was true. We came to
7  find that that wasn't the case, that she was
8  disingenuous in actually being willing to move out
9  of the property after she was paid for it, and just
10 kind of kept coming up with delay after delay, but
11 was unwilling to accept our help, which we offered
12 many times of helping to move things out, so that's
13 what -- why this was filed.
14 Q.        Okay. And on the last page, is that your
15 verification?
16 A.        It is, yes.
17 Q.        Okay. And that's your signature?
18 A.        Yep.
19 Q.        Okay. So you submitted -- the problem
20 that you're talking about, that is in her not going
21 to settlement and being on the property, to the
22 Court of Common Pleas for adjudication, correct?
23 A.        Correct. Yeah, I don't know if there was
24 anything more to the suit than that, than the two
25 things you mentioned, but that's what --

Page 35

1  Q.        Okay. Thank you. You're getting the flow
2  here. So there's a hearing, correct?
3  A.        Um-hum. Yes.
4  Q.        And you attend that hearing?
5  A.        Yes.
6  Q.        And Mr. Brydzinski attends it as well?
7  A.        I think he was there, but I can't recall
8  that. I was there, we were represented by Lee
9  Herman, and then Simona was there, I believe my
10 driver was there, and then she had an attorney as
11 well.
12 Q.        Okay. So my understanding was that, you
13 know, at that time, through counsel and through your
14 discussion here, that you wanted her -- you didn't
15 feel as though she had any rights in the property,
16 at least to continue to stay there, and you wanted
17 her out, and you wanted her to transfer that
18 property officially by going to settlement.
19                MR. BARTOS: Objection to form.
20 BY MR. SCHROM:
21 Q.        Is that correct?
22 A.        Well, that's because that's what we agreed
23 to.
24 Q.        I understand.
25 A.        Yeah, we didn't want anything more than

Page 36

1  what we had agreed to.
2  Q.        Okay. So let's go through the hearing
3  transcript. Did you stay the entire time for that?
4  A.        Yes.
5                (P-5 Lingo was introduced and
6           marked for identification.)
7  BY MR. SCHROM:
8  Q.        Okay. And did Mr. Brydzinski stay the
9  entire time, to the best of your knowledge?
10 A.        You asked earlier if he was there, and I
11 don't recall either way.
12 Q.        Okay. All right. I'd like to go through
13 some pages of that, so let's look to page eight, and
14 the beginning of page eight, there's a comment by
15 counsel, and why don't you read lines one through
16 five into the record on page eight?
17 A.        "The Plaintiff's buyer was anxious to move
18 that process forward." I guess the process is
19 described on the prior page. "He had his own
20 financing in place and subsequently we learned that
21 the property has been condemned by the Township of
22 Radnor. It is no longer fit for human habitation."
23 Q.        Okay. That's fine. And so your counsel
24 informed the court that the property had previously
25 been condemned; is that correct? Is that what you

Page 37

1  recall as well?
2                MR. BARTOS: Objection.
3           Compound. You can answer.
4                THE WITNESS: Yeah, that -- I
5           mean, that's what it says here.
6  BY MR. SCHROM:
7  Q.        Yeah, so you recall being there when that
8  was said?
9  A.        Well, I don't remember all the words that
10 were said, but I was there, and that's what was said
11 according to this document.
12 Q.        Okay. Let's go to the next page.
13 A.        Yeah, and I think it looks like the
14 court -- yeah, the court was acknowledging that we
15 were the owner of the property at this time, yeah.
16 Q.        Let's go to page 37. Will you, please,
17 read lines 16 through 21 on page 37 into the record?
18 A.        All right. 16 --
19 Q.        Starting with you're?
20 A.        "You're going to still have a right."
21 Q.        No. Starting with your attorney?
22 A.        "Your attorney will assist" -- looks like
23 the court -- this is the court is the speaker here?
24 Q.        Yes.
25 A.        "Your attorney will assist, and there will

Page 38

1  be an agreement, a court order, that will make --
2  that will incorporate an agreement between the
3  parties that says that although the property has
4  been officially sold, that you're allowed to live
5  and/or access the property up until September 1st."
6  Q.        Okay.  So the judge is listening to the
7  various arguments, and then making this
8  pronouncement that I imagine he was looking at
9  Ms. Ockley at that point, that you're allowed to
10 live and/or access the property up until
11 September 1st, is that what you recall in that
12 hearing?
13                 MR. BARTOS:  Objection.
14         Mischaracterization of the transcript.
15         You can answer.
16                 THE WITNESS:  Yeah, I don't
17         remember her being allowed to move back
18         into the property, because it was
19         uninhabitable.
20 BY MR. SCHROM:
21 Q.        Other than your understanding that you
22 thought it was uninhabitable, do you have any
23 other --
24 A.        It wasn't just my thought that it was
25 uninhabitable.  It was the thought of -- we just

Page 39

1  looked at --
2  Q.        The township?
3  A.        Yeah, the township was -- condemned the
4  property from human habitation, and we had gone in
5  it, and it was absolutely unsafe, and she had hurt
6  herself there, and that's -- they didn't want her to
7  hurt herself again by living in the filth that was
8  there.
9  Q.        My understanding is that she slipped down
10 the stairs, but -- you know.
11 A.        Well, there's stuff everywhere.  Have you
12 seen -- did you see the pictures?  There's stuff
13 piled everywhere.  There would've been nowhere safe
14 to walk, so, you know, it might have been the stairs
15 that she fell down, but it wouldn't surprise me.  I
16 think anybody could have fallen down those stairs.
17 Very unsafe.
18 Q.        Did you take any pictures on your cell
19 phone?
20 A.        No.
21 Q.        No?
22 A.        No.
23 Q.        Do you know if anybody else did?
24 A.        At some point we had, I thought, a video
25 of the property.

Page 40

1  Q.        Do you know who has that video?
2  A.        I don't know, no.
3  Q.        You mean the interior?
4  A.        Yeah, the interior.  Yeah.
5  Q.        Well, if you think about it and a name
6  comes up, could you give it to counsel?
7  A.        Yeah, for sure.
8  Q.        And then, if you get that document, also
9  provide that?
10 A.        Which document is that?
11                 MR. BARTOS:  The video.
12 BY MR. SCHROM:
13 Q.        The video, if there is one.
14 A.        Okay.  Yeah.
15 Q.        Okay.  In any event, that is what the
16 judge said, correct, to the best of your knowledge?
17                 MR. BARTOS:  Objection to form.
18         You can answer.
19                 THE WITNESS:  Yeah, I'm just
20         reading what the transcript here is.
21 BY MR. SCHROM:
22 Q.        Okay.  Do you have any independent memory?
23 A.        I do not remember the judge saying that
24 she was allowed to live in there, because we all
25 knew that that was a really, really bad idea because

Page 41

1  of how unsafe it was, but I absolutely remember
2  agreeing that she could go in to take stuff out, and
3  that we would allow her to do that kind of at any
4  time during this period.  Unfortunately, she never
5  did.  She just didn't want to do it.
6  Q.        Okay.  Can you turn to the next page, 38,
7  and read 23 and 24 lines, please?
8  A.        I don't -- it says I don't know --
9  Q.        It's the court speaking.
10 A.        I don't know what you're saying.  We'll
11 have a court order allowing you to access and/or
12 residency at this property until -- up until
13 September 1st, so you'll have a court order in your
14 hand.  So it looks like that it was the judge
15 talking to Ms. Ockley.
16 Q.        Okay.  And you want to read that again?
17                 MR. BARTOS:  Objection.  Asked
18         and answered.  It's been read.
19                 MR. SCHROM:  Okay.  Well, I
20         thought it was a little unclear, but --
21                 THE WITNESS:  My reading was
22         unclear?
23 BY MR. SCHROM:
24 Q.        No, but -- that's all right.  So there's a
25 second indication that -- allowing her access and/or

Page 42

1 residency at that property until September 1st,
2 correct?
3            MR. BARTOS: Objection. Form.
4       You can answer.
5            THE WITNESS: The two things
6            that we just read were what the court said
7            in this document that you just gave me.
8 BY MR. SCHROM:
9 Q.    Right?
10 A.    The -- but ultimately the house was
11 condemned, it was unsafe to live in, so nobody
12 should be living in this property, and that wasn't
13 necessarily the jurisdiction of the court to
14 determine whether it was safe or not, so of course
15 it had to be safe. You know, I would assume the
16 judge was assuming that the place was safe, which it
17 was not.
18 Q.    Well, I think that there was a notation
19 that we previously read where the judge was informed
20 that the property is condemned, correct?
21 A.    Yeah.
22            MR. BARTOS: Objection.
23            Argumentative. Calls for speculation.
24       You can answer.
25 BY MR. SCHROM:

Page 43

1 Q.    All right. Let's go to page 39, lines 23
2 and 24, if you would read that into the record
3 starting with I'm giving you?
4 A.    All right. This is from the court. "I'm
5 giving you to September 1st to live and/or access
6 the property, but not -- but again" --
7 Q.    You can stop there, that's okay, just that
8 section. So this is the judge again --
9            MR. BARTOS: If the witness
10            wanted to keep answering, I think he's
11            entitled to answer.
12            MR. SCHROM: I'm sorry.
13            MR. BARTOS: If he wanted to
14            keep reading it for context, that's his
15            choice.
16            THE WITNESS: Yeah, I just
17            didn't know where we were -- that's fine.
18            We can stop there.
19 BY MR. SCHROM:
20 Q.    So this is the judge a third time making a
21 pronouncement regarding her ability to live in the
22 property, correct?
23            MR. BARTOS: Same objection as
24            before. You can answer.
25            THE WITNESS: Again, I don't

Page 44

1            know that the judge has jurisdiction to
2            tell somebody that they can live in a
3            property, but -- if the property is
4            determined to be uninhabitable.
5 BY MR. SCHROM:
6 Q.    Okay.
7 A.    He wanted -- the best I could tell from
8 that, the judge wanted her to have the ability to
9 move her stuff out, and we did too, we didn't want
10 her stuff in there, and we didn't want to have to
11 move her stuff, so we asked for months, over a year,
12 to see how we could help.
13 Q.    Okay.
14 A.    She took our money, and then she just
15 moved back in the house, like she stole our money
16 and then wanted her property back. Who does that?
17 It's crazy.
18 Q.    Let's look at 44 -- or is it 41? Wait a
19 minute. Next is 44, lines 22 and 23, if you would
20 read that into the record? This is the court
21 speaking.
22 A.    "The Court: You have free access to this
23 property to do whatever you want from now until
24 September 1st."
25 Q.    Okay. Do you recall the court making that

Page 45

1 statement?
2 A.    No.
3 Q.    Did you ever review this transcript?
4 A.    No, but I'm -- we were totally happy to
5 give her access to get the stuff out at any time.
6 We worked with her on that, and we were fine with
7 that. We didn't want her stuff.
8 Q.    On page 45, lines three, four and five,
9 the court speaking again, if you would read that
10 into the record?
11 A.    "The Court: Okay." -- responding to
12 something from Ms. Ockley -- "Just make sure the
13 order reflects that she has that complete and free
14 access up until the 1st."
15 Q.    Do you have any recollection of that
16 statement?
17 A.    I definitely remember that we were
18 agreeing to let her go through the place up until
19 the 1st to remove her stuff.
20 Q.    But you don't disagree that the judge said
21 she could live and reside there?
22            MR. BARTOS: Objection.
23            THE WITNESS: Oh, I don't think
24            the judge was intending for her to reside
25            there. The judge would've had no idea

Page 46

1      that it was -- how unsafe the place was,
2      so it would have been the local
3      jurisdiction that would've said that this
4      is completely unsafe. I think the EMT
5      people like had to carry her out of it
6      through the crap, like when she was kind
7      of down and had hurt her leg or whatever,
8      so, yeah, the judge never went to the
9      house to see how bad it was.
10 BY MR. SCHROM:
11 Q.      Okay. Let's look at page 47, Mr. Herman
12 speaking, is that your attorney?
13 A.      Mr. Herman was our attorney for this case,
14 yes.
15 Q.      Okay. Could you please read line eight
16 and nine? It's Mr. Herman speaking.
17 A.      It says, "Mr. Herman: My client advises
18 that the unfettered access is not an issue."
19 Q.      Okay. And 11 and 12, please?
20 A.      Mr. Herman continues, "So we'll abide by
21 the Court's suggestion."
22 Q.      Okay. So was it your understanding that
23 the Court's comment regarding the ability to live
24 there or reside there was not to be followed?
25              MR. BARTOS: Objection. Form.

Page 47

1      Mischaracterization. You can answer.
2              THE WITNESS: She -- it was
3      definitely not our expectation that she
4      would be moving back into the house.
5      There's no way. The house was completely
6      unsafe to live in. It was our expectation
7      that she would be able to access the house
8      to move her stuff out, but instead she
9      changed the utilities back to her name,
10      moved in, and didn't move any of her stuff
11      out.
12 BY MR. SCHROM:
13 Q.      I don't have anything further on that.
14 Thank you. The next is Judge Whelan's order as of
15 7/15, P-6.
16              (P-6 Lingo was introduced and
17      marked for identification.)
18 BY MR. SCHROM:
19 Q.      Can you identify that?
20 A.      It says exhibit A, Court of Common Pleas
21 of Delaware County Pennsylvania, Rockwell-Glynn
22 versus Simona Ockley, and it's an order that was
23 signed by Judge Whelan.
24 Q.      Okay. Did you give any testimony at the
25 hearing?

