# EXHIBIT 6

# Deposition Transcript

Case Number: 2:24-cv-0470-GAW
Date: May 21, 2025

In the matter of:

## Ockley v Township of Radnor, Pennsylvania, et al.

# KEVIN W. KOCHANSKI, RLA, CZO



Reported by:
Stephanie Weldon

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1                IN THE COURT OF COMMON PLEAS
                PHILADELPHIA COUNTY, PENNSYLVANIA
 2                         -  -  -

 3

 4   SIMONA OCKLEY,            :   CIVIL ACTION
                              :   NO: 2:24-CV-0470
 5            Plaintiff,       :
                              :
 6   vs.                      :
                              :
 7   TOWNSHIP OF RADNOR,      :
     PENNSYLVANIA, et al.,    :
 8                            :
              Defendants.      :
 9

10                        -  -  -
                 Wednesday, May 21, 2025
11                        -  -  -

12

13            Sworn video-recorded deposition of

14      KEVIN W. KOCHANSKI, RLA, CZO was taken pursuant

15      to notice held at SCHROM, SHAFFER & BOTEL,

16      P.C., 4 West Front Street, Media, Pennsylvania

17      19063 on the above date, beginning at

18      approximately 10:17 a.m., before Stephanie

19      Weldon, Court Reporter and Notary Public for

20      the State of Pennsylvania, there being present

21      virtually.

22

23                        -  -  -
                    STENO AGENCY, INC.
24           315 West 9th Street, Suite 807
             Los Angeles, California 90015
25                   (888) 707-8366
                    www.steno.com
```

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 2

```
1  APPEARANCES:
2
3     SCHROM, SHAFFER & BOTEL, P.C.
      BY:  GERARD K. SCHROM, ESQUIRE
      BY:  NEIL BOTEL, ESQUIRE
4        4 West Front Street
         Media, Pennsylvania 19063
5        (610) 565-5050
         gschrom@schromandshaffer.com
6        Representing the Plaintiff
7
      MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
8     BY:  JOHN P. GONZALES, ESQUIRE
         2000 Market Street, Suite 2300
9        Philadelphia, Pennsylvania 19103
         (215) 575-2600
10       jpgonzales@mdwcg.com
         Representing the Defendants,
11       Township of Radnor, Jennifer Cocco,
         Joseph Pinto and Brady McHale
12
13    SPRUCE LAW GROUP, LLC
      BY:  TODD BARTOS, ESQUIRE
14       1622 Spruce Street
         Philadelphia, Pennsylvania 19103
15       (267) 546-0600
         tb@sprucelaw.com
16       Representing the Defendants,
         Tyler Prete, Jeffrey Brydzinski
17       and Rockwell Glynn, LP
18
   ALSO PRESENT:
19
      Alan Power, Videotape Tech
20
      Elizabeth C. Malloy, Paralegal
21
      Xavier Bush, Steno Technician
22
23
24
25
```

Page 3

```
1               I N D E X
2  WITNESS                              PAGE
3    KEVIN W. KOCHANSKI, RLA, CZO
      (Witness sworn.)
4
   DIRECT EXAMINATION
5  BY: Mr. Schrom                      6, 95
6  CROSS-EXAMINATION
   BY: Mr. Bartos                       89
7
8
9
10
11
12          E X H I B I T S
13
   NO.          DESCRIPTION             PAGE
14
   Kochanski-1    Radnor Fire Company    55
15               Ambulance
   Kochanski-2    4/26/22 Notice of      56
16               Condemnation
   Kochanski-3    4/26/22 Notice of Violation  59
17
   Kochanski-4    Notice of Violation for  61
18               Property Maintenance
   Kochanski-5    Court Order            62
19
   Kochanski-6    Court Order August 9, 2022  65
20
   Kochanski-7    E-mails correspondences  67
21
   Kochanski-8    E-mails correspondences  76
22
   Kochanski-9    E-mails correspondences  79
23
   Kochanski-10   Text Messages          92
24
25
```

Page 4

```
1        (It is agreed by and among
2   counsel that the sealing, filing, and
3   certification are hereby waived and
4   all objections, except as to the form
5   of the questions, are reserved until
6   the time of trial.)
7              - - -
8        THE VIDEOTAPE TECHNICIAN:
9   Good morning.  We are going on the
10  record at 10:17 a.m. Eastern Time on
11  May 21st, 2025 to begin the video-
12  recorded deposition of Kevin W.
13  Kochanski, taken in the matter of
14  Simona Ockley versus the Township of
15  Radnor, Pennsylvania, et al.  This
16  case is venued in the United States
17  District Court for the Eastern
18  District of Pennsylvania, Case
19  No. 2:24-CV-0470.
20       This deposition is taking
21  place at the Law Offices of Schrom,
22  Shaffer & Botel, located at 4 West
23  Front Street, Media, Pennsylvania.
24  The legal videographer is Alan Power,
25  and the court reporter is Stephanie
```

Page 5

