# EXHIBIT 5

# Deposition Transcript

Case Number: 2:24-cv-04070-GAW
Date: March 27, 2025

In the matter of:

## Ockley v Township of Radnor, Pennsylvania, et al.

# JEFFREY BRYDZINSKI



**CERTIFIED COPY**

Reported by:
KIMBERLY WENDT

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1            IN THE UNITED STATES COURT

 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3               CIVIL ACTION - LAW

 4                    -   -   -

 5  SIMONA OCKLEY          :   Case 2:24-cv-04070-GAW
                           :
 6            Plaintiff :
                           :
 7           vs.           :
                           :
 8  TOWNSHIP OF RADNOR,    :
    PENNSYLVANIA           :
 9          and           :
    JENNIFER COCCO in her  :
10  individual capacity    :
            and           :
11  JOSEPH PINTO in his    :
    individual capacity    :
12          and           :
    BRADY MCHALE in his    :
13  individual capacity    :
            and           :
14  BRIAN BROWN in his     :
    individual capacity    :
15          and           :
    JEFFREY BRYDZINSKI     :
16          and           :
    TYLER PRETE            :
17          and           :
    ROCKWELL-GLYNN, LP     :
18                         :
              Defendants :
19

20                    -   -   -

21           Thursday, March 27, 2025

22                    -   -   -

23        Sworn videotaped deposition of JEFFREY

24  BRYDZINSKI, was held at the offices of Schrom,

25  Shaffer & Botel, P.C., 4 West Front Street, Media,
```

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

**Page 2**

```
1   Pennsylvania commencing at 10:02 a.m. on the above
2   date before Kimberly Wendt, RPR, a Certified
3   Shorthand Reporter and Notary Public in and for the
4   State of Pennsylvania.
5                     -   -   -
6                     STENO
                 Concierge@Steno.com
7              888-707-8366
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   APPEARANCES:
2
3   FOR THE PLAINTIFF:
4            SCHROM, SHAFFER & BOTEL, P.C.
             BY:  GERARD SCHROM, ESQUIRE
5            4 West Front Street
             Media, PA 17543
6            610-565-5050
             Gschrom@schromandshaffer.com
7
8   FOR THE DEFENDANTS:
9            SPRUCE LAW GROUP
             BY:  TODD BARTOS, ESQUIRE
10           1622 Spruce Street
             Philadelphia, PA 19103
11           267-546-0600
             Tb@sprucelaw.com
12           Counsel for Jeffrey Brydzinski,
             Tyler Prete, Rockwell-Glynn, LP
13
14           MARSHALL DENNEHEY
             BY: D. CONNOR WARNER, ESQUIRE
15             JOHN P. GONZALES, ESQUIRE
             2000 Market Street
16           Suite 3200
             Philadelphia, PA 19103
17           215-575-2871
             Jpgonzales@mdwcg.com
18           Counsel for Township of Radnor,
             Pennsylvania, Jennifer Cocco,
19           Joseph Pinto, Brady McHale and
             Brian Brown
20           (Attending via Zoom)
21
22   ALSO PRESENT:
23           Neil Botel, Esquire
24           Elizabeth Malloy
25           Alan Paller - Videographer
```

**Page 4**

```
1                I N D E X
2
3   WITNESS                                    PAGE
4   JEFFREY BRYDZINSKI
5      By:  Mr. Schrom                         7
6      By:  Mr. Bartos                         168
7
                 E X H I B I T S
8
9   NUMBER            DESCRIPTION             PAGE
10  P-1 Brydzinski    LinkedIn Profile        16
11  P-1A Brydzinski  LinkedIn Expanded Profile 20
12  P-2 Brydzinski    Agreement of Sale       82
13  P-3 Brydzinski  Radnor Township EMS Report 83
14  P-4 Brydzinski  Radnor Township PD Report 85
15  P-5 Brydzinski    Photo of Legal Notice   87
16  P-6 Brydzinski    Condemnation Notice     89
17  P-7 Brydzinski  Radnor Township Notice of 93
                     Violation 4/27/22
18
    P-8 Brydzinski    Amendment to Agreement  94
19                    of Sale
20  P-9 Brydzinski  Rockwell-Glynn Complaint  95
21  P-10 Brydzinski  Transcript of Proceedings 101
22  P-11 Brydzinski      7/15/22 Order        114
23  P-12 Brydzinski    Agreement of Sale      118
                    Rockwell-Glynn/Brydzinski
24
    P-13 Brydzinski       Deed                129
25
```

**Page 5**

```
1   P-14 Brydzinski  Kochanski-Attanasi Letter 129
2   P-15 Brydzinski  Handwritten Ockley Motion 132
3   P-16 Brydzinski      8/9/22 Order         133
4   P-17 Brydzinski    Incident Report 8/9/22 138
5   P-18 Brydzinski    Lingo-Kochanski Email  139
6   P-19 Brydzinski   Incident Report 8/12/22 141
7   P-20 Brydzinski     Supplemental Incident 147
                       Report 8/12/22
8
    P-21 Brydzinski     8/12/22 Herman Letter 151
9
    P-22 Brydzinski   Police Criminal Complaint 154
10
    P-23 Brydzinski  Order Granting Plaintiff's 156
11               Motion for Reconsideration
12  P-24 Brydzinski     8/22/22 Herman Letter 162
13  P-25 Brydzinski      Criminal Docket      164
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1              -    -    -
2              MR. BARTOS:  Same stips?
3              MR. SCHROM:  Yes, that's fine.
4              VIDEOGRAPHER:  Good morning.  We
5    are going on the record at 10:02 a.m.
6    Eastern Time on March 27, 2025 to begin
7    the deposition of Jeffrey Brydzinski in
8    the matter of Simona Ockley versus The
9    Township of Radnor Pennsylvania, et. al.
10   This case is venued in the United States
11   District Court for the Eastern District of
12   Pennsylvania, case number 2:24-cv-04070.
13   This deposition is taking place at the Law
14   Offices of Schrom, Shaffer and Botel
15   located at 4 West Front Street, Media,
16   Pennsylvania.
17             The legal videographer is
18   Alan Paller, and the court reporter is
19   Kim Wendt.  We are here on behalf of
20   Steno Court Reporting.  At this time
21   would counsel, please, identify
22   yourselves and state whom you represent?
23             MR. SCHROM:  Gerard Schrom,
24   S-C-H-R-O-M, ID number 39282, on behalf of
25   plaintiff Simona Ockley.

Page 7

1              MR. BARTOS:  Todd Bartos with
2    Spruce Law Group representing Mr. Prete,
3    Mr. Brydzinski and Rockwell-Glynn, LP.
4              MR. WARNER:  David Connor Warner
5    with Marshall Dennehey representing
6    defendants Township of Radnor, Jennifer
7    Cocco, Joseph Pinto, Brady McHale and
8    Brian Brown.
9              VIDEOGRAPHER:  The court
10   reporter will swear in the witness.
11             -    -    -
12             JEFFREY BRYDZINSKI, after having
13        been duly sworn, was examined and
14        testified as follows:
15             -    -    -
16   BY MR. SCHROM:
17   Q.     Good morning, Mr. Brydzinski.  How do
18   you --
19   A.     Good morning.
20   Q.     -- say your last name, pronounce it?
21   A.     You said it right.
22   Q.     Oh, I did?
23   A.     Yes.
24   Q.     Good.  Anyway, please state your name,
25   spell the last, if you would?

Page 8

1    A.     Jeffrey Brydzinski, B-R-Y-D-Z-I-N-S-K-I.
2    Q.     Okay.  And your present address?
3    A.     416 South Ithan Avenue, Villanova,
4    Pennsylvania.
5    Q.     Okay.  And the cell number that you were
6    using during the time of this incident?
7    A.     The telephone number?
8    Q.     Yes.
9    A.     215-888-9554.
10   Q.     Did you have a private email that you used
11   during this time?
12   A.     I do have a private email.  I don't know
13   if I used it or not.
14   Q.     Okay.  And what would that be?
15   A.     JBrydzinski@Gmail.com.
16   Q.     Okay.  And at the time of this interaction
17   were you married?
18   A.     Yes.
19   Q.     I'd like to go through just your
20   educational and work experience background, so if
21   you would start with your educational background?
22   A.     How far do you want me go?
23   Q.     You can start wherever.  I know that when
24   I was thinking about becoming a member of the
25   Delaware Bar they wanted references from grammar

Page 9

1    school.  The application was -- process was about
2    that thick.  That was enough to dissuade me.
3    Anyway, wherever you want to start?
4    A.     Okay.  Well, I come from humble
5    background.  I grew up in Hamilton, New Jersey.  I
6    went to public school.  I was an okay student in
7    grammar school, as you said, but I had a great
8    mentor and teacher who really encouraged me, said I
9    was capable of more, and she put a charge in me, and
10   ever since that interaction I was a very good
11   student in school.
12             I wound up going to Muhlenberg College.
13   It was a stretch for my family.  I had to get a lot
14   of loans, scholarships and -- to be able to even go
15   to the school like that.  I went there, I always had
16   a love of government, law.  Again, great mentor in
17   high school, really got me motivated to study the
18   Constitution, to study civil liberties, all kinds of
19   things like that, and so I, in college, had a goal
20   of getting into law school.
21             Eventually, I applied to law school,
22   finances were another issue, but I went to Widener
23   University.  At the time the school didn't have a
24   great reputation, so I knew I needed to do well, so
25   I worked nonstop and became number one in my class

Page 10

1  there, wound up getting a full scholarship to attend
2  law school, and I didn't stop there.  I was told
3  that no one ever went to Morgan -- worked at Morgan
4  Lewis from my school, so I said I'm going to be the
5  first, so I went there.  Many, many interviews later
6  they took a chance on me, and I started working at
7  Morgan Lewis where I worked there for about eight
8  years, maybe nine, eight or nine years, and then I
9  went to a construction boutique firm called Cohen
10 Seglias, and I worked there for another eight years.
11 Q.        And you're working where now?
12 A.        So from there I helped out a friend who
13 had a small law firm.  I was a three-year contract,
14 and I worked on a couple cases for them, and in that
15 process I found a job out in Villanova where I work
16 for a real estate development company, and a
17 foundation that deals with assisting underserved
18 children how to postsecondary -- get into
19 postsecondary education, trade school or military.
20 Q.        And what's the name of that organization?
21 A.        The Uncommon Individual Foundation.
22 Q.        Okay.  Now --
23 A.        I also work for a company called Provco
24 Group.
25 Q.        Is that your full-time job?

Page 11

1  A.        Those two, they're sister companies.
2  Q.        Okay.
3  A.        Yes, my full-time job.
4  Q.        Okay.  And did you -- I may have not heard
5  you.  Did you say you transferred into Penn, or
6  there was some Penn connection, or was it Widener
7  the whole way?
8  A.        Widener the whole way.  I was offered a
9  spot at Villanova, but I wanted to stick it out with
10 Widener and -- because I couldn't afford Villanova
11 personally, so I needed to stay at Widener and reap
12 the benefits of that scholarship.
13 Q.        I do have a LinkedIn profile I'd like you
14 to look at for a moment, but first the duties that
15 you have at the present job?
16 A.        I'm general counsel of both organizations.
17 For the foundation I think my title is director of
18 legal affairs and general counsel, and for the real
19 estate group I am general counsel, vice president.
20 Q.        Okay.  Just as a quick conversational
21 aside, who was the grammar school teacher that
22 prompted you, just to put that person's name back
23 into place, so to speak?
24 A.        Mrs. Stout, and when I became number one
25 in the class in law school, I wrote her a letter

Page 12

1  thanking her --
2  Q.        Really?
3  A.        -- and telling her that I'm not sure if I
4  would've achieved this without you, so it was very
5  special to her, and she's since passed away.
6  Q.        I had some teachers like that, just
7  quickly --
8  A.        Yeah.
9  Q.        -- and they were critical in my
10 development.
11 A.        I think teachers are the most important
12 people out there.
13 Q.        Yeah.  It was Mrs. Reilly in fourth grade
14 who said I would be a good lawyer, and I really -- I
15 didn't even know what a lawyer really was, but it
16 sounded pretty good, and that was my first
17 orientation, Mrs. Reilly.
18 A.        I took a class called government and law
19 related experiences, and I took a class called human
20 physiology, and I, you know, didn't know what I
21 wanted to do in high school, and that government --
22 it was called gallery, and the professor -- or the
23 teacher -- there weren't professors -- teacher had
24 different people from the community every day come
25 in and speak to us about different topics, and our

Page 13

1  homework assignment was, we had -- back in the day
2  when you looked at news articles, you had to get two
3  articles from local, state, federal -- what am I
4  missing -- you know, branches of government and
5  create a logbook, and you just ask the person
6  questions from your logbook about what was going on
7  in the world.  I never was more informed about what
8  was going on in the world than in that class, and
9  that just was the inspiration for me to keep going.
10 Q.        Great.  That's a nice back story for
11 certain.  So in order to be number one -- my quick
12 story regarding number one in the class was my study
13 partner, who, when I met him, he just seemed to be
14 extremely strong, it made me feel very weak, and
15 ultimately he did achieve the number one spot, and I
16 was also paired with another friend of mine, still
17 friend of mine, who actually had a photographic
18 memory.  He already had a master's degree, he was an
19 officer, and one time he came in and said here, it
20 was like a 20-page outline, he said I know every
21 word, I said yeah right, he said I do, so I started
22 asking him and his -- he would kind of look up when
23 I would ask him the thing, as though he was kind of
24 trying to absorb it.  Later on he said I'm seeing it
25 in my mind and I'm reading it.  I don't really

Page 14

1 always know what I'm reading, I haven't fully
2 processed it, but I am reading it.  Anyway, between
3 those two guys, that made me feel really inferior.
4 **A.        Well, that wasn't me at all.  I've always**
5 **had to work, and I don't have a photographic memory.**
6 **I -- I would stay up all night studying, working,**
7 **doing outlines.  I came up with a technique where I**
8 **would go in a classroom, and I would literally teach**
9 **the empty classroom the lesson and my outlines.  I'd**
10 **write it out on the board and literally, critically**
11 **think about it and explain it to people that weren't**
12 **even sitting there, and I was the unexpected number**
13 **one, no one expected me to do that, achieve that,**
14 **and people started catching onto that technique --**
15 Q.        Oh, really?
16 **A.        -- and during exams, the entire building**
17 **was filled with people doing that same exercise.**
18 Q.        Wow.  That's pretty good.
19 **A.        Yeah.  And when I took the test, I**
20 **could -- I could remember teaching it to somebody,**
21 **and that's how I did well on the test.**
22 Q.        That is interesting, because I was an
23 English teacher for 15 years, and, you know, I can
24 certainly appreciate that.  So it would be fair to
25 say that you try to study problems in detail -- I'm

Page 15

1 just going to take you through my little
2 questions -- so you try to study them in detail,
3 right?  If the problem is presented to you, you try
4 to analyze it from A to Z?
5 A.        Of course.
6 Q.        Right.  And pay attention to those
7 details, correct?
8 A.        Yes.
9 Q.        And if you don't understand something,
10 that you would ask others, or try to find an answer
11 yourself?
12 A.        Yes.
13 Q.        Okay.  And naturally you had tried to be
14 accurate in the advice that you're absorbing and
15 giving?
16 A.        Yes.
17 Q.        Okay.  So in preparation for today's
18 deposition, did you review any documents?
19 A.        Yes.
20 Q.        What did you review?
21 **A.        The notice of condemnation, I believe a**
22 **letter Mr. Lee Herman sent to the judge.  I think**
23 **that's the extent of it.  Yeah, that's the extent of**
24 **it.**
25 Q.        Okay.  Did you review any videos?

Page 16

1 **A.        No.**
2 Q.        Okay.  Did you ever review any videos?
3 **A.        Of what?**
4 Q.        Of the interior of the home or the arrest?
5 **A.        No.**
6 Q.        No?  Did you review any case law?
7 **A.        No.**
8 Q.        Statutory law?
9 **A.        No.**
10 Q.        Municipal law?
11 **A.        No.**
12 Q.        Did you speak with Mr. Lingo?
13 **A.        No.**
14 Q.        Did you text him?
15 **A.        No.**
16 Q.        Did you speak with the officers?
17 **A.        No.**
18 Q.        Do you have any prior lawsuits that you
19 brought or defended individually?
20 **A.        No.**
21              (P-1 Brydzinski was introduced and
22              marked for identification.)
23 BY MR. SCHROM:
24 Q.        I'm going to show you a document which has
25 been marked P-1 Brydzinski.

Page 17

1              MR. SCHROM:  That's for you.
2              You want to just give that other one to
3              him?  Thanks.
4 BY MR. SCHROM:
5 Q.        Are you able to identify that document?
6 **A.        Yes.**
7 Q.        Okay.  And what is that document?
8 **A.        It looks like a printout of my LinkedIn**
9 **page.**
10 Q.        Okay.  And this is from Provco, is that
11 who sponsored it or created it?
12 **A.        No.**
13 Q.        No?  You created it?
14 **A.        Yes.**
15 Q.        Okay.  Is there any reason that, at least
16 on mine, that would be the imprint before your name?
17 **A.        Yes.  That's my company logo.**
18 Q.        Okay.  So I'd like you to just read in a
19 couple of sections here, particularly just the first
20 sentence in about, starting with Jeff's ability?
21 **A.        Okay.**
22 Q.        Just read that first sentence up to --
23 **A.        "Jeff's ability to problem solve,**
24 **strategize, organize, innovate, motivate and**
25 **communicate have made him a respected litigator and**

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 18

1  contract negotiator."
2  Q.        And read the second part, up to manager?
3  A.        "These same traits have made Jeff an
4  admired leader and manager, a role Jeff has enjoyed
5  expanding over the past decade to achieve
6  operational excellence within his firms, and now as
7  general counsel for two thriving organizations."
8  Q.        Okay.  And the next paragraph, starting
9  with Jeff's?
10  A.        "Jeff's legal training started strong when
11  his hard work earned him the number one ranking in
12  his law school class.  From there Jeff went on to
13  work for some of the best law firms in the region.
14  For over 19 years Jeff has been litigating complex
15  commercial matters, as well as performing
16  transactional work for an array of high profile
17  corporate clients.  Jeff's background in complex
18  multiparty litigation, including mass tort cases,
19  gives him the ability to manage complex, data
20  driven, document heavy matters."
21  Q.        And the next sentence, just that sentence
22  starting with Jeff?
23  A.        "Jeff has particular expertise handling
24  construction and real estate matters."
25  Q.        Okay.  Do you believe that all of what you

Page 19

1  read previously is true and correct?
2  A.        Yes.
3  Q.        Okay.  I'd like to draw your attention, if
4  I can, to the next page, talking about experience,
5  vice president, general counsel.  Do you see that
6  section?
7  A.        Yes.
8  Q.        Under Provco Group?
9  A.        Yes.
10  Q.        That's the entity that you're working for
11  now?
12  A.        One of the two, yes.
13  Q.        One of the two.  If you would read that
14  paragraph up to also administers, starting with Jeff
15  is responsible?
16  A.        Where?
17             MS. MALLOY:  Yeah, I don't have
18        that.
19             MR. SCHROM:  You don't have
20        that?
21             MS. MALLOY:  Yeah.
22             MR. SCHROM:  Okay.  For whatever
23        reason, that part hasn't been copied, but
24        I'm going to have to give you these, and
25        I'll send -- give that to you in a moment,

Page 20

1        but essentially I'm just going to have him
2        read those highlighted sections into the
3        record.
4             MR. BARTOS:  Is that just the
5        expanded part --
6             MR. SCHROM:  Yes, I believe so.
7             MR. BARTOS:  -- as you click and
8        open --
9             MR. SCHROM:  Yes, right.
10             MR. BARTOS:  -- online.
11             THE WITNESS:  Where?  How does
12        that work?
13             MR. SCHROM:  You don't have it.
14        This is the one that has it.
15             MR. BARTOS:  Can we just mark
16        this as 1A?
17             MR. SCHROM:  Yeah, that's a good
18        idea.
19             (P-1A Brydzinski was introduced
20        and marked for identification.)
21  BY MR. SCHROM:
22  Q.        Okay.  I'm showing you a document that is
23  marked 1A.  Can you identify that second section
24  right there?  You may have read that, but if not, go
25  to the next highlighted section.

Page 21

1  A.        I really don't know what this is.
2  Q.        Okay.
3  A.        I can assume it's whatever you tell me it
4  is, but I don't know what this is.
5  Q.        We don't want you to assume, but I can
6  tell you that I performed a search and pulled up
7  this LinkedIn profile, and there were sections where
8  you could expand the profile.
9  A.        Okay.
10  Q.        And when I clicked on those, that
11  additional information came up, but does that appear
12  to be a true and correct copy of that LinkedIn
13  profile?
14  A.        If you say so.  I don't know.  I'm not on
15  LinkedIn right now.
16  Q.        Or wherever that was created?
17  A.        I can only assume --
18  Q.        Or it might be Facebook?
19  A.        I have no idea.
20  Q.        Okay.  But is the information correct?
21  Let's just go through the sections for a minute.
22  A.        Sure.
23  Q.        Let's just turn that one over.  So looking
24  at what appears to be 3 of 13 in the bottom
25  right-hand corner, previously marked as 1A, it talks

JEFFREY BRYDZINSKI                                          JOB NO. 1501921
MARCH 27, 2025

Page 22

1  about experience.  Could you read that into the
2  record?
3  **A.        Sure.  "Jeff is responsible for**
4  **overseeing, managing and advising on legal aspects**
5  **of the real estate development process.  This**
6  **includes acquiring new properties, navigating land**
7  **use and zoning approvals, preparing contractual and**
8  **leasing documents, securing" -- and then for some**
9  **reason you didn't highlight financing and insurance,**
10 **then you highlighted "working with the design,**
11 **construction and maintenance teams, and handling all**
12 **claims and/or litigation matters."**
13 Q.        Okay.
14 **A.        Is there a reason why financing and**
15 **insurance wasn't highlighted?**
16 Q.        No, no, not really.  I just didn't think
17 it related to this matter, but --
18 **A.        Oh, it definitely does.**
19 Q.        Okay.  Well, let's include that as -- is
20 that part of a document that you created at some
21 point?
22 **A.        I have no idea, but if you're asking me if**
23 **this is true, these facts?**
24 Q.        Yes.
25 **A.        Yes.**

Page 23

1  Q.        Okay.  And those are the things you
2  perform for Provco, correct?
3  **A.        Yes.**
4  Q.        You talked about some prior experience
5  that you had.  I'd like you to look at 1A on the
6  bottom, right-hand corner.  It indicates page five.
7  Can you look at that and see whether that
8  information appears to be true and correct, given
9  your history?
10 **A.        Where?**
11 Q.        Starting here.  You can read that part.
12 **A.        Is this from Cohen Seglias?**
13 Q.        I'm not certain, so that would be a
14 question -- if you would take a moment to read that
15 and see whether or not -- where it relates to your
16 resume or your history?
17          MR. BARTOS:  Objection to form.
18          You can answer.
19          **THE WITNESS:  Well, I'm looking**
20          **at your document, there's something that**
21          **says LinkedIn on the top, so I'm assuming**
22          **you're pulling all this from LinkedIn.**
23          **There's a section that says Cohen Seglias,**
24          **that I worked seven years, 11 months.  I**
25          **was senior counsel there, that's**

Page 24

1          **highlighted.  And then, there's a section**
2          **that you highlighted that I can read, if**
3          **you'd like.**
4  BY MR. SCHROM:
5  Q.        Yeah, this section first.
6  **A.        "Construction of sporting arenas, hotels,**
7  **resorts, commercial buildings, residential**
8  **buildings, school buildings, highways, sewage**
9  **systems, airports and energy producing facilities,**
10 **including, for example, projects involving Lincoln**
11 **Financial Field, Citizens Bank Park, The Piazza at**
12 **Schmidts, Symphony House, Four Seasons, Great Exuma**
13 **at Emerald Bay, Ritz Carlton Grand Cayman, Kaheawa**
14 **Wind Farm, Hawaii, Philadelphia International**
15 **Airport, Marine Club" and then there's a dot, dot,**
16 **dot.  There's a tab that says show more, but it's**
17 **not clicked.**
18 Q.        Are those all projects that you worked
19 on in --
20 **A.        Yes.**
21 Q.        -- the past?  Okay.  And then, if you
22 would look to the one below that, it talks about
23 senior counsel and team leader, is that with the
24 same company, and is that information correct
25 that -- as part of your resume?

Page 25

1  **A.        I don't know why it says senior counsel**
2  **twice, and team leader, I'm not sure why that would**
3  **be --**
4  Q.        Okay.
5  **A.        -- different, but --**
6  Q.        I don't know that either, but can you just
7  look at the blurb, and see whether or not it's
8  consistent with your history?
9  **A.        "Jeffrey Brydzinski was senior counsel in**
10 **the construction group of Cohen Seglias Pallas**
11 **Greenhall and Furman, P.C.  Jeffrey's practice**
12 **involved litigating complex commercial and**
13 **construction law claims on behalf of owners,**
14 **contractors, design builders and subcontractors in**
15 **multiple jurisdictions."**
16 Q.        Is that information correct relative to
17 your history?
18 **A.        Yes.**
19 Q.        Okay.  Thanks.  And just one more, I think
20 it's the last sentence that continues after what you
21 just read starting -- it's not highlighted, it
22 starts with he advised, and you can turn the page
23 over?
24 **A.        Okay.  What would you like me to do?**
25 Q.        He advised, and then you can -- yeah, just

Page 26

1  read those?
2  A.        "He advised clients on numerous
3  multimillion dollar projects and litigation claims
4  involving construction and design defects, product
5  defects, project delays, unforeseen conditions,
6  productivity and" dot, dot, dot, and then there's a
7  show more thing that you can click.
8  Q.        Is that part of your history and resume?
9  A.        Yes.
10  Q.        Okay.  And can you give us a sense of
11  unforeseen conditions?  What does that reference?
12  A.        Unforeseen conditions?  Meaning it's a
13  legal -- you can look up a legal definition of it.
14  I'm not sure I'm prepared to tell you what the legal
15  definition of it is.
16  Q.        Okay.  But a common definition, common use
17  of the words would mean what in the context of what
18  you were doing?
19  A.        I don't know.
20  Q.        Okay.  Do you have any particular example
21  of a project where there were unforeseen conditions,
22  and then you were able to resolve them?
23  A.        Soil contamination.
24  Q.        Soil contamination.  Okay.  So that wasn't
25  anticipated, and you were able to deal with it and

Page 27

1  come up to some acceptable resolution?
2  A.        You would have to remediate the soil.
3  Q.        Okay.  Any other examples of an unforeseen
4  condition?
5  A.        I'm sure there's thousands, but none come
6  to mind.
7  Q.        Okay.  That's fine.  So I'd like to focus
8  now on kind of the history of events, how this whole
9  thing transpired, you know, how -- I'll separate it
10  out in a moment, but how you met Mr. Lingo, how you
11  selected the property and decided on him, and then
12  we'll go into what transpired generally on a
13  month-to-month basis, and then more specifically on
14  a day-to-day basis, and then maybe an hour-to-hour
15  basis into August of 2022.  So, first, how did you
16  meet Mr. Lingo?
17  A.        Well, I had started a job in Villanova in
18  2020, pre-pandemic.  I lived in Philadelphia for 19
19  years up to that point.  I started this job out
20  here, was commuting in, during the pandemic it
21  wasn't much of an issue.  After the pandemic, 76
22  traffic became brutal, as everyone here probably
23  knows.  It was my birthday, February 28, 2022, I
24  believe, and I was talking with someone I worked
25  with and telling them how difficult it was to

Page 28

1  commute in, I love Philadelphia, didn't want to
2  leave, but I just -- it was just too much, too many
3  hours in the car, and he told me that he -- I had
4  been to his house before.  He had a great builder,
5  really respectable guy, and he picked up the phone
6  on that same day, and he said, Greg, I have a great
7  guy, really likes the house that you built for me,
8  and he'd be interested in if you had any projects
9  coming up, and that was the phone call, and he said
10  Greg said, with my colleague on the phone, said as a
11  matter of fact I have a project, a property under
12  agreement of sale since October of 2021, and I
13  believe he also had the deed of title at that time,
14  and he said this is something you should check out,
15  so I did.
16  Q.        Okay.  So did you meet with Mr. Lingo
17  after that?
18  A.        I believe I may have met him with my
19  colleague at the property, and just curbside looked
20  at it.
21  Q.        Okay.  When do you think that might have
22  been?
23  A.        March.
24  Q.        In March.  March of '22?
25  A.        Yes.

Page 29

1  Q.        Okay.  And you didn't go in the property
2  at that point?
3  A.        No.
4  Q.        Did you get out of the car?
5  A.        Yes.
6  Q.        Okay.  How long did you look at the
7  property?
8  A.        Not very long, but I -- normal amount of
9  time, not long at all.  It was during the workday.
10  Q.        Okay.  And then, what happened next?
11  A.        I believe we talked about what the next
12  steps would be, if I was interested in purchasing
13  the property from him.
14  Q.        Okay.  And that was around March of '22?
15  A.        Yes.
16  Q.        Okay.  And then, what was the next step
17  that you took?
18  A.        Well, I don't have disposable funds, and I
19  wouldn't be able to purchase the property without
20  selling my Philadelphia home.
21  Q.        Okay?
22  A.        So I told him that I would start looking
23  into whether I could sell my house and be able to do
24  something like this.  It was a huge risk for me, I
25  was very scared about doing it, but I thought it was

Page 30

1 the right move for me to leave the city, so I spoke
2 with a real estate agent in Philadelphia.
3 Q.        Okay.  And who was that agent?
4 A.        I can't remember her last name.  Her first
5 name was Andrea.
6 Q.        Do you know the name of the firm?
7 A.        No.
8 Q.        Did they get a commission as part of
9 the --
10 A.        I assume so.  I don't know if the seller
11 or the buyer gets commission --
12 Q.        Okay.
13 A.        -- who gets the commission.  I assume she
14 gets it from me.  I don't know.
15 Q.        Did she go to the settlement?
16 A.        Of my house in Philadelphia?
17 Q.        Yeah.
18 A.        Yeah, I would assume so, yeah.
19 Q.        Okay.  When did you sell your house in
20 Philadelphia?
21 A.        So I remember speaking with her in March,
22 and we -- she had some potential people interested
23 in the house, and that didn't pan out so we decided
24 to list the house, and the house sold in one day.
25 Q.        Oh.  And when did you go to settlement on

Page 31

1 that house?
2 A.        April.
3 Q.        Do you know whether it's early, mid or
4 late April?  Do you remember the date at all?
5 A.        Early.
6 Q.        And when did you have to get out of that
7 house?
8 A.        Well, it's tied to this.  I was told, and
9 I was shown papers that Ms. Ockley -- Mrs. Ockley
10 had agreed to a June 10th closing.  This presented a
11 problem for me, because the seller -- or the
12 purchaser of my home didn't want to close until
13 July, but I needed the money to be able to purchase
14 the property from Mrs. Ockley, so I had to pretty
15 much beg, almost at a financial cost, the purchaser
16 to close early on my home so we could have the funds
17 to close on the Ithan property.  It's the only way I
18 could have purchased the property was with funds
19 from my sale.
20 Q.        So when do you think that you closed on
21 that property?
22 A.        I closed on June 8th, because I wired the
23 funds to the title company on June 9th for the
24 June 10th closing, which was supposed to occur per
25 the agreement of sale.

Page 32

1 Q.        June 10th closing with Rockwell-Glynn?
2 A.        Well, yes, with Rockwell-Glynn or Ockley,
3 I'm not sure who it was going to be at that time,
4 but, yes, Rockwell-Glynn.
5 Q.        Because that's where you got the deed
6 from, correct?
7 A.        Yes.  Yes.  The closing was scheduled for
8 June 10th.
9 Q.        Originally?
10 A.        Yes.
11 Q.        Right.  Okay.
12 A.        I even wired the funds on June 9th.
13 Q.        Okay.
14 A.        And it was at great detriment to me to be
15 able to make that closing.  During that time, I
16 scratched my cornea.  It was the worst time of my
17 life in May and June, and I had to push through to
18 be able to move the things out of my house.  I had
19 an embryonic membrane over my eyeball.  I bring --
20 thinking about this has been very upsetting to me,
21 because it was a very, very difficult time for me,
22 and I had to -- I had no choice but to move, find
23 another place to live, and be able to make the
24 settlement date.
25 Q.        So you sell the property, but you had to

Page 33

1 find, as you say, another place to live, so where
2 did you end up going?  When did you actually leave
3 your house?
4 A.        Yeah, I had to rent a place.  I had to get
5 a rental, a one-year rental.
6 Q.        Well, when?
7 A.        Which started in I guess May, and I know
8 the rental went til April 30th I guess.
9 Q.        Of '23?
10 A.        Yes.
11 Q.        So you had to pay, as you say, for an
12 entire year?
13 A.        Yeah, of course.
14 Q.        When was the -- when was the new house
15 ready?
16 A.        The new house?
17 Q.        Yeah.
18 A.        It was delayed, and it was ready at the
19 end of May of 2023.
20 Q.        Okay.  So when did you start to have your
21 eye issues, what's the date; do you recall?
22 A.        Early May.
23 Q.        Early May.
24 A.        Um-hum.
25         MR. BARTOS:  You just have to

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 34

1        give a verbal.
2                    THE WITNESS:  What?
3                    MR. BARTOS:  You went um-hum.
4                    THE WITNESS:  Oh, yes, early
5        May.
6                    MR. BARTOS:  Even though we're
7        on video, and they can see you nodding
8        your head up and down --
9                    THE WITNESS:  Sorry.  I should
10        know better.
11    BY MR. SCHROM:
12    Q.        Did you go to Wills Eye or?
13    A.        Yes, and Penn.  They couldn't figure out
14    what the infection was, and 40 percent of my cornea
15    was destroyed during that process.
16    Q.        Is that one eye?
17    A.        Yes.
18    Q.        What eye is it?
19    A.        Left.
20    Q.        And so do you have residual issues with
21    that eye?
22    A.        Yes.  I can't see very well out of it.
23    Q.        So at some point you sign a construction
24    agreement with Rockwell-Glynn and Lingo?
25    A.        Yes.