Page 48

1 A.      I don't recall. It would be in those
2 notes that you just gave me though, if I did.
3 Q.      I don't think so.
4 A.      Okay. Then, yeah, I don't recall.
5 Q.      Okay. But you were capable of doing that,
6 correct?
7 A.      I can speak, and, yeah, I didn't have
8 any impediments at the time.
9 Q.      Right. Did you ever become aware of this
10 order?
11 A.      Yes.
12 Q.      And your attorney gave you a copy of this,
13 I guess? Is that how you got it?
14 A.      I don't know how I got it.
15 Q.      Okay.
16 A.      But I definitely -- this is what they had
17 agreed to, it looks like, at that hearing, where we
18 would record the deed, transfer the property, pay
19 her for the property, and then she could get her
20 stuff out.
21 Q.      Okay. So --
22 A.      It says here that she would have access to
23 the property at her own risk to remove her personal
24 property until September 1, 2022. So that answers
25 your question about moving in. She could get her

Page 49

1 stuff out. Because it then goes onto say any
2 personal property remaining at the property after
3 September 1st will be deemed abandoned and would be
4 then removed by the plaintiff.
5 Q.      Now, line three, can you read that
6 sentence into the record, please?
7 A.      Yes. "Defendant shall have unlimited and
8 unfettered access to the property at her own risk to
9 remove her personal property until September 1,
10 2022."
11 Q.      Okay. What is your understanding of what
12 that means?
13 A.      That it was a dangerous situation, that
14 she would have to be on her own risk, if she was to
15 go in there to remove anything, but that she would
16 have unlimited and unfettered access to do so. She
17 could remove whatever she wanted. She decided not
18 to remove any of it.
19 Q.      Now, do you know how long Ms. Ockley was
20 living in that property prior to the sale?
21 A.      No idea.
22 Q.      Okay. If I told you over 20 years, do you
23 have any reason to dispute that?
24 A.      Doesn't mean anything to me. I don't -- I
25 have no idea how long she lived there.

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

Page 50

1  Q.        Okay.  So your understanding of this order
2  is that she couldn't live in the property; is that
3  correct?
4  A.        It doesn't say anywhere in here that she
5  could live in this property on this order.  This is
6  the judge's order, so earlier you had me reading
7  things the judge was saying, but when the order came
8  out it doesn't say that she could live there.  She
9  knew that.
10  Q.        But what's your understanding of unlimited
11  access?  That could be 24 hours a day, couldn't it?
12  A.        If she wanted to, yeah.
13  Q.        But if you had to remove items from a
14  property, if it were your property, wouldn't you
15  need to turn the lights on?
16  A.        No.  We ended up -- actually -- we
17  actually did remove the stuff from this property, if
18  you remember, because she wouldn't, so, no, we
19  didn't have to turn the lights on, we just moved the
20  stuff out.
21  Q.        Well, that may be how it happened
22  ultimately, but I'm just saying that if -- if you
23  were to go into a property to remove your items,
24  wouldn't you need to turn the lights on so that you
25  would be able to see?

Page 51

1  A.        Not at all.  We removed it without turning
2  lights on, so why would somebody else have to do it
3  differently.
4  Q.        Well, I mean, she's a different person,
5  she's not a company.  But in any event, I'm just
6  asking in your experience wouldn't it be more
7  difficult to effectuate the judge's order if there's
8  no electricity and there's no water?
9                 MR. BARTOS:  Objection.  Asked
10         and answered.  You can answer it again.
11                 THE WITNESS:  Not at all.
12  BY MR. SCHROM:
13  Q.        Not at all?
14  A.        Not at all.  The stuff -- you just go in
15  and you move the stuff out.  You don't need the
16  lights to do that.  You need the lights to live
17  there, which is what she intended to do, so she
18  switched the utilities back in her name and
19  physically moved into the property we owned after we
20  paid her for it.
21  Q.        Let's look at seven, the agreement of sale
22  from Rockwell-Glynn to Brydzinski.
23                 (P-7 Lingo was introduced and
24         marked for identification.)
25  BY MR. SCHROM:

Page 52

1  Q.        Okay.  I'm showing you a document
2  previously marked P-7 Lingo.  Can you identify that
3  document?
4  A.        Yes, it says standard agreement for the
5  sale of real estate, and it's between buyer Jeffrey
6  Brydzinski and seller Rockwell-Glynn.
7  Q.        Okay.  Does that say your agreement of
8  sale for the property?
9  A.        Yeah, it does.
10  Q.        So after the hearing, Ockley conveyed the
11  property to you, and you're now conveying it to
12  Brydzinski; is that correct?
13  A.        Yeah, we ultimately sold it to Brydzinski.
14  Q.        Okay.  And is that your signature, at
15  least, on the --
16  A.        Yeah.  Let me look at the last pages.
17  Q.        Are those your initials, too?
18  A.        Yes, it's mine.
19  Q.        All right.  Thank you.  Next document is
20  the deed conveying the property to Brydzinski and
21  Tyler Prete.
22                 (P-8 Lingo was introduced and
23         marked for identification.)
24  BY MR. SCHROM:
25  Q.        I'm showing you a document that has been

Page 53

1  previously marked P-8 Lingo.  Can you identify that?
2  A.        It says it's an instrument number -- a
3  document type, deed.  It's a -- yeah, it looks like
4  the deed to the -- let's see what the -- yeah, it's
5  a deed where we were transferred the property from
6  Rockwell-Glynn to Jeffrey Brydzinski and Tyler
7  Prete.
8  Q.        Okay.  Is that your signature on those
9  documents?  I think there's a signature on it.
10  A.        Yes.  Right here is the manager for
11  Rockwell-Glynn GP, LLC.
12                 MR. BARTOS:  Page four of six of
13         the exhibit.
14                 THE WITNESS:  And that signature
15         was --
16  BY MR. SCHROM:
17  Q.        Okay.  That appears to be a true and
18  correct copy of --
19  A.        It appears to be, yes.
20  Q.        -- the deed transferred as of July 19th?
21                 MR. BARTOS:  I think the
22         question is as of that date.
23                 THE WITNESS:  Yeah, I don't know
24         the date on it.  It says there recorded
25         date on the 21st of 2022, July 21, 2022 is

Page 54

1        the record date.
2 BY MR. SCHROM:
3 Q.        But under that, I think the transfer
4 occurred on the 19th.  I don't think it's --
5 A.        I don't know that it matters, but her --
6 it says I signed it on July 19, 2021.
7 Q.        All right.  That's fine.
8                MR. SCHROM:  That's yours.
9        Okay.
10               MR. BARTOS:  Took a shot, but I
11       knew where you were going.
12 BY MR. SCHROM:
13 Q.        Okay.  The next is just the check
14 confirming that.
15            (P-9 Lingo was introduced and
16        marked for identification.)
17 BY MR. SCHROM:
18 Q.        Showing you the copy of a check that was
19 created.  Can you identify that?
20 A.        Yeah, this is a check from the title
21 company Hollister Land Services to -- paid to Simona
22 Ockley, closing -- it says closing proceeds.
23 Q.        Okay.  Did you attend the settlement?
24 A.        I don't recall.  I don't typically attend
25 closings.

Page 55

1 Q.        Did you have somebody else go?
2 A.        Well, the title company conducts the
3 closing.
4 Q.        Okay.  Do you have any reason to dispute
5 that was a -- I guess a net payout to Ockley?
6 A.        It says here paid to Simona Ockley, and
7 then it says closing proceeds, so the settlement
8 date was July 18, 2022, and the disbursement date
9 was the following day.
10 Q.        Okay.  That's fine.  Do you have a real
11 estate license?
12 A.        I don't.
13 Q.        Okay.  8/5/2022, an email exchange between
14 you and Mr. Kochanski, do you know who that is?
15 A.        No, I would have to look at the email.
16            (P-10 Lingo was introduced and
17        marked for identification.)
18 BY MR. SCHROM:
19 Q.        Okay.  I'm showing you a document that's
20 previously marked P-10.  Can you identify that?
21 A.        It's an email exchange on October 5, 2022
22 between the director of community development at
23 Radnor Township and myself.
24 Q.        Did you say October or August?
25 A.        Sorry.  August 5, 2022.

Page 56

1 Q.        Okay.  And do you know who that Kevin
2 Kochanski is?
3 A.        Yeah, it says here he's director of
4 community development for Radnor Township.
5 Q.        BCO, do you know what that means?
6 A.        I have no idea what that means.
7 Q.        Okay.  Anyway, looking at the message, can
8 you read that into the record?  Is that your email?
9 A.        Yes, it's my email at 1:41 p.m. that day.
10 It says, "Thank you, Kevin.  She is absolutely not
11 permitted to stay in the home.  She is only
12 permitted to move her stuff out between now and 9/1.
13 We have the property locked up.  I will talk to her
14 attorney and her to make sure that is once again
15 clear."
16 Q.        Okay.  So it's your understanding as of
17 that date that she cannot live in the property; is
18 that correct?
19 A.        It was my understanding well before that
20 date that she couldn't live in that property.  The
21 property was unsafe to live in, uninhabitable,
22 absolutely disgusting.
23 Q.        If you go to 1:50 p.m. on Radnor
24 exhibit Bates stamp 53, and 287, the right-hand
25 corner, it's a couple -- just like two pages in --

Page 57

1                MR. BARTOS:  Yeah, that's the
2        one.
3 BY MR. SCHROM:
4 Q.        287?
5 A.        Yeah, it's the same email here.
6 Q.        This one starts with thanks Greg?
7 A.        Yep.
8 Q.        Okay.  Yeah, I see that.  Let's -- if we
9 can just stay on the first page, it will be a little
10 easier.  Why don't you read the response from Kevin
11 to you?
12 A.        All right.  So previously at 1:41 p.m., I
13 just read that, what I sent to him, and then he
14 responded back with, "Thanks, Greg.  Township locks
15 are on the doors.  When Luke inquired about putting
16 locks on, we said we would remove our locks once the
17 property maintenance invoices were paid.  They are
18 attached for your processing."
19 Q.        Okay.  And Luke is the -- Luke Attanasi?
20 A.        Yes.  You met Luke earlier today.
21 Q.        Right.  Okay.  And apparently there were
22 invoices that were due for maintenance, or for lawn
23 care?
24 A.        I --
25 Q.        Which are attached?

Page 58

1  A.      I'd have to look.
2  Q.      If you look a little further back, Tommy's
3  Paving and Excavating?
4  **A.      Yeah, it looks like there's invoices from**
5  **while Simona still owned the property that she was**
6  **apparently not keeping up with it, so the township**
7  **went onto her property to maintain it.  It looks**
8  **like clean up for a variety of things here.**
9  Q.      Okay.  Thank you.
10          MR. SCHROM:  The next is 11.
11          (P-11 Lingo was introduced and
12      marked for identification.)
13 BY MR. SCHROM:
14 Q.      I'm showing you a document.  I don't know
15 whether you've ever seen that.  Have you ever seen
16 that?  Was that ever sent to you?
17 **A.      I don't have any idea.**
18 Q.      If I represented it was a request for an
19 emergency hearing in front of a Common Pleas judge
20 by Simona Ockley, did you have any notice of that?
21          MR. BARTOS:  Object to form.
22      You can answer.
23          **THE WITNESS:  It says emergency**
24      **motion, it's handwritten, it looks like,**
25      **Simona -- Tinicum Township, there's a red**

Page 59

1      roof plus -- something or other -- but,
2      yeah, there's a handwritten note here.
3  BY MR. SCHROM:
4  Q.      I just --
5  **A.      You want me to read it?**
6  Q.      No, you don't have to, I just wanted to
7  know whether or not you recall that at all or ever
8  saw it?
9  **A.      I don't know that we were ever given that.**
10 Q.      Okay.  So the answer is I don't know.
11 Okay.
12          (P-12 Lingo was introduced and
13      marked for identification.)
14 BY MR. SCHROM:
15 Q.      Okay.  The next is an August 9th order of
16 Judge Dozor in response to that emergency petition,
17 I believe.  Showing you a document we previously
18 marked P-12 Lingo.  Can you identify that?
19 **A.      It says -- it's an order from --**
20 Q.      It's Judge Dozor.
21 **A.      Okay.  Yeah, it's an order, it says -- you**
22 **said that it's signed by Judge Dozor.**
23 Q.      Right.  Did you ever see that order?
24 **A.      Let me see.  I don't know specifically.**
25 Q.      Do you remember whether you saw one or two

Page 60

1  orders?
2  **A.      I don't recall, no, but it looks like it's**
3  **consistent that she was allowed to access the**
4  **property so that she could remove her personal**
5  **stuff, and that she was doing that at her own risk.**
6          (P-13 Lingo was introduced and
7      marked for identification.)
8  BY MR. SCHROM:
9  Q.      I'm showing you a document previously
10 marked P-13.  Are you able to identify that at all?
11 It's a photograph.
12 **A.      It looks like a photograph from inside a**
13 **car.**
14 Q.      Yes.  I can represent to you that it -- MG
15 Trees that were on the Ockley property, but I don't
16 know whether you are familiar with that, the tree
17 company, or whether you --
18 **A.      No, I've heard of MG Tree Company but,**
19 **yeah, I don't know what this picture is.**
20 Q.      Okay.  There are a couple of more
21 pictures.  At some point did you ask for a tree
22 company to go to the Ockley site and cut the trees?
23 **A.      I didn't or wouldn't have, but --**
24 Q.      That would have been Luke?
25 **A.      I have no idea.  You would have to ask**

Page 61

1  him.  I don't know.
2  Q.      All right.
3          (P-14 Lingo was introduced and
4      marked for identification.)
5  BY MR. SCHROM:
6  Q.      I'm showing you a document P-14, it's a
7  locksmith bill.  You indicated that she attempted to
8  break the locks or take the locks off.  Do you
9  recall a locksmith company by that name going to the
10 property and changing locks?
11 **A.      No idea.  No idea.**
12 Q.      No idea?
13          MR. BARTOS:  Are you good or do
14      you need a break?
15          **THE WITNESS:  I'm good.**
16          (P-15 Lingo was introduced and
17      marked for identification.)
18 BY MR. SCHROM:
19 Q.      I'm showing you a document previously
20 marked P-15.  Are you able to identify that?
21 **A.      There's an email from me to Kevin**
22 **Kochanski with a copy to Luke and Andy Pancoast,**
23 **also at Radnor Township.**
24 Q.      Okay?
25 **A.      That's at 8 -- that's at 3:10 p.m. on**