```
1   Weldon.  We are here on behalf of
2   Steno Court Reporting.
3        At this time, would counsel
4   please identify yourselves and state
5   whom you represent.
6        MR. SCHROM:  Good morning.
7   Gerard Schrom on behalf of Simona
8   Ockley, plaintiff.
9        MR. GONZALES:  John Gonzales
10  for Radnor defendants.
11       MR. BARTOS:  Todd Bartos,
12  Spruce Law Group, representing
13  Mr. Prete, Brydzinski and Rockwell
14  Glynn, LP.
15       THE VIDEOTAPE TECHNICIAN:  The
16  court reporter will swear in the
17  witness.
18             - - -
19       KEVIN W. KOCHANSKI, RLA, CZO
20  after having been duly sworn, was
21  examined and testified as follows:
22             - - -
23       MR. GONZALES:  Yeah.
24       MR. SCHROM:  Yes.  Consistent
25  with prior depositions in this matter.
```

Page 6

1    MR. GONZALES:  And the witness
2    is going to read and sign.
3    - - -
4    DIRECT EXAMINATION
5    - - -
6    BY MR. SCHROM:
7    Q.    Good morning, Mr. Kochanski.
8    A.    Good morning.
9    Q.    So in preparation for today's
10   deposition, did you have an opportunity to
11   review any documents, videos or anything else
12   like that?
13   A.    Files in -- our documents in our files.
14   Q.    Oh, okay.
15   A.    No videos.
16   Q.    So what were the documents that were in
17   your files?
18   A.    Violation letters, the property
19   maintenance violation letter, the municipal
20   condemnation photographs from the site, and
21   most recently some text messages.
22   Q.    Okay.  Did you review any court orders?
23   A.    I may have early on.  I don't recall
24   specifically.
25   Q.    Okay.  Did you talk with anybody else

Page 7

1    in preparation for this deposition other than
2    counsel?
3    A.    Possibly the other code official that
4    was involved in this, Andy Pancoast from our
5    office.
6    Q.    Okay.  Anybody else?
7    A.    Not that I can recall.
8    Q.    Okay.  Did you ever have a deposition
9    previously?
10   A.    I have.
11   Q.    Okay.  And what were the matters that
12   you were involved in?
13   A.    Typically, code enforcement.
14   Q.    Okay.  And how many times were you
15   deposed?
16   A.    It's been a handful of times.  I don't
17   know specifically.
18   Q.    Okay.  And what was the nature of your
19   testimony?
20   A.    Generally my involvement in the code
21   enforcement action.
22   Q.    And what do they typically involve?  Is
23   that like a condemnation action or --
24   A.    It could be property maintenance, it
25   could be rental housing, it could be

Page 8

1    condemnation.
2    Q.    Okay.  Have you ever had a deposition
3    in a matter that related to condemnation?
4    A.    I don't recall specifically what the
5    exact matters were.  It's been some years.
6    Q.    What is your educational
7    background?
8    A.    I have a bachelor's degree in --
9    bachelor's of science in landscape
10   architecture.
11   Q.    Okay.  Anything else?
12   A.    I have two associate's degree from the
13   Community College of the Air Force; one in
14   human resource management; the other in, I
15   think, applied engineering sciences or
16   electrical sciences.
17   Q.    Okay.  Do you have any ongoing classes
18   that you have to take as a -- in the position
19   that you're in?
20   A.    I have -- I hold various
21   certifications, maintaining my registered
22   landscape architecture license through the
23   Commonwealth; I have continuing requirements
24   for that.  I'm a certified zoning official in
25   the State of Pennsylvania; I have continuing

Page 9

1    education requirements for that.  I also hold
2    three certifications through the department of
3    L&I through the State.  My BCO, plumbing --
4    commercial pluming inspection, commercial
5    plumbing plan review that I take continuing
6    education requirements for.
7    Q.    Okay.  And I'm looking at your business
8    card, which also has a designation, RLA?
9    A.    Correct.
10   Q.    What is that?
11   A.    Registered landscape architect.
12   Q.    Oh.  Registered landscape architect,
13   okay.  Any other credentials?
14   A.    Not that I can think of.
15   Q.    Okay.  In term of your work experience,
16   would you be able to just summarize your work
17   experience for us?
18   A.    I've been with Radnor Township since
19   2011, I think December is when I came onboard
20   there as the director, and have been involved
21   in the administration of the zoning ordinance
22   and the various other ordinances assigned to
23   the department, including property maintenance,
24   rental housing and the building codes.
25   Q.    Okay.  I noticed that you mentioned Air

Page 10

1  Force.  Were you in the Air Force?
2  A.    I am currently in the Pennsylvania Air
3  National Guard.
4  Q.    Okay.  And how long have you been
5  there?
6  A.    Since 1994.
7  Q.    Okay.  How would you characterize your
8  familiarity with policies of Radnor Township in
9  terms of extremely familiar, very familiar,
10 familiar, and so on?
11         MR. GONZALES:  You say
12         policies, which policies are you
13         referring to?
14         MR. SCHROM:  Policies that
15         relate specifically to condemnation.
16         But all township ordinance policies.
17         THE WITNESS:  Well, that would
18         vary.  Those policies that involve the
19         community development department, I'm
20         very familiar with.  Policies that
21         would involve areas outside the
22         community development department, I --
23         it would vary somewhat to not familiar
24         at all.
25 BY MR. SCHROM:

Page 11

1  Q.    Okay.  So what is the community
2  development umbrella; what does that include,
3  that terminology?
4  A.    Building, zoning, property maintenance,
5  rental housing.
6  Q.    Okay.  By building, what does that
7  mean?
8  A.    The application and issuance of the
9  permits for vertical construction.
10 Q.    Okay.  Does that also include
11 ordinances related to condemnation?
12 A.    Yes.
13 Q.    Okay.  So let me ask:  How familiar are
14 you with the ordinances that relate to
15 condemnation?
16 A.    Pretty familiar.
17 Q.    Okay.  And how familiar are you with
18 those procedures that relate to condemnation
19 matters?
20 A.    Pretty familiar.
21 Q.    Okay.  And if you had to characterize
22 your level of conscientiousness, overall, in
23 performing these duties, how would you
24 characterize that along the same scale?
25 A.    I'm not sure I understand, level of

Page 12

1  consciousness.
2  Q.    Conscientiousness, meaning that, you
3  know, if you had to rate your own
4  conscientiousness relative to performing the
5  duties of the job, would -- you would rate
6  them, "consider myself extremely
7  conscientiousness," "very conscientiousness,"
8  "conscientiousness," and so on?
9  A.    I'm not -- I guess I'm not
10 understanding the question in terms of
11 conscientiousness and --
12 Q.    Okay.  Well --
13 A.    -- in performing those duties.
14 Q.    Let me maybe approach it differently.
15 In terms of attention to detail, how would you
16 rate yourself in the -- relative to the job
17 duties that you have at Radnor Township?
18 A.    It's a very high level of attention to
19 detail.
20 Q.    Okay.  How would you rate the township
21 regarding those same things if you had to rate
22 the township as to their attention to detail
23 regarding matters involving community
24 development that you delineated?
25 A.    I couldn't.  I would only rate those at

Page 13

1  which I'm involved in.
2  Q.    Okay.  And how would you rate the ones
3  that we're talking about relative to the
4  township's involvement?
5  A.    For those that I'm involved in, I'm
6  very detailed-oriented, but I can't speak for
7  others and their efforts towards those matters.
8  Q.    Okay.  I'd like to take a moment to go
9  through some of the duties of the job.  Can you
10 walk us through what the duties of this
11 position is, director of community development?
12 A.    Over all, it's to ensure the
13 enforcement applicability of the various codes
14 assigned to the department; as I mentioned, the
15 zoning ordinance, the building codes adopted by
16 the UCC, a property maintenance code, the
17 rental housing code.
18 Q.    What is the UCC?
19 A.    Uniform Construction Code adopted by
20 Pennsylvania.
21 Q.    Are there any other codes that Radnor
22 employs?
23 A.    There are a variety of codes that the
24 township employs those assigned to the
25 department typically fall under the building

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

Page 14

1  codes on to the UCC, property maintenance code,
2  the rental housing code, and the zoning code.
3  Q.      Is there an international code that
4  relates as well?
5  A.      I'm sorry?
6  Q.      Is there any -- are there any
7  international codes that relate?
8  A.      The Uniform Construction Code adopts
9  the international code series for building
10 construction --
11 Q.      Okay.
12 A.      -- with amendments.
13 Q.      Okay.  So on a typical day, what does
14 your day involve?
15 A.      Answering complaints, responding to
16 complaints, answering questions from residents,
17 reviewing permit applications, answering phone
18 calls, site visits to look at compliance or
19 follow-up on a complaint.
20 Q.      Okay.  When did you become familiar
21 with the Ockley property?
22 A.      I believe it was in the spring of 2022.
23 Q.      Okay.  And how did you become familiar
24 with this property?
25 A.      I believe it was through our police

Page 15

1  department and their involvement and concerns
2  about the conditions of the interior of the
3  house.
4  Q.      Okay.  Did you go to the house on, I
5  think -- I'll represent it was April 21st, does
6  that refresh your memory relative to the
7  beginning of your involvement?
8  A.      I believe I was aware of the concerns
9  at the property.  I don't know if I was there
10 on the 21st or the 22nd, but it was in that
11 time frame that I had first visited the site.
12 Q.      Okay.  Were you the first person from
13 the township to visit the site or was there
14 another person or persons?
15 A.      I believe our police were the first to
16 respond, and then they reached out to us.
17 Q.      Okay.  Do you know who that officer
18 was?
19 A.      I do not.
20 Q.      Okay.  So what did that officer
21 indicate?
22 A.      I don't recall.  I don't recall if I
23 received the first call or if somebody else in
24 our department; that would have been Andy
25 Pancoast, if he received the call.

Page 16

1  Q.      Okay.  So you or Andy receive a call
2  and then you go out to the property; is that
3  right?
4  A.      Yes.  We will follow-up and respond to
5  the call from the police and visit the site.
6  Q.      Okay.  So at that time, Ms. Ockley was
7  not present, correct?
8  A.      She was not present when I was there.
9  Q.      Right.  And that's because she was
10 taken to the hospital?
11 A.      I don't know.
12 Q.      Okay.  Did the officer indicate to you
13 or to Andy or to anyone in Radnor Township that
14 she was taken to the hospital?
15 A.      I can't speak for what an officer told
16 somebody.  I did not speak -- I don't recall
17 speaking to an officer, but then subsequently
18 becoming aware that Ms. Ockley was taken to the
19 hospital.
20 Q.      Okay.  So just take me to -- through
21 the procedure.  The officer notifies Radnor
22 Township that he thinks that there's an issue
23 demanding your attention, correct?
24 A.      We'll receive notification from the
25 police that there's a concern about the

Page 17

1  conditions of the property.
2  Q.      Okay.  And then you and/or Andy go to
3  the property within the next 24, 48 hours?
4  A.      Typically, we respond while the police
5  are present on the site.
6  Q.      Was there -- when you responded, was
7  there a police officer onsite?
8  A.      Not when I responded.  I believe when
9  Andy was there and he responded, there were
10 police that were still present.
11 Q.      Okay.  So what if anything transpired
12 at that point?
13 A.      I don't know.  I was not there.
14 Q.      Okay.  So you believed that Andy was
15 the first person there?
16 A.      I believe Andy was the first person
17 from the department, from the Community
18 Development Department that was there.
19 Q.      Okay.  But you also visited that site?
20 A.      After, yes.
21 Q.      Okay.  So the officer is the first on
22 the scene, I'll represent to you, to respond to
23 an emergency call.  And then Andy is onsite.
24 And then at some point you're onsite as well;
25 is that how it went?

Page 18

1  A.      From what I can recall, yes.
2  Q.      Okay.  Did you ever walk around the
3  property with Andy?
4  A.      Not that I recall.
5  Q.      Okay.  When you were on the property,
6  what if anything did you do?
7  A.      I -- I believe my involvement on the
8  property was to post the property maintenance
9  violation notice, as well as the notice of
10 condemnation on the property.
11 Q.      Okay.  So you didn't go in the
12 property?
13 A.      I'm sorry?
14 Q.      You didn't go in the property?
15 A.      I was on the property, yes.
16 Q.      Okay.  But did you go inside the house?
17 A.      I was not inside the house.
18 Q.      Okay.  So Andy was inside the house,
19 though, correct?
20 A.      I believe Andy was inside the house.
21 Q.      Okay.  So he goes around the house with
22 the officer, and -- and then he creates a
23 condemnation notice; is that correct?
24 A.      I can't speak for who was involved in
25 Andy's visit to the site because I was not

Page 19

1  there.  So I don't know if he was joined by an
2  officer or not.  Andy will document, staff will
3  document the conditions of the property, we
4  post it usually immediately onsite with a green
5  placard for unfit for human habitation, and
6  then we will come back and prepare the formal
7  violation notices and a notice of condemnation.
8  Q.      Okay.  And what is your involvement
9  with that?
10 A.      I worked with Andy to prepare the --
11 the notices, and I believe I signed the property
12 official condemnation notice and the property
13 maintenance --
14 Q.      Okay.
15 A.      -- violation notice.
16 Q.      And then you gave copies to certain
17 persons?
18 A.      I don't recall specifically the -- who
19 received the notice.  But typically, it's
20 posted on the property, which is when I believe
21 the first time I was on the property was to
22 post the notice.  We will send it out U.S.
23 Mail, both regular and certified, as well as
24 then copy the township solicitor, township
25 manager, and usually just the commissioner of

Page 20

1  the ward at which the property's located in.
2  Q.      Mm-hmm.  Do you know whether that
3  certified mailer came back?
4  A.      I do not recall.
5  Q.      Is that in your file?
6  A.      I don't know.
7  Q.      When was the last time you looked at
8  the file?
9  A.      In bits and pieces, most recently as
10 late last week.
11 Q.      Did you ever see a request from counsel
12 to give a copy of your file?
13 A.      I believe that there was a request for
14 the files that was submitted to the township
15 and responded to.
16 Q.      Do you know if the certified mail would
17 be in a different folder?
18 A.      Typically, the green card, when we get
19 it back from the post office, is attached to
20 the notice.  It should be put in the file, I
21 don't know if it was.
22 Q.      Okay.  Do you have access to that file?
23 A.      Sure.
24 Q.      Okay.  I would request that you give a
25 look-see, and try to see if that green card is

Page 21

1  available.  And if so -- and give it to couns
2  -- give a copy of it to counsel.
3  A.      Okay.
4              MR. SCHROM:  And I would ask
5          the counsel to forward that on to us.
6              (Whereupon, a request was
7          made.)
8  BY MR. SCHROM:
9  Q.      So as I understand it, the condemn not
10 -- condemnation notice was created with the
11 assistance of Andy and you.  You were the
12 individual that posted it on the property,
13 correct?
14 A.      I believe so, yes.
15 Q.      Okay.  And at any point, was the
16 property padlocked?
17 A.      Yes.
18 Q.      Okay.  And who padlocked the property?
19 A.      I believe Andy put the locks on the
20 property.
21 Q.      Okay.  So when you arrived, were there
22 locks on the property already?
23 A.      I don't -- I don't recall other than
24 recently going through correspondence.  I
25 believe that it indicated that Andy put the

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

Page 22

1  locks on the property.
2  Q.      Okay.  So he went to the property with
3  the officer, made a determination that it
4  should be condemned, put locks on the property,
5  and then went back to create a report in
6  concert with you?
7  A.      I don't know when the locks were put
8  on.
9  Q.      Okay.  But you believe that Andy was
10 part of that process?
11 A.      I believe Andy was part of that
12 process.
13 Q.      Is there a separate locksmith that you
14 call, or is that part of the duties of -- of
15 Andy or an assistant director of community
16 development?
17 A.      Typically, we -- staff will put the
18 locks on when warranted.  We don't -- we used
19 to use a third-party for that.
20 Q.      Uh-huh.
21 A.      I think we've gotten out of that and
22 just done it internally.
23 Q.      Okay.  So you have, I guess a -- store
24 them with a whole bunch of locks and keys?
25 A.      I wouldn't -- we have access to locks

Page 23

1  and keys.
2  Q.      Okay.  Other than Andy and -- did you
3  consult with anyone else before writing the
4  condemnation notices?
5  A.      The notice would have been -- we
6  typically, on matters of this nature, we'll
7  consult with our solicitor, township solicitor.
8  Q.      Okay.  And did you consult with that
9  person?
10 A.      I believe I did.  I don't know
11 specifically.
12 Q.      Okay.  And what would be the nature of
13 that consultation?
14 A.      To verify that the content of the
15 notice meets all of the requirements of the
16 underlying codes.
17 Q.      Okay.  Who was the solicitor?
18 A.      John Rice.  Grim, Biehn & Thatcher out
19 of Perkasie, Pennsylvania.
20 Q.      John?
21 A.      Rice.  R-I-C-E.
22 Q.      Okay.  Did you ever return to the
23 property?
24 A.      Yes.
25 Q.      When was that?

Page 24

1  A.      I know I was there.  I removed the
2  locks, it was in August.  There may have been
3  times between April, when we posted the
4  property and in August, when I removed the
5  locks that I drove by to look at the property
6  -- we had a property maintenance issue with the
7  grass.  I had our property maintenance
8  inspector, Bill Bruno, issue that violation
9  notice for that, as a property that has been
10 condemned just to, you know, drive past to make
11 sure that -- how the property's currently being
12 managed.
13 Q.      Okay.  So the property was condemned
14 for violation of various ordinances; is that
15 correct?
16 A.      Yes.
17 Q.      Okay.  And why did you remove the locks
18 and when?
19 A.      The locks were removed in August.  The
20 property had transferred, the new owner had
21 paid the outstanding fees for the property
22 maintenance of the lawn to have that cut and
23 maintained.  And it had transferred ownership,
24 so we removed the lock with the understanding
25 that it was not going to be -- it was a

Page 25

1  transfer of real estate only, and they were
2  going to be correcting the violations.
3  Q.      Okay.  And the violations that were
4  being corrected related to weeds, is that the
5  one that you're referring to?
6  A.      No.  It would be the property
7  maintenance, the condemnation notice.  So the
8  property was still condemned but under new
9  ownership, who was going to address.
10 Q.      Okay.  So you took the locks off
11 because the change of ownership; is that
12 correct?
13 A.      Yes.
14 Q.      Is there any other reason you changed
15 -- removed the locks?
16 A.      There may have been primarily just
17 because it had been -- a transfer of real
18 estate had occurred --
19 Q.      Mm-hmm.
20 A.      -- and the new owner was now
21 responsible for and going to be addressing the
22 violations.
23 Q.      Okay.  Any other reason?
24 A.      Again, there may have been others.  I
25 -- that was the primary reason.

KEVIN W. KOCHANSKI, RLA, CZO                                JOB NO. 1655055
MAY 21, 2025

Page 26

1  Q.    Okay.  So just focusing on April 21st
2  for a moment.  Would it be correct to say that
3  the officers went to the property, that Andy
4  Pancoast went to the property, that Ockley went
5  to the hospital, and then the property was
6  condemned; all of that transpired on the 21st,
7  correct?
8  A.    That's about the time frame when it
9  started.  I don't know specifically if that was
10 it without looking at the file and seeing
11 photographs, typically, date stamp the photos.
12 Q.    Okay.  But that appears to be around
13 the time; is that a --
14 A.    Correct.
15 Q.    -- fair statement?  Okay.
16       Do you know -- know whether or not the
17 notice or notices of condemnation were ever
18 sent to the hospital where Ockley was taken?
19 A.    I don't know if they were sent to the
20 hospital.
21 Q.    Who would know that if not you?
22 A.    I don't know.
23 Q.    Would Andy know that?
24 A.    I don't know what Andy would know.
25 Q.    Do you know whether any phone call was

Page 27

1  placed to Ockley, for instance, a text message
2  that "your property is condemned," do you know
3  if that occurred?
4  A.    I don't know.  I had very little
5  interactions with Ms. Ockley, so I don't know
6  who else spoke with her and when and what the
7  nature of those conversations were.
8  Q.    Okay.  So are you aware of any e-mails
9  that were sent to Ockley regarding that same
10 notice or notices of condemnation?
11 A.    I am not aware that I -- that I
12 believe.  I'm not familiar with any other
13 communications.
14 Q.    Okay.  You indicated you think that
15 there may have been a certified mail that was
16 sent, but at the time you're not sure whether
17 or not that was ever signed for; is that
18 correct?
19 A.    Our typical procedure is to send it
20 certified.  I'd have to look at the notice of
21 violation to see if it was sent certified.  If
22 it was, I don't know if we received the signed
23 letter back.
24 Q.    Okay.  When you condemn a property, you
25 have a duty to notify the homeowner, correct,

Page 28

1  or the owner of the property?
2  A.    We have a responsibility to send the
3  notice and to post it on the property, which is
4  what we did.
5  Q.    Mm-hmm.  But just looking at it quickly
6  for a moment, if the person is in the hospital
7  and certified mail is sent to the home, that
8  person wouldn't get it, correct?
9  A.    Possibly.
10 Q.    And if the person isn't living on the
11 property then the person wouldn't see it,
12 correct?
13 A.    Possibly.
14 Q.    Do you have any reason to believe that
15 Ockley was aware that on April 21st, that the
16 property was posted as condemned?
17 A.    I have no understanding of what
18 Ms. Ockley was or was not aware of.
19 Q.    Or when she was aware of what?
20 A.    Correct.
21 Q.    Okay.  Do you know whether this
22 condemnation notice was ever sent to Lingo?  Do
23 you know who he is?
24 A.    Mr. Greg Lingo?
25 Q.    Yeah.

Page 29

1  A.    Yes.  I do know who he is.  I don't
2  know if he requested a copy or if he saw the
3  copy that was posted on the property.
4  Q.    Do you know whether a copy was ever
5  given to Mr. Brydzinski?  Do you know --
6  A.    I do not know.  I believe he was the
7  owner.
8  Q.    The second owner.
9  A.    The second owner.
10 Q.    Yeah.  So you're not sure?
11 A.    I'm not sure.
12 Q.    Okay.  Since Ockley was in the
13 hospital, do you know whether or not a courier
14 ever took a notice, that notice to Ockley?
15 A.    I do not know.
16 Q.    Is there anybody else that would know
17 other than you?
18 A.    I have no idea what people would know
19 or not know.
20 Q.    Okay.  How many cases would you say
21 that you dealt with regarding where a property
22 was condemned in the course of your being
23 there, I guess, 14 years or so; is that right?
24 A.    Yes.
25 Q.    Okay.  How many cases of condemnation

Page 30

1 where a property was determined to be unfit for
2 human habitation have you had?
3                MR. GONZALES:  When you say
4        "cases," are you -- are you talking
5        about lawsuits?
6                MR. SCHROM:  No.
7                MR. GONZALES:  Or --
8                MR. SCHROM:  Sorry.
9 BY MR. SCHROM:
10 Q.    How many instances of condemnation
11 notices have been sent or properties condemned
12 over the time that you've been there in that
13 job?
14 **A.    Anywhere from eight to twelve.**
15 Q.    And in that eight to twelve, how
16 many properties have you had condemned where
17 the property was sold but a prior owner had
18 court orders related to accessing that
19 property?
20 **A.    I'm not familiar if that has occurred**
21 **previously.  I can't recall that that...**
22 Q.    Okay.  So you're not -- you're not
23 certain?
24 **A.    I'm not certain.**
25 Q.    Okay.  And how many cases have -- or

Page 31

1 rather, how many condemnations have you had
2 where there was a property that was transferred
3 to another owner but the prior owner had court
4 orders allowing access where the person was
5 ultimately arrested?
6 **A.    And I'm not familiar if that has**
7 **occurred where we've condemned the property and**
8 **there have been court orders.**
9 Q.    Okay.  Who, other than you, might know
10 that, or are you in the best position to know
11 that?
12 **A.    Andy possibly, because he deals with**
13 **these right along side of me.**
14 Q.    Okay.  What is his official role?
15 **A.    He's a code official with the township.**
16 Q.    Okay.  But you're his boss?
17 **A.    Correct.**
18 Q.    Okay.  And would it be fair to say that
19 you're generally familiar with all the
20 activities that he's involved with?
21 **A.    I won't say all activities.  A very**
22 **busy department, so there's things that Andy**
23 **handles on a daily basis that I am not aware of**
24 **and --**
25 Q.    Okay.

Page 32

1 **A.    -- he's empowered to do his job.**
2 Q.    But regarding condemnations, since
3 that's more unusual, would you be aware?
4 **A.    Typically, I would be aware of that.**
5 Q.    Okay.
6 **A.    There have been times where I've been**
7 **out of the office for military training, that**
8 **there may have been a case or two that was**
9 **handled outside of my knowledge.**
10 Q.    Okay.  But not this one?