Page 35

1    Q.        Do you remember when that was?
2    A.        It would have been after the -- I entered
3    an agreement of sale on my home.
4    Q.        So May?
5    A.        No.
6    Q.        June?
7    A.        No.  Way before that.
8    Q.        April?
9    A.        Probably.
10    Q.        Okay.  April of' 22 you signed an
11    agreement for him to construct the home on that
12    site, correct?
13    A.        Yes.
14    Q.        And he was going to take the role of GC,
15    general contractor?
16    A.        Rockwell Construction?
17    Q.        Yes.
18    A.        Yes.
19    Q.        Do you know if he had other companies that
20    were working with him, or any other agreement that
21    you signed?  I'm thinking just of another Rockwell
22    entity.
23    A.        No.  It was Rockwell Custom Homes.
24    Q.        Rockwell Custom Homes?
25    A.        I believe.

Page 36

1    Q.        Okay.  Now, around this period of time,
2    which is April of '22, did you become aware that the
3    property was vacated on April 21st?
4    A.        I -- yes.
5    Q.        How did you become aware of that?
6    A.        I was told that the property was
7    condemned.
8    Q.        Okay.  And who conveyed that information
9    to you?
10    A.        I don't know at this point.
11    Q.        Okay.  At that point did you also find out
12    that Ms. Ockley was hospitalized?  Did you know
13    that?
14    A.        I think I knew that, yes.
15    Q.        Okay.  And did you know that there was a
16    9-1-1 call to take her to the hospital?  Did you
17    ever know that?
18    A.        No.
19    Q.        Did you ever know that the day that she
20    went to the hospital was the same day of the
21    condemnation?
22    A.        No, I didn't.
23    Q.        Okay.  Around April 21st of '22, did you
24    have any contact with the township --
25    A.        No.

Page 37

1    Q.        -- authorities?
2    A.        No.
3    Q.        Okay.  Or the police?
4    A.        No.  Why would I?
5    Q.        I don't know.  Just asking.  Were you
6    aware that the property was vacant from April 21st
7    until the client returned -- our client Ockley
8    returned on or about August 8th?
9    A.        Yes.  There was a notice of condemnation
10    that no one was to be inside the property, and it
11    was locked by the township.
12    Q.        Okay.  At some point there was a complaint
13    filed against Ockley, are you aware of that, in
14    Delaware County Court of Common Pleas?
15    A.        I believe there were several complaints
16    filed against her.
17    Q.        No, I'm just talking about a complaint in
18    Common Pleas.
19                    MR. SCHROM:  I don't know if we
20        have a copy of that.  Do we have that?
21                    MS. MALLOY:  Yes, we do.
22                    MR. SCHROM:  Let me look at it
23        for just a second.
24                    MS. MALLOY:  Are you producing
25        it?

Page 38

1          MR. SCHROM:  I'm not going to
2      mark it.
3  BY MR. SCHROM:
4  Q.      I'm just showing you a document.  I'm not
5  going to mark it right now.  Can you identify that?
6  A.      Is there a date on this?
7  Q.      Is there a date?  I think it's June.
8  A.      Okay.  It's in June.  This is after --
9  yeah, this is probably after she failed and was in
10 default of the agreement of sale and didn't show up
11 to closing or didn't close.
12 Q.      So that refreshes your recollection
13 regarding a complaint being filed against her?
14 A.      Well, I didn't file that complaint.
15 Q.      I know.
16 A.      Yes, there was a complaint.
17 Q.      Okay.  And the essential elements of the
18 complaint were that she needed to convey the
19 property over to Rockwell-Glynn, and the -- and she
20 needed to be removed?
21 A.      If I remember --
22 Q.      Or not allowed on the property?
23 A.      If I remember correctly, she signed an
24 agreement of sale in October of 2021, she had nine
25 months to move her stuff out of the property, she --

Page 39

1  the township was going to foreclose on the house,
2  because she had failed to pay taxes for several
3  years.  Mr. Lingo didn't want her to be removed from
4  the house and lose the house to the township, and
5  allowed her to use the deposit money to pay the
6  several years of back taxes.
7          In exchange for that, I believe she signed
8  the deed over to Rockwell-Glynn, passing title to
9  him, and that the only thing left for us to close
10 was for her to remove her things, which she had nine
11 months to do.  The closing was to be on June 10th.
12 I did everything in my power to be able to meet that
13 closing at my own detriment, and to my own extreme
14 hardship, and Mrs. Ockley agreed to that.  And then,
15 out of nowhere, she didn't or chose to not show up
16 to the closing.  She was aware of my circumstances,
17 didn't care, and I remember Mr. Lingo was bending
18 over backwards to accommodate her, to help her.  I
19 was doing the same.  I knew -- I didn't know as much
20 at the time, and -- and I believe the complaint was
21 filed because of all of that.
22 Q.      Okay.  And were you aware that Ockley was
23 originally in the hospital, Bryn Mawr Hospital, for
24 a period of time, and then transferred over to a
25 rehabilitation hospital or entity after that?

Page 40

1  A.      I really wasn't familiar with what her
2  medical care was.
3  Q.      Did you know in June that she was in a
4  hospital setting?
5          MR. BARTOS:  Objection to form.
6      You can answer.
7          THE WITNESS:  I don't know when
8      she was in the hospital.
9  BY MR. SCHROM:
10 Q.      Okay.  Did you read the -- did you get a
11 copy of the complaint that was filed by Lingo, the
12 one that you just reviewed?
13         MR. BARTOS:  Objection to form.
14 BY MR. SCHROM:
15 Q.      Before it was filed?
16         MR. BARTOS:  You can answer.
17         THE WITNESS:  I don't remember,
18     but I did read it at one point.
19 BY MR. SCHROM:
20 Q.      Okay.  Did you read it before the hearing?
21 A.      I don't know.
22 Q.      Did you read it since the hearing, which
23 would have been --
24 A.      Since the hearing.
25 Q.      -- two years ago, three years ago?

Page 41

1  A.      I'm sure I read that document at some
2  point, yes.
3  Q.      Okay.  And as I understand the document in
4  sum, it's requesting that she sign the title over,
5  and that she be removed from the property?
6  A.      That's incorrect.
7          MR. BARTOS:  Objection.
8  BY MR. SCHROM:
9  Q.      Okay.  What's your understanding?
10 A.      She had already signed the title over.
11 The deed was in escrow.
12 Q.      Okay.  So the final parts of it were not
13 finished, as I understand it.  In looking at the
14 record, I believe that she signed the final
15 paperwork June 15th, and then on June 19th
16 Rockwell-Glynn conveyed it to you?
17         MR. BARTOS:  Objection to form.
18 BY MR. SCHROM:
19 Q.      Does that refresh your recollection at
20 all?
21 A.      The deed was signed over back in 2021.
22 Q.      That -- my understanding is that it was
23 held in escrow, but she didn't complete all the
24 paperwork.
25 A.      I have no idea.

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 42

1  Q.        And the final paperwork was completed
2  June 15th.
3  A.        I purchased the home from
4  Rockwell-Glynn --
5  Q.        I'm sorry.  July 15th.
6  A.        I purchased the home from Rockwell-Glynn.
7  Q.        On July 19th; is that correct?
8  A.        I did, yes.
9  Q.        There was a hearing on that complaint, are
10  you aware of that?
11  A.        Yes.
12  Q.        Okay.  And you attended that hearing?
13  A.        I did, with a patch on my eye, yes.
14  Q.        And how did you become aware of the
15  hearing?
16  A.        I assume Greg told me.
17  Q.        Okay.  And he asked you to attend?
18  A.        No.
19  Q.        You wanted to attend?
20  A.        I wanted to attend in case the judge
21  wanted to hear from me, yes.
22  Q.        Okay.  And did you -- you weren't
23  represented at that time?
24  A.        No.
25  Q.        Okay.  At that hearing, were you there

Page 43

1  from the beginning of the hearing to the end?
2  A.        Yes.
3  Q.        Okay.  And sometimes it's hard to hear the
4  judge.  Were you able to hear the judge throughout
5  the process?
6  A.        Yes.
7  Q.        Okay.  Did you review any documents at
8  that time; do you recall?
9  A.        What documents?
10  Q.        It might have been the complaint that I
11  just showed you, or other documents that -- I'm just
12  asking?
13  A.        I'm sure I had the notice of condemnation
14  with me.
15  Q.        Okay.  So you had the notice of
16  condemnation with you, and --
17  A.        Yes.  I was extremely concerned about
18  that.
19  Q.        Okay.  What was your concern?
20  A.        Because it stated that the property itself
21  was a threat to human life, and I, given my
22  background as a construction attorney, our primary
23  goal is to keep people safe, and that was of extreme
24  importance to me.
25  Q.        In that you thought that maybe you would

Page 44

1  get sued, is that what --
2  A.        No.  I didn't want someone to die.
3  Q.        Okay.  Were there other concerns?
4  A.        Of course there's a liability issue as
5  well.
6  Q.        Okay.  Anything else?
7  A.        I didn't want her things damaged.
8  Q.        Okay.  Anything else?
9  A.        I didn't want a fire to happen.  I didn't
10  want the neighborhood to be impacted by it.  I had a
11  lot of concerns.
12  Q.        Okay.  Any other come to mind, other than
13  what you just mentioned?
14  A.        Probable many, several.
15  Q.        As you sit here today can you remember --
16  can you think of anything else, other than what you
17  just indicated?
18  A.        Someone dying, I think that was probably
19  top of the list.
20  Q.        Okay.  At that point had you been inside
21  the property?
22  A.        No.  It was locked by the township.  No
23  one could go inside.
24  Q.        Okay.  At that point did you see pictures
25  of what the inside looked like?

Page 45

1  A.        Only what was attached to the notice of
2  condemnation.
3  Q.        Okay.  So the hearing starts Mr. Lingo is
4  there, his counsel is there, you're there, anyone
5  else?
6  A.        There was several people in the courtroom.
7  Q.        I mean, that are related to this matter?
8  A.        Mrs. Ockley was there.
9  Q.        Okay.
10  A.        The lawyer that she had fired was there.
11  Q.        Okay?
12  A.        The judge demanded that he be there.
13  Q.        Okay?
14  A.        And there was a fellow I didn't recognize
15  that looked like knew her.  And then, there was
16  other people in the courtroom.  I don't know who
17  they were.
18  Q.        Okay.  So the hearing starts, and what do
19  you recall from that?
20  A.        I recall her attorney being there, and her
21  refusing to represent -- him refusing to represent
22  her, and I don't know if it was said in open court,
23  or it was implied, or we all got the gist of it, but
24  she was trying to commit insurance fraud.  She was
25  trying to prevent the sale of the home, because she

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 46

1  didn't want the proceeds at that time, because she
2  had several outstanding hospital bills to pay, and
3  that had she had proceeds, those proceeds would go
4  towards those hospital bills, and it became very
5  clear to me why she didn't show up at the closing on
6  the day she promised and said she would, and I
7  realized that we were dealing with a con artist.  I
8  realized that we were dealing with someone who is
9  not truthful, and her attorney would not represent
10 her and allow her to commit that fraud.
11 Q.       Did you review any documents that relate
12 to that matter?
13 A.       No.  I was an observer.  I was shocked to
14 hear -- to hear what I heard, because that's not at
15 all what I was expecting.
16 Q.       Did you ever review a transcript of
17 that --
18 A.       No.
19 Q.       -- hearing?
20 A.       I can only tell you what I remember.
21 Q.       Okay.
22 A.       Or what I gathered from it.
23 Q.       Okay.  But if there was a transcript,
24 would you say that that would be, to the best of
25 your knowledge, a full record?

Page 47

1                   MR. BARTOS:  Objection to form.
2                   THE WITNESS:  I don't know
3           what's recorded or the transcript, or
4           what's not, what was at side bar, what
5           wasn't, when he had it recording, but I
6           know that that's what I gathered from the
7           hearing.
8  BY MR. SCHROM:
9  Q.       Okay.  What do you recall the judge saying
10 regarding the transfer of property, or the transfer
11 of the final paperwork?  Do you recall whether he
12 made any pronouncements regarding that?
13 A.       This is going back a long time, and my
14 memory was that the title had passed, it was -- the
15 deed was signed already, and it was in escrow.  The
16 only thing left was to figure out how to remove her
17 items from the house safely, when we were under a
18 notice of condemnation where the township and the
19 code officials had deemed it not safe to be inside,
20 that it was a threat to human life to be inside that
21 house, that it was a fire risk, risk of fire, risk
22 of collapse, and I was in that courtroom very
23 concerned of how this woman, who was elderly, older,
24 and potentially handicapped from her injury was
25 going to safely move her things from that house.

Page 48

1  And I believe Mr. Lingo was offering her, at his own
2  cost, professional trained people to remove those
3  things from the house safely at their own risk.  And
4  that's another reason I was in the courtroom that
5  day, because I wanted to understand how this was
6  going to be done, given my experience.  It was an
7  extreme concern of mine.
8  Q.       Okay.  Did you or someone else present the
9  condemnation order to the judge?
10 A.       I was not involved in that litigation, so
11 I had no -- I had no ability to do anything during
12 that hearing but listen.
13 Q.       Okay.  But you did have the condemnation
14 order with you?
15 A.       I don't know.  I assume I would.  I don't
16 know if I did or not, but knowing myself, yes, I
17 would have had the condemnation order.
18 Q.       Okay.  Do you know whether or not there
19 was a discussion regarding the property being
20 condemned that was relayed to the judge?
21 A.       Yes, I am sure of it.  Yes.
22 Q.       Okay.  So the judge was aware that the
23 property was condemned, correct?
24 A.       Yes.
25 Q.       Okay.

Page 49

1  A.       There was never an issue of anything about
2  that.  The issue only was how is this woman going to
3  safely remove her things from the house.  There was
4  no intention of anything other than that, something
5  that she had nine months to do and did not even -- I
6  was told not even one thing to prepare for the move.
7  Q.       Do you know if there was an understanding
8  between Lingo and Ms. Ockley, at least initially,
9  that they would -- she would try to move out in the
10 spring?  Did you ever hear of anything like that?
11 A.       I was told that Mrs. Ockley planned on
12 moving back to Romania, and that an agreement of
13 sale was entered in October of 2021, and Mr. Lingo
14 was allowing her time to move her possessions, and
15 that was -- that was the extent of it, and I
16 reviewed the agreement of sale, I reviewed the
17 closing date, and I reviewed the deed, and -- that
18 was already signed, so on -- based on that due
19 diligence, I sold my house.
20 Q.       Okay.
21 A.       And I take agreements of sale very -- I
22 deal with them on a regular basis, as you read my
23 resume, and they're very serious documents with
24 implications, because people are reasonably relying
25 on them.

Page 50

1  Q.       So were the concerns that you're voicing
2  now brought in front of the judge by Mr. Herman, to
3  the best of your knowledge?
4  A.       I would be shocked if it wasn't.  Yes, I
5  believe it was.
6  Q.       Okay.  And at some point I think that you
7  were introduced to the court?  Someone said, you
8  know, who is this individual, and you were
9  identified; is that right?
10  A.       I don't remember that happening, but if
11  you say it did, it did.  I don't remember being
12  introduced.
13  Q.       Okay.  Do you remember where you were --
14  A.       I would have loved to speak at that
15  hearing.  If I was introduced, I would have talked.
16  Q.       Okay.  Do you remember where you were
17  sitting, whether you were sitting in the gallery or
18  whether you were sitting behind the --
19  A.       Behind the bar?
20  Q.       Yes.
21  A.       I was definitely behind the bar, because I
22  wasn't -- I was there as an observer.  I know I was
23  there with an eye patch, I know that.  I know I was
24  in extreme pain.  I had to put a needle in my eye
25  every three hours.  I know that it was a very, very

Page 51

1  difficult time.
2  Q.       Did you talk to Mr. Lingo during or after
3  the hearing?
4            MR. BARTOS:  Objection.  You can
5            answer.
6            THE WITNESS:  I don't know.  I'm
7            sure I would have talked to him.
8  BY MR. SCHROM:
9  Q.       Do you remember what the extent of that
10  conversation was?
11  A.       No.
12  Q.       Do you recall talking to his attorney at
13  the end of the matter?
14  A.       I would have talked to his attorney, yes.
15  Q.       Do you remember what the contents of that
16  conversation were?
17  A.       I don't recall.
18  Q.       Okay.  At some point on or about July 15th
19  there was an order that was created by Judge John J.
20  Whelan.  Did you become aware of that?
21  A.       I most likely was, yes.
22  Q.       And when did you become aware of that
23  July 15th order, would you say?
24  A.       I'm sure I was aware of it when it came
25  out.

Page 52

1  Q.       And who would have given you a copy?
2  A.       Mr. Herman.
3  Q.       After the order came out, did you have any
4  discussions with Mr. Herman regarding the contents
5  of the order?
6  A.       I don't know.
7  Q.       Do you remember having a discussion with
8  Mr. Lingo, regarding the contents of the order?
9  A.       I don't understand the question.  I'm
10  sorry.
11  Q.       I just want to know whether or not you
12  talked to Mr. Lingo regarding the order when it came
13  out?
14  A.       I don't know.  I don't know what that
15  means, talk about the order.
16  Q.       Well, you had concerns.  You were hoping
17  that the judge would take a position that resolved
18  some of those problems that you had?
19  A.       The judge did.
20  Q.       He did?
21  A.       Yes.  The order said it.
22  Q.       And what do you understand the order to
23  mean?
24  A.       It gave her a time limit to remove the
25  stuff from the property, and access to remove the

Page 53

1  stuff from the property.
2  Q.       But was she able to live there during that
3  period of time?
4  A.       Absolutely not.  That would be absolutely
5  ridiculous, and that would be completely unsafe
6  given there was a notice of condemnation that said
7  no one could sleep in the building, that it was a
8  threat to -- I would like to see the condemnation
9  order, if you have it, but it said that it was a
10  likelihood of sickness, that there was a -- a
11  likelihood of sickness or disease, that there was a
12  chance of fire, there was a chance of collapse, that
13  no one could sleep in that house.  Why would -- how
14  could any judge allow a human being to be put in a
15  life threatening situation?
16  Q.       Do you know whether or not the judge ever
17  talked about whether she could live there in that
18  hearing?
19  A.       I would have to see, but I would assume
20  that -- there was no question whether she was living
21  there.  The only thing that was discussed at that
22  hearing was how to get her stuff out of the house.
23  The house was being already transferred over --
24  Q.       Living there --
25  A.       It was being sold.  How could she have the

Page 54

1  right to live in a house she doesn't own, in a house
2  that was condemned by the township as being unfit
3  for a human to occupy it.
4  Q.      Did you --
5  A.      The even suggestion that a human being
6  would live in that house is reckless.
7  Q.      This was in July, correct?
8  A.      July?
9  Q.      July of '22, right?
10                 MR. BARTOS:  What was --
11  BY MR. SCHROM:
12  Q.      When the hearing took place.
13  A.      The hearing took place in July?  I thought
14  it took place in June.
15  Q.      It took place I believe July 11th.
16  A.      Okay.  If it did, it did.  Yeah, I guess.
17  Q.      Okay.  And do you know where she was
18  residing in July?
19  A.      No.
20  Q.      So you don't know whether or not she was
21  residing at a medical facility, or in the home,
22  correct?
23  A.      In the home?  July?
24  Q.      Yes.
25  A.      The house was locked by the township.  No

Page 55

1  one was living in a condemned structure.  The
2  structure had signs all over it that said no one was
3  to enter.  It was a life threatening building.  I
4  would love to see the signage, but it said you were
5  not permitted.  Someone could -- the floors could
6  collapse on someone living inside.  This is -- I
7  don't know what you mean by that.  Of course she was
8  not living there in July.  No one was living there
9  in July.
10  Q.      Okay.  I thought you made a reference to
11  that, but --
12  A.      No one had even been inside the house.
13  Q.      -- no one was living in there in July?  I
14  think we can all agree nobody was living there in
15  July?
16  A.      No.
17  Q.      Or June or May or after --
18  A.      Yes, the house --
19  Q.      -- April 21st?
20  A.      -- the house was locked for four months
21  because it was inhabitable -- uninhabitable.  Sorry.
22  And not only was it an issue on the inside, but the
23  outside had 33 dead trees with no leaves on them
24  that the township arborist came out and deemed to be
25  a hazard and a fire hazard, that if even a spark was

Page 56

1  present near these trees, it could light up the
2  entire neighborhood on fire, so we had to go to the
3  shade tree commission and present the hazardous
4  issue to them, and they gave us authority to remove
5  the 33 trees, which were about to fall down through
6  the house, through the roof of the house, or
7  elsewhere, or on the roadway, or on a poor kid that
8  was riding by, and that was another hazard we were
9  dealing with at the time, so in addition to the
10  hazards inside the house.
11  Q.      Okay.  And do you know was that presented
12  to the judge as well, to the best of your knowledge?
13  A.      I don't know.  The trees?  I don't know.
14  Q.      Okay.
15  A.      It was presented to the township and the
16  shade tree commission, and there was a hearing on
17  it.
18  Q.      Do you remember when that hearing was?
19  A.      No.
20  Q.      Do you remember the month?
21  A.      No.
22                 MR. SCHROM:  The next series of
23          questions are surrounding when she arrived
24          back on the property, which would be
25          August 8th, but we've been at it for an

Page 57

1          hour so why don't we take a ten-minute
2          break.
3                 MR. BARTOS:  Okay.
4                 VIDEOGRAPHER:  Off the record at
5          11:14.
6                 (At this time, a short break was
7          taken.)
8                 VIDEOGRAPHER:  We are back on
9          the record at 11:39.
10  BY MR. SCHROM:
11  Q.      Okay.  Where we last left, you were
12  talking about the property being condemned, and you
13  thought it was in -- when you read all those
14  conditions, you know, it made you extremely
15  concerned, correct?
16  A.      Correct.
17  Q.      Right.  Did you ever independently verify
18  any of those conditions?
19  A.      Yes.
20  Q.      Okay.  And how did you do that?
21  A.      I believe Mrs. Ockley called the township
22  in August, late August -- no, I'm sorry, I can't
23  remember what week in August, but she told them that
24  she wanted the locks removed.
25  Q.      No, I'm not up to that yet.  I'm just

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 58

1  saying --
2  A.        Well, I'm telling you when I saw it.
3  Q.        I just wanted to just pull you back before
4  August 8th.
5  A.        Why?
6  Q.        I'm just trying to see whether or not --
7  A.        You asked me if I verified it, and I'm
8  going to tell you when I verified it and how.
9  Q.        All right.  Then, go ahead?
10 A.        So she called the township, the township
11 told her that she -- it was a notice of
12 condemnation, which she was well aware of, and that
13 she could not reside in the house, but she could
14 move her things out of the house, and they said we
15 will take the locks off when you give us an
16 address -- by the way, this is what I was told.  I
17 don't know -- I wasn't privy to these conversations,
18 but I was told she -- she needed to provide an
19 address where she was living while she was moving
20 her things out.  She refused to do that.  The
21 township needed to finally unlock the property for I
22 can't remember what reason, inspections or -- the
23 house has been sealed for four, four and a half
24 months, and I don't know if the code official wanted
25 to see it, or -- you know, I don't remember the

Page 59

1  reason, but the doors were unlocked in August, and I
2  wanted to see what the conditions were that, you
3  know, was subject of the notice of condemnation.
4          They unlocked the doors.  I was inside for
5  a total of maybe three minutes.  It was the most
6  horrific thing I had ever seen in my life.  It was
7  filled with garbage and debris and filth.  It was
8  over 100 degrees inside.  There was pieces of the
9  floor that had completely collapsed from leaks and
10 just maintenance issues.  I, again, was just
11 recovering with my eye.  I was afraid that I would
12 even get a further infection, so I did not stay
13 anywhere inside.  I don't think anyone could.  You
14 couldn't breathe.  There was -- the smell was just
15 repulsive.
16         I wanted to cry to think that someone
17 lived there at some point.  It was just filled with
18 trash.  It was -- you felt like you were getting
19 bugs all over you, and I lasted three minutes.  I
20 believe Luke was present for that, and he was taking
21 pictures, or a video or something.  I think the
22 township wanted it documented, I can't remember why,
23 and I left, and I went home, and I threw all my
24 clothes in a washer and got a shower because it
25 was -- it was literally horrific and unbelievably

Page 60

1  hazardous.
2  Q.        Okay.  Did you become aware on August 8th
3  that she was out of Bryn Mawr Rehab and at the
4  property?
5  A.        I don't believe that's correct.
6  Q.        Okay.  When do you understand her to be
7  out of the property -- out of the rehab, and at the
8  property?
9  A.        I think she was at the property on, if I
10 remember correctly, August 9th.
11 Q.        Okay.
12 A.        And I know that because there was tree
13 contractors who were remedying the trees that were
14 about to collapse onto the house, and I remember the
15 tree contractors were the ones who said there was a
16 woman with a crowbar trying to break into the
17 property.
18 Q.        That was MG Tree?
19 A.        Yes.
20 Q.        Okay.
21 A.        That's correct.
22 Q.        Did you contract them or did Lingo?
23              MR. BARTOS:  Objection to form.
24         You can answer.
25              THE WITNESS:  I don't remember.

Page 61

1  BY MR. SCHROM:
2  Q.        Okay.  Do you remember anything else about
3  August 9th?
4  A.        August 9th?
5  Q.        Or 8th rather?
6  A.        I don't remember anything on August 8th.
7  Q.        Okay.
8  A.        I remember August 9th the tree contractor
9  saying there was a woman trying to break the
10 townships locks, and I don't think she was
11 successful.
12 Q.        Okay.  And do you recall anything else
13 transpiring on the 9th?
14 A.        Not that I remember.
15 Q.        Do you remember -- do you recall whether
16 or not she filed an emergency petition with the
17 court?
18 A.        No, I don't.  I don't remember that.
19 Q.        Did you ever see an order that was created
20 by Judge Dozor on August 9th?
21 A.        It's hindsight, so, yeah, I've seen that
22 now.  I don't know when.
23 Q.        Okay.  What do you recall transpired on
24 August 10th?
25 A.        I believe the tree contractors told me

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 62

1  that she had successfully broken into the home and
2  that she was inside it.  I believe she had Comcast
3  turn the TV on, which I'm not even sure how.  She
4  had Verizon at the house that day.  All the
5  utilities were no longer in her name, so I don't
6  know how she did all this, but she did, and I, at
7  some point, received a phone call from Aqua about
8  the water service.  All of that was off during the
9  vacancy of the house, due to the condemnation status
10 and the hazards.
11 Q.       Right.  Do you know who requested that the
12 water and utilities be turned off?
13 A.       I don't recall, but the house was an
14 extreme fire hazard, and that's why the electricity
15 was off, and the water and mechanical systems were
16 in extreme disrepair.  I remember seeing it with my
17 own eyes, the toilet was filled with sewage when I
18 saw the bathroom, which by the way was just filled
19 with trash as well that you couldn't even see the
20 toilet.  There was so much trash in the bathroom and
21 actually everywhere.  You couldn't even walk around.
22 There was trash bags and trash and garbage and --
23 everywhere, so the water was turned off because of I
24 think there was leaking, and the floor was
25 collapsing.  The kitchen floor had a huge hole,

Page 63

1  where you could see into the basement from the
2  kitchen because of some sort of water leaking, so
3  the utilities were all off.
4  Q.       Okay.  And you're not sure who turned them
5  off, whether it was you or Lingo or somebody else?
6  Would that be fair?
7  A.       I don't recall, but I know that the
8  utilities had to be put in my name when I took
9  ownership of the house, that was something that had
10 to be done, so I believe they were all put in my
11 name.
12 Q.       That would have been after July 19th?
13 A.       Yes.
14 Q.       Okay.  And when they were put in your
15 name, the utilities weren't on, they were just
16 officially no longer in Lingo's name or
17 Rockwell-Glynn, they were --
18 A.       I don't think they were ever in
19 Rockwell-Glynn's name because --
20          MR. BARTOS:  Make sure he
21      finishes the question.
22          THE WITNESS:  Oh, sorry.
23 BY MR. SCHROM:
24 Q.       You can continue what you were saying.
25 A.       What's the question?

Page 64

1  Q.       Do you know whether they were ever in
2  Rockwell-Glynn's name?
3  A.       I don't know, but I would assume no.  They
4  owned the property for a day.
5  Q.       When did you become first aware of the
6  August 9th order?
7  A.       I don't remember.
8  Q.       Do you know if it would be around that
9  time, August 9th, 10th, 11th, 12th, somewhere in
10 there?
11 A.       Probably not, because I don't remember any
12 hearings or anything.  I don't remember being given
13 notice about it or anything.  I don't remember Greg
14 telling me about it.  I don't remember him being
15 notified of it.
16 Q.       Okay.  Anything else that you did or
17 remember on August 10th?
18 A.       No.
19 Q.       Okay.  August 11th, what, if anything, do
20 you remember regarding August 11th?
21 A.       I remember it being extremely hot.  It was
22 a heat wave.  It was over 90 degrees.  I remember a
23 township inspector who was supposed to do a pest
24 inspection of the home -- and by the way, I don't
25 know if this was -- I don't know what day it was,

Page 65

1  but I know it was all going on, and they were there
2  to do the pest inspection of the home, and
3  Mrs. Ockley was locked inside, she had changed the
4  locks, she wouldn't let the inspector in.  It was a
5  requirement that the inspector inspect the house for
6  pests and, you know, for neighborhood safety
7  reasons.  She would not let them in.
8          I remember at one point the contractors,
9  the tree contractor said that she was preventing the
10 tree work, and they had to shut down for three
11 hours, because she was screaming at them and telling
12 them to stop working, even though they were
13 performing work to protect her -- the house from
14 being crushed by a tree with no leaves on it falling
15 through the home with her inside.  I remember
16 agonizing over thinking that this woman was inside
17 that house with 95-degree temperatures, no -- she
18 had no A/C that worked.  She -- she could be injured
19 at any moment, she could die at any moment.  I
20 didn't want that to happen.  I couldn't sleep.  I
21 was terrified of this woman dying, and I couldn't
22 live with myself if that happened.
23 Q.       Do you recall any other interactions that
24 you might have had on the 11th?
25 A.       With who?

Page 66

1 Q.        With the police or others?

2 A.        No.

3 Q.        Do you recall sending any emails or

4 receiving any emails on August 11th?

5 A.        From who?

6 Q.        With township officials.

7 A.        That would have been Rockwell.  Rockwell

8 was communicating with the township.

9 Q.        Okay.  Do you remember anything else about

10 the 11th?

11 A.        I mean, that's a lot.  It was a horrible,

12 horrible day.

13 Q.        And do I understand all during this period

14 of time, 8th, 9th, August 10th, 11th, 12th, 13th,

15 14th, 15th, you still had your eye issues?

16 A.        Recovering.  Recovering.

17 Q.        Were you still in pain during that period

18 of time?

19 A.        I don't remember.  I'm still in pain.

20 Q.        Anything else that you can recall

21 regarding the 11th?

22 A.        The 11th?

23 Q.        Yeah.

24 A.        Not off the top of my head.

25 Q.        August 12th, do you have any recollection

Page 67

1 of what transpired on or about August 12th?

2 A.        Yes.  I had to sit in my house, after not

3 sleeping for three days, knowing that a woman might

4 be dying in a house that was deemed hazardous and

5 uninhabitable, unsafe to occupy, with a fire hazard,

6 a risk of burning, a risk of collapsing with her

7 inside, and I was beside myself that this woman was

8 going to die in that house.

9 Q.        Okay.  Do you recall anything else that

10 transpired on that day, or were --

11 A.        Yes, I was --

12 Q.        -- you informed of anything else?

13 A.        No, I was left with no choice but to -- I

14 didn't know what else to do, and I was fearful for

15 her life so I went to the police, and I had wanted

16 them to handle it.

17 Q.        Okay.  And what did you do -- did you

18 appear in person?

19 A.        Yes.

20 Q.        Okay.  And what transpired?

21 A.        I told the police officers that I was

22 afraid that this woman was going to die in this

23 house that the township had deemed uninhabitable,

24 unsafe, and she was handicapped.  I had seen it with

25 my own eyes how horrible the conditions were.  I

Page 68

1 wouldn't want any, any person to be living in that

2 kind of situation, and I told them I needed -- I

3 told them I needed them to address it.

4 Q.        Okay.  Do you remember who you spoke to?

5 A.        No.

6 Q.        Okay.  And do you remember how long you

7 were there?

8 A.        No.

9 Q.        Do you remember whether you gave them any

10 paperwork?

11 A.        I probably would have -- probably, yeah, I

12 don't know what.

13 Q.        Would you have given them a court order

14 from July 15th?

15 A.        I don't know.

16 Q.        Do you think you might have had the court

17 order of August 9th by that point?

18 A.        I don't think I even knew what that was,

19 no.

20 Q.        Anything else that you did on the 12th?

21 A.        Besides go to the police?

22 Q.        Yes.

23 A.        I don't know.

24 Q.        Were you informed by the police that there

25 was an attempt to 302 her?

Page 69

1 A.        The police asked me if I wanted to press

2 charges against her or have her arrested or

3 anything, and I told them all I cared about was her

4 being safe, all I cared about was that, and I did

5 not want to press charges, and I did not want her

6 arrested or anything.  I just wanted that woman to

7 be safe.

8 Q.        Okay.  And at some point did you become

9 aware that there was a 302 action initiated by the

10 police?

11 A.        I believe one of the officers called me

12 and told me what they had seen when they showed up.

13 The woman was sitting in her own filth, in a couch

14 filled with human feces.  It was over 95-degrees.

15 There was trash everywhere.  She was -- there was a

16 path that she had from the door to the couch.  She

17 was sitting there watching television, and I think

18 they said that the floor had collapsed in another

19 spot, so you couldn't even go into the kitchen area,

20 and they said that it was unsafe for her, and that

21 they brought her to the hospital.  That was my

22 understanding, and I was relieved that she was in a

23 safe place.