Page 62

1 Friday, August 5, 2022.
2 Q.        Okay.  Can you read that into the record?
3 A.        It says, "Okay.  We will bring a check
4 over Monday."  That would be the check for us to pay
5 for the maintenance that she didn't take care of
6 while she owned the property, so just another favor
7 that we were doing for her.
8 Q.        Can I see that?  Okay.  Would you read the
9 top entry, Kevin I wanted?
10 A.        This is a little out of context, because
11 it doesn't necessarily say when I sent it.
12 Q.        Okay.
13 A.        But it says, "Kevin, I wanted to bring --
14 I wanted to update you regarding this property, 416
15 South Ithan, that we purchased and then sold and
16 plan to start construction on imminently for the
17 current owner.  We did not unlock the home, and we
18 had turned off the utilities to the home; however,
19 earlier today the prior owner Simona Ockley broke
20 into the home and is apparently squatting there.  I
21 called the Radnor Township Police and spoke to
22 Officer Ray Rodden.  Officer Rodden was nice,
23 professional, courteous, but could not do anything
24 this evening to remove her from the property.  I let
25 him know that I was reaching out to you, and that we

Page 63

1 would go through the courts to have her forcibly
2 removed.  Our attorney is drafting the documents
3 this evening, and we will have them filed with
4 alacrity.  Please let me know if there's anything
5 else you would like us to do at this time.  Kind
6 regards," from me.  Again, I do not know the day of
7 it.
8 Q.        Okay.  There's a date above, it says --
9 A.        Well, there's --
10 Q.        Is that --
11 A.        The date above doesn't have anything to do
12 with it.
13 Q.        Sent August 11, 2022 from Greg Lingo, is
14 that --
15 A.        Yeah, this isn't our -- this is not our
16 system here, so I don't know what that's talking
17 about.  There's a big line across the email, and
18 then there's a bunch of --
19 Q.        Right.
20 A.        -- other stuff.
21 Q.        Well, that's because I believe it was an
22 archived document, which they pulled up.
23 A.        Yeah, I have no idea when it was sent.
24 Q.        Okay.  So it says that it was sent on
25 August 11, Thursday, but you're saying --

Page 64

1 A.        Yeah, it doesn't say that to me.  Down
2 here --
3 Q.        I'm just looking --
4 A.        Down here it's very clear that there's an
5 email from me, and there's a date and time --
6 Q.        Right?
7 A.        -- on August 5th.  Up here it doesn't
8 have that, so I have no idea what that is.
9                 MR. BARTOS:  Just note for the
10         record the witness is pointing -- I have
11         no idea what that is -- pointing at the
12         portion above the dark black horizontal
13         line.
14 BY MR. SCHROM:
15 Q.        Right.  Which says archived Thursday,
16 December 12, 2024 from Greg Lingo -- it's hard to
17 read -- received time, Thursday, 11 August 2022,
18 2:57, sent Thursday, 11 August 2022, 2:56 to Kevin
19 Kochanski, cc Luke Attanasi, Andy Pancoast, subject
20 416 South Ithan, importance, normal sensitivity.  So
21 you recall sending it, you're just not sure of the
22 date?
23 A.        I have no idea the date, and I don't
24 recall -- I don't recall the date that I sent it.
25 There's an email below that clearly defines when I

Page 65

1 sent it, but this one does not do that.
2 Q.        Okay.  All right.
3                 (P-16 Lingo was introduced and
4         marked for identification.)
5                 MR. BARTOS:  Same objection to
6         the extent that it may not reflect what
7         was actually filed, in terms of
8         handwriting on the document.
9                 MR. SCHROM:  I'm sorry, what was
10         the objection?
11                 MR. BARTOS:  That it may
12         misrepresent what was delivered by
13         Mr. Herman to Judge Dozor, just based on
14         the -- there may be additional handwriting
15         on there.  I just haven't seen the
16         original.
17                 MR. SCHROM:  Yeah.  Yes, I note
18         that there is faintly handwriting,
19         printing on the first page and the second
20         page, with some underlining.
21 BY MR. SCHROM:
22 Q.        Did you ever see that document?  Did you
23 ever get a copy of that document?
24 A.        It looks like my entity Rockwell-Glynn was
25 copied on it.

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

Page 66

1  Q.      Okay.  Do you ever recall seeing that?
2  A.      I would have to read the whole thing.  Do
3  you want me to do that?
4  Q.      Sure, if you could?
5  A.      It looks like it's a letter from our
6  attorney at the time on this case Lee Herman to
7  Judge Dozor, explaining that we were never served
8  the emergency petition -- so earlier you had asked
9  me if I ever received that handwritten note from
10 her, and this is saying that we hadn't.  We wanted
11 to make the court aware of recent developments,
12 indicating that Ms. Ockley no longer owned the
13 property, because we purchased it from her, and then
14 we sold it to Mr. Brydzinski, indicating that she,
15 without our permission, moved into the property,
16 that she removed the locks that were installed by
17 the township, that she tore down the township notice
18 of condemnation and notice of violations, despite
19 the warning that anyone removing the notices would
20 be prosecuted.
21         It also says that she caused PECO to
22 terminate the service.  So Mr. Brydzinski had
23 changed, because he was the owner, PECO into his
24 name, but she switched it back into her name.
25 Defendant refused entry to the plaintiff

Page 67

1  Mr. Brydzinski, to the inspectors, who were required
2  to report to Radnor Township prior to the issuance
3  of the demolition permit.
4         The letter goes onto say as noted in
5  plaintiff's previously filed moving papers, Radnor
6  Township contends the home is unsafe for human
7  habitation.  We were concerned -- we are concerned
8  for the defendant's safety, as well as the ability
9  to move forward with the planned demolition in early
10 September 2022.  It requested of the court to
11 confirm that the defendant has no right or authority
12 to move into or occupy the condemned property, or to
13 refuse access to the plaintiff and the property, and
14 that the defendant Ms. Ockley's access is solely
15 limited for the recovery of personal property, which
16 is what everyone understood, including her.
17 Q.      Okay.  And the last sentence?
18 A.      We further request the court vacate its
19 order and allow plaintiff an opportunity to respond
20 to defendant's motion.
21 Q.      Okay.  So and you say that you believe
22 that you saw this.  Now that you read it, does it
23 refresh your recollection?
24 A.      No, it doesn't refresh my recollection,
25 but it was copied to my entity Rockwell-Glynn.

Page 68

1  Q.      Do you have any reason to believe that you
2  didn't receive it?
3  A.      I have no idea.
4  Q.      Okay.  But in essence it's asking the
5  court to vacate the previously created order,
6  correct?
7  A.      The recently -- yeah, because Ms. Ockley
8  didn't ever give us the complaint, so she didn't do
9  that, so then an order was determined that we had no
10 idea was happening, so it's just disingenuous to not
11 let people know.  She had my cell phone number, and
12 she called me all the time --
13 Q.      Okay?
14 A.      -- so she would've -- if we would've --
15 all she would've had to do is drop off -- she knew
16 where our office was -- a copy of what she was
17 sending the court, but she didn't do that, because
18 she didn't want us to know, I assume.
19 Q.      But there was a prior order as well that
20 said essentially the same thing, correct?
21 A.      No, it didn't.  They weren't the same.
22 Q.      They weren't the same?
23 A.      No.
24 Q.      Okay.  Let's take a moment to just look
25 through those orders.

Page 69

1  A.      Off the record?  On the record?  What did
2  you say?
3  Q.      I just said we'll just take a moment to
4  look at those orders.
5  A.      Oh, okay.  Yeah, yeah.  I didn't know what
6  you were -- I thought you were looking for
7  documents.
8         MR. SCHROM:  So you want to grab
9         those two?  You want to take a five-minute
10        break, since we've been going about an
11        hour?
12        VIDEOGRAPHER:  Off the record at
13        3:07.
14        (At this time, a short break was
15        taken.)
16        VIDEOGRAPHER:  We're back on the
17        record at 3:15.
18 BY MR. SCHROM:
19 Q.      I'm showing you what was previously marked
20 P-6 and P-12.  P-6 is an order signed by Judge
21 Whelan on or about July 15th, and exhibit 12 is an
22 order created by Judge Dozor on or about
23 August 9th.  You indicated a moment ago I believe
24 that you thought that the orders were different.
25 Can you --

Page 70

1  A.         Correct.
2  Q.         -- you enumerate more particularly?
3  A.         Yeah, they're signed by different judges,
4  and they say different things.
5  Q.         Okay.  So how are they different?
6  A.         Well, you want me to read them both to
7  you?
8  Q.         Well, I mean, I would just like your
9  understanding of the differences, what you
10 understood?
11 A.         Judge Whelan's order talks about the
12 transaction of purchasing the property.  There's
13 three bullet points on it, so this was in July 15th
14 of 2022.  One, plaintiff may immediately record a
15 deed to 416 South Ithan Avenue, Villanova, PA
16 previously executed by the defendant, so the --
17 Q.         Excuse me.  And that did occur?
18 A.         She definitely signed the deed, yeah, and
19 then we recorded it.  The title company shall
20 disburse the proceeds it currently holds in the
21 approximate amount of $490,000.00 to the defendant,
22 and then it says the defendant shall have unlimited
23 and unfettered access to the property at her own
24 risk to remove her personal property until
25 September 1, 2022.  Any personal property remaining

Page 71

1  at the property after September 1, 2022 shall be
2  deemed abandoned and may be removed by plaintiff as
3  refuse.  That was from Judge Whelan.
4  Q.         Okay.
5  A.         The date on that -- there's two different
6  dates here.  There's one below it.  On the lower
7  side it says July 11, but then up in the document it
8  says July 15.
9  Q.         Okay.
10 A.         The other one is from a different judge on
11 a different date.  It doesn't have any discussion
12 about the purchase of the property, and it talks
13 about defendant Simona Ockley shall have unlimited
14 and unfettered access to the property located at 416
15 South Ithan Avenue, Villanova --
16 Q.         Okay.  Stop there for a second.  Isn't
17 that the identical wording of the other judge?
18           MR. BARTOS:  Which wording?
19 BY MR. SCHROM:
20 Q.         Unfettered and unrestricted.
21 A.         Yeah, so, no, it talks about the
22 defendant, and then this one, the defendant Simona
23 Ockley --
24 Q.         I mean the phrasing unfettered and
25 unrestricted access?

Page 72

1  A.         It doesn't say unrestricted anywhere.
2  You're making that up.  It says shall have unlimited
3  and unfettered access to the property located at 416
4  South Ithan, that's what Judge Dozor said, at her
5  own risk to remove her personal property --
6  Q.         Let me just stop you there for a second.
7  Do you see unfettered and unrestricted in the --
8  A.         No, you keep saying --
9  Q.         -- prior order?
10 A.         -- unrestricted.  You're making that up.
11 It doesn't say that.
12 Q.         Let me look at it.  I'm sorry.  Unlimited
13 and unfettered is the wording that both judges used,
14 correct?
15 A.         In both documents they used that language.
16 Q.         Okay.  All right.
17 A.         But they're different.
18 Q.         Okay.  Go on?
19 A.         Do you want me to continue reading?
20 Q.         Sure?
21 A.         Plaintiff shall remove -- this is judge --
22 you said this is Dozor, but it doesn't say that,
23 so -- plaintiff shall remove any additional locks so
24 the defendant may access the property until
25 September 1, 2022.  Plaintiff and/or Radnor Police

Page 73

1  Department shall allow access by removing locks to
2  provide defendant access to the property to remove
3  her personal property until September 1, 2022.
4           So it's very specific that it's about
5  removing her personal property.  It's not about what
6  you said, which is she can move back in.  It was
7  unsafe to live in there.  Nobody wanted her to do
8  that.  They had already taken her out of there in a
9  very compromised physical condition the last time
10 she hurt herself in the property.  They didn't want
11 to see that happen again, nor did we.  She was
12 allowed to take her stuff out of the property, she
13 refused to do that.
14 Q.         On 8/15 there was Rockwell-Glynn's motion
15 for reconsideration of the 8/9 order that you just
16 read.
17           (P-17 Lingo was introduced and
18      marked for identification.)
19 BY MR. SCHROM:
20 Q.         I'm showing you a document previously
21 marked P-17.  Can you identify that?
22           MR. BARTOS:  Same objection for
23      the handwritten notations.
24           MR. SCHROM:  Okay.
25 BY MR. SCHROM:

Page 74

1  Q.        There are handwritten notations, which I
2  don't believe are original to the document.
3  A.        This appears to be a letter from Lee
4  Herman acting as attorney -- I don't know what this
5  means -- but Rockwell-Glynn, LP on August 15, 2022,
6  and it's a --
7  Q.        A letter or -- I think that's the title?
8  A.        It says motion for reconsideration of
9  plaintiff Rockwell-Glynn, LP.
10 Q.        Okay.  And is that a request for
11 reconsideration of the judge's order of Dozor that
12 you just read?
13 A.        Yeah.  It goes onto say defendant never
14 served her emergency motion for reconsideration upon
15 movant or movant's counsel -- yeah, so it was asking
16 for reconsideration of Judge Dozor.
17 Q.        Okay.  To the best of your knowledge, was
18 there ever a new order issued?
19 A.        Oh, I have no idea.
20 Q.        Okay.  Did you get a copy of this?
21 A.        No idea.
22 Q.        Okay.
23 A.        Looks like it did attach -- this does
24 reference attached photographs.  This document
25 includes a draft of an order, I don't know if it was

Page 75

1  ever filed or not, but what Mr. Herman was asking
2  for from the court was for defendant to continue to
3  have access to the property for purpose of removing
4  her personal property, but that she couldn't move
5  in, or otherwise remain in the property, for a
6  reason other than the removal of her personal
7  property, which is what everyone understood, but she
8  took advantage and decided to move back into the
9  property after we paid her for it.  And then, it
10 says and this is an order to properly protect the
11 defendant from dangers at 416 South Ithan.  Her
12 access shall be subject to the supervision of Radnor
13 Township.  That's what Lee Herman was asking for the
14 judge to do, because it was so unsafe to live in
15 there.
16 Q.        But that, to the best of your knowledge,
17 wasn't ever signed by a judge?
18 A.        I have no idea.
19 Q.        If I represented to you that it was never
20 signed, do you have any reason to dispute that?
21 A.        Yeah, I have no idea whether it was or
22 wasn't.
23          (P-18 Lingo was introduced and
24       marked for identification.)
25 BY MR. SCHROM:

Page 76

1  Q.        I'm showing you a document previously
2  marked P-18.  The document does appear to have
3  writing on it.  This writing is not your writing,
4  correct?
5  A.        That's not my writing.
6  Q.        Okay.  And so other than the writing on
7  it, handwritten notes, do you recall receiving that
8  document at any point?
9  A.        There's a cc to my entity Rockwell-Glynn
10 via email, so it would have been sent to us from Lee
11 Herman.
12 Q.        Okay?
13 A.        And it looks like it was also copying
14 Simona Ockley who was at a correctional facility at
15 the time.
16 Q.        Do you know why she was at a correctional
17 facility?
18 A.        No idea.  Sounds like she got arrested.
19 Q.        Do you know why she got arrested?
20 A.        No idea.  Probably breaking an entering.
21 I don't know what else she was doing, but she
22 certainly was doing that here.
23 Q.        Do you know who called the police and said
24 that she was breaking an entering?
25 A.        I don't.