11 **A.    Not this one.**
12 Q.    Okay.  Questions regarding the written
13 policies and procedures of the township, who or
14 what is the official policy maker for the
15 township, or ordinance maker?
16 **A.    Policy would be through the department**
17 **head and the township manager, and the Board of**
18 **Commissioners.  Official ordinances officially**
19 **are adopted through the Board of Commissioners.**
20 Q.    Do you attend the Board of
21 Commissioners meetings?
22 **A.    I attend some of the meetings.**
23 Q.    Okay.  Do you have a duty to do that?
24 **A.    If there is an item that I'm**
25 **responsible for, I will attend.**

Page 33

1 Q.    Okay.  So if it relates to your
2 department, you attend those meetings?
3 **A.    Typically, yes.**
4 Q.    Okay.  And the Board of Gov -- of
5 Commissioners is the governing board for the
6 township?
7 **A.    Yes.**
8 Q.    So they ultimately approve and/or
9 create all ordinances; is that correct?
10                MR. GONZALES:  I'm just going
11        to object.  I'm letting him answer
12        these questions, but this is all set
13        forth in the Pennsylvania code.
14                MR. SCHROM:  Sure.
15                MR. GONZALES:  So...
16                MR. SCHROM:  I understand.
17                MR. GONZALES:  To the extent
18        he's giving his understanding and his
19        knowledge and his opinions, they are
20        that.  The law would dictate who is
21        responsible, either as a policy maker
22        for Radnor Township and/or responsible
23        for passing ordinances, et cetera.
24        But --
25                MR. SCHROM:  Mm-hmm.

Page 34

1    MR. GONZALES: -- again, I'm
2  not instructing the witness not to
3  answer.  He can answer it --
4    MR. SCHROM:  No.
5    MR. GONZALES:  -- but I just
6  want to put that objection on the
7  record.
8    MR. SCHROM:  And I understand
9  that and I appreciate that.  Thank
10 you.
11    THE WITNESS:  I believe it's
12  the Board of Commissioners that
13  ultimately have to adopt an ordinance.
14 BY MR. SCHROM:
15 Q.    Okay.  And these procedures are updated
16 at various times; is that correct?
17 A.    Which procedures?
18 Q.    Procedures and policies of the
19 township.
20 A.    Sure.  They're -- I would imagine it's
21 an evolving, you know, procedure or policy is
22 things need to change, we make those decisions
23 to change those as it involves escalating it up
24 through the chain of command.  We do that as
25 needed.

Page 35

1 Q.    Okay.  Regarding the condemnation
2 policy, do you know when the last time that --
3 who created that or when that was updated?
4 A.    The rules and regulations regarding
5 condemnation are set forth in our property
6 maintenance code that I believe is the 2009
7 international property maintenance code that
8 has been adopted.  I don't recall when
9 specifically that was.  I believe it was in the
10 2010 time frame, is when that was adopted by
11 the township.
12 Q.    Okay.  And that's the code that was in
13 place in '22?
14 A.    Yes.
15 Q.    As it would relate to the Ockley
16 property?
17 A.    Yes.
18 Q.    Okay.  Is there any policy in effect
19 that relates -- to the best of your knowledge,
20 that relates to the effects of Court of Common
21 Pleas orders on ordinances?
22 A.    We would confer with our township
23 solicitor on how to proceed if we become aware
24 of such matters.
25 Q.    But do you know whether there's a

Page 36

1 specific written policy to that effect?
2 A.    I'm not aware of a written policy.
3 Q.    Okay.  Do you know if there's a written
4 policy regarding specifically what to do if a
5 Common Pleas order is in conflict with a
6 township ordinance?
7 A.    Again, we would --
8    MR. BARTOS:  Objection.
9    THE WITNESS: -- defer to the
10  township solicitor for advice on that
11  matter.
12 BY MR. SCHROM:
13 Q.    Okay.  Do you know whether there is a
14 written policy in place?
15 A.    I don't know if there is.
16 Q.    Okay.
17 A.    Or not.
18 Q.    Is there any person who -- other than
19 you, who would know relative to the
20 condemnation?
21 A.    We would defer that to our township
22 solicitor and he would know.
23 Q.    Okay.  So the township solicitor would
24 know what to do if there's a conflict between a
25 Common Pleas order and ordinance, if they're in

Page 37

1 conflict, correct?
2 A.    We would defer to the solicitor's
3 office.
4 Q.    Okay.  Would you defer to anybody else?
5 A.    On that -- a legal matter, we would
6 defer to the solicitor's office.
7 Q.    Okay.  Do you know if there is a policy
8 in place regarding the interaction between
9 condemnations and police activity, which could
10 include arrests?
11 A.    I don't understand the question.
12 Q.    I'm just asking if there's a written
13 policy that you'd be able to read that relates
14 to condemnation procedures and how they
15 intersect or interact with police.
16 A.    I'm not aware of a written policy.
17 Q.    Okay.  Regarding the training of
18 police, are you aware of any training that
19 occurs for the police that relate to
20 condemnation ordinances?
21 A.    I'm not aware of specific training that
22 our police officers receive.
23 Q.    All right.  Have you ever been asked to
24 be involved in training officers relative to
25 condemnation procedures?

KEVIN W. KOCHANSKI, RLA, CZO                                      JOB NO. 1655055
MAY 21, 2025

Page 38

1  A.      I don't recall ever being asked to
2  perform that training.
3  Q.      Do you know if anybody else in the
4  department was ever asked?
5  A.      I do not know.
6  Q.      You know whether or not there's any
7  training that occurred for police officers in
8  enforcing condemnation ordinances?
9  A.      And I'm not familiar with what training
10 our officers would receive or not.
11 Q.      Did anyone ask you in any way what --
12 police ever ask you in any way, or the Board of
13 Commissioners ever ask you to train the police
14 in condemnation enforcement, condemnation
15 procedures?
16 A.      Again, I have not been involved in any
17 training and don't recall ever being asked to
18 provide training to our police department.
19 Q.      Do you know whether or not you were
20 ever asked, or anyone in your office, was ever
21 asked to train officers relative to -- you may
22 have already answered this -- the impact of a
23 Common Pleas order relative to condemnation?
24 A.      I'm not aware.
25 Q.      Okay.  Are you aware of any -- or have

Page 39

1  you been asked to participate in any training
2  regarding the implementation of Common Pleas
3  orders?
4  A.      I have not, to my knowledge, been asked
5  to participate or aware of any such training.
6  Q.      Do you know whether there's any
7  training regarding the specific enforcement
8  mechanisms for Common Pleas orders or as they
9  would relate to condemnations?
10 A.      I'm sorry.  Could you repeat that?
11 Q.      Were you ever asked or are you aware of
12 any training that was ever created for the
13 enforcement of Common Pleas orders relative to
14 condemnations and the police?
15 A.      I'm not aware of any such training.
16 Q.      Do you know whether or not the officers
17 are instructed or trained as to what to do if
18 there is that conflict between orders and
19 ordinances?
20 A.      I'm not aware of any training that our
21 officers receive regarding condemnation orders
22 -- condemnation notices and court orders.
23 Q.      Okay.  Did you ever receive any
24 training relative to Common Pleas orders versus
25 condemnation -- condemnation ordinances?

Page 40

1  A.      Not that I can recall.
2  Q.      Would it be fair to say that -- that,
3  to the best of your understanding, the township
4  makes a conscious choice to train or not to
5  train on condemnation matters or related
6  matters?
7              MR. GONZALES:  Objection.
8              You can answer.
9          THE WITNESS:  I can't speak
10         for what the township in its entity
11         makes a conscious decision to do or
12         not to do something.
13 BY MR. SCHROM:
14 Q.      But to the best of your knowledge, the
15 township does recall, over all, the -- the
16 training that officers receive, correct?
17 A.      I can't speak to that.
18 Q.      Okay.  The township does control the
19 training that you receive, the additional
20 training that you might receive, right?
21             MR. GONZALES:  Objection.  You
22         keep using the term "the township,"
23         and the witness has already answered
24         this, that he doesn't know what the,
25         quote/unquote, the township would be

Page 41

1  and who you're referring to.  If you
2  have a specific person or official
3  within the township that you're
4  referring to, you know, that might be
5  more appropriate.  But otherwise, he's
6  already answered this question
7  multiple times and I'm going to object
8  to it.  But he can answer.
9  BY MR. SCHROM:
10 Q.      Okay.
11 A.      Could you repeat the question?
12 Q.      Well, let me just try it slightly
13 differently.  If you were asked to set up a
14 list of protocols for police regarding
15 condemnation procedures, would you be able to
16 do that?
17 A.      By whom would be asking?
18 Q.      The township or any -- you know, any
19 person in authority in the township?
20 A.      I would need to know the basis of that
21 request.
22 Q.      But do you have the -- do you -- in
23 that capacity -- relative to your knowledge,
24 experience, have the capacity to give a course
25 in condemnation, condemnation procedures and

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

Page 42

1  enforcement?
2  **A.      I would say that I would defer to our**
3  **solicitor's office to provide any kind of legal**
4  **training regarding condemnation notices and**
5  **court orders.**
6  Q.      Okay.  But to the best of your
7  knowledge, that hasn't occurred, correct?
8  **A.      I don't know.**
9  Q.      Is there anybody else who would know?
10 **A.      I would not know what training people**
11 **have and have not received or have been**
12 **offered.**
13 Q.      Have you ever been provided with a --
14 kind of a -- or is there a -- kind of a
15 priority pole as to how the entire condemnation
16 procedure works from beginning to end?
17 **A.      Provided a poll?**
18 Q.      Yeah.  Meaning, you know, just this
19 would be the initial step, this would be the
20 ultimate step.  The first step would be to take
21 a call, walk around the outside of the
22 property, you know, just see whether or not
23 there are any immediate issues, animals, broken
24 fences, rocks, trees throughout the road, and
25 then move to the interior of the property,

Page 43

1  upstairs, downstairs, check electric, sewer,
2  water, leaks, you know.  And then after the
3  determination is made, you know, how --
4  basically, though, how it would go from the
5  beginning of that to the end?
6            MR. GONZALES:  Objection.
7            But you can answer.
8  **THE WITNESS:  Taking courses**
9  **on the legal aspects of code**
10 **enforcement, part of our continuing**
11 **education courses of that nature,**
12 **whenever we have a concern that has**
13 **been brought to our attention, we will**
14 **document it, determine where there may**
15 **be deficiencies in the code, confer**
16 **with our solicitor's office in terms**
17 **of writing a violation notice, if one**
18 **is warranted, and proceed under the**
19 **guidance of our solicitor's office.**
20 BY MR. SCHROM:
21 Q.      Okay.  Have you ever been asked to
22 provide that same orientation to the police?
23 **A.      Not that I can recall being asked.**
24 Q.      As part of your analysis relative to
25 condemnation of property as they would affect

Page 44

1  individuals, is part of your analysis a
2  foreseeable harm determination?
3  **A.      We will look at the provisions of the**
4  **code and determine what violations existed to**
5  **cite as compared to what the code requires.**
6  Q.      So regarding foreseeable harm, is that
7  part of the analysis or not necessarily?
8  **A.      I'm not familiar if that term is in our**
9  **codes.**
10 Q.      Okay.  Is there an urgency criteria as
11 part of that equation?  Meaning that it's very
12 urgent, not so urgent?  Is there an urgency
13 orientation that is included in the analysis?
14           MR. GONZALES:  Objection.  I'm
15           lost.  Are you talking about when the
16           township or when the code officer or
17           -- decides to condemn a property?  Are
18           you talking about what the standards
19           are to actually condemn a property?
20           MR. SCHROM:  Yeah.
21           MR. GONZALES:  Okay.
22           MR. SCHROM:  It relates to the
23           condemnation, and I just wondered or
24           not -- whether or not there is --
25           urgency is one of the criteria that

Page 45

1  you look at.
2            MR. GONZALES:  Okay.  Thanks.
3  That's all.
4            You can answer.
5  **THE WITNESS:  I don't believe**
6  **-- I'm not familiar if urgency is used**
7  **in our code.  But we will go through**
8  **the various sections of our code,**
9  **determine what is in compliance, what**
10 **is out of compliance, formulate a**
11 **notice, talk that -- those issues**
12 **through with our solicitor's office to**
13 **make the final determination, whether**
14 **or not a property should be condemned.**
15 BY MR. SCHROM:
16 Q.      Okay.  You say that you think that you
17 talk to the solicitor, do you know whether he
18 ever went to the property?
19 **A.      Who went the property?**
20 Q.      The solicitor?
21 **A.      I don't know.**
22 Q.      Did you ask him to go to the property?
23 **A.      I typically don't ask the solicitor to**
24 **go to the property, whether he chose to go, I**
25 **don't know.**

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

Page 46

1  Q.      Okay.  Other than -- do you know how
2  many times you talked with a solicitor
3  regarding this?
4  A.      Regarding contamination notices?
5  Q.      Yeah.  Regarding a condemnation notice
6  as it relates to the Ockley matter?
7  A.      I don't know specifically if it was a
8  couple of phone calls, if it was a couple of
9  e-mails.  Typically, what happens is we will
10 prepare the notice, provide the documentation
11 that we have, get comments back and then issue
12 the notice.
13 Q.      Will those comments be part of the
14 e-mails that you have?
15 A.      If we received -- if we sent or
16 requested a solicitor to review and for
17 guidance and they provided comments back, they
18 would be.
19 Q.      Okay.  Do you know whether or not there
20 were any provided in this matter?
21 A.      I do not recall.
22              MR. SCHROM:  Again, the
23        request will be made, if you can look
24        to see whether or not there are any
25        comments by a solicitor, and then

Page 47

1        provide them to counsel, we would
2        request that, when you're going
3        through the file looking for the green
4        card.
5              (Whereupon, a request was
6        made.)
7              MR. SCHROM:  Okay.  It's been
8        an hour, I'd like to just take a quick
9        break --
10             MR. GONZALES:  Mm-hmm.
11             MR. SCHROM:  -- and then we'll
12       come back.
13             THE VIDEOTAPE TECHNICIAN:  Off
14       the record at 11:12.
15             (Whereupon, a recess was
16       taken.)
17             THE VIDEOTAPE TECHNICIAN:
18       We're back on the record at 11:40.
19 BY MR. SCHROM:
20 Q.      Okay.  I want to show you a court
21 order.  Actually -- yeah.  That's okay.  I'll
22 go through it with the court orders -- I mean
23 the other.
24       At some point, did you become aware
25 that there was a court order relative to this

Page 48

1  property?
2  A.      At some point, I did become aware, yes.
3  Q.      Okay.  When was that or do you
4  remember?
5  A.      Don't recall.
6  Q.      Do you have any notes indicating that?
7  A.      Not that I'm aware of.
8  Q.      Do you know whether or not any court
9  orders got scanned in and date stamped?
10 A.      I do not recall.
11 Q.      Is there a procedure for that at the
12 township?
13 A.      Nothing specific.  If we feel that it
14 is relevant to the situation, we try to get as
15 much information in our files.  Doesn't --
16 Q.      In this --
17 A.      -- always happen --
18 Q.      -- circumstance, do you know whether or
19 not that either of the court orders were ever
20 scanned into --
21 A.      I do not know.
22 Q.      -- your system?  You don't know?
23 A.      No.
24 Q.      Are you able to determine that today,
25 if you went back and pulled up your computer

Page 49

1  and typed in that address, would -- would it be
2  filed under the address?
3  A.      Typically, it would be filed under the
4  address.
5              MR. SCHROM:  Okay.  That would
6        be the next request, if you could pull
7        up the address and see whether or not
8        there's any orders in the system, with
9        indication as to when they were put in
10       the system, and then provide that to
11       counsel, which I am requesting he turn
12       over to us.
13             (Whereupon, a request was
14       made.)
15             THE WITNESS:  Okay.
16 BY MR. SCHROM:
17 Q.      I'll represent that Ms. Ockley
18 indicated that she called the township on 8/9,
19 at 8:50, and attempted to speak to Pat Hagan.
20 Do you know who Pat Hagan is or was?
21 A.      I'm not aware of a Pat Hagan.  We do
22 have a Peggy Hagan.
23 Q.      Okay.  Peggy Hagan.  And who is she?
24 A.      Her current role is the executive
25 assistant to the township manager.

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

Page 50

1  Q.      Is her telephone number (610) 306-5020?
2  A.      I don't know that number.
3  Q.      Okay.  Did you ever have a conversation
4  with Peggy Hagan regarding the court orders or
5  the removal of rock -- blocks?
6  A.      Not that I can recall regarding the
7  court order.  But there were communications
8  between Ms. Hagan and I in and around the
9  August 9th, 2022 time frame as if I had spoken
10 with Ms. Ockley.
11 Q.      Okay.  And at that time, had you spoken
12 to Ockley?
13 A.      I believe when Ms. Hagan reached out to
14 me, I had since then talked with Ms. Ockley.
15 Q.      And what was that conversation?  When
16 was that conversation?
17 A.      Which conversation?
18 Q.      When you were speaking to Ockley.
19 A.      I don't recall the specific
20 conversation that I had with Ms. Ockley.
21 Q.      Okay.  But would it have been around
22 August 9th?
23 A.      I believe it was the same day that she
24 reached out to Ms. Hagan.
25 Q.      Okay.  And do you know whether it

Page 51

1  related to removal of the blocks and court
2  orders?
3  A.      I don't recall the nature of the
4  conversation.
5  Q.      Okay.  Based on that conversation with
6  Peggy, did you take any action?
7  A.      I don't believe any action that I took
8  regarding this property was at the direction of
9  Ms. Hagan.
10 Q.      Okay.  I'll represent that the client
11 indicated at 9, 10 and 11:00, placed a call to
12 a Mr. White.  Do you know who that is?
13 A.      Yes.  That would be the township
14 manager.  Bill White is the township manager,
15 that is who I assume she would be referring to.
16 Q.      Okay.  She indicates that she didn't
17 talk to Peggy Hagan or talk to Ms. --
18 Mr. White, but left messages.  Did you ever
19 have a conversation with Mr. Bill White
20 regarding Ockley on or around August 9th, 2022?
21 A.      Not that I can recall.
22 Q.      I'll represent that Ockley said on 8/10
23 at approximately 8:57, she placed another call
24 to the township manager at (610) 688-5602,
25 extension 124.  Do you recognize that number?

Page 52

1  A.      It is similar to our township number,
2  which is (610) 688-5600.
3  Q.      Right.
4  A.      Since 124 is the extension for
5  Ms. Hagan.
6  Q.      Okay.  And not Mr. White?
7  A.      That would be Ms. Hagan.
8  Q.      Okay.  I'll represent that on 8/10,
9  Ms. Ockley, at around 9:25, attempted to call
10 Ms. Hagan again, indicates that she left a
11 message, called (610) 306-5020.  That's a
12 number you said you don't --
13 A.      I am --
14 Q.      -- recognize?
15 A.      -- not familiar -- that phone number's
16 not something that I can recognize.
17 Q.      Do you recall whether or not you had a
18 conversation with Hagan on that day, the 10th?
19 A.      I do not recall.  I believe there was
20 only one instance in which Ms. Hagan and I
21 communicated regarding reaching out to
22 Ms. Ockley.
23 Q.      Okay.  And you can't remember what that
24 conversation was?
25 A.      It was something I recently discovered

Page 53

1  in the text messages, which I forwarded to
2  counsel.
3  Q.      Okay.  And what's your recollection of
4  that?
5  A.      I believe it was Ms. Hagan asking me if
6  I had been in contact with Ms. Ockley, at which
7  point, I believe, I responded I had.
8  Q.      Okay.  But you can't remember the
9  nature of it; is that right?
10 A.      Nature of the phone conversation or
11 next -- nature of the text message?
12 Q.      Nature of either.
13 A.      I just summarized the -- my
14 understanding of the text messages, and I said
15 earlier that I was not aware of the nature of
16 the conversation with Ms. Ockley.
17 Q.      Okay.  Are you aware of who told the
18 police to go to the Ockley property on 8/12?
19 A.      I am not aware.
20 Q.      Are you aware of who told the police to
21 go to the property on 8/13?
22 A.      I am not aware.
23 Q.      Is there a procedure in place regarding
24 court orders as they would relate to a
25 condemnation matter for breach of ordinances?

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 54

1    MR. GONZALES: Objection.
2    But you can answer.
3    **THE WITNESS: I am not aware.**
4    BY MR. SCHROM:
5    Q.    Regarding the Ockley matter, are you
6    aware of any meetings that you were involved in
7    regarding any of the -- of the two court
8    orders, one on, I think, 7/19; is that right?
9    MS. MALLOY: I'm sorry. 7/15.
10    MR. SCHROM: Yeah.
11    BY MR. SCHROM:
12    Q.    7/15, and another one on 8/9?
13    **A.    I don't recall being in any meetings**
14    **regarding court orders for Ms. Ockley.**
15    Q.    Do you recall talking to the solicitor
16    regarding either of those orders?
17    **A.    Not that I can recall.**
18    Q.    Do you recall talking to the district
19    attorney regarding those court orders?
20    **A.    I don't believe I spoken with the**
21    **district attorney.**
22    Q.    Do you believe you or anybody out of --
23    on your staff spoke with a judge who issued the
24    orders?
25    **A.    I am not aware of any conversations**

Page 55

1    with a judge regarding the orders.
2    Q.    And did you or any of your staff talk
3    to the judge's staff regarding these orders?
4    **A.    I am not aware of that, and I did not.**
5    Q.    Same question regarding the law clerk
6    for the judges.
7    **A.    I don't -- I'm not aware of anybody,**
8    **and I don't believe I did either.**
9    Q.    Okay. I'm going to show you a number
10    of documents, we'll just go through that and
11    that will be it for me.
12    (Whereupon, Kochanski-1 was
13    marked as of this date and is attached
14    hereto.)
15    BY MR. SCHROM:
16    Q.    I am showing you a document that was
17    previously Kochanski-1. Are you able to
18    identify that one?
19    **A.    I don't recall seeing this before.**
20    Q.    Okay. What is that document?
21    **A.    I have no idea. There's something that**
22    **says Radnor Fire Company Ambulance on it. But,**
23    **again, I don't know what this is.**
24    Q.    Is Radnor Fire Company Ambulance under
25    the umbrella of Radnor Township or it a

Page 56

1    separate organization?
2    **A.    I am not familiar with how they're**
3    **interrelated with the township.**
4    Q.    Okay. If you look at that upper-right
5    hand corner, I'll just represent to you that it
6    was created on 4/21; is that correct?
7    **A.    There is a date that says 4/21/2022 on**
8    **there.**
9    Q.    Okay. And it says "Patient: Simona
10    Ockley"; is that correct?
11    **A.    Yes.**
12    Q.    Okay. And it relates to that same
13    address?
14    **A.    It does relate to 416 South Ithan.**
15    Q.    Okay. So apparently the Radnor
16    Police -- rather, Fire Company went to that
17    address on that day. And that's consistent
18    with your recollection that she was taken to
19    the hospital on that day?
20    **A.    In and around that time.**
21    Q.    Okay. I'm showing you another
22    document --
23    MR. GONZALES: You don't have
24    to put it on mine.
25    (Whereupon, Kochanski-2 was

Page 57

1    marked as of this date and is attached
2    hereto.)
3    BY MR. SCHROM:
4    Q.    -- marked Kochanski-2. Do you -- are
5    you able to identify that document?
6    **A.    This is a Notice of Condemnation issued**
7    **to Simona Ockley for 416 South Ithan, dated,**
8    **looks like it's April 26th, 2022, under my**
9    **signature.**
10    Q.    Okay. And you want to summarize this
11    document for us?
12    **A.    Not particularly. I think the document**
13    **speaks for itself. It's a notice of**
14    **condemnation for the property.**
15    Q.    Okay. There are -- on page 2, there's
16    certain rights. Are any other indication of
17    rights or responsibilities indicated to Ockley
18    -- or indicated in this piece of the
19    correspondence? In other words, was there an
20    addendum or is this the entire document?
21    **A.    This is the entirety of the notice of**
22    **condemnation.**
23    Q.    Okay. And was this posted on the
24    property?
25    **A.    I believe this was posted on the**

KEVIN W. KOCHANSKI, RLA, CZO                                      JOB NO. 1655055
MAY 21, 2025

Page 58

1  property.
2  Q.     Okay.  And was this sent to Ms. Ockley?
3  A.     Yes.
4  Q.     Okay.  And it was sent to that same
5  address that she's not living at, correct?
6  A.     Correct.
7  Q.     Okay.  And I think you previously
8  indicated that it wasn't taken by courier to
9  the hospital or it wasn't sent by e-mail, text
10 or in any other way, correct?
11 A.     I believe it was -- as indicated on
12 here, it says regular mail and property
13 posting.  I do not note that there's any
14 certified mailing indication on here.
15 Q.     Okay.  So would that mean -- would you
16 normally notify -- I mean, put a certified mail
17 number on the letter?
18 A.     Typically, we would put the certified
19 mail, regular mail and certified mail along