24 Q.        Was that Officer Cocco?

25 A.        No idea.

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 70

1  Q.      Okay.  Do you recall anything else
2  regarding the 12th?
3  A.      I don't know.
4  Q.      Okay.  Moving to the 13th, what
5  recollection do you have, if any, regarding the
6  13th?
7  A.      I was out of town.
8  Q.      Did you ever become aware that she was
9  arrested on the 13th?
10 A.      I was, yes.  Yes.  An officer called me.
11 Q.      Was that Officer Cocco?
12 A.      No idea.
13 Q.      And what did you learn from that
14 conversation?
15 A.      That she was arrested, that she was
16 hospitalized, she left the hospital, and she was
17 found on the property trying to break in again.
18 Q.      Okay.  Anything else?
19 A.      I had nothing to do with that, I didn't
20 authorize them to arrest her, I was just told about
21 it, because all I cared about was her being safe.
22 Q.      Okay.  Do you recall anything else about
23 the 13th, other than what you just testified to?
24 A.      No.
25 Q.      Do you have any recollection of the 14th?

Page 71

1  A.      No.  After that, I was completely
2  uninvolved in this.  I was -- I had my limit, and
3  I -- I didn't want to be involved.
4  Q.      Okay.  Were you aware that on the 15th
5  there was a request for reconsideration of the
6  judicial orders?
7  A.      I remember that Mrs. Ockley was completely
8  misconstruing the order for some reason, I don't
9  know why, and the judge was asked to clarify because
10 it was -- I believe that's the case, and then the
11 judge -- they went before the judge, I don't believe
12 I was there, and the judge said -- clarified that
13 the house was unsafe and was never his intention for
14 anyone to live in the house.  The intention was for
15 her to move her property out of the house.
16 Q.      Okay.  And how did you get that
17 information?  Who gave you that information?
18 A.      I don't remember.
19 Q.      Could it have --
20 A.      Telephone calls.  I don't know.
21 Q.      -- been Mr. Herman?
22 A.      Probably.  Yeah, probably.
23 Q.      Okay.  And not Mr. Lingo?
24 A.      It probably would've been Lee Herman.  He
25 went by Lee.  Lee.

Page 72

1  Q.      Okay.
2  A.      I think he might've wrote a letter to the
3  court.  I don't remember.
4  Q.      We have some documents which --
5  A.      Okay.
6  Q.      -- you can look at it later.  Did he give
7  you a copy of the request for reconsideration at any
8  point?
9  A.      Yeah, he probably did.
10 Q.      Okay.  That wasn't filed on your behalf
11 though, it was filed on behalf of Rockwell-Glynn,
12 correct?
13 A.      Yes.
14 Q.      Okay.  Do you know whether or not there
15 was ever an order that was created subsequent to
16 August 9th, in response to the request for
17 reconsideration?
18 A.      Just so you know, I was a purchaser of a
19 home.  I was given certain information.  I -- I
20 didn't have a lot of involvement in all this, nor
21 did I want to.  You know, I was told that we were
22 closing on this house on June 10th per a written
23 document and agreement, and all of this other stuff
24 didn't have anything to do with me.
25 Q.      Okay.

Page 73

1  A.      My only concern was that someone didn't
2  die on my watch, that someone didn't die without me
3  doing something to prevent it.  I couldn't live with
4  myself, I couldn't live at that house knowing
5  something like that, that I sat back and did nothing
6  while I knew someone could die.  That's the only
7  thing I was worried about at that point of time in
8  August.  I wasn't going to live my life knowing that
9  I let someone die, and be able to have a future
10 living in that home.  It's outrageous to me that
11 we're even -- this is even being discussed, because
12 it's so egregious.
13 Q.      Do you know how long she had lived in that
14 home?
15 A.      No.
16 Q.      If I suggested 20 years, do you have any
17 reason to dispute that?
18 A.      It would make sense, because the home had
19 not been repaired, and the fact that everything was
20 in disrepair and probably had not been touched in 20
21 years, yes, that would make sense to me.  I'm
22 surprised the house didn't collapse with her inside
23 it.
24 Q.      You didn't have an engineer or anybody
25 else, or a builder go and -- other than Lingo go

JEFFREY BRYDZINSKI                                    JOB NO. 1501921
MARCH 27, 2025

Page 74

1  through the house?
2  A.        I don't believe Lingo ever went through
3  the house.
4  Q.        Oh, okay.  And you didn't have any
5  engineer or structural engineer or anybody else go
6  through the house during that time, correct?
7  A.        The Radnor Township code officials
8  inspected the house and deemed it to be
9  uninhabitable, so why would I have an engineer go
10 into the house?
11 Q.        I'm just asking.
12 A.        I relied on the code officials who I think
13 is, in my industry, the preeminent authority.
14 Q.        Okay.  I'd like to just take you through
15 some questions regarding the legal parts of this.
16 There may be other legal and factual ones, but just
17 starting with order number one from Judge Whelan,
18 did you ever seek advice regarding what that order
19 said?
20 A.        No.  I was present in the court, and I
21 heard what was said, I saw what was said, and the
22 purpose of the order was to get her to safely, at
23 her own risk -- because the judge told her, ma'am,
24 you're an elderly woman in a dangerous home that is
25 filled with trash and rubbish, you should have a

Page 75

1  professional remove all these items, and I know that
2  Greg at his own cost was going to have professional
3  people safely remove the items from the home.
4          The other concern was that the -- that the
5  items in the home were sitting there in a vacant
6  home with no conditioning for four -- over four and
7  a half months, and her whatever was in that house
8  wasn't even safe from the elements, or to be
9  destroyed by the house itself, so Mr. Lingo bent
10 over backwards coming up with solutions, offering
11 people to help her, offering to transfer her to the
12 house to sit there as he would carry items out one
13 by one asking her what she wanted done with them,
14 where she wanted them put.
15         There was so much effort that went into
16 accommodating her to get her stuff out of that house
17 safely.  She would agree to it, and we would pay for
18 -- Mr. Lingo would arrange the transport, would
19 arrange the -- would arrange all the type of --
20 whatever they were talking about to accommodate her,
21 and she would agree to it, they'd spend all the
22 time, all the resources to make it happen, and then
23 she would say no, and then it didn't happen.  There
24 was so many efforts that were going in to getting
25 that stuff out of the house safely so that she was

Page 76

1  not harmed in the process, and so that her items
2  weren't harmed in the process, and that's all the
3  order was, so I really don't even understand what
4  we're talking about here.
5  Q.        Well, when you saw the order, the order --
6  and we'll reference it in a moment -- talked about
7  unlimited and unfettered access to the house,
8  correct?
9  A.        Yes, access to remove her personal
10 property, it's the whole sentence, to remove.  That
11 was the most important part of what the judge was
12 conveying.  That was the only purpose.  She didn't
13 even own the house.
14 Q.        In August you owned the house?
15 A.        That's correct.
16 Q.        Regarding that first order of Judge
17 Whelan, did you ever review case law regarding --
18 A.        I wasn't an attorney on the case.
19             MR. BARTOS:  Just let him finish
20         the question.
21             THE WITNESS:  Okay.
22 BY MR. SCHROM:
23 Q.        As to any ambiguity that that order may
24 have presented?
25 A.        I wasn't involved in that litigation, or

Page 77

1  that complaint, or any of that.
2  Q.        Okay.  So the answer would be no?
3  A.        No.
4  Q.        Okay.  Did you --
5  A.        I wasn't hired to review case law.
6  Q.        Okay.  Did you ever on your own review any
7  statutory law, as it would relate to that matter?
8  A.        I don't even know what I would be looking
9  up.
10 Q.        Okay.  Did you ever do any Lexis searches,
11 regarding your understanding of that order?
12 A.        I don't understand the question.  I don't
13 even know what I would be researching.
14 Q.        Well, ultimately there's a question as to
15 whether or not the condemnation determination
16 trumped the court order, that's an aspect of this
17 litigation, would you agree?
18 A.        No, I wouldn't.
19 Q.        You would not.  Okay.
20 A.        I don't -- I'm not saying I agree to
21 anything.  I don't understand what you're saying.
22 Q.        Well, it appears as though you're saying
23 that the house was in horrible shape, there was a
24 condemnation order, the condemnation order should be
25 followed?

Page 78

1  A.        There was no conflict between the two
2  orders.
3  Q.        I mean condemnation determination, not an
4  order.  There's a judicial order, and there's a
5  condemnation determination.
6  A.        Yes.
7  Q.        So it seems like you're heavily focusing
8  on the condemnation determination, but there's also
9  the judicial order.
10                MR. BARTOS:  Objection.
11         Argumentative.  You've answered it
12         already.  If you want to answer it again,
13         you can.  If you don't want to, you don't
14         have to.
15                THE WITNESS:  I have had 22
16         years of experience in construction law.
17         When there is a -- anything that deals
18         with the threat to human life, it is the
19         top issue in anything, because you're not
20         going to let a human being die ever.  That
21         is the most important thing in
22         construction law, or any type of law
23         related to that, so there is no conflict
24         between those orders whatsoever.  If
25         there's a threat to human life, that is

Page 79

1         always precedent or top priority to
2         anyone, to any judge, to anyone, as it
3         should be, so I don't see a conflict
4         between the two orders.
5  BY MR. SCHROM:
6  Q.        Between the two?
7  A.        The two documents.  There's no -- they run
8  simultaneous to one another.  There was no question
9  of anything to do with living at this house.  I
10 don't know why you keep saying that.  The judge
11 never intended for her to live there.  Why would any
12 person want this woman to live there, live in a
13 house that was uninhabitable, that was about to blow
14 up at any moment, that was about to burn down, that
15 was about to collapse?  What person would ever think
16 that anyone would be living in that structure?
17        The only issue on the table was how to get
18 her items out of the house without them being
19 damaged, and someone getting hurt in the process.
20 The judge said you should have a professional do
21 this, Miss, why would you not want that?  She got
22 upset and said, no, I don't want anyone helping me.
23 So the judge said, well, then you realize there's
24 risks involved in this, you can get hurt?  And she
25 said I'll take it on at my risk.  And the judge said

Page 80

1  that, okay, I will give you access to remove your
2  things at your risk.  That was all that was being
3  discussed in that order, so, no, I didn't do any
4  research or case law, because the judge was telling
5  her at her risk she can get her stuff out of the
6  house, even though she was advised that it was very
7  against her interest, because she could get
8  seriously hurt.  It was very upsetting to me that
9  she would not take help and do that, that she was
10 going to put herself at risk.  And I saw that house,
11 there's no way a woman, an elderly woman who could
12 not walk could do anything to remove her stuff in
13 that house, so I was very concerned for her.
14 Q.        I'd like to direct your attention if I
15 could, to judge's order number two.  You may have
16 already told me this, but when do you think in
17 estimate you might have seen order number two, which
18 was created on August 9th?
19                MR. BARTOS:  Objection.  Asked
20         and answered.  You can answer again.
21                THE WITNESS:  Yeah, I already
22         answered that.
23 BY MR. SCHROM:
24 Q.        I'm finished with this part of it, but I
25 would like to start walking through the document

Page 81

1  pack, but I'd rather just break for lunch, and then
2  go through the rest of it.  I have probably another
3  hour and a half.
4  A.        Can't we just get this done?
5  Q.        I'd really like to take a break.
6  A.        I'd really like to get back to work.  I
7  mean, this has taken a lot of my time already.
8  Q.        I understand.
9                MR. BARTOS:  How short of a
10         break can we take?
11                MR. SCHROM:  40 minutes I think
12         is realistic.
13                MR. BARTOS:  Can we do 30?  Chew
14         fast?
15                MR. SCHROM:  Yeah, 1 o'clock.
16                THE WITNESS:  I guess I have no
17         choice, do I.
18                VIDEOGRAPHER:  Should I go off
19         the record?
20                MR. SCHROM:  Yeah.
21                VIDEOGRAPHER:  Off the record at
22         12:16.
23           (At this time, a luncheon recess
24       was taken.)
25                VIDEOGRAPHER:  We are back on

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 82

1    the record at 1:12.
2            (P-2 Brydzinski was introduced and
3        marked for identification.)
4  BY MR. SCHROM:
5  Q.        I would like now to run through some
6  exhibits, and I'll have some questions regarding
7  them.  First exhibit is -- the second exhibit
8  rather, is the executed agreement of sale between
9  Rockwell-Glynn, Lingo and Simona Ockley.
10            MR. BARTOS:  Do you mind if I
11        preserve my objection to the extent
12        there's handwriting on any of these that
13        may not turn out to be on the original?
14            MR. SCHROM:  Okay.  That's fine.
15            MR. BARTOS:  That way I don't
16        have to keep saying it.
17            MR. SCHROM:  Yep.  That's
18        acceptable.
19            MR. BARTOS:  Appreciate it.
20  BY MR. SCHROM:
21  Q.        Can you take a moment to review that
22  exhibit?
23  A.        I looked through it.
24  Q.        Okay.  Are you able to identify that
25  agreement or that document?

Page 83

1  A.        Looks like a standard agreement of sale of
2  real estate, yeah, for the property.
3  Q.        Okay.  Did you ever see that document
4  prior to today?
5  A.        Yes.
6  Q.        Okay.  When would that have been,
7  approximately?
8  A.        I don't recall.
9  Q.        I'd like to show you another document,
10  Radnor Township EMS report.
11            (P-3 Brydzinski was introduced and
12        marked for identification.)
13  BY MR. SCHROM:
14  Q.        Are you able to identify that document?
15  A.        What is your question?
16  Q.        Are you able to identify that document?
17  A.        I don't understand the question.
18  Q.        Have you ever seen that document?
19  A.        No.
20  Q.        Okay.  In looking through the document,
21  does that appear to be one that indicates that
22  Simona Ockley called Radnor Fire Company on or about
23  May 21, 2022?
24            MR. BARTOS:  Objection to form.
25        You can answer.

Page 84

1            THE WITNESS:  I have no idea.
2  BY MR. SCHROM:
3  Q.        Okay.
4  A.        It's several pages, very small print.  I
5  can't even read it.  I don't know.
6  Q.        Okay.  But just looking at the very first
7  page, if you look to the top, left-hand corner, you
8  see a last and first name?
9  A.        Simona Ockley.
10  Q.        Okay.  And then, if you look on the right
11  side, in the top white area, the date -- you see the
12  date?
13  A.        It says 4/21/22.
14  Q.        Okay.  And then, looking further down
15  under the injury section of the third column, do you
16  see that?
17  A.        Is there a question for me other than
18  reading this?
19  Q.        Yeah, I just want to know --
20            MR. BARTOS:  Just let him ask
21        the question.
22  BY MR. SCHROM:
23  Q.        -- whether you see that injury
24  delineation, the word injury?
25  A.        Yeah, it says injury.

Page 85

1  Q.        Okay.  And to the right of that, it says
2  fall on same level, home, 4/11/2022, correct?
3  A.        It says that.
4  Q.        Okay.  On or around 4/21/22 did you become
5  aware of her calling 9-1-1 and Radnor Fire Company?
6  A.        No.
7  Q.        When was the first time that you became
8  aware of that she had an injury?
9  A.        I don't know.
10  Q.        Do you have an approximate --
11  A.        No.
12  Q.        -- amount of time?  Do you know whether it
13  was in April, May, June, July?
14  A.        I don't know.
15  Q.        Okay.
16            (P-4 Brydzinski was introduced and
17        marked for identification.)
18  BY MR. SCHROM:
19  Q.        I'd like to show you a document previously
20  marked P-4.  Are you able to identify that document?
21  A.        Are you saying identify it by just reading
22  the title?
23  Q.        That would be fine.
24  A.        It says Radnor Township PD incident report
25  form.

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 86

1  Q.        Okay.  Have you ever seen that document
2  prior to today?
3  A.        No.
4  Q.        Okay.  I'd like to direct your attention
5  to page three of that document, wherein I'd like you
6  to read one section beginning with I spoke with
7  staff at the hospital.
8  A.        I'm just reading it?
9  Q.        Yes.  This, I believe, is a report from --
10                MR. BARTOS:  Sorry, what page,
11        Mr. Schrom?
12                MR. SCHROM:  Three.
13                MR. BARTOS:  Three?
14                MR. SCHROM:  Yeah.
15  BY MR. SCHROM:
16  Q.        Officer Mark Bates, did you ever meet or
17  speak with Mark Bates?
18  A.        I have no idea.
19  Q.        Did you ever speak or meet with Sergeant
20  Katherine Reardon?
21  A.        I have no idea.
22  Q.        Okay.  If you would read that sentence?
23  A.        "I spoke with staff at the hospital"?
24  Q.        Yes.
25  A.        "Who advised Ockley will be admitted for

Page 87

1  treatment, then to rehab for long-term care."
2  Q.        Do you have any independent knowledge that
3  that information is correct -- incorrect rather?
4  A.        I don't know her medical treatments, no.
5  I don't know.
6  Q.        Okay.  Thank you.
7                (P-5 Brydzinski was introduced and
8        marked for identification.)
9  BY MR. SCHROM:
10  Q.        Next is a notice posted on Ockley door,
11  condemnation.  Not on that one.
12  A.        Excuse me?
13  Q.        It's a different document.  I'm finished
14  with that one.
15  A.        I was reading the rest of the sentence,
16  paragraph, to see what this means, because I have no
17  idea.
18  Q.        Okay.
19  A.        Something in here about a cleanout
20  service, so I don't know what this means.
21  Q.        Okay.
22  A.        So I assume that they were trying to
23  clean -- remove her items.  I don't know.
24                MR. BARTOS:  It's okay if you
25        don't know, just say you don't know.

Page 88

1                THE WITNESS:  All right.
2  BY MR. SCHROM:
3  Q.        Next document, P-5, notice posted on
4  Ockley door regarding condemnation, have you ever
5  seen that document, or can you identify that
6  document, rather?
7  A.        Well, it's a picture of what looks like a
8  legal notice of danger.  This structure is declared
9  unsafe for human occupancy or use.  It is unlawful
10  for any person to use or occupy this building after
11  4/21/22, so, yeah, I saw this sign, it was posted on
12  every entranceway of the building, the dwelling.
13  Q.        And when did you recall that you saw that
14  notice?
15  A.        Any time I was at the site for a site
16  inspection of the outside area.
17  Q.        Okay.
18  A.        It was on every single door.
19  Q.        Okay.  And so when was the first time you
20  saw that, would you estimate?
21  A.        I don't know when I -- when I would have
22  been -- any time I was on site, I saw that legal
23  notice.
24  Q.        Okay.
25  A.        As did anybody who was on site.

Page 89

1  Q.        Okay.  How many times were you on site
2  overall would you say?
3  A.        I don't --
4                MR. BARTOS:  You mean -- can you
5        narrow that to --
6  BY MR. SCHROM:
7  Q.        Before the property was demolished?
8  A.        I don't know.
9  Q.        Okay.
10                (P-6 Brydzinski was introduced and
11        marked for identification.)
12  BY MR. SCHROM:
13  Q.        I'd like to show you an exhibit which will
14  be marked P-6.  Are you able to identify that
15  document?
16  A.        Yeah, this is the notice of condemnation.
17  Q.        Okay.  And that relates to property
18  maintenance?
19  A.        Excuse me?
20  Q.        And that notice of condemnation relates to
21  property maintenance; is that correct?
22  A.        I don't understand what you're saying.  It
23  states --
24  Q.        I was just looking at the notation on the
25  first page.

JEFFREY BRYDZINSKI                                        JOB NO. 1501921
MARCH 27, 2025

Page 90

1 A.        I'm looking at the notice of violation.
2 It says the building structure, any portion thereof,
3 is clearly unsafe for its use and occupancy.  It
4 says it has -- it's unsanitary, unfit for human
5 habitation, or in such a condition that is likely to
6 cause sickness or disease.  It says that there's a
7 substantial risk of fire, building collapse, or any
8 other threat to life and safety.  It says the
9 building structure, or any portion thereof, is
10 clearly unsafe for use and its occupancy.  It says
11 it lacks sufficient or proper fire resistent rated
12 construction, fire protection systems, electric
13 systems, fuel connections, mechanical systems,
14 plumbing systems, or other causes determined by the
15 code official to be a threat to life or health.
16        Due to the amount of clutter, filth and
17 rubbish throughout the house, the dwelling was found
18 to be unsanitary, lacking maintenance and in general
19 state of disrepair.  Every room of the dwelling
20 contained a significant amount of filth, clutter,
21 debris and rubbish.  These conditions constitute
22 violations of this code section.  Debris and rubbish
23 were observed throughout the inside of the dwelling.
24 This constitutes a violation of the code section.
25 The kitchen area was observed with a significant

Page 91

1 amount of clutter and filth as being kept in an
2 unsanitary condition.  This constitutes a violation
3 of this code section.  Smoke alarms were not
4 observed in the dwelling unit.  The dwelling shall
5 be vacated immediately and shall be secured to
6 prevent entry by unwanted individuals, and shall not
7 be reoccupied until the above listed violations have
8 been corrected.
9        It gives an appeal right.  It states
10 adults may occupy this dwelling during the hours of
11 8:00 a.m. to 4:00 p.m. only for the sole purpose of
12 abating the violations.  There shall be no other
13 activity on the property, including cooking,
14 sleeping, conducting other business, et cetera,
15 other than the activity of abating the violations.
16 No children shall be permitted in the dwelling.  The
17 property shall not be reoccupied until all of these
18 violations have been corrected, and a compliance
19 reinspection shall be conducted by the office before
20 the dwelling is reoccupied.
21 Q.        Is this the condemnation notice that you
22 were referring to previously?
23 A.        Yes.
24 Q.        Okay.  Do you know whether or not this
25 notice was presented to the judge?

Page 92

1 A.        I don't know.
2 Q.        The hearing was on July 11th or
3 thereabouts, correct?
4 A.        I don't remember the exact date.
5 Q.        Do you have any reason to believe it was
6 not on that day?
7 A.        No reason to believe it wasn't.
8 Q.        This document was created on or about
9 April 26th, correct?
10 A.        It's dated April 26, 2022.
11 Q.        Right.  Several months before that
12 hearing, correct?
13 A.        Yes.
14 Q.        Do you know whether you presented -- did
15 you have a copy of this, you said, with you on that
16 day?
17        MR. BARTOS: Objection. Asked
18        and answered.  You can answer again.
19        THE WITNESS: I don't know.  I
20        know I had seen it.
21 BY MR. SCHROM:
22 Q.        Okay.  And you're not certain of whether
23 or not this was presented to the judge at that
24 hearing?
25 A.        I don't know.  I would have thought so,

Page 93

1 yes.  I don't know.
2 Q.        The attorney Mr. Herman, to the best of
3 your knowledge did he have a copy of that notice of
4 condemnation as well?
5 A.        You would have to ask Lee Herman.
6        (P-7 Brydzinski was introduced and
7        marked for identification.)
8 BY MR. SCHROM:
9 Q.        I'm going to show you a document marked
10 Radnor Township property violation.  This is a
11 document previously marked P-7.  Are you able to
12 identify that?  Sorry.
13 A.        What is the question?
14 Q.        I didn't have a question, other than are
15 you able to identify the document?
16 A.        I can read the heading of it.
17 Q.        Okay?
18 A.        Notice of violation, property maintenance.
19 Q.        Prior -- when was the first time you saw
20 this document?
21 A.        I didn't say I saw this document.
22 Q.        Okay.  Did you ever see this document?
23 A.        I don't know.
24 Q.        Do you know whether the document was
25 presented to the judge?

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 94

1  A.        This is about cutting the grass.
2  Q.        Right.
3  A.        I don't know.
4  Q.        Okay.  Next document is the amendment to
5  agreement of sale.
6                  (P-8 Brydzinski was introduced and
7            marked for identification.)
8  BY MR. SCHROM:
9  Q.        I'm showing you a document previously
10 marked P-8.  Are you able to identify that document?
11 A.        Yes.
12 Q.        And what is that document?
13 A.        It's an amendment to the agreement of sale
14 setting the closing date for June 10, 2022.
15 Q.        When was the first time that you saw this
16 document, to the best of your recollection?
17 A.        Probably when it was signed.
18 Q.        Which would have been?
19 A.        It says April 17, 2022.
20 Q.        And I believe that you referenced this
21 document previously?
22 A.        Yes, because the seller or the purchaser
23 of my home wanted to close in July, and I didn't
24 have the funds to make this purchase, so I needed to
25 negotiate my price with that seller to -- for them

Page 95

1  to close early, which was a financial hit to me.
2  Q.        Okay.  Was June 10th a date that was
3  discussed with Greg Lingo?
4  A.        It was a closing date.
5  Q.        I know, but --
6  A.        In a contract.
7  Q.        Okay.  Do you have any other recollections
8  regarding the amendment?
9  A.        It's a standard amendment that sets a
10 closing date, which I worked hard to meet.
11 Q.        Okay.  Do you know -- do you have any
12 knowledge as to where that document was signed?
13 A.        No.
14 Q.        Okay.
15                  (P-9 Brydzinski was introduced and
16            marked for identification.)
17 BY MR. SCHROM:
18 Q.        Next document I'm going to show you is, I
19 previously referenced it, Rockwell-Glynn Complaint.
20 It's previously marked P-9.  Can you identify that?
21 A.        Well, there's a bunch of notations all
22 over it.
23 Q.        Okay.
24 A.        Things are crossed out, questions marks,
25 circled.

Page 96

1  Q.        Got it.  I think we can stipulate that was
2  not part of the original --
3  A.        Okay.  Verification.
4  Q.        -- and should be considered excluded?
5  A.        Yeah, looks like the Complaint that was
6  filed when Ms. Ockley defaulted on her contract.
7  Q.        Okay.  Do you know whether the attorney
8  Lee Herman met with you in preparation for this
9  Complaint?
10 A.        In person?
11 Q.        Or via telephone or Zoom?
12 A.        Yes.
13 Q.        Okay.  And would it be fair to say that
14 you explained the circumstances and wanted to
15 expedite the matter?
16 A.        I didn't want to --
17                  MR. BARTOS:  Objection to form.
18            You can answer.
19                  THE WITNESS:  Yeah, there was no
20            expediting anything.  There was a closing
21            date, which Mrs. Ockley defaulted on.
22 BY MR. SCHROM:
23 Q.        Okay.  So that relates to the breach of
24 contract piece?  Would that be fair?
25 A.        I had transferred my funds to close to the

Page 97

1  title agent on June 9th.  I had no idea why we were
2  not closing on June 10th, as I was promised.
3  Q.        Okay.  Do you know whether or not you ever
4  saw a copy of this Complaint before it was filed?
5  A.        I don't know if I saw it before it was
6  filed.
7  Q.        But you did assist in the preparation; is
8  that fair?
9  A.        I provided facts to Mr. Herman.
10 Q.        Okay.  You've read the Complaint at a
11 subsequent point?
12 A.        Yes.
13 Q.        Does all the information appear to be true
14 and correct, to the best of your knowledge?
15 A.        Yes, as it relates to me.
16 Q.        Okay.  So Rockwell-Glynn, with some of
17 your assistance, agreed to allow the Court of Common
18 Pleas to assist in this matter; is that correct?
19                  MR. BARTOS:  Objection to form.
20            THE WITNESS:  I don't understand
21            the question.
22 BY MR. SCHROM:
23 Q.        You submitted the different problems that
24 you had to the Court of Common Pleas for possible
25 resolution, correct?

JEFFREY BRYDZINSKI                                    JOB NO. 1501921
MARCH 27, 2025

Page 98

1            MR. BARTOS:  Objection.
2            THE WITNESS:  I didn't submit
3       anything.
4  BY MR. SCHROM:
5  Q.      Mr. Herman did with your assistance,
6  correct?
7            MR. BARTOS:  Objection to form.
8            THE WITNESS:  I provided facts
9       to Mr. Herman.  I don't know what the
10      question -- I don't understand the
11      question.
12 BY MR. SCHROM:
13 Q.      Well, isn't it true that there were issues
14 that were surrounding the property that you -- and
15 we have talked about, and all of that was presented
16 to the court on July 11th at a hearing?
17           MR. BARTOS:  Sorry --
18           THE WITNESS:  What is the
19      question?
20           MR. BARTOS:  -- could you read
21      the question back, please?
22           (The court reporter read back for
23      the record.)
24           MR. BARTOS:  I'm just going to
25      object, form, foundation and speculation,

Page 99

1       but if you understand the question --
2            THE WITNESS:  I don't.
3            MR. BARTOS:  -- you can answer.
4            MR. SCHROM:  All right.  Well,
5       we can redo it.
6  BY MR. SCHROM:
7  Q.      So Mr. Herman filed a Complaint on behalf
8  of Rockwell-Glynn, correct?
9  A.      It says Lee Herman, attorney for
10 plaintiff, the caption is Rockwell-Glynn v. Simona
11 Ockley.
12 Q.      Okay.  And as a consequence of this
13 presentation, there was a hearing scheduled,
14 correct?
15           MR. BARTOS:  Objection to form.
16      You can answer.
17           THE WITNESS:  I don't know if
18      the hearing was in relation to this.
19 BY MR. SCHROM:
20 Q.      Well, you attended a hearing, correct?
21 A.      Yes.
22 Q.      Okay.  What did you think the hearing was
23 in relation to?
24 A.      I don't know.  I don't know if it was
25 associated with this or something else, but I

Page 100

1  attended the hearing.  This was not my lawsuit.
2  Q.      Did you meet with Mr. Herman and Mr. Lingo
3  prior to that hearing?
4            MR. BARTOS:  About anything at
5       any time?
6            THE WITNESS:  Yeah, I don't --
7  BY MR. SCHROM:
8  Q.      No, I mean on that day, sorry.  On that
9  day, that would be July 11th, prior to the hearing,
10 did you meet with Mr. Lingo and/or Mr. Herman?
11 A.      I went to the courthouse and went and
12 attended the hearing.
13 Q.      Did you talk with them immediately prior
14 to the hearing?
15 A.      I don't remember.
16 Q.      Did Mr. Herman ever say this is why we're
17 here today?
18 A.      This Complaint?
19 Q.      Yes.
20 A.      I knew why we were there.  Mrs. Ockley had
21 defaulted on her closing date, which I had
22 transferred the funds to close, and the meeting --
23 the hearing was about how to -- her title had
24 already transferred over, the title needed to be
25 recorded, and we needed to figure out a safe way for

Page 101

1  her to remove her items from the house, which she no
2  longer owned.
3  Q.      Okay.  And this Complaint was part of
4  that, correct?
5  A.      I guess so.  I wasn't involved in the
6  legal piece of this.
7  Q.      Okay.
8            (P-10 Brydzinski was introduced
9       and marked for identification.)
10 BY MR. SCHROM:
11 Q.      I'm going to show you a document that has
12 been previously marked.  It's a transcript of the
13 proceedings.  It's been marked P-10.  You indicated
14 that you never saw a transcript; is that correct?
15           MR. BARTOS:  I'm sorry, Counsel,
16      I don't mean to interrupt, but I assume
17      you mean prior to physically putting it in
18      front of him?
19           MR. SCHROM:  Yes.  Thank you.
20           THE WITNESS:  I really don't
21      know.  I really don't.  I'm getting really
22      tired.  I don't know.
23 BY MR. SCHROM:
24 Q.      Okay.  I'd like to direct your attention
25 to certain pages of that transcript.  I'd like to

Page 102

1  direct your attention to page eight.
2  A.       And this is a 51-page transcript.
3  Q.       Right.  This is page eight.
4  A.       Yes.
5  Q.       All right.  So if you would read into the
6  record the first two -- three sentences?
7  A.       Where?
8  Q.       Starting with the plaintiff's buyer.
9  A.       Who's saying this?
10 Q.       Mr. Herman.
11 A.       Well, you're asking me to read in the
12 middle of his statement, so I'll start at the
13 beginning.  "Mr. Herman:  And my client was prepared
14 to accommodate, do whatever was necessary to
15 understand the situation and move the property in a
16 way that was comfortable for both parties.  In the
17 interim, my client had in turn met with a buyer who
18 signed an agreement with my client, my plaintiff's
19 buyer.  The property was to be demolished and a new
20 home would be built from the plaintiff's buyer.  The
21 plaintiff's buyer was anxious to move that process
22 forward.  He had his own financing in place, and
23 subsequently we have learned that the property has
24 been condemned by the Township of Radnor.  It is no
25 longer fit for human habitation."