Page 77

1  Q.        I mean, was it you?
2  A.        I don't recall.
3  Q.        Could it have been you?
4  A.        Could I have called the police and --
5  well, we didn't own the property at this time.
6  Q.        No, you did.
7  A.        No, we didn't.  August 22nd we didn't.
8  Q.        You owned the property -- oh, that's
9  right.  Brydzinski owned the property after July.
10 Do you know if Brydzinski called the police?
11 A.        Oh, I have no idea.
12 Q.        Okay.  That's fine.  Did you ask
13 Mr. Attanasi to go to the police on or about
14 August 9th of 2022?
15 A.        I have no idea.
16 Q.        Were you in communication with him on that
17 particular day?
18 A.        I don't recall who I talked to on
19 August 9th three years ago.  I have no idea.
20 Q.        I know, but -- well, I'll send you -- as a
21 matter of fact, I'll give you this document, maybe
22 it will refresh your recollection.  This is P-2
23 Attanasi.  It was a document that is titled Radnor
24 Township Incident Report Form.  Have you ever seen
25 that document?

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

Page 78

1  A.      Not to my knowledge.
2  Q.      Okay.  If you would take a moment to just
3  look at page three, there's a short paragraph, maybe
4  that would refresh your recollection regarding
5  Mr. Attanasi?
6  A.      Do you have a question for me?
7  Q.      Yeah.  Does it refresh your recollection
8  at all regarding his going to the police department?
9  A.      No.  I mean, I don't know either way.  I
10 wasn't part of this.  I don't know.
11 Q.      You weren't involved with that, at that
12 point?
13 A.      Doesn't have my name on this at all.
14 Q.      No, it doesn't.
15 A.      Yeah, so then I don't know what your
16 question is.
17 Q.      Well, I just wanted to know whether or not
18 that refreshed your recollection regarding whether
19 or not you would ask Luke to go to the police
20 department --
21 A.      Yeah, I don't know.
22 Q.      -- to kick her out?
23              MR. BARTOS:  Objection.
24              THE WITNESS:  She shouldn't have
25        been living in there.  She wasn't allowed

Page 79

1        to live in there.  That was agreed.
2  BY MR. SCHROM:
3  Q.      Okay.
4  A.      Yeah.  It was unsafe to live there.
5  Q.      Okay.
6              MR. SCHROM:  All right.  Let me
7        see that.
8              (P-19 Lingo was introduced and
9        marked for identification.)
10 BY MR. SCHROM:
11 Q.      Showing you a document that's previously
12 marked P-19.  At some point did you become aware
13 that Ms. Ockley, although she was locked up for
14 trespassing and other charges, that all those
15 charges were dismissed?
16 A.      I have no idea.
17 Q.      Did you ever become aware of that?
18 A.      I have no idea.
19 Q.      Okay.  So I guess a question would be why
20 didn't you wait the two weeks from August to
21 September, and then there would be no issues at all?
22 What prompted you directly or indirectly to try to
23 push her out in August, when you could have waited
24 until September, when none of this would have
25 occurred?

Page 80

1              MR. BARTOS:  Objection.  Form.
2        You can answer.
3              MR. GONZALES:  So I have an
4        objection to that as well.
5              MR. SCHROM:  Okay.
6              MR. GONZALES:  You can answer.
7              THE WITNESS:  Yeah, you're
8        insinuating that I pushed her out, which I
9        didn't do at all.
10 BY MR. SCHROM:
11 Q.      Okay.
12 A.      She was not permitted to live in the
13 house.  The house was unsafe to live in.  I don't
14 know why you would want your client to live in an
15 unsafe house, and literally there was -- as I
16 mentioned earlier, there was trash, garbage and
17 defecate everywhere in this house.  There were holes
18 in the floor.  It was completely unsafe.  She had
19 recently broken a leg that she had to get carried
20 out of the place.  She should never have been into
21 that -- in there to move back in.  She was allowed
22 to go in to remove her stuff, but she refused to do
23 that as well.  I don't know why.  I don't know why.
24 We tried to accommodate her, kept moving the
25 settlement date back for her so that she could have

Page 81

1  more time to take her stuff out.  We ultimately
2  ended up moving her stuff for her and put it into a
3  pod, because she refused to do it herself.
4              But you can't get paid $550,000.00 and
5  then just move back into the house.  I can't imagine
6  how you or anyone would feel if you went to buy a
7  car, and as soon as you paid for it, the guy jumped
8  in, took your money, and took the car and left.  You
9  can't do that.  It wasn't our agreement.  And she
10 reached out to me in the first place to sell the
11 property.  She wanted to sell the property so she
12 could move to Romania and join the Army.
13 Q.      But wouldn't you agree that if you waited
14 the two weeks, then all of the orders only give her
15 until September 1, right, to access the property in
16 whatever way?
17 A.      She was allowed to access the property,
18 not in whatever way, to remove her personal
19 belongings.
20 Q.      I know, but you sat in the courtroom and
21 heard the judge four or five times said that she
22 could live there, that she could reside there.
23 A.      That was not the judge's order.
24 Q.      Well, the judge's order didn't contradict
25 any of what was said.

Page 82

1             MR. BARTOS:  Objection
2        argumentative.
3    BY MR. SCHROM:
4    Q.        Did it?
5    A.        I disagree.
6    Q.        Okay.  So did you read the complaint in
7    this case?
8    A.        Her complaint?
9    Q.        Yeah.
10   A.        The one that was handwritten?
11   Q.        No, not that.  The one --
12   A.        Yeah, I never saw that one.
13   Q.        The one that's in the court?
14   A.        At some point I'm sure I read part of it.
15   Q.        Well, it says that she had property that
16   was also destroyed, so do you know who the last
17   person in the house was before it was destroyed?
18   A.        So you're asking the complaint that we
19   filed?
20   Q.        No.  The one that she filed against you.
21   A.        No.  Remember, I -- we didn't get a copy
22   of it.
23   Q.        Well, that's a -- I think you're referring
24   to a different circumstance.
25   A.        I don't know what complaint you're talking

Page 83

1    about.
2    Q.        The complaint in this case?
3    A.        No.
4    Q.        Well, in the complaint in this case she
5    says that she's missing property, a piano and other
6    things.  Do you know what happened -- did you ever
7    see a piano in that house?
8    A.        I don't recall what was in the house.
9    There was piles and piles of junk.
10   Q.        Okay.
11   A.        I tried to get her -- I tried to work with
12   her.  At some point she said she was trying to sell
13   it, and I was trying to help her with that, and then
14   I asked her how much money she was going to get from
15   selling it, and I said I'll pay you that for the
16   stuff, and then we would've just thrown it out, it
17   was garbage, quite frankly, in my opinion; however,
18   we respected it, it was her property, and we moved
19   it into a pod for her, when she refused to move it
20   herself.
21   Q.        Okay.  But you had access to the property
22   from April 21st, when she was taken into the
23   hospital, until about August, correct?
24   A.        I don't think that's true.
25   Q.        You don't think that's true?

Page 84

1    A.        Yeah.
2    Q.        What do you think is untrue about that?
3    A.        We wouldn't have went into her house
4    August -- or April 20, whatever you said.  Just
5    because somebody is in the hospital doesn't give us
6    the right to go into their property.
7    Q.        Okay.  So are you saying that you -- you
8    or persons that work for you or with you never went
9    in the property from April 21st until August?
10             MR. BARTOS:  Objection.
11             THE WITNESS:  I didn't say that
12        either.  I have no idea when people were
13        in the -- were in the house.
14   BY MR. SCHROM:
15   Q.        When was the last time that you remember
16   going in that house?
17   A.        I don't remember going in.  I saw imagery
18   of it, but -- when we bought it, potentially I went
19   in, and then I don't think I've gone in since
20   Mr. Brydzinski built a new house there.
21   Q.        Was there any pressure from Mr. Brydzinski
22   to build the house sooner rather than later?
23   A.        We don't -- our customers typically want
24   their homes done in a timely manner, but we don't
25   ever sacrifice quality or anything to try to rush

Page 85

1    something, so I don't recall there being an urgent
2    situation with, you know, with him in particular
3    that was any different than any other customer that
4    wanted to move in.
5    Q.        She's saying that, and there was a
6    suggestion from Mr. Attanasi, that the piano was the
7    last item -- one of the last items that he saw in
8    the house, before the house was destroyed.  Do you
9    have any reason to dispute that?
10   A.        No.  You had Luke earlier here.  He
11   would've been able to answer that.  I have no idea.
12   Q.        Okay.  And my client is saying that she
13   had furniture that was missing, not in the pods,
14   when she returned.  Do you know anything about that?
15   A.        No.  No.  She never -- she had my phone
16   number.  She never called me to talk about any of
17   this.
18   Q.        Okay.  She also indicated in the complaint
19   that she had jewelry, or other items that were
20   missing.  Do you have any recollection, or any
21   knowledge of that circumstance?
22   A.        Not at all.
23   Q.        Have you had any actions brought against
24   you as Rockwell-Glynn other than this?
25   A.        Not that I know of.

Page 86

1  Q.      Okay.  Have you brought any actions
2  against others?
3  A.      Not that I recall.
4  Q.      That's all I have.  Thank you.
5              MR. BARTOS:  John?
6              MR. GONZALES:  I have no
7        questions.  Thank you.
8  BY MR. BARTOS:
9  Q.      Mr. Lingo, very quickly --
10             THE WITNESS:  Can I pause you
11        for one second?  Can we go off the record
12        for one quick second?
13             MR. SCHROM:  Yeah, sure.
14             VIDEOGRAPHER:  Off the record at
15        3:40.
16          (At this time, a short break was
17        taken.)
18             VIDEOGRAPHER:  Back on the
19        record, 3:41.
20  BY MR. BARTOS:
21  Q.      Mr. Lingo, P-5 Lingo is the transcript of
22  the proceedings before Judge Whelan.  It says June
23  11, 2022, I believe the record shows it was actually
24  July 11, 2022 for the proceedings, and you were
25  asked a number of questions about very specific

Page 87

1  sections.  Do you recall that testimony?
2  A.      I do, yeah.
3  Q.      I'm going to read -- I'm going to have to
4  show you also, starting on page 45, line 20 through
5  46, line two, starting on line 20 Mr. Herman says,
6  "Judge, she can't move in there, Radnor Township
7  will not allow" -- and then there's something
8  inaudible.  The court then says, "Well, that's fine,
9  but I don't know if she goes in and fixes up, if --
10  that's a different issue.  I called Resident Center
11  Access for very specific reason.  I don't know if
12  she can correct what was preventing her from or
13  removing I guess the condemnation.  I don't know
14  what the issues are."
15      Does that refresh your recollection at all
16  as to the conversations toward the end of the
17  hearing that the bench was having with counsel and
18  Ms. Ockley about access versus reside and the
19  condemnation?
20  A.      Yes.  We were concerned that she would try
21  to live there, which was unsafe, and it was -- and
22  the property was condemned, so Mr. Herman was just
23  kind of making that clear to the judge, and then the
24  judge was pretty clear in what he said, that he
25  didn't know what the conditions were in the house,

Page 88

1  and if there was any way for her to remediate those
2  conditions, so that she could live there during that
3  timeframe.
4  Q.      And in terms of Resident Center Access --
5  and I will represent to you, at least in my
6  research, I have not found anything, place called a
7  Resident Center Access in Delaware County or in
8  Radnor Township -- if, in fact, the audio from
9  this -- if the audio is found, and the audio
10  reflects that it's actually the judge saying I
11  called it reside and/or access for a very specific
12  reason, I don't know if she can correct what was
13  preventing her from or removing I guess the
14  condemnation, I don't know what the issues are, if
15  you assume that the judge was saying reside and/or
16  access, similar to other language used that you were
17  asked earlier in that sentence, does that refresh
18  your recollection as to the judge's discussion with
19  counsel and Ms. Ockley pro se regarding whether she
20  could reside, and the impediments that the
21  condemnation may provide?
22  A.      Yes.
23  Q.      In what way?
24  A.      Well, the judge's order, as we reviewed
25  earlier, talked about unfettered access, and I think

Page 89

1  this makes it clear that the judge was unaware of
2  what conditions would have to be resolved in order
3  for her to actually live there, so he didn't know if
4  that could be accomplished.  And you mentioned pro
5  se, she did have an attorney.
6  Q.      Do you recall whether she believed that
7  attorney represented her at that hearing?
8  A.      I wouldn't begin to guess what she
9  believed.
10  Q.      Fair enough.  I have nothing further,
11  subject to follow up.
12             MR. SCHROM:  John?
13             MR. GONZALES:  Nope.  No
14        further -- I don't have any questions.
15             VIDEOGRAPHER:  Off the record?
16             MR. SCHROM:  No, not yet.
17        Nothing additional.
18             VIDEOGRAPHER:  All right.  This
19        concludes today's testimony given by Greg
20        Lingo in the matter of Simona Ockley
21        versus Township of Radnor, Pennsylvania,
22        et al.  We are off the record at 3:46.
23             -  -  -
24             COURT REPORTER:  Mr. Gonzales,
25        can you hear me?