20 with the number for certified mailing.
21 Q.     Okay.  On the letter?
22 A.     Correct.
23 Q.     Yeah.  We do that as well.  So because
24 it's not there, that would indicate in all
25 probability that it was not sent by certified

Page 59

1  mail, correct?
2  A.     The absence of that information would
3  lead me to believe that it may not have gone
4  out, but I would not be certain until I checked
5  the file.
6  Q.     Okay.  And you said you would do that?
7  A.     Yes.
8  Q.     Okay.  Thank you.  I'm showing you
9  another document.
10         (Whereupon, Kochanski-3 was
11         marked as of this date and is attached
12         hereto.)
13 BY MR. SCHROM:
14 Q.     Kochanski-3.  Can you identify that?
15 A.     This is Notice of Violation issued to
16 Simona Ockley, 416 South Ithan Avenue,
17 Villanova, PA 19085.  Date of issuance is April
18 26th, 2022.
19 Q.     And --
20 A.     Under my signature.
21 Q.     Okay.  And what is this?
22 A.     This is the Notice of Violation that
23 were observed during the visit to the property.
24 Q.     Okay.  And more specifically it's
25 separate than the one we just referenced with

Page 60

1  more detail; is that correct?
2  A.     Correct.  This calls out the specific
3  violations that were observed at the time of
4  the visit.
5  Q.     Okay.  And I notice on the bottom that
6  a CC went to Commissioner Moira Mulroney, and
7  who is that person?
8  A.     Commissioner Mulroney is the
9  commissioner of the ward at which this
10 property's located in, I believe.
11 Q.     So she is on the board?
12 A.     She would be one of the elected.
13 Q.     Okay.  And then William White, we
14 talked about the township manager, Andy
15 Pancoast is your associate, Chris Flanagan,
16 superintendent of police, that's the police
17 chief; is that --
18 A.     Correct.
19 Q.     -- right?  And John Rice, you talked
20 about that, township solicitor and the property
21 file; that's the file that you keep?
22 A.     Correct.
23 Q.     Okay.  At the time that you wrote this,
24 you indicated that you weren't sure that --
25 whether you went inside.  Since this talks

Page 61

1  about interior, this is based on what Andy
2  observed; is that right?
3  A.     This notice was prepared in
4  coordination with Andy.
5  Q.     Okay.  Thank you.
6         MR. SCHROM:  I'm showing you
7         another document marked Kochanski-4.
8         (Whereupon, Kochanski-4 was
9         marked as of this date and is attached
10         hereto.)
11 BY MR. SCHROM:
12 Q.     Can you identify that, please?
13 A.     Notice of Violation for Property
14 Maintenance.  This would be issued -- was
15 issued by Bill Bruno, our property maintenance
16 code official for high grass and weeds.
17 Q.     Okay.  And it is a document that shows
18 multiple pictures including a Notice of
19 Violation in yellow; legal notice, danger; all
20 the notices are all that were posted, including
21 a picture of the lock; is that correct?
22 A.     There are a variety of photos attached
23 to this exhibit, including a copy of the Notice
24 of Violation, the legal notice, and
25 condemnation notice, as well as the property

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 62

1  maintenance violation notice, as well as a copy
2  -- pictures of the locks.
3  Q.    Okay.  The -- do you see at the top of
4  the picture on one that was taken at 10:33.
5  It's Radnor Defendant 000017.
6  A.    Yes.
7  Q.    Are you able to identify that document?
8  A.    Not from this picture, of certainty.
9  Q.    It looks as though it's violations that
10  you just went over.  But --
11  A.    It's possible.
12  Q.    Okay.  You don't know?
13  A.    Not from this picture, I cannot make...
14  Q.    Okay.  Thanks.  These are the
15  condemnation documents that we just reviewed,
16  all of them together make up the condemnation
17  documents?
18  A.    I would not agree with that statement.
19  Q.    Okay.  What would you say?
20  A.    I would say that that is a property
21  maintenance violation notice and the
22  condemnation notice is the condemnation notice.
23  Q.    Okay.  I'll show you another document.
24        (Whereupon, Kochanski-5 was
25        marked as of this date and is attached

Page 63

1        hereto.)
2  BY MR. SCHROM:
3  Q.    I'm showing you a document previously
4  marked Kochanski-5.  Are you able to identify
5  that document?
6  A.    It says in the Court of Common Pleas of
7  Delaware County, Pennsylvania.  It appears to
8  be a court order between Rockwell Glynn, L.P.,
9  plaintiff v. Simona Ockley, Defendant.
10  Q.    Okay.  When was the first time that you
11  saw that order?
12  A.    I don't recall.
13  Q.    Do you have an estimate as to when you
14  might have seen that order?
15  A.    I do not.
16  Q.    Could you take a moment to read that
17  order?
18  A.    Okay.
19  Q.    Okay.  Direct your attention to Item
20  No. 3.
21  A.    Okay.
22  Q.    I'll just read it and ask you a
23  question about it.  "Defendant shall have
24  limited and unfettered access to the property
25  at her own risk to remove her personal property

Page 64

1  until September 1st, 2022."  Did I read that
2  correctly?
3  A.    I believe you said have limited and --
4  Q.    I'm sorry.
5  A.    My version says unlimited.
6  Q.    Unlimited.  Thank you.  That's a very
7  important...  Let me read it again.
8        "Defendant shall have unlimited and
9  unfettered access to the property at her own
10  risk to remove her personal property until
11  September 1st, 2022."  Is that correct?
12  A.    That is what it reads.
13  Q.    Okay.  "And any personal property
14  remaining on the property after September 1st
15  shall be deemed abandoned and may be removed by
16  plaintiff as refuse."  Is that correct?
17  A.    Correct.
18  Q.    Does that refresh your recollection as
19  to when you might have received that order, if
20  you ever received it?
21  A.    No.
22  Q.    Do you know whether or not -- you said
23  today you -- in the beginning of the
24  deposition, you thought that you might have
25  reviewed some orders, is this one of the orders

Page 65

1  that you may have reviewed?
2  A.    I am aware of this order.
3  Q.    You are aware?
4  A.    Yes.
5  Q.    But you're not sure of when you became
6  aware of it?
7  A.    That is correct.
8  Q.    Are you a able to approximate when you
9  were -- aware of it maybe?
10  A.    I would -- based on the date of the
11  document, sometime after July 11th, 2022.
12  Q.    And you're going to see whether or not
13  a copy of this is in your file, correct?
14  A.    Yes.
15  Q.    Okay.
16        MS. MALLOY:  Give me No. 5,
17        please.
18        (Whereupon, Kochanski-6 was
19        marked as of this date and is attached
20        hereto.)
21  BY MR. SCHROM:
22  Q.    I'm showing you a document previously
23  marked Kochanski-6.  Are you able to identify
24  that document?
25  A.    In the Court of Common Pleas of

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 66

1  Delaware County, Pennsylvania, it's a civil
2  action law order, Rockwell Glynn, L.P. versus
3  Simona Ockley, dated 9, August, 2022.
4  Q.    Okay.  Do you recall ever seeing that
5  document before?
6  A.    I was aware that there were two court
7  orders, this would appear to be the second one.
8  Q.    Okay.  When do you think that you
9  became aware of that second court order dated
10 August 9th?
11 A.    I would assume it would be after August
12 9th, but I couldn't tell you specifically when.
13 Q.    So do you -- do you know whether or not
14 it was in August or whether it was some time
15 later?
16 A.    I do not know.  I do not recall.
17 Q.    Are you able to recall whether or not
18 you saw it within the past, you know, several
19 months as opposed to -- let me rephrase it.
20       Do you have any awareness of whether
21 you saw it in 2022?
22 A.    Not specifically.
23 Q.    Do you have any awareness of whether
24 you saw it in 2023?
25 A.    Again, I don't know specifically when I

Page 67

1  first became aware of this document.
2  Q.    Do you have any recollection of whether
3  or not you saw it in 2024?
4  A.    I don't recall.
5  Q.    Or 2025?
6  A.    More than likely in 2025, in
7  preparation for the deposition today.
8  Q.    Okay.  So that would be a couple of
9  days ago or --
10 A.    Well, it would have maybe been --
11 Q.    Within less --
12 A.    -- couple months --
13 Q.    -- than 30 --
14 A.    -- ago.
15 Q.    -- days?
16 A.    30 to 60 days, yes.
17 Q.    Okay.  So you're cert -- more certain
18 about that but not certain about the earlier
19 times?
20 A.    I don't recall when I first became
21 aware of this document.
22       (Whereupon, Kochanski-7 was
23       marked as of this date and is attached
24       hereto.)
25 BY MR. SCHROM:

Page 68

1  Q.    I'm showing you a document previously
2  marked Kochanski-- Kochanski-7.  Can you
3  identify that?
4  A.    This appears to be a chain of e-mails
5  between myself and Luke from Rockwell Custom
6  Homes in...
7  Q.    Okay.  Did you provide this to counsel?
8  A.    Appears that this was provided to the
9  township -- or from the township.
10 Q.    Okay.  Do you know whether or not you
11 had any additional communication with
12 Mr. Attanasi or other than this?
13 A.    Local contractor, could have been a
14 phone call, is in the township often enough,
15 could have been a meeting at the township where
16 he stopped in to -- to see me.  I don't recall
17 any specifics other than, you know, what is
18 documented in this e-mail chain.
19 Q.    Okay.  So let's just take a moment to
20 go through it.  So on Jul -- let's start with
21 the beginning, which would be July 25th.  Do
22 you see that?
23 A.    Yes.
24 Q.    Okay.  So that is from Luke Attanasi,
25 you want to read that into the record, please,

Page 69

1  to you?
2  A.    "Kevin, please let me know if this is
3  what you are looking for.  To whom it may
4  concern, I am writing this letter in reference
5  to the purchase of the property located at 416
6  South Ithan Ave.  I understand that the current
7  property is deemed condemned and unhabitable.
8  At no time will any person live or occupy the
9  property in the current condition.  We are in
10 the process of permitting through the township,
11 and ultimately building a new home on this
12 property.  In doing so, we will be demolishing
13 the current structure entirely in order to
14 construct a new home.  Sincerely Luke
15 Attanasi."
16 Q.    Okay.  Do you know whether or not you
17 had any conversations with Luke regarding this
18 e-mail?
19 A.    Well, there are subsequent responses.
20 Q.    Right.  We'll get to that.  But do you
21 remember having a conversation -- not -- not --
22 not in e-mail form, whether you called him up
23 or he called you?
24 A.    This would have been in response to the
25 real estate transfer, which we would have done

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

Page 70

1   real estate -- a certificate of occupancy for
2   real estate transfer only, allowing the
3   property to transfer from one owner to another
4   in the condition with having a condemnation
5   notice on there.  So there would have been some
6   sort of communication with Luke, letting him
7   know that we needed a letter from him in order
8   to facilitate the township process of
9   initiating the transfer.
10  Q.     Okay.  So that was his initial letter
11  to you, indicating that the transfer has gone
12  from Rockwell Glynn or from whom to whom; do
13  you recall?
14  A.     I do not recall.
15  Q.     Okay.  You received another -- do you
16  know whether or not you responded to that?  I'm
17  not seeing anything between the 25th and the
18  27th, in any other way, like a phone call or a
19  meeting?
20  A.     I don't recall.  Luke followed up on
21  Wednesday of that week, July 27th, 2022 at 8:44
22  in the morning, I guess looking for an answer.
23  So based off of that, I would assume I had not
24  responded to Luke yet.  But --
25  Q.     Okay.  So --

Page 71

1   A.     -- I don't --
2   Q.     -- why don't we --
3   A.     -- recall.
4   Q.     -- read that, "Hi, Kevin."  Second one.
5   A.     "Hi, Kevin.  I wanted to follow-up on
6   this letter so we can get the locks off.  Can
7   you let me know if this is what you were
8   looking for.  If so, I can print it out on
9   letterhead and have it signed back" --
10  Q.     Okay --
11  A.     -- "thanks, Luke Attanasi."
12  Q.     -- so he's talking about the locks that
13  you put on the property or your --
14  A.     The township locks.
15  Q.     The township locks.  Okay.
16         Let's go to the next one.  And this is
17  from you on the 27th at 10:00, a couple of
18  hours later, right?
19  A.     Less than two hours later, yes.
20  Q.     Okay.  Why don't you read that?
21  A.     "Good morning, Luke.  The posed wording
22  is sufficient.  Please submit a signed copy on
23  the company's letterhead.  Also, due to an
24  ongoing property maintenance issue, the
25  township has had to contract out the grass

Page 72

1   cutting for this property.  Please advise on
2   the following; who shall we send the invoice
3   to, please advise when we should cancel the
4   mowing services.  These items will need to be
5   addressed prior to our removing our locks.
6   Kevin."
7   Q.     Okay.  You recall any separate
8   conversations or meetings with Luke Attanasi
9   other than this?
10  A.     I don't recall.
11  Q.     Okay.  And at some point, did they pay
12  the invoice?
13  A.     I believe the invoice was paid.
14  Q.     Okay.  So as I understand this, you
15  sent people to mow the lawn, trim the area, and
16  gave the invoice to him.  He paid the invoice,
17  you took the locks off; is that how it went?
18  A.     That was part of the process.
19  Q.     Okay.  And then the last part of this
20  e-mail chain.  Why don't you read that?
21  A.     Are you referring to the portion from
22  Luke, dated Thursday, 28, July, 2022?
23  Q.     Yes.
24  Q.     At 8:59 p.m.?
25  Q.     Yes.

Page 73

1   A.     All right.  "Hi Kevin.  Attached is a
2   letter signed by the new owner.  Additionally,
3   we can handle cutting the grass immediately.
4   What is the balance outstanding?  I will work
5   on getting you an address to the previous
6   owner."
7   Q.     Okay.  You don't know who exactly he
8   was referring to?
9   A.     I...
10  Q.     Is that right?
11  A.     My assumption would be Ms. Ockley.
12  Q.     Okay.  As part of this exhibit pack on
13  Radnor Defendants Bate Stamp 000043, can you
14  look to that?
15  A.     Yes.
16  Q.     What is that?
17  A.     This is a letter from Jeff Brydzinski,
18  dated July 8th, 2022, addressed to Radnor
19  Township regarding 416 South Ithan Avenue,
20  Villanova, PA 19085.  And it says "To whom it
21  may concern, I am writing this letter about the
22  property located at 416 South Ithan Avenue, in
23  parentheses, the property that I purchased on
24  July 19th, 2022.  I understand that the
25  property -- the current property is deemed

Page 74

1  condemned and unhabitable. At no time will any
2  person live or occupy the property in a current
3  condition. We're in the process OF permitting
4  through Radnor Township to build a new home on
5  the property to commence as soon as possible.
6  In doing so, we will be demolishing the current
7  structure in its entirety to construct the new
8  proposed home on the property. Should you have
9  any questions or want to discuss this matter
10  further, please contact me. Very truly yours,
11  Jeff Brydzinski."
12  Q.     Okay. Was this a letter that was in
13  your individual file?
14  A.     I believe that this was provided by the
15  township as part of the records request.
16  Q.     Okay. Did you ever have an e-mail
17  interaction, text, phone call or in-person
18  interaction with Mr. Brydzinski?
19  A.     Not that I can recall.
20  Q.     Do you recall when you would have seen
21  this July 28th letter?
22  A.     Chances are it would have been on July
23  29th, given the date at which this came in to
24  my e-mail, the date stamp on the e-mail.
25  But...

Page 75

1  Q.     No. I'm referring to the Brydzinski.
2  A.     Yes. So am I.
3  Q.     Okay. So let's look back to that
4  e-mail. What were you looking at?
5  A.     There's, under the letter -- the e-mail
6  that came in from Luke, which I referenced
7  earlier in reading the "Attached is the letter
8  signed by the new owner." There is a date
9  stamped mail received time, Thursday, 28, July
10  2022 at 8:59 p.m. and 22 seconds.
11  Q.     Okay.
12  A.     And there's an attachment indicated in
13  that e-mail.
14  Q.     Oh, okay. So this is the attachment?
15  A.     I'm making that conclusion that the
16  letter that is referenced in Luke's e-mail is
17  what is attached to that e-mail and --
18  Q.     And that's --
19  A.     -- is part of this exhibit.
20  Q.     The July 28th letter to the township,
21  "To whom it may concern" by Brydzinski?
22  A.     Correct.
23  Q.     Okay. Thank you.
24         MR. SCHROM: We'll do the next
25     one.

Page 76

1         (Whereupon, Kochanski-8 was
2          marked as of this date and is attached
3          hereto.)
4  BY MR. SCHROM:
5  Q.     I'm showing you another document marked
6  Kochanski-8. Are you able to identify that
7  one?
8  A.     It's a series of e-mails between myself
9  and Greg Lingo and Luke Attanasi, as well as
10  other members of the Rockwell Development
11  Group.
12  Q.     Okay.
13  A.     It appears to be referencing the
14  outstanding invoices noted earlier regarding
15  the property maintenance for the grass cutting.
16  Q.     Okay. So let's just start from the
17  back of it, which is Radnor 10 or Radnor
18  Defendants 58.
19  A.     Mm-hmm.
20  Q.     That shows an invoice for $230 --
21  A.     Correct.
22  Q.     -- from Tommy's -- oh, regarding this
23  property; is that right?
24  A.     Yes.
25  Q.     Then the next one, 57, is another

Page 77

1  invoice for $2,060, same property, cleaning?
2  A.     Correct.
3  Q.     A third invoice, 345, same property,
4  same company; is that correct?
5  A.     Correct.
6  Q.     Yeah. And so these are the invoices
7  that are being referenced in the e-mails?
8  A.     Yes.
9  Q.     Okay. And ultimately they paid those?
10  A.     I believe they did.
11  Q.     And then you removed the locks?
12  A.     Yes.
13  Q.     Correct?
14         Okay. You did receive -- oh. Let me
15  direct your attention to August 5th. It's an
16  e-mail from you to Greg Lingo. "Importance:
17  High." You want to read that one, please?
18  A.     Is this the one, Friday, August 5th,
19  2022, at 1:22 p.m.?
20  Q.     Yes.
21  A.     All right. "I received an
22  out-of-office response from Luke. I understand
23  that the prior owner is getting released from
24  rehab on Monday and had indicated she is
25  allowed to stay on the property until the

Page 78

1  beginning of September.  The house remains
2  posted as unfit for human occupancy.  Kevin."
3  Q.    Okay.  Do you recall whether or not you
4  have seen any of the orders by that point?
5  A.    I don't recall.
6  Q.    I'd like to direct your attention to
7  the one above it, August 5th at 1:41 to you.
8  A.    Yes.
9  Q.  Can you please read that?
10  A.    "Thank you, Kevin.  She is absolutely
11  not permitted to stay in the home.  She's only
12  permitted to move her stuff out between now and
13  9/1.  We have the property locked up.  I will
14  talk with her attorney and make sure she --
15  make sure that is once again clear."
16  Q.    Okay.  Do you know whether or not that
17  e-mail triggers a memory as to whether or not
18  you saw the orders that we discussed?
19  A.    It does not change my recollection of
20  when I saw the orders.
21  Q.    Okay.  And then finishing up on that,
22  you responded August 5th, 1:50.  "Locks are on
23  the doors.  Basically when the invoice is paid,
24  we'll remove them."  And then the one after
25  that from Greg Lingo indicating:  "Okay, we'll

Page 79

1  bring a check over."
2  A.    Correct.
3  Q.    And then on the top of that there are
4  attachments listed, and you believe that these
5  are the attachments that are listed?
6  A.    References -- the attachments reference
7  Tommy's Paving and Excavating, which are the
8  invoices for the property maintenance.
9  Q.    Okay.  Thank you.
10         (Whereupon, Kochanski-9 was
11         marked as of this date and is attached
12         hereto.)
13  BY MR. SCHROM:
14  Q.    I'm showing you what's previously
15  marked Kochanski-9.  Are you able to identify
16  that?
17  A.    A series of e-mails between myself and
18  members at Rockwell Development.
19  Q.    On or about August 11th through August
20  5th, or August 5th through 11th; is that right?
21  A.    It starts -- actually, the chain of
22  e-mails start July 27th of 2022 from my
23  administrative assistant, Timmy, and ends
24  Thursday, 11, August 2022.
25  Q.    Maybe we're not looking at the same

Page 80

1  thing.
2  A.    Just what you gave me.
3         MS. MALLOY:  This is it.
4  BY MR. SCHROM:
5  Q.    Let's start on 46, which is the last
6  page.
7  A.    Okay.
8  Q.    And let's move over to 45.  This is
9  from you to Greg Lingo, correct?  The one --
10  A.    Which --
11  Q.    -- on the bottom.
12  A.    -- specifically?
13  Q.    August 5th at 1:22.
14  A.    Yes.
15  Q.    Okay.  Do you want to read that into
16  the record, please?
17  A.    This sounds like what I just read into
18  the record.  "I received an out-of-office
19  response from Luke.  I understand that the
20  prior owner's getting released from rehab on
21  Monday and has indicated she is allowed to stay
22  on the property until the beginning of
23  September.  The house remains posted as unsafe
24  for human occupancy."
25  Q.    Okay.  So as of -- as of August 5th,

Page 81

1  you were aware that she would be getting out on
2  Monday, which is the 8th; is that correct?
3  A.    Yes.
4  Q.    Okay.  And you were also aware that
5  there -- or you're saying you're not certain as
6  to whether or not you were aware there was a
7  July 15th court order, you're not sure --
8  A.    My recollection --
9  Q.    -- you saw that?
10  A.    -- hasn't changed on that.
11  Q.    Okay.  Did you ever communicate this
12  information to the police, that Ms. Ockley is
13  getting out on Monday?
14  A.    I don't recall how I became aware of
15  her pending release.  I believe it was from the
16  police department, made us aware.
17  Q.    The police department?  How would they
18  know that?
19  A.    I don't know.
20  Q.    Did you have any communication with any
21  police officer regarding her getting out on the
22  8th or the contents of a message that she's
23  allowed to stay on the property until
24  September?
25  A.    I'm sorry.  Can you rephrase that?  It

Page 82

1  seemed like there were a couple questions in
2  that.
3  Q.      Yeah.  Let me try it again.  This
4  message indicates that you know when she's
5  getting out, correct?
6          MR. GONZALES:  That who knows?
7          MR. SCHROM:  Let me rephrase
8          it.  Thank you.
9  BY MR. SCHROM:
10 Q.      This e-mail dated Friday, August 5th,
11 indicates that you are aware that Ms. Ockley
12 will be released from rehab on Monday the 8th,
13 correct?
14 A.      Correct.
15 Q.      And you also believe, at that point,
16 from a source, that you're not certain, that
17 she is allowed to -- on the property until the
18 beginning of September, correct?
19         MR. GONZALES:  Can you
20         rephrase that question again?
21         MR. SCHROM:  Sure.
22 BY MR. SCHROM:
23 Q.      Do you have an awareness as, you know,
24 in reading this e-mail, that Ockley is allowed
25 to stay on the property until the beginning of

Page 83

1  September?
2          MR. GONZALES:  Objection.
3          That mischaracterizes what he has on
4          this e-mail, which is, she has
5          indicated she is allowed.
6          But you can answer if you
7          know.
8          THE WITNESS:  Correct.  That
9          the e-mail states that Ms. Ockley
10         indicated that she was allowed to stay
11         on the property.
12 BY MR. SCHROM:
13 Q.      Okay.  Did you have a conversation with
14 her prior to that?
15 A.      I don't recall having a conversation
16 with her --
17 Q.      Do you --
18 A.      -- regarding that.
19 Q.      -- know how you received that
20 information?
21 A.      As I stated earlier, I believe I
22 received that inf -- we received that
23 information from the police department.
24 Q.      Okay.  Then you receive, after that, a
25 response from Mr. Lingo.  You want to read that

Page 84

1  into the record, please?
2  A.      The one, August 5th, 2022 at 1:41 p.m.?
3  Q.      Yes.
4  A.      "Thank you, Kevin.  She is absolutely
5  not permitted to stay in the home.  She's only
6  permitted to move her stuff out between now and
7  9/1.  We have the property locked up.  I will
8  talk with her attorney and make sure she --
9  make sure that is once again clear."
10 Q.      Does that refresh any recollection as
11 to a court ord -- any court orders that you may
12 have reviewed at that point?
13 A.      Still does not.
14 Q.      If you would read the one directly
15 above that.
16 A.      "Thanks, Greg.  Township locks are on
17 the doors.  When Luke inquired about putting
18 your locks on, we said we would remove our
19 locks once the property maintenance invoices
20 were paid.  They are attached for your
21 processing."
22 Q.      Okay.  And when he paid them, you
23 removed them but his locks were still on; is
24 that correct, to the best of your knowledge?
25 A.      I am not certain.  I believe that there

Page 85

1  was a second set of locks on the doors.  I'm
2  not certain.
3  Q.      Okay.  That's because you didn't --  do
4  you have any reason to doubt that e-mail?
5  A.      I would have no reason to question that
6  e-mail.
7  Q.      If you would read the e-mail on 44,
8  Radnor Defendants 44, Bates Stamped on the
9  bottom right.
10 A.      Mm-hmm.
11 Q.      Which part?
12 A.      Begins "Kevin, I wanted".
13 Q.      "Kevin, I wanted to update you
14 regarding the -- this property, 416 South Ithan
15 that we purchased and then sold and planned to
16 start construction on -- imminently for the
17 current owner.  We did not unlock the home.  We
18 had turned off utilities to the home.  However,
19 earlier today the prior owner, Simona Ockley,
20 broke into the home and is apparently squatting
21 there.  I called the Radnor Township Police and
22 spoke with Officer Ray Rodden.  Officer Rodden
23 was nice, professional, courteous, but could
24 not do anything this evening to remove her from
25 the property.  I let him know that I was

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 86