Page 103

1  Q.       Okay.
2  A.       "And we are in position where essentially
3  I believe what, as I learned in law school, perhaps
4  I'm wrong, but when an agreement of sale is signed
5  on real estate, the buyer becomes an equitable
6  owner, but I believe" -- and then the court --
7  Q.       That's okay.
8  A.       -- got involved.
9  Q.       That's fine.  Wait a moment.
10          MR. BARTOS:  We spoke too soon
11          about Mr. Botel's silence.
12          MR. SCHROM:  We did.
13 BY MR. SCHROM:
14 Q.       Anyway, so I'm just focusing on the
15 condemnation language for a moment.  So the judge
16 was informed that the property had been condemned by
17 the township, correct?
18 A.       Mr. Herman said what we just read.
19 Q.       Right.  So the judge was informed at least
20 verbally, and maybe with documents, that the
21 township condemned the property, correct?
22 A.       I guess.
23 Q.       Okay.  I'd like to direct your attention
24 to --
25          THE WITNESS:  This is taking

Page 104

1          forever.
2          MR. BARTOS:  Listen to the
3          questions, and answer them as best you
4          can.
5  BY MR. SCHROM:
6  Q.       -- page 37 starting with lines 16 through
7  21.  This is the court speaking.  Can you read that
8  into the record starting with your attorney on 16?
9  A.       "Court:  The closing, though you'd be the
10 closing, is going to have to occur before the end
11 of" -- dot, space, space --
12 Q.       Let me -- wait a minute.
13 A.       "but you're going to be able to retrieve
14 and/or go back to this property somehow if you get
15 permission to do so" --
16          MR. SCHROM:  I'm going to stop
17          your client.  I didn't ask him to read
18          that section.
19          THE WITNESS:  Well, I can't just
20          read something out of thin air.  I need to
21          have the context of what I'm reading, if
22          you're going to ask me a question about
23          it.
24 BY MR. SCHROM:
25 Q.       It's fine for you to read the entire thing

Page 105

1  first, but I'm focusing on a certain section of
2  that, so --
3  A.       Well, I believe you need to read
4  everything into context, to understand what a
5  sentence is.
6  Q.       And that may be, but the deposition is
7  being conducted by me and your counsel.
8  A.       So I'm just being brought in here to
9  read --
10          MR. BARTOS:  No.
11          THE WITNESS:  -- items from a
12          transcript?
13          MR. BARTOS:  Well, if he wants
14          you to -- if he wants you to read specific
15          sentences, that's a reasonable question.
16          If you believe it's misleading, you can --
17          you can let counsel know that and why, or
18          if you're not comfortable --
19          THE WITNESS:  I have no idea --
20 BY MR. SCHROM:
21 Q.       Okay.  Well --
22 A.       I'll sit and read the whole thing then.
23 Q.       -- take a moment to read that section from
24 16 through 21 --
25 A.       I feel like I need to read this whole

Page 106

1 transcript, to be honest with you.
2 Q.        Well, I mean, do you need to take a
3 moment, or come back on another day?
4 A.        No.  I have a career, a job.  I have
5 important stuff to do.
6 Q.        Okay.
7 A.        Okay.  I'm not going to read this whole
8 thing, so what do you want me to read?
9 Q.        16 through 21.  The court is speaking.
10 A.        "You're going to still have a right.  Your
11 attorney will assist and there will be an agreement,
12 a court order that will make -- that will
13 incorporate an agreement between the parties that
14 says that although the property has been officially
15 sold, that you're allowed to live and/or access the
16 property up until September 1st."
17 Q.        Okay.  Does that refresh your recollection
18 as to whether the judge addressed the issue of
19 living in the property?
20 A.        This is an absolute misconstruing of an
21 entire -- let's see -- 51-page document, and that's
22 not at all what the judge meant, and I believe the
23 judge was asked to clarify, and an order was
24 subsequently issued where it stated exactly what the
25 judge meant, and it had -- it was absolutely not

Page 107

1 authorization for her to live in a house that's been
2 condemned and deemed a threat to human health and
3 safety.  No judge in this country would put someone
4 in harm.
5 Q.        I'd like to direct your attention to page
6 38, lines 23, 24, and runs over into the next page.
7 A.        23, 24.  "I don't know what you're saying.
8 We'll have a court order allowing you access and/or
9 residency at the property up until September 1st so
10 you'll have a court order in your hand."
11 Q.        Okay.  Would you agree that this is a
12 second reference to allowing her to reside on the
13 property?
14              MR. BARTOS:  Objection to form.
15              THE WITNESS:  No, I do not
16              believe that's at all what the judge
17              meant.
18 BY MR. SCHROM:
19 Q.        Okay.  But that's what he said --
20              MR. BARTOS:  Objection to form.
21 BY MR. SCHROM:
22 Q.        -- do you have any reason --
23 A.        No.  He says and/or, and it would be
24 handled in an order.
25 Q.        Okay.

Page 108

1 A.        And it was.  The order stated that she was
2 allowed permission to remove.  It never said
3 anything about living, and if the judge said it here
4 in this transcript, it's because after, when the
5 order was worked out, it was deemed that it was
6 unsafe to live in the house, so that's why those
7 words are not in the order.  It's funny that he says
8 that an order will address it, but it does not -- he
9 does not use those words in the order.  There is no
10 word live in any of those orders, because everybody
11 knew that it was a threat to her life living in that
12 house, and that's why the order does not use this
13 language, and he does not say that that's the
14 ruling.  He says that the order will set forth
15 whether you can live and/or remove your items, and
16 that is very, very -- an important distinction
17 between what you're implying, and what that order
18 actually says.
19 Q.        Okay.  I'd like to direct your attention
20 to 39, lines 23 and 24, beginning with I'm giving
21 you.  Just that one sentence is sufficient.
22 A.        Okay.  What do you want me to read?
23 Q.        Where it says I'm giving you to September
24 1st?
25 A.        "I'm giving you to September 1st to live

Page 109

1 and/or access the property."
2 Q.        So do you recall the judge making that
3 statement?
4 A.        I recall the judge saying and/or, and when
5 it was understood that it was unsafe to live at a
6 condemned residence, he wrote an order that said
7 access only, basically.  It says you have access to
8 remove your personal property.  It never used the
9 word live in the order.  This is a 51-page hearing,
10 and you're trying to pick and choose different
11 things when there's an and/or present.  It's very
12 insulting, actually, and really shocking to me that
13 we're talking about this, that we're talking about a
14 woman living in a home -- who would ever want to
15 live in a home that could collapse on them, that
16 could combust into flames, that could have a tree
17 fall through the ceiling on them.  What are we even
18 talking about here?
19 Q.        I'd like to direct your attention to 44,
20 if I may, lines 22 and 23, if you would review that
21 section?  The court is again speaking.
22 A.        "You have free access to this property to
23 do whatever you want from now until September 1st."
24 Q.        Do you recall the judge making that
25 statement?

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 110

1  A.      It's right here in the transcript.
2  Access, again, access to the property.
3  Q.      Indicating to do whatever you want,
4  correct?
5  A.      The point of this hearing was to move her
6  stuff.  What are we talking about here?  I do not
7  understand this.  I do not understand what we're
8  talking about here.  We're trying to establish that
9  the woman should live in a building that was
10 collapsing, in a building that was dangerous, that a
11 code official said was life -- a threat to her life,
12 that was prone to cause sickness and disease, that
13 was -- that was filled with debris, rubbish, that
14 had no working utilities, that had no plumbing?  I
15 don't understand what's going on here.
16 Q.      I'd like to direct your attention to 45,
17 page 45, lines three, four and five?
18 A.      "Okay.  Just make sure the order reflects
19 that she has the complete and free access up until
20 the 1st."
21 Q.      Does that refresh your recollection as to
22 what the judge commented on regarding
23 availability --
24 A.      I remember that when the order was being
25 worked out by the court, the judge understood the --

Page 111

1  the issue with the -- maybe at this point he did
2  not, but by the time the order was written, he made
3  sure that the order did not say live.  At the end of
4  the day, he signed the order.
5  Q.      I'd like to direct your attention to 45,
6  line 18, where it begins she may, to the end of the
7  sentence?
8  A.      "I'm going to" -- there's a space -- "she
9  may even move there, I don't know.  I don't know
10 what her -- she can't move in there.  Radnor
11 Township will not allow it.  Well, that's fine, but
12 I don't know if she goes in and fixes it up, if
13 that's a different issue.  I called residents center
14 access for a very specific reason."
15      That does bring some -- to prevent from
16 removing, I guess the condemnation -- I don't what
17 the issues -- the judge didn't know what the issues
18 were.  I guess the condemnation notice wasn't
19 presented to the judge.  He didn't know the
20 seriousness of what this house was, and it could
21 have been a violation for grass, like you showed me.
22 It wasn't a violation for grass.  It was about 10 or
23 15 life-threatening violations, and it's clear to me
24 now that you presented this to me and refreshed my
25 memory that the judge was not aware of the serious

Page 112

1  nature of -- perhaps wasn't aware, but what the
2  judge was saying was, if she could cut the grass and
3  move in and resolve the code violation, then that's
4  a different issue.  That's what I believe the judge
5  was talking about there.  Again, this is a huge
6  document, and it might even be vetted in the
7  document, or even off the record, or at side bar.
8  Q.      I'd like to direct your attention to page
9  47, lines 8 and 9 and 10, 11 and 12.  Take a moment
10 to look at that.
11 A.      What is it?
12 Q.      47, 8 through 12?
13 A.      "Mr. Herman: My client advises that the
14 unfettered access is not an issue.  Court: Okay, so
15 we'll abide by the Court's suggestion."
16 Q.      Okay.  What is your understanding of
17 unfettered access?
18 A.      I recall that the -- Mrs. Ockley didn't
19 want to have to make appointments, so the discussion
20 was to use unfettered so that she didn't have to
21 make appointments to get into the house.
22 Q.      What's your understanding of the word
23 unfettered?
24      MR. BARTOS:  Objection.  Asked
25 and answered.

Page 113

1      THE WITNESS:  Yeah, that was my
2      understanding, so she wouldn't have to
3      make appointments to go in and out of the
4      house.  She could do her own schedule, as
5      long as it was within the condemnation.
6  BY MR. SCHROM:
7  Q.      So unfettered relates to scheduling, as
8  you understood it?
9      MR. BARTOS:  Objection.  Asked
10      and answered.
11      THE WITNESS:  Yes, I already
12      answered it.
13 BY MR. SCHROM:
14 Q.      Okay.  I'd like to show you a document you
15 may not have seen.  Did you ever see any responses,
16 handwritten responses by Simona at any point?
17 A.      Handwritten responses?  What does that
18 mean?
19 Q.      Responses or writings, letters, did you
20 see any -- any -- all the documents look kind of
21 like that, which is just a handwritten note.
22 A.      That's her handwriting?
23 Q.      That's her handwriting.  Do you recall
24 seeing any of her handwritten documents during the
25 course of this?

JEFFREY BRYDZINSKI                                          JOB NO. 1501921
MARCH 27, 2025

Page 114

1  A.        I don't know.
2  Q.        I'd like to show you a document that has
3  been previously marked --
4            MR. SCHROM:  I'm going to jump
5       over that.
6            MS. MALLOY:  Okay.  So this is
7       not being marked?
8            MR. SCHROM:  It's going to be 13
9       is next.
10           MS. MALLOY:  Okay.  So we're not
11      marking this now?
12           MR. SCHROM:  No.
13           MS. MALLOY:  This is P-11.
14      (P-11 Brydzinski was introduced
15      and marked for identification.)
16           MR. BARTOS:  Do you want to take
17      a break?
18           THE WITNESS:  No, I'm just
19      exhausted.  We'll keep going.
20 BY MR. SCHROM:
21 Q.        I'm showing you a document previously
22 marked P-11.  Can you identify that?
23 A.        Okay.  This is the July 15, 2022 order.
24 Q.        Okay.  And you believe that you saw that
25 order a few days after it was created; is that

Page 115

1  correct?
2  A.        I believe that's correct.
3  Q.        Okay.  Why don't you just read that into
4  the record?
5  A.        The entire order?
6  Q.        Yes.
7  A.        "Upon consideration of the Complaint and
8  petition for special injunction filed by plaintiff
9  Rockwell-Glynn after a hearing on July 11, 2022, and
10 having heard the arguments advanced by defendant
11 Simona Ockley and Lee Herman, Esquire, counsel for
12 plaintiff, and good cause appearing, it is on the
13 15th day of July 2022 hereby ordered and decreed as
14 follows.  One, plaintiff may immediately record the
15 deed to 416 South Ithan Avenue, Villanova, PA 19085
16 ("the property") previously executed by defendant.
17 Two, the title company shall disperse the proceeds
18 it currently holds in the proximate amount of
19 $490,000.00," and then it's a parenthetical with the
20 number, numerical 490,000.00, end of parenthetical
21 to defendant.  "Three, defendant shall have
22 unlimited and unfettered access to the property at
23 her own risk to remove her personal property until
24 September 1, 2022.  Any personal property remaining
25 at the property after September 1, 2022 shall be

Page 116

1  deemed abandoned and may be removed by plaintiff as
2  refuse.  By the court, Judge J. Whelan, dated
3  July 11, 2022."
4  Q.        Okay.  So paragraph number one,
5  immediately record the deed, that did occur,
6  correct?
7  A.        Yes.
8  Q.        And number two, the title company shall
9  disperse the funds, that occurred, correct?
10 A.        I have to assume so, yes, because I bought
11 the property subsequent, but the question would be
12 directed to Rockwell.
13 Q.        Okay.  And then, in number three we talked
14 about unfettered, but the judge also uses the word
15 unlimited, correct?
16 A.        Yes, unlimited and unfettered access to
17 the property at her own risk to remove her personal
18 property.
19 Q.        Correct.  Yes.
20 A.        Nothing in there about live.
21 Q.        But unlimited is a word that I'm focusing
22 on, and that would mean, in your understanding,
23 without limit, or is that not correct?
24 A.        Unlimited and unfettered was because
25 Mrs. Ockley made a point to the judge that she

Page 117

1  didn't want to have to schedule every time she came
2  to remove her stuff, so the judge said you can
3  remove your stuff without having to schedule it with
4  the township, because the township had the keys, the
5  township had the locks, the township had the notice
6  of condemnation, and the township declared that it
7  was only safe to be in that house from 8:00 a.m. to
8  4:00 p.m.  The reason being is because it was a fire
9  hazard, and electricity could not be on at the
10 house.  If the electricity was on at the house, the
11 house could burn down and destroy all of her
12 personal property, so therefore the township had the
13 keys, and the judge put in unlimited and unfettered
14 because they didn't want to have to have her call
15 the township every time they needed to unlock the
16 house.  That's what unlimited and unfettered means,
17 to remove her personal property.  There was no
18 intention in this order whatsoever for a woman to
19 live in a condemned house that was deemed unsafe.
20 And had the judge meant that, he would have written
21 the word live in this document.  Instead, he chose
22 the word access.
23 Q.        And that was clear to you?
24 A.        Clear, yes.
25 Q.        There weren't any ambiguities regarding

JEFFREY BRYDZINSKI                                          JOB NO. 1501921
MARCH 27, 2025

Page 118

1  that, correct?
2  A.       No, because the house was deemed to be
3  unsafe for human occupancy, and no one would put
4  someone's life at risk, no one.
5  Q.       I'd like you to look at a document
6  marked --
7                   MS. MALLOY:  P-12.  12.  You
8              skipped these two, so the next one is 12.
9                   (P-12 Brydzinski was introduced
10             and marked for identification.)
11                  MR. BARTOS:  Do you need to
12             stretch at all?
13                  THE WITNESS:  No.
14 BY MR. SCHROM:
15  Q.       I'm showing you a document marked P-12.
16 Can you identify that?
17  A.       This looks like my agreement of sale with
18 Rockwell, yep.
19  Q.       Okay.  And that document is dated when?
20  A.       Let me see.  Can you point me to a date?
21  Q.       It's probably at the end?
22  A.       Oh, there might be --
23  Q.       Yeah, it's probably is at the end, 7/19.
24                  MR. BARTOS:  Bates 33 on the
25             document.

Page 119

1                   THE WITNESS:  Yes, 7/19/22.
2  BY MR. SCHROM:
3  Q.       Okay.  So you signed that document and
4  there was also an addendum exhibit A; is that
5  correct?
6  A.       Yes.
7  Q.       So you signed the agreement of sale and
8  the addendum; is that correct?
9  A.       Yeah, it looks like it, yes.  That's my
10 signature.
11  Q.       So can you explain what this
12 indemnification agreement is and who created it?
13  A.       I probably created it.
14  Q.       Okay.  And what was the purpose of the
15 agreement?
16  A.       I'd have to refresh my memory.
17  Q.       Okay.
18  A.       And read it.
19  Q.       Take a moment.
20  A.       I mean, this is a very long document with
21 a lot of stuff in it.  I mean, it speaks for itself
22 but what would you like to know specifically?
23  Q.       I just want to focus on a couple of
24 sections that were gone through previously.
25  A.       Sure.

Page 120

1  Q.       So can you tell us just the overall
2  purpose of the document, as you understand it?
3  A.       We had a building that was in great
4  disrepair, there was possessions inside it that
5  could have been damaged or destroyed within the past
6  four-month vacancy period.  I wanted no
7  responsibility or nothing at all to do with any of
8  her possessions.  I wanted nothing to do with that
9  piece of this.  I wanted an empty house turned over
10 to me, but I was willing to accommodate and allow
11 them to safely remove the items from her home, and I
12 didn't want to have any part of that whatsoever, so
13 that's what this was about.  Rockwell was to handle
14 working with Ms. Ockley to remove her things, which
15 she had nine months to remove, nine months to get
16 her things together, and I don't think there was any
17 signs of her packing even one box in those nine
18 months, so I didn't know what was inside the house
19 at the time of this, I didn't know whether the
20 things -- you know, whether the house had collapsed
21 on itself, and the things in it were damaged.  I
22 wanted no responsibility to do with any of that
23 stuff, and in order to close, I felt this
24 indemnification was necessary so that Rockwell and
25 Mrs. Ockley work together to get her items safely

Page 121

1  out of the house.  That's what I recall this
2  document being about.
3  Q.       Okay.  Thank you.  And if you would just
4  take a moment to look at F?
5  A.       F?
6  Q.       If you would read that first sentence on
7  F, and I'll ask you a question about it when you're
8  finished.
9  A.       Once -- want me to read it?  Inside?
10  Q.       Did you review it?
11  A.       Yep.  Yep.  I mean, it says exactly what
12 it says, that they would abide by the order of the
13 court, and the rules and regulations imposed by the
14 township to allow for the removal of personal
15 property from the structure at no cost to me, and
16 that was I wanted to make sure they were doing this
17 safe, that she was not harmed in the process, that
18 they were following the township's rules on the 8:00
19 to 4:00, and that they would all come to terms
20 together to make sure that they can coordinate a
21 reasonable way to safely remove her things from the
22 house.  I had owned the property at this part.  I
23 had to insure the property at this part.  I would be
24 the one who would be at fault if someone was hurt,
25 injured or something was damaged, so that was a

JEFFREY BRYDZINSKI                                    JOB NO. 1501921
MARCH 27, 2025

Page 122

1  concern of mine.
2  Q.        Okay.  And you attached Judge Whelan's
3  order to this as tab one, is that correct, under D?
4  A.        I don't see an order attached.
5  Q.        I don't see it either, but it is
6  referenced here as D under background?
7  A.        Oh, D?  Paragraph D?
8  Q.        Yes.
9  A.        Let's see.  Court order is referenced --
10  oh, yeah, attached to tab one.
11  Q.        Yeah?
12  A.        It says that.  I don't see it attached.
13  Q.        Okay.  Is the order that you just reviewed
14  a copy of that order, to the best of your knowledge?
15  A.        Probably.
16              MR. BARTOS:  Counsel, you're
17          referring to P-11?
18              MR. SCHROM:  Yes.
19              THE WITNESS:  It probably was.
20  BY MR. SCHROM:
21  Q.        Okay.  Look at page two of that?
22  A.        Page two, gotcha.
23  Q.        Page two talks about owner shall -- on the
24  third line, owner shall not access the property or
25  the structure during the removal term.

Page 123

1  A.        That's right.
2  Q.        Nor owner permit, which is you, any other
3  individuals or third parties other than Rockwell and
4  the previous owner -- and then it goes on -- to
5  enter the property.
6  A.        Where is this?  What paragraph?
7              MR. BARTOS:  He's referring to
8          the top.
9              MR. SCHROM:  It's F.
10              MR. BARTOS:  Above G.
11  BY MR. SCHROM:
12  Q.        Sorry.  It starts owner, third line down,
13  second line down from the top.
14  A.        It says owner, respective employees,
15  agents, contractors, beneficiaries, affiliates and
16  movers.  What do you mean?
17  Q.        I'm just commenting that -- that this
18  language was incorporated into this document, owner,
19  that's all.
20  A.        I don't know the question.  I'm not sure
21  what the question is.
22  Q.        It's just --
23  A.        The document speaks for itself.  I don't
24  know what you're asking.
25              MR. BARTOS:  Just let him ask a

Page 124

1          question.
2  BY MR. SCHROM:
3  Q.        I'll move on from there.  Let's look at H.
4              MR. BARTOS:  Did you say 8 or A?
5              MR. SCHROM:  H.  Sorry.
6              MR. BARTOS:  None of the above.
7  BY MR. SCHROM:
8  Q.        Why don't you read H?  I think that it
9  reaffirms what you said a moment ago.
10  A.        Yes.  Okay.  I read it.
11  Q.        Okay.  Why don't you read that into the
12  record?
13  A.        "Rockwell agrees to defend, indemnify and
14  save harmless owner for any and all claims by the
15  previous owner or any other third party related to
16  personal property and the removal of the same, as
17  set forth in greater detail herein."
18  Q.        Okay.  And I believe you've already
19  explained your understanding of why you would put
20  that in.  I'd like to move over to B on the bottom
21  on page two?
22  A.        B on page two?  Yes?
23  Q.        Rockwell basically agrees to indemnify in
24  connection with any alleged negligence, act,
25  omission, claim, condition caused or created whole

Page 125

1  or in part by Rockwell, Rockwell's affiliates,
2  employees, agents or any other persons whatsoever,
3  including previous owner Ockley, whether or not
4  based in part by the active, passive, concurrent but
5  not sole negligence of the indemnified party.
6  What's your understanding of that paragraph?
7  A.        I would read it back to you, that's my
8  understanding of it.
9  Q.        Okay.
10  A.        How else do I explain it?  I wrote it.
11  Q.        So if there's ever a claim by Ockley
12  against you for anything, they agree to indemnify
13  you; is that correct?
14              MR. BARTOS:  Objection to form.
15              THE WITNESS:  No, that's not
16          what it reads.  There's a whole bunch of
17          things.  Sole negligence.  There's a whole
18          bunch of things in here.
19  BY MR. SCHROM:
20  Q.        Well, it says in connection with any
21  negligence, any act, any omission, any claim, any
22  condition caused or created in whole or in part by
23  Rockwell affiliates, employees, agents or other
24  persons whatsoever, including prior owner Ockley,
25  whether or not based in part on the active, passive,

JEFFREY BRYDZINSKI                                            JOB NO. 1501921
MARCH 27, 2025

Page 126

1  concurrent but not sole negligence of the
2  indemnified party.
3  A.        No, no, my -- wait, my sole negligence, is
4  that what that means?
5  Q.        Yes.  I mean, you wrote it?
6  A.        Yeah, but not -- I don't know, I'm
7  exhausted at this point, but I know that it's --
8  we're dealing with a dangerous situation, and these
9  people were taking on that risk, and I didn't want
10 to be associated with that risk.
11 Q.        Okay.
12 A.        We're talking about a house about to
13 collapse on people.  I mean, I couldn't just sit
14 back and not have some protection if that were to
15 happen, and they chose to do that.
16 Q.        Looking at two, I believe it's line seven,
17 relates to owner and that's you.  I'm reading it,
18 "owner shall not permit or invite anybody to enter
19 the property, or the structure on the property," is
20 that -- that was your intention?
21 A.        No, that's not -- you've got to read the
22 whole paragraph.  That's not all my intention.
23 Q.        Okay?
24 A.        It says that they're going to coordinate
25 with the previous owner to obtain keys to the

Page 127

1  entranceway to the structure, or otherwise gain
2  access to the structure.  Rockwell also agrees to
3  coordinate with the township to obtain the keys to
4  the bolt locks, and to gain access from the township
5  to the structure.  Owner shall not permit or invite
6  anyone to enter the property, structure on the
7  property, where the personal property is being
8  stored, other than Rockwell and the previous owner,
9  and the respective employees, agents, contractors,
10 beneficiaries, affiliates and movers.  That was my
11 effort to protect her items in that house.
12 Q.        I understand.  But you did invite the
13 police to enter the property?
14 A.        I did not invite --
15           MR. BARTOS:  Objection to form.
16           THE WITNESS:  -- the police
17 to --
18           MR. BARTOS:  Wait a minute.  Let
19 me get my objection -- objection to form.
20 You can answer.
21           THE WITNESS:  No, that is not
22 true.
23 BY MR. SCHROM:
24 Q.        You -- but you did go to the police
25 station, and -- on the 11th or 12th and indicate

Page 128

1  that the person was on the property illegally,
2  correct?
3  A.        I was aware that a human being was inside
4  the home with no -- in the middle of a heat wave,
5  95-degree temperatures, in a structure that was
6  about to collapse on top of them, in a structure
7  that was a fire risk, in a structure that was not
8  safe for human occupancy, who had been in that
9  house, locked inside, refusing anybody to enter for
10 three days.  The only thing I knew, and the only
11 thing that was reasonable, and the only thing that
12 wouldn't be reckless, and the only thing that
13 wouldn't be due to my sole negligence was to go to
14 the police and ask them to look into the matter and
15 see if this woman was safe, because I would never
16 live with myself if she died in that house.  I would
17 never be able to live with myself, never, knowing
18 that a woman was inside the house in those
19 conditions, in that heat, and I needed to make sure
20 that she was okay, and that's why I went to the
21 police and I let it -- that's what I did, because
22 that's what you do when you're afraid someone is
23 going to die, and I let the police handle it from
24 there, and I had no involvement.  I wasn't at the
25 property.  I let the police assess the situation.

Page 129

1  And when the police did assess the situation, they
2  feared for her life as well.
3           (P-13 Brydzinski was introduced
4            and marked for identification.)
5  BY MR. SCHROM:
6  Q.        I'd like to direct your attention to the
7  next document previously marked 13.  Are you able to
8  identify that document?
9  A.        Yes.  This is the deed to the property.
10 Q.        And on July 19th?
11 A.        Yes.
12           (P-14 Brydzinski was introduced
13            and marked for identification.)
14 BY MR. SCHROM:
15 Q.        Next document previously marked P-14 --
16           THE WITNESS:  Is there two?
17           MS. MALLOY:  Oh, I gave extra
18 copies sorry.
19 BY MR. SCHROM:
20 Q.        Can you identify that two-page document?
21 A.        Okay.
22 Q.        Directing your attention to the second
23 page --
24 A.        Oh, sorry.  That's what I read.
25 Q.        Okay.  The second page, a letter --

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 130

1  A.       I don't know what this -- why this is -- I
2  don't know why we did this.  I don't know -- was it
3  in response to something?  I don't --
4              MR. BARTOS:  Just wait for him
5         to ask a question.
6              THE WITNESS:  Oh, sorry.
7  BY MR. SCHROM:
8  Q.       Go ahead?
9  A.       I don't -- out of just looking at it, I
10 don't -- I don't remember the document, but --
11 Q.       Okay.
12 A.       Kevin?  I'm trying to think of who these
13 people are.  Good morning, Luke.  Oh, this has to do
14 again something with the grass, probably a neighbor
15 complaint.
16 Q.       Got it.  It's a letter from Kevin
17 Kochanski, director of community development, Radnor
18 Township, saying -- from Luke Attanasi --
19              MR. BARTOS:  You are on page
20         one, Counsel?  You're on page one?
21              MR. SCHROM:  Yeah, sorry.
22              THE WITNESS:  Isn't this a
23         letter that's attached to the email?
24 BY MR. SCHROM:
25 Q.       Yes.

Page 131

1  A.       Okay.  So I guess that it's important to
2  read the email.
3  Q.       Go ahead?
4  A.       And it's from -- where does the chain
5  start, at the top or below it?
6  Q.       I can't say.
7              MS. MALLOY:  Below at the
8         bottom.
9              THE WITNESS:  I think what was
10        happening was that Mrs. Ockley was in
11        violation of not taking care of the
12        property with the grass, and the township
13        was paying -- was doing it because of
14        neighbor complaints, and that -- I think
15        it was Rockwell telling the township, to
16        help out Mrs. Ockley, that they would take
17        care of cutting it so that she didn't keep
18        incurring those costs.  It might have
19        been -- Rockwell was doing everything in
20        their power to help out Mrs. Ockley, and
21        this, I think, was one of them.  Please
22        advise that we should cancel the mowing
23        services, these items will need to be
24        addressed prior to removing her locks, and
25        I think -- I think -- yeah, it says we can

Page 132

1              handle cutting the grass immediately, what
2              is the balance outstanding, I will work on
3              getting you an address of the previous
4              owner so as to sort of stop the bleed of
5              the lawn services.  I guess because I had
6              owned it at that point.
7  BY MR. SCHROM:
8  Q.       So is --
9  A.       So, yeah, I guess that's what this was.
10 It was a long time ago.
11 Q.       Okay.  So on July 28th you wrote a letter
12 to the township indicating I understand the property
13 is deemed condemned and uninhabitable, at no time
14 will any person live nor occupy the property in the
15 current condition?
16 A.       That's right.  No one was allowed to live
17 and occupy, based on the postings on the house, and
18 the notice.  I was assuring the township that no one
19 would be living or occupying a house that they
20 deemed unsafe to live or occupy, which was
21 important.
22              MR. SCHROM:  Do you have that
23         one?
24         (P-15 Brydzinski was identified
25     and marked for identification.)

Page 133

1  BY MR. SCHROM:
2  Q.       I'm showing you a document previously
3  marked P-15.  Did you ever see that document?
4  A.       No.
5  Q.       Okay.  It's my understanding in looking at
6  the heading, Emergency Motion For Reconsideration of
7  July 15th Order, my name is Simona Ockley, and she
8  states in it that she was discharged on August 8,
9  2022.  Do you have any reason to believe that she
10 wasn't discharged from Bryn Mawr Manor on 8/8 --
11 A.       No idea.
12 Q.       Okay.  There was a court order that was
13 created on 8/9 in response to this it appears.  You
14 don't know whether or not you ever saw P-15?
15 A.       No, I don't believe -- I don't believe any
16 of us knew anything about that.
17              (P-16 Brydzinski was identified
18         and marked for identification.)
19 BY MR. SCHROM:
20 Q.       Showing you a document marked P-16.  Can
21 you identify that?
22 A.       It's an order of August 9th.
23 Q.       When was the first time that you saw that
24 order?
25 A.       I don't know.

JEFFREY BRYDZINSKI                                    JOB NO. 1501921
MARCH 27, 2025

Page 134

1  Q.      Would it be in August of '22?
2  A.      I don't know when this would have made it
3  to me.
4  Q.      Okay.  Do you know whether it was before
5  you asked the police to get involved?
6  A.      I have no idea.
7  Q.      Okay.  Why don't you take a moment just to
8  read this order from Judge Dozor into the record?
9  A.      You're going to ask me to read this entire
10 thing?  I just told you I have eye problems.
11 Q.      Oh, okay.  Well, I'll read it and then --
12 A.      You can read it.
13 Q.      Okay.  And now this 9th day -- sorry about
14 that.  I'll read the other things.  "And now this
15 9th day of August 2022, upon consideration of
16 defendant's emergency petition, and upon review of
17 the docket, and the July 15th order signed by Judge
18 Whelan after a prior hearing on the matter, it's
19 hereby ordered that defendant's petition is granted.
20 Defendant Simona Ockley shall have unlimited and
21 unfettered access to the property located at 416
22 South Ithan Avenue, Villanova, PA 19085 at her own
23 risk to remove her personal property until
24 September 1st.  Plaintiff shall remove" that is
25 Rockwell-Glynn "shall remove any and all locks so

Page 135

1  that defendant may access the property until
2  September 1, 2022.  Plaintiff Rockwell-Glynn and/or
3  Radnor Police Department shall allow access by
4  removing locks to provide defendant access to the
5  property to remove her personal property until
6  September 1, 2022."
7          MR. SCHROM:  Did I read that
8          correctly, Counsel?
9          THE WITNESS:  That's what it
10         says.
11         MR. BARTOS:  I just note one
12         clarification.  In the second paragraph,
13         third line, plaintiff shall remove any
14         additional locks.  I believe you had said
15         plaintiff shall remove any and all locks
16         in your recitation.
17         MR. SCHROM:  Okay.  Thank you.
18 BY MR. SCHROM:
19 Q.      Signed Barry Dozer.  I believe you
20 indicated you're not sure when you saw that order,
21 although you did see it at some point?
22 A.      I can't even see -- where does it say when
23 it was filed?  Because your Bates label is over when
24 it was filed.
25 Q.      Probably up here.

Page 136

1  A.      Oh, yeah, I don't know what this means
2  down here.  I don't know when we received this, but
3  this says exactly the same thing, that she has
4  access to the property at her own risk to remove her
5  personal property.  There's nothing in this order
6  that says she's living there.  That would be in
7  direct violation of a notice of condemnation stating
8  that no one can live there, because it's unsafe to
9  live there.  Someone could die living there.  That's
10 what the order -- that's what the condemnation says.
11         This order reiterates the same, she has
12 access to remove her property, not to live in a
13 building that's falling apart, that's unsafe, that's
14 a fire hazard, that has no working utilities, that
15 is 100 degrees inside, that is unsafe for someone,
16 even a healthy person, to be walking around, let
17 alone an elderly handicap person.  I don't know --
18 this order says the same thing.  The only thing
19 that's different is it's directing the township to
20 remove the locks.  The locks were not
21 Rockwell-Glynn.  The locks were the township.  The
22 township locked that building to keep someone from
23 dying.
24 Q.      There were two sets of locks on there,
25 weren't there?

Page 137

1  A.      Not that I'm aware of.
2  Q.      One over another?
3  A.      Not that I'm aware of.  I know that
4  Mrs. Ockley had a locksmith change locks and put
5  locks on the doors.  I don't remember other locks
6  being on there.  I remember the township locking,
7  putting some kind of mechanism that locked those
8  doors.  It was the township that ultimately unlocked
9  the doors.  Well, actually, I think she might have
10 broken the locks, but I knew that it had to be
11 worked out and coordinated with the township.  It
12 was their locks, and I know that the township wanted
13 to make sure she was safe, and that's why they were
14 going to come up with a plan with Mrs. Ockley to
15 safely remove her items.
16         MR. BARTOS:  Do you need --
17         THE WITNESS:  No, let's just
18         keep doing it.
19         MR. SCHROM:  This is 18?
20         MS. MALLOY:  No.  P-17.
21         MR. BARTOS:  If it's easier to
22         go nonsequential and just skip numbers,
23         I'm fine with that.
24         MS. MALLOY:  You have to keep up
25         with the numbers.  You got rid of another

JEFFREY BRYDZINSKI                                              JOB NO. 1501921
MARCH 27, 2025

Page 138

1        document.
2                    MR. SCHROM:  Yeah, okay, that's
3        fine.  Okay.  Why don't you give me that
4        one?
5                    MS. MALLOY:  P-17.
6              (P-17 Brydzinski was identified
7              and marked for identification.)
8   BY MR. SCHROM:
9   Q.       I'm showing you a document previously
10  marked P-17.  Can you identify that?  I'll read it,
11  and then counsel can make any corrections.
12  A.       What is -- you want me to identify it?  It
13  looks like it's a Radnor Township Incident Report
14  from the 9th.
15  Q.       Correct.  Filed by Faust, approved by
16  Fischer.  Do you know anything about this report?
17  A.       I can tell you I've never seen this
18  before.
19  Q.       Okay.  Well, it says that Luke Attanasi
20  came into the police department to report police
21  information.
22  A.       Okay.
23  Q.       Saying that his company is the new owner
24  of the property, and actually on 8/9 you owned the
25  property, correct?