Page 90

1           MR. GONZALES:  Yes, I can.  I do
2    want a copy of both transcripts, both
3    depositions, and I'll take copies of the
4    videos from both, please.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 91

1              C E R T I F I C A T I O N
2
3         I, KIMBERLY WENDT, a Certified
4    Professional Reporter and Notary Public for the
5    Commonwealth of Pennsylvania, do hereby certify that
6    the foregoing is a true and accurate transcript of
7    the stenographic notes taken by me in the
8    aforementioned matter.
9    Dated: April 2, 2025
10                        - - -
11
12
13
14
15
16
17
18
19              *Kimberly Wendt*
20    KIMBERLY WENDT
       Notary Public
21    My Commission Expires
       On January 15, 2027
22
23
24
25

Page 92

1                        - - -
2         E R R A T A   S H E E T
3                        - - -
4
5    PAGE    LINE    CHANGE
6    _____   _____   _____
7    _____   _____   _____
8    _____   _____   _____
9    _____   _____   _____
10   _____   _____   _____
11   _____   _____   _____
12   _____   _____   _____
13   _____   _____   _____
14   _____   _____   _____
15   _____   _____   _____
16   _____   _____   _____
17   _____   _____   _____
18   _____   _____   _____
19   _____   _____   _____
20   _____   _____   _____
21   _____   _____   _____
22   _____   _____   _____
23   _____   _____   _____
24   _____   _____   _____
25

Page 93

1         ACKNOWLEDGMENT OF DEPONENT
2
3         I,                 , do hereby certify
4    that I have read the foregoing pages and that the
5    same is a correct transcription of the answers given
6    by me to the questions therein propounded, except
7    for the corrections or changes in form or substance,
8    if any, noted in the attached Errata Sheet.
9
10
11
12
13
       _____        _____
14   Date                Signature
15
16
17   Subscribed and sworn to before me this _____ day
       of _____ 20____.
18
19   My commission expires: _____
20
21   _____
       Notary Public
22
23
24
25

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

### Exhibits

**P-1 Lingo** 4:11 26:16

**P-2 Lingo** 4:12 28:14,18

**P-3 Lingo** 4:13 29:12,16

**P-4 Lingo** 4:14 32:17

**P-5 Lingo** 4:15 36:5 86:21

**P-6 Lingo** 4:16 47:16

**P-7 Lingo** 4:17 51:23 52:2

**P-8 Lingo** 4:19 52:22 53:1

**P-9 Lingo** 4:20 54:15

**P-10 Lingo** 4:21 55:16

**P-11 Lingo** 4:22 58:11

**P-12 Lingo** 4:24 59:12, 18 69:21

**P-13 Lingo** 4:25 60:6

**P-14 Lingo** 5:1 61:3

**P-15 Lingo** 5:2 61:16

**P-16 Lingo** 5:3 65:3

**P-17 Lingo** 5:4 73:17

**P-18 Lingo** 5:6 75:23

**P-19 Lingo** 5:7 79:8

### $

**$490,000.00** 70:21

**$550,000.00** 19:24 81:4

### 1

**1** 48:24 49:9 70:25 71:1 72:25 73:3 81:15

**1/29/72** 8:5

**10** 30:16

**10/20/21** 26:15

**100** 20:9,13 22:4,7

**11** 46:19 58:10 63:13,25 64:17,18 71:7 86:23,24

**12** 18:19 46:19 64:16 69:21

**15** 71:8 74:5

**150** 20:10,13 22:5,7

**15th** 24:5 25:10 69:21 70:13

**16** 37:17,18

**17th** 31:23

**18** 55:8

**19** 54:6

**19th** 14:7 53:20 54:4

**1:36** 6:3

**1:41** 56:9 57:12

**1:50** 56:23

**1st** 38:5,11 41:13 42:1 43:5 44:24 45:14,19 49:3

### 2

**20** 28:23 30:1 49:22 84:4 87:4,5

**200** 7:24

**2021** 30:2 54:6

**2022** 17:20,22 18:15 20:9 28:23 30:16 48:24 49:10 53:25 55:8,21,25 62:1 63:13 64:17,18 67:10 70:14,25 71:1 72:25 73:3 74:5 77:14 86:23,24

**2024** 64:16

**2025** 6:4

**21** 6:4 37:17 53:25

**21st** 15:19 31:24 53:25 83:22 84:9

**22** 12:25 24:5 44:19

**22nd** 77:7

**23** 41:7 43:1 44:19

**24** 41:7 43:2 50:11

**26** 28:23

**26th** 29:5

**27th** 29:6

**287** 56:24 57:4

**2:24-cv-04070** 6:10

**2:56** 64:18

**2:57** 64:18

### 3

**302-367-6648** 8:3

**31** 8:15

**31st** 30:16

**37** 37:16,17

**372** 27:15

**377** 27:15

**38** 41:6

**39** 43:1

**3:07** 69:13

**3:10** 61:25

**3:15** 69:17

**3:40** 86:15

**3:41** 86:19

**3:46** 89:22

### 4

**4** 6:13

**4,000** 19:20

**4/26** 28:13

**41** 44:18

**416** 8:1 10:19 19:12 20:7 28:22 30:3 62:14 64:20 70:15 71:14 72:3 75:11

**44** 44:18,19

**45** 45:8 87:4

**46** 87:5

**47** 46:11

### 5

**5** 55:21,25 62:1

**53** 56:24

**550** 13:20

**5th** 64:7

### 7

**7/15** 47:15

**70** 18:9,10,11

**703** 28:1

### 8

**8** 61:25

**8/15** 73:14

**8/5/2022** 55:13

**8/9** 73:15

### 9

**9/1** 56:12

**9th** 59:15 69:23 77:14,19

### A

**abandoned** 49:3 71:2

**abide** 31:3 46:20

**ability** 43:21 44:8 46:23 67:8

**absolutely** 14:17 15:2 16:9,11,18 20:18 23:19 26:6 39:5 41:1 56:10,22

**accept** 34:11

**acceptable** 7:13

**access** 38:5,10 41:11,25 43:5 44:22 45:5,14 46:18 47:7 48:22 49:8,16 50:11 60:3 67:13,14 70:23 71:14, 25 72:3,24 73:1,2 75:3,12 81:15,17 83:21 87:11,18

88:4,7,11,16,25

**accommodate** 80:24

**accomplished** 89:4

**acknowledging** 37:14

**Acquiring** 9:17

**acquisition** 22:11

**acting** 74:4

**actions** 85:23 86:1

**active** 18:12

**addition** 17:18 19:14

**additional** 23:10 65:14
72:23 89:17

**address** 7:23 28:22

**adjudication** 34:22

**advantage** 75:8

**advises** 46:17

**afternoon** 6:2

**agree** 30:13 31:4 81:13

**agreed** 15:14 16:25 20:3
21:12,13,20 35:22 36:1
48:17 79:1

**agreeing** 41:2 45:18

**agreement** 11:6,7,19
16:1 21:10 23:9 26:15,22
27:2,4 28:8 29:11,17,25
30:2,7,11,15 34:2 38:1,2
51:21 52:4,7 81:9

**agreements** 30:12

**air** 20:13

**alacrity** 63:4

**Alan** 6:16

**allowed** 38:4,9,17 40:24
60:3 73:12 78:25 80:21
81:17

**allowing** 41:11,25

**amenable** 12:16

**amend** 30:6

**amendment** 29:11,17,
23 32:14

**amount** 70:21

**and/or** 20:10 22:7,8 38:5,
10 41:11,25 43:5 72:25
88:11,15

**Andy** 61:22 64:19

**animal** 14:18 16:14

**animals** 14:22,24

**answering** 43:10

**answers** 48:24

**anxious** 36:17

**anymore** 23:3,4

**apparently** 57:21 58:6
62:20

**appears** 53:17,19 74:3

**approximate** 70:21

**approximately** 8:22
18:12 20:11

**April** 12:25 13:2 15:7,19
28:23 29:5,6 31:23 83:22
84:4,9

**archived** 63:22 64:15

**argumentative** 42:23
82:2

**arguments** 38:7

**Army** 12:19,20 81:12

**arrested** 76:18,19

**assist** 37:22,25

**assume** 42:15 68:18
88:15

**assuming** 42:16

**attach** 74:23

**attached** 57:18,25 74:24

**Attanasi** 22:2 57:19
64:19 77:13,23 78:5 85:6

**attempted** 61:7

**attend** 35:4 54:23,24

**attends** 35:6

**attorney** 11:7,9,10,18
17:8 31:16 35:10 37:21,22,
25 46:12,13 48:12 56:14
63:2 66:6 74:4 89:5,7

**audio** 88:8,9

**August** 15:4,19 16:21
55:24,25 59:15 62:1 63:13,
25 64:7,17,18 69:23 74:5
77:7,14,19 79:20,23 83:23
84:4,9

**authority** 67:11

**Avenue** 7:24 8:1 10:19
28:22 70:15 71:15

**aware** 48:9 66:11 79:12,
17

---

## B

**back** 12:11,22 14:12 15:8,
11 16:4,5,6 19:22 20:5
26:10 38:17 44:15,16 47:4,
9 51:18 57:14 58:2 66:24
69:16 73:6 75:8 80:21,25
81:5 86:18

**background** 8:10
29:24 30:5

**bad** 40:25 46:9

**baffling** 19:18

**balls** 20:12

**banks** 19:3

**Bartos** 6:24 7:15 9:2
11:15 17:20 21:7,15 24:23
25:14,20,23 27:6,12,25
28:4 32:19,23 33:8,11
35:19 37:2 38:13 40:11,17
41:17 42:3,22 43:9,13,23
45:22 46:25 51:9 53:12,21
54:10 57:1 58:21 61:13
64:9 65:5,11 71:18 73:22
78:23 80:1 82:1 84:10
86:5,8,20

**based** 65:13

**basically** 9:15 19:22

**Bates** 56:24

**bathroom** 16:18,23

**BCO** 56:5

**begin** 6:4 89:8

**beginning** 36:14

**behalf** 6:17,22,25 7:4

**believed** 89:6,9

**belongings** 81:19

**bench** 87:17

**big** 13:22 20:1 63:17

**bill** 61:7

**birth** 8:4

**bit** 13:25 17:24

**black** 64:12

**boarded** 26:1

**boards** 16:11

**borrow** 19:24

**borrowed** 13:18

**borrowing** 19:10 31:1

**Botel** 6:12

**bottom** 27:13,14

**bought** 14:16 84:18

**break** 15:11 61:8,14
69:10,14 86:16

**breaking** 76:20,24

**bring** 62:3,13

**broke** 12:24 14:13 19:22
62:19

**broken** 26:7 80:19

**Broomall** 13:10,11
31:11

**brought** 85:23 86:1

**Brydzinski** 7:1 13:24
14:7 17:11,14 21:11,19
35:6 36:8 51:22 52:6,12,
13,20 53:6 66:14,22 67:1
77:9,10 84:20,21

**Brydzinski's** 20:23

**Bryn** 13:5 31:9,10

**build** 9:15 10:16 14:4
21:4,13,20 84:22

**builders** 20:10

**building** 8:16 18:24
20:16,21 21:23

**builds** 17:23

**built** 14:1 17:11 84:20

**bullet** 70:13

**bunch** 23:21 63:18

**business** 9:10 13:25 17:5 19:7 22:23

**businesses** 9:9 17:17 18:4,6

**buy** 13:19 15:15 19:25 81:6

**buyer** 29:25 30:6,13 36:17 52:5

**buys** 10:16

### C

**call** 10:7

**called** 10:20 15:14 62:21 68:12 76:23 77:4,10 85:16 87:10 88:6,11

**Calls** 42:23

**capable** 48:5

**car** 60:13 81:7,8

**care** 57:23 62:5

**carried** 80:19

**carry** 46:5

**case** 6:7,10 10:18 21:11 31:4 34:7 46:13 66:6 82:7 83:2,4

**caused** 66:21

**cell** 7:25 8:3 39:18 68:11

**center** 13:11 87:10 88:4,7

**chance** 15:10

**changed** 47:9 66:23

**changing** 16:5 61:10

**characterize** 8:25

**charge** 24:10

**charges** 79:14,15

**check** 13:7 54:13,18,20 62:3,4

**choice** 43:15

**choices** 9:5

**circle** 27:8,10

**circles** 27:14

**circumstance** 33:19 82:24 85:21

**civil** 33:16

**clarity** 27:7

**clean** 58:8

**clear** 15:1 56:15 64:4 87:23,24 89:1

**client** 46:17 80:14 85:12

**closing** 12:10 54:22 55:3,7

**closings** 54:25

**comfortable** 30:20

**comment** 36:14 46:23

**comments** 28:7

**Common** 33:16 34:22 47:20 58:19

**Commonwealth** 30:5

**communication** 77:16

**community** 20:15 55:22 56:4

**company** 10:21 13:25 17:23 19:1 20:9 22:20,21 23:11,12 51:5 54:21 55:2 60:17,18,22 61:9 70:19

**complaint** 32:15 33:17 68:8 82:6,8,18,25 83:2,4 85:18

**complete** 45:13

**completely** 46:4 47:5 80:18

**Compound** 21:16 37:3

**compromised** 73:9

**concerned** 67:7 87:20

**concludes** 89:19

**condemnation** 28:13, 19 29:1,3 66:18 87:13,19 88:14,21

**condemned** 16:8 29:2 36:21,25 39:3 42:11,20 67:12 87:22

**condition** 73:9

**conditions** 87:25 88:2 89:2

**conducts** 55:2

**confirm** 67:11

**confirming** 54:14

**consideration** 30:12

**consistent** 21:9 60:3

**construction** 20:23 21:2,3 62:16

**contends** 67:6

**context** 43:14 62:10

**continue** 15:24 35:16 72:19 75:2

**continues** 30:5 46:20

**contractor** 22:19

**contractors** 9:14 10:14

**contradict** 81:24

**conversations** 87:16

**conveyed** 52:10

**conveying** 52:11,20

**copied** 65:25 67:25

**copies** 90:3

**copy** 28:8 48:12 53:18 54:18 61:22 65:23 68:16 74:20 82:21 90:2

**copying** 76:13

**Cornell** 8:12

**corner** 56:25

**correct** 11:13 18:18 21:18 22:10 23:18 27:4 28:8 34:22,23 35:2,21 36:25 40:16 42:2,20 43:22 48:6 50:3 52:12 53:18 56:18 68:6,20 70:1 72:14 76:4 83:23 87:12 88:12