```
1   reaching out to you and that we would go
2   through the courts to have her forcibly
3   removed.  Our attorney is drafting the
4   documents this evening and will have them filed
5   with" -- Alocs?
6                   MR. GONZALES:  Alacrity.
7                   THE WITNESS:  "Alacrity."
8           Thank you.  "Please let me know if
9           there is anything else you would like
10          us to do at this time.  Kind regards."
11  BY MR. SCHROM:
12  Q.      Okay.  And when was that sent to you?
13  A.      Received Thursday, August 11th, 2022,
14  at 2:57.
15  Q.      Okay.  Based on that e-mail, did you
16  take any action or direct others to take
17  action?
18  A.      I believe I may have forwarded this
19  e-mail to the township solicitor.
20  Q.      And what if anything did the township
21  solicitor indicate you should do?
22  A.      I do believe there is a response from
23  the solicitor but I don't recall specifically
24  what that is.
25  Q.      Okay.  Was that an e-mail response?
```

Page 87

```
1   A.      I believe it may have been.
2   Q.      Could you again look through your
3   e-mails and see whether or not you can find
4   that e-mail, then give it to counsel and he'll
5   give it -- forwarded it to me?
6                   MR. GONZALES:  Perhaps.  Since
7           it's come from counsel, we'll
8           determine whether it's protected.  But
9           if it's discoverable, we will produce
10          it.
11                  MR. SCHROM:  Understandable.
12                  (Whereupon, a request was
13          made.)
14  BY MR. SCHROM:
15  Q.      Do you know how to pull up documents
16  under the Pennsylvania Unified Judicial System
17  website?
18  A.      Not specifically.
19  Q.      Were you ever given any instruction on
20  that?
21  A.      Not that I can recall.
22  Q.      Do you know whether or not the
23  solicitor viewed the judicial orders?
24  A.      I have no idea.
25  Q.      When you e-mailed him, do you recall
```

Page 88