Page 139

1   A.       Yes.
2   Q.       Okay.  And they had a court order saying
3   that the current resident must vacate the property.
4   It did not -- the order did not say that --
5   A.       This isn't me who was at the police.
6   Q.       I understand, but the order didn't say --
7   any of those two orders that you read didn't say
8   vacate -- must vacate the property, correct?
9                    MR. BARTOS:  Objection to form.
10                   THE WITNESS:  I would disagree,
11        because no one is to live in the house, so
12        I would say the order does say that.
13  BY MR. SCHROM:
14  Q.       Okay.  And they provided a copy of the
15  court documents?
16  A.       Okay.
17  Q.       That's all.
18  A.       Yes, it also says that --
19                   MR. BARTOS:  There's no
20        question.
21                   THE WITNESS:  Okay.
22                   MR. SCHROM:  Next document --
23        I'm going to skip over that one.
24             (P-18 Brydzinski was identified
25             and marked for identification.)

Page 140

1   BY MR. SCHROM:
2   Q.       Next document, I'm showing you a document
3   previously marked P-18.  Are you able to identify
4   that document?  I'm focusing on it just for a
5   specific purpose, and that is that they admitted
6   that they turned off the electricity -- the
7   utilities to the home in this document.
8   A.       Who?
9   Q.       Greg Lingo and Rockwell-Glynn, on the
10  second line.
11  A.       Okay.
12  Q.       We did not unlock the home, and we had
13  turned off the utilities to the home.  I think
14  previously you said I'm not sure whether I turned
15  them off, or whether or not Rockwell-Glynn turned
16  them off.  This says Rockwell-Glynn turned the
17  utilities off.
18  A.       Okay, if that's what it says.
19  Q.       Does that refresh your recollection?
20  A.       It says it.  I don't know who turned the
21  utilities off, but it does say that.
22  Q.       Okay.
23  A.       I know no one was living there for four
24  months and paying bills, so I doubt the utilities
25  were even on, but -- and also I'm not sure if they

Page 141

1   were turned off at the notice of condemnation, due
2   to the fire conditions, which I assume would have
3   happened, so I don't know if he's correct or not.
4   Q.       All right.  That's fine.  Next one.
5              (P-19 Brydzinski was identified
6              and marked for identification.)
7   BY MR. SCHROM:
8   Q.       I'm showing you a document previously
9   marked P-19.  Can you identify that one?
10                   MR. BARTOS:  12th?
11                   MR. SCHROM:  Yeah.
12                   THE WITNESS:  This is the Radnor
13        Township incident report form.
14  BY MR. SCHROM:
15  Q.       Do you -- this also is a summary from
16  Sergeant Reardon, Katherine Reardon, and Michael
17  Fischer indicating that you responded to 7690 -- I
18  don't know what 7690 is.  Do you know what that is?
19  A.       No.
20  Q.       In regards to a possible squatting issue,
21  I guess that's when you called?
22  A.       I didn't call.  I went to the police
23  station.
24  Q.       Went to the police station on the 12th?
25  A.       Yes.

Page 142

1  Q.        Okay.  So I'll read it.  It says "Jeffrey
2  Brydzinski responded" -- maybe that's their unit
3  number -- "in regards to a possible squatting issue
4  at 416 South Ithan Avenue.  Made contact with Jeff
5  Brydzinski who added Simona Ockley, previous
6  property owner of the above address, had been
7  occupying 416 South Ithan Avenue since Wednesday
8  8/10.  As of today's date Brydzinski is the current
9  owner of 416 South Ithan Avenue" -- I'm skipping --
10 "the property was deemed uninhabitable by Radnor
11 Township codes back in May" --
12 A.        And that was wrong, because it was April.
13 Q.        April, correct.  "Ockley only had
14 permission to be inside the property to retrieve and
15 clear out specific belongings."  No court order
16 talked about specific belongings, did it?
17              MR. BARTOS:  Objection to form.
18         You can answer the question, if you're
19         able.
20              THE WITNESS:  This is someone
21         creating a report.  These aren't my words.
22 BY MR. SCHROM:
23 Q.        Okay.
24 A.        Personal property I would say, if I was
25 writing it.

Page 143

1  Q.        Okay.  "Ockley has yet to remove the
2  belongings from the residence.  She has removed any
3  signage for legal notice and condemnation" --
4  A.        She did rip down all of the notices of
5  condemnation from the property, which made it not
6  only unsafe for her, but unsafe for the neighborhood
7  as well, and the kids in the neighborhood.
8  Q.        Okay.  "And condemnation and is refusing
9  to leave."  Did you -- was that part correct, that
10 you told them that she is refusing to leave?
11 A.        She locked herself in the house, she was
12 refusing to let anyone inside, including the
13 township inspectors, and, yes, she was refusing to
14 leave.
15 Q.        Okay.  "Brydzinski created a written
16 statement attesting to the above."  I don't think
17 I --
18 A.        I have the -- you skipped a line.
19 "Attempting to work on the property, observed her
20 arrive" -- and that's the wrong address, 716.  It
21 should be 416 -- "with an unidentified black male in
22 a yellow cab.  The unidentified male was observed
23 breaking the locks on the garage door and the back
24 kitchen doors with a hammer on 8/10.  Rockwell
25 Custom advised Brydzinski that Ockley has hindered

Page 144

1  construction for several hours."
2              I do -- my -- the tree contractors did
3  report that she was standing in front of the tree
4  equipment for three hours one day hindering them
5  from doing that work.  An inspector arrived for a
6  pest inspection, she blocked his entry into the
7  home.  She contacted -- Ockley also contacted PECO
8  and had the electrical changed back into her name,
9  contacted Verizon to connect phone services, and
10 contacted Aqua.  "Brydzinski completed a written
11 statement attesting to the above.  Brydzinski also
12 provided proof the home was in his name and
13 purchased it from Ockley."
14 Q.        Did you have a copy -- did you keep a copy
15 of that statement?
16 A.        I don't believe they gave me one.
17              MR. SCHROM:  I don't think I
18         ever received that one.  Off the record.
19              VIDEOGRAPHER:  Did you say off
20         the record?
21              MR. SCHROM:  Yeah.
22              VIDEOGRAPHER:  Off the record
23         2:54.
24         (At this time, a discussion was
25    held off the record.)

Page 145

1              VIDEOGRAPHER:  Back on the
2         record at 2:54.
3              THE WITNESS:  Can I ask you a
4         question?
5              MR. BARTOS:  Yeah, we'll go off
6         the record.
7              VIDEOGRAPHER:  Wait.  Going off
8         the record again.  Off the record at 2:55.
9         (At this time, counsel confers
10    with his client.)
11              VIDEOGRAPHER:  Back on the
12         record, 2:55.
13 BY MR. SCHROM:
14 Q.        On August 12th did you ever become aware
15 that Mental Health Procedures Act of 1976, section
16 302, involuntary emergency exam and treatment
17 application was made regarding her?
18 A.        I was told by the officers, because they
19 asked me if I wanted her arrested, I said no, I just
20 wanted her to be safe.  They called me back and they
21 said when they found her there she was in a 95 to
22 100-degree house sitting in a couch filled with
23 feces, and they observed that parts of the home had
24 collapsed.  She was sitting amongst filth and trash,
25 and that they thought it was necessary to take her

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 146

1  to the hospital to seek care.  That's what I was
2  told, that's what I understood, and I was grateful
3  that she was being cared for.
4  Q.      Okay.  And at some point did you ever
5  learn the determination as to whether or not she
6  should be held, consistent with the 302?
7  A.      I thought she was being hospitalized for
8  care, being sitting in a house for three days in
9  100-degree weather with no -- not using the
10  bathroom.  I don't think I was aware of her having
11  any mental issue, if that's what you're asking.
12  Q.      Did you ever see any documentation
13  indicating that after review they -- the examining
14  entities determined that she shows good insight,
15  fair judgment, does not at this time show evidence
16  of delusion?
17  A.      I'm not privy to her medical records, no.
18  Q.      Okay.  But you're aware that they made a
19  determination that she wasn't a candidate to be
20  held, but she was released after examination?  Were
21  you aware of that?
22  A.      There's a lot to that question, I'm -- I
23  know she was released.  I don't know anything about
24  her medical conditions.  I don't know anything about
25  that.

Page 147

1  Q.      Okay.
2          (P-20 Brydzinski was identified
3          and marked for identification.)
4  BY MR. SCHROM:
5  Q.      Thank you.  I'm showing you a document
6  previously marked P-20.  Are you able to identify
7  that, particularly the bottom paragraph that relates
8  to you?
9  A.      Was this attached to the other incident
10  report I read?
11  Q.      I don't know.  It says page five on the
12  bottom.
13  A.      So this was a part of the other exhibit?
14  Q.      It could be.  I think so, because it was
15  created on 8/12, the same day.
16  A.      Okay.  Yes, this is the document that
17  talks about when they found her, small path from the
18  porch door area where she was sitting, she had cable
19  service to the home restored, she was watching TV,
20  there was a stench of raw sewage, there was no
21  running water, there was no ventilation in the home,
22  temperatures inside the home were extremely hot, the
23  floor was caving in, there was a large hole in the
24  kitchen floor, we attempted to explain to Ockley the
25  home was not only condemned but legally was not hers

Page 148

1  anymore.  She kept stating that there was a court
2  order and she could be inside the house.  The court
3  order she was speaking about states the home is
4  condemned, and that she is able to get her
5  belongings out of the home, as it is not owned by
6  her anymore.  Ockley was given several attempts to
7  leave voluntarily but kept shouting the police were
8  in her home fraudulently.  Mobile crisis did speak
9  to her and observed her behavior, which was deemed
10  enough to have Ockley 302'd.
11          302 paperwork was signed by mobile crisis
12  staff, and RFC slash A was called to transport
13  Ockley, since she could not be transported safely in
14  a police vehicle.  Something about a walker, cane,
15  Ace bandage on her leg, body fluids on her clothes.
16  Ockley initially resisted leaving her home, but with
17  some slight coercion and assistance with sitting up
18  from the sofa, she walked outside to await a
19  stretcher.
20          And then, it says I followed her to RFC
21  slash A and Ockley to Crozer E.R. where they
22  provided the 302.  Ockley was turned over to Crozer
23  staff without further incident.  I did contact
24  homeowner Jeff Brydzinski about the possibility, if the
25  Ockley could be released from the hospital, if the

Page 149

1  crisis doctor did not think she needed assistance.
2  Brydzinski advised he was having contractors board
3  up entrances and requested added patrol to the
4  residence.  Brydzinski advised no one should be at
5  the house after dark or over the weekend.
6  Brydzinski also put up new no trespassing and
7  condemned signs at the home.  Brydzinski is
8  demolishing the home in the next two weeks, and
9  Ockley being in the home is unsafe.
10  Q.      Okay.  Your statement that no one should
11  be at the home after dark, is that in either of the
12  judges' orders?
13  A.      It's per the notice of condemnation, which
14  was in place to protect someone from being killed.
15  Q.      And --
16  A.      Or severely injured.
17  Q.      Okay.  And over the weekend, is that the
18  same response?  Does the condemnation say nobody can
19  be there over the weekend?
20  A.      I don't know.
21  Q.      Does the judicial order say nobody can be
22  there over the weekend?
23  A.      I would defer to the condemnation order.
24  Q.      The condemnation wasn't an order.  I would
25  say it's a --

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 150

1  A.       Notice by code officials.

2  Q.       It's a notice.

3  A.       I believe at this point the judge was
4  going to get involved to protect this woman from
5  getting hurt, and that's my primary -- at this point
6  my primary objective was to not live knowing that I
7  recklessly allowed this woman to die in the house,
8  and I believe Lee Herman wrote an emergency letter
9  to the judge to -- for him to clear up her
10 misunderstanding of the order, to save her life.
11 And I believe that that day, August 12, 2022, we
12 saved Mrs. Ockley's life.  We absolutely saved her
13 life on that day, absolutely, because had even
14 another evening went by, I believe she would have
15 died in that house, being in a house during a heat
16 wave, 100 degrees, sitting in her own filth, floors
17 crumbling around her, I believe we saved her life on
18 that day.

19 Q.       How do you know that she was there 24
20 hours a day?

21 A.       The contractors saw her lock herself in
22 the home, and she had never left the house, unless
23 she left at some time when they didn't see her, but
24 she was inside the house, contractors were there
25 very early, they were doing the tree work actually

Page 151

1  to prevent a tree from crashing through the house,
2  because there were several dead trees that were
3  leaning over the house with no leaves on them.  My
4  fear was that they were going to crash through the
5  house on her, or crash through the house and damage
6  her property, I was concerned about that as well.
7  She was locked inside, she was refusing anyone to
8  get in, she certainly didn't have the right to do
9  that, including a township official.  She also had
10 changed all the utilities out of my name, the owner,
11 into her own name.  The water department would not
12 turn the water back on, due to the notice of
13 condemnation.

14 Q.       You referenced a letter from Herman a
15 moment ago.

16          MR. SCHROM:  Can you get that?

17          MS. MALLOY:  Yeah, I got it.

18          (P-21 Brydzinski was identified
19      and marked for identification.)

20 BY MR. SCHROM:

21 Q.       Showing you a document marked P-21.  Are
22 you able to identify that?

23 A.       Again, as we said before, it looks like
24 there's all kinds of handwriting on it.  It looks
25 like on August 12th, the same day that we went to

Page 152

1  the police, it looks like it's an emergency letter
2  to -- let's see -- this is Judge Dozor, yeah, Judge
3  Dozor.

4  Q.       I'll represent that's the August 9th judge
5  who signed that.

6  A.       Okay.  Yeah, I think it was the judge that
7  she went to -- she went -- purposely she went to a
8  different judge than the judge that heard the case
9  and probably misrepresented things to that judge,
10 and I guess this was to make sure the judge
11 understood that this woman's life was at risk.

12          (Mr. Gonzales joins the
13      deposition.)

14 BY MR. SCHROM:

15 Q.       Okay.  Now, I direct your attention to the
16 last paragraph.  That's the relief that was
17 requested.  Did he speak with you prior to writing
18 this letter?

19 A.       I'm sure Mr. Herman spoke with me.

20 Q.       Okay.  And reading this paragraph it says
21 we respectfully -- this is the relief requested --
22 we respectfully request that the court immediately
23 schedule a hearing to confirm that defendant has no
24 right or authority to move into or occupy the
25 condemned property, or to refuse access to the

Page 153

1  plaintiff and/or the owner, and that defendant's
2  access is solely limited to recover personal
3  property.

4  A.       That's correct.  That's what -- what was
5  the first judge's name?

6  Q.       Judge Whelan.

7  A.       Judge Whelan, that was his intentions, and
8  that's what -- exactly what this was, to inform the
9  other judge who did not have the hearing that that
10 was -- that was what Judge Whelan's intentions were,
11 and I believe that's what -- that was the purpose.

12 Q.       So it appears as though there was some
13 lack of clarity regarding what the --

14 A.       No, there wasn't a lack of clarity at all.
15 The lack of clarity was Mrs. Ockley was refusing to
16 accept that the order stated, that she was to remove
17 her possessions and not live in a condemned house
18 that was unsafe for her.  And that judge did -- the
19 judge did -- in response to that, there was a
20 hearing, I don't believe I participated in it, but
21 the judge did eventually clarify that it was unsafe
22 to live in that house.  He didn't have to --

23 Q.       Not prior to her arrest?

24 A.       Prior to her arrest?

25 Q.       She got arrested on 8/13.  Are you talking

Page 154

1  about a September hearing?
2  A.        I know there was a hearing after the fact.
3                    (P-22 Brydzinski was identified
4          and marked for identification.)
5  BY MR. SCHROM:
6  Q.        I'm showing you a document marked P-22.
7  Are you able to identify that?
8  A.        It looks like a police criminal complaint.
9  Q.        Okay.  So did you ever see -- when was the
10 first time you saw this document?
11 A.        I believe Lee did a right to know request,
12 and received it some time way after the fact.
13 Q.        Okay.  So would it be fair to say that as
14 a result of information received from Rockwell-Glynn
15 and you, that an affidavit of probable cause was
16 created and she was arrested?
17                   MR. BARTOS:  Objection to form.
18                   THE WITNESS:  All I know is that
19         on the 12th I went to the police concerned
20         that a woman might die in a house.  I
21         asked them to take care of it from there,
22         and I had no involvement after that.
23 BY MR. SCHROM:
24 Q.        Okay.  So would it be fair to say that you
25 don't know what was created by the police department

Page 155

1  at that time, 8/12/22?
2                    MR. BARTOS:  Objection to form.
3                    THE WITNESS:  I don't understand
4          the question.
5  BY MR. SCHROM:
6  Q.        Do you know -- as of August 12th, you
7  weren't made aware by the police department of this
8  affidavit of probable cause, or the charges that
9  were going to be brought against her?
10 A.        Police department called me after she was
11 arrested on August 13th and told me she was
12 arrested.
13 Q.        Okay.  And did they go into any more
14 detail?
15 A.        On that phone call?  Not besides the fact
16 that -- no -- that she had been released from the
17 hospital and was trying to break back into the
18 house.
19 Q.        Okay.  Did you, at that point, tell them
20 that you didn't want her arrested?
21 A.        She was already arrested.
22 Q.        I know that, but did you ever tell them
23 that that was not your intention?
24 A.        My intention was for this woman not to
25 die.  It should've been your -- it should be your

Page 156

1  intention too.  My intention was that she was not
2  going to die in a 100-degree house that was deemed
3  uninhabitable.  That was my only intention.  I
4  wanted to make sure this woman did not die.  I truly
5  believe she would have died had the police not saved
6  her life and got her into a safer place, and that
7  was my intention.
8  Q.        Okay.  Well, the safer place ended up
9  being jail.
10 A.        By her choice, and that would've been --
11 that was safer than her dying in a home.
12                   MR. BARTOS:  Note my objection
13         to the question.
14                   (P-23 Brydzinski was identified
15         and marked for identification.)
16 BY MR. SCHROM:
17 Q.        I'm looking at a document that was created
18 on 8/13, there's just a reference that says
19 Brydzinski was notified on 8/14 of the outcome.  Is
20 that what you were referring to?
21 A.        I thought it was 8/13, but maybe it was
22 8/14.  I was called by the police, I know that, and
23 they told me that she had been arrested.
24 Q.        Did several officers contact you on the
25 14th?

Page 157

1  A.        I don't know.
2  Q.        Because there's another notation from
3  another officer saying I contacted Brydzinski to
4  update him on the situation, he's trying to get an
5  emergency court date --
6  A.        That's right.
7  Q.        -- to try to have Ockley's belongings
8  removed and put into a pod.  Brydzinski is
9  attempting to avoid further issues with Ockley to
10 reestablish residency.  Is that correct, as far as
11 you can recall?
12 A.        Yes.
13 Q.        Showing you a document previously marked
14 P-23, are you able to identify that?
15 A.        Looks like this is the motion that Lee
16 Herman submitted on behalf of Rockwell-Glynn.
17 Q.        Okay.  And there's an attachment of two
18 court orders, I believe, at least one, but order of
19 the 15th -- I don't know, it does reference both,
20 but I only see one here.  Anyway, so did Mr. Herman
21 consult with you prior to the filing of this
22 document?  Did you consult with him?
23 A.        I don't remember.
24 Q.        Okay.  Would you agree with all the
25 provisions requested in the wherefore clause at the

JEFFREY BRYDZINSKI                                    JOB NO. 1501921
MARCH 27, 2025

Page 158

1  end of the --
2  A.       Honestly --
3  Q.       -- request for reconsideration?
4  A.       At this point, part of that indemnity
5  agreement that we talked about had kicked in.
6  Rockwell-Glynn was handling this issue.  I had been
7  put through enough with this whole thing, and I
8  don't -- I don't recall if I participated in this or
9  not at this point.  I was -- my objective was to
10 make sure Mrs. Ockley was safe and out of harm's
11 way, and at this point when this was filed I believe
12 she was.
13 Q.       Okay.  Ultimately, the request is to
14 clarify, amend -- well, vacate the August 9th order
15 and amend the July 15th order on the last page?
16 A.       Okay.
17 Q.       Where it says defendant's access is
18 limited to entry for the sole purpose of removing
19 personal property, would it be fair to say that
20 apparently that order was not sufficiently clear?
21          MR. BARTOS:  Objection to form.
22          THE WITNESS:  No, it was
23          entirely clear.  It was not clear to your
24          client, I guess.  Your client refused to
25          accept the words in that order, so she

Page 159

1          insisted on, I guess, more words needed to
2          be added to reflect the judge's
3          intentions.
4  BY MR. SCHROM:
5  Q.       Okay.  But this is a request by --
6  A.       Yes, because your client was still
7  insisting that the order said something other than
8  what it said.
9  Q.       Okay.  And then, defendant may not move
10 into or otherwise remain in the property for any
11 reason other than removal.  That was also something
12 that was unclear or needed to be clarified?
13          MR. BARTOS:  Objection to form.
14          THE WITNESS:  No, I do not think
15          it needed clarification.  It needed
16          clarification I guess for your client to
17          accept the words of the order.
18 BY MR. SCHROM:
19 Q.       Okay.  And the same would apply to
20 three --
21          MR. BARTOS:  Same objection.
22 BY MR. SCHROM:
23 Q.       -- in order to properly protect -- shall
24 be subject to the supervision of Radnor Township
25 Police?

Page 160

1  A.       You might have thought this was all a
2  joke, but this was someone's life, and I don't think
3  this is a joke, and you might think it's a joke and
4  be cute about it, but all of this was being put in
5  place so that this woman didn't get injured, an
6  elderly -- you know her, your client, an elderly,
7  handicapped woman that you wanted to live in a
8  building that had no air-conditioning, that was
9  collapsing, that had no -- I just don't understand
10 what we're talking about here, I really don't.  This
11 is very upsetting to me.  So this order was -- this
12 motion was because your client wouldn't give up on
13 the fact that the order said something it didn't,
14 and we all knew what the judge wanted, and what the
15 judge was insisting upon, and what the township
16 wanted.  They didn't want to see someone die.
17 Q.       Well, you think if Rockwell turned on the
18 electricity, that would make it a little easier for
19 her?
20 A.       I think -- no, I think that would
21 potentially cause the building to catch on fire,
22 cause the trees around it, which were dead and
23 hazardous deemed by the township to catch on fire,
24 that the neighborhood could potentially catch on
25 fire, so, no, I don't.  I think it was a life safety

Page 161

1  issue.  I've had 22 years of construction
2  experience.  You went through my C.V., my resume.
3  Everything teaches you that you want to prevent a
4  disaster, a catastrophic event from occurring, and
5  this was a catastrophic event waiting to happen at
6  any moment, at any moment.  The house had not been
7  maintained for 40 something years.  There was damage
8  everywhere.  I can't believe someone didn't get hurt
9  sooner than they did, so absolutely not.
10          The reason there's a notice in the
11 condemnation order, the reason why 8:00 a.m. to
12 4:00 p.m. is in that order, is because of the hazard
13 with electricity, due to electricity, and
14 Mrs. Ockley somehow, I don't know how she did it,
15 but she had the electricity on in the house, she was
16 watching television when the police found her, so
17 I'm not sure I understand the question, because she
18 had electricity in there.
19 Q.       And what about water being turned on?
20 A.       The water was not able to be turned on --
21          MR. BARTOS:  Objection.  Asked
22          and answered.  You can answer.
23          THE WITNESS:  The code official
24          deemed that there was not proper water --
25          what is called -- mechanical components

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

Page 162

1    to the house.  The toilets didn't work,
2    the dishwasher or something or other had
3    leaked so bad that the floor collapsed.
4    There was no way to safely maintain that
5    without the house coming down.  Have you
6    ever had water infiltration in your house?
7    It destroys and deteriorates everything,
8    it creates mold everywhere, so no, it was
9    not safe to have the water on in the
10   house.
11            This was not some, oh, you
12   forgot to cut the grass, let me give you
13   a condemnation order.  This was the house
14   was about to collapse, the house was
15   about to catch on fire.  What do you not
16   understand about that?  What -- I'm not
17   sure -- I'm not sure -- I saw this with
18   my own eyes, I'm sure you saw photos of
19   the house.  This was horrible, horrible.
20   I wouldn't want any human being to live
21   like that.  It was heartbreaking to me,
22   absolutely heartbreaking.
23            MR. SCHROM:  Thank you.
24         (P-24 Brydzinski was identified
25   and marked for identification.)

Page 163

1 BY MR. SCHROM:
2 Q.        Another letter from Lee Herman.  I'm
3 showing you a document previously marked P-24.  Have
4 you ever seen that document, ignoring the writings
5 on the side?
6 A.        Yes, I've read this email, this letter.
7 Q.        Okay.  The last paragraph, it references
8 we renew plaintiff's request that the court
9 immediately schedule a hearing and confirm that --
10 and then it goes through that same list of items,
11 that she can't move into the property and can't
12 prevent access and other things.  And then, you
13 received a copy of this letter, correct?
14 A.        Yes.
15 Q.        She was already in prison, correct?  It's
16 on the bottom.
17 A.        Yes.  She had bail set at a dollar for her
18 release.  She refused to pay.  She refused to
19 provide an address for her to go to when she was
20 released, and they asked that she undergo a
21 competency exam, which she refused to take.
22 Q.        How do you know that she refused the
23 competency exam?
24 A.        It says that right here.
25 Q.        But do you know whether or not that

Page 164

1 occurred?
2 A.        Oh, I don't know if she ever took one, but
3 it says here that she was refusing.
4 Q.        And did you receive a copy of this letter?
5 A.        Yes.
6 Q.        Okay.  And it does appear as though a copy
7 went to George W. Hill, cc'd on the second page?
8 A.        Yes.
9 Q.        And it's a cc to you as well?
10 A.        Yes.
11 Q.        Do you believe the court had jurisdiction
12 over this particular matter?
13            MR. BARTOS:  Objection to form.
14            Calls for a legal conclusion.  You can
15            answer.
16            THE WITNESS:  Yeah, I don't
17            know.  I'm not studying this for legal
18            purposes.
19         (P-25 Brydzinski was identified
20         and marked for identification.)
21 BY MR. SCHROM:
22 Q.        I'm showing you a document marked P-25.
23 Are you able to identify that?
24 A.        What's the question?
25 Q.        Just can you identify it?  Did you ever

Page 165

1 see that before?
2 A.        No.
3 Q.        Okay.  It's a magisterial district judge
4 determination that all the offenses that were laid
5 out against Ockley on 8/13, including criminal
6 trespass, burglary, defiant trespass and criminal
7 mischief were dismissed.  At some point did you
8 become aware that all the charges against her were
9 dismissed?
10 A.        No, I didn't even know what charges were
11 made against her.
12 Q.        Okay.
13 A.        And was there hearing about this?  I was
14 never asked to testify.  I don't even know what this
15 is.
16 Q.        Yeah, there was.
17 A.        Why would I not have been at the hearing
18 then?
19            MR. BARTOS:  You answered the
20            question.
21 BY MR. SCHROM:
22 Q.        Yeah.  There was a hearing -- just by
23 giving you some information, there was a hearing,
24 and the judge determined that weren't sufficient --
25 at least my understanding of it was there were not

JEFFREY BRYDZINSKI                                                      JOB NO. 1501921
MARCH 27, 2025

Page 166

1  sufficient grounds in order to establish probable
2  cause in a prima fascia case.
3  A.      I wasn't aware of the hearing nor asked to
4  testify at it.
5  Q.      Other than what you've already testified
6  to, which is your concern for her safety, were there
7  any other reasons that you didn't wait the two weeks
8  just until September 1st?
9               MR. BARTOS:  Objection to form.
10        You can answer.
11               THE WITNESS:  It would be
12        negligent of me, entirely reckless, and I
13        would never be able to live with myself if
14        she died in a condemned house that she was
15        living in.
16  BY MR. SCHROM:
17  Q.      Okay.
18  A.      And I think that that trumps anything else
19  I could be worried about.  Waiting was not a choice.
20  I brought it to the attention of the police, and I
21  left it up to them to handle.
22  Q.      Do you have any idea where some of her
23  items went, like a piano?
24  A.      I have not -- I have no idea where any of
25  her possessions are, were.  I wanted absolutely

Page 168

1  the property was condemned.  I don't know the answer
2  to that.  What I do know is, the utilities had to be
3  put in my name when I owned the property, because it
4  had to in order to get disconnects and all kinds of
5  stuff for the upcoming demolition of the house.
6  Q.      So that would have been -- so it
7  would have been Ockley on April 21st, and then
8  July 15th --
9  A.      To answer your question, I don't know.
10  Q.      Okay.
11  A.      I could tell you I know why they're off.
12  They're off to prevent a catastrophic event.
13  Q.      Okay.  All right.  If you don't know the
14  sequencing, all right, that's fine.
15               MR. SCHROM:  Thank you.  Nothing
16        additional.  Thank you.
17               MR. BARTOS:  John, do you have
18        anything?
19               MR. GONZALES:  I have no
20        questions.
21  BY MR. BARTOS:
22  Q.      Just a few questions, Mr. Brydzinski.  On
23  August 13th -- sorry, August 12th you -- there's
24  reference in the records that you had contacted the
25  contractor to board up the home.  Why did you do

Page 167

1  nothing to do with it.  Rockwell-Glynn knew I wanted
2  absolutely nothing to do with it.  The
3  indemnification agreement states I wanted absolutely
4  nothing to do with it.  I held -- I stuck by that,
5  and I have nothing to do with it.  I have no
6  knowledge of it whatsoever.
7               MR. SCHROM:  I'm just going to
8        take a couple of minutes.  I think I'm
9        done.
10               VIDEOGRAPHER:  Off the record at
11        3:35.
12        (At this time, a short break was
13        taken.)
14               VIDEOGRAPHER:  We're back on the
15        record at 3:52.
16  BY MR. SCHROM:
17  Q.      I'm just trying to follow the utilities
18  for a second.  On April 21st the utilities were on,
19  then she got taken out of the house, it was
20  condemned later that day, so did Rockwell turn them
21  off, and then Ockley turned them back on, and then
22  you turned them off?  Is that kind of how it went,
23  if you can --
24  A.      Okay.  Being in the construction industry,
25  I would assume the utilities were turned off when

Page 169

1  that?
2  A.      I believe it was August 12th, and the
3  reason was that after the police had gone into the
4  home at my request to find -- to investigate what
5  was going on, they determined that the property was
6  extremely unsafe, that a portion of the floor had
7  collapsed, that the house was 100 something degrees,
8  absolutely unbearable heat-wise, there was no --
9  there was a couch filled with feces, there was --
10  they told me that the property was an extreme threat
11  to Ms. Ockley, to anybody at that point, and they
12  asked me to secure the house I guess until this
13  could've been worked out, which I did.  I had
14  Rockwell do that, and that was the end of it.
15  Q.      So there -- you and Mr. Prete own this
16  property as tenants by the entireties, correct?
17  A.      Yes.
18  Q.      And I assume Mr. Prete -- what was
19  Mr. Prete's involvement, if any, in the property,
20  anything to do with the property from July 19, 2022
21  through the date of the demolition of Ms. Ockley's
22  prior residence?
23  A.      Other than signing the closing documents,
24  had absolutely no role or no involvement whatsoever
25  with this.