**correctional** 76:14,16

**couch** 16:17,23

**counsel** 6:19 27:6 35:13 36:15,23 40:6 74:15 87:17 88:19

**County** 16:1 30:4 47:21 88:7

**couple** 56:25 60:20

**court** 6:8,16,18 7:5 16:1 32:25 33:15,16 34:22 36:24 37:14,23 38:1 41:9, 11,13 42:6,13 43:4 44:20, 22,25 45:9,11 47:20 66:11 67:10,18 68:5,17 75:2 82:13 87:8 89:24

**Court's** 46:21,23

**courteous** 62:23

**courtroom** 81:20

**courts** 63:1

**covenants** 30:12

**cover** 33:16

**coworkers** 14:2

**crap** 46:6

**crazy** 20:5 44:17

**create** 8:20 31:13

**created** 31:25 32:13 54:19 68:5 69:22

**current** 62:17

**custom** 17:4 22:23 23:1, 12,13

**customer** 85:3

**customers** 84:23

**cut** 60:22

### D

**damages** 27:22

**dangerous** 49:13

**dangers** 75:11

**Darby** 8:11

**dark** 64:12

**date** 8:4 12:10 14:10 15:5 16:3 24:1,2,6,7 28:22 30:1, 15 31:23 53:22,24,25 54:1

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

55:8 56:17,20 63:8,11
64:5,22,23,24 71:5,11
80:25

**dated** 26:15

**dates** 15:9,21,22 16:22,
25 31:9 33:23 71:6

**day** 50:11 55:9 56:9 63:6
77:17

**day-to-day** 9:16

**deals** 20:21

**December** 64:16

**decided** 49:17 75:8

**deed** 12:5 24:4 48:18
52:20 53:3,4,5,20 70:15,18

**deemed** 29:8 49:3 71:2

**defecate** 16:12 80:17

**defecation** 14:19

**defend** 12:19

**defendant** 33:18 49:7
66:25 67:11,14 70:16,21,
22 71:13,22 72:24 73:2
74:13 75:2,11

**defendant's** 67:8,20

**defendants** 7:4

**defines** 64:25

**Delaware** 15:25 17:24
30:4 47:21 88:7

**delay** 34:10

**delivered** 65:12

**demo** 23:21,22 24:17

**demolition** 67:3,9

**department** 73:1 78:8,
20

**deposition** 6:5,11 8:7

**depositions** 7:14 90:3

**desire** 30:6

**destroyed** 82:16,17
85:8

**determine** 42:14

**determined** 26:5 44:4
68:9

**develop** 10:14

**developed** 10:12

**developing** 9:18

**development** 8:16,24
55:22 56:4

**developments** 66:11

**develops** 9:22

**die** 11:13

**died** 11:11

**differences** 70:9

**differently** 51:3

**difficult** 51:7

**directly** 22:1 79:22

**director** 55:22 56:3

**disagree** 45:20 82:5

**disburse** 70:20

**disbursement** 55:8

**discussion** 35:14 71:11
88:18

**disgusting** 14:17 15:2
16:19 56:22

**disingenuous** 34:8
68:10

**dismissed** 79:15

**dispute** 15:20 49:23 55:4
75:20 85:9

**District** 6:8,9

**document** 26:20,21
28:17 29:15 31:7,25 33:14
37:11 40:8,10 42:7 52:1,3,
19,25 53:3 55:19 58:14
59:17 60:9 61:6,19 63:22
65:8,22,23 71:7 73:20
74:2,24 76:1,2,8 77:21,23,
25 79:11

**documents** 8:6 26:14
53:9 63:2 69:7 72:15

**dollars** 13:19

**doors** 57:15

**Dozor** 59:16,20,22 65:13
66:7 69:22 72:4,22 74:11,
16

**draft** 74:25

**drafting** 63:2

**driver** 26:8 35:10

**driving** 14:14

**drop** 68:15

**due** 57:22

**duly** 7:9

**dumbfounded** 14:15

**duties** 9:16

### E

**eager** 12:18,22

**earlier** 27:3 36:10 50:6
57:20 62:19 66:8 80:16
85:10 88:17,25

**early** 67:9

**easier** 30:22 57:10

**Eastern** 6:4,9

**Edgemont** 18:22,23

**edits** 33:6

**educational** 8:9

**effective** 30:1

**effectuate** 51:7

**electricity** 51:8

**elements** 23:17

**email** 55:13,15,21 56:8,9
57:5 61:21 63:17 64:5,25
76:10

**emergency** 58:19,23
59:16 66:8 74:14

**employee** 22:18

**EMT** 46:4

**end** 87:16

**ended** 14:3 50:16 81:2

**Engineering** 8:12

**entering** 76:20,24

**entire** 36:3,9

**entities** 19:3

**entitled** 43:11

**entity** 9:13,14 19:5 23:2
65:24 67:25 76:9

**entry** 62:9 66:25

**enumerate** 70:2

**essence** 68:4

**essentially** 68:20

**estate** 8:15,24 9:17 11:23
19:20 22:17 26:22 30:1
34:3 52:5 55:11

**et al** 6:7 89:22

**evening** 62:24 63:3

**event** 40:15 51:5

**exact** 15:9

**examined** 7:9

**Excavating** 58:3

**exchange** 12:5 55:13,
21

**excited** 14:3

**Excuse** 70:17

**executed** 70:16

**exhibit** 33:20 47:20
53:13 56:24 69:21

**existing** 24:17

**expectation** 47:3,6

**experience** 8:14,18,23
51:6

**experienced** 8:25 9:1,4

**explain** 10:1

**explaining** 66:7

**extended** 30:16

**extension** 32:12

**extent** 32:20 65:6

**extra** 31:5 32:3,5

**extremely** 8:25

### F

**facility** 76:14,17

**fact** 77:21 88:8

**faintly** 65:18

**fair** 15:7 25:9,12 89:10

**fallen** 39:16

**familiar** 20:13,18 60:16

**family** 13:13

**favor** 12:7 62:6

**feces** 15:1

**feel** 35:15 81:6

**fell** 39:15

**file** 23:21 32:25

**filed** 32:16 33:22 34:13
    63:3 65:7 67:5 75:1 82:19,
    20

**filth** 39:7

**financed** 10:5 20:20

**financing** 22:12 36:20

**find** 34:7

**fine** 7:17 12:8 28:3,11
    36:23 43:17 45:6 54:7
    55:10 77:12 87:8

**fit** 36:22

**five-minute** 69:9

**fixes** 87:9

**floor** 13:7 16:11 80:18

**flow** 35:1

**focus** 22:11

**follow** 89:11

**forcibly** 63:1

**form** 9:2 35:19 40:17 42:3
    46:25 58:21 77:24 80:1

**forward** 36:18 67:9

**found** 88:6,9

**frankly** 83:17

**free** 44:22 45:13

**frequently** 19:15

**Friday** 62:1

**front** 6:13 18:19 58:19

**fully** 10:11

**furniture** 85:13

## G

**garbage** 80:16 83:17

**gave** 17:7 42:7 48:2,12

**GC** 22:24

**general** 22:19

**generally** 23:12

**Gerard** 6:21

**give** 18:8,21 24:24 25:21
    30:17,19 40:6 45:5 47:24
    68:8 77:21 81:14 84:5

**giving** 43:3,5

**Gonzales** 7:3,17 80:3,6
    86:6 89:13,24 90:1

**good** 6:2 29:10 61:13,15

**GP** 53:11

**grab** 69:8

**graduated** 8:11,13

**Greg** 6:5 57:6,14 63:13
    64:16 89:19

**Gregory** 7:2,8,22

**gross** 16:13,23

**Group** 6:25

**guess** 11:25 21:9 36:18
    48:13 55:5 79:19 87:13
    88:13 89:8

**guy** 81:7

## H

**habitation** 16:9 36:22
    39:4 67:7

**half** 13:19

**hand** 41:14

**handwriting** 26:24
    27:13 65:8,14,18

**handwritten** 32:21
    33:5 58:24 59:2 66:9 73:23
    74:1 76:7 82:10

**happen** 73:11

**happened** 10:18 13:6
    50:21 83:6

**happening** 68:10

**happy** 45:4

**hard** 11:12 64:16

**hardest** 25:23

**head** 17:16

**healthcare** 13:4 19:15

**hear** 89:25

**heard** 60:18 81:21

**hearing** 35:2,4 36:2
    38:12 47:25 48:17 52:10
    58:19 87:17 89:7

**helped** 14:14

**helping** 13:15 34:12

**Herman** 35:9 46:11,13,
    16,17,20 65:13 66:6 74:4
    75:1,13 76:11 87:5,22

**hey** 12:3

**High** 8:11

**hire** 10:5

**hired** 17:5 21:2 22:25

**hires** 9:14 21:3 22:19

**hiring** 14:4

**history** 29:22

**holding** 12:5

**holds** 70:20

**holes** 80:17

**Hollister** 54:21

**home** 8:16 14:1 17:4
    21:13 23:12 56:11 62:17,
    18,20 67:6

**homeowner** 21:11

**homes** 17:23 20:10 22:7
    23:13 84:24

**hording** 14:21

**horizontal** 64:12

**hospital** 13:5 15:10
    31:10,20,24 83:23 84:5

**hour** 69:11

**hours** 50:11

**house** 10:17,25 12:12,
    13,18,24 13:3 14:5,13,15,
    16,17,18 15:7,8,12 16:3,4,
    7,10 17:10,11,14,16 20:22,
    23 21:4,20,24 22:3 24:20
    25:2 42:10 44:15 46:9
    47:4,5,7 80:13,15,17 81:5
    82:17 83:7,8 84:3,13,16,
    20,22 85:8 87:25

**houses** 18:24 20:16 22:5

**human** 14:22 16:14
    36:22 39:4 67:6

**hurt** 39:5,7 46:7 73:10

**husband** 17:12

## I

**idea** 17:16 25:15 32:10
    40:25 45:25 49:21,25 56:6
    58:17 60:25 61:11,12
    63:23 64:8,11,23 68:3,10
    74:19,21 75:18,21 76:18,
    20 77:11,15,19 79:16,18
    84:12 85:11

**identical** 71:17

**identification** 26:17
    28:15 29:13 32:18 36:6
    47:17 51:24 52:23 54:16
    55:17 58:12 59:13 60:7
    61:4,17 65:4 73:18 75:24
    79:9

**identify** 6:19 26:21 28:18
    29:16 33:13 47:19 52:2
    53:1 54:19 55:20 59:18
    60:10 61:20 73:21

**identifying** 10:4

**imagery** 84:17

**imagine** 38:8 81:5

**immediately** 70:14

**imminently** 62:16

**impediments** 48:8
    88:20

**importance** 64:20

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

inaudible 87:8

Incident 77:24

includes 74:25

including 67:16

incorporate 38:2

incursions 12:20

independent 40:22

indicating 66:12,14

indication 41:25

indirectly 79:22

individual 20:17

information 17:8 24:3

informed 36:24 42:19

initials 52:17

inquired 57:15

inside 10:25 12:12,13
60:12

insinuating 80:8

inspectors 67:1

installed 66:16

instance 20:22

instrument 31:13 53:2

intended 51:17

intending 45:24

interaction 19:12

interest 10:22

interior 40:3,4

intimately 20:20

introduced 26:16 28:14
29:12 32:17 36:5 47:16
51:23 52:22 54:15 55:16
58:11 59:12 60:6 61:3,16
65:3 73:17 75:23 79:8

investment 20:2

invoices 57:17,22 58:4

involve 9:17

involved 9:23 78:11

issuance 28:23 67:2

issue 46:18 87:10

issued 74:18

issues 23:15 79:21 87:14
88:14

item 85:7

items 50:13,23 85:7,19

Ithan 8:1 10:19 19:12
28:22 30:3 62:15 64:20
70:15 71:15 72:4 75:11

---

## J

January 30:16

Jeff 13:24

Jeffrey 52:5 53:6

Jersey 17:24

jewelry 85:19

job 18:19 21:1 30:23

John 7:3,16 86:5 89:12

join 12:18 81:12

judge 16:2 17:1 38:6
40:16,23 41:14 42:16,19
43:8,20 44:1,8 45:20,24,25
46:8 47:14,23 50:7 58:19
59:16,20,22 65:13 66:7
69:20,22 70:11 71:3,10,17
72:4,21 74:16 75:14,17
81:21 86:22 87:6,23,24
88:10,15 89:1