```
1   any conversation or notation explan --
2   explanation as to how to proceed relative to
3   the orders that were in place?
4   A.      I do not recall.
5   Q.      Do you recall any additional e-mails
6   from Greg Lingo after this e-mail?
7   A.      Not that I can recall.
8   Q.      Or conversation that you had with him?
9   A.      Not that I can recall.
10  Q.      Did you ever have a meeting with him?
11  A.      Not that I can recall.
12  Q.      Did you ever go to the property again?
13  A.      I don't know if I specifically went
14  there.  I probably drove past there just to
15  check on progress.
16  Q.      Did you become aware that the police
17  went out there?
18  A.      Not specifically.
19  Q.      Are you in the same building as the
20  police?
21  A.      We are.
22  Q.      Did anyone from the police department
23  reach out to you regarding this matter?
24  A.      Not that I can recall.
25  Q.      Do you have any awareness of whether or
```

Page 89

```
1   not the police reached out to the solicitor or
2   anybody else regarding the orders?
3   A.      I do not know.
4                   MR. SCHROM:  I would request
5           that you provide a copy of your file
6           to counsel, who will review it.  And
7           we would request all non-privileged
8           documents be provided.
9                   (Whereupon, a request was
10          made.)
11                  MR. SCHROM:  I don't have
12          anything else.
13                  MR. GONZALES:  Todd?
14                  MR. BARTOS:  Mr. Kochanski,
15          just give me a moment.  I'm going to
16          look at my notes, please.
17                  THE WITNESS:  Sure.
18                      - - -
19                  CROSS-EXAMINATION
20                      - - -
21  BY MR. BARTOS:
22  Q.      All right.  Mr. Kochanski, in what way
23  was the property at 416 South Ithan unfit for
24  human occupan -- or I'm sorry, unsafe for human
25  occupancy, if you use that language, in the
```

1  e-mail that you just reviewed with counsel?
2  **A.      Those items were noted in the property**
3  **maintenance violation notice.**
4  Q.      All right.  And that led to the
5  condemnation order?
6  **A.      Correct.**
7  Q.      And in your e-mail of August 5th, 2022,
8  which I think was Kochanski-7 or 8.  It's the
9  Radnor Defendants 45.
10              MS. MALLOY:  9.
11  BY MR. BARTOS:
12  Q.      Where you had e-mailed Mr. Lingo,
13  Ms. Flynn, and an Andy Panik -- Andy --
14              MS. MALLOY:  Pancoast.
15  BY MR. BARTOS:
16  Q.      -- Pancoast.  "I received an
17  out-of-office response from Luke.  I
18  understand the prior" --
19              MR. GONZALES:  Hold on.  Hold
20          on.  Todd, one moment.  The witness
21          does not have the exhibit in front of
22          him to --
23              MR. BARTOS:  I'm sorry.  Let
24          me display it then.  I apologize.
25              MS. MALLOY:  Here.

1              MR. GONZALES:  That's all
2  right.  We have it.
3              MS. MALLOY:  We have it.
4              MR. GONZALES:  We have it.
5              MS. MALLOY:  Exhibit-9.
6              MR. GONZALES:  Yeah.  It's --
7          **THE WITNESS:  I thought he**
8  **said Exhibit-7.**
9              MR. GONZALES:  He did.  But
10  it's for Defendants Radnor page 45; is
11  that what you're reading from?
12              MR. BARTOS:  Yes, I am.
13              MR. GONZALES:  Okay.  That's
14  right.  That's on Exhibit-9.
15              MR. BARTOS:  It should be
16  displayed on the screen now as well.
17              MR. GONZALES:  The screen is
18  very --
19              THE WIT:  Yeah.
20              MR. GONZALES:  -- far from the
21  witness and no one can see it.
22              MR. SCHROM:  Yes.
23              MR. GONZALEZ:  But he has a
24  hard copy in front of him, Todd.
25              MR. BARTOS:  Fair enough.  I

1          appreciate that, John.
2  BY MR. BARTOS:
3  Q.      What was the purpose, Mr. Kochanski --
4  or chanski -- excuse me, Mr. Kochanski, of you
5  placing the sentence, "The house remains posted
6  as, quote, unsafe for human occupancy, close
7  quote?"  As you sit here today, do you recall
8  the reason you wrote that sentence?
9  **A.      Not specifically.  Looking at the**
10  **context of the e-mail, there was concern if it**
11  **was expressed to us that Mr. Ockley was going**
12  **to be staying at the property, it was a**
13  **reminder to -- to Greg that the property was**
14  **still in violation and could not be occupied.**
15              MR. BARTOS:  And what number
16          -- we're on 9?  I guess we can mark
17          this as 10.
18              (Whereupon, Kochanski-10 was
19          marked as of this date and is attached
20          hereto.)
21              MR. BARTOS:  And specifically,
22          Counsel, I'm just looking at what was
23          produced by the Radnor Defendants two
24          days ago, which is Radnor Defendants,
25          I believe that number is 0 --

1              THE VIDEOTAPE TECHNICIAN:  Do
2          we need to move that?
3              MR. GONZALES:  We might.
4              MS. MALLOY:  Go off the
5          record, so I can print that.
6              MR. SCHROM:  Okay.  I'd like
7          to just take a break for a second when
8          he finishes.  Not right now.
9              MR. BARTOS:  Starting with
10  Bates Number 1295.
11              MR. GONZALES:  All right.
12          Hold.  Todd, before you move forward,
13          just, let's go off the record for a
14          second.
15              THE VIDEOTAPE TECHNICIAN:  All
16          right.  Off the record at 12:44.
17              MR. GONZALES:  I think
18          Elizabeth is going to get hard copies
19          of these documents.
20              (Whereupon, a recess was
21          taken.)
22              THE VIDEOTAPE TECHNICIAN:
23          Back on the record at 12:50.
24  BY MR. BARTOS:
25  Q.      Mr. Kochanski, I'm just showing you

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 94

1   what we'll mark as Kochanski-10.  This is a
2   text from, presuming -- it says Patty -- or
3   sorry, Peggy Hagan at the top of this.  And
4   then it's dated Tuesday, August 9th, 2022, 9:11
5   a.m.  In just reviewing this text -- and let me
6   know, you know, if I'm scrolling too fast.  My
7   question simply is:  Do you know whose phone
8   this is from?  That's my first question.
9   A.      This was a text exchange between Peggy
10  and myself on my phone.
11  Q.      And are you the -- the right side, if
12  you will, in the blueish?
13  A.      Correct.
14  Q.      And at the bottom it says "Headed over
15  to pull our locks.  I told her she needs to
16  work through Rockwell but" -- and then in all
17  caps, "Cannot live there."  Does that refresh
18  your recollection at all as to whether you had
19  a conversation with Ms. Ockley on the morning
20  or afternoon of August 9th, 2022?
21  A.      It does indicate that I spoke with
22  Ms. Ockley.  I couldn't tell you if it was that
23  day or a day prior to that.  But yes, this
24  indicated that I did speak with her.
25  Q.      And given how you typically text with

Page 95

1   -- with Peggy, is -- how certain are you that
2   you would have actually told Ms. Ockley in some
3   fashion, whether on the phone or in person, on
4   or around this time, that she was not to live
5   at the residence at 416 South Ithan?
6   A.      How confident am I that I expressed
7   that to her?
8   Q.      Yes.
9   A.      Extremely confident.
10          MR. BARTOS:  That's all I
11       have.  Thank you.
12          - - -
13          REDIRECT EXAMINATION
14          - - -
15  BY MR. SCHROM:
16  Q.      Okay.  You just mentioned that you're
17  extremely confident that she can't live on the
18  property.  Is that based on your condemnation
19  of the property?
20          MR. BARTOS:  Objection to the
21       form.
22          MR. GONZALES:  Yeah.
23       Objection to form.  That's not what he
24       said.  He said he was extremely
25       confident that that's what he said to

Page 96

1        her.
2           MR. SCHROM:  Yes.
3           MR. GONZALES:  Okay.
4           MR. SCHROM:  Yes.
5           MR. GONZALES:  You asked a
6        different question.
7           MR. SCHROM:  Okay.
8   BY MR. SCHROM:
9   Q.      But, yeah.  Just staying with that more
10  a moment.  You were extremely confident
11  regarding that interaction because of what?
12  A.      Because of my response to Ms. Hagan
13  that says I told her, or however it -- I don't
14  have it up.  But that the language that I used
15  in my response to Ms. Hagan indicates that I
16  told Ms. Ockley she was not allowed to live at
17  the property.
18  Q.      Right.  And that was based on the
19  condemnation breach of ordinances, correct?
20  A.      That was based on the condemnation
21  order that was in effect at the time of that
22  conversation.
23  Q.      Meaning that the condemnation -- I
24  don't want to use the term order, you're
25  talking about the ordinances that were -- that

Page 97

1   were broken and in place, correct?
2   A.      The notices that were written and
3   posted on the property --
4   Q.      Right.  All the notices that you posted
5   on the property that we reviewed?
6   A.      Correct.
7   Q.      Is that correct?
8   A.      Yes.
9   Q.      It was not based on the court orders,
10  correct?
11  A.      It would have been based off of the
12  condemnation notice that I issued and posted on
13  the property.
14  Q.      Okay.  But it wasn't based on the court
15  orders; is that correct?
16  A.      I don't know that it was or wasn't.  I
17  deal with the notices that I issued, and that
18  is what, sitting here today, I would have based
19  that statement off of.
20  Q.      Right.  And you don't have a
21  recollection of when you saw the court orders
22  anyway?
23  A.      Still do not.
24  Q.      Okay.  As you sit here today, do you
25  know whether or not a Common Pleas order trumps

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

Page 98

1  a township ordinance violation?
2  **A.      I would defer to our solicitor for that**
3  **determination.**
4  Q.      Do you recall now whether or not, based
5  on all the things that we talked about, that
6  you referred this matter to the solicitor at
7  any point after the initial designation that
8  the property should be condemned?
9  **A.      I don't recall what and when any**
10 **additional conversations would have occurred**
11 **with the solicitor other than what I testified**
12 **a little bit ago that there was communication**
13 **with the solicitor regarding Ms. Ockley's**
14 **release.**
15 Q.      Do you recall any conversation that you
16 had regarding -- with the solicitor regarding
17 an order trumping it, the ordinance violations?
18 **A.      Do not recall.**
19 Q.      As you sit here today, do you have any
20 understanding of whether or not a Township
21 ordinance trumps a Common Pleas order?
22              MR. GONZALES:  Objection.
23          Asked and answered.  He can answer it
24          again.
25              **THE WITNESS:  I would defer to**

Page 99

1              **our solicitor for that.**
2  BY MR. SCHROM:
3  Q.      I'll show you a document marked
4  Kochanski-10 --
5              MS. MALLOY:  This, here.
6              MR. SCHROM:  I thought it was
7          that.
8              MS. MALLOY:  Yeah.  That's his
9          document.
10             THE VIDEOTAPE TECHNICIAN:
11         You're up to 11 now?
12             MR. GONZALES:  Hold on.
13             MS. MALLOY:  No.
14             MR. BARTOS:  11.
15             MS. MALLOY:  Did you do this?
16             MR. GONZALES:  No.  We -- this
17         is 11.  10 is the text message.
18             MR. SCHROM:  Oh.
19             MS. MALLOY:  Oh.  Let me get
20         it.  It's in this.
21             MR. SCHROM:  Yeah.  I didn't
22         see that text message.  Oh, there it
23         is.  Okay.
24             MS. MALLOY:  Just for
25         accuracy, is it the whole --

Page 100

1              MR. SCHROM:  Yeah --
2              MR. GONZALES:  No.  It's this
3  -- this document.
4              MR. SCHROM:  Right.  That's
5  it.
6              MR. GONZALES:  That.  That was
7  10.
8              MR. SCHROM:  Yeah.  It's the
9  same thing.  We went -- we went
10 through it.  He scrolled through it.
11             MR. GONZALES:  Mm-hmm.
12             MR. SCHROM:  Yeah.
13             MS. MALLOY:  So we're up to
14 11.
15             MR. SCHROM:  It's not one
16 document.  It's not one.  It's the
17 whole --
18             MS. MALLOY:  It's this --
19             MR. SCHROM:  -- thread.
20             MS. MALLOY:  No.  He showed me
21 one page.
22             MR. SCHROM:  I know.  But
23 there was a thread.
24             MS. MALLOY:  Are we including
25 the entire thread as the exhibits or

Page 101

1  just this page?
2              MR. GONZALES:  Todd used the
3  exhibit, so it's Todd's call.  But
4  there's only one page of the text
5  exchange between Peggy Hagan and the
6  witness, which was marked as 10.  No
7  other portion of the text message was
8  questioned by Todd.
9          Correct, Todd?
10             MR. BARTOS:  That is correct.
11             MR. GONZALES:  Okay.
12             MR. BARTOS:  And it is just
13 that one page, and it is only -- it's
14 the only page with Ms. Hagan's name at
15 the top.
16             MS. MALLOY:  Yes.  I have that
17 as Exhibit-10.
18             MR. SCHROM:  That's fine.
19             MR. GONZALES:  You got five
20 minutes.
21             MR. SCHROM:  That's it.  I
22 don't have anything additional.
23             MR. GONZALES:  Okay.  You're
24 not going to question anything else?
25         All right.  Todd, any more

KEVIN W. KOCHANSKI, RLA, CZO                                                    JOB NO. 1655055
MAY 21, 2025

Page 102

```
 1   questions?
 2            MR. BARTOS:  No, sir.  Thank
 3   you.  Thank you, Counsel.  Thank you,
 4   Mr. Kochanski.  I appreciate your time
 5   today, sir.
 6            THE WITNESS:  Thank you.
 7            THE VIDEOTAPE TECHNICIAN:
 8   This concludes today's testimony given
 9   by Kevin Kochanski, in the matter of
10   Simona Ockley versus the Township of
11   Radnor, PA, et al.  We are off the
12   record at 12:59.
13            THE COURT REPORTER:  I will
14   get the orders really quickly:
15   Mr. Schrom, do you have a preference
16   of what you want?  Condensed, full,
17   both, electronic?
18            MS. MALLOY:  They give it to
19   us -- they give us everything.  And
20   I'm going to require a rough.
21            MR. GONZALES:  Yes, please.
22   Electronic and mini is fine.  No, I
23   don't need a rough.
24            - - -
25            (Whereupon, the deposition
```

Page 103

```
 1   testimony of KEVIN W. KOCHANSKI, RLA,
 2   CZO was concluded at 12:59 p.m.)
 3            - - -
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 104

```
 1            C E R T I F I C A T E
 2                                )
                                  )
                                  )
 3   _____     )
 4     I, STEPHANIE WELDON, a Notary Public in and
     for the Common Wealth of Pennsylvania, do
 5   hereby certify that before me, by video
     teleconference, personally appeared SCHROM,
 6   SHAFFER & BOTEL, P.C., 4 West Front Street,
     Media, Pennsylvania 19063, the witness herein;
 7   who then was by me first duly worn to testify
     the truth, the whole truth, and nothing but the
 8   truth in the taking of a deposition in the
     cause aforesaid; that the testimony then given
 9   by KEVIN W. KOCHANSKI, RLA, as above set forth
     was reduced to stenotype by me, in the presence
10   of said witness, and
     Afterwards transcribed by computer-aided
11   Transcription under my direction.
12     I do further certify that this deposition was
     taken at the time and place specified in the
13   foregoing caption, and signature was not
     waived.
14
       I do further certify that I am not a relative
15   Of or counsel or attorney for any party hereto,
     Nor am I otherwise interested in the event of
16   this action.
17     IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at
18   SCHROM, SHAFFER & BOTEL, P.C., 4 West Front
     Street, Media, Pennsylvania 19063, on this day
19   of Wednesday, May 21, 2025.
20     The foregoing certification does not apply to
     any reproduction of this transcript in any
21   respect unless under the direct control and/or
     Direction of the certifying reporter.
22
23
24
25   DATED: June 4, 2025a
                Stephanie Weldon
```

Page 105

```
 1        Reporter Name:  Stephanie Weldon
                          - - - - - - -
 2              E R R A T A
 3                          - - - - - - -
 4   PAGE        LINE          CHANGE
 5   - - -       - - -       - - - - - - - - - - -
 6   - - -       - - -       - - - - - - - - - - -
 7   - - -       - - -       - - - - - - - - - - -
 8   - - -       - - -       - - - - - - - - - - -
 9   - - -       - - -       - - - - - - - - - - -
10   - - -       - - -       - - - - - - - - - - -
11   - - -       - - -       - - - - - - - - - - -
12   - - -       - - -       - - - - - - - - - - -
13   - - -       - - -       - - - - - - - - - - -
14   - - -       - - -       - - - - - - - - - - -
15   - - -       - - -       - - - - - - - - - - -
16   - - -       - - -       - - - - - - - - - - -
17   - - -       - - -       - - - - - - - - - - -
18   - - -       - - -       - - - - - - - - - - -
19   - - -       - - -       - - - - - - - - - - -
20   - - -       - - -       - - - - - - - - - - -
21   - - -       - - -       - - - - - - - - - - -
22   - - -       - - -       - - - - - - - - - - -
23   - - -       - - -       - - - - - - - - - - -
24   - - -       - - -       - - - - - - - - - - -
25
```

Page 106

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3

4                  I, [KEVIN W. KOCHANSKI, RLA], do

5         hereby certify that I have read the

6         foregoing pages, and that the same is a

7         correct transcription of the answers given

8         by me to the questions therein propounded,

9         except for the corrections or changes in

10        form or substance, if any, noted in the

11        attached errata sheet.