JEFFREY BRYDZINSKI                                    JOB NO. 1501921
MARCH 27, 2025

Page 170

1  Q.        To your knowledge, did Mr. Prete ever
2  speak with Mr. Lingo or Rockwell regarding
3  Ms. Ockley?
4  A.        Never.
5  Q.        Did Mr. Prete, to your knowledge, speak to
6  anyone at the township regarding Ms. Ockley and her
7  possessions?
8  A.        Never.
9  Q.        That would include the police, did he ever
10 speak with the police on or about August 12, 2022?
11 A.        No.
12 Q.        To your knowledge, has Mr. Prete spoken
13 with anyone other than perhaps you in connection
14 with just, hey, we both got sued, but has Mr. Prete
15 spoken with anybody about Ms. Ockley's possessions
16 between -- or, you know, I'm going to strike that.
17        Has Mr. Prete spoken with anyone else to
18 your knowledge regarding the possessions that
19 Ms. Ockley had in her residence in July 19th through
20 the date of demolition at that time as well?
21 A.        No one, nor does he have any knowledge
22 with regard to -- anything to do with her
23 possessions.
24                MR. BARTOS:  Okay.  That's all I
25        have, subject to any follow up from

Page 171

1  counsel.
2                MR. SCHROM:  Nothing additional.
3  Thank you.
4                MR. GONZALES:  Nothing.  Thanks.
5                VIDEOGRAPHER:  This concludes
6  today's testimony given by Jeffrey
7  Brydzinski in the matter of Simona Ockley
8  versus the Township of Radnor
9  Pennsylvania, et al.  The time is 3:58
10 Eastern Time.  We are off the record.
11                COURT REPORTER:  Mr. Gonzales,
12 do you need a copy?
13                MR. GONZALES:  Yes, please.
14                MR. BARTOS:  Yes, a copy, and
15 also read and sign.
16                COURT REPORTER:  And you said
17 you wanted copies of the other transcripts
18 as well?
19                MR. BARTOS:  Yes, please.
20                -  -  -
21
22
23
24
25

Page 172

1          C E R T I F I C A T I O N
2
3        I, KIMBERLY WENDT, a Certified
4  Professional Reporter and Notary Public for the
5  Commonwealth of Pennsylvania, do hereby certify that
6  the foregoing is a true and accurate transcript of
7  the stenographic notes taken by me in the
8  aforementioned matter.
9
10                -  -  -
11
12
13
14
15
16
17
18
19        *Kimberly Wendt*
20        KIMBERLY WENDT
          Notary Public
          My Commission Expires
21        On January 15, 2027
22
23
24
25

Page 173

1                -  -  -
2          E R R A T A   S H E E T
3                -  -  -
4
5  PAGE      LINE      CHANGE
6  _____     _____     _____
7  _____     _____     _____
8  _____     _____     _____
9  _____     _____     _____
10 _____     _____     _____
11 _____     _____     _____
12 _____     _____     _____
13 _____     _____     _____
14 _____     _____     _____
15 _____     _____     _____
16 _____     _____     _____
17 _____     _____     _____
18 _____     _____     _____
19 _____     _____     _____
20 _____     _____     _____
21 _____     _____     _____
22 _____     _____     _____
23 _____     _____     _____
24 _____     _____     _____
25