judge's 50:6 51:7 74:11
81:23,24 88:18,24

judges 70:3 72:13

July 14:7 24:5 25:10
53:20,25 54:6 55:8 69:21
70:13 71:7,8 77:9 86:24

jumped 81:7

June 30:16 86:22

junk 83:9

jurisdiction 42:13 44:1
46:3

---

## K

keeping 58:6

Kevin 56:1,10 57:10
61:21 62:9,13 64:18

keys 17:9

kick 78:22

Kim 6:17

kind 12:9 13:7 16:1 17:6
18:1,16 19:16 20:6,25 29:6
34:10 41:3 46:6 63:5 87:23

knew 40:25 50:9 54:11
68:15

knocking 24:19

knowledge 36:9 40:16
74:17 75:16 78:1 85:21

Kochanski 55:14 56:2
61:22 64:19

---

## L

L-I-N-G-O 7:22

land 22:11 54:21

language 72:15 88:16

Lansdowne 7:24

Law 6:11,25

lawn 57:22

learned 36:20

leave 19:18

Lee 35:8 66:6 74:3 75:13
76:10

left 24:18 81:8

leg 12:24 46:7 80:19

legal 6:15 19:7,9

legally 19:9

lend 19:3

letter 66:5 67:4 74:3,7

liability 18:25

license 55:11

---

lieu 12:5

life 19:19

lights 25:11 50:15,19,24
51:2,16

limited 67:15

lines 27:15 36:15 37:17
41:7 43:1 44:19 45:8

Lingo 6:5 7:2,8,22 26:16
28:14,18 29:12,16 32:17
36:5 47:16 51:23 52:2,22
53:1 54:15 55:16 58:11
59:12,18 60:6 61:3,16
63:13 64:16 65:3 73:17
75:23 79:8 86:9,21 89:20

list 18:8

listening 38:6

literally 80:15

live 14:16,18,22 38:4,10
40:24 42:11 43:5,21 44:2
45:21 46:23 47:6 50:2,5,8
51:16 56:17,20,21 73:7
75:14 79:1,4 80:12,13,14
81:22 87:21 88:2 89:3

lived 49:25

living 14:22 39:7 42:12
49:20 78:25

LLC 18:23 53:11

LLCS 18:7,11,16

loan 19:5

loans 19:3

local 46:2

located 6:13 71:14 72:3

location 18:24

locked 56:13 79:13

locks 14:13 57:14,16
61:8,10 66:16 72:23 73:1

locksmith 61:7,9

long 49:19,25

longer 11:11 36:22 66:12

looked 15:3 39:1

lose 11:24 12:4

lot 14:4 17:15 19:13 20:12

21:19

**lots** 20:10 22:6,7,8

**lower** 71:6

**LP** 7:1 29:18 33:18 74:5,9

**Luke** 17:4 22:2,18,20 23:6 57:15,19,20 60:24 61:22 64:19 78:19 85:10

**M**

**mailing** 28:21

**maintain** 58:7

**maintenance** 28:20 57:17,22 62:5

**make** 13:12 20:2 24:16 30:22 38:1 45:12 56:14 66:11

**makes** 89:1

**making** 21:9 38:7 43:20 44:25 72:2,10 87:23

**manage** 18:8

**manager** 21:2,3,25 22:3 53:10

**manner** 84:24

**March** 6:4

**mark** 27:8,11 28:2

**marked** 26:17,21 28:15, 18 29:13,16 32:18 36:6 47:17 51:24 52:2,23 53:1 54:16 55:17,20 58:12 59:13,18 60:7,10 61:4,17, 20 65:4 69:19 73:18,21 75:24 76:2 79:9,12

**market** 18:2

**marks** 32:21

**matter** 6:5 30:24 77:21 89:20

**matters** 8:1 54:5

**mattress** 20:1

**Mawr** 13:5 31:10

**MBA** 8:13

**Meaning** 21:11

**means** 10:11 49:12 56:5, 6 74:5

**Media** 6:13 17:25

**medication** 32:11

**medications** 32:8

**meet** 20:17

**meeting** 19:14

**memory** 40:22

**mentioned** 16:7 23:15 34:25 80:16 89:4

**message** 56:7

**met** 13:23 14:2 57:20

**MG** 60:14,18

**million** 13:19

**mine** 52:18

**minute** 44:19

**Mischaracterization** 38:14 47:1

**misrepresent** 65:12

**missing** 33:23 83:5 85:13,20

**Misters** 7:1

**moment** 26:14 33:13 68:24 69:3,23 78:2

**Monday** 62:4

**money** 13:18 19:24 20:1 21:9 31:1 44:14,15 81:8 83:14

**months** 11:2 44:11

**motion** 58:24 67:20 73:14 74:8,14

**movant** 74:15

**movant's** 74:15

**move** 13:16 15:8 16:9 17:2,6 30:17 32:13 34:8,12 36:17 38:17 44:9,11 47:8, 10 51:15 56:12 67:9,12 73:6 75:4,8 80:21 81:5,12 83:19 85:4 87:6

**moved** 13:9 14:12 16:3 19:21 44:15 47:10 50:19 51:19 66:15 83:18

**movers** 17:5

**moving** 12:10,17 13:16 16:6 20:5 30:19 47:4 48:25 67:5 80:24 81:2

**multiple** 19:4 20:16

**N**

**necessarily** 9:25 18:13 20:21 42:13 62:11

**needed** 32:12

**negotiating** 11:2

**net** 55:5

**nice** 62:22

**normal** 64:20

**notation** 42:18

**notations** 73:23 74:1

**note** 32:19 33:4 59:2 64:9 65:17 66:9

**noted** 28:5 67:4

**notes** 48:2 76:7

**notice** 28:13,19 29:1,2,4 58:20 66:17,18

**notices** 29:3 66:19

**number** 6:10 7:25 12:13 53:2 68:11 85:16 86:25

**numbers** 18:8

**nurse** 13:6

**nursing** 13:10

**O**

**Object** 58:21

**objection** 9:2 21:7,15 25:14 32:20 33:5 35:19 37:2 38:13 40:17 41:17 42:3,22 43:23 45:22 46:25 51:9 65:5,10 73:22 78:23 80:1,4 82:1 84:10

**occupy** 67:12

**occur** 23:8 70:17

**occurred** 54:4 79:25

**Ockley** 6:6,23 10:20 26:23 28:21,24 29:19 33:18 38:9 41:15 45:12 47:22 49:19 52:10 54:22 55:5,6 58:20 60:15,22 62:19 66:12 68:7 71:13,23 76:14 79:13 87:18 88:19 89:20

**Ockley's** 67:14

**October** 30:1 55:21,24

**offer** 11:5

**offered** 12:12 13:16 34:11

**office** 17:25 68:16

**Officer** 62:22

**Offices** 6:12

**officially** 35:18 38:4

**opinion** 83:17

**opportunity** 67:19

**order** 19:25 23:20,22 30:17 32:12 38:1 41:11,13 45:13 47:14,22 48:10 50:1, 5,6,7 51:7 59:15,19,21,23 67:19 68:5,9,19 69:20,22 70:11 72:9 73:15 74:11,18, 25 75:10 81:23,24 88:24 89:2

**orders** 60:1 68:25 69:4, 24 81:14

**original** 27:9,16 28:2 32:25 33:7 65:16 74:2

**outlines** 29:6

**owned** 22:17 51:19 58:5 62:6 66:12 77:8,9

**owner** 8:19,20 9:13 13:23 37:15 62:17,19 66:23

**ownership** 23:11

**P**

**P-1** 26:16,21

**P-10** 55:16,20

**P-11** 58:11

**P-12** 59:12,18 69:20

**P-13** 60:6,10

**P-14** 61:3,6

**P-15** 61:16,20

**P-16** 65:3

**P-17** 73:17,21

**P-18** 75:23 76:2

**P-19** 79:8,12

**P-2** 28:14,18 77:22

**P-3** 29:12,16

**P-4** 32:17

**P-5** 36:5 86:21

**P-6** 47:15,16 69:20

**P-7** 51:23 52:2

**P-8** 52:22 53:1

**P-9** 54:15

**p.m.** 6:3 56:9,23 57:12 61:25

**PA** 70:15

**padlocks** 26:10

**pages** 36:13 52:16 56:25

**paid** 13:18 14:13 15:12 19:18,21 34:2,3,9 51:20 54:21 55:6 57:17 75:9 81:4,7

**pain** 13:8

**Paller** 6:16

**Pancoast** 61:22 64:19

**papers** 67:5

**paragraph** 78:3

**part** 9:9 19:19 22:12,20 25:24 29:5 30:15 32:24 33:6 78:10 82:14

**parties** 29:25 38:3

**pause** 86:10

**Paving** 58:3

**pay** 12:4 48:18 62:4 83:15

**paying** 11:23 19:23

**payout** 55:5

**PECO** 66:21,23

**Pennsylvania** 6:7,9,14 7:24 17:23 30:5 33:16 47:21 89:21

**people** 10:6 22:13 31:3 46:5 68:11 84:12

**period** 11:1 15:10 17:3 41:4

**permission** 66:15

**permit** 23:21,22 67:3

**permits** 24:16

**permitted** 56:11,12 80:12

**person** 14:14 20:17 28:20 34:5 51:4 82:17

**personal** 48:23 49:2,9 60:4 67:15 70:24,25 72:5 73:3,5 75:4,6 81:18

**personally** 31:15

**persons** 84:8

**perspective** 19:10

**petition** 59:16 66:8

**pets** 14:24

**phases** 9:24

**Philadelphia** 18:2

**phone** 8:3 19:16 39:19 68:11 85:15

**photograph** 60:11,12

**photographs** 74:24

**phrasing** 71:24

**physical** 73:9

**physically** 51:19

**piano** 83:5,7 85:6

**picture** 60:19

**pictures** 39:12,18 60:21

**piled** 39:13

**piles** 14:20 83:9

**place** 6:11 14:6,20 20:4 23:9 31:11 36:20 42:16 45:18 46:1 80:20 81:10 88:6

**places** 31:12

**plaintiff** 6:22 33:17 49:4 66:25 67:13,19 70:14 71:2 72:21,23,25 74:9

**plaintiff's** 36:17 67:5

**plan** 62:16

**planned** 67:9

**Pleas** 33:16 34:22 47:20 58:19

**pod** 17:2,4,6,8 81:3 83:19

**pods** 17:7 85:13

**point** 11:9,24 12:23 13:9, 23 14:12 15:25 16:8,24,25 17:10 23:17 26:3,6 31:8 38:9 39:24 60:21 76:8 78:12 79:12 82:14 83:12

**pointing** 64:10,11

**points** 70:13

**police** 62:21 72:25 76:23 77:4,10,13 78:8,19

**portion** 64:12

**possessions** 30:14,18

**possibly** 19:7

**potentially** 84:18

**preparation** 8:7

**present** 31:19

**pressure** 84:21

**Prete** 7:1 14:7 52:21 53:7

**pretty** 87:24

**preventing** 87:12 88:13

**previously** 26:20 28:18 29:15 36:24 42:19 52:2 53:1 55:20 57:12 59:17 60:9 61:19 67:5 68:5 69:19 70:16 73:20 76:1 79:11

**price** 11:2 15:14 17:13 20:2

**primary** 9:10

**printing** 65:19

**prior** 7:14 36:19 49:20 62:19 67:2 68:19 72:9

**pro** 88:19 89:4

**problem** 34:19

**proceedings** 86:22,24

**proceeds** 54:22 55:7 70:20

**process** 11:22 24:15 25:24 36:18

**processing** 57:18

**professional** 62:23

**project** 18:22 20:7 21:25 22:2

**projects** 18:1,17,18 19:4 20:6

**prompted** 79:22

**pronouncement** 38:8 43:21

**properly** 75:10

**properties** 9:15,20,21, 22 10:4,6 20:19 22:12

**property** 10:11,13,15, 17,22,24 11:24 12:7 13:18, 24 14:3 15:19 16:8 19:6,23 20:19 21:12 23:16 24:17 25:12 26:1 27:23 28:19 29:1,7 33:24 34:4,9,21 35:15,18 36:21,24 37:15 38:3,5,10,18 39:4,25 41:12 42:1,12,20 43:6,22 44:3, 16,23 48:18,19,23,24 49:2, 8,9,20 50:2,5,14,17,23 51:19 52:8,11,20 53:5 56:13,17,20,21 57:17 58:5, 7 60:4,15 61:10 62:6,14,24 66:13,15 67:12,13,15 70:12,23,24,25 71:1,12,14 72:3,5,24 73:2,3,5,10,12 75:3,4,5,7,9 77:5,8,9 81:11,15,17 82:15 83:5,18, 21 84:6,9 87:22

**prosecuted** 66:20

**protect** 75:10

**provide** 40:9 73:2 88:21

GREGORY LINGO
MARCH 21, 2025

JOB NO. 1501919

**pulled** 63:22

**purchase** 10:15 12:12 13:22 20:2,18,19 23:25 30:3 33:23 71:12

**purchased** 11:1 13:18 17:15 23:19 24:9 25:6 62:15 66:13

**purchases** 9:21

**purchasing** 10:22 14:4 23:24 70:12

**purpose** 18:7,11 19:5 75:3

**purposes** 18:25

**push** 79:23

**pushed** 80:8

**put** 81:2

**putting** 26:10 57:15

---

**Q**

**quality** 84:25

**question** 10:9 27:8,11 28:1 48:25 53:22 78:6,16 79:19

**questions** 86:7,25 89:14

**quick** 86:12

**quickly** 86:9

---

**R**

**Radnor** 6:7 7:4 16:8 28:24 29:8 30:4 36:22 55:23 56:4,23 61:23 62:21 67:2,5 72:25 75:12 77:23 87:6 88:8 89:21

**range** 20:11

**Ray** 62:22

**reached** 10:20 20:3 81:10

**reaching** 62:25

**read** 30:8 36:15 37:17 41:7,16,18 42:6,19 43:2 44:20 45:9 46:15 49:5 56:8

57:10,13 59:5 62:2,8 64:17 66:2 67:22 70:6 73:16 74:12 82:6,14 87:3

**reading** 40:20 41:21 43:14 50:6 72:19

**real** 8:15,24 9:17 11:23 19:20 22:17 26:22 30:1 34:3 52:5 55:10

**reason** 14:9 15:20 19:2 20:4 49:23 55:4 68:1 75:6, 20 85:9 87:11 88:12

**reasons** 19:7,8

**recall** 19:11 33:19 35:7 36:11 37:1,7 38:11 44:25 48:1,4 54:24 59:7 60:2 61:9 64:21,24 66:1 76:7 77:2,18 83:8 85:1 86:3 87:1 89:6