12

13   DATE

14   _____

15

16   Subscribed and sworn to before me.

17   My commission expires September 2025.

18

19

20

21              Stephanie Weldon

22              Notary Public

23

24

25
```

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**$**

**$2,060** 77:1
**$230** 76:20

**0**

**0** 92:25
**000017** 62:5
**000043** 73:13

**1**

**10** 51:11 76:17 92:17
99:17 100:7 101:6
**10:00** 71:17
**10:17** 4:10
**10:33** 62:4
**10th** 52:18
**11** 79:24 99:11,14,17
100:14
**11:00** 51:11
**11:12** 47:14
**11:40** 47:18
**11th** 65:11 79:19,20 86:13
**124** 51:25 52:4
**1295** 93:10
**12:44** 93:16
**12:50** 93:23
**12:59** 102:12 103:2
**14** 29:23
**15th** 81:7
**19085** 59:17 73:20
**1994** 10:6
**19th** 73:24
**1:22** 77:19 80:13
**1:41** 78:7 84:2
**1:50** 78:22

**1st** 64:1,11,14

**2**

**2** 57:15
**2009** 35:6
**2010** 35:10
**2011** 9:19
**2022** 3:19 14:22 50:9
51:20 57:8 59:18 64:1,11
65:11 66:3,21 70:21 72:22
73:18,24 75:10 77:19
79:22,24 84:2 86:13 90:7
94:4,20
**2023** 66:24
**2024** 67:3
**2025** 4:11 67:5,6
**21st** 4:11 15:5,10 26:1,6
28:15
**22** 35:13 75:10
**22nd** 15:10
**24** 17:3
**25th** 68:21 70:17
**26th** 57:8 59:18
**27th** 70:18,21 71:17 79:22
**28** 72:22 75:9
**28th** 74:21 75:20
**29th** 74:23
**2:24-CV-0470** 4:19
**2:57** 86:14

**3**

**3** 63:20
**30** 67:13,16
**345** 77:3

**4**

**4** 4:22

**4/21** 56:6
**4/21/2022** 56:7
**4/26/22** 3:15,16
**416** 56:14 57:7 59:16 69:5
73:19,22 85:14 89:23 95:5
**44** 85:7,8
**45** 80:8 90:9 91:10
**46** 80:5
**48** 17:3

**5**

**5** 65:16
**55** 3:14
**56** 3:15
**57** 76:25
**58** 76:18
**59** 3:16
**5th** 77:15,18 78:7,22
79:20 80:13,25 82:10 84:2
90:7

**6**

**6** 3:5
**60** 67:16
**61** 3:17
**610 306-5020** 50:1
52:11
**610 688-5600** 52:2
**610 688-5602** 51:24
**62** 3:18
**65** 3:19
**67** 3:20

**7**

**7/15** 54:9,12
**7/19** 54:8

**76** 3:21
**79** 3:22

**8**

**8** 90:8
**8/10** 51:22 52:8
**8/12** 53:18
**8/13** 53:21
**8/9** 49:18 54:12
**89** 3:6
**8:44** 70:21
**8:50** 49:19
**8:57** 51:23
**8:59** 72:24 75:10
**8th** 73:18 81:2,22 82:12

**9**

**9** 3:19 51:11 66:3 90:10
92:16
**9/1** 78:13 84:7
**92** 3:23
**95** 3:5
**9:11** 94:4
**9:25** 52:9
**9th** 50:9,22 51:20 66:10,
12 94:4,20

**A**

**a.m.** 4:10 94:5
**abandoned** 64:15
**absence** 59:2
**absolutely** 78:10 84:4
**access** 20:22 22:25 31:4
63:24 64:9
**accessing** 30:18
**accuracy** 99:25

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**action** 7:21,23 51:6,7
66:2 86:16,17

**activities** 31:20,21

**activity** 37:9

**addendum** 57:20

**additional** 40:19 68:11
88:5 98:10 101:22

**Additionally** 73:2

**address** 25:9 49:1,2,4,7
56:13,17 58:5 73:5

**addressed** 72:5 73:18

**addressing** 25:21

**administration** 9:21

**administrative** 79:23

**adopt** 34:13

**adopted** 13:15,19 32:19
35:8,10

**adopts** 14:8

**advice** 36:10

**advise** 72:1,3

**affect** 43:25

**afternoon** 94:20

**agree** 62:18

**agreed** 4:1

**Air** 8:13 9:25 10:1,2

**Alacrity** 86:6,7

**Alan** 4:24

**allowed** 77:25 80:21
81:23 82:17,24 83:5,10
96:16

**allowing** 31:4 70:2

**Alocs** 86:5

**Ambulance** 3:15 55:22,
24

**amendments** 14:12

**analysis** 43:24 44:1,7,13

**and/or** 17:2 33:8,22

**Andy** 7:4 15:24 16:1,13
17:2,9,14,16,23 18:3,18,20
19:2,10 21:11,19,25 22:9,
11,15 23:2 26:3,23,24
31:12,22 60:14 61:1,4
90:13

**Andy's** 18:25

**animals** 42:23

**answering** 14:15,16,17

**apologize** 90:24

**apparently** 56:15 85:20

**appears** 26:12 63:7
68:4,8 76:13

**applicability** 13:13

**application** 11:8

**applications** 14:17

**applied** 8:15

**approach** 12:14

**approve** 33:8

**approximate** 65:8

**approximately** 51:23

**April** 15:5 24:3 26:1 28:15
57:8 59:17

**architect** 9:11,12

**architecture** 8:10,22

**area** 72:15

**areas** 10:21

**arrested** 31:5

**arrests** 37:10

**arrived** 21:21

**aspects** 43:9

**assigned** 9:22 13:14,24

**assistance** 21:11

**assistant** 22:15 49:25
79:23

**associate** 60:15

**associate's** 8:12

**assume** 51:15 66:11
70:23

**assumption** 73:11

**attached** 20:19 55:13
57:1 59:11 61:9,22 62:25
65:19 67:23 73:1 75:7,17
76:2 79:11 84:20 92:19

**attachment** 75:12,14

**attachments** 79:4,5,6

**Attanasi** 68:12,24 69:15
71:11 72:8 76:9

**attempted** 49:19 52:9

**attend** 32:20,22,25 33:2

**attention** 12:15,18,22
16:23 43:13 63:19 77:15
78:6

**attorney** 54:19,21 78:14
84:8 86:3

**August** 3:19 24:2,4,19
50:9,22 51:20 66:3,10,11,
14 77:15,18 78:7,22 79:19,
20,24 80:13,25 82:10 84:2
86:13 90:7 94:4,20

**authority** 41:19

**Ave** 69:6

**Avenue** 59:16 73:19,22

**aware** 15:8 16:18 27:8,11
28:15,18,19 31:23 32:3,4
35:23 36:2 37:16,18,21
38:24,25 39:5,11,15,20
47:24 48:2,7 49:21 53:15,
17,19,20,22 54:3,6,25
55:4,7 65:2,3,6,9 66:6,9
67:1,21 81:1,4,6,14,16
82:11 88:16

**awareness** 66:20,23
82:23 88:25

---

**B**

---

**bachelor's** 8:8,9

**back** 19:6 20:3,19 22:5
27:23 46:11,17 47:12,18
48:25 71:9 75:3 76:17
93:23

**background** 8:7

**balance** 73:4

**Bartos** 3:6 5:11 36:8
89:14,21 90:11,15,23
91:12,15,25 92:2,15,21
93:9,24 95:10,20 99:14
101:10,12 102:2

**based** 51:5 61:1 65:10
70:23 86:15 95:18 96:18,
20 97:9,11,14,18 98:4

**basically** 43:4 78:23

**basis** 31:23 41:20

**Bate** 73:13

**Bates** 85:8 93:10

**BCO** 9:3

**begin** 4:11

**beginning** 15:7 42:16
43:5 64:23 68:21 78:1
80:22 82:18,25

**Begins** 85:12

**behalf** 5:1,7

**believed** 17:14

**Biehn** 23:18

**Bill** 24:8 51:14,19 61:15

**bit** 98:12

**bits** 20:9

**blocks** 50:5 51:1

**blueish** 94:12

**board** 32:17,19,20 33:4,5
34:12 38:12 60:11

**boss** 31:16

**Botel** 4:22

**bottom** 60:5 80:11 85:9
94:14

**breach** 53:25 96:19

**break** 47:9 93:7

**bring** 79:1

**broke** 85:20

**broken** 42:23 97:1

**brought** 43:13

**Bruno** 24:8 61:15

**Brydzinski** 5:13 29:5
73:17 74:11,18 75:1,21

**build** 74:4

**building** 9:24 11:4,6
13:15,25 14:9 69:11 88:19

**bunch** 22:24

**business** 9:7

**busy** 31:22

---

## C

**call** 15:23,25 16:1,5 17:23 22:14 26:25 42:21 51:11, 23 52:9 68:14 70:18 74:17 101:3

**called** 49:18 52:11 69:22, 23 85:21

**calls** 14:18 46:8 60:2

**cancel** 72:3

**capacity** 41:23,24

**caps** 94:17

**card** 9:8 20:18,25 47:4

**case** 4:16,18 32:8

**cases** 29:20,25 30:4,25

**cert** 67:17

**certainty** 62:8

**certificate** 70:1

**certification** 4:3

**certifications** 8:21 9:2

**certified** 8:24 19:23 20:3,16 27:15,20,21 28:7 58:14,16,18,19,20,25

**cetera** 33:23

**chain** 34:24 68:4,18 72:20 79:21

**Chances** 74:22

**change** 25:11 34:22,23 78:19

**changed** 25:14 81:10

**chanski** 92:4

**characterize** 10:7 11:21,24

**check** 43:1 79:1 88:15

**checked** 59:4

**chief** 60:17

**choice** 40:4

**chose** 45:24

**Chris** 60:15

**circumstance** 48:18

**cite** 44:5

**civil** 66:1

**classes** 8:17

**cleaning** 77:1

**clear** 78:15 84:9

**clerk** 55:5

**client** 51:10

**close** 92:6

**code** 7:3,13,20 13:16,17, 19 14:1,2,3,8,9 31:15 33:13 35:6,7,12 43:9,15 44:4,5,16 45:7,8 61:16

**codes** 9:24 13:13,15,21, 23 14:1,7 23:16 44:9

**College** 8:13

**command** 34:24

**commence** 74:5

**comments** 46:11,13,17, 25

**commercial** 9:4

**commissioner** 19:25 60:6,8,9

**Commissioners** 32:18,19,21 33:5 34:12 38:13

**Common** 35:20 36:5,25 38:23 39:2,8,13,24 63:6 65:25 97:25 98:21

**Commonwealth** 8:23

**communicate** 81:11

**communicated** 52:21

**communication** 68:11 70:6 81:20 98:12

**communications** 27:13 50:7

**community** 8:13 10:19, 22 11:1 12:23 13:11 17:17 22:15

**company** 3:14 55:22,24 56:16 77:4

**company's** 71:23

**compared** 44:5

**complaint** 14:19

**complaints** 14:15,16

**compliance** 14:18 45:9,10

**computer** 48:25

**concern** 16:25 43:12 69:4 73:21 75:21 92:10

**concerns** 15:1,8

**concert** 22:6

**concluded** 103:2

**concludes** 102:8

**conclusion** 75:15

**condemn** 21:9 27:24 44:17,19

**condemnation** 3:16 6:20 7:23 8:1,3 10:15 11:11,15,18 18:10,23 19:7, 12 21:10 23:4 25:7 26:17 27:10 28:22 29:25 30:10 35:1,5 36:20 37:14,20,25 38:8,14,23 39:21,22,25 40:5 41:15,25 42:4,15 43:25 44:23 46:5 53:25 57:6,14,22 61:25 62:15,16, 22 70:4 90:5 95:18 96:19, 20,23 97:12

**condemnations** 31:1 32:2 37:9 39:9,14

**condemned** 22:4 24:10,13 25:8 26:6 27:2 28:16 29:22 30:11,16 31:7 45:14 69:7 74:1 98:8

**Condensed** 102:16

**condition** 69:9 70:4 74:3

**conditions** 15:2 17:1 19:3

**confer** 35:22 43:15

**confident** 95:6,9,17,25 96:10

**conflict** 36:5,24 37:1 39:18

**conscientiousness** 11:22 12:2,4,7,8,11

**conscious** 40:4,11

**consciousness** 12:1

**consistent** 5:24 56:17

**construct** 69:14 74:7

**construction** 11:9 13:19 14:8,10 85:16

**consult** 23:3,7,8

**consultation** 23:13

**contact** 53:6 74:10

**contamination** 46:4

**content** 23:14

**contents** 81:22

**context** 92:10

**continuing** 8:23,25 9:5 43:10

**contract** 71:25

**contractor** 68:13

**control** 40:18

**conversation** 50:3,15, 16,17,20 51:4,5,19 52:18, 24 53:10,16 69:21 83:13, 15 88:1,8 94:19 96:22 98:15

**conversations** 27:7 54:25 69:17 72:8 98:10

**coordination** 61:4

**copies** 19:16 93:18

**copy** 19:24 20:12 21:2 29:2,3,4 61:23 62:1 65:13 71:22 89:5 91:24

**corner** 56:5

**correct** 9:9 16:7,23 18:19,23 21:13 24:15 25:12 26:2,7,14 27:18,25 28:8,12,20 31:17 33:9 34:16 37:1 40:16 42:7 56:6,10 58:5,6,10,22 59:1 60:1,2,18,22 61:21 64:11, 16,17 65:7,13 75:22 76:21

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

77:2,4,5,13 79:2 80:9 81:2
82:5,13,14,18 83:8 84:24
90:6 94:13 96:19 97:1,6,7,
10,15 101:9,10

**corrected** 25:4

**correcting** 25:2

**correctly** 64:2

**correspondence**
21:24 57:19

**correspondences**
3:20,21,22

**couns** 21:1

**counsel** 4:2 5:3 7:2
20:11 21:2,5 47:1 49:11
53:2 68:7 87:4,7 89:6 90:1
92:22 102:3

**County** 63:7 66:1

**couple** 46:8 67:8,12
71:17 82:1

**courier** 29:13 58:8

**courses** 43:8,11

**court** 3:18,19 4:17,25 5:2,
16 6:22 30:18 31:3,8 35:20
39:22 42:5 47:20,22,25
48:8,19 50:4,7 51:1 53:24
54:7,14,19 63:6,8 65:25
66:6,9 81:7 84:11 97:9,14,
21 102:13

**courteous** 85:23

**courts** 86:2

**create** 22:5 33:9

**created** 21:10 35:3 39:12
56:6

**creates** 18:22

**credentials** 9:13

**criteria** 44:10,25

**CROSS-**
**EXAMINATION** 3:6
89:19

**current** 49:24 69:6,9,13
73:25 74:2,6 85:17

**Custom** 68:5

**cut** 24:22

**cutting** 72:1 73:3 76:15

**CZO** 3:3 5:19 103:2

## D

**daily** 31:23

**danger** 61:19

**date** 26:11 48:9 55:13
56:7 57:1 59:11,17 61:9
62:25 65:10,19 67:23
74:23,24 75:8 76:2 79:11
92:19

**dated** 57:7 66:3,9 72:22
73:18 82:10 94:4

**day** 14:13,14 50:23 52:18
56:17,19 94:23

**days** 67:9,15,16 92:24

**deal** 97:17

**deals** 31:12

**dealt** 29:21

**December** 9:19

**decides** 44:17

**decision** 40:11

**decisions** 34:22

**deemed** 64:15 69:7
73:25

**Defendant** 62:5 63:9,23
64:8

**defendants** 5:10 73:13
76:18 85:8 90:9 91:10
92:23,24

**defer** 36:9,21 37:2,4,6
42:2 98:2,25

**deficiencies** 43:15

**degree** 8:8,12

**Delaware** 63:7 66:1

**delineated** 12:24

**demanding** 16:23

**demolishing** 69:12
74:6

**department** 9:2,23
10:19,22 13:14,25 15:1,24

17:17,18 31:22 32:16 33:2
38:4,18 81:16,17 83:23
88:22

**deposed** 7:15

**deposition** 4:12,20
6:10 7:1,8 8:2 64:24 67:7
102:25

**depositions** 5:25

**DESCRIPTION** 3:13

**designation** 9:8 98:7

**detail** 12:15,19,22 60:1

**detailed-oriented**
13:6

**determination** 22:3
43:3 44:2 45:13 98:3

**determine** 43:14 44:4
45:9 48:24 87:8

**determined** 30:1

**development** 10:19,22
11:2 12:24 13:11 17:18
22:16 76:10 79:18

**dictate** 33:20

**differently** 12:14 41:13

**direct** 3:4 6:4 63:19 77:15
78:6 86:16

**direction** 51:8

**directly** 84:14

**director** 9:20 13:11
22:15

**discoverable** 87:9

**discovered** 52:25

**discuss** 74:9

**discussed** 78:18

**display** 90:24

**displayed** 91:16

**district** 4:17,18 54:18,21

**document** 19:2,3 43:14
55:16,20 56:22 57:5,11,12,
20 59:9 61:7,17 62:7,23
63:3,5 65:11,22,24 66:5
67:1,21 68:1 76:5 99:3,9
100:3,16

**documentation** 46:10

**documented** 68:18

**documents** 6:11,13,16
55:10 62:15,17 86:4 87:15
89:8 93:19

**doors** 78:23 84:17 85:1

**doubt** 85:4

**downstairs** 43:1

**drafting** 86:3

**drive** 24:10

**drove** 24:5 88:14

**due** 71:23

**duly** 5:20

**duties** 11:23 12:5,13,17
13:9,10 22:14

**duty** 27:25 32:23

## E

**e-mail** 58:9 68:18 69:18,
22 72:20 74:16,24 75:4,5,
13,16,17 77:16 78:17
82:10,24 83:4,9 85:4,6,7
86:15,19,25 87:4 88:6
90:1,7 92:10

**e-mailed** 87:25 90:12

**e-mails** 3:20,21,22 27:8
46:9,14 68:4 76:8 77:7
79:17,22 87:3 88:5

**earlier** 53:15 67:18 75:7
76:14 83:21 85:19

**early** 6:23

**Eastern** 4:10,17

**education** 9:1,6 43:11

**educational** 8:6

**effect** 35:18 36:1 96:21

**effects** 35:20

**efforts** 13:7

**elected** 60:12

**electric** 43:1

**electrical** 8:16

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

electronic 102:17,22

Elizabeth 93:18

emergency 17:23

employs 13:22,24

empowered 32:1

end 42:16 43:5

ends 79:23

enforcement 7:13,21
13:13 38:14 39:7,13 42:1
43:10

enforcing 38:8

engineering 8:15

ensure 13:12

entire 42:15 57:20 100:25

entirety 57:21 74:7

entity 40:10

equation 44:11

escalating 34:23

estate 25:1,18 69:25
70:1,2

estimate 63:13

et al 4:15 102:11

evening 85:24 86:4

evolving 34:21

exact 8:5

EXAMINATION 3:4
6:4 95:13

examined 5:21

Excavating 79:7

exchange 94:9 101:5

excuse 92:4

executive 49:24

exhibit 61:23 73:12
75:19 90:21 101:3

Exhibit-10 101:17

Exhibit-7 91:8

Exhibit-9 91:5,14

exhibits 100:25

existed 44:4

experience 9:15,17
41:24

explan 88:1

explanation 88:2

expressed 92:11 95:6

extension 51:25 52:4

extent 33:17

extremely 10:9 12:6
95:9,17,24 96:10

---

## F

facilitate 70:8

fair 26:15 31:18 40:2
91:25

fall 13:25

familiar 10:9,10,20,23
11:13,16,17,20 14:20,23
27:12 30:20 31:6,19 38:9
44:8 45:6 52:15 56:2

familiarity 10:8

fashion 95:3

fast 94:6

feel 48:13

fees 24:21

fences 42:24

file 20:5,8,12,20,22 26:10
47:3 59:5 60:21 65:13
74:13 89:5

filed 49:2,3 86:4

files 6:13,17 20:14 48:15

filing 4:2

final 45:13

find 87:3

fine 101:18 102:22

finishes 93:8

finishing 78:21

Fire 3:14 55:22,24 56:16

Flanagan 60:15

Flynn 90:13

focusing 26:1

folder 20:17

follow-up 14:19 16:4
71:5

Force 8:13 10:1

forcibly 86:2

foreseeable 44:2,6

form 4:4 69:22 95:21,23

formal 19:6

formulate 45:10

forward 21:5 93:12

forwarded 53:1 86:18
87:5

frame 15:11 26:8 35:10
50:9

Friday 77:18 82:10

front 4:23 90:21 91:24

full 102:16

---

## G

gave 19:16 72:16 80:2

generally 7:20 31:19

Gerard 5:7

give 20:12,24 21:1,2
41:24 65:16 87:4,5 89:15
102:18,19

giving 33:18

Glynn 5:14 63:8 66:2
70:12

Gonzales 5:9,23 6:1
10:11 30:3,7 33:10,15,17
34:1,5 40:7,21 43:6 44:14,
21 45:2 47:10 54:1 56:23
82:6,19 83:2 86:6 87:6
89:13 90:19 91:1,4,6,9,13,
17,20 93:3,11,17 95:22
96:3,5 98:22 99:12,16
100:2,6,11 101:2,11,19,23
102:21

GONZALEZ 91:23

Good 4:9 5:6 6:7,8 71:21

Gov 33:4

governing 33:5

grass 24:7 61:16 71:25
73:3 76:15

green 19:4 20:18,25 47:3

Greg 28:24 76:9 77:16
78:25 80:9 84:16 88:6
92:13

Grim 23:18

Group 5:12 76:11

Guard 10:3

guess 12:9 22:23 29:23
70:22 92:16

guidance 43:19 46:17

---

## H

habitation 19:5 30:2

Hagan 49:19,20,21,22,23
50:4,8,13,24 51:9,17 52:5,
7,10,18,20 53:5 94:3
96:12,15 101:5

Hagan's 101:14

hand 56:5

handful 7:16

handle 73:3

handled 32:9

handles 31:23

happen 48:17

hard 91:24 93:18

harm 44:2,6

he'll 87:4

head 32:17

Headed 94:14

hereto 55:14 57:2 59:12
61:10 63:1 65:20 67:24
76:3 79:12 92:20

high 12:18 61:16 77:17

hold 8:20 9:1 90:19 93:12
99:12

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**home** 28:7 69:11,14 74:4,
8 78:11 84:5 85:17,18,20

**homeowner** 27:25

**Homes** 68:6

**hospital** 16:10,14,19
26:5,18,20 28:6 29:13
56:19 58:9

**hour** 47:8

**hours** 17:3 71:18,19

**house** 15:3,4 18:16,17,
18,20,21 78:1 80:23 92:5

**housing** 7:25 9:24 11:5
13:17 14:2

**human** 8:14 19:5 30:2
78:2 80:24 89:24 92:6

─────────────

**I**

**idea** 29:18 55:21 87:24

**identify** 5:4 55:18 57:5
59:14 61:12 62:7 63:4
65:23 68:3 76:6 79:15

**imagine** 34:20

**immediately** 19:4 73:3

**imminently** 85:16

**impact** 38:22

**implementation** 39:2

**Importance** 77:16

**important** 64:7

**in-person** 74:17

**include** 11:2,10 37:10

**included** 44:13

**including** 9:23 61:18,
20,23 100:24

**indicating** 48:6 70:11
78:25

**indication** 49:9 57:16
58:14

**individual** 21:12 74:13

**individuals** 44:1

**inf** 83:22

**information** 48:15 59:2
81:12 83:20,23

**initial** 42:19 70:10 98:7

**initiating** 70:9

**inquired** 84:17

**inside** 18:16,17,18,20
60:25

**inspection** 9:4

**inspector** 24:8

**instance** 27:1 52:20

**instances** 30:10

**instructed** 39:17

**instructing** 34:2

**instruction** 87:19

**interact** 37:15

**interaction** 37:8 74:17,
18 96:11

**interactions** 27:5

**interior** 15:2 42:25 61:1

**internally** 22:22

**international** 14:3,7,9
35:7

**interrelated** 56:3

**intersect** 37:15

**invoice** 72:2,12,13,16
76:20 77:1,3 78:23

**invoices** 76:14 77:6
79:8 84:19

**involve** 7:22 10:18,21
14:14

**involved** 7:4,12 9:20
13:1,5 18:24 31:20 37:24
38:16 54:6

**involvement** 7:20 13:4
15:1,7 18:7 19:8

**involves** 34:23

**involving** 12:23

**issuance** 11:8 59:17

**issue** 16:22 24:6,8 46:11
71:24

**issued** 54:23 57:6 59:15
61:14,15 97:12,17

**issues** 42:23 45:11

**item** 32:24 63:19

**items** 72:4 90:2

**Ithan** 56:14 57:7 59:16
69:6 73:19,22 85:14 89:23
95:5

─────────────

**J**

**Jeff** 73:17 74:11

**job** 12:5,16 13:9 30:13
32:1

**John** 5:9 23:18,20 60:19
92:1

**joined** 19:1

**judge** 54:23 55:1

**judge's** 55:3

**judges** 55:6

**judicial** 87:16,23

**Jul** 68:20

**July** 65:11 68:21 70:21
72:22 73:18,24 74:21,22
75:9,20 79:22 81:7

─────────────

**K**

**Kevin** 3:3 4:12 5:19 69:2
71:4,5 72:6 73:1 78:2,10
84:4 85:12,13 102:9 103:1

**keys** 22:24 23:1

**kind** 42:3,14 86:10

**knowledge** 32:9 33:19
35:19 39:4 40:14 41:23
42:7 84:24

**Kochanski** 3:3 4:13
5:19 6:7 89:14,22 92:3,4
93:25 102:4,9 103:1

**Kochanski-** 68:2

**Kochanski-1** 3:14
55:12,17

**Kochanski-10** 3:23
92:18 94:1 99:4

**Kochanski-2** 3:15
56:25 57:4

**Kochanski-3** 3:16
59:10,14

**Kochanski-4** 3:17
61:7,8

**Kochanski-5** 3:18
62:24 63:4

**Kochanski-6** 3:19
65:18,23

**Kochanski-7** 3:20
67:22 68:2 90:8

**Kochanski-8** 3:21
76:1,6

**Kochanski-9** 3:22
79:10,15

─────────────

**L**

**L&i** 9:3

**L.P.** 63:8 66:2

**landscape** 8:9,22 9:11,
12

**language** 89:25 96:14

**late** 20:10

**law** 4:21 5:12 33:20 55:5
66:2

**lawn** 24:22 72:15

**lawsuits** 30:5

**lead** 59:3

**leaks** 43:2

**led** 90:4

**left** 51:18 52:10

**legal** 4:24 37:5 42:3 43:9
61:19,24

**letter** 6:19 27:23 58:17,21
69:4 70:7,10 71:6 73:2,17,
21 74:12,21 75:5,7,16,20

**letterhead** 71:9,23

**letters** 6:18

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**letting** 33:11 70:6

**level** 11:22,25 12:18

**license** 8:22

**limited** 63:24 64:3

**Lingo** 28:22,24 76:9
77:16 78:25 80:9 83:25
88:6 90:12

**list** 41:14

**listed** 79:4,5

**live** 69:8 74:2 94:17 95:4,
17 96:16

**living** 28:10 58:5

**Local** 68:13

**located** 4:22 20:1 60:10
69:5 73:22