Page 174

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3        I,                    , do hereby certify
 4  that I have read the foregoing pages and that the
 5  same is a correct transcription of the answers given
 6  by me to the questions therein propounded, except
 7  for the corrections or changes in form or substance,
 8  if any, noted in the attached Errata Sheet.
 9
10
11
12
13
         _____        _____
14       Date              Signature
15
16
17       Subscribed and sworn to before me this _____ day
         of  _____ 202__.
18
19       My commission expires: _____
20
21       _____
         Notary Public
22
23
24
25
```

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

## Exhibits

**Exhibit 1** 4:10
**Exhibit 1A** 4:11
**Exhibit 2** 4:12
**Exhibit 3** 4:13
**Exhibit 4** 4:14
**Exhibit 5** 4:15
**Exhibit 6** 4:16
**Exhibit 7** 4:17
**Exhibit 8** 4:18
**Exhibit 9** 4:20
**Exhibit 10** 4:21
**Exhibit 11** 4:22
**Exhibit 12** 4:23
**Exhibit 13** 4:24
**Exhibit 14** 5:1
**Exhibit 15** 5:2
**Exhibit 16** 5:3
**Exhibit 17** 5:4
**Exhibit 18** 5:5
**Exhibit 19** 5:6
**Exhibit 20** 5:7
**Exhibit 21** 5:8
**Exhibit 22** 5:9
**Exhibit 23** 5:10
**Exhibit 24** 5:12
**Exhibit 25** 5:13

## $

**$490,000.00** 115:19

## 1

**1** 81:15 115:24,25 135:2,6
**10** 94:14 111:22 112:9

**100** 59:8 136:15 150:16 169:7
**100-degree** 145:22 146:9 156:2
**10:02** 6:5
**10th** 31:10,24 32:1,8 39:11 61:24 64:9,17 66:14 72:22 95:2 97:2
**11** 23:24 112:9 115:9 116:3
**11:14** 57:5
**11:39** 57:9
**11th** 54:15 64:9,19,20 65:24 66:4,10,14,21,22 92:2 98:16 100:9 127:25
**12** 112:9,12 118:7,8 150:11 170:10
**12:16** 81:22
**12th** 64:9 66:14,25 67:1 68:20 70:2 127:25 141:10, 24 145:14 151:25 154:19 155:6 168:23 169:2
**13** 21:24 114:8 129:7
**13th** 66:14 70:4,6,9,23 155:11 168:23
**14th** 66:15 70:25 156:25
**15** 14:23 111:23 114:23
**15th** 41:15 42:2,5 51:18, 23 66:15 68:14 71:4 115:13 133:7 134:17 157:19 158:15 168:8
**16** 104:6,8 105:24 106:9
**17** 94:19
**18** 111:6 137:19
**19** 18:14 27:18 169:20
**19085** 115:15 134:22
**1976** 145:15
**19th** 41:15 42:7 63:12 129:10 170:19
**1:12** 82:1
**1A** 20:16,23 21:25 23:5
**1st** 106:16 107:9 108:24, 25 109:23 110:20 134:24

166:8

## 2

**20** 73:16,20
**20-page** 13:20
**2020** 27:18
**2021** 28:12 38:24 41:21 49:13
**2022** 27:15,23 83:23 92:10 94:14,19 114:23 115:9,13,24,25 116:3 133:9 134:15 135:2,6 150:11 169:20 170:10
**2023** 33:19
**2025** 6:6
**21** 83:23 104:7 105:24 106:9
**215-888-9554** 8:9
**21st** 36:3,23 37:6 55:19 167:18 168:7
**22** 28:24 29:14 35:10 36:2, 23 54:9 78:15 109:20 134:1 161:1
**23** 33:9 107:6,7 108:20 109:20
**24** 107:6,7 108:20 150:19
**26** 92:10
**26th** 92:9
**27** 6:6
**28** 27:23
**28th** 132:11
**2:24-cv-04070** 6:12
**2:54** 144:23 145:2
**2:55** 145:8,12

## 3

**3** 21:24
**30** 81:13
**302** 68:25 69:9 145:16 146:6 148:11,22

**302'd** 148:10
**30th** 33:8
**33** 55:23 56:5 118:24
**37** 104:6
**38** 107:6
**39** 108:20
**39282** 6:24
**3:35** 167:11
**3:52** 167:15
**3:58** 171:9

## 4

**4** 6:15
**4/11/2022** 85:2
**4/21/22** 84:13 85:4 88:11
**40** 34:14 81:11 161:7
**416** 8:3 115:15 134:21 142:4,7,9 143:21
**44** 109:19
**45** 110:16,17 111:5
**47** 112:9,12
**490,000.00** 115:20
**4:00** 91:11 117:8 121:19 161:12

## 5

**51-page** 102:2 106:21 109:9

## 7

**7/19** 118:23
**7/19/22** 119:1
**716** 143:20
**76** 27:21
**7690** 141:17,18

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

**8**

**8** 112:9,12 124:4 133:8
**8/10** 142:8 143:24
**8/12** 147:15
**8/12/22** 155:1
**8/13** 153:25 156:18,21 165:5
**8/14** 156:19,22
**8/8** 133:10
**8/9** 133:13 138:24
**8:00** 91:11 117:7 121:18 161:11
**8th** 31:22 37:8 56:25 58:4 60:2 61:5,6 66:14

**9**

**9** 112:9
**9-1-1** 36:16 85:5
**90** 64:22
**95** 145:21
**95-degree** 65:17 128:5
**95-degrees** 69:14
**9th** 31:23 32:12 60:10 61:3,4,8,13,20 64:6,9 66:14 68:17 72:16 80:18 97:1 133:22 134:13,15 138:14 152:4 158:14

**A**

**a.m.** 6:5 91:11 117:7 161:11
**A/c** 65:18
**abandoned** 116:1
**abating** 91:12,15
**abide** 112:15 121:12
**ability** 17:20,23 18:19 48:11

**absolute** 106:20
**absolutely** 53:4 106:25 150:12,13 161:9 162:22 166:25 167:2,3 169:8,24
**absorb** 13:24
**absorbing** 15:14
**accept** 153:16 158:25 159:17
**acceptable** 27:1 82:18
**access** 52:25 76:7,9 80:1 106:15 107:8 109:1,7,22 110:2,19 111:14 112:14,17 115:22 116:16 117:22 122:24 127:2,4 134:21 135:1,3,4 136:4,12 152:25 153:2 158:17 163:12
**accommodate** 39:18 75:20 102:14 120:10
**accommodating** 75:16
**accurate** 15:14
**Ace** 148:15
**achieve** 13:15 14:13 18:5
**achieved** 12:4
**acquiring** 22:6
**act** 124:24 125:21 145:15
**action** 69:9
**active** 125:4,25
**activity** 91:13,15
**added** 142:5 149:3 159:2
**addendum** 119:4,8
**addition** 56:9
**additional** 21:11 135:14 168:16 171:2
**address** 8:2 58:16,19 68:3 108:8 132:3 142:6 143:20 163:19
**addressed** 106:18 131:24
**administers** 19:14
**admired** 18:4

**admitted** 86:25 140:5
**adults** 91:10
**advanced** 115:10
**advice** 15:14 74:18
**advise** 131:22
**advised** 25:22,25 26:2 80:6 86:25 143:25 149:2,4
**advises** 112:13
**advising** 22:4
**affairs** 11:18
**affidavit** 154:15 155:8
**affiliates** 123:15 125:1, 23 127:10
**afford** 11:10
**afraid** 59:11 67:22 128:22
**agent** 30:2,3 97:1
**agents** 123:15 125:2,23 127:9
**agonizing** 65:16
**agree** 55:14 75:17,21 77:17,20 107:11 125:12 157:24
**agreed** 31:10 39:14 97:17
**agreement** 28:12 31:25 34:24 35:3,11,20 38:10,24 49:12,16 72:23 82:8,25 83:1 94:5,13 102:18 103:4 106:11,13 118:17 119:7, 12,15 158:5 167:3
**agreements** 49:21
**agrees** 124:13,23 127:2
**ahead** 58:9 130:8 131:3
**air** 104:20
**air-conditioning** 160:8
**Airport** 24:15
**airports** 24:9
**Alan** 6:18
**alarms** 91:3
**alleged** 124:24

**allowed** 38:22 39:5 106:15 108:2 132:16 150:7
**allowing** 49:14 107:8,12
**ambiguities** 117:25
**ambiguity** 76:23
**amend** 158:14,15
**amendment** 94:4,13 95:8,9
**amount** 29:8 85:12 90:16,20 91:1 115:18
**analyze** 15:4
**and/or** 22:12 100:10 104:14 106:15 107:8,23 108:15 109:1,4,11 135:2 153:1
**Andrea** 30:5
**anticipated** 26:25
**anxious** 102:21
**anymore** 148:1,6
**apparently** 158:20
**appeal** 91:9
**appearing** 115:12
**appears** 21:24 23:8 77:22 133:13 153:12
**application** 9:1 145:17
**applied** 9:21
**apply** 159:19
**appointments** 112:19, 21 113:3
**approvals** 22:7
**approved** 138:15
**approximate** 85:10
**approximately** 83:7
**April** 31:2,4 33:8 35:8,10 36:2,3,23 37:6 55:19 85:13 92:9,10 94:19 142:12,13 167:18 168:7
**Aqua** 62:7 144:10
**arborist** 55:24
**area** 69:19 84:11 88:16 90:25 147:18

**arenas** 24:6

**Argumentative** 78:11

**arguments** 115:10

**arrange** 75:18,19

**array** 18:16

**arrest** 16:4 70:20 153:23, 24

**arrested** 69:2,6 70:9,15 145:19 153:25 154:16 155:11,12,20,21 156:23

**arrive** 143:20

**arrived** 56:23 144:5

**articles** 13:2,3

**artist** 46:7

**aspect** 77:16

**aspects** 22:4

**assess** 128:25 129:1

**assignment** 13:1

**assist** 97:7,18 106:11

**assistance** 97:17 98:5 148:17 149:1

**assisting** 10:17

**assume** 21:3,5,17 30:10, 13,18 42:16 48:15 53:19 64:3 87:22 101:16 116:10 141:2 167:25 169:18

**assuming** 23:21

**assuring** 132:18

**attached** 45:1 122:2,4, 10,12 130:23 147:9

**attachment** 157:17

**Attanasi** 130:18 138:19

**attempt** 68:25

**attempted** 147:24

**attempting** 143:19 157:9

**attempts** 148:6

**attend** 10:1 42:17,19,20

**attended** 42:12 99:20 100:1,12

**attention** 15:6 19:3 80:14 86:4 101:24 102:1 103:23 107:5 108:19 109:19 110:16 111:5 112:8 129:6,22 152:15 166:20

**attesting** 143:16 144:11

**attorney** 43:22 45:20 46:9 51:12,14 76:18 93:2 96:7 99:9 104:8 106:11

**August** 27:15 37:8 56:25 57:22,23 58:4 59:1 60:2,10 61:3,4,6,8,20,24 64:6,9,17, 19,20 66:4,14,25 67:1 68:17 72:16 73:8 76:14 80:18 133:8,22 134:1,15 145:14 150:11 151:25 152:4 155:6,11 158:14 168:23 169:2 170:10

**authorities** 37:1

**authority** 56:4 74:13 152:24

**authorization** 107:1

**authorize** 70:20

**availability** 110:23

**Avenue** 8:3 115:15 134:22 142:4,7,9

**avoid** 157:9

**await** 148:18

**aware** 36:2,5 37:6,13 39:16,22 42:10,14 48:22 51:20,22,24 58:12 60:2 64:5 69:9 70:8 71:4 85:5,8 111:25 112:1 128:3 137:1, 3 145:14 146:10,18,21 155:7 165:8 166:3

---

## B

**B-R-Y-D-Z-I-N-S-K-I** 8:1

**back** 11:22 13:1,10 39:6 41:21 47:13 49:12 56:24 57:8 58:3 73:5 81:6,25 98:21,22 104:14 106:3 125:7 126:14 142:11 143:23 144:8 145:1,11,20 151:12 155:17 167:14,21

**background** 8:20,21 9:5 18:17 43:22 122:6

**backwards** 39:18 75:10

**bad** 162:3

**bags** 62:22

**bail** 163:17

**balance** 132:2

**bandage** 148:15

**Bank** 24:11

**bar** 8:25 47:4 50:19,21 112:7

**Barry** 135:19

**Bartos** 6:2 7:1 20:4,7,10, 15 23:17 33:25 34:3,6 40:5,13,16 41:7,17 47:1 51:4 54:10 57:3 60:23 63:20 76:19 78:10 80:19 81:9,13 82:10,15,19 83:24 84:20 86:10,13 87:24 89:4 92:17 96:17 97:19 98:1,7, 17,20,24 99:3,15 100:4 101:15 103:10 104:2 105:10,13 107:14,20 112:24 113:9 114:16 118:11,24 122:16 123:7, 10,25 124:4,6 125:14 127:15,18 130:4,19 135:11 137:16,21 139:9,19 141:10 142:17 145:5 154:17 155:2 156:12 158:21 159:13,21 161:21 164:13 165:19 166:9 168:17,21 170:24 171:14,19

**based** 49:18 125:4,25 132:17

**basement** 63:1

**basically** 109:7 124:23

**basis** 27:13,14,15 49:22

**Bates** 86:16,17 118:24 135:23

**bathroom** 62:18,20 146:10

**Bay** 24:13

**beg** 31:15

**begin** 6:6

**beginning** 43:1 86:6 102:13 108:20

**begins** 111:6

**behalf** 6:19,24 25:13 72:10,11 99:7 157:16

**behavior** 148:9

**belongings** 142:15,16 143:2 148:5 157:7

**bending** 39:17

**beneficiaries** 123:15 127:10

**benefits** 11:12

**bent** 75:9

**bills** 46:2,4 140:24

**birthday** 27:23

**black** 143:21

**bleed** 132:4

**blocked** 144:6

**blow** 79:13

**blurb** 25:7

**board** 14:10 149:2 168:25

**body** 148:15

**bolt** 127:4

**Botel** 6:14

**Botel's** 103:11

**bottom** 21:24 23:6 124:20 131:8 147:7,12 163:16

**bought** 116:10

**boutique** 10:9

**box** 120:17

**Brady** 7:7

**branches** 13:4

**breach** 96:23

**break** 57:2,6 60:16 61:9 70:17 81:1,5,10 114:17 155:17 167:12

**breaking** 143:23

**breathe** 59:14

**Brian** 7:8

**bring** 32:19 111:15

**broken** 62:1 137:10

**brought** 16:19 50:2
69:21 105:8 155:9 166:20

**Brown** 7:8

**brutal** 27:22

**Brydzinski** 6:7 7:3,12,
17 8:1 16:21,25 20:19 25:9
82:2 83:11 85:16 87:7
89:10 93:6 94:6 95:15
101:8 114:14 118:9 129:3,
12 132:24 133:17 138:6
139:24 141:5 142:2,5,8
143:15,25 144:10,11 147:2
148:24 149:2,4,6,7 151:18
154:3 156:14,19 157:3,8
162:24 164:19 168:22
171:7

**Bryn** 39:23 60:3 133:10

**bugs** 59:19

**builder** 28:4 73:25

**builders** 25:14

**building** 14:16 53:7 55:3
88:10,12 90:2,7,9 110:9,10
120:3 136:13,22 160:8,21

**buildings** 24:7,8

**built** 28:7 102:20

**bunch** 95:21 125:16,18

**burglary** 165:6

**burn** 79:14 117:11

**burning** 67:6

**business** 91:14

**buyer** 30:11 102:8,17,19,
20,21 103:5

—————————————

**C**

—————————————

**C.V.** 161:2

**cab** 143:22

**cable** 147:18

**call** 28:9 36:16 62:7
117:14 141:22 155:15

**called** 10:9,23 12:18,19,
22 57:21 58:10 69:11
70:10 83:22 111:13 141:21
145:20 148:12 155:10
156:22 161:25

**calling** 85:5

**calls** 71:20 164:14

**cancel** 131:22

**candidate** 146:19

**cane** 148:14

**capable** 9:9

**caption** 99:10

**car** 28:3 29:4

**care** 39:17 40:2 87:1
131:11,17 146:1,8 154:21

**cared** 69:3,4 70:21 146:3

**career** 106:4

**Carlton** 24:13

**carry** 75:12

**case** 6:10,12 16:6 42:20
71:10 76:17,18 77:5 80:4
152:8 166:2

**cases** 10:14 18:18

**catastrophic** 161:4,5
168:12

**catch** 160:21,23,24
162:15

**catching** 14:14

**caused** 124:25 125:22

**caving** 147:23

**Cayman** 24:13

**cc'd** 164:7

**ceiling** 109:17

**cell** 8:5

**center** 111:13

**cetera** 91:14

**chain** 131:4

**chance** 10:6 53:12

**change** 137:4

**changed** 65:3 144:8
151:10

**charge** 9:9

**charges** 69:2,5 155:8
165:8,10

**check** 28:14

**Chew** 81:13

**children** 10:18 91:16

**choice** 32:22 67:13
81:17 156:10 166:19

**choose** 109:10

**chose** 39:15 117:21
126:15

**circled** 95:25

**circumstances** 39:16
96:14

**Citizens** 24:11

**city** 30:1

**civil** 9:18

**claim** 124:25 125:11,21

**claims** 22:12 25:13 26:3
124:14

**clarification** 135:12
159:15,16

**clarified** 71:12 159:12

**clarify** 71:9 106:23
153:21 158:14

**clarity** 153:13,14,15

**class** 9:25 11:25 12:18,19
13:8,12 18:12

**classroom** 14:8,9

**clause** 157:25

**clean** 87:23

**cleanout** 87:19

**clear** 46:5 111:23 117:23,
24 142:15 150:9 158:20,23

**click** 20:7 26:7

**clicked** 21:10 24:17

**client** 37:7 102:13,17,18
104:17 112:13 145:10

158:24 159:6,16 160:6,12

**clients** 18:17 26:2

**close** 31:12,16,17 38:11
39:9 94:23 95:1 96:25
100:22 120:23

**closed** 31:20,22

**closing** 31:10,24 32:1,7,
15 38:11 39:11,13,16 46:5
49:17 72:22 94:14 95:4,10
96:20 97:2 100:21 104:9,
10 169:23

**clothes** 59:24 148:15

**Club** 24:15

**clutter** 90:16,20 91:1

**Cocco** 7:7 69:24 70:11

**code** 47:19 58:24 74:7,12
90:15,22,24 91:3 110:11
112:3 150:1 161:23

**codes** 142:11

**coercion** 148:17

**Cohen** 10:9 23:12,23
25:10

**collapse** 47:22 53:12
55:6 60:14 73:22 79:15
90:7 109:15 126:13 128:6
162:14

**collapsed** 59:9 69:18
120:20 145:24 162:3 169:7

**collapsing** 62:25 67:6
110:10 160:9

**colleague** 28:10,19

**college** 9:12,19

**column** 84:15

**combust** 109:16

**Comcast** 62:2

**comfortable** 102:16
105:18

**commented** 110:22

**commenting** 123:17

**commercial** 18:15 24:7
25:12

**commission** 30:8,11,
13 56:3,16

**commit** 45:24 46:10

**common** 26:16 37:14,18 97:17,24

**communicate** 17:25

**communicating** 66:8

**community** 12:24 130:17

**commute** 28:1

**commuting** 27:20

**companies** 11:1 35:19

**company** 10:16,23 17:17 24:24 31:23 83:22 85:5 115:17 116:8 138:23

**competency** 163:21,23

**complaint** 37:12,17 38:13,14,16,18 39:20 40:11 42:9 43:10 77:1 95:19 96:5,9 97:4,10 99:7 100:18 101:3 115:7 130:15 154:8

**complaints** 37:15 131:14

**complete** 41:23 110:19

**completed** 42:1 144:10

**completely** 53:5 59:9 71:1,7

**complex** 18:14,17,19 25:12

**compliance** 91:18

**components** 161:25

**con** 46:7

**concern** 43:19 48:7 73:1 75:4 122:1 166:6

**concerned** 43:17 47:23 57:15 80:13 151:6 154:19

**concerns** 44:3,11 50:1 52:16

**concludes** 171:5

**conclusion** 164:14

**concurrent** 125:4 126:1

**condemnation** 15:21 36:21 37:9 43:13,16 45:2 47:18 48:9,13,17 53:6,8

58:12 59:3 62:9 77:15,24 78:3,5,8 87:11 88:4 89:16, 20 91:21 93:4 103:15 111:16,18 113:5 117:6 136:7,10 141:1 143:3,5,8 149:13,18,23,24 151:13 161:11 162:13

**condemned** 36:7 48:20,23 54:2 55:1 57:12 102:24 103:16,21 107:2 109:6 117:19 132:13 147:25 148:4 149:7 152:25 153:17 166:14 167:20 168:1

**condition** 27:4 90:5 91:2 124:25 125:22 132:15

**conditioning** 75:6

**conditions** 26:5,11,12, 21 57:14,18 59:2 67:25 90:21 128:19 141:2 146:24

**conducted** 91:19 105:7

**conducting** 91:14

**confers** 145:9

**confirm** 152:23 163:9

**conflict** 78:1,23 79:3

**connect** 144:9

**connection** 11:6 124:24 125:20 170:13

**connections** 90:13

**Connor** 7:4

**consequence** 99:12

**consideration** 115:7 134:15

**considered** 96:4

**consistent** 25:8 146:6

**constitute** 90:21

**constitutes** 90:24 91:2

**Constitution** 9:18

**construct** 35:11

**construction** 10:9 18:24 22:11 24:6 25:10,13 26:4 34:23 35:16 43:22 78:16,22 90:12 144:1 161:1 167:24

**consult** 157:21,22

**contact** 36:24 142:4 148:23 156:24

**contacted** 144:7,9,10 157:3 168:24

**contained** 90:20

**contamination** 26:23, 24

**contents** 51:15 52:4,8

**context** 26:17 104:21 105:4

**continue** 63:24

**continues** 25:20

**contract** 10:13 18:1 60:22 95:6 96:6,24

**contractor** 35:15 61:8 65:9 168:25

**contractors** 25:14 60:13,15 61:25 65:8 123:15 127:9 144:2 149:2 150:21,24

**contractual** 22:7

**conversation** 51:10,16 70:14

**conversational** 11:20

**conversations** 58:17

**convey** 38:18

**conveyed** 36:8 41:16

**conveying** 76:12

**cooking** 91:13

**coordinate** 121:20 126:24 127:3

**coordinated** 137:11

**copied** 19:23

**copies** 129:18 171:17

**copy** 21:12 37:20 40:11 52:1 72:7 92:15 93:3 97:4 122:14 139:14 144:14 163:13 164:4,6 171:12,14

**cornea** 32:16 34:14

**corner** 21:25 23:6 84:7

**corporate** 18:17

**correct** 15:7 19:1 21:12, 20 23:2,8 24:24 25:16 32:6 35:12 42:7 48:23 54:7,22 57:15,16 60:5,21 72:12 74:6 76:8,15 85:2 87:3 89:21 92:3,9,12 97:14,18, 25 98:6 99:8,14,20 101:4, 14 103:17,21 110:4 115:1, 2 116:6,9,15,19,23 118:1 119:5,8 122:3 125:13 128:2 138:15,25 139:8 141:3 142:13 143:9 153:4 157:10 163:13,15 169:16

**corrected** 91:8,18

**corrections** 138:11

**correctly** 38:23 60:10 135:8

**cost** 31:15 48:2 75:2 121:15

**costs** 131:18

**couch** 69:13,16 145:22 169:9

**could've** 169:13

**counsel** 6:21 11:16,18, 19 18:7 19:5 23:25 24:23 25:1,9 45:4 101:15 105:7, 17 115:11 122:16 130:20 135:8 138:11 145:9 171:1

**country** 107:3

**County** 37:14

**couple** 10:14 17:19 119:23 167:8

**court** 6:11,18,20 7:9 37:14 45:22 50:7 61:17 68:13,16 72:3 74:20 77:16 97:17,24 98:16,22 103:6 104:7,9 106:9,12 107:8,10 109:21 110:25 112:14 116:2 121:13 122:9 133:12 139:2,15 142:15 148:1,2 152:22 157:5,18 163:8 164:11 171:11,16

**Court's** 112:15

**courthouse** 100:11

**courtroom** 45:6,16 47:22 48:4

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

**crash** 151:4,5

**crashing** 151:1

**create** 13:5

**created** 17:11,13 21:16
22:20 51:19 61:19 72:15
80:18 92:8 114:25 119:12,
13 124:25 125:22 133:13
143:15 147:15 154:16,25
156:17

**creates** 162:8

**creating** 142:21

**criminal** 154:8 165:5,6

**crisis** 148:8,11 149:1

**critical** 12:9

**critically** 14:10

**crossed** 95:24

**crowbar** 60:16

**Crozer** 148:21,22

**crumbling** 150:17

**crushed** 65:14

**cry** 59:16

**curbside** 28:19

**current** 132:15 139:3
142:8

**Custom** 35:23,24 143:25

**cut** 112:2 162:12

**cute** 160:4

**cutting** 94:1 131:17
132:1

---

**D**

**damage** 151:5 161:7

**damaged** 44:7 79:19
120:5,21 121:25

**danger** 88:8

**dangerous** 74:24
110:10 126:8

**dark** 149:5,11

**data** 18:19

**date** 31:4 32:24 33:21
38:6,7 49:17 84:11,12 92:4
94:14 95:2,4,10 96:21
100:21 118:20 142:8 157:5
169:21 170:20

**dated** 92:10 116:2 118:19

**David** 7:4

**day** 12:24 13:1 28:6 30:24
36:19,20 46:6 48:5 62:4
64:4,25 66:12 67:10 92:6,
16 100:8,9 106:3 111:4
115:13 134:13,15 144:4
147:15 150:11,13,18,20
151:25 167:20

**day-to-day** 27:14

**days** 67:3 114:25 128:10
146:8

**dead** 55:23 151:2 160:22

**deal** 26:25 49:22

**dealing** 46:7,8 56:9
126:8

**deals** 10:17 78:17

**debris** 59:7 90:21,22
110:13

**decade** 18:5

**decided** 27:11 30:23

**declared** 88:8 117:6

**decreed** 115:13

**deed** 28:13 32:5 39:8
41:11,21 47:15 49:17
115:15 116:5 129:9

**deemed** 47:19 55:24
67:4,23 74:8 107:2 108:5
116:1 117:19 118:2
132:13,20 142:10 148:9
156:2 160:23 161:24

**default** 38:10

**defaulted** 96:6,21
100:21

**defects** 26:4,5

**defend** 124:13

**defendant** 115:10,16,21
134:20 135:1,4 152:23
159:9

**defendant's** 134:16,19
153:1 158:17

**defendants** 7:6

**defended** 16:19

**defer** 149:23

**defiant** 165:6

**definition** 26:13,15,16

**degree** 13:18

**degrees** 59:8 64:22
136:15 150:16 169:7

**Delaware** 8:25 37:14

**delayed** 33:18

**delays** 26:5

**delineation** 84:24

**delusion** 146:16

**demanded** 45:12

**demolished** 89:7
102:19

**demolishing** 149:8

**demolition** 168:5
169:21 170:20

**Dennehey** 7:5

**department** 135:3
138:20 151:11 154:25
155:7,10

**deposit** 39:5

**deposition** 6:7,13
15:18 105:6 152:13

**design** 22:10 25:14 26:4

**destroy** 117:11

**destroyed** 34:15 75:9
120:5

**destroys** 162:7

**detail** 14:25 15:2 124:17
155:14

**details** 15:7

**deteriorates** 162:7

**determination** 77:15
78:3,5,8 146:5,19 165:4

**determined** 90:14
146:14 165:24 169:5

**detriment** 32:14 39:13

**development** 10:16
12:10 22:5 130:17

**die** 44:2 65:19 67:8,22
73:2,6,9 78:20 128:23
136:9 150:7 154:20 155:25
156:2,4 160:16

**died** 128:16 150:15 156:5
166:14

**difficult** 27:25 32:21
51:1

**diligence** 49:19

**direct** 80:14 86:4 101:24
102:1 103:23 107:5 108:19
109:19 110:16 111:5 112:8
129:6 136:7 152:15

**directed** 116:12

**directing** 129:22 136:19

**director** 11:17 130:17

**disagree** 139:10

**disaster** 161:4

**discharged** 133:8,10

**disconnects** 168:4

**discussed** 53:21 73:11
80:3 95:3

**discussion** 48:19 52:7
112:19 144:24

**discussions** 52:4

**disease** 53:11 90:6
110:12

**dishwasher** 162:2

**dismissed** 165:7,9

**disperse** 115:17 116:9

**disposable** 29:18

**dispute** 73:17

**disrepair** 62:16 73:20
90:19 120:4

**dissuade** 9:2

**distinction** 108:16

**district** 6:11 165:3

**docket** 134:17

**doctor** 149:1

**document** 16:24 17:5,7 18:20 20:22 22:20 23:20 38:4 41:1,3 72:23 80:25 82:25 83:3,9,14,16,18,20 85:19,20 86:1,5 87:13 88:3,5,6 89:15 92:8 93:9, 11,15,20,21,22,24 94:4,9, 10,12,16,21 95:12,18 101:11 106:21 112:6,7 113:14 114:2,21 117:21 118:5,15,19,25 119:3,20 120:2 121:2 123:18,23 129:7,8,15,20 130:10 133:2,3,20 138:1,9 139:22 140:2,4,7 141:8 147:5,16 151:21 154:6,10 156:17 157:13,22 163:3,4 164:22

**documentation** 146:12

**documented** 59:22

**documents** 15:18 22:8 43:7,9,11 46:11 49:23 72:4 79:7 103:20 113:20,24 139:15 169:23

**dollar** 26:3 163:17

**door** 69:16 87:10 88:4,18 143:23 147:18

**doors** 59:1,4 137:5,8,9 143:24

**dot** 24:15,16 26:6 104:11

**doubt** 140:24

**Dozer** 135:19

**Dozor** 61:20 134:8 152:2, 3

**draw** 19:3

**driven** 18:20

**due** 49:18 62:9 90:16 128:13 141:1 151:12 161:13

**duly** 7:13

**duties** 11:14

**dwelling** 88:12 90:17, 19,23 91:4,10,16,20

**dying** 44:18 65:21 67:4 136:23 156:11

## E

**E.R.** 148:21

**early** 31:3,5,16 33:22,23 34:4 95:1 150:25

**earned** 18:11

**easier** 137:21 160:18

**Eastern** 6:6,11 171:10

**education** 10:19

**educational** 8:20,21

**effort** 75:15 127:11

**efforts** 75:24

**egregious** 73:12

**elderly** 47:23 74:24 80:11 136:17 160:6

**electric** 90:12

**electrical** 144:8

**electricity** 62:14 117:9, 10 140:6 160:18 161:13, 15,18

**elements** 38:17 75:8

**email** 8:10,12 130:23 131:2 163:6

**emails** 66:3,4

**embryonic** 32:19

**Emerald** 24:13

**emergency** 61:16 133:6 134:16 145:16 150:8 152:1 157:5

**employees** 123:14 125:2,23 127:9

**empty** 14:9 120:9

**EMS** 83:10

**encouraged** 9:8

**end** 33:2,19 43:1 51:13 104:10 111:3,6 115:20 118:21,23 158:1 169:14

**ended** 156:8

**energy** 24:9

**engineer** 73:24 74:5,9

**English** 14:23

**enjoyed** 18:4

**enter** 55:3 123:5 126:18 127:6,13 128:9

**entered** 35:2 49:13

**entire** 14:16 33:12 56:2 104:25 106:21 115:5 134:9

**entireties** 169:16

**entities** 146:14

**entity** 19:10 35:22 39:25

**entrances** 149:3

**entranceway** 88:12 127:1

**entry** 91:6 144:6 158:18

**equipment** 144:4

**equitable** 103:5

**escrow** 41:11,23 47:15

**Esquire** 115:11

**essential** 38:17

**essentially** 20:1 103:2

**establish** 110:8 166:1

**estate** 10:16 11:19 18:24 22:5 30:2 83:2 103:5

**estimate** 80:17 88:20

**et al** 171:9

**evening** 150:14

**event** 161:4,5 168:12

**events** 27:8

**eventually** 9:21 153:21

**evidence** 146:15

**exact** 92:4

**exam** 145:16 163:21,23

**examination** 146:20

**examined** 7:13

**examining** 146:13

**examples** 27:3

**exams** 14:16

**excellence** 18:6

**exchange** 39:7

**excluded** 96:4

**Excuse** 87:12 89:19

**executed** 82:8 115:16

**exercise** 14:17

**exhausted** 114:19 126:7

**exhibit** 82:7,22 89:13 119:4 147:13

**exhibits** 82:6

**expand** 21:8

**expanded** 20:5

**expanding** 18:5

**expected** 14:13

**expecting** 46:15

**expedite** 96:15

**expediting** 96:20

**experience** 8:20 19:4 22:1 23:4 48:6 78:16 161:2

**experiences** 12:19

**expertise** 18:23

**explain** 14:11 119:11 125:10 147:24

**explained** 96:14 124:19

**extent** 15:23 49:15 51:9 82:11

**extra** 129:17

**extreme** 39:13 43:23 48:7 50:24 62:14,16 169:10

**extremely** 13:14 43:17 57:14 64:21 147:22 169:6

**Exuma** 24:12

**eye** 33:21 34:12,16,18,21 42:13 50:23,24 59:11 66:15 134:10

**eyeball** 32:19

**eyes** 62:17 67:25 162:18

## F

**Facebook** 21:18

**facilities** 24:9

**facility** 54:21

**fact** 28:11 73:19 154:2,12
155:15 160:13

**facts** 22:23 97:9 98:8

**factual** 74:16

**failed** 38:9 39:2

**fair** 14:24 63:6 96:13,24
97:8 146:15 154:13,24
158:19

**fall** 56:5 85:2 109:17

**falling** 65:14 136:13

**familiar** 40:1

**family** 9:13

**Farm** 24:14

**fascia** 166:2

**fast** 81:14

**fault** 121:24

**Faust** 138:15

**fear** 151:4

**feared** 129:2

**fearful** 67:14

**February** 27:23

**feces** 69:14 145:23 169:9

**federal** 13:3

**feel** 13:14 14:3 105:25

**fellow** 45:14

**felt** 59:18 120:23

**Field** 24:11

**figure** 34:13 47:16
100:25

**file** 38:14

**filed** 37:13,16 38:13 39:21
40:11,15 61:16 72:10,11
96:6 97:4,6 99:7 115:8
135:23,24 138:15 158:11

**filing** 157:21

**filled** 14:17 59:7,17
62:17,18 69:14 74:25
110:13 145:22 169:9

**filth** 59:7 69:13 90:16,20
91:1 145:24 150:16

**final** 41:12,14 42:1 47:11

**finally** 58:21

**finances** 9:22

**financial** 24:11 31:15
95:1

**financing** 22:9,14
102:22

**find** 15:10 32:22 33:1
36:11 169:4

**fine** 6:3 27:7 82:14 85:23
103:9 104:25 111:11
137:23 138:3 141:4 168:14

**finish** 76:19

**finished** 41:13 80:24
87:13 121:8

**finishes** 63:21

**fire** 44:9 47:21 53:12
55:25 56:2 62:14 67:5
83:22 85:5 90:7,11,12
117:8 128:7 136:14 141:2
160:21,23,25 162:15

**fired** 45:10

**firm** 10:9,13 30:6

**firms** 18:6,13

**Fischer** 138:16 141:17

**fit** 102:25

**fixes** 111:12

**flames** 109:16

**floor** 59:9 62:24,25 69:18
147:23,24 162:3 169:6

**floors** 55:5 150:16

**fluids** 148:15

**focus** 27:7 119:23

**focusing** 78:7 103:14
105:1 116:21 140:4

**follow** 167:17 170:25

**foreclose** 39:1

**forever** 104:1

**forgot** 162:12

**form** 23:17 40:5,13 41:17
47:1 60:23 83:24 85:25
96:17 97:19 98:7,25 99:15
107:14,20 125:14 127:15,
19 139:9 141:13 142:17
154:17 155:2 158:21
159:13 164:13 166:9

**forward** 102:22

**found** 10:15 70:17 90:17
145:21 147:17 161:16

**foundation** 10:17,21
11:17 98:25

**four-month** 120:6

**fourth** 12:13

**fraud** 45:24 46:10

**fraudulently** 148:8

**free** 109:22 110:19

**friend** 10:12 13:16,17

**front** 6:15 50:2 101:18
144:3

**fuel** 90:13

**full** 10:1 46:25

**full-time** 10:25 11:3

**fully** 14:1

**funds** 29:18 31:16,18,23
32:12 94:24 96:25 100:22
116:9

**funny** 108:7

**Furman** 25:11

**future** 73:9

## G

**gain** 127:1,4

**gallery** 12:22 50:17

**garage** 143:23

**garbage** 59:7 62:22

**gathered** 46:22 47:6

**gave** 52:24 56:4 68:9
71:17 129:17 144:16

**GC** 35:14

**general** 11:16,18,19 18:7
19:5 35:15 90:18

**generally** 27:12

**George** 164:7

**Gerard** 6:23

**gist** 45:23

**give** 17:2 19:24,25 26:10
34:1 58:15 72:6 80:1 138:3
160:12 162:12

**giving** 15:15 108:20,23,
25 165:23

**goal** 9:19 43:23

**Gonzales** 152:12
168:19 171:4,11,13

**good** 6:4 7:17,19,24 9:10
12:14,16 14:18 20:17
115:12 130:13 146:14

**gotcha** 122:22

**government** 9:16
12:18,21 13:4

**grade** 12:13

**grammar** 8:25 9:7 11:21

**Grand** 24:13

**granted** 134:19

**grass** 94:1 111:21,22
112:2 130:14 131:12 132:1
162:12

**grateful** 146:2

**great** 9:7,16,24 13:10
24:12 28:4,6 32:14 120:3

**greater** 124:17

**Greenhall** 25:11

**Greg** 28:6,10 42:16 64:13
75:2 95:3 140:9

**grew** 9:5

**grounds** 166:1

**group** 7:2 10:24 11:19
19:8 25:10

**guess** 33:7,8 54:16 81:16
101:5 103:22 111:16,18
131:1 132:5,9 141:21
152:10 158:24 159:1,16
169:12

**guy** 28:5,7

**guys** 14:3

---

## H

**habitation** 90:5 102:25

**half** 58:23 75:7 81:3

**Hamilton** 9:5

**hammer** 143:24

**hand** 107:10

**handicap** 136:17

**handicapped** 47:24
67:24 160:7

**handle** 67:16 120:13
128:23 132:1 166:21

**handled** 107:24

**handling** 18:23 22:11
158:6

**handwriting** 82:12
113:22,23 151:24

**handwritten** 113:16,
17,21,24

**happen** 44:9 65:20
75:22,23 126:15 161:5

**happened** 29:10 65:22
141:3

**happening** 50:10
131:10

**hard** 18:11 43:3 95:10

**hardship** 39:14

**harm** 107:4

**harm's** 158:10

**harmed** 76:1,2 121:17

**harmless** 124:14

**Hawaii** 24:14

**hazard** 55:25 56:8 62:14
67:5 117:9 136:14 161:12

**hazardous** 56:3 60:1
67:4 160:23

**hazards** 56:10 62:10

**head** 34:8 66:24

**heading** 93:16 133:6

**health** 90:15 107:2
145:15

**healthy** 136:16

**hear** 42:21 43:3,4 46:14
49:10

**heard** 11:4 46:14 74:21
115:10 152:8

**hearing** 40:20,22,24
42:9,12,15,25 43:1 45:3,18
46:19 47:7 48:12 50:15
51:3 53:18,22 54:12,13
56:16,18 92:2,12,24 98:16
99:13,18,20,22 100:1,3,9,
12,14,23 109:9 110:5
115:9 134:18 152:23
153:9,20 154:1,2 163:9
165:13,17,22,23 166:3

**hearings** 64:12

**heartbreaking** 162:21,
22

**heat** 64:22 128:4,19
150:15

**heat-wise** 169:8

**heavily** 78:7

**heavy** 18:20

**held** 41:23 144:25 146:6,
20 167:4

**helped** 10:12

**helping** 79:22

**Herman** 15:22 50:2 52:2,
4 71:21,24 93:2,5 96:8
97:9 98:5,9 99:7,9 100:2,
10,16 102:10,13 103:18
112:13 115:11 150:8
151:14 152:19 157:16,20
163:2

**hey** 170:14

**high** 9:17 12:21 18:16

**highlight** 22:9

**highlighted** 20:2,25
22:10,15 24:1,2 25:21

**highways** 24:8

**Hill** 164:7

**hindered** 143:25

**hindering** 144:4

**hindsight** 61:21

**hired** 77:5

**history** 23:9,16 25:8,17
26:8 27:8

**hit** 95:1

**holds** 115:18

**hole** 62:25 147:23

**home** 16:4 29:20 31:12,
16 35:3,11 42:3,6 45:25
54:21,23 59:23 62:1 64:24
65:2,15 72:19 73:10,14,18
74:24 75:3,5,6 85:2 94:23
102:20 109:14,15 120:11
128:4 140:7,12,13 144:7,
12 147:19,21,22,25 148:3,
5,8,16 149:7,8,9,11 150:22
156:11 168:25 169:4

**homeowner** 148:24

**Homes** 35:23,24

**homework** 13:1

**honest** 106:1

**Honestly** 158:2

**hoping** 52:16

**horrible** 66:11,12 67:25
77:23 162:19

**horrific** 59:6,25

**hospital** 36:16,20 39:23,
25 40:4,8 46:2,4 69:21
70:16 86:7,23 146:1
148:25 155:17

**hospitalized** 36:12
70:16 146:7

**hot** 64:21 147:22

**hotels** 24:6

**hour** 57:1 81:3

**hour-to-hour** 27:14

**hours** 28:3 50:25 65:11
91:10 144:1,4 150:20

**house** 24:12 28:4,7
29:23 30:16,19,23,24 31:1,
7 32:18 33:3,14,16 39:1,4
47:17,21,25 48:3 49:3,19
53:13,22,23 54:1,6,25
55:12,18,20 56:6,10 58:13,
14,23 60:14 62:4,9,13 63:9
65:5,13,17 67:2,4,8,23
71:13,14,15 72:22 73:4,22
74:1,3,6,8,10 75:7,9,12,16,
25 76:7,13,14 77:23 79:9,
13,18 80:6,10,13 90:17
101:1 107:1 108:6,12
111:20 112:21 113:4
117:7,10,11,16,19 118:2
120:9,18,20 121:1,22
126:12 127:11 128:9,16,18
132:17,19 139:11 143:11
145:22,23 146:8 148:2
149:5 150:7,15,22,24
151:1,3,5 153:17,22
154:20 155:18 156:2
161:6,15 162:1,5,6,10,13,
14,19 166:14 167:19 168:5
169:7,12

**huge** 29:24 62:25 112:5

**human** 12:19 43:21
47:20 53:14 54:3,5 69:14
78:18,20,25 88:9 90:4
102:25 107:2 118:3 128:3,
8 162:20

**humble** 9:4

**hurt** 79:19,24 80:8 121:24
150:5 161:8

---

## I

**ID** 6:24

**idea** 20:18 21:19 22:22
41:25 69:25 70:12 84:1
86:18,21 87:17 97:1
105:19 133:11 134:6
166:22,24

**identification** 16:22
20:20 82:3 83:12 85:17
87:8 89:11 93:7 94:7 95:16
101:9 114:15 118:10
129:4,13 132:25 133:18
138:7 139:25 141:6 147:3

151:19 154:4 156:15
162:25 164:20

**identified** 50:9 132:24
133:17 138:6 139:24 141:5
147:2 151:18 153:3 156:14
162:24 164:19

**identify** 6:21 17:5 20:23
38:5 82:24 83:14,16 85:20,
21 88:5 89:14 93:12,15
94:10 95:20 114:22 118:16
129:8,20 133:21 138:10,12
140:3 141:9 147:6 151:22
154:7 157:14 164:23,25

**ignoring** 163:4

**illegally** 128:1

**immediately** 91:5
100:13 115:14 116:5 132:1
152:22 163:9

**impacted** 44:10

**implications** 49:24

**implied** 45:23

**implying** 108:17

**importance** 43:24

**important** 12:11 76:11
78:21 106:5 108:16 131:1
132:21

**imposed** 121:13

**imprint** 17:16

**incident** 8:6 85:24
138:13 141:13 147:9
148:23

**include** 22:19 170:9

**includes** 22:6

**including** 18:18 24:10
91:13 125:3,24 143:12
151:9 165:5

**incorporate** 106:13

**incorporated** 123:18

**incorrect** 41:6 87:3

**incurring** 131:18

**indemnification**
119:12 120:24 167:3

**indemnified** 125:5
126:2

**indemnify** 124:13,23
125:12

**indemnity** 158:4

**independent** 87:2

**independently** 57:17

**indicating** 110:3 132:12
141:17 146:13

**individual** 10:21 50:8

**individually** 16:19

**individuals** 91:6 123:3

**industry** 74:13 167:24

**infection** 34:14 59:12

**inferior** 14:3

**infiltration** 162:6

**inform** 153:8

**information** 21:11,20
23:8 24:24 25:16 36:8
71:17 72:19 87:3 97:13
138:21 154:14 165:23

**informed** 13:7 67:12
68:24 103:16,19

**inhabitable** 55:21

**initially** 49:8 148:16

**initiated** 69:9

**injunction** 115:8

**injured** 65:18 121:25
149:16 160:5

**injury** 47:24 84:15,23,24,
25 85:8

**innovate** 17:24

**inside** 37:10 44:20,23,25
47:19,20 55:6,12,22 56:10
59:4,8,13 62:2 65:3,15,16
67:7 73:22 90:23 120:4,18
121:9 128:3,9,18 136:15
142:14 143:12 147:22
148:2 150:24 151:7

**insight** 146:14

**insisted** 159:1

**insisting** 159:7 160:15

**inspect** 65:5

**inspected** 74:8

**inspection** 64:24 65:2
88:16 144:6

**inspections** 58:22

**inspector** 64:23 65:4,5
144:5

**inspectors** 143:13

**inspiration** 13:9

**insulting** 109:12

**insurance** 22:9,15
45:24

**insure** 121:23

**intended** 79:11

**intention** 49:4 71:13,14
117:18 126:20,22 155:23,
24 156:1,3,7

**intentions** 153:7,10
159:3

**interaction** 8:16 9:10

**interactions** 65:23

**interest** 80:7

**interested** 28:8 29:12
30:22

**interesting** 14:22

**interim** 102:17

**interior** 16:4

**International** 24:14

**interrupt** 101:16

**interviews** 10:5

**introduced** 16:21 20:19
50:7,12,15 82:2 83:11
85:16 87:7 89:10 93:6 94:6
95:15 101:8 114:14 118:9
129:3,12

**investigate** 169:4

**invite** 126:18 127:5,12,14

**involuntary** 145:16

**involved** 25:12 48:10
71:3 76:25 79:24 101:5
103:8 134:5 150:4

**involvement** 72:20
128:24 154:22 169:19,24

**involving** 24:10 26:4

**issue** 9:22 27:21 44:4
49:1,2 55:22 56:4 78:19
79:17 106:18 111:1,13
112:4,14 141:20 142:3
146:11 158:6 161:1

**issued** 106:24

**issues** 33:21 34:20 59:10
66:15 98:13 111:17 157:9

**items** 47:17 75:1,3,5,12
76:1 79:18 87:23 101:1
105:11 108:15 120:11,25
127:11 131:23 137:15
163:10 166:23

**Ithan** 8:3 31:17 115:15
134:22 142:4,7,9

---

**J**

**jail** 156:9

**Jbrydzinski@gmail.
com.** 8:15

**Jeff** 18:3,4,12,14,22,23
19:14 22:3 142:4 148:24

**Jeff's** 17:20,23 18:9,10,
17

**Jeffrey** 6:7 7:12 8:1 25:9
142:1 171:6

**Jeffrey's** 25:11

**Jennifer** 7:6

**Jersey** 9:5

**job** 10:15,25 11:3,15
27:17,19 106:4

**John** 51:19 168:17

**joins** 152:12

**joke** 160:2,3

**Joseph** 7:7

**judge** 15:22 42:20 43:4
45:12 47:9 48:9,20,22 50:2
51:19 52:17,19 53:14,16
56:12 61:20 71:9,11,12
74:17,23 76:11,16 79:2,10,
20,23,25 80:4 91:25 92:23
93:25 103:15,19 106:18,
22,23,25 107:3,16 108:3

109:2,4,24 110:22,25
111:17,19,25 112:2,4
116:2,14,25 117:2,13,20
122:2 134:8,17 150:3,9
152:2,4,6,8,9,10 153:6,7,9,
10,18,19,21 160:14,15
165:3,24

**judge's** 80:15 153:5
159:2

**judges'** 149:12

**judgment** 146:15

**judicial** 71:6 78:4,9
149:21

**July** 31:13 42:5,7 51:18,
23 54:7,8,9,13,15,18,23
55:8,9,13,15 63:12 68:14
85:13 92:2 94:23 98:16
100:9 114:23 115:9,13
116:3 129:10 132:11 133:7
134:17 158:15 168:8
169:20 170:19

**jump** 114:4

**June** 31:10,22,23,24
32:1,8,12,17 35:6 38:7,8
39:11 40:3 41:15 42:2
54:14 55:17 72:22 85:13
94:14 95:2 97:1,2

**jurisdiction** 164:11

**jurisdictions** 25:15

---

**K**

**Kaheawa** 24:13

**Katherine** 86:20 141:16

**Kevin** 130:12,16

**keys** 117:4,13 126:25
127:3

**kicked** 158:5

**kid** 56:7

**kids** 143:7

**killed** 149:14

**Kim** 6:19

**kind** 13:22,23 27:8 68:2
113:20 137:7 167:22

**kinds** 9:18 151:24 168:4

**kitchen** 62:25 63:2 69:19
90:25 143:24 147:24

**knew** 9:24 36:14 39:19
45:15 68:18 73:6 100:20
108:11 128:10 133:16
137:10 160:14 167:1

**knowing** 48:16 67:3
73:4,8 128:17 150:6

**knowledge** 46:25 50:3
56:12 87:2 93:3 95:12
97:14 122:14 167:6 170:1,
5,12,18,21

**Kochanski** 130:17

---

**L**

**label** 135:23

**lack** 153:13,14,15

**lacking** 90:18

**lacks** 90:11

**laid** 165:4

**land** 22:6

**language** 103:15 108:13
123:18