**receive** 68:2

**received** 64:17 66:9

**receiving** 76:7

**recent** 66:11

**recently** 68:7 80:19

**recollection** 45:15 67:23,24 77:22 78:4,7,18 85:20 87:15 88:18

**reconsideration** 73:15 74:8,11,14,16

**record** 6:3 36:16 37:17 43:2 44:20 45:10 48:18 49:6 54:1 56:8 62:2 64:10 69:1,12,17 70:14 86:11,14, 19,23 89:15,22

**recorded** 53:24 70:19

**records** 15:18

**recovery** 67:15

**red** 58:25

**reference** 74:24

**referenced** 27:3 28:25

**referring** 82:23

**reflect** 65:6

**reflects** 45:13 88:10

**refresh** 67:23,24 77:22 78:4,7 87:15 88:17

**refreshed** 78:18

**refuse** 67:13 71:3

**refused** 66:25 73:13 80:22 81:3 83:19

**refusing** 19:17

**refute** 14:9

**relating** 8:1

**relative** 8:24 29:3

**relying** 13:13

**remain** 75:5

**remaining** 49:2 70:25

**remediate** 88:1

**remember** 13:1,2 15:9 16:20,24 17:13 24:1 31:9 34:2 37:9 38:17 40:23 41:1 45:17 50:18 59:25 82:21 84:15,17

**removal** 75:6

**remove** 45:19 48:23 49:9,15,17,18 50:13,17,23 57:16 60:4 62:24 70:24 72:5,21,23 73:2 80:22 81:18

**removed** 49:4 51:1 63:2 66:16 71:2

**removing** 66:19 73:1,5 75:3 87:13 88:13

**renege** 12:6

**renovation** 17:4

**renovations** 23:12,13

**report** 67:2 77:24

**reporter** 6:16 7:6 89:24

**Reporting** 6:18

**reports** 22:1

**represent** 6:20 60:14 88:5

**represented** 35:8 58:18 75:19 89:7

**request** 58:18 67:18 74:10

**requested** 67:10

**required** 67:1

**research** 88:6

**resecure** 26:7

**resecuring** 26:9

**reside** 45:21,24 46:24 81:22 87:18 88:11,15,20

**residency** 41:12 42:1

**Resident** 87:10 88:4,7

**resolved** 89:2

**respected** 83:18

**respond** 67:19

**responded** 57:14

**responding** 45:11

**response** 57:10 59:16

**responsibilities** 9:11

**responsible** 10:3 28:20

**returned** 85:14

**review** 8:6 45:3

**reviewed** 11:7 88:24

**right-hand** 56:24

**rights** 35:15

**risk** 48:23 49:8,14 60:5 70:24 72:5

**Road** 30:3

**Rockwell** 18:23 22:23 23:1

**Rockwell-glynn** 6:25 8:18 9:12,19,21 17:19 18:3 22:14,17,19 26:23 29:18 33:18 47:21 51:22 52:6 53:6,11 65:24 67:25 74:5,9 76:9 85:24

**Rockwell-glynn's** 73:14

**Rodden** 62:22

**rodents** 15:1

**Romania** 12:21 81:12

**Romanian** 12:19,20

**roof** 59:1

**run** 17:18

**running** 21:1,23

**runs** 17:4

**rush** 84:25

**Russians** 12:21

---

**S**

**S-C-H-R-O-M** 6:22

**sacrifice** 84:25

**safe** 16:11 24:17,18 39:13 42:14,15,16

**safety** 67:8

**sale** 11:6,7,25 17:13 26:15,22 27:2,4 29:11,18, 25 30:2,7,15 49:20 51:21 52:5,8

**sales** 10:6

**sat** 81:20

**save** 12:8

**School** 8:11,12

**Schrom** 6:12,21 7:12,16, 19 9:6 11:20 17:21 21:8,17 25:3,16,25 26:18,19 27:10, 17,20 28:3,5,6,16 29:14 32:22 33:1,9,12 35:20 36:7 37:6 38:20 40:12,21 41:19, 23 42:8,25 43:12,19 44:5 46:10 47:12,18 51:12,25 52:24 53:16 54:2,8,12,17 55:18 57:3 58:10,13 59:3, 14 60:8 61:5,18 64:14 65:9,17,21 69:8,18 71:19 73:19,24,25 75:25 79:2,6, 10 80:5,10 82:3 84:14 86:13 89:12,16

**Sean** 22:1

**section** 30:14 43:8

**sections** 87:1

**secure** 26:12

**sell** 10:6,8,10 12:11,14,18 21:12 23:6 81:10,11 83:12

**seller** 29:24 30:6,13 52:6

**selling** 9:20 12:7 20:22 22:5,9 83:15

**sells** 9:22

**send** 77:20

**sending** 64:21 68:17

**sensitivity** 64:20

**sentence** 49:6 67:17 88:17

**September** 38:5,11 41:13 42:1 43:5 44:24 48:24 49:3,9 67:10 70:25 71:1 72:25 73:3 79:21,24 81:15

**served** 66:7 74:14

**service** 66:22

**Services** 54:21

**set** 19:2 30:7,12

**setting** 13:5

**settlement** 30:14,15 33:23 34:21 35:18 54:23 55:7 80:25

**Shaffer** 6:12

**sheet** 33:17

**sheriff's** 11:25

**short** 69:14 78:3 86:16

**shot** 54:10

**show** 15:18 87:4

**showing** 26:20 28:17 29:15 52:1,25 54:18 55:19 58:14 59:17 60:9 61:6,19 69:19 73:20 76:1 79:11

**shows** 86:23

**shut** 23:17,20 25:5,6,8,13

**shutting** 24:10

**side** 71:7

**sign** 10:8

**signature** 26:25 29:20 34:17 52:14 53:8,9,14

**signed** 28:9 31:6 32:1 47:23 54:6 59:22 69:20 70:3,18 75:17,20

**signing** 34:1

**similar** 88:16

**Simona** 6:6,22 10:20 23:15 26:8,23 28:21,24 29:18 33:18 35:9 47:22 54:21 55:6 58:5,20,25 62:19 71:13,22 76:14 89:20

**simply** 22:17

**single** 18:7,11 19:5

**sir** 28:10

**site** 60:22

**sitting** 20:1

**situation** 14:21 49:13 85:2

**skilled** 13:10

**slipped** 39:9

**sold** 19:23 20:9 21:19 38:4 52:13 62:15 66:14

**solely** 67:14

**sooner** 84:22

**sound** 14:8 24:5

**sounds** 13:1,21,22 76:18

**South** 8:1 10:19 19:12 30:3 62:15 64:20 70:15 71:15 72:4 75:11

**speak** 48:7

**speaker** 37:23

**speaking** 41:9 44:21 45:9 46:12,16

**specific** 18:17 19:6 22:3 73:4 86:25 87:11 88:11

**specifically** 16:25 19:5 22:24 34:3,5 59:24

**speculation** 42:23

**spell** 7:20

**spoke** 62:21

**spots** 19:15

**Spruce** 6:24

**squatted** 19:22

**squatting** 62:20

**squirrels** 14:24,25

**stairs** 39:10,14,16

**stamp** 56:24

**standard** 26:22 52:4

**start** 30:23,25 31:1 62:16

**started** 20:23 31:2

**starting** 37:19,21 43:3 87:4,5

**starts** 57:6

**state** 6:20 7:20

**statement** 45:1,16

**States** 6:8

**stay** 35:16 36:3,8 56:11 57:9

**staying** 23:16

**Steno** 6:17

**step** 21:5 24:15

**stepped** 12:3

**stipulate** 11:15

**stipulations** 7:14

**stole** 44:15

**stop** 43:7,18 71:16 72:6

**stopped** 11:23

**Street** 6:13 18:19

**stressed** 30:18

**stressful** 12:17

**stuff** 12:12,13 13:16 14:20 16:2 17:2,3 32:13 39:11,12 41:2 44:9,10,11 45:5,7,19 47:8,10 48:20 49:1 50:17,20 51:14,15 56:12 60:5 63:20 73:12 80:22 81:1,2 83:16

**subbed** 20:25

**subcontractors** 21:4

**subject** 28:4 64:19 75:12 89:11

**submitted** 11:5 34:19

subs 9:18

subsequently 36:20

successful 16:5

suggested 29:1

suggestion 46:21 85:6

suit 34:24

super 14:21

supervision 75:12

Supreme 33:15

surprise 39:15

surrounding 33:20

surveyor 27:23

swear 7:6

switched 51:18 66:24

sworn 7:9

system 63:16

**T**

taking 6:11

talk 19:15 23:14 56:13
85:16

talked 11:1 19:13 77:18
88:25

talking 10:10 23:24
26:10 32:11 34:20 41:15
63:16 82:25

talks 70:11 71:12,21

taxes 11:23 12:5 34:3

terminate 66:22

terms 8:23 11:5 26:9 29:8
65:7 88:4

testified 7:9

testimony 47:24 87:1
89:19

thing 30:8 66:2 68:20

things 23:22 33:4 34:12,
25 42:5 50:7 58:8 70:4
83:6

thought 38:22,24,25
39:24 41:20 69:6,24

thrilled 32:2

thrown 83:16

Thursday 63:25 64:15,
17,18

time 6:4,18 12:17 13:4,14
15:10 17:3,18 18:22 20:7
21:25 22:4,9 23:11 25:10
30:17,19,21 31:5 32:3,5,8,
11,12 35:13 36:3,9 37:15
41:4 43:20 45:5 48:8 63:5
64:5,17 66:6 68:12 69:14
73:9 76:15 77:5 81:1 84:15
86:16

timeframe 88:3

timely 84:24

times 10:21 11:8 34:12
81:21

Timmons 22:1

Tinicum 58:25

title 54:20 55:2 70:19 74:7

titled 77:23

today 57:20 62:19

today's 8:7 89:19

Todd 6:24

told 11:8 12:17 34:1,4
49:22

Tommy's 58:2

top 17:16 27:9 62:9

tore 17:10 66:17

totally 45:4

township 6:6 7:4 16:8
18:22 26:4 28:24 29:8 30:4
36:21 39:2,3 55:23 56:4
57:14 58:6,25 61:23 62:21
66:17 67:2,6 75:13 77:24
87:6 88:8 89:21

tradename 22:25

transaction 13:15
70:12

transactions 19:20
20:14

transcript 36:3 38:14
40:20 45:3 86:21

transcripts 90:2

transfer 14:6 35:17
48:18 54:3

transferred 53:5,20

transpired 14:11

trash 80:16

tree 60:16,18,21

trees 60:15,22

tremendous 13:8

trespassing 79:14

true 28:8 34:6 53:17
83:24,25

turn 41:6 50:15,19,24

turned 25:18 62:18

turning 51:1

Tyler 52:21 53:6

type 53:3

typically 31:3 54:24
84:23

**U**

ultimate 13:23 21:10

ultimately 13:17 17:10
19:18 20:22 42:10 50:22
52:13 81:1

Um-hum 18:5 24:21
35:3

Um-um 23:5 25:19

unaware 89:1

unclear 41:20,22

underlining 33:3,6
65:20

understand 15:16
19:16 33:1 35:24

understanding 12:16
35:12 38:21 39:9 46:22
49:11 50:1,10 56:16,19
70:9

understood 67:16
70:10 75:7

undeveloped 10:13

unfettered 46:18 49:8,
16 70:23 71:14,20,24 72:3,
7,13 88:25

uninhabitable 25:2
38:19,22,25 44:4 56:21

United 6:8

University 8:12,13

unlimited 49:7,16 50:10
70:22 71:13 72:2,12

unlock 62:17

unrestricted 71:20,25
72:1,7,10

unsafe 14:21 16:7,11
26:5,6 29:7 39:5,17 41:1
42:11 46:1,4 47:6 56:21
67:6 73:7 75:14 79:4
80:13,15,18 87:21

untrue 84:2

unwilling 34:11

update 62:14

Upper 8:11

urgent 85:1

utilities 16:5 23:17,20
24:10,18 25:1,5 47:9 51:18
62:18

**V**

vacate 67:18 68:5

varies 9:25

variety 58:8

venued 6:8

verbal 24:24 25:21

verification 34:15

versus 6:6 47:22 87:18
89:21

video 39:24 40:1,11,13

videos 8:7 90:4

Villanova 8:2,13 10:19
30:3 70:15 71:15

**violation** 28:21

**violations** 66:18

**visit** 13:3,12

**visited** 13:4,5

---

**W**

**wait** 44:18 79:20

**waited** 79:23 81:13

**waiting** 11:9

**walk** 26:13 39:14

**walked** 10:24

**wanted** 12:19 30:19,25
31:4 32:5 35:14,16,17
43:10,13 44:7,8,16 49:17
50:12 59:6 62:9,13,14
66:10 73:7 78:17 81:11
85:4

**warning** 66:19

**water** 25:17 51:8

**Wayne** 7:24

**weeks** 79:20 81:14

**Wendt** 6:17

**West** 6:13 18:19

**Whelan** 47:23 69:21 71:3
86:22

**Whelan's** 47:14 70:11

**winter** 30:23

**word** 34:5

**wording** 71:17,18 72:13

**words** 37:9

**work** 8:14 11:12 12:14
22:13 83:11 84:8

**worked** 11:3,18 12:9
13:24 22:1 45:6

**working** 11:11

**works** 12:1 22:22

**would've** 39:13 45:25
46:3 68:14,15 83:16 85:11

**write** 27:23

**writing** 27:19,20 76:3,5,6

---

**Y**

**year** 13:2 44:11

**years** 8:15,22 23:10
49:22 77:19