**lock** 24:24 61:21

**locked** 78:13 84:7

**locks** 21:19,22 22:1,4,7,
18,24,25 24:2,5,17,19
25:10,15 62:2 71:6,12,14,
15 72:5,17 77:11 78:22
84:16,18,19,23 85:1 94:15

**locksmith** 22:13

**long** 10:4

**look-see** 20:25

**looked** 20:7

**lost** 44:15

**LP** 5:14

**Luke** 68:5,24 69:14,17
70:6,20,24 71:11,21 72:8,
22 75:6 76:9 77:22 80:19
84:17 90:17

**Luke's** 75:16

---

**M**

---

**made** 21:7 22:3 43:3
46:23 47:6 49:14 81:16
87:13 89:10

**mail** 19:23 20:16 27:15
28:7 58:12,16,19 59:1 75:9

**mailer** 20:3

**mailing** 58:14,20

**maintained** 24:23

**maintaining** 8:21

**maintenance** 3:18
6:19 7:24 9:23 11:4 13:16
14:1 18:8 19:13 24:6,7,22
25:7 35:6,7 61:14,15 62:1,
21 71:24 76:15 79:8 84:19
90:3

**make** 24:10 34:22 45:13
62:13,16 78:14,15 84:8,9

**maker** 32:14,15 33:21

**makes** 40:4,11

**making** 75:15

**MALLOY** 54:9 65:16
80:3 90:10,14,25 91:3,5
93:4 99:5,8,13,15,19,24
100:13,18,20,24 101:16
102:18

**managed** 24:12

**management** 8:14

**manager** 19:25 32:17
49:25 51:14,24 60:14

**mark** 92:16 94:1

**marked** 55:13 57:1,4
59:11 61:7,9 62:25 63:4
65:19,23 67:23 68:2 76:2,5
79:11,15 92:19 99:3 101:6

**matter** 4:13 5:25 8:3
36:11 37:5 46:6,20 53:25
54:5 74:9 88:23 98:6 102:9

**matters** 7:11 8:5 11:19
12:23 13:7 23:6 35:24
40:5,6

**meaning** 12:2 42:18
44:11 96:23

**mechanisms** 39:8

**Media** 4:23

**meeting** 68:15 70:19
88:10

**meetings** 32:21,22 33:2
54:6,13 72:8

**meets** 23:15

**members** 76:10 79:18

**memory** 15:6 78:17

**mentioned** 9:25 13:14
95:16

**message** 27:1 52:11
53:11 81:22 82:4 99:17,22
101:7

**messages** 3:23 6:21
51:18 53:1,14

**military** 32:7

**mine** 56:24

**mini** 102:22

**minutes** 101:20

**mischaracterizes**
83:3

**Mm-hmm** 20:2 25:19
28:5 33:25 47:10 76:19
85:10 100:11

**Moira** 60:6

**moment** 13:8 26:2 28:6
63:16 68:19 89:15 90:20
96:10

**Monday** 77:24 80:21
81:2,13 82:12

**months** 66:19 67:12

**morning** 4:9 5:6 6:7,8
70:22 71:21 94:19

**move** 42:25 78:12 80:8
84:6 93:2,12

**mow** 72:15

**mowing** 72:4

**Mulroney** 60:6,8

**multiple** 41:7 61:18

**municipal** 6:19

---

**N**

---

**National** 10:3

**nature** 7:18 23:6,12 27:7
43:11 51:3 53:9,10,11,12,
15

**necessarily** 44:7

**needed** 34:25 70:7

**nice** 85:23

**non-privileged** 89:7

**notation** 88:1

**note** 58:13

**noted** 76:14 90:2

**notes** 48:6 89:16

**notice** 3:15,16,17 18:9,
23 19:7,12,15,19,22 20:20
21:10 23:5,15 24:9 25:7
26:17 27:10,20 28:3,22
29:14 43:17 45:11 46:5,10,
12 57:6,13,21 59:15,22
60:5 61:3,13,18,19,23,24,
25 62:1,21,22 70:5 90:3
97:12

**noticed** 9:25

**notices** 19:7,11 23:4
26:17 27:10 30:11 39:22
42:4 46:4 61:20 97:2,4,17

**notification** 16:24

**notifies** 16:21

**notify** 27:25 58:16

**number** 50:1,2 51:25
52:1,12 55:9 58:17,20
92:15,25 93:10

**number's** 52:15

---

**O**

---

**object** 33:11 41:7

**objection** 34:6 36:8
40:7,21 43:6 44:14 54:1
83:2 95:20,23 98:22

**objections** 4:4

**observed** 59:23 60:3
61:2

**occupan** 89:24

**occupancy** 70:1 78:2
80:24 89:25 92:6

**occupied** 92:14

**occupy** 69:8 74:2

**occurred** 25:18 27:3
30:20 31:7 38:7 42:7 98:10

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

occurs 37:19

**Ockley** 4:14 5:8 14:21
16:6,18 26:4,18 27:1,5,9
28:15,18 29:12,14 35:15
46:6 49:17 50:10,12,14,18,
20 51:20,22 52:9,22 53:6,
16,18 54:5,14 56:10 57:7,
17 58:2 59:16 63:9 66:3
73:11 81:12 82:11,24 83:9
85:19 92:11 94:19,22 95:2
96:16 102:10

**Ockley's** 98:13

**offered** 42:12

**office** 7:5 20:19 32:7
37:3,6 38:20 42:3 43:16,19
45:12

**officer** 15:17,20 16:12,
15,17,21 17:7,21 18:22
19:2 22:3 44:16 81:21
85:22

**officers** 26:3 37:22,24
38:7,10,21 39:16,21 40:16

**Offices** 4:21

**official** 7:3 8:24 19:12
31:14,15 32:14,18 41:2
61:16

**officially** 32:18

**onboard** 9:19

**ongoing** 8:17 71:24

**onsite** 17:7,23,24 19:4

**opinions** 33:19

**opportunity** 6:10

**opposed** 66:19

**ord** 84:11

**order** 3:18,19 36:5,25
38:23 47:21,25 50:7 63:8,
11,14,17 64:19 65:2 66:2,9
69:13 70:7 81:7 90:5
96:21,24 97:25 98:17,21

**orders** 6:22 30:18 31:4,8
35:21 39:3,8,13,18,21,22,
24 42:5 47:22 48:9,19 49:8
50:4 51:2 53:24 54:8,14,
16,19,24 55:1,3 64:25 66:7
78:4,18,20 84:11 87:23
88:3 89:2 97:9,15,21
102:14

**ordinance** 9:21 10:16
13:15 32:15 34:13 36:6,25
98:1,17,21

**ordinances** 9:22 11:11,
14 24:14 32:18 33:9,23
35:21 37:20 38:8 39:19,25
53:25 96:19,25

**organization** 56:1

**orientation** 43:22 44:13

**out-of-office** 77:22
80:18 90:17

**outstanding** 24:21
73:4 76:14

**owner** 24:20 25:20 28:1
29:7,8,9 30:17 31:3 70:3
73:2,6 75:8 77:23 85:17,19

**owner's** 80:20

**ownership** 24:23 25:9,
11

**P**

**p.m.** 72:24 75:10 77:19
84:2 103:2

**PA** 59:17 73:20 102:11

**pack** 73:12

**padlocked** 21:16,18

**paid** 24:21 72:13,16 77:9
78:23 84:20,22

**Pancoast** 7:4 15:25
26:4 60:15 90:14,16

**Panik** 90:13

**parentheses** 73:23

**part** 22:10,11,14 43:10,24
44:1,7,11 46:13 72:18,19
73:12 74:15 75:19 85:11

**participate** 39:1,5

**passing** 33:23

**past** 24:10 66:18 88:14

**Pat** 49:19,20,21

**Patient** 56:9

**Patty** 94:2

**Paving** 79:7

**pay** 72:11

**Peggy** 49:22,23 50:4
51:6,17 94:3,9 95:1 101:5

**pending** 81:15

**Pennsylvania** 4:15,18,
23 8:25 10:2 13:20 23:19
33:13 63:7 66:1 87:16

**people** 29:18 42:10
72:15

**perform** 38:2

**performing** 11:23 12:4,
13

**Perkasie** 23:19

**permit** 14:17

**permits** 11:9

**permitted** 78:11,12
84:5,6

**permitting** 69:10 74:3

**person** 15:12,14 17:15,
16 23:9 28:6,8,10,11 31:4
36:18 41:2,19 60:7 69:8
74:2 95:3

**personal** 63:25 64:10,13

**persons** 15:14 19:17

**phone** 14:17 26:25 46:8
52:15 53:10 68:14 70:18
74:17 94:7,10 95:3

**photographs** 6:20
26:11

**photos** 26:11 61:22

**picture** 61:21 62:4,8,13

**pictures** 61:18 62:2

**piece** 57:18

**pieces** 20:9

**placard** 19:5

**place** 4:21 35:13 36:14
37:8 53:23 88:3 97:1

**placing** 92:5

**plaintiff** 5:8 63:9 64:16

**plan** 9:5

**planned** 85:15

**Pleas** 35:21 36:5,25
38:23 39:2,8,13,24 63:6
65:25 97:25 98:21

**plumbing** 9:3,5

**pluming** 9:4

**point** 17:12,24 21:15
47:24 48:2 53:7 72:11 78:4
82:15 84:12 98:7

**pole** 42:15

**police** 14:25 15:15 16:5,
25 17:4,7,10 37:9,15,18,
19,22 38:7,12,13,18 39:14
41:14 43:22 53:18,20
56:16 60:16 81:12,16,17,
21 83:23 85:21 88:16,20,
22 89:1

**policies** 10:8,12,14,16,
18,20 32:13 34:18

**policy** 32:14,16 33:21
34:21 35:2,18 36:1,2,4,14
37:7,13,16

**poll** 42:17

**portion** 72:21 101:7

**posed** 71:21

**position** 8:18 13:11
31:10

**possibly** 7:3 28:9,13
31:12

**post** 18:8 19:4,22 20:19
28:3

**posted** 19:20 21:12 24:3
28:16 29:3 57:23,25 61:20
78:2 80:23 92:5 97:3,4,12

**posting** 58:13

**Power** 4:24

**preference** 102:15

**preparation** 6:9 7:1
67:7

**prepare** 19:6,10 46:10

**prepared** 61:3

**present** 16:7,8 17:5,10

**presuming** 94:2

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**Prete** 5:13

**Pretty** 11:16,20

**previous** 73:5

**previously** 7:9 30:21 55:17 58:7 63:3 65:22 68:1 79:14

**primarily** 25:16

**primary** 25:25

**print** 71:8 93:5

**prior** 5:25 30:17 31:3 72:5 77:23 80:20 83:14 85:19 90:18 94:23

**priority** 42:15

**probability** 58:25

**procedure** 16:21 27:19 34:21 42:16 48:11 53:23

**procedures** 11:18 32:13 34:15,17,18 37:14, 25 38:15 41:15,25

**proceed** 35:23 43:18 88:2

**process** 22:10,12 69:10 70:8 72:18 74:3

**processing** 84:21

**produce** 87:9

**produced** 92:23

**professional** 85:23

**progress** 88:15

**properties** 30:11,16

**property** 3:18 6:18 7:24 9:23 11:4 13:16 14:1,21,24 15:9 16:2 17:1,3 18:3,5,8, 10,12,14,15 19:3,12,20,21 21:12,16,18,20,22 22:1,2,4 23:23 24:4,5,6,7,9,13,20, 21 25:6,8 26:3,4,5 27:2,24 28:1,3,11,16 29:3,21 30:1, 17,19 31:2,7 35:5,7,16 42:22,25 43:25 44:17,19 45:14,18,19,22,24 48:1 51:8 53:18,21 57:14,24 58:1,12 59:23 60:20 61:13, 15,25 62:20 63:24,25 64:9, 10,13,14 69:5,7,9,12 70:3 71:13,24 72:1 73:22,23,25 74:2,5,8 76:15,23 77:1,3,

25 78:13 79:8 80:22 81:23 82:17,25 83:11 84:7,19 85:14,25 88:12 89:23 90:2 92:12,13 95:18,19 96:17 97:3,5,13 98:8

**property's** 20:1 24:11 60:10

**proposed** 74:8

**protected** 87:8

**protocols** 41:14

**provide** 38:18 42:3 43:22 46:10 47:1 49:10 68:7 89:5

**provided** 42:13,17 46:17,20 68:8 74:14 89:8

**provisions** 44:3

**pull** 49:6 87:15 94:15

**pulled** 48:25

**purchase** 69:5

**purchased** 73:23 85:15

**purpose** 92:3

**put** 20:20 21:19,25 22:4,7, 17 34:6 49:9 56:24 58:16, 18 71:13

**putting** 84:17

---

## Q

**question** 12:10 37:11 41:6,11 55:5 63:23 82:20 85:5 94:7,8 96:6 101:24

**questioned** 101:8

**questions** 4:5 14:16 32:12 33:12 74:9 82:1 102:1

**quick** 47:8

**quickly** 28:5 102:14

**quote** 92:6,7

**quote/unquote** 40:25

---

## R

**R-I-C-E** 23:21

**Radnor** 3:14 4:15 5:10 9:18 10:8 12:17 13:21 16:13,21 33:22 55:22,24, 25 56:15 62:5 73:13,18 74:4 76:17 85:8,21 90:9 91:10 92:23,24 102:11

**rate** 12:3,5,16,20,21,25 13:2

**Ray** 85:22

**reach** 88:23

**reached** 15:16 50:13,24 89:1

**reaching** 52:21 86:1

**read** 6:2 37:13 63:16,22 64:1,7 68:25 71:4,20 72:20 77:17 78:9 80:15,17 83:25 84:14 85:7

**reading** 75:7 82:24 91:11

**reads** 64:12

**real** 25:1,17 69:25 70:1,2

**reason** 25:14,23,25 28:14 85:4,5 92:8

**recall** 6:23 7:7 8:4 15:22 16:16 18:1,4 19:18 20:4 21:23 30:21 35:8 38:1,17 40:1,15 43:23 46:21 48:5, 10 50:6,19 51:3,21 52:17, 19 54:13,15,17,18 55:19 63:12 66:4,16,17 67:4,20 68:16 70:13,14,20 71:3 72:7,10 74:19,20 78:3,5 81:14 83:15 86:23 87:21, 25 88:4,5,7,9,11,24 92:7 98:4,9,15,18

**receive** 16:1,24 37:22 38:10 39:21,23 40:16,19, 20 77:14 83:24

**received** 15:23,25 19:19 27:22 42:11 46:15 64:19, 20 70:15 75:9 77:21 80:18 83:19,22 86:13 90:16

**recently** 6:21 20:9 21:24 52:25

**recess** 47:15 93:20

**recognize** 51:25 52:14, 16

**recollection** 53:3 56:18 64:18 67:2 78:19 81:8 84:10 94:18 97:21

**record** 4:10 34:7 47:14, 18 68:25 80:16,18 84:1 93:5,13,16,23 102:12

**recorded** 4:12

**records** 74:15

**REDIRECT** 95:13

**reference** 69:4 79:6

**referenced** 59:25 75:6, 16 77:7

**References** 79:6

**referencing** 76:13

**referred** 98:6

**referring** 10:13 25:5 41:1,4 51:15 72:21 73:8 75:1

**refresh** 15:6 64:18 84:10 94:17

**refuse** 64:16

**registered** 8:21 9:11,12

**regular** 19:23 58:12,19

**regulations** 35:4

**rehab** 77:24 80:20 82:12

**relate** 10:15 11:14,18 14:7 35:15 37:19 39:9 53:24 56:14

**related** 8:3 11:11 25:4 30:18 40:5 51:1

**relates** 14:4 33:1 35:19, 20 37:13 44:22 46:6 56:12

**relative** 12:4,16 13:3 15:6 36:19 37:24 38:21,23 39:13,24 41:23 43:24 47:25 88:2

**release** 81:15 98:14

**released** 77:23 80:20 82:12

**relevant** 48:14

**remaining** 64:14

**remains** 78:1 80:23 92:5

KEVIN W. KOCHANSKI, RLA, CZO                                    JOB NO. 1655055
MAY 21, 2025

**remember** 48:4 52:23
53:8 69:21

**reminder** 92:13

**removal** 50:5 51:1

**remove** 24:17 63:25
64:10 78:24 84:18 85:24

**removed** 24:1,4,19,24
25:15 64:15 77:11 84:23
86:3

**removing** 72:5

**rental** 7:25 9:24 11:5
13:17 14:2

**repeat** 39:10 41:11

**rephrase** 66:19 81:25
82:7,20

**report** 22:5

**reporter** 4:25 5:16
102:13

**Reporting** 5:2

**represent** 5:5 15:5
17:22 49:17 51:10,22 52:8
56:5

**representing** 5:12

**request** 20:11,13,24
21:6 41:21 46:23 47:2,5
49:6,13 74:15 87:12 89:4,
7,9

**requested** 29:2 46:16

**requesting** 49:11

**require** 102:20

**requirements** 8:23
9:1,6 23:15

**requires** 44:5

**reserved** 4:5

**residence** 95:5

**residents** 14:16

**resource** 8:14

**respond** 15:16 16:4
17:4,22

**responded** 17:6,8,9
20:15 53:7 70:16,24 78:22

**responding** 14:15

**response** 69:24 77:22
80:19 83:25 86:22,25
90:17 96:12,15

**responses** 69:19

**responsibilities**
57:17

**responsibility** 28:2

**responsible** 25:21
32:25 33:21,22

**return** 23:22

**review** 6:11,22 9:5 46:16
89:6

**reviewed** 62:15 64:25
65:1 84:12 90:1 97:5

**reviewing** 14:17 94:5

**Rice** 23:18,21 60:19

**rights** 57:16,17

**risk** 63:25 64:10

**RLA** 3:3 5:19 9:8 103:1

**road** 42:24

**rock** 50:5

**rocks** 42:24

**Rockwell** 5:13 63:8 66:2
68:5 70:12 76:10 79:18
94:16

**Rodden** 85:22

**role** 31:14 49:24

**rough** 102:20,23

**rules** 35:4

---

# S

**scale** 11:24

**scanned** 48:9,20

**scene** 17:22

**Schrom** 3:5 4:21 5:6,7,
24 6:6 10:14,25 21:4,8
30:6,8,9 33:14,16,25 34:4,
8,14 36:12 40:13 41:9
43:20 44:20,22 45:15
46:22 47:7,11,19 49:5,16
54:4,10,11 55:15 57:3
59:13 61:6,11 63:2 65:21

67:25 75:24 76:4 79:13
80:4 82:7,9,21,22 83:12
86:11 87:11,14 89:4,11
91:22 93:6 95:15 96:2,4,7,
8 99:2,6,18,21 100:1,4,8,
12,15,19,22 101:18,21
102:15

**science** 8:9

**sciences** 8:15,16

**screen** 91:16,17

**scrolled** 100:10

**scrolling** 94:6

**sealing** 4:2

**seconds** 75:10

**sections** 45:8

**send** 19:22 27:19 28:2
72:2

**sentence** 92:5,8

**separate** 22:13 56:1
59:25 72:7

**September** 64:1,11,14
78:1 80:23 81:24 82:18
83:1

**series** 14:9 76:8 79:17

**services** 72:4

**set** 33:12 35:5 41:13 85:1

**sewer** 43:1

**Shaffer** 4:22

**show** 47:20 55:9 62:23
99:3

**showed** 100:20

**showing** 55:16 56:21
59:8 61:6 63:3 65:22 68:1
76:5 79:14 93:25

**shows** 61:17 76:20

**side** 31:13 94:11

**sign** 6:2

**signature** 57:9 59:20

**signed** 19:11 27:17,22
71:9,22 73:2 75:8

**similar** 52:1

**Simona** 4:14 5:7 56:9
57:7 59:16 63:9 66:3 85:19
102:10

**simply** 94:7

**Sincerely** 69:14

**sir** 102:2,5

**sit** 92:7 97:24 98:19

**site** 6:20 14:18 15:11,13
16:5 17:5,19 18:25

**sitting** 97:18

**situation** 48:14

**slightly** 41:12

**sold** 30:17 85:15

**solicitor** 19:24 23:7,17
35:23 36:10,22,23 45:17,
20,23 46:2,16,25 54:15
60:20 86:19,21,23 87:23
89:1 98:2,6,11,13,16 99:1

**solicitor's** 37:2,6 42:3
43:16,19 45:12

**sort** 70:6

**sounds** 80:17

**source** 82:16

**South** 56:14 57:7 59:16
69:6 73:19,22 85:14 89:23
95:5

**speak** 13:6 16:15,16
18:24 40:9,17 49:19 94:24

**speaking** 16:17 50:18

**speaks** 57:13

**specific** 36:1 37:21 39:7
41:2 48:13 50:19 60:2

**specifically** 6:24 7:17
8:4 10:15 19:18 23:11 26:9
35:9 36:4 46:7 59:24
66:12,22,25 80:12 86:23
87:18 88:13,18 92:9,21

**specifics** 68:17

**spoke** 27:6 54:23 85:22
94:21

**spoken** 50:9,11 54:20

**spring** 14:22

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**Spruce** 5:12

**squatting** 85:20

**staff** 19:2 22:17 54:23
55:2,3

**stamp** 26:11 73:13 74:24

**stamped** 48:9 75:9 85:8

**standards** 44:18

**start** 68:20 76:16 79:22
80:5 85:16

**started** 26:9

**Starting** 93:9

**starts** 79:21

**state** 5:4 8:25 9:3

**stated** 83:21

**statement** 26:15 62:18
97:19

**states** 4:16 83:9

**stay** 77:25 78:11 80:21
81:23 82:25 83:10 84:5

**staying** 92:12 96:9

**Steno** 5:2

**step** 42:19,20

**Stephanie** 4:25

**stopped** 68:16

**store** 22:23

**Street** 4:23

**structure** 69:13 74:7

**stuff** 78:12 84:6

**submit** 71:22

**submitted** 20:14

**subsequent** 69:19

**subsequently** 16:17

**sufficient** 71:22

**summarize** 9:16 57:10

**summarized** 53:13

**superintendent** 60:16

**swear** 5:16

**sworn** 3:3 5:20

**system** 48:22 49:8,10
87:16

---

**T**

**taking** 4:20 43:8

**talk** 6:25 45:11,17 51:17
55:2 78:14 84:8

**talked** 46:2 50:14 60:14,
19 98:5

**talking** 13:3 30:4 44:15,
18 54:15,18 71:12 96:25

**talks** 60:25

**TECHNICIAN** 4:8 5:15
47:13,17 93:1,15,22 99:10
102:7

**telephone** 50:1

**term** 9:15 40:22 44:8
96:24

**terminology** 11:3

**terms** 10:9 12:10,15
43:16

**testified** 5:21 98:11

**testimony** 7:19 102:8
103:1

**text** 3:23 6:21 27:1 53:1,
11,14 58:9 74:17 94:2,5,9,
25 99:17,22 101:4,7

**Thatcher** 23:18

**thing** 80:1 100:9

**things** 12:21 31:22 34:22
98:5

**thinks** 16:22

**third-party** 22:19

**thought** 64:24 91:7 99:6

**thread** 100:19,23,25

**Thursday** 72:22 75:9
79:24 86:13

**time** 4:6,10 5:3 15:11 16:6
19:21 20:7 26:8,13 27:16
30:12 35:2,10 50:9,11
56:20 60:3,23 63:10 66:14
69:8 74:1 75:9 86:10 95:4
96:21 102:4

**times** 7:14,16 24:3 32:6
34:16 41:7 46:2 67:19

**Timmy** 79:23

**today** 48:24 64:23 67:7
85:19 92:7 97:18,24 98:19
102:5

**today's** 6:9 102:8

**Todd** 5:11 89:13 90:20
91:24 93:12 101:2,8,9,25

**Todd's** 101:3

**told** 16:15 53:17,20 94:15
95:2 96:13,16

**Tommy's** 76:22 79:7

**top** 62:3 79:3 94:3 101:15

**township** 4:14 9:18
10:8,16 12:17,20,22 13:24
15:13 16:13,22 19:24
20:14 23:7 31:15 32:13,15,
17 33:6,22 34:19 35:11,22
36:6,10,21,23 40:3,10,15,
18,22,25 41:3,18,19 44:16
48:12 49:18,25 51:13,14,
24 52:1 55:25 56:3 60:14,
20 68:9,14,15 69:10 70:8
71:14,15,25 73:19 74:4,15
75:20 84:16 85:21 86:19,
20 98:1,20 102:10

**township's** 13:4

**train** 38:13,21 40:4,5

**trained** 39:17

**training** 32:7 37:17,18,
21,24 38:2,7,9,17,18 39:1,
5,7,12,15,20,24 40:16,19,
20 42:4,10

**transfer** 25:1,17 69:25
70:2,3,9,11

**transferred** 24:20,23
31:2

**transpired** 17:11 26:6

**trees** 42:24

**trial** 4:6

**triggers** 78:17

**trim** 72:15

**trumping** 98:17

**trumps** 97:25 98:21

**Tuesday** 94:4

**turn** 49:11

**turned** 85:18

**twelve** 30:14,15

**typed** 49:1

**typical** 14:13 27:19

**typically** 7:13,22 13:25
17:4 19:19 20:18 22:17
23:6 26:11 32:4 33:3 45:23
46:9 49:3 58:18 94:25

---

**U**

**U.S.** 19:22

**UCC** 13:16,18 14:1

**Uh-huh** 22:20

**ultimate** 42:20

**ultimately** 31:5 33:8
34:13 69:11 77:9

**umbrella** 11:2 55:25

**underlying** 23:16

**understand** 11:25 21:9
33:16 34:8 37:11 69:6
72:14 73:24 77:22 80:19
90:18

**Understandable** 87:11

**understanding** 12:10
24:24 28:17 33:18 40:3
53:14 98:20

**unfettered** 63:24 64:9

**unfit** 19:5 30:1 78:2 89:23

**unhabitable** 69:7 74:1

**Unified** 87:16

**Uniform** 13:19 14:8

**United** 4:16

**unlimited** 64:5,6,8

**unlock** 85:17

**unsafe** 80:23 89:24 92:6

KEVIN W. KOCHANSKI, RLA, CZO
MAY 21, 2025

JOB NO. 1655055

**unusual** 32:3

**update** 85:13

**updated** 34:15 35:3

**upper-right** 56:4

**upstairs** 43:1

**urgency** 44:10,12,25
45:6

**urgent** 44:12

**utilities** 85:18

---

**V**

---

**variety** 13:23 61:22

**vary** 10:18,23

**venued** 4:16

**verify** 23:14

**version** 64:5

**versus** 4:14 39:24 66:2
102:10

**vertical** 11:9

**video-** 4:11

**videos** 6:11,15

**VIDEOTAPE** 4:8 5:15
47:13,17 93:1,15,22 99:10
102:7

**viewed** 87:23

**Villanova** 59:17 73:20

**violation** 3:16,17 6:18,
19 18:9 19:7,15 24:8,14
27:21 43:17 59:15,22
61:13,19,24 62:1,21 90:3
92:14 98:1

**violations** 25:2,3,22
44:4 60:3 62:9 98:17

**visit** 15:13 16:5 18:25
59:23 60:4

**visited** 15:11 17:19

**visits** 14:18

---

**W**

---

**waived** 4:3

**walk** 13:10 18:2 42:21

**wanted** 71:5 85:12,13

**ward** 20:1 60:9

**warranted** 22:18 43:18

**water** 43:2

**website** 87:17

**Wednesday** 70:21

**weeds** 25:4 61:16

**week** 20:10 70:21

**Weldon** 5:1

**West** 4:22

**White** 51:12,14,18,19
52:6 60:13

**William** 60:13

**WIT** 91:19

**wondered** 44:23

**wording** 71:21

**words** 57:19

**work** 9:15,16 73:4 94:16

**worked** 19:10

**works** 42:16

**writing** 23:3 43:17 69:4
73:21

**written** 32:12 36:1,2,3,14
37:12,16 97:2

**wrote** 60:23 92:8

---

**Y**

---

**years** 8:5 29:23

**yellow** 61:19

---

**Z**

---

**zoning** 8:24 9:21 11:4
13:15 14:2