**large** 147:23

**lasted** 59:19

**late** 31:4 57:22

**law** 6:13 7:2 9:16,20,21
10:2,13 11:25 12:18 16:6,
8,10 18:12,13 25:13 76:17
77:5,7 78:16,22 80:4 103:3

**lawn** 132:5

**lawsuit** 100:1

**lawsuits** 16:18

**lawyer** 12:14,15 45:10

**leader** 18:4 24:23 25:2

**leaked** 162:3

**leaking** 62:24 63:2

**leaks** 59:9

**leaning** 151:3

**learn** 70:13 146:5

**learned** 102:23 103:3

**leasing** 22:8

**leave** 28:2 30:1 33:2
143:9,10,14 148:7

**leaves** 55:23 65:14 151:3

**leaving** 148:16

**Lee** 15:22 71:24,25 93:5
96:8 99:9 115:11 150:8
154:11 157:15 163:2

**left** 34:19 39:9 47:16
57:11 59:23 67:13 70:16
150:22,23 166:21

**left-hand** 84:7

**leg** 148:15

**legal** 6:17 11:18 18:10
22:4 26:13,14 74:15,16
88:8,22 101:6 143:3
164:14,17

**legally** 147:25

**lesson** 14:9

**letter** 11:25 15:22 72:2
129:25 130:16,23 132:11
150:8 151:14 152:1,18
163:2,6,13 164:4

**letters** 113:19

**level** 85:2

**Lewis** 10:4,7

**Lexis** 77:10

**liability** 44:4

**liberties** 9:18

**life** 32:17 43:21 47:20
53:15 55:3 59:6 67:15 73:8
78:18,25 90:8,15 108:11
110:11 118:4 129:2
150:10,12,13,17 152:11
156:6 160:2,25

**life-threatening**
111:23

**light** 56:1

**likelihood** 53:10,11

**likes** 28:7

**limit** 52:24 71:2 116:23

**limited** 153:2 158:18

**Lincoln** 24:10

**lines** 104:6 107:6 108:20
109:20 110:17 112:9

**Lingo** 16:12 27:10,16
28:16 34:24 39:3,17 40:11
45:3 48:1 49:8,13 51:2
52:8,12 60:22 63:5 71:23
73:25 74:2 75:9,18 82:9
95:3 100:2,10 140:9 170:2

**Lingo's** 63:16

**Linkedin** 11:13 17:8
21:7,12,15 23:21,22

**list** 30:24 44:19 163:10

**listed** 91:7

**listen** 48:12 104:2

**literally** 14:8,10 59:25

**litigating** 18:14 25:12

**litigation** 18:18 22:12
26:3 48:10 76:25 77:17

**litigator** 17:25

**live** 32:23 33:1 53:2,17
54:1,6 65:22 71:14 73:3,4,
8 79:11,12 106:15 107:1
108:6,10,15,25 109:5,9,15
110:9 111:3 116:20
117:19,21 128:16,17
132:14,16,20 136:8,9,12
139:11 150:6 153:17,22
160:7 162:20 166:13

**lived** 27:18 59:17 73:13

**living** 53:20,24 55:1,6,8,
13,14 58:19 68:1 73:10
79:9,16 106:19 108:3,11
109:14 132:19 136:6,9
140:23 166:15

**loans** 9:14

**local** 13:3

**located** 6:15 134:21

**lock** 150:21

**locked** 37:11 44:22
54:25 55:20 65:3 128:9
136:22 137:7 143:11 151:7

**locking** 137:6

**locks** 57:24 58:15 61:10 65:4 117:5 127:4 131:24 134:25 135:4,14,15 136:20,21,24 137:4,5,10, 12 143:23

**locksmith** 137:4

**logbook** 13:5,6

**logo** 17:17

**long** 29:6,8,9 47:13 68:6 73:13 113:5 119:20 132:10

**long-term** 87:1

**longer** 62:5 63:16 101:2 102:25

**looked** 13:2 28:19 44:25 45:15 82:23

**lose** 39:4

**lot** 9:13 44:11 66:11 72:20 81:7 119:21 146:22

**love** 9:16 28:1 55:4

**loved** 50:14

**LP** 7:3

**Luke** 59:20 130:13,18 138:19

**lunch** 81:1

**luncheon** 81:23

---

**M**

---

**made** 13:14 14:3 17:25 18:3 47:12 55:10 57:14 111:2 116:25 134:2 142:4 143:5 145:17 146:18 155:7 165:11

**magisterial** 165:3

**maintain** 162:4

**maintained** 161:7

**maintenance** 22:11 59:10 89:18,21 90:18 93:18

**make** 32:15,23 63:20 73:18,21 75:22 94:24 106:12 110:18 112:19,21 113:3 121:16,20 128:19

137:13 138:11 152:10 156:4 158:10 160:18

**making** 109:2,24

**male** 143:21,22

**MALLOY** 19:17,21 37:21,24 114:6,10,13 118:7 129:17 131:7 137:20,24 138:5 151:17

**manage** 18:19

**manager** 18:2,4

**managing** 22:4

**Manor** 133:10

**March** 6:6 28:23,24 29:14 30:21

**Marine** 24:15

**mark** 20:15 38:2,5 86:16, 17

**marked** 16:22,25 20:20, 23 21:25 82:3 83:12 85:17, 20 87:8 89:11,14 93:7,9,11 94:7,10 95:16,20 101:9,12, 13 114:3,7,15,22 118:6,10, 15 129:4,7,13,15 132:25 133:3,18,20 138:7,10 139:25 140:3 141:6,9 147:3,6 151:19,21 154:4,6 156:15 157:13 162:25 163:3 164:20,22

**marking** 114:11

**marks** 95:24

**married** 8:17

**Marshall** 7:5

**mass** 18:18

**master's** 13:18

**matter** 6:8 22:17 28:11 45:7 46:12 51:13 77:7 96:15 97:18 128:14 134:18 164:12 171:7

**matters** 18:15,20,24 22:12

**Mawr** 39:23 60:3 133:10

**Mchale** 7:7

**Meaning** 26:12

**means** 52:15 87:16,20 117:16 126:4 136:1

**meant** 106:22,25 107:17 117:20

**mechanical** 62:15 90:13 161:25

**mechanism** 137:7

**Media** 6:15

**medical** 40:2 54:21 87:4 146:17,24

**meet** 27:16 28:16 39:12 86:16,19 95:10 100:2,10

**meeting** 100:22

**member** 8:24

**membrane** 32:19

**memory** 13:18 14:5 47:14 111:25 119:16

**mental** 145:15 146:11

**mentioned** 44:13

**mentor** 9:8,16

**met** 13:13 27:10 28:18 96:8 102:17

**MG** 60:18

**Michael** 141:16

**mid** 31:3

**middle** 102:12 128:4

**might've** 72:2

**military** 10:19

**mind** 13:25 27:6 44:12 82:10

**mine** 13:16,17 17:16 48:7 122:1

**minute** 21:21 104:12 127:18

**minutes** 59:5,19 81:11 167:8

**mischief** 165:7

**misconstruing** 71:8 106:20

**misleading** 105:16

**misrepresented**

152:9

**missing** 13:4

**misunderstanding** 150:10

**mobile** 148:8,11

**mold** 162:8

**moment** 11:14 19:25 23:14 27:10 65:19 76:6 79:14 82:21 103:9,15 105:23 106:3 112:9 119:19 121:4 124:9 134:7 151:15 161:6

**money** 31:13 39:5

**month** 56:20

**month-to-month** 27:13

**months** 23:24 38:25 39:11 49:5 55:20 58:24 75:7 92:11 120:15,18 140:24

**Morgan** 10:3,7

**morning** 6:4 7:17,19 130:13

**motion** 133:6 157:15 160:12

**motivate** 17:24

**motivated** 9:17

**move** 30:1 32:18,22 38:25 47:25 49:6,9,14 58:14 71:15 102:15,21 110:5 111:9,10 112:3 124:3,20 152:24 159:9 163:11

**movers** 123:16 127:10

**moving** 49:12 58:19 70:4

**mowing** 131:22

**Muhlenberg** 9:12

**multimillion** 26:3

**multiparty** 18:18

**multiple** 25:15

**Municipal** 16:10

## N

**narrow** 89:5

**naturally** 15:13

**nature** 112:1

**navigating** 22:6

**needed** 9:24 11:11 31:13
38:18,20 58:18,21 68:2,3
94:24 100:24,25 117:15
128:19 149:1 159:1,12,15

**needle** 50:24

**negligence** 124:24
125:5,17,21 126:1,3
128:13

**negligent** 166:12

**negotiate** 94:25

**negotiator** 18:1

**neighbor** 130:14 131:14

**neighborhood** 44:10
56:2 65:6 143:6,7 160:24

**news** 13:2

**nice** 13:10

**night** 14:6

**nodding** 34:7

**nonsequential** 137:22

**nonstop** 9:25

**normal** 29:8

**notation** 89:24 157:2

**notations** 95:21

**note** 113:21 135:11
156:12

**notice** 15:21 37:9 43:13,
15 45:1 47:18 53:6 58:11
59:3 64:13 87:10 88:3,8,
14,23 89:16,20 90:1 91:21,
25 93:3,18 111:18 117:5
132:18 136:7 141:1 143:3
149:13 150:1,2 151:12
161:10

**notices** 143:4

**notified** 64:15 156:19

**number** 6:12,24 8:5,7
9:25 11:24 13:11,12,15
14:12 18:11 74:17 80:15,
17 115:20 116:4,8,13
142:3

**numbers** 137:22,25

**numerical** 115:20

**numerous** 26:2

## O

**object** 98:25

**objection** 23:17 40:5,13
41:7,17 47:1 51:4 60:23
78:10 80:19 82:11 83:24
92:17 96:17 97:19 98:1,7
99:15 107:14,20 112:24
113:9 125:14 127:15,19
139:9 142:17 154:17 155:2
156:12 158:21 159:13,21
161:21 164:13 166:9

**objective** 150:6 158:9

**observed** 90:23,25 91:4
143:19,22 145:23 148:9

**observer** 46:13 50:22

**obtain** 126:25 127:3

**occupancy** 88:9 90:3,
10 118:3 128:8

**occupy** 54:3 67:5 88:10
91:10 132:14,17,20 152:24

**occupying** 132:19
142:7

**occur** 31:24 104:10 116:5

**occurred** 116:9 146:1

**occurring** 161:4

**Ockley** 6:8,25 31:9,14
32:2 36:12 37:7,13 39:14,
22 45:8 49:8,11 57:21 65:3
71:7 82:9 83:22 84:9 86:25
87:10 88:4 96:6,21 99:11
100:20 112:18 115:11
116:25 120:14,25 125:3,
11,24 131:10,16,20 133:7
134:20 137:4,14 142:5,13
143:1,25 144:7,13 147:24
148:6,10,13,16,21,22,25
149:9 153:15 157:9 158:10

161:14 165:5 167:21 168:7
169:11 170:3,6,19 171:7

**Ockley's** 150:12 157:7
169:21 170:15

**October** 28:12 38:24
49:13

**of'** 35:10

**offenses** 165:4

**offered** 11:8

**offering** 48:1 75:10,11

**office** 91:19

**officer** 13:19 69:24
70:10,11 86:16 157:3

**officers** 16:16 67:21
69:11 145:18 156:24

**Offices** 6:14

**official** 58:24 90:15
110:11 151:9 161:23

**officially** 63:16 106:14

**officials** 47:19 66:6
74:7,12 150:1

**older** 47:23

**omission** 124:25 125:21

**one-year** 33:5

**online** 20:10

**open** 20:8 45:22

**operational** 18:6

**order** 13:11 48:9,14,17
51:19,23 52:3,5,8,12,15,
21,22 53:9 61:19 64:6
68:13,17 71:8 72:15 74:17,
18,22 76:3,5,16,23 77:11,
16,24 78:4,9 80:3,15,17
106:12,23 107:8,10,24
108:1,5,7,8,9,12,14,17
109:6,9 110:18,24 111:2,3,
4 114:23,25 115:5 117:18
120:23 121:12 122:3,4,9,
13,14 133:7,12,22,24
134:8,17 135:20 136:5,10,
11,18 139:2,4,6,12 142:15
148:2,3 149:21,23,24
150:10 153:16 157:18
158:14,15,20,25 159:7,17,
23 160:11,13 161:11,12
162:13 166:1 168:4

**ordered** 115:13 134:19

**orders** 71:6 78:2,24 79:4
108:10 139:7 149:12
157:18

**organization** 10:20

**organizations** 11:16
18:7

**organize** 17:24

**orientation** 12:17

**original** 82:13 96:2

**originally** 32:9 39:23

**outcome** 156:19

**outline** 13:20

**outlines** 14:7,9

**outrageous** 73:10

**outstanding** 46:2
132:2

**overseeing** 22:4

**owned** 64:4 76:14 101:2
121:22 132:6 138:24 148:5
168:3

**owner** 103:6 122:23,24
123:2,4,12,14,18 124:14,
15 125:3,24 126:17,18,25
127:5,8 132:4 138:23
142:6,9 151:10 153:1

**owners** 25:13

**ownership** 63:9

## P

**P-1** 16:21,25

**P-10** 101:8,13

**P-11** 114:13,14,22 122:17

**P-12** 118:7,9,15

**P-13** 129:3

**P-14** 129:12,15

**P-15** 132:24 133:3,14

**P-16** 133:17,20

**P-17** 137:20 138:5,6,10

**P-18** 139:24 140:3

**P-19** 141:5,9

**P-1A** 20:19

**P-2** 82:2

**P-20** 147:2,6

**P-21** 151:18,21

**P-22** 154:3,6

**P-23** 156:14 157:14

**P-24** 162:24 163:3

**P-25** 164:19,22

**P-3** 83:11

**P-4** 85:16,20

**P-5** 87:7 88:3

**P-6** 89:10,14

**P-7** 93:6,11

**P-8** 94:6,10

**P-9** 95:15,20

**P.C.** 25:11

**p.m.** 91:11 117:8 161:12

**PA** 115:15 134:22

**pack** 81:1

**packing** 120:17

**pages** 84:4 101:25

**pain** 50:24 66:17,19

**paired** 13:16

**Pallas** 25:10

**Paller** 6:18

**pan** 30:23

**pandemic** 27:20,21

**papers** 31:9

**paperwork** 41:15,24
42:1 47:11 68:10 148:11

**paragraph** 18:8 19:14
87:16 116:4 122:7 123:6
125:6 126:22 135:12 147:7
152:16,20 163:7

**parenthetical** 115:19,
20

**Park** 24:11

**part** 18:2 19:23 20:5 22:20
23:11 24:25 26:8 30:8
76:11 80:24 96:2 101:3
120:12 121:22,23 125:1,4,
22,25 143:9 147:13 158:4

**participated** 153:20
158:8

**parties** 102:16 106:13
123:3

**partner** 13:13

**parts** 41:12 74:15 145:23

**party** 124:15 125:5 126:2

**passed** 12:5 47:14

**passing** 39:8

**passive** 125:4,25

**past** 18:5 24:21 120:5

**patch** 42:13 50:23

**path** 69:16 147:17

**patrol** 149:3

**pay** 15:6 33:11 39:2,5
46:2 75:17 163:18

**paying** 131:13 140:24

**PD** 85:24

**PECO** 144:7

**Penn** 11:5,6 34:13

**Pennsylvania** 6:9,12,
16 8:4 171:9

**people** 12:12,24 14:11,
14,17 30:22 43:23 45:6,16
48:2 49:24 75:3,11 126:9,
13 130:13

**percent** 34:14

**perform** 23:2

**performed** 21:6

**performing** 18:15
65:13

**period** 36:1 39:24 53:3
66:13,17 120:6

**permission** 104:15
108:2 142:14

**permit** 123:2 126:18
127:5

**permitted** 55:5 91:16

**person** 13:5 67:18 68:1
79:12,15 88:10 96:10
128:1 132:14 136:16,17

**person's** 11:22

**personal** 76:9 109:8
115:23,24 116:17 117:12,
17 121:14 124:16 127:7
134:23 135:5 136:5 142:24
153:2 158:19

**personally** 11:11

**persons** 125:2,24

**pest** 64:23 65:2 144:6

**pests** 65:6

**petition** 61:16 115:8
134:16,19

**Philadelphia** 24:14
27:18 28:1 29:20 30:2,16,
20

**phone** 28:5,9,10 62:7
144:9 155:15

**photographic** 13:17
14:5

**photos** 162:18

**physically** 101:17

**physiology** 12:20

**piano** 166:23

**Piazza** 24:11

**pick** 109:10

**picked** 28:5

**picture** 88:7

**pictures** 44:24 59:21

**piece** 96:24 101:6 120:9

**pieces** 59:8

**Pinto** 7:7

**place** 6:13 11:23 32:23
33:1,4 54:12,13,14,15
69:23 102:22 149:14
156:6,8 160:5

**plaintiff** 6:25 99:10

115:8,12,14 116:1 134:24
135:2,13,15 153:1

**plaintiff's** 102:8,18,20,
21 163:8

**plan** 137:14

**planned** 49:11

**Pleas** 37:14,18 97:18,24

**plumbing** 90:14 110:14

**pod** 157:8

**point** 22:21 27:19 29:2
34:23 36:10,11 37:12
40:18 41:2 44:20,24 50:6
51:18 59:17 62:7 65:8
68:17 69:8 72:8 73:7 97:11
110:5 111:1 113:16 116:25
118:20 126:7 132:6 135:21
146:4 150:3,5 155:19
158:4,9,11 165:7 169:11

**police** 37:3 66:1 67:15,21
68:21,24 69:1,10 127:13,
16,24 128:14,21,23,25
129:1 134:5 135:3 138:20
139:5 141:22,24 148:7,14
152:1 154:8,19,25 155:7,
10 156:5,22 159:25 161:16
166:20 169:3 170:9,10

**poor** 56:7

**porch** 147:18

**portion** 90:2,9 169:6

**position** 52:17 103:2

**possessions** 49:14
120:4,8 153:17 166:25
170:7,15,18,23

**possibility** 148:24

**posted** 87:10 88:3,11

**postings** 132:17

**postsecondary**
10:18,19

**potential** 30:22

**potentially** 47:24
160:21,24

**power** 39:12 131:20

**practice** 25:11

**pre-pandemic** 27:18

**precedent** 79:1

**preeminent** 74:13

**preparation** 15:17 96:8
97:7

**prepare** 49:6

**prepared** 26:14 102:13

**preparing** 22:7

**present** 8:2 11:15 48:8
56:1,3 59:20 74:20 109:11

**presentation** 99:13

**presented** 15:3 31:10
56:11,15 76:24 91:25
92:14,23 93:25 98:15
111:19,24

**preserve** 82:11

**president** 11:19 19:5

**press** 69:1,5

**Prete** 7:2 169:15,18
170:1,5,12,14,17

**Prete's** 169:19

**pretty** 12:16 14:18 31:14

**prevent** 45:25 73:3 91:6
111:15 151:1 161:3 163:12
168:12

**preventing** 65:9

**previous** 123:4 124:15
125:3 126:25 127:8 132:3
142:5

**previously** 19:1 21:25
85:19 91:22 93:11 94:9,21
95:19,20 101:12 114:3,21
115:16 119:24 129:7,15
133:2 138:9 140:3,14
141:8 147:6 157:13 163:3

**price** 94:25

**prima** 166:2

**primary** 43:22 150:5,6

**print** 84:4

**printout** 17:8

**prior** 16:18 23:4 83:4 86:2
93:19 100:3,9,13 101:17
125:24 131:24 134:18
152:17 153:23,24 157:21

169:22

**priority** 79:1

**prison** 163:15

**private** 8:10,12

**privy** 58:17 146:17

**probable** 44:14 154:15
155:8 166:1

**problem** 15:3 17:23
31:11

**problems** 14:25 52:18
97:23 134:10

**Procedures** 145:15

**proceedings** 101:13

**proceeds** 46:1,3 115:17

**process** 9:1 10:15 22:5
34:15 43:5 76:1,2 79:19
102:21 121:17

**processed** 14:2

**producing** 24:9 37:24

**product** 26:4

**productivity** 26:6

**professional** 48:2
75:1,2 79:20

**professor** 12:22

**professors** 12:23

**profile** 11:13 18:16 21:7,
8,13

**project** 26:5,21 28:11

**projects** 24:10,18 26:3
28:8

**promised** 46:6 97:2

**prompted** 11:22

**prone** 110:12

**pronounce** 7:20

**pronouncements**
47:12

**proof** 144:12

**proper** 90:11 161:24

**properly** 159:23

**properties** 22:6

**property** 27:11 28:11,19
29:1,7,13,19 31:14,17,18,
21 32:25 36:3,6 37:6,10
38:19,22,25 41:5 43:20
44:21 47:10 48:19,23
52:25 53:1 56:24 57:12
58:21 60:4,7,8,9,17 64:4
70:17 71:15 76:10 83:2
89:7,17,21 91:13,17 93:10,
18 98:14 102:15,19,23
103:16,21 104:14 106:14,
16,19 107:9,13 109:1,8,22
110:2 115:16,22,23,24,25
116:11,17,18 117:12,17
121:15,22,23 122:24 123:5
124:16 126:19 127:6,7,13
128:1,25 129:9 131:12
132:12,14 134:21,23
135:1,5 136:4,5,12 138:24,
25 139:3,8 142:6,10,14,24
143:5,19 151:6 152:25
153:3 158:19 159:10
163:11 168:1,3 169:5,10,
16,19,20

**protect** 65:13 127:11
149:14 150:4 159:23

**protection** 90:12
126:14

**Provco** 10:23 17:10 19:8
23:2

**provide** 58:18 135:4
163:19

**provided** 97:9 98:8
139:14 144:12 148:22

**provisions** 157:25

**proximate** 115:18

**public** 9:6

**pull** 58:3

**pulled** 21:6

**pulling** 23:22

**purchase** 29:19 31:13
94:24

**purchased** 31:18 42:3,
6 144:13

**purchaser** 31:12,15
72:18 94:22

**purchasing** 29:12

**purpose** 74:22 76:12
91:11 119:14 120:2 140:5
153:11 158:18

**purposely** 152:7

**purposes** 164:18

**push** 32:17

**put** 9:9 11:22 50:24 53:14
63:8,10,14 75:14 80:10
107:3 117:13 118:3 124:19
137:4 149:6 157:8 158:7
160:4 168:3

**putting** 101:17 137:7

---

**Q**

**question** 23:14 52:9
53:20 63:21,25 76:20
77:12,14 79:8 83:15,17
84:17,21 93:13,14 97:21
98:10,11,19,21 99:1
104:22 105:15 116:11
121:7 123:20,21 124:1
130:5 139:20 142:18 145:4
146:22 155:4 156:13
161:17 164:24 165:20
168:9

**questions** 13:6 15:2
56:23 74:15 82:6 95:24
104:3 168:20,22

**quick** 11:20 13:11

**quickly** 12:7

---

**R**

**Radnor** 6:9 7:6 74:7
83:10,22 85:5,24 93:10
102:24 111:10 130:17
135:3 138:13 141:12
142:10 159:24 171:8

**ranking** 18:11

**rated** 90:11

**raw** 147:20

**read** 17:18,22 18:2 19:1,
13 20:2,24 22:1 23:11,14
24:2 25:21 26:1 40:10,18,
20,22 41:1 49:22 57:13

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

84:5 86:6,22 93:16 97:10
98:20,22 102:5,11 103:18
104:7,17,20,25 105:3,9,14,
22,23,25 106:7,8 108:22
115:3 119:18 121:6,9
124:8,10,11 125:7 126:21
129:24 131:2 134:8,9,11,
12,14 135:7 138:10 139:7
142:1 147:10 163:6 171:15

**reading** 13:25 14:1,2
84:18 85:21 86:8 87:15
104:21 126:17 152:20

**reads** 125:16

**ready** 33:15,18

**reaffirms** 124:9

**real** 10:16 11:18 18:24
22:5 30:2 83:2 103:5

**realistic** 81:12

**realize** 79:23

**realized** 46:7,8

**reap** 11:11

**Reardon** 86:20 141:16

**reason** 17:15 19:23 22:9,
14 48:4 58:22 59:1 71:8
73:17 92:5,7 107:22
111:14 117:8 133:9 159:11
161:10,11 169:3

**reasonable** 105:15
121:21 128:11

**reasons** 65:7 166:7

**recall** 33:21 43:8 45:19,
20 47:9,11 51:12,17 61:12,
15,23 62:13 63:7 65:23
66:3,20 67:9 70:1,22 83:8
88:13 109:2,4,24 112:18
113:23 121:1 157:11 158:8

**receive** 164:4

**received** 62:7 136:2
144:18 154:12,14 163:13

**receiving** 66:4

**recess** 81:23

**recitation** 135:16

**reckless** 54:6 128:12
166:12

**recklessly** 150:7

**recognize** 45:14

**recollection** 38:12
41:19 66:25 70:5,25 94:16
106:17 110:21 140:19

**recollections** 95:7

**reconsideration** 71:5
72:7,17 133:6 158:3

**record** 6:5 20:3 22:2
41:14 46:25 57:4,9 81:19,
21 82:1 98:23 102:6 104:8
112:7 115:4,14 116:5
124:12 134:8 144:18,20,
22,25 145:2,6,8,12 167:10,
15 171:10

**recorded** 47:3 100:25

**recording** 47:5

**records** 146:17 168:24

**recover** 153:2

**recovering** 59:11 66:16

**redo** 99:5

**reestablish** 157:10

**reference** 26:11 55:10
76:6 107:12 156:18 157:19
168:24

**referenced** 94:20 95:19
122:6,9 151:14

**references** 8:25 163:7

**referring** 91:22 122:17
123:7 156:20

**reflect** 159:2

**reflects** 110:18

**refresh** 41:19 106:17
110:21 119:16 140:19

**refreshed** 111:24

**refreshes** 38:12

**refuse** 116:2 152:25

**refused** 58:20 158:24
163:18,21,22

**refusing** 45:21 128:9
143:8,10,12,13 151:7
153:15 164:3

**regard** 170:22

**region** 18:13

**regular** 49:22

**regulations** 121:13

**rehab** 60:3,7 87:1

**rehabilitation** 39:25

**Reilly** 12:13,17

**reinspection** 91:19

**reiterates** 136:11

**relate** 46:11 77:7

**related** 12:19 22:17 45:7
78:23 124:15

**relates** 23:15 89:17,20
96:23 97:15 113:7 126:17
147:7

**relation** 99:18,23

**relative** 25:16

**relayed** 48:20

**release** 163:18

**released** 146:20,23
148:25 155:16 163:20

**relied** 74:12

**relief** 152:16,21

**relieved** 69:22

**relying** 49:24

**remain** 159:10

**remaining** 115:24

**remediate** 27:2

**remedying** 60:13

**remember** 14:20 30:4,
21 31:4 35:1 38:21,23
39:17 40:17 44:15 46:20
50:10,11,13,16 51:9,15
52:7 56:18,20 57:23 58:22,
25 59:22 60:10,14,25 61:2,
6,8,14,15,18 62:16 64:7,
11,12,13,14,17,20,21,22
65:8,15 66:9,19 68:4,6,9
71:7,18 72:3 92:4 100:15
110:24 130:10 137:5,6
157:23

**removal** 121:14 122:25

124:16 159:11

**remove** 39:10 47:16 48:2
49:3 52:24,25 56:4 75:1,3
76:9,10 80:1,12 87:23
101:1 108:2,15 109:8
115:23 116:17 117:2,3,17
120:11,14,15 121:21
134:23,24,25 135:5,13,15
136:4,12,20 137:15 143:1
153:16

**removed** 38:20 39:3
41:5 57:24 116:1 143:2
157:8

**removing** 111:16
131:24 135:4 158:18

**renew** 163:8

**rent** 33:4

**rental** 33:5,8

**reoccupied** 91:7,17,20

**repaired** 73:19

**report** 83:10 85:24 86:9
138:13,16,20 141:13
142:21 144:3 147:10

**reporter** 6:18 7:10 98:22
171:11,16

**Reporting** 6:20

**represent** 6:22 45:21
46:9 152:4

**represented** 42:23

**representing** 7:2,5

**repulsive** 59:15

**reputation** 9:24

**request** 71:5 72:7,16
152:22 154:11 158:3,13
159:5 163:8 169:4

**requested** 62:11 149:3
152:17,21 157:25

**requesting** 41:4

**requirement** 65:5

**research** 80:4

**researching** 77:13

**reside** 58:13 107:12

**residence** 109:6 143:2

149:4 169:22 170:19

**residency** 107:9 157:10

**resident** 139:3

**residential** 24:7

**residents** 111:13

**residing** 54:18,21

**residual** 34:20

**resisted** 148:16

**resistent** 90:11

**resolution** 27:1 97:25

**resolve** 26:22 112:3

**resolved** 52:17

**resorts** 24:7

**resources** 75:22

**respectable** 28:5

**respected** 17:25

**respectfully** 152:21,22

**respective** 123:14
127:9

**responded** 141:17
142:2

**response** 72:16 130:3
133:13 149:18 153:19

**responses** 113:15,16,
17,19

**responsibility** 120:7,
22

**responsible** 19:15 22:3

**rest** 81:2 87:15

**restored** 147:19

**result** 154:14

**resume** 23:16 24:25 26:8
49:23 161:2

**retrieve** 104:13 142:14

**returned** 37:7,8

**review** 15:18,20,25 16:2,
6 43:7 46:11,16 76:17
77:5,6 82:21 109:20
121:10 134:16 146:13

**reviewed** 40:12 49:16,
17 122:13

**RFC** 148:12,20

**rid** 137:25

**ridiculous** 53:5

**riding** 56:8

**right-hand** 21:25 23:6

**rip** 143:4

**risk** 29:24 47:21 48:3 67:6
74:23 79:25 80:2,5,10 90:7
115:23 116:17 118:4
126:9,10 128:7 134:23
136:4 152:11

**risks** 79:24

**Ritz** 24:13

**roadway** 56:7

**Rockwell** 35:16,21,23,
24 66:7 116:12 118:18
120:13,24 123:3 124:13,23
125:1,23 127:2,8 131:15,
19 143:24 160:17 167:20
169:14 170:2

**Rockwell's** 125:1

**Rockwell-glynn** 7:3
32:1,2,4 34:24 38:19 39:8
41:16 42:4,6 63:17 72:11
82:9 95:19 97:16 99:8,10
115:9 134:25 135:2 136:21
140:9,15,16 154:14 157:16
158:6 167:1

**Rockwell-glynn's**
63:19 64:2

**role** 18:4 35:14 169:24

**Romania** 49:12

**roof** 56:6

**room** 90:19

**rubbish** 74:25 90:17,21,
22 110:13

**rules** 121:13,18

**ruling** 108:14

**run** 79:7 82:5

**running** 147:21

**runs** 107:6

## S

**S-C-H-R-O-M** 6:24

**safe** 43:23 47:19 69:4,7,
23 70:21 75:8 100:25
117:7 121:17 128:8,15
137:13 145:20 158:10
162:9

**safely** 47:17,25 48:3 49:3
74:22 75:3,17,25 120:11,
25 121:21 137:15 148:13
162:4

**safer** 156:6,8,11

**safety** 65:6 90:8 107:3
160:25 166:6

**sale** 28:12 31:19,25 35:3
38:10,24 45:25 49:13,16,
21 82:8 83:1 94:5,13 103:4
118:17 119:7

**sat** 73:5

**save** 124:14 150:10

**saved** 150:12,17 156:5

**scared** 29:25

**schedule** 113:4 117:1,3
152:23 163:9

**scheduled** 32:7 99:13

**scheduling** 113:7

**Schmidts** 24:12

**scholarship** 10:1 11:12

**scholarships** 9:14

**school** 9:1,6,7,11,15,17,
20,21,23 10:2,4,19 11:21,
25 12:21 18:12 24:8 103:3

**Schrom** 6:3,14,23 7:16
16:23 17:1,4 19:19,22
20:6,9,13,17,21 24:4 34:11
37:19,22 38:1,3 40:9,14,19
41:8,18 47:8 51:8 54:11
56:22 57:10 61:1 63:23
76:22 79:5 80:23 81:11,15,
20 82:4,14,17,20 83:13
84:2,22 85:18 86:11,12,14,
15 87:9 88:2 89:6,12 92:21
93:8 94:8 95:17 96:22
97:22 98:4,12 99:4,6,19

100:7 101:10,19,23
103:12,13 104:5,16,24
105:20 107:18,21 113:6,13
114:4,8,12,20 118:14
119:2 122:18,20 123:9,11
124:2,5,7 125:19 127:23
129:5,14,19 130:7,21,24
132:7,22 133:1,19 135:7,
17,18 137:19 138:2,8
139:13,22 140:1 141:7,11,
14 142:22 144:17,21
145:13 147:4 151:16,20
152:14 154:5,23 155:5
156:16 159:4,18,22 162:23
163:1 164:21 165:21
166:16 167:7,16 168:15
171:2

**scratched** 32:16

**screaming** 65:11

**sealed** 58:23

**search** 21:6

**searches** 77:10

**Seasons** 24:12

**section** 19:6 20:23,25
23:23 24:1,5 84:15 86:6
90:22,24 91:3 104:18
105:1,23 109:21 145:15

**sections** 17:19 20:2
21:7,21 119:24

**secure** 169:12

**secured** 91:5

**securing** 22:8

**seek** 74:18 146:1

**Seglias** 10:10 23:12,23
25:10

**selected** 27:11

**sell** 29:23 30:19 32:25

**seller** 30:10 31:11 94:22,
25

**selling** 29:20

**send** 19:25

**sending** 66:3

**senior** 23:25 24:23 25:1,
9

**sense** 26:10 73:18,21

**sentence** 17:20,22
18:21 25:20 76:10 86:22
87:15 105:5 108:21 111:7
121:6

**sentences** 102:6
105:15

**separate** 27:9

**September** 106:16
107:9 108:23,25 109:23
115:24,25 134:24 135:2,6
154:1 166:8

**sequencing** 168:14

**Sergeant** 86:19 141:16

**series** 56:22

**seriousness** 111:20

**service** 62:8 87:20
147:19

**services** 131:23 132:5
144:9

**set** 108:14 124:17 163:17

**sets** 95:9 136:24

**setting** 40:4 94:14

**settlement** 30:15,25
32:24

**severely** 149:16

**sewage** 24:8 62:17
147:20

**shade** 56:3,16

**Shaffer** 6:14

**shape** 77:23

**shocked** 46:13 50:4

**shocking** 109:12

**short** 57:6 81:9 167:12

**should've** 155:25

**shouting** 148:7

**show** 16:24 24:16 26:7
38:10 39:15 46:5 83:9
85:19 89:13 93:9 95:18
101:11 113:14 114:2
146:15

**showed** 43:11 69:12

111:21

**shower** 59:24

**showing** 20:22 38:4
94:9 114:21 118:15 133:2,
20 138:9 140:2 141:8
147:5 151:21 154:6 157:13
163:3 164:22

**shown** 31:9

**shows** 146:14

**shut** 65:10

**sickness** 53:10,11 90:6
110:12

**side** 47:4 84:11 112:7
163:5

**sign** 34:23 41:4 88:11
171:15

**signage** 55:4 143:3

**signature** 119:10

**signed** 35:10,21 38:23
39:7 41:10,14,21 47:15
49:18 94:17 95:12 102:18
103:4 111:4 119:3,7
134:17 135:19 148:11
152:5

**significant** 90:20,25

**signing** 169:23

**signs** 55:2 120:17 149:7

**silence** 103:11

**Simona** 6:8,25 82:9
83:22 84:9 99:10 113:16
115:11 133:7 134:20 142:5
171:7

**simultaneous** 79:8

**single** 88:18

**sister** 11:1

**sit** 44:15 67:2 75:12
105:22 126:13

**site** 35:12 88:15,22,25
89:1

**sitting** 14:12 50:17,18
69:13,17 75:5 145:22,24
146:8 147:18 148:17
150:16

**situation** 53:15 68:2
102:15 126:8 128:25 129:1
157:4

**skip** 137:22 139:23

**skipped** 118:8 143:18

**skipping** 142:9

**slash** 148:12,21

**sleep** 53:7,13 65:20

**sleeping** 67:3 91:14

**slight** 148:17

**small** 10:13 84:4 147:17

**smell** 59:14

**Smoke** 91:3

**sofa** 148:18

**soil** 26:23,24 27:2

**sold** 30:24 49:19 53:25
106:15

**sole** 91:11 125:5,17
126:1,3 128:13 158:18

**solely** 153:2

**solutions** 75:10

**solve** 17:23

**someone's** 118:4 160:2

**sooner** 161:9

**sort** 63:2 132:4

**sounded** 12:16

**South** 8:3 115:15 134:22
142:4,7,9

**space** 104:11 111:8

**spark** 55:25

**speak** 11:23 12:25 16:12,
16 50:14 86:17,19 148:8
152:17 170:2,5,10

**speaking** 30:21 104:7
106:9 109:21 148:3

**speaks** 119:21 123:23

**special** 12:5 115:8

**specific** 105:14 111:14
140:5 142:15,16

**specifically** 27:13
119:22

**speculation** 98:25

**spell** 7:25

**spend** 75:21

**spoke** 30:1 68:4 86:6,23
103:10 152:19

**spoken** 170:12,15,17

**sponsored** 17:11

**sporting** 24:6

**spot** 11:9 13:15 69:19

**spring** 49:10

**Spruce** 7:2

**squatting** 141:20 142:3

**staff** 86:7,23 148:12,23

**standard** 83:1 95:9

**standing** 144:3

**start** 8:21,23 9:3 29:22
33:20 80:25 102:12 131:5

**started** 10:6 13:21 14:14
18:10 27:17,19 33:7

**starting** 17:20 18:8,22
19:14 23:11 25:21 74:17
102:8 104:6,8

**starts** 25:22 45:3,18
123:12

**state** 6:22 7:24 13:3
90:19

**stated** 43:20 106:24
108:1 153:16

**statement** 102:12
109:3,25 143:16 144:11,15
149:10

**states** 6:10 89:23 91:9
133:8 148:3 167:3

**stating** 136:7 148:1

**station** 127:25 141:23,24

**status** 62:9

**statutory** 16:8 77:7

**stay** 11:11 14:6 59:12

**stench** 147:20

JEFFREY BRYDZINSKI
MARCH 27, 2025

JOB NO. 1501921

**Steno** 6:20

**step** 29:16

**steps** 29:12

**stick** 11:9

**stips** 6:2

**stipulate** 96:1

**stop** 10:2 65:12 104:16
132:4

**stored** 127:8

**story** 13:10,12

**Stout** 11:24

**strategize** 17:24

**Street** 6:15

**stretch** 9:13 118:12

**stretcher** 148:19

**strike** 170:16

**strong** 13:14 18:10

**structural** 74:5

**structure** 55:1,2 79:16
88:8 90:2,9 121:15 122:25
126:19 127:1,2,5,6 128:5,
6,7

**stuck** 167:4

**student** 9:6,11

**study** 9:17,18 13:12
14:25 15:2

**studying** 14:6 164:17

**stuff** 38:25 52:25 53:1,22
72:23 75:16,25 80:5,12
106:5 110:6 117:2,3
119:21 120:23 168:5

**subcontractors** 25:14

**subject** 59:3 159:24
170:25

**submit** 98:2

**submitted** 97:23 157:16

**subsequent** 72:15
97:11 116:11

**subsequently** 102:23
106:24

**substantial** 90:7

**successful** 61:11

**successfully** 62:1

**sued** 44:1 170:14

**sufficient** 90:11 108:21
165:24 166:1

**sufficiently** 158:20

**suggested** 73:16

**suggestion** 54:5
112:15

**sum** 41:4

**summary** 141:15

**supervision** 159:24

**supposed** 31:24 64:23

**surprised** 73:22

**surrounding** 56:23
98:14

**swear** 7:10

**sworn** 7:13

**Symphony** 24:12

**systems** 24:9 62:15
90:12,13,14

---

## T

**tab** 24:16 122:3,10

**table** 79:17

**taking** 6:13 59:20 103:25
126:9 131:11

**talk** 51:2 52:15 100:13

**talked** 23:4 29:11 50:15
51:7,14 52:12 53:17 76:6
98:15 116:13 142:16 158:5

**talking** 19:4 27:24 37:17
51:12 57:12 75:20 76:4
109:13,18 110:6,8 112:5
126:12 153:25 160:10

**talks** 21:25 24:22 122:23
147:17

**taxes** 39:2,6

**teach** 14:8

**teacher** 9:8 11:21 12:23
14:23

**teachers** 12:6,11

**teaches** 161:3

**teaching** 14:20

**team** 24:23 25:2

**teams** 22:11

**technique** 14:7,14

**telephone** 8:7 71:20
96:11

**television** 69:17 161:16

**telling** 12:3 27:25 58:2
64:14 65:11 80:4 131:15

**temperatures** 65:17
128:5 147:22

**ten-minute** 57:1

**tenants** 169:16

**term** 122:25

**terms** 121:19

**terrified** 65:21

**test** 14:19,21

**testified** 7:14 70:23
166:5

**testify** 165:14 166:4

**testimony** 171:6

**text** 16:14

**thanking** 12:1

**thereabouts** 92:3

**thereof** 90:2,9

**thick** 9:2

**thin** 104:20

**thing** 13:23 26:7 27:9
39:9 47:16 49:6 53:21 59:6
73:7 78:21 104:25 105:22
106:8 128:10,11,12 134:10
136:3,18 158:7

**things** 9:19 23:1 32:18
39:10 44:7 47:25 48:3 49:3
58:14,20 80:2 95:24
109:11 120:14,16,20,21
121:21 125:17,18 134:14
152:9 163:12

**thinking** 8:24 32:20
35:21 65:16

**thought** 29:25 43:25
54:13 55:10 57:13 92:25
145:25 146:7 156:21 160:1

**thousands** 27:5

**threat** 43:21 47:20 53:8
78:18,25 90:8,15 107:2
108:11 110:11 169:10

**threatening** 53:15 55:3

**three-year** 10:13

**threw** 59:23

**thriving** 18:7

**tied** 31:8

**til** 33:8

**time** 6:6,20 8:6,11,16 9:23
13:19 28:13 29:9 32:3,15,
16,21 36:1 39:20,24 42:23
43:8 46:1 47:13 49:14 51:1
52:24 53:3 56:9 57:6 64:9
66:14,18 73:7 74:6 75:22
81:7,23 85:7,12 88:15,19,
22 93:19 94:15 100:5
111:2 117:1,15 120:19
132:10,13 133:23 144:24
145:9 146:15 150:23
154:10,12 155:1 167:12
170:20 171:9,10

**times** 89:1

**tired** 101:22

**title** 11:17 28:13 31:23
39:8 41:4,10 47:14 85:22
97:1 100:23,24 115:17
116:8

**today** 44:15 83:4 86:2
100:17

**today's** 15:17 142:8
171:6

**Todd** 7:1

**toilet** 62:17,20

**toilets** 162:1

**told** 10:2 28:3 29:22 31:8
36:6 42:16 49:6,11 57:23
58:11,16,18 61:25 67:21
68:2,3 69:3,12 70:20 72:21
74:23 80:16 134:10 143:10

145:18 146:2 155:11
156:23 169:10

**top** 23:21 44:19 66:24
78:19 79:1 84:7,11 123:8,
13 128:6 131:5

**topics** 12:25

**tort** 18:18

**total** 59:5

**touched** 73:20

**town** 70:7

**township** 6:9 7:6 36:24
37:11 39:1,4 44:22 47:18
54:2,25 55:24 56:15 57:21
58:10,21 59:22 64:23 66:6,
8 67:23 74:7 83:10 85:24
93:10 102:24 103:17,21
111:11 117:4,5,6,12,15
121:14 127:3,4 130:18
131:12,15 132:12,18
136:19,21,22 137:6,8,11,
12 138:13 141:13 142:11
143:13 151:9 159:24
160:15,23 170:6 171:8

**township's** 121:18

**townships** 61:10

**trade** 10:19

**traffic** 27:22

**trained** 48:2

**training** 18:10

**traits** 18:3

**transactional** 18:16

**transcript** 46:16,23
47:3 101:12,14,25 102:2
105:12 106:1 108:4 110:1

**transcripts** 171:17

**transfer** 47:10 75:11

**transferred** 11:5 39:24
53:23 96:25 100:22,24

**transpired** 27:9,12
61:23 67:1,10,20

**transpiring** 61:13

**transport** 75:18 148:12

**transported** 148:13

**trash** 59:18 62:19,20,22
69:15 74:25 145:24

**treatment** 87:1 145:16

**treatments** 87:4

**tree** 56:3,16 60:12,15,18
61:8,25 65:9,10,14 109:16
144:2,3 150:25 151:1

**trees** 55:23 56:1,5,13
60:13 151:2 160:22

**trespass** 165:6

**trespassing** 149:6

**true** 19:1 21:12 22:23 23:8
97:13 98:13 127:22

**trumped** 77:16

**trumps** 166:18

**truthful** 46:9

**turn** 21:23 25:22 62:3
82:13 102:17 151:12
167:20

**turned** 62:12,23 63:4
120:9 140:6,13,14,15,16,
20 141:1 148:22 160:17
161:19,20 167:21,22,25

**TV** 62:3 147:19

**two-page** 129:20

**type** 75:19 78:22

---

### U

**ultimately** 13:15 77:14
137:8 158:13

**um-hum** 33:24 34:3

**unbearable** 169:8

**unbelievably** 59:25

**unclear** 159:12

**Uncommon** 10:21

**undergo** 163:20

**underserved** 10:17

**understand** 15:9 41:3,
13 48:5 52:9,22 60:6 66:13
76:3 77:12,21 81:8 83:17
89:22 97:20 98:10 99:1
102:15 105:4 110:7,15

120:2 127:12 132:12 139:6
155:3 160:9 161:17 162:16

**understanding** 41:9,
22 49:7 69:22 77:11
112:16,22 113:2 116:22
124:19 125:6,8 133:5
165:25

**understood** 109:5
110:25 113:8 146:2 152:11

**unexpected** 14:12

**unfettered** 76:7 112:14,
17,20,23 113:7 115:22
116:14,16,24 117:13,16
134:21

**unfit** 54:2 90:4

**unforeseen** 26:5,11,12,
21 27:3

**unidentified** 143:21,22

**uninhabitable** 55:21
67:5,23 74:9 79:13 132:13
142:10 156:3

**uninvolved** 71:2

**unit** 91:4 142:2

**United** 6:10

**University** 9:23

**unlawful** 88:9

**unlimited** 76:7 115:22
116:15,16,21,24 117:13,16
134:20

**unlock** 58:21 117:15
140:12

**unlocked** 59:1,4 137:8

**unsafe** 53:5 67:5,24
69:20 71:13 88:9 90:3,10
108:6 109:5 117:19 118:3
132:20 136:8,13,15 143:6
149:9 153:18,21 169:6

**unsanitary** 90:4,18
91:2

**unwanted** 91:6

**upcoming** 168:5

**update** 157:4

**upset** 79:22

**upsetting** 32:20 80:8
160:11

**utilities** 62:5,12 63:3,8,
15 110:14 136:14 140:7,
13,17,21,24 151:10
167:17,18,25 168:2

---

### V

**vacancy** 62:9 120:6

**vacant** 37:6 75:5

**vacate** 139:3,8 158:14

**vacated** 36:3 91:5

**vehicle** 148:14

**ventilation** 147:21

**venued** 6:10

**verbal** 34:1

**verbally** 103:20

**Verification** 96:3

**verified** 58:7,8

**verify** 57:17

**Verizon** 62:4 144:9

**versus** 6:8 171:8

**vetted** 112:6

**vice** 11:19 19:5

**video** 34:7 59:21

**videos** 15:25 16:2

**Villanova** 8:3 10:15
11:9,10 27:17 115:15
134:22

**violation** 90:1,24 91:2
93:10,18 111:21,22 112:3
131:11 136:7

**violations** 90:22 91:7,
12,15,18 111:23

**voicing** 50:1

**voluntarily** 148:7

---

### W

**wait** 103:9 104:12 126:3
127:18 130:4 145:7 166:7

**waiting** 161:5 166:19

**walk** 62:21 80:12

**walked** 148:18

**walker** 148:14

**walking** 80:25 136:16

**wanted** 8:25 11:9 12:21 42:19,20,21 48:5 57:24 58:3,24 59:2,16,22 67:15 69:1,6 75:13,14 94:23 96:14 120:6,8,9,22 121:16 137:12 145:19,20 156:4 160:7,14,16 166:25 167:1, 3 171:17

**Warner** 7:4

**washer** 59:24

**watch** 73:2

**watching** 69:17 147:19 161:16

**water** 62:8,12,15,23 63:2 147:21 151:11,12 161:19, 20,24 162:6,9

**wave** 64:22 128:4 150:16

**weak** 13:14

**weather** 146:9

**Wednesday** 142:7

**week** 57:23

**weekend** 149:5,17,19, 22

**weeks** 149:8 166:7

**Wendt** 6:19

**West** 6:15

**whatsoever** 78:24 117:18 120:12 125:2,24 167:6 169:24

**Whelan** 51:20 74:17 76:17 116:2 134:18 153:6, 7

**Whelan's** 122:2 153:10

**wherefore** 157:25

**white** 84:11

**Widener** 9:22 11:6,8,10, 11

**Wills** 34:12

**Wind** 24:14

**wired** 31:22 32:12

**woman** 47:23 49:2 60:16 61:9 65:16,21 67:3,7,22 69:6,13 74:24 79:12 80:11 109:14 110:9 117:18 128:15,18 150:4,7 154:20 155:24 156:4 160:5,7

**woman's** 152:11

**word** 13:21 84:24 108:10 109:9 112:22 116:14,21 117:21,22

**words** 26:17 108:7,9 142:21 158:25 159:1,17

**work** 8:20 10:15,23 14:5 18:11,13,16 20:12 65:10, 13 81:6 120:25 132:2 143:19 144:5 150:25 162:1

**workday** 29:9

**worked** 9:25 10:3,7,10, 14 23:24 24:18 27:24 65:18 95:10 108:5 110:25 137:11 169:13

**working** 10:6,11 14:6 19:10 22:10 35:20 65:12 110:14 120:14 136:14

**world** 13:7,8

**worried** 73:7 166:19

**worst** 32:16

**would've** 12:4 71:24 156:10

**wound** 9:12 10:1

**Wow** 14:18

**write** 14:10

**writing** 142:25 152:17

**writings** 113:19 163:4

**written** 72:22 111:2 117:20 143:15 144:10

**wrong** 103:4 142:12 143:20

**wrote** 11:25 72:2 109:6 125:10 126:5 132:11 150:8

---
**Y**
---

**year** 33:12

**years** 10:8,10 14:23 18:14 23:24 27:19 39:3,6 40:25 73:16,21 78:16 161:1,7

**yellow** 143:22

---
**Z**
---

**zoning** 22:7

**Zoom** 96:11