# EXHIBIT 18

# Deposition Transcript

Case Number: 2:24-cv-04070-GAW
Date: March 20, 2025

In the matter of:

## Ockley v Township of Radnor, Pennsylvania, et al.

# OFFICER JENNIFER COCCO

Reported by:
KIMBERLY WENDT



CERTIFIED COPY

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1              IN THE UNITED STATES COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                  CIVIL ACTION - LAW

 4                     -   -   -

 5   SIMONA OCKLEY              :   Case 2:24-cv-04070-GAW
                                :
 6              Plaintiff :
                                :
 7             vs.              :
                                :
 8   TOWNSHIP OF RADNOR,        :
     PENNSYLVANIA               :
 9           and               :
     JENNIFER COCCO in her      :
10   individual capacity        :
             and               :
11   JOSEPH PINTO in his        :
     individual capacity        :
12           and               :
     BRADY MCHALE in his        :
13   individual capacity        :
             and               :
14   BRIAN BROWN in his         :
     individual capacity        :
15           and               :
     JEFFREY BRYDZINSKI         :
16           and               :
     TYLER PRETE                :
17           and               :
     ROCKWELL-GLYNN, LP         :
18                             :
                Defendants :
19

20                     -   -   -

21            Thursday, March 20, 2025

22                     -   -   -

23        Sworn videotaped deposition of OFFICER

24   JENNIFER COCCO was held at the offices of Schrom,

25   Shaffer & Botel, P.C., 4 West Front Street, Media,
```

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 2

```
1  Pennsylvania commencing at 10:20 a.m. on the above
2  date before Kimberly Wendt, RPR, a Certified
3  Shorthand Reporter and Notary Public in and for the
4  State of Pennsylvania.
5                        -  -  -
6                      STENO
              Concierge@Steno.com
7                  888-707-8366
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  APPEARANCES:
2
3  FOR THE PLAINTIFF:
4        SCHROM, SHAFFER & BOTEL, P.C.
          BY:  GERARD SCHROM, ESQUIRE
5          4 West Front Street
           Media, PA 17543
6          610-565-5050
           Gschrom@schromandshaffer.com
7
8  FOR THE DEFENDANTS:
9        MARSHALL DENNEHEY
          BY:  JOHN P. GONZALES, ESQUIRE
10         2000 Market Street
           Suite 3200
11         Philadelphia, PA 19103
           215-575-2871
12         Jpgonzales@mdwcg.com
           Counsel for Township of Radnor,
13         Pennsylvania, Jennifer Cocco,
           Joseph Pinto, Brady McHale and
14         Brian Brown
15
          SPRUCE LAW GROUP
16         BY:  TODD BARTOS, ESQUIRE
           1622 Spruce Street
17         Philadelphia, PA 19103
           267-546-0600
18         Tb@sprucelaw.com
           Counsel for Jeffrey Brydzinski,
19         Tyler Prete and Rockwell-Glynn, LP
           (Attending via Zoom)
20
21  ALSO PRESENT:
22         Neil Botel, Esquire
23         Elizabeth Malloy
24         Alan Paller - Videographer
25
```

Page 4

```
1              I N D E X
2
3  WITNESS                             PAGE
4  OFFICER JENNIFER COCCO
5
6    By:  Mr. Schrom                    8, 99
7    By:  Mr. Bartos                   87, 99
8
9            E X H I B I T S
10
   NUMBER        DESCRIPTION           PAGE
11
12 P-1     Judge Whelan Order of 7/15/22    10
13 P-2     Judge Dozor Order of 8/9/22      12
14 P-3        Notice of Condemnation        26
15 P-4      Municipal Police Officer        34
              Basic Training Program
16
   P-5    Radnor Township Police Department 48
17             Polices and Procedures
18 P-6       Photo of Legal Notice          76
19 P-7    Radnor Township Incident Report   77
20 P-8       Police Criminal Complaint      78
21
22
23
24
25
```

Page 5

```
1                  -  -  -
2          VIDEOGRAPHER:  Good morning.  We
3  are going on the record at 10:20 a.m.
4  Eastern Time on March 20, 2025 to begin
5  the deposition of Officer Jennifer Cocco
6  taken in the matter of Simona Ockley
7  versus the Township of Radnor,
8  Pennsylvania, et al.  This case is venued
9  in the United States District Court for
10  the Eastern District of Pennsylvania, case
11  number 2:24-cv-04070.  This deposition is
12  taking place at the Law Offices of Schrom,
13  Shaffer and Botel, located at 4 West Front
14  Street, Media, Pennsylvania.
15          The legal videographer is
16  Alan Paller, and the court reporter is
17  Kim Wendt.  We are here on behalf of
18  Steno Court Reporting.  At this time
19  would counsel identify yourselves and
20  state whom you represent?
21          MR. SCHROM:  Good morning.
22  Gerard Schrom, S-C-H-R-O-M, ID number
23  39282 on behalf of plaintiff Ockley.
24          MR. GONZALES:  John Gonzales on
25  behalf of the Radnor Township defendants.
```

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 6

1      MR. BARTOS:  Good morning.  Todd
2  Bartos at Spruce Law Group, and I
3  represent Rockwell-Glynn, LP, Mr. Prete
4  and Mr. Brydzinski.
5      VIDEOGRAPHER:  The court
6  reporter will swear in the witness.
7          -  -  -
8      OFFICER JENNIFER COCCO, after
9  having been duly sworn, was examined and
10 testified as follows:
11         -  -  -
12     VIDEOGRAPHER:  Proceed.
13     MR. SCHROM:  Okay.  Rather than
14 have usual stipulations, I'd like to read
15 these in, if that's agreeable regarding
16 objections.  They'll be preserved until
17 time of trial, all objections except those
18 as to form and privilege are reserved
19 until trial.  Is that acceptable?
20     MR. GONZALES:  Yes.
21     MR. SCHROM:  Okay.  Regarding
22 speaking objections, no speaking
23 objections are allowed.  Counsel should
24 not make objections to statements which
25 may suggest an answer to a witness.  Is

Page 7

1  that acceptable?
2      MR. GONZALES:  I reserve the
3  right to decide what type of objection to
4  make, depending on the question, so that's
5  not acceptable.
6      MR. SCHROM:  And regarding
7  limiting instruction to not answer,
8  counsel shall not direct or request that a
9  witness refuse to answer a question,
10 unless the counsel has objected to the
11 question on the ground that the question
12 seeks privileged information or
13 deponent -- or counsel intends to present
14 a motion to the court for the termination
15 of the deposition on the ground it's been
16 conducted in bad faith, or in some other
17 unreasonable manner to annoy, embarrass or
18 oppress the party or the deponent, or to
19 discover evidence that deponent's counsel
20 believes is not discoverable.  Is that
21 acceptable?
22     MR. GONZALES:  I'm not going to
23 agree to that.  I reserve the right to
24 object and instruct the witness not to
25 answer based upon my understanding and

Page 8

1      interpretation of the rules of civil
2      procedure and applicable case law and will
3      be guided thereby.
4      MR. SCHROM:  And regarding
5      consulting with the witness during the
6      deposition, private consultation between
7      deponents and their attorneys during the
8      actual taking of the deposition would be
9      considered improper, except for the
10     purpose of determining whether a privilege
11     should be asserted.  Is that acceptable?
12     MR. GONZALES:  I don't agree
13     with that either, but I will be guided by
14     applicable case law and the rules of civil
15     procedure when it comes to my
16     communications with my client during the
17     deposition.
18     MR. SCHROM:  Okay.  With those
19     understandings, we'll go forward.
20 BY MR. SCHROM:
21 Q.     So, Officer Cocco, a threshold question,
22 you never looked at the court orders of Judge Whelan
23 or Judge Dozor before arresting Simona Ockley,
24 correct?
25     MR. GONZALES:  Objection to the

Page 9

1      form, but you can answer.
2      **THE WITNESS:  At one point I**
3      **know I saw them.  I can't remember exactly**
4      **when.  It was definitely not the Friday**
5      **incident where -- with the 302, but at one**
6      **point I was aware there was the court**
7      **order, but I don't remember when it was**
8      **seen.**
9  BY MR. SCHROM:
10 Q.     Okay.  So when we're talking about court
11 order, are you specifically --
12     MR. SCHROM:  Do you have those?
13     MS. MALLOY:  Yes.  Which one do
14     you want?
15     MR. SCHROM:  Just give me both.
16 BY MR. SCHROM:
17 Q.     I'm showing you a document which hasn't
18 been marked as yet.
19     MR. SCHROM:  Can you mark that
20     one?
21     MS. MALLOY:  Which one you want
22     first?
23     MR. SCHROM:  That one.
24     MS. MALLOY:  15th?
25     MR. SCHROM:  Let's go in

OFFICER JENNIFER COCCO                                    JOB NO. 1501917
MARCH 20, 2025

Page 10

1    chronological order.  Let's mark this one
2    first.
3                MR. GONZALES:  Do you have extra
4    copies?
5                MS. MALLOY:  I do.
6                MR. GONZALES:  Great.  Sorry.
7                MR. SCHROM:  Do you have an
8    extra copy for him?  I'll just give it to
9    him.  Thank you.
10               MR. GONZALES:  Thanks.
11               MR. SCHROM:  Sure.  Can I grab
12   that back for a second?  Okay.
13               (P-1 was introduced and marked for
14   identification.)
15   BY MR. SCHROM:
16   Q.     I'm showing you a document that has been
17   previously marked P-1.  Are you able to identify
18   that document?
19   A.     It's just -- it's a court order from
20   July 15th.
21   Q.     Okay.  Can you read that order into the
22   record, please?
23   A.     "Upon consideration" -- do you want me to
24   start at the top?
25   Q.     Sure.

Page 11

1    A.     And like with all this?
2    Q.     Yeah, you can go all the way down.
3    A.     Okay.  In the Court of Common Pleas of
4    Delaware County, Rockwell, plaintiff, versus Simona
5    Ockley, defendant, Court of Common Pleas of Delaware
6    County, number CV-2022-004275, civil action.
7    "Order:  Upon consideration of the Complaint and
8    Petition for Special Injunction filed by Plaintiff
9    Rockwell-Glynn, and after a hearing on July 11, 2022
10   and having heard the arguments advanced by Defendant
11   Simona Ockley and Lee M. Herman, Esquire, counsel
12   for plaintiff, and good cause appearing, it is on
13   this 15th day of July 2022 hereby ordered and
14   decreed as follows:  Plaintiff may immediately
15   record the deed of 416 South Ithan Avenue,
16   Villanova, PA 19085, the property, previously
17   executed by defendant.  The title company shall
18   disperse the proceeds it currently holds in the
19   approximate amount of $490,000.00 to the defendant.
20   Defendant shall have unlimited and unfettered access
21   to the property at her own risk to remove her
22   personal property until September 1, 2022.  Any
23   personal property remaining at the property after
24   September 1, 2022 shall be deemed abandoned and may
25   be removed by the plaintiff as refuse."  And it is

Page 12

1    signed by John -- Judge John J. Whelan.
2    Q.     Thank you.  So you indicated previously
3    that at the time of the arrest you had not seen
4    that; is that correct?
5                MR. GONZALES:  Objection.  You
6    can answer.
7                THE WITNESS:  I don't remember
8    which one I saw.  I know there was a court
9    order, but I don't remember which.  There
10   are two -- there are two orders, there are
11   two court orders.
12   BY MR. SCHROM:
13   Q.     Right.
14   A.     And I don't remember which one I saw.
15   Q.     Okay.  So let's go to the next one, which
16   is P-2.
17               (P-2 was introduced and marked for
18   identification.)
19               MR. SCHROM:  I think you have
20   that one.
21               MR. GONZALES:  I do.  Thank you.
22   BY MR. SCHROM:
23   Q.     Can you look at P-2, please, the document
24   previously marked P-2?  Do you recognize that
25   document?

Page 13

1    A.     Yes.
2    Q.     Okay.  And when do you think that you saw
3    that document?
4    A.     I don't remember when I actually saw this
5    document, to be honest.
6    Q.     So you don't know whether you saw it
7    before you arrested her or after; is that right?
8    A.     Yes, I don't remember.
9    Q.     Okay.  Why don't you read that one into
10   the record as well?
11   A.     In the Court of Common Pleas of Delaware
12   County Pennsylvania, civil action law,
13   Rockwell-Glynn, LP versus Simona Ockley, number
14   2022-004275 order.  "And now this 9th day of
15   August 2022 upon consideration of defendant's
16   emergency petition, and upon review of the docket
17   and the July 15th order signed by Judge Whelan after
18   a prior hearing on the matter, it is hereby ordered
19   that defendant's petition is granted.  Defendant
20   Simona Ockley shall have unlimited and unfettered
21   access to the property located at 416 South Ithan,
22   Villanova, PA at her own risk to remove her personal
23   property until September 1, 2022.  Plaintiff shall
24   remove any additional locks so that the defendant
25   may access the property until September 1, 2022.

Page 14

1 Plaintiff and/or the Radnor Police Department shall
2 allow access by removing locks to provide defendant
3 access to the property to remove her personal
4 property until September 1, 2022."
5 Q.      Okay.  So did you see P-2, the order from
6 Judge Dozor, before you arrested Simona?
7 A.      No.
8 Q.      You did not?
9 A.      I don't remember when I actually saw the
10 order.
11 Q.      Had you seen the order, would you have
12 still proceeded with the arrest?
13 A.      No.
14 Q.      You would have not?
15 A.      I'm sorry, yes, I would have.
16 Q.      You would have?
17 A.      Yes.
18 Q.      And if you had seen Judge Whelan's order,
19 would you still have proceeded with the arrest?
20 A.      Yes.
21 Q.      Okay.  Do you know whether or not Officer
22 Pinto read P-1 and P-2, the order from Judge Whelan
23 and Judge Dozor, prior to their involvement in
24 the --
25 A.      That --

Page 15

1 Q.      -- in this matter?
2 A.      I can't answer for somebody else and
3 speculate what they would say.
4 Q.      Some of these people were at the site
5 though with you, correct?
6 A.      Yes, but that was not -- neither of these
7 were in question right now -- at that time.  I'm
8 sorry.
9 Q.      What do you mean they weren't in question?
10 A.      Because she was actually trying to live in
11 the house, not remove items from her home, which
12 this states.
13 Q.      Okay.  Do you know what the word
14 unfettered means?  What's your understanding of that
15 word?
16 A.      I don't -- I don't --
17 Q.      You don't know?
18 A.      No, I don't know.
19 Q.      Okay.  It's an unusual word.
20 A.      Yes.
21 Q.      But you understand the unrestricted?
22 A.      Yes.
23 Q.      Okay.  And you understand the removal of
24 the locks?
25 A.      Yes, but she was to notify the plaintiff,

Page 16

1 us, or the Radnor Police, which was not done, to
2 remove those locks.  The house was deemed
3 uninhabitable, and when we do that, as a Radnor
4 Township code, it is locked up, she has to call, she
5 can only have access to the property regardless of
6 this order, which was not talked about with the
7 judges.  She cannot go in the house during the
8 evening, and it's between 8:00 and 4:00, and we have
9 to unlock that for her, which is I believe why it
10 says Radnor Police Department on here.
11 Q.      Okay.  So but you were at the property,
12 why wouldn't you just unlock it for her?
13 A.      We were called to the property, because
14 she was already in the property.
15 Q.      Okay.  And so if she's in the property,
16 what --
17 A.      I'm confused.  What day are we talking
18 about?  Are we talking about the 12th or --
19 Q.      Well, we can -- we can --
20 A.      Because I was there two days.
21 Q.      You were there two days.
22 A.      Yes.
23 Q.      Let's start with the first one, but before
24 we do that, you are aware that she asked you at
25 least ten times to look at an order; isn't that

Page 17

1 correct?
2 A.      I don't remember.
3 Q.      You don't remember.  Okay.  Do you think
4 the video that has been given to us by counsel would
5 be a correct historian, visual historian, of what
6 transpired that day?
7 A.      Absolutely.
8 Q.      Okay.  So if in that video it said that
9 Simona was -- it indicated that Simona asked you ten
10 times to look at the orders, that would be correct?
11 A.      If the video said it, then probably.
12 Q.      Okay.  She indicated that she also had
13 orders right next to her.  Do you recall that?
14 A.      I'd have to look at the video again.  This
15 is two years ago.
16 Q.      Okay.  Did you look at any videos in
17 preparation for today?
18 A.      Yes.
19 Q.      And what videos did you look at?
20 A.      The arrest.
21 Q.      You looked at the arrest video?
22 A.      Um-hum.  Um-hum.
23          MR. GONZALES:  You have to say
24 verbally yes or no.
25          THE WITNESS:  Yes.  Yes.

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 18

1  BY MR. SCHROM:
2  Q.        Okay.  So and that was the arrest video,
3  were there videos taken of the prior day as well?
4  A.        That was not preserved, no.
5  Q.        And what does that mean?
6  A.        The video, we got a whole new system, and
7  it is no longer available.
8  Q.        Okay.  So from one day to the next, the
9  video that --
10  A.        So you have --
11  Q.        -- wasn't available is now available?  I
12  mean, we have one out of the two days.
13  A.        Yes.
14  Q.        Okay.
15  A.        Is there a question?
16  Q.        Yeah, so what -- can you explain that a
17  little bit more, as to what transpired, or what you
18  understand?
19  A.        For what?
20  Q.        Regarding why there is no video on one
21  day, and a video on another, or an earlier visit,
22  later visit?
23  A.        From my understanding, our video cameras
24  are activated on every call.  Every call is not
25  preserved, based on what the actual call was.  The

Page 19

1  Saturday's was preserved because it was tagged in
2  our system as an arrest.  The video from Friday was
3  not preserved, because it was a --
4  Q.        302?
5  A.        It was a 302, yes.  It was a mental health
6  issue, I believe it got tagged in, so that's why it
7  was not preserved in our system.
8  Q.        Do they normally not preserve 302 issues?
9  A.        Yes.
10  Q.        Do you know the purpose of that?
11  A.        No, I do not.  That's above my pay grade.
12  Q.        Do you know who makes that decision?
13  A.        That would probably be a sergeant or
14  lieutenant if that -- those videos -- if the videos
15  they feel need to be preserved, they will have us
16  fill out paperwork for it.
17  Q.        Do you know if there's a township policy
18  regarding the preservation of 302 videos?
19  A.        There is a policy, yes.
20  Q.        Do you know what that policy is?
21  A.        I do not, off the top of my head.
22  Q.        Okay.  Who would be the person who would
23  have made that decision regarding the 302 of Ockley?
24            MR. GONZALES:  What decision?
25            The decision to 302 her, or to preserve --

Page 20

1  BY MR. SCHROM:
2  Q.        No, the decision not to preserve the
3  video.
4  A.        It's based on the system, like I said.  If
5  we -- as officers, we go in and tag them for certain
6  things.  Certain things are preserved as I would tag
7  it arrest, which was from Saturday, and on probably
8  Friday it was probably preserved as miscellaneous,
9  and we did not fill out paperwork to preserve that,
10  because we didn't feel there was a need to, because
11  it was a 302 warrant, and there would be enough
12  paperwork to --
13  Q.        Okay.  So my understanding is that the
14  officers that were there at the time regarding the
15  302, that would be you and who else?
16  A.        It was Lieutenant Pinto who called us all
17  down there.  I believe it was Officer McHale, and I
18  cannot remember -- I can't remember the other
19  officer.
20  Q.        And you?
21  A.        And me.
22  Q.        And at the time, all of the body cams were
23  on and working?
24  A.        I cannot speak for everyone else, but mine
25  was on, yes.

Page 21

1  Q.        Yours was on?
2  A.        Yes.
3  Q.        Okay.  And do you know the name of the
4  person that would have made the decision to preserve
5  or not to preserve?
6  A.        No.  And like I said, it's not any one
7  person's decision, it's what we label everything on
8  there, and as stated before, I don't know the exact
9  policy, but that did not get tagged as being
10  preserved, and it's two years, and we got a new
11  system, and that is completely -- completely gone.
12  Q.        Okay.  So you are aware that the case
13  proceeded to D.J. court, correct?
14  A.        I -- after this -- which case?
15  Q.        The case against Ockley, the arrest?
16  A.        Arrest?
17  Q.        Yeah.
18  A.        After this incident, I had no, like,
19  notification of anything, so --
20  Q.        Oh, really?
21  A.        Yeah, no notification of anything.
22  Q.        So on the day of the hearing in front of
23  Judge Lang, you were not notified --
24  A.        No, sir.
25  Q.        -- to come?

Page 22

1 A.        Didn't get a subpoena or anything, no.
2 This is the -- when I real -- the first notification
3 I got about Ms. Ockley since that Saturday incident
4 was when Mr. Gonzales's office contacted me.
5 Q.        Oh, okay.  And that was like, I don't
6 know, a year ago, or half a year ago?
7 A.        Yeah.  The fall, I think.
8 Q.        Okay.  So you don't -- you didn't -- you
9 were never aware that the case actually got thrown
10 out?
11 A.        No, not until the other day.
12 Q.        Which would have been like how long ago?
13 A.        Two days ago.
14 Q.        Two days ago, really?
15 A.        Yes.
16 Q.        So regarding this grouping of orders, P-1
17 and P-2, as I understand it at the time you're not
18 certain whether or not you saw either of them.
19 You're a little more familiar with P-2, but you're
20 not certain as to whether you saw that prior to the
21 arrest; is that correct?
22                MR. GONZALES:  Objection.  Asked
23          and answered, but you can answer again.
24                THE WITNESS:  Yeah, I'm not
25          certain which -- I definitely believe I

Page 23

1          saw this one, but again I'm not certain.
2 BY MR. SCHROM:
3 Q.        Pointing to the Dozor --
4 A.        The Dozor, the P-2, yes.
5 Q.        Okay.  And you -- regarding the P-2, did
6 you ever call a judge to confirm that that order was
7 a true and correct order?
8 A.        No.  It was irrelevant.
9 Q.        Okay.  Did you ever call a solicitor,
10 township solicitor, to ask them their interpretation
11 of the order or for instruction?
12 A.        No.
13 Q.        Did you ever have a superior look at that
14 order and ask for instruction?
15 A.        I -- well, again, I can't answer for
16 Lieutenant Pinto, and the sergeant on duty, but -- I
17 don't know if they saw it, but I think Lieutenant --
18 again, I can't answer, I don't know if Lieutenant
19 Pinto knew about these orders or not, I believe he
20 did, and we still were directed to go to the house
21 and remove Ms. Ockley from it.
22 Q.        Okay.  Who was the person that gave you
23 that direction?
24 A.        This is on Friday for the 302.  It was
25 Lieutenant Pinto.

Page 24

1 Q.        Okay.  And then, the next day to arrest
2 her?
3 A.        It was Sergeant Fischer actually called
4 Lieutenant Pinto, and he gave that direction.
5 Q.        Okay.  Is there any reason that when
6 Ockley requested or begged to look at the order,
7 that you didn't review both orders at the time?
8 A.        Yes.  They were irrelevant to the crime at
9 hand that she was committing.
10 Q.        They were irrelevant?
11 A.        Um-hum.
12 Q.        Okay.
13 A.        Yes.  Sorry.
14 Q.        And you base that upon what in particular?
15 A.        The fact that she had set up residence,
16 and that was not on the order.  She was not supposed
17 to be living inside the home --
18 Q.        Do you see --
19                MR. GONZALES:  Were you
20          finished, or was there more?
21 BY MR. SCHROM:
22 Q.        Sorry.
23 A.        No.  I was going to add on.
24 Q.        Okay.
25 A.        Basically, Ms. Ockley was residing in the

Page 25

1 residence, which she was not to do, since April of
2 2022.  She actually turned on the PECO, which
3 Mr. Brydzinski -- I'm sorry, I'm going to --
4 Q.        Brydzinski.
5 A.        Brydzinski said he was having trouble,
6 because she put the PECO back in her name, she put
7 the cable back in her name, as she was sitting on
8 her couch watching TV, and then she was on the phone
9 with Aqua, attempting to get the Aqua restored.
10 Ms. Ockley was -- the home was deemed inhabitable in
11 April.  She was not supposed to be living there.
12 These orders said she was supposed to be going in
13 and removing items.  Ms. Ockley had no one there.
14 She was unable to remove items by herself, as she
15 could barely walk, so she was actually residing
16 inside the home, which was a danger, and she should
17 not have been.
18                We requested that she leave, she was
19 living in a hotel room before that, had plenty of
20 chances to remove items, and she refused to do that,
21 so that is why we went into that house, because it
22 was unsafe for her.  We gave her plenty of chances
23 to leave, to go back to a hotel room, and she
24 refused.  It was unsafe, and she was not doing what
25 these orders said, which was to remove items, not

Page 26

1 reside in the house.
2 Q.        Do you see any language in P-1 from Judge
3 Whelan, or P-2 from Dozor that say that she is not
4 to reside in the house?
5 A.        These orders do not overpower the order of
6 the home being -- she's not able to live in the
7 home.  It was deemed uninhabitable.  These orders,
8 nothing says that.  She's not allowed to live in the
9 home.  And again, it says to remove items, not live
10 in the home.
11 Q.        Okay.
12              (P-3 was identified and marked for
13          identification.)
14              MR. GONZALES:  Thank you.  P-3?
15              MS. MALLOY:  Yeah.
16 BY MR. SCHROM:
17 Q.        I'm showing you a document marked P-3.
18 Can you identify that?
19 A.        Yes.  It's the Notice of Condemnation by
20 Radnor Township on April 26, 2022.
21 Q.        Condemnation.
22 A.        Condemnation.
23 Q.        Is that what you said?
24 A.        Yeah.  Yeah, condemnation.
25 Q.        Okay.  So it's your opinion that the

Page 27

1 Notice of Condemnation trumps the Common Pleas Court
2 orders; is that correct?
3 A.        Say that again?
4 Q.        It's your understanding that the
5 condemnation notice trumps the Common Pleas
6 documents --
7 A.        Yes.
8 Q.        -- the Common Pleas orders?
9 A.        Yes, because this -- Ms. Ockley was
10 attempting to reside in her home, not remove items,
11 which this says.
12              MR. GONZALES:  This meaning P-2?
13              THE WITNESS:  This meaning P-2,
14          yes.
15 BY MR. SCHROM:
16 Q.        Which is the order of Judge Dozor?
17 A.        Dozor, yes.
18 Q.        Okay.  But as to what order trumps what,
19 you never sought separate counsel regarding the
20 apparent conflict between the judge's orders and the
21 condemnation notice?
22 A.        I don't understand that question.
23 Q.        Okay.  Would it be fair to say that the
24 judge's orders say that she has unlimited access to
25 the property, unfettered access to the property, and

Page 28

1 that the locks have to be removed?
2 A.        Okay.  But --
3              MR. BARTOS:  Objection to form.
4              THE WITNESS:  Okay.
5              MR. GONZALES:  He's objecting,
6          that's all.  You can still answer the
7          question.
8              THE WITNESS:  But you keep
9          leaving out to remove her personal
10          property every time you ask me that
11          question.  She was not removing her
12          personal property, and there was no way
13          she was physically able to do that, nor
14          was there anyone else there, and nor was
15          she telling me that's what she was doing
16          each time we were there.  She was --
17          removed plywood, after we told her she is
18          no longer allowed on the property, it's a
19          safety concern, and because she was
20          attempting to live there and squatting
21          there, that was why she was arrested the
22          next day.  She was told by police officers
23          not to come back, even though there was an
24          order, because she was not doing what is
25          on this order, which is removing property.

Page 29

1          She is physically unable to remove
2          property from that residence.
3 BY MR. SCHROM:
4 Q.        So because she was physically unable to
5 remove property, it was your determination that that
6 was an illegal act?
7              MR. GONZALES:  Objection.
8 BY MR. SCHROM:
9 Q.        Is that correct?
10              MR. GONZALES:  Objection.  That
11          mischaracterizes her testimony.  You can
12          answer.
13              THE WITNESS:  No.  The act that
14          she was arrested for was returning after
15          she was told not to, which is trespassing.
16          We attempted to get her help.  She refused
17          any type of help and came back and
18          attempted to break into the residence with
19          the help of someone else who was not there
20          when I arrived, and she never said she was
21          waiting for someone to come help her get
22          stuff out.  She said she was waiting for
23          someone to get into her -- her house,
24          which is no longer hers.
25 BY MR. SCHROM:

Page 30

1  Q.      Right.  But it does say she had until
2  September 1st, correct?
3  A.      I understand that, but --
4              MR. BARTOS:  Objection.
5              THE WITNESS:  -- again, she was
6        told the day before because of her actions
7        she was no longer allowed to be on the
8        property, and I believe Mr. Brydzinski and
9        his company were attempting to get an
10       emergency order for her to no longer be
11       allowed at the property at all, because
12       she was attempting to move back into the
13       residence, which is no longer hers.
14  BY MR. SCHROM:
15  Q.      Did you ever see an emergency order, or
16  any other Common Pleas order, other than these two?
17  A.      No.
18  Q.      To the best of your knowledge, does any of
19  those orders exist?
20  A.      No.
21  Q.      So although Brydzinski may have attempted
22  to get additional orders, you never saw any
23  additional orders?
24  A.      No.
25  Q.      Did you ever ask the solicitor whether

Page 31

1  there were any other orders?
2  A.      No.
3  Q.      Did you ever ask any district attorney
4  whether there were any other orders?
5  A.      No.
6  Q.      Did you ever ask any other township
7  authority as to whether there were any other orders?
8  A.      No.
9  Q.      At the time that Ockley was sitting
10  outside on the second instance, she had some bags
11  with her with papers in them; isn't that correct?
12  A.      Yes.
13  Q.      Okay.  Did you go through all those
14  papers?
15  A.      Later at the police station, that's where
16  I believe I saw the -- first saw the orders.
17  Q.      So at the police station is probably where
18  you saw P-1 and P-2; is that correct?
19  A.      Possibly, yes.
20  Q.      Okay.  Did you ask for any clarification
21  regarding P-1 and P-2 after you saw those orders?
22  A.      No.
23  Q.      Did you show those orders to your
24  supervisor?
25  A.      No.

Page 32

1  Q.      Did you ask for any clarification from a
2  district attorney?
3  A.      No.
4  Q.      Did you show those orders to any other
5  persons?
6  A.      No.
7  Q.      And that would also include Fischer and
8  McHale, Brown, no other officers?
9  A.      No.
10  Q.      So you looked at P-2, at least you think
11  you may have looked at P-2 and P-1, and then you put
12  them back in her bag?
13  A.      Yes.
14  Q.      And that was that?
15  A.      Um-hum.
16              MR. GONZALES:  You have to say
17        yes or no.
18              THE WITNESS:  Yes.  Sorry.
19  BY MR. SCHROM:
20  Q.      And then you proceeded with the processing
21  her with the arrest, correct?
22  A.      Officer Brown did, yes.
23  Q.      Okay.  So would it be fair to say that
24  these orders were approximately one foot away from
25  her when she was sitting on her back porch?

Page 33

1  A.      Yes.
2  Q.      You could have looked at them at that
3  juncture, couldn't you?
4              MR. GONZALES:  Objection.  You
5        can answer if you --
6              THE WITNESS:  Yes, but as I
7        stated earlier, they were irrelevant to
8        the arrest that day.
9  BY MR. SCHROM:
10  Q.      Okay.  And that's your personal
11  determination?
12  A.      That is legal -- law.  She was told not to
13  return to the property, and she returned to the
14  property.  We gave her ample time to leave the
15  property, and then she refused to leave the
16  property, and she was subsequently arrested.
17  Q.      Okay.  Did you have trouble transporting
18  her?
19  A.      Yes.
20  Q.      And why was that?
21  A.      Because she was unable to walk, which she
22  had a walker, a cane.  She apparently had broken her
23  leg back in April, which led to the condemnation of
24  her home, and she -- yeah, we had to get an
25  ambulance to transport her back to the police

OFFICER JENNIFER COCCO                                         JOB NO. 1501917
MARCH 20, 2025

Page 34

1  station.
2  Q.      Okay.  And but you did cuff her once you
3  arrested her?
4  A.      Yes.
5  Q.      Is that standard procedure?
6  A.      It's policy, yes.
7  Q.      Okay.  Do you ever have any exceptions to
8  that policy for people who are infirmed or have
9  limitations?
10  A.      Yes.  She was cuffed in the front and not
11  in the back.
12  Q.      Okay.  Were you afraid of a weapon?
13  A.      No.  I was afraid she would keep grabbing
14  her items, which were right next to her, including
15  her phone and make phone calls.  When you get
16  arrested, you do not have access to any of your
17  belongings anymore.
18              (P-4 was introduced and marked for
19          identification.)
20              MR. SCHROM:  P-4.
21              MR. GONZALES:  Thank you.
22              THE WITNESS:  When was that
23          dated?
24  BY MR. SCHROM:
25  Q.      I'll be asking some questions about that

Page 35

1  in just a minute, but let's go through your
2  background.  Why don't you tell us about your
3  educational background and your work experience?
4  A.      Educational, like I went to West Chester.
5  I have my bachelors in criminal justice.  After that
6  I went to the Delaware County Municipal Police
7  Officers Academy, and then I was subsequently hired
8  with Darby Township Police Department in 2005.  I
9  worked there until I was hired with Radnor Township
10  Police Department in 2007.
11  Q.      And you've been there ever since?
12  A.      Yes.
13  Q.      Okay.  What is your rank?
14  A.      I'm a police officer.
15  Q.      Okay.  And what -- did you have any
16  additional training at all over the course of those
17  years, other than what you've indicated?
18              MR. GONZALES:  In anything, or
19          is there a specific --
20  BY MR. SCHROM:
21  Q.      You know, in -- well, in how to deal with
22  incapacitated people or 302 individuals?
23  A.      Yes.  One of our mandatory trainings with
24  Radnor Township is crisis intervention team.  It is
25  a three-day class where we are trained by social

Page 36

1  workers, psychologists, on how to deal with many
2  aspects of mental health, and how to fill out 302s,
3  and what is applicable for someone to be warranted
4  with a 302.
5  Q.      Okay.  It was your determination that you
6  thought Simona was 302 worthy, so to speak?
7  A.      It was not my determination.
8  Q.      Whose determination was that?
9  A.      Lieutenant Pinto notified mobile crisis,
10  and they responded to the scene, and they made that
11  determination through a delegate.
12  Q.      Okay.  You are aware though that she was
13  not determined to be a harm to herself or others,
14  and the 302 was rejected?
15  A.      The 302 -- she was not 302'd --
16              MR. GONZALES:  Yeah, I just want
17          to interpose an objection, because you're
18          using a term there about rejected, and I
19          think that's where the confusion is coming
20          in, so I'm going to object to the form of
21          the question, but I'll let the witness
22          answer it to the best of her ability.
23              THE WITNESS:  A 302, when you go
24          to the hospital, it's basically not an
25          evaluation.  She met the standards, which

Page 37

1          was she was not able to take care of
2          herself, and she was living in a house
3          without running water and not showering,
4          even though she had access to a hotel
5          room.  They deemed her -- which is another
6          part of the 302, it doesn't have to be a
7          danger to herself or others, she was
8          incapable of taking care of herself and
9          making sound decisions.  That's what they
10          deemed, mobile crisis and the delegate.
11              The 302 is a warrant to get
12          evaluated, mandatory evaluation.  That
13          doctor at the E.R. I guess evaluated her
14          and did not think she needed the 72-hour
15          hold.  That is not up to the police
16          department.  We did our job.  The
17          delegate and mobile crisis did their job.
18          They evaluated her, said she did not need
19          the 72-hour hold.
20  BY MR. SCHROM:
21  Q.      Okay.  And then, she went back to the
22  property?
23  A.      Yes.
24  Q.      Okay.  And that seemed to upset you, at
25  least in the video; is that correct?

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 38

1  A.       Well, she was told she was not allowed to
2  return.
3  Q.       And I think the video indicates that you
4  said that this lady is crazy, isn't that -- do you
5  recall that?
6  A.       I don't recall.
7  Q.       Do you recall a discussion with other
8  officers regarding that she should have been 302'd,
9  and why didn't they hold her for 72 hours?
10  A.       I'd have to watch the video again.
11  Q.       You don't remember?
12  A.       Um-um.
13                MR. GONZALES:  You have to say
14           yes or no.
15                THE WITNESS:  Yes.
16  BY MR. SCHROM:
17  Q.       Did you ever have any additional training
18  regarding property rights?
19  A.       No.  Just -- no.
20  Q.       Okay.  Did you review any documents in
21  preparation for today's deposition?
22  A.       Yes.
23  Q.       What were the ones that you reviewed?
24  A.       My -- the incident report I wrote, and the
25  criminal complaint by Officer Brown.

Page 39

1  Q.       Okay.  So that was the Affidavit --
2  A.       Yes.
3  Q.       -- of Probable Cause?
4  A.       Yes.
5  Q.       So you looked at the Affidavit of Probable
6  Cause and the video?
7  A.       Yes.
8  Q.       And that's it, to the best of your
9  knowledge?
10  A.       Yeah, I believe that's it.
11  Q.       Okay.
12  A.       And there was another incident with --
13  from when the house got condemned, I read that
14  incident as well.
15  Q.       Which is what I showed you a moment ago?
16  A.       No.  That's --
17  Q.       Are you looking for the sticker, the one
18  that was on the property?
19  A.       No.  There was actually an incident
20  where there's -- a couple incidents where -- the one
21  where the house got condemned, where Ms. Ockley was
22  taken out of the home, and then there was another
23  one when -- I can't remember the one Officer Faust
24  was involved with checking the property, or
25  something like that.

Page 40

1                MR. SCHROM:  Do you have a copy
2           of that?  The ones she's talking about?
3           Faust?  Off the record.
4                VIDEOGRAPHER:  Want me to go
5           off?
6                MR. SCHROM:  Yeah.
7                VIDEOGRAPHER:  Off the video
8           record.  The time is 11 o'clock.
9                (At this time, a discussion was
10           held off the record.)
11                VIDEOGRAPHER:  Back on the
12           record.  11:01.
13  BY MR. SCHROM:
14  Q.       Okay.  You indicated that you had training
15  in the local police academy --
16  A.       Yes.
17  Q.       -- is that correct?  Okay.  I'd like you
18  to, again, look at P-4.  Can you identify that?
19  A.       Yes.  It's the, I guess, municipal police
20  officers basic training program.
21  Q.       Is that the program that you went through?
22  A.       I believe.  It was a very long time ago
23  that I went through this, so things may have
24  changed.
25  Q.       Okay.  So how long have you been an

Page 41

1  officer now?
2  A.       20 years.
3  Q.       20 years.  Okay.  Do you have any reason
4  to believe it's not a true and correct copy of the
5  training program, municipal police officer basic
6  training program?
7                MR. GONZALES:  I'm just going
8           object.  I notice the copyright at the
9           bottom is 2024, and, you know, this is not
10           a document that was created by the witness
11           or by Radnor Township, so having the
12           witness verify its accuracy or
13           authenticity I don't think is appropriate.
14           It's also 22 pages.  Anyway, I'm just
15           going to object.  I mean, I'm not going to
16           instruct her not to answer, but it doesn't
17           seem like this is the appropriate witness
18           to answer that.
19  BY MR. SCHROM:
20  Q.       Can you take an opportunity just to look
21  through it to see whether or not it appears to be
22  similar orientation, if you see anything obvious?
23  A.       I mean, there's --
24                MR. GONZALES:  Hold on.  Similar
25           orientation to what, what she --

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 42

1          MR. SCHROM:  Regarding what
2   training that she had.
3          MR. GONZALES:  Back in 2005 or
4   '04?
5          THE WITNESS:  2004 I went
6   through the academy.
7          MR. GONZALES:  So that's 20
8   years ago.
9          MR. SCHROM:  Yeah.
10         MR. GONZALES:  Okay.
11         THE WITNESS:  I feel
12  uncomfortable answering that, because I
13  can't remember what exactly I -- courses I
14  took back 20 years ago.  I just know I
15  graduated and passed everything.  You
16  know, I --
17  BY MR. SCHROM:
18  Q.     I understand.
19  A.     -- I can't -- I don't know which changed,
20  what each of these were called.  Yeah, I can't --
21  Q.     I see.  Well, this is -- this is a '24,
22  it's not from 20 years ago, but I understand that
23  answer.  Why don't we just turn over for a moment to
24  page three?  It talks about overview, and it's
25  volume one; is that correct?  Do you know whether

Page 43

1   there was, when you were taking the basic municipal
2   police training curriculum, there was an intro to
3   the academy?
4   A.     Yes.  I -- like I said, I don't remember
5   what I -- exactly everything was called, but I
6   remember going through the academy, and obviously
7   I'm a police officer, so I passed.
8   Q.     I'd like you to look at the third line, if
9   you could, and under the intro to the academy,
10  volume one, could you read that sentence into the
11  record?
12         MR. GONZALES:  I'm sorry, what
13         page are we on?
14  BY MR. SCHROM:
15  Q.     Page five.
16  A.     Oh.  We were on page three.  All right.
17  Q.     Starts with the learning and study skills?
18  A.     The learning and study skills block
19  provides the police cadet with valuable information
20  to assist them in developing some basic skills
21  regarding how to actively listen and participate in
22  class, think critically, and study for and take
23  rigorous tests.
24  Q.     Okay.  So at the time of the incident --
25  well, let me strike that.

Page 44

1          So one of the very first things that is
2   indicated in this manual that may or may not have
3   been present at the time, you're not certain, is a
4   focus on how to actively listen.  You think that's
5   still relevant today?
6          MR. GONZALES:  I'm going to
7          object.  When you say relevant today, so
8          relevant at the police academy, or
9          relevant in real world practice on the
10         street?
11         MR. SCHROM:  Well, it will be
12         both.
13  BY MR. SCHROM:
14  Q.     Do you think it's relevant to your
15  instruction that you received 20 years ago?
16  A.     Active listening, yes.  I mean, it's --
17  yes.
18  Q.     And thinking critical, is that a critical
19  function of a police officer?
20  A.     Yes.
21  Q.     Okay.  And then, would you read the last
22  sentence?
23  A.     "These skills will not only help them
24  successfully complete the academy, but will develop
25  into good habits that will help them later as they

Page 45

1   become certified police officers."
2   Q.     Okay.  Do you believe that's true and
3   correct today?
4   A.     Yes.
5   Q.     For police officers?
6   A.     Yes.
7   Q.     Okay.  So in the very first paragraph in
8   volume one, how to actively listen, that's
9   important, and thinking critically.  Do you think at
10  the time of the incident that you fully listened to
11  the concerns of Simona Ockley?
12  A.     Yes.
13  Q.     Do you think that you were thinking
14  critically regarding the totality of circumstances
15  that were presented to you at that time?
16  A.     Yes.
17  Q.     I'd like you to look to page seven,
18  there's a category human relations; is that correct?
19  A.     It says human relations, yes.
20  Q.     Okay.  Do you know whether that was a
21  subject matter that was -- that you took at that
22  time?
23  A.     I don't know.
24  Q.     Okay.  Do you know whether or not the --
25  it's -- I'm going to ask you whether or not you

1 believe it's still applicable today, so would you
2 read the first sentence under human relations?
3 A.        **"Communication necessary to promote**
4 **effective human interaction will be the focus of**
5 **volume five."**
6 Q.        Okay.  Do you believe that effective human
7 interaction is a critical role of a police officer?
8 A.        Yes.
9 Q.        Okay.  Why don't you read the sentence
10 that begins with they?
11 A.        **"They will discuss the basic**
12 **characteristics of effective interpersonal**
13 **communication, and gain an understanding of the**
14 **benefits of active listening, as well as the**
15 **barriers to active listening, and how to overcome**
16 **those barriers."**
17 Q.        Okay.  So would you state that those same
18 characteristics are applicable today?
19 A.        Yes.
20 Q.        Okay.  So it does reemphasize the
21 importance of active listening, correct?
22 A.        Yes.
23 Q.        And sometimes there are barriers to active
24 listening; isn't that correct?
25 A.        Yes.

1 Q.        When you were trying to listen to Simona,
2 it seems as though you were talking over her rather
3 than listening.  Do you agree with that
4 characterization?
5          MR. GONZALES:  Objection.  You
6          can answer.
7          **THE WITNESS:  Simona kept**
8          **repeating herself with stuff I already**
9          **knew, and it was irrelevant to what the**
10          **situation was, so, yes, I was talking over**
11          **her, yes.**
12 BY MR. SCHROM:
13 Q.        Okay.  And what you knew at that time was
14 not the judge's orders, but you knew that the place
15 was condemned and sold to somebody else; is that
16 correct?
17 A.        **Yes.  And she was told not to be there.**
18 Q.        You told her not to be there?
19 A.        **Many people told her not to be there.**
20 Q.        Okay.  And who are the people included in
21 that?
22 A.        **The people who were there on Friday after**
23 **the 302.**
24 Q.        The officers?
25 A.        **Yes.**

1 Q.        Okay.  So three or four officers told her
2 not to be there?
3 A.        **And the township said she could not live**
4 **there.**
5 Q.        Because of the condemnation?
6 A.        **Yes.**
7 Q.        Okay.  But at the time of the arrest, you
8 hadn't seen these judicial orders, correct?
9          MR. GONZALES:  Objection.  Asked
10          and answered.  She's answered that
11          question --
12          MR. SCHROM:  She has.
13          MR. GONZALES:  -- at least four
14          or five times.
15          MR. SCHROM:  That's fine.  Next
16          one.
17          MR. GONZALES:  P-5?
18          (P-5 was introduced and
19          marked for identification.)
20 BY MR. SCHROM:
21 Q.        I'm showing you a document previously
22 marked P-5.  Can you identify that document?
23 A.        **Yes.**
24 Q.        Okay.  What's that?
25 A.        **It is our policy and procedures for**

1 emotionally disturbed persons.
2 Q.        Okay.  Would you take a moment to look at
3 that, and determine whether or not you believe it's
4 essentially the same as today?
5 A.        **It's the same as today, yes.**
6 Q.        Okay.  So I'd like to direct your
7 attention to the first three paragraphs, if I may?
8          MR. GONZALES:  On page one?
9          MR. SCHROM:  Yeah, on page one.
10 BY MR. SCHROM:
11 Q.        Will you read that from the top, and the
12 paragraph involving purpose, but start from the top
13 of the page, please?
14 A.        **"Radnor Township Police Department**
15 **Policies and Procedures, subject emotionally**
16 **disturbed persons, by the order of superintendent of**
17 **police, number of pages 15.  Purpose:  The purpose**
18 **of this policy is to maintain guidance for**
19 **departmental personnel in recognizing and dealing**
20 **with persons with mental illness or emotional**
21 **disturbances.  It is the policy of the Radnor**
22 **Township Police Department to treat emotionally**
23 **disturbed persons, and persons with mental illness**
24 **with dignity, respect, and through deescalation**
25 **tactics to the extent possible, and to divert them**

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 50

1 from the criminal justice system and possible use of
2 force or unnecessary injury whenever possible."
3 Q.      And the next paragraph?
4 A.      "It is further the policy of this
5 department that the procedures necessary to
6 involuntary commit persons with mental illness
7 conform to the provisions of the Mental Health
8 Procedure Act of 1976, Section 7201, et seq, and
9 Section 7302, et seq, where applicable in order to
10 provide the public good while maintaining the rights
11 and dignity of the persons being committed."
12 Q.      Okay.  And regarding the Simona Ockley
13 incident, I'll characterize it as that, do you
14 believe that your behavior, and the behavior of the
15 other officers were -- was consistent with that
16 policy?
17 A.      Yes.
18 Q.      There's a phrase in the second line which
19 says basically treating persons with mental illness
20 with dignity, respect, through deescalation tactics
21 to the extent possible; is that correct?
22 A.      Are you asking me if that line is correct?
23 Q.      Yeah.
24 A.      Yes, it says deescalation tactic.
25 Q.      What is a deescalation tactic?

Page 51

1 A.      It is doing everything in your power to
2 make the scene calm, and not have to rise to the
3 next level of use of force, or doing everything we
4 can to accommodate that person, instead of putting
5 them through the criminal justice system, so
6 basically calming down the scene and making sure we
7 can handle something without having to go to using
8 arrests, anything to make the scene --
9 Q.      Right?
10 A.      -- better.
11 Q.      Okay.  So it says and divert them from the
12 criminal justice system, meaning not trying to push
13 them into the criminal justice system but keep them
14 out of it; is that right?
15 A.      Yes.
16 Q.      Okay.  Do you think that you and the other
17 officers did that regarding the Ockley incident?
18 A.      Yes, sir.
19 Q.      Okay.  I believe on the next page, under
20 C, there is actually a definition of deescalation.
21 I'd like you to read that, and ask whether you agree
22 with that?
23 A.      "Deescalation is calmly communicating with
24 an agitated person in order to understand, manage
25 and resolve his/her concerns.  Ultimately, these

Page 52

1 actions should help reduce the person's agitation
2 and potential for future aggression or violence."
3 Q.      Okay.  So would it be fair to say that
4 Ms. Ockley indicated at least ten times that she
5 wanted you to look at the order or orders?
6          MR. GONZALES:  When?
7 BY MR. SCHROM:
8 Q.      Do you remember?
9 A.      What day?
10 Q.      The day of --
11 A.      Because we're talking about -- we're
12 talking about her mental health, and then you're
13 going to her arrest.
14 Q.      I understand, but we'll just take it for
15 the day of the arrest?
16 A.      Yes.  And as I stated before, those orders
17 were irrelevant, so I did not need to, and she was
18 asked to leave, we attempted to get her to leave the
19 property and not arrest her, trying to deescalate
20 the situation, and she refused to leave several
21 times.
22 Q.      Okay.  But you hadn't -- the only two
23 things that you had, as I understand it, was the
24 agreement of sale, and the condemnation notice at
25 that juncture?

Page 53

1          MR. GONZALES:  Objection.  I
2          think that mischaracterizes the testimony,
3          but I'll let the witness answer.
4          THE WITNESS:  At that time,
5          Ms. Ockley was told to not return to the
6          property, she returned to the property.
7          Because it was unsafe, the entire property
8          was unsafe, they were doing work outside,
9          and inside was condemned, she was told on
10          Friday not to return.  She returned, and
11          she kept saying I'm trying to get into my
12          home, which we could not have, and we told
13          her to get a ride, get someone to take
14          her, she refused, and we ultimately had to
15          arrest her because she would not leave the
16          property as directed.  Which if you look
17          at Criminal Title 18, defiant trespass,
18          I -- she was told by a police officer not
19          to return, which is what she was charged
20          with.
21 BY MR. SCHROM:
22 Q.      Well, regarding the deescalation, so
23 you're saying that you believe the Radnor Police
24 Department, you specifically tried to resolve her
25 concerns and reduce the agitation and potential for

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 54

1 future aggression; is that right?
2 A.      Yes.
3                  MR. GONZALES:  It's been an
4         hour.  Can we take a short break?
5                  MR. SCHROM:  Yeah.
6                  VIDEOGRAPHER:  Off the record at
7         11:17.
8                  (At this time, a short break was
9         taken.)
10                 VIDEOGRAPHER:  We're back on the
11        record at 11:39.
12 BY MR. SCHROM:
13 Q.      Okay.  Over the course of your career,
14 have you been required to follow orders from the
15 Court of Common Pleas?
16 A.      I'm not understanding that question,
17 like --
18 Q.      Let me rephrase it.  If you received an
19 order from the Court of Common Pleas directing the
20 Radnor Police Department to do something, would you
21 do it?
22 A.      Possibly just a warrant from -- and we
23 have, bench warrants are usually from the Court of
24 Common Pleas, but otherwise like civil orders or
25 PFA's, other than that, no, that would be more of a

Page 55

1 civil issue.
2 Q.      Okay.  If you received a court order from
3 the Court of Common Pleas to do something, that is
4 if the Radnor Police Department received a court
5 order for the Radnor Police to do something, would
6 you believe you were required to do that?
7                  MR. GONZALES:  I'm going to
8         object.  I mean, it's giving her a
9         hypothetical, but I mean, she can answer,
10        go ahead, but I'm going to object.
11                 THE WITNESS:  Yeah, I don't know
12        how that would -- that would be, I
13        believe, someone over my pay grade.  A
14        sergeant or lieutenant would have to
15        verify and look into that and let me know,
16        but as a patrol officer, I would probably
17        let a superior officer look at and handle
18        that if it was not something we usually do
19        like a PFA or a bench warrant.
20 BY MR. SCHROM:
21 Q.      I'd like to go back to P-2 for a moment,
22 if you could look at that for a second, P-2.  Do you
23 have that in front of you?
24 A.      Yes.
25 Q.      Okay.  I'm reading one section, which is

Page 56

1 the last -- part of the last paragraph, if you would
2 read it with me.  "Plaintiff shall remove any
3 additional locks so that the defendant Simona Ockley
4 may access the property until September 1st."  Did
5 I read that right?
6 A.      Yes.
7 Q.      Okay.  "And plaintiff and/or the Radnor
8 Police Department shall allow access by removing the
9 locks to provide defendant access to the property."
10 You talked about someone would have to notify Radnor
11 Police and request that assistance?
12 A.      For the -- that's for the condemnation.
13 The locks on the building were from the
14 condemnation, they locked it up and did not allow
15 access based on the township, and we have the key,
16 and they have to call us when they need the access,
17 and then call us back to lock it up after 4:00 p.m.
18 Q.      Okay.  So but all of that procedural thing
19 is not mentioned in this order, is it?
20 A.      That's not a Radnor Township order.  It's
21 a civil order.  We weren't acting on any of those
22 orders.  We were acting on like legal and safety
23 issues.
24 Q.      You were acting on the condemnation order,
25 and the agreement of sale conveying the property to

Page 57

1 somebody else?
2 A.      We were not acting on the agreement of
3 sale.  That's a civil issue.  That's a civil issue.
4 We were acting on the fact that Ms. Ockley was
5 living in the home where it was unsafe, and she was
6 told she cannot live in the home because it was
7 condemned.
8 Q.      Okay.  So because P-2, the condemnation
9 order, was in place, you indicated that you didn't
10 believe that the requirements of P-2 applied,
11 correct?
12                 MR. GONZALES:  You -- hold on.
13 BY MR. SCHROM:
14 Q.      Sorry, P-3, that P-3, the notice of
15 condemnation was in place, you didn't believe the
16 requirements of P-2 applied, correct?  Isn't that
17 what you just said?
18                 MR. GONZALES:  Objection, but
19        you can answer.
20                 THE WITNESS:  I'm
21        not understanding.  So you're saying --
22 BY MR. SCHROM:
23 Q.      Well, let me do it differently.
24 A.      Okay.
25 Q.      Let's just do it visually for a moment.

Page 58

1  There was a condemnation order in place, and you
2  said this was it?
3  **A.        Yes.**
4  Q.        And the condemnation order has a bunch of
5  criteria that are associated with it, you have to do
6  this and do that, and -- that's all.  And this is a
7  township order, correct?
8  **A.        Yes.**
9  Q.        Or not an order, it's a township dictate
10 or document, correct?
11 **A.        Yes.**
12 Q.        Okay.  And then, there's also the two
13 judicial orders from Dozor and Whelan, and you're
14 saying that as you viewed the circumstance, the
15 condemnation took priority over the Common Pleas
16 orders, and so you followed the notice of
17 condemnation procedures, correct?
18           MR. GONZALES:  Objection, but
19           you can answer.
20           **THE WITNESS:  Yes, because it**
21           **became a safety issue when Ms. Ockley**
22           **decided to squat in a residence that no**
23           **longer belonged to her without removing**
24           **her items, which the civil order stated.**
25 BY MR. SCHROM:

Page 59

1  Q.        Okay.  If you had to characterize your
2  ability to actively listen, would you characterize
3  it as excellent, very good, good, fair, poor?
4           MR. GONZALES:  Objection, but
5           she can answer.
6           **THE WITNESS:  Very good.**
7  BY MR. SCHROM:
8  Q.        If you had to characterize your
9  decision making, as it relates to police activity,
10 how would you characterize it along the same scale?
11 **A.        Very good.**
12 Q.        If you had to characterize your attention
13 to detail, how would you characterize that?
14 **A.        Very good.**
15 Q.        If you had to characterize your following
16 orders and procedure, how would you characterize
17 that?
18 **A.        Very good.**
19 Q.        Have you ever been sanctioned or
20 reprimanded?
21 **A.        Within the police department?**
22 Q.        Yes.
23 **A.        Yes.**
24 Q.        And when did that occur or --
25 **A.        I can't remember.**

Page 60

1  Q.        Do you remember the incident or
2  circumstance?
3  **A.        I backed into a pole, which usually -- it**
4  **was a couple accidents.**
5  Q.        Okay.  So they related to vehicles?
6  **A.        Um-hum.**
7  Q.        Anything else?
8           MR. GONZALES:  You have to say
9           yes or no.
10          **THE WITNESS:  Yes.**
11 BY MR. SCHROM:
12 Q.        Anything else?
13 **A.        Not that I can recall.**
14 Q.        It's your position at the time of the
15 incident that you believe the plaintiff did not have
16 a legal right to be on the property; is that
17 correct?
18 **A.        Yes.**
19 Q.        Other than the documents that we talked
20 about, which were the orders that you read after the
21 arrest, and the condemnation notices, did you review
22 any other documentation?
23 **A.        I can't -- I don't recall really.**
24 Q.        Do you know who called the police in the
25 first instance, the 302 instance?

Page 61

1  **A.        From reviewing the report, it was**
2  **Mr. Brydzinski actually came to the police station**
3  **and spoke to -- I believe Lieutenant Pinto advised**
4  **they went into the house -- unlocked the door, went**
5  **into the house, and Ms. Ockley was sitting on the**
6  **couch watching TV.  They went in to do work, and**
7  **they were actually doing tree work outside, and they**
8  **were concerned that she was in the house, and it was**
9  **a safety issue, because they did not know she was in**
10 **there, and a tree could have fell on the house.**
11 Q.        Okay.  And you understood Mr. Brydzinski
12 to be one of the owners?
13 **A.        Yes.**
14 Q.        Is that how he identified himself?
15 **A.        I did not speak to him.**
16 Q.        Oh, okay.
17 **A.        Everything came from Lieutenant Pinto, why**
18 **I went to the house in the first place --**
19 Q.        Okay.
20 **A.        -- on that Friday.**
21 Q.        So Mr. Brydzinski goes to Pinto and says I
22 own the property, this lady is living in the house,
23 the property was condemned, she should be removed,
24 essentially?
25 **A.        I can't --**

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 62

1  Q.      You don't know that?
2                  MR. GONZALES:  Yeah, I'm going
3           to object.  She just said what he said, so
4           and that mischaracterizes what her
5           testimony just was, so --
6                  MR. SCHROM:  I'll rephrase it.
7  BY MR. SCHROM:
8  Q.      Other than what you testified to, do you
9  have any additional information regarding how the
10 police became involved?
11 A.      No.
12 Q.      Do you know whether -- did you ever
13 determine whether or not Mr. Prete was involved in
14 any of the instances surrounding we'll call it the
15 Ockley matter?
16 A.      Who?
17 Q.      Mr. Prete?
18 A.      I don't know who that is.
19 Q.      He's a co-owner.  No?
20 A.      I don't know who that is.
21 Q.      Okay.  Did you ever meet Mr. Brydzinski?
22 A.      I believe I spoke to him on the phone.  I
23 don't know if I ever met him in person.
24 Q.      Okay.  Would that be after Simona was
25 arrested?

Page 63

1  A.      I spoke to -- I'd have to review the
2  report.  I can't remember what day I spoke to him,
3  but I updated him on what was going on.
4  Q.      Okay.  And the update would include that
5  she was arrested and removed from the property?
6                  MR. GONZALES:  Objection, but
7           you can answer.
8                  THE WITNESS:  I know
9           Mr. Brydzinski said after Friday they were
10          putting plywood up, so I don't know who he
11          told that to, but I know they were putting
12          plywood up because they broke the locks on
13          the back door.  They put plywood up on the
14          back door and on the garage again, because
15          that's how she entered at one point, and
16          asked us to -- I don't know who he spoke
17          to, but I know he asked us to do added
18          patrol of the house to make sure no one
19          got back into the home.
20 BY MR. SCHROM:
21 Q.      Okay.  Prior to the first instance, did
22 you ever have any contact with Simona Ockley?
23 A.      Yes.
24 Q.      You did?  And what was that?
25 A.      I had an incident where she was at the

Page 64

1  Villanova post office claiming that the post office
2  stole all her mail.
3  Q.      And do you know when that was?
4  A.      I can't remember when that was.
5  Q.      Okay.  Any other instance?
6  A.      Not me, but several other officers have
7  had contact with her.
8  Q.      And do you know the nature of that contact
9  or when?
10 A.      I believe they were neighbor disputes.
11 Q.      Neighbor disputes?
12 A.      Yes.
13 Q.      Okay.  Anything else?
14 A.      Not that I can recall.
15 Q.      Okay.  What are the protocols that you
16 typically follow when handling a situation involving
17 Ms. Ockley, as she presented on the first day of the
18 302 day?
19 A.      That day Lieutenant Pinto handled
20 everything by calling prior to -- he called mobile
21 crisis that day.
22 Q.      Okay.  So he was the first to arrive on
23 the scene?
24 A.      I can't remember who was there first.
25 Q.      Okay.  But you arrived on the scene.  When

Page 65

1  you arrived on the scene, how many other officers
2  were there?
3  A.      I can remember two other officers.  It
4  would be Lieutenant Pinto and Officer McHale.
5  Q.      Did you receive any additional training
6  regarding -- and you may have answered this
7  before -- regarding the handling of property
8  disputes or verification of legal rights to a
9  property?
10 A.      I answered that, no.
11 Q.      Did you ever on your own study legal
12 standards and procedures for determining property
13 rights in Pennsylvania?
14 A.      No.
15 Q.      There were two aspects to why you removed
16 her, at least that's my understanding.  One, that
17 the property was no longer hers, and, two, that the
18 property was condemned.  Regarding the property was
19 no longer hers, how did you make that determination,
20 or did you look at a document, or something online,
21 or what did you -- how did you figure that out?
22                  MR. GONZALES:  I'm going to
23          object.  You mischaracterized her
24          testimony before you answered -- before
25          you asked the question, so your preamble

OFFICER JENNIFER COCCO                                      JOB NO. 1501917
MARCH 20, 2025

Page 66

1     about the two reasons I think
2     mischaracterizes her testimony, so I'm
3     objecting to the question. You can answer
4     it. I'm not going to tell her not to, but
5     I don't know how she can.
6              THE WITNESS: I believe I
7     already mentioned before how I found out
8     that the house was condemned.
9  BY MR. SCHROM:
10 Q.     Yeah, that part, but regarding the title
11 changing, how did you find out that?
12 A.     From the new owner.
13 Q.     And that was Mr. Brydzinski?
14 A.     Yes.
15 Q.     Okay. Did he ever show you anything; do
16 you know?
17 A.     No.
18 Q.     Do you know? You don't --
19 A.     I did not have contact with
20 Mr. Brydzinski. It was all Lieutenant Pinto.
21 That's --
22 Q.     Okay. Okay.
23 A.     All my information was from Lieutenant
24 Pinto on that first day.
25 Q.     Okay. Who was the highest ranking officer

Page 67

1  of the first day, the 302, was that Pinto?
2  A.     Yes.
3  Q.     And on the second day it was?
4  A.     Sergeant Fischer.
5  Q.     Fischer?
6  A.     But we --
7              MR. GONZALES: Can I -- just so
8     we're clear, when you ask that question,
9     are you talking that were physically at
10    the scene, or were on duty that day?
11             MR. SCHROM: Physically at the
12    scene.
13 BY MR. SCHROM:
14 Q.     Yes?
15 A.     Yes. Sorry.
16 Q.     Okay. Thank you. Did you make any
17 personal notes regarding what transpired on this
18 particular group of occasions regarding Ms. Ockley?
19 A.     No.
20 Q.     At the time of removing her from the
21 property, were you aware of potential legal
22 consequences of removing the plaintiff from the
23 property?
24 A.     What day?
25 Q.     Either day.

Page 68

1              MR. GONZALES: Objection. You
2     can answer. What do you mean by legal
3     consequences?
4              MR. SCHROM: Just what it says.
5     She can -- however she understands that
6     question.
7              THE WITNESS: No, because I --
8              MR. BARTOS: Note my objection
9     to form as well.
10 BY MR. SCHROM:
11 Q.     I guess the question essentially is, did
12 you have any reservations in your actions, you know,
13 where a woman is saying please look at these
14 documents and presenting as she did, did you have
15 any reservations regarding your actions?
16             MR. GONZALES: I'm going to
17    object. What do you mean by reservations?
18             MR. SCHROM: Second thoughts,
19    consternation.
20             MR. GONZALES: I object to the
21    question. I can't instruct her not to
22    answer that, but that's really
23    inappropriate, but -- it's irrelevant, but
24    she can answer it.
25             THE WITNESS: No.

Page 69

1  BY MR. SCHROM:
2  Q.     Were all the officers on the scene of each
3  day all in concert agreeing that the actions that
4  they -- that you collectively took were the
5  appropriate ones?
6  A.     Yes.
7  Q.     So there wasn't an outlier or an officer
8  that didn't believe that the activity was --
9  A.     Not to my knowledge.
10 Q.     -- was not appropriate? Okay. Regarding
11 this particular incident, did you ever receive any
12 disciplinary action, or have any review, or any
13 other action taken with you regarding the Ockley
14 matter?
15 A.     No.
16 Q.     Can you describe your observations of the
17 scene upon your arrival to 416 Ithan the very first
18 day?
19 A.     I walked in, it was --
20 Q.     Front door or the back door?
21 A.     The back door, the porch door. We had to
22 make a path to even get into the home. I believe
23 there was a large hole in the kitchen. It was
24 extremely hot, it was August, it had to be over
25 100 degrees in the home, and it smelled terrible

Page 70

1  inside the home, and there was just stuff in bags
2  and items strewn everywhere in the home.
3  Q.      And her condition, the condition of the
4  plaintiff at that time, what did you observe?
5  A.      She was sitting on the couch, on the
6  phone, in a dirty hospital gown.  She unfortunately
7  smelled like she had not and looked like she had not
8  bathed in several days.  And then, she had a large
9  bandage on her one leg.  I can't remember what leg
10  it was.
11  Q.      Was the mobile crisis unit already called
12  out to that site, or was it called out after that?
13  A.      I believe they were called.  I don't know
14  when they were called.  Lieutenant Pinto handled
15  that.  I don't know exactly when they were called.
16  Q.      Okay.  And you were present when the Elwyn
17  delegates arrived?
18  A.      Yes.
19  Q.      Okay.  And what did, if anything, did they
20  do?
21  A.      They spoke to Ms. Ockley.  I don't know
22  where, when.  I don't know if I was present.  I
23  don't remember that.
24  Q.      So you weren't involved in that process?
25  A.      No.  We are -- we cannot be involved in

Page 71

1  that process.
2  Q.      So you didn't discuss anything with them
3  or did you?
4  A.      I can't remember if I spoke to them or
5  Lieutenant Pinto did.  We usually just give them a
6  rundown on why we're there, and then they make the
7  determination after speaking with the subject they
8  were called for.
9  Q.      Did you think the plaintiff was
10  delusional?
11  A.      I thought she just did not want to leave
12  her home.
13  Q.      Do you think she was crazy?  Would you use
14  that word?
15  A.      I would not use that word.
16  Q.      Did you have any contact with Greg Lingo
17  prior to the 302 incident day?
18  A.      I have no idea who that is.
19  Q.      You have no idea who he is?  He's an owner
20  of a company called Rockwell-Glynn.
21  A.      I don't know what that is.
22  Q.      Do you know what that is?
23  A.      No.  I know it from here, it's the company
24  doing the property at 416.
25  Q.      Okay.  You've never had any contact with

Page 72

1  anybody from there?
2  A.      This incident, that's about it, and
3  Mr. Brydzinski, talking to him on the phone.
4  Q.      Do you know if someone from Rockwell-Glynn
5  went to the police station at any juncture regarding
6  this matter?
7  A.      I believe I answered that.  Mr. Brydzinski
8  went to --
9  Q.      He's the owner.
10  A.      Okay.  Well, he went to the police station
11  and talked to Lieutenant Pinto about the first day.
12  Q.      Right.
13  A.      And then, I believe that report with
14  Officer Faust has someone going to --
15  Q.      Okay.  But --
16  A.      -- the police station as well.
17  Q.      But regarding any employees of
18  Rockwell-Glynn going to the police station, are you
19  aware of that?  No?
20  A.      Um-um.
21          MR. GONZALES:  You have to say
22          yes or no.
23          THE WITNESS:  No.  I keep
24          forgetting.  I apologize.
25          MR. GONZALES:  That's okay.

Page 73

1  BY MR. SCHROM:
2  Q.      You want to tell me about Officer Brown,
3  when he arrived on the scene?
4  A.      Officer Brown was there the second day
5  when Ms. Ockley was arrested, and Officer Brown was
6  in training, and he arrived with his field training
7  officer, Officer Bell (ph), and he was just, I guess
8  standing in the background.  After watching the
9  video, he was just standing in the background.
10  Q.      Okay.  But did he create the affidavit of
11  probable cause?
12  A.      Yes.
13  Q.      Is there any reason that he got assigned
14  to that?
15  A.      Usually, when you're in training, they
16  have you do the paperwork for training purposes.
17  Q.      Is he still with the force?
18  A.      He is with the Upper Darby Police
19  Department.
20  Q.      Okay.  Do you know why he switched?
21  A.      That's something you would have to ask
22  him.
23  Q.      Okay.  How long did he stay with Radnor?
24  A.      It was not very long.
25  Q.      Okay.  Less than a year?

OFFICER JENNIFER COCCO

JOB NO. 1501917

MARCH 20, 2025

Page 74

1  A.      Yes.

2  Q.      Okay.  You were the principal witness, and
3  he was the scribner, is that how it went?

4  A.      I guess if you say it like that, yeah.
5  Yes.

6  Q.      I think you referenced in the video that
7  you would call the owner.  Did you have his
8  telephone number?  Did he ever call you directly?

9  A.      He never called me directly.

10  Q.     Were you provided with his number by
11  someone?

12  A.     If I had his number, it was from the
13  report from Friday, and it was put in that.

14  Q.     Do you know who would have done that?

15  A.     I don't know.  I think it would be on the
16  report who did it.  I don't know.

17  Q.     My understanding is you said that you may
18  have spoken to Brydzinski after the incident, but
19  that's about it?

20  A.     Yes.

21  Q.     That one time?

22  A.     Yes.  It was either once or twice.  It was
23  either on both days, or on one or the other, either
24  day, and it would be noted in a report.

25  Q.     When you went through her black bag, other

Page 75

1  than those two orders did you see anything else of
2  interest to you, or something that would motivate
3  you to take other actions?  No?

4  A.      I can't remember.

5  Q.      Okay.  Do you remember what you looked at,
6  what was in the bag?

7  A.      No.

8  Q.      Did you ever have a circumstance in your
9  past, that is in the last 20 years, where you had to
10  verify an individual's legal right to be on the
11  property?

12  A.     Not that I can recall.

13  Q.     So this would be a first?

14  A.     I don't remember.

15  Q.     Okay.  During this what I will call the
16  Ockley instance or matter, did you have
17  conversations with the people from code enforcement?

18  A.     No.

19  Q.     No?  Do you know if anybody else did?

20  A.     No.

21  Q.     The condemnation notice has a person's
22  business card attached to it.  Did you see that, or
23  a copy of one, that was taped to the garage?

24  A.     Ms. Ockley removed them, every single item
25  of condemnation from the building.

Page 76

1  Q.      Okay.  And did you find them later?

2  A.      I can't remember where I found them, but
3  she removed them.

4  Q.      Okay.

5              MR. SCHROM:  Why don't you mark
6         this one.  This is six.

7              (P-6 was introduced and marked for
8         identification.)

9  BY MR. SCHROM:

10  Q.     I'm showing you a document marked --
11  previously marked P-6.  Can you identify that?

12  A.     It's the, I guess, the legal notice that
13  was on the structure at 416 South Ithan Avenue.

14  Q.     All right.  Yeah, thank you.  I don't know
15  whether you can read that, but there's a card, it's
16  looks like a business card?  Who is --

17  A.     Yeah, I only know who it is because I work
18  with Andy, so it's Andy Pancoast from the code
19  enforcement.

20  Q.     Did you have any conversations with him
21  regarding this incident?

22  A.     Again, I was brought to the property from
23  conversations Lieutenant Pinto had, so I don't know
24  what conversations he had prior to us going there.

25  Q.     Okay.  This is exhibit seven.

Page 77

1              (P-7 was introduced and marked for
2         identification.)

3  BY MR. SCHROM:

4  Q.      I'm showing you a document marked P-7.
5  Can you identify that?

6  A.      It's my supplemental report for the
7  incident on --

8  Q.      Okay.  And I think that you talked about
9  paragraph one, but why don't you read paragraph two
10  into the record, if you would, starting with I did?

11  A.     I did contact homeowner Jeff Brydzinski
12  about the possibility Ockley could be released from
13  the hospital if the crisis doctor did not think she
14  needed assistance.  Brydzinski advised she was
15  having contractors board up -- he was having
16  contractors board up all entrances and requested
17  added patrol to the residence.  Brydzinski advised
18  no one should be at the house after dark or over the
19  weekend.  Brydzinski is also putting a new
20  no-trespassing and condemned signs at the home.
21  Brydzinski is demolishing the home in the next two
22  weeks and Ockley being in the home is unsafe.

23  Q.     Okay.  So does that refresh your
24  recollection regarding your interaction with
25  Brydzinski?

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 78

1  A.      Just that I contacted him and advised that
2  she could -- yeah, it's self-explanatory.
3  Q.      Okay.  And do you recall anything else
4  that Brydzinski told you, other than what you noted
5  here?
6  A.      No.
7  Q.      Do you know whether or not he said that he
8  was aware of the court orders, or anything like
9  that?  Was there any conversation regarding that?
10 A.      Again, that's the only conversation I had
11 with him.
12 Q.      Okay.
13               MR. SCHROM:  Mark this one.
14               (P-8 was introduced and marked or
15       identification.)
16               MR. SCHROM:  Thank you.
17 BY MR. SCHROM:
18 Q.      I'm showing you a document marked P-8.
19 Can you identify that, please?
20 A.      It is the police criminal complaint filed
21 against Simona Ockley by Officer Brian Brown on the
22 13th of August '22.
23 Q.      Okay.  Are you familiar with this
24 document?
25 A.      I believe I've seen it, yes.  I read it

Page 79

1  prior to this.
2  Q.      Okay.  So that was one of the documents
3  you reviewed --
4  A.      Yes.
5  Q.      -- before the hearing?
6  A.      Um-hum.
7  Q.      Okay.
8               MR. GONZALES:  Before the
9          hearing?  You mean --
10              MR. SCHROM:  I'm sorry.
11              MR. GONZALES:  -- before the
12         deposition?
13 BY MR. SCHROM:
14 Q.      So the answer is yes?
15 A.      Yes.
16 Q.      Does P-7 appear to be a true and correct
17 copy of that?
18 A.      Yes.
19              MR. GONZALES:  It's P-8.
20              MR. SCHROM:  P-8.  Thank you.
21 BY MR. SCHROM:
22 Q.      P-8 appear to be a true and correct copy?
23 A.      Yes.
24 Q.      So let's just take a moment to go through
25 it.  As a consequence of all of what you testified

Page 80

1  to, you believe that there were crimes committed
2  and -- that Ockley should be charged with; is that
3  correct?
4  A.      Yes.
5  Q.      And what were those crimes, and why don't
6  you go through them one at a time and tell us
7  what -- why you think they were appropriate?
8  A.      I believe --
9  Q.      You can start with page --
10 A.      Three?  3503, which is criminal trespass,
11 entering structure, not adapted for overnight
12 accommodation, and defiant trespass, actual
13 communication to the actor.  And then, criminal
14 mischief, damaging property, that's 3304, Title 18.
15 Q.      Okay.  Let's go to the very first one.
16 What do you believe -- why did you believe that
17 criminal trespass, entering a structure, was
18 appropriate?
19 A.      Because she was not licensed or privileged
20 to be at the property.
21 Q.      And even after you read the judge's order,
22 you didn't believe that this should be rescinded,
23 correct?
24 A.      Yes.
25 Q.      Okay.  And number two?

Page 81

1  A.      Burglary, not adapted.  She attempted to
2  enter the home, after being told she was not allowed
3  to, by removing plywood off of the garage.
4  Q.      Any other reason?
5  A.      No.
6  Q.      Do you think that she physically removed
7  the plywood herself?
8  A.      I can't answer that question.  I was not
9  there.  For me to think is speculating.
10 Q.      Because she didn't seem to be in the best
11 health, that's what you said.
12              MR. GONZALES:  That's not a
13         question.  That's a statement.
14              MR. BARTOS:  Objection.
15              MR. GONZALES:  Objection.
16 BY MR. SCHROM:
17 Q.      Yeah.  You indicated that you had to get a
18 gurney to get her off the property, right?
19 A.      Yes.
20 Q.      And did she seem capable to you of
21 handling tools, or dealing with plywood at the time?
22 A.      If I was there, I could answer that
23 question, at the time of the plywood being removed,
24 but I was not there, so I'm not going to speculate
25 whether she did it or not.

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 82

1  Q.        Okay.  So you don't know whether she did
2  it or not?
3  A.        Yes.
4  Q.        Is that right?
5  A.        Yes.
6  Q.        But you still charged her?
7  A.        Yes.
8  Q.        And the next?
9  A.        Defiant trespass, actual communication,
10 she was told she could not return to the property,
11 that means any part of the property.
12 Q.        Okay.  By Radnor police officers, correct?
13 A.        Yes.
14 Q.        Okay.  And the next?
15 A.        And the criminal mischief, she damaged the
16 property.
17 Q.        And how did she do that?
18 A.        By possibly taking the plywood or
19 directing someone to do so.
20 Q.        Anything else?
21 A.        No.
22 Q.        Okay.  And other than what you've
23 testified to regarding defiant trespass, actual
24 communication to, were there any other reasons other
25 than what you gave?

Page 83

1  A.        No.
2  Q.        Would you agree that Radnor Police, and
3  you and Officer Brown were instrumental in causing a
4  criminal proceeding to be initiated against Simona
5  Ockley?
6  A.        Can you clarify that question?
7  Q.        Yeah.  I mean, you brought a criminal
8  proceeding against Simona Ockley, right?
9  A.        Yes.
10 Q.        Okay.  And it resulted in her arrest?
11 A.        Yes.
12 Q.        And ultimately that proceeding was
13 terminated in her favor, correct?
14 A.        According to court documents, yes, I just
15 found out the other day.
16 Q.        Okay.  You don't have any reason to
17 dispute those court documents, do you?
18 A.        I wasn't there, and I was not aware that
19 they got dismissed.
20 Q.        Okay.  Do you know what probable cause is?
21 A.        Yes.
22 Q.        Okay.  What's probable cause?
23 A.        It is the belief that someone -- a
24 reasonable belief that someone has committed a
25 crime, and it is basically what leads my decision

Page 84

1  making on whether to arrest or not.
2  Q.        And you indicated previously that you
3  didn't believe that the judicial orders affected
4  that decision making; is that correct?
5  A.        Yes.
6  Q.        Other than that, what you testified to in
7  P-8 by going through the individual crimes, do you
8  have any other reason for believing there was
9  probable cause for each of those?
10 A.        No.
11 Q.        And it's your understanding that those
12 judicial orders didn't remove any of your authority
13 to arrest her prior to September 1st, correct?
14         MR. GONZALES:  Objection.  I
15         think we've covered this pretty
16         extensively.
17         MR. SCHROM:  This is slightly
18         different.
19         MR. GONZALES:  Yeah, I don't see
20         that it is, but, again, I'm not
21         instructing her not to answer, she can
22         answer it again if she can.
23         THE WITNESS:  I mean, yeah, I
24         already answered that it's a civil order.
25         It had irrelevance on the safety concerns

Page 85

1         we had for Ms. Ockley.
2  BY MR. SCHROM:
3  Q.        Who was the person cutting the tree down
4  at the same time; do you remember?
5  A.        No.
6  Q.        You said there was a company there?
7  A.        Yes.
8  Q.        Did they have trucks?
9  A.        There was numerous trucks on location,
10 yes.
11 Q.        Did they have -- were they in the process
12 of cutting trees down?
13 A.        I can't remember.
14 Q.        Do you know if they had any like large
15 trucks or cranes?
16         MR. GONZALES:  I'm just going to
17         object and clarify which day are we
18         talking about?
19         MR. SCHROM:  Either day.
20         MR. GONZALES:  Okay.  Did you
21         understand that when you were answering
22         the questions?
23         THE WITNESS:  No.
24 BY MR. SCHROM:
25 Q.        Okay.  When you were there regarding the

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 86

1  302 incident, and the next day during the arrest, do
2  you recall any cranes on the property?
3  A.        There were large trucks from a tree
4  company that I don't remember, but there were large
5  trucks on location.  I don't remember what was on
6  them, what kind of trucks they were, but you could
7  definitely tell they were there to take trees down,
8  if that makes any sense.
9  Q.        And did they stay on the property during
10 the time you were there?
11 A.        Yes, and I -- yeah, I can't remember if
12 they were told to stop, or by -- I don't know who
13 they were told to stop by, but they were not
14 currently working when we were on location for
15 safety reasons.
16 Q.        So at some point they were told they can't
17 continue?
18 A.        Yes.
19 Q.        Do you know who told them that?
20 A.        No.
21 Q.        Do you think it was somebody from the
22 police department, or you're not certain?
23 A.        I don't know.
24              MR. SCHROM:  Okay.  I'll just
25          take two minutes, and then I'm just about

Page 87

1          done.
2              VIDEOGRAPHER:  Off the record at
3          12:30.
4          (At this time, a short break was
5      taken.)
6              VIDEOGRAPHER:  We're back on the
7          record at 12:37.
8              MR. SCHROM:  Thank you for your
9          answers, nothing additional at this time.
10         I reserve the right to recall, if
11         necessary.
12 BY MR. BARTOS:
13 Q.        Thank you.  Officer Cocco, my name is Todd
14 Bartos.  We were introduced prior to the deposition
15 today.  I represent Mr. Brydzinski, Mr. Prete and
16 Rockwell-Glynn, LP who are defendants in this action
17 that Ms. Ockley has commenced.  I have a few
18 questions for you.  Again, as you've been doing, if
19 you don't know something, just tell me you don't
20 know it.  If you do an uh-huh, uh-uh, a nod, a
21 shrug, I'll just remind you we need a verbal answer.
22 Again, I'm not trying to be rude.  I just want to
23 make sure we have an accurate record here.  If
24 there's something in my question that doesn't make
25 sense, there's -- I don't have many questions, but

Page 88

1  there's a good chance something I will say may not
2  make sense, that's fine, just tell me you don't
3  understand it; is that fair?
4  A.        Yes.
5  Q.        Officer Cocco, in terms of this
6  particular, you know, what's been referred to as the
7  incident, I'll refer to the time period between the
8  9th of August and 13th of August 2022, so I'm
9  talking just about that timeframe generally.  To the
10 best of your recollection, when you were on site on
11 the 12th of August 2022, were you still -- was the
12 property still under active condemnation?
13 A.        Yes.
14 Q.        To the best of your recollection, as of
15 August 12, 2022, was it your understanding when you
16 were on the property at 416 South Ithan, that
17 Ms. Ockley was no longer the record owner of that
18 property?
19 A.        Yes.
20 Q.        To the best of your recollection, as of
21 August 12, 2022, was anyone permitted to live in
22 that property at 416 South Ithan for any reason?
23 A.        No.
24 Q.        Why not?
25 A.        I'm sorry, you cut out.  You said why not?

Page 89

1  Q.        Why not?
2  A.        The house was condemned.  It was
3  unlivable.  There was no running water.  They
4  actually I believe turned off the PECO, because it
5  wasn't being used, and they were going to demolish
6  it, and you have to turn -- get the meter turned
7  off.
8  Q.        If a homeowner in Radnor Township in
9  August of 2022 is concerned that there may be a
10 person living in a condemned structure on their
11 property, would you as a police officer hope and
12 expect that that citizen would contact the police to
13 address the issue and not engage in self-help?
14 A.        Yes.
15 Q.        Did you ever see as of August 12, 2022 any
16 order or other paperwork from the township or any
17 court that dissolved the active condemnation on 416
18 South Ithan?
19 A.        No.
20 Q.        As of August 12, 2022 -- let me see if I
21 can show this, I -- see if I can get this to work.
22              VIDEOGRAPHER:  Are you sharing
23          your screen?
24              MR. BARTOS:  I am.
25              VIDEOGRAPHER:  All right.  Let

Page 90

1              me make sure you have the permissions and
2              everything.  Okay.
3    BY MR. BARTOS:
4    Q.        Officer Cocco, I'm just showing you --
5    this is --
6    A.        I can read it.
7                   MR. GONZALES:  You can read it?
8              Wow.  You have good eyesight.  Sorry.
9    BY MR. BARTOS:
10   Q.        It's an August 9th -- excuse me -- an
11   August 9, 2022 document.  For the record, it's
12   Radnor Defendants 023.  You talked earlier about a
13   Faust report?
14   A.        Yes.
15   Q.        Or words to that effect.  Is this, in
16   fact, starting on page 23 of the Radnor Defendants
17   document production, the Faust report that you
18   discussed earlier today?
19   A.        Yes, sir.
20   Q.        And then, going to the second page, which
21   is, for identification, Defendants 24, there's
22   involved persons at the top.  It says contact
23   Luke -- or Attanasi, Luke, do you see that?
24   A.        Yes.
25   Q.        And then, underneath that, Ockley, Simona?

Page 91

1    A.        Yes.
2    Q.        Do you see that?
3    A.        Yes.
4    Q.        And then, under here it says division,
5    patrol, Sergeant Michael Fischer?
6    A.        Yes.
7    Q.        And is Sergeant Fischer the same Sergeant
8    Fischer we've been talking about today?
9    A.        Yes.
10   Q.        Is there only one Sergeant Fischer in the
11   Radnor Township -- was there only one Sergeant
12   Fischer in the Radnor Township Police Department in
13   August of '22?
14   A.        There was and is, and only one Sergeant
15   Fischer in the Radnor Police Department.
16   Q.        And the narrative that's here now on page
17   25, when it says C, and then a colon, do you know
18   what that means, that abbreviation?
19   A.        It's basically the complainant, who is
20   Mr. Attanasi.
21   Q.        Mr. Attanasi came into Radnor Township
22   Police Department, RTPD, to report police
23   information?
24   A.        Yes.
25   Q.        And I'm just going to read this into the

Page 92

1    record, just make sure I read this correctly, but --
2    "Report, Attanasi of Rockwell Custom Renovations
3    states that his company is the new owner of the
4    property at 416 South Ithan Avenue and has received
5    a court order stating that current resident Simona
6    Ockley must vacate the property.  Attanasi also
7    noted that the property has been deemed
8    uninhabitable by Radnor Township codes.  Attanasi
9    provided a copy of the order from the Delaware
10   County Court of Common Pleas stating that Ockley
11   must remove her property by 9/1/2022.  Attanasi
12   stated that he and Township Community Development
13   Director Kevin Kochanski would be meeting Ockley at
14   the residence shortly for the removal of property.
15   Attanasi advised that he wanted police to be aware
16   of the circumstances, but did not need assistance at
17   this time.  The court document was uploaded to the
18   attachments folder Faust 129."  Did I read that
19   correctly?
20   A.        Yes.
21   Q.        Is Faust 129, is that the officer's badge
22   number?
23   A.        Yes.
24   Q.        In terms of the attachments folder, and
25   the court document being uploaded, is that something

Page 93

1    that would be available to officers in the field, or
2    only to officers at the station?
3    A.        It should be available on the field, but I
4    believe this is our -- I can't remember if this is
5    our old or new reporting system, but depending on
6    our computers, and if they're working that day, you
7    can get them on the field, but usually it's easier
8    to get them from the station.  I can't tell if --
9    this might be Code E (ph) or alert.
10   Q.        And in terms of the court order, and we've
11   looked at those today, as counsel for Ms. Ockley was
12   asking you some questions, to the best of your
13   understanding as of August 2022, did either of the
14   court orders that were presented to you as P-1 and
15   two for identification here today, did either of
16   those permit -- well, did either of those dissolve
17   the condemnation?
18   A.        No.
19   Q.        Did either of those orders compel the
20   record owner of the property to allow a third party
21   to reside in the residence?
22   A.        No.
23   Q.        And if I understood correctly in P-3, the
24   condemnation posting, it was -- there was access
25   that would be permitted between is it 8:00 a.m. and

Page 94

1  4:00 p.m. with --
2  A.      Yes.
3  Q.      And is that access overseen by the
4  township?
5  A.      Township, yes, and police on weekends --
6  on weekends, like some time -- yes.
7  Q.      All right.  And why is it -- what is -- as
8  of August of '22, what was your understanding as to
9  why either someone from the township or the police
10 would have to be involved in a person accessing a
11 condemned structure?
12 A.      It was to prevent them from being harmed,
13 because it's condemned for a reason.  It's condemned
14 for safety reason in that it is -- nobody should be
15 living there in fear that something would happen to
16 them, so we have to make sure that we let them in,
17 and they cannot stay overnight due to the safety
18 concerns.
19 Q.      Bear with me one moment.  And, I
20 apologize, I forget which document number, exhibit
21 number this is.  I'll have to defer to counsel on
22 that.  I'm specifically looking at page 31 of the
23 Radnor Defendant's production, which you looked at
24 earlier, Officer Cocco, which is your supplemental
25 narrative.

Page 95

1  A.      Yes.
2          MR. GONZALES:  It's exhibit P-7,
3  just for the record.
4          MR. BARTOS:  Thank you, Counsel.
5  Exhibit P-7 for the record.
6  BY MR. BARTOS:
7  Q.      When would this narrative -- how is this
8  narrative constructed?  Is it dictated?  Do you type
9  it?
10 A.      I type it.
11 Q.      And we talked -- counsel had asked you a
12 number of questions about the court order, and I
13 just want to -- I'm going to read in the middle of
14 the first paragraph, one, two, three -- six,
15 seven -- eight lines down.  We attempted to explain
16 to Ockley the home was not only condemned but
17 legally not hers anymore.  Ockley kept stating she
18 has a court order, and she can be inside the home.
19 The court order Ockley is speaking about states the
20 home is condemned, and she is able to get belongings
21 out of the home, as it is not owned by her anymore.
22 Ockley was given several attempts to leave
23 voluntarily, but kept shouting the police were in
24 her home, quote, fraudulently, close quote.  Did I
25 read that accurately?

Page 96

1  A.      Yes.
2  Q.      And certainly if there's other parts you
3  need to refer to, please do so.  My question is the
4  fraudulently in quotes, is that something that would
5  be a direct word that Ms. Ockley used?
6  A.      Yes.  Usually, when I types incidents, if
7  someone says something, I would put it in quotes.
8  It would be a direct quote from her.
9  Q.      And based on this narrative, do you
10 believe that in August of 2022 when you wrote this
11 narrative, that you were aware of at least one, if
12 not both, court orders, and the text of those orders
13 that you've seen as P-1 and P-2 here today?
14 A.      Yes.  I don't -- as I said before, I don't
15 recall when or if I was told about court orders.  I
16 don't remember if I saw them, or was told by the
17 lieutenant who was dealing with it, if he spoke to
18 codes and -- I don't know when, but according to the
19 report I at least knew there was at least one court
20 order, and like I said, that could have been me
21 hearing it from Lieutenant Pinto, so I don't recall,
22 again, like when I saw those orders.
23 Q.      In terms of the chain of command, once
24 Lieutenant Pinto has made a decision and directed
25 you to do something, is it your job to then redo all

Page 97

1  of Lieutenant Pinto's investigative work and
2  assessments to make sure that what he was asking you
3  to do was actually appropriate?
4  A.      No.
5  Q.      Why not?
6  A.      He's a lieutenant.  He is trained the same
7  way I am, and he's my superior officer, so I have to
8  trust his judgment and experience to do so, and I
9  followed his orders to do so.
10 Q.      Bear with me one moment.  I apologize.
11 I'm trying to -- the last thing I want to go
12 through, Officer Cocco, unless, you know, there's
13 follow up from other counsel, is the affidavit of
14 probable cause itself.  I believe you were asked
15 some questions about the criminal complaint.  In
16 terms of the affidavit of probable cause itself,
17 which is Plaintiff's 49 in the initial Rule 26
18 disclosures, is this affidavit of probable cause
19 typed by you?
20 A.      No.  It was typed by Officer Brown, but I
21 believe we -- he was asking me as he was typing what
22 conspired that day.
23 Q.      And --
24 A.      The day before and -- yeah.
25 Q.      And in reviewing the affidavit of probable

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

Page 98

1  cause here today, is there anything in the affidavit
2  of probable cause that you believe that Officer
3  Brown got wrong in his factual recitation of what
4  occurred, based on your personal observations on the
5  12th and 13th of August 2022?
6  **A.        The only thing I can see is that -- that I**
7  **said at the request of the homeowner to check the**
8  **residence, we were told to check it as a police**
9  **department well -- as well, just to make sure no one**
10 **was gaining access to the -- to the residence.**
11 Q.      So there were actually two reasons --
12 **A.      Yes.**
13 Q.      -- instead of just --
14 **A.      Yes.**
15 Q.      Officer Cocco, those are all the questions
16 I have for you at this moment.  I certainly reserve
17 the right to follow up, but, again, I do appreciate
18 your time here today and thank you.
19 **A.      Thank you.**
20         MR. GONZALES:  I have no
21       questions.
22         VIDEOGRAPHER:  All right.
23       Should I go off the video?
24         MR. SCHROM:  No.  I may just
25       have one.

Page 99

1  BY MR. SCHROM:
2  Q.      Officer Cocco, did you ever have an
3  opportunity to see the transcript of the proceeding
4  from Rockwell-Glynn to Simona Ockley?
5  **A.      No.**
6  Q.      So if I were to represent to you that the
7  judge, that is Judge John J. Whelan, was aware of
8  the condemnation, and the statement from counsel
9  that it is no longer fit for habitation, as of page
10 eight, would that change your mind regarding any of
11 the prior statements that you made?
12 **A.      No.**
13         MR. SCHROM:  Nothing additional.
14         MR. GONZALES:  Todd, any further
15       questions?
16         MR. BARTOS:  Just a quick
17       followup.
18 BY MR. BARTOS:
19 Q.      Officer Cocco, counsel was asking you
20 about the transcript, and if I represent to you that
21 in the transcript the court states that she could,
22 or at least the language the court states on page 45
23 of the transcript, line 22, after Mr. Herman says,
24 "Judge, she can't move in there, Radnor Township
25 will not allow" -- and then there's an inaudible,

Page 100

1  the judge says, "Well, that's fine, but I don't know
2  if she goes in and fixes up, if -- that's a
3  different issue."  Were you aware that the judge
4  stated on the record those words?
5  **A.      No, I was not aware.**
6  Q.      As counsel asked you, does that change
7  your opinion about whether the court orders lifted
8  the condemnation without any further action being
9  undertaken by Ms. Ockley?
10 **A.      No.**
11         MR. BARTOS:  Thank you.  Nothing
12       further.
13         MR. SCHROM:  Nothing additional.
14         VIDEOGRAPHER:  All right.  Off
15       the video?
16         MR. GONZALES:  Yep.
17         VIDEOGRAPHER:  This concludes
18       today's testimony given by Officer
19       Jennifer Cocco in the matter of Simona
20       Ockley versus Township of Radnor,
21       Pennsylvania, et al.  We are off the
22       record at 12:57 Eastern Time.
23              -  -  -
24
25

Page 101

1         C E R T I F I C A T I O N
2
3         I, KIMBERLY WENDT, a Certified
4  Professional Reporter and Notary Public for the
5  Commonwealth of Pennsylvania, do hereby certify that
6  the foregoing is a true and accurate transcript of
7  the stenographic notes taken by me in the
8  aforementioned matter.
9
10              -  -  -
11
12
13
14
15
16
17
18
19         *Kimberly Wendt*
20         KIMBERLY WENDT
           Notary Public
21         My Commission Expires
           On January 15, 2027
22
23
24
25

Page 102

```
 1                  - - -
 2          E R R A T A   S H E E T
 3                  - - -
 4
 5   PAGE    LINE     CHANGE
 6   _____   _____    _____
 7   _____   _____    _____
 8   _____   _____    _____
 9   _____   _____    _____
10   _____   _____    _____
11   _____   _____    _____
12   _____   _____    _____
13   _____   _____    _____
14   _____   _____    _____
15   _____   _____    _____
16   _____   _____    _____
17   _____   _____    _____
18   _____   _____    _____
19   _____   _____    _____
20   _____   _____    _____
21   _____   _____    _____
22   _____   _____    _____
23   _____   _____    _____
24   _____   _____    _____
25
```

Page 103

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3        I,                    , do hereby certify
 4   that I have read the foregoing pages and that the
 5   same is a correct transcription of the answers given
 6   by me to the questions therein propounded, except
 7   for the corrections or changes in form or substance,
 8   if any, noted in the attached Errata Sheet.
 9
10
11
12
13
       _____          _____
14     Date                 Signature
15
16
17     Subscribed and sworn to before me this _____ day
       of  _____ 20___.
18
19     My commission expires: _____
20
21     _____
       Notary Public
22
23
24
25
```

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

### Exhibits

Exhibit P-1  4:12
Exhibit P-2  4:13
Exhibit P-3  4:14
Exhibit P-4  4:15
Exhibit P-5  4:16
Exhibit P-6  4:18
Exhibit P-7  4:19 95:2,5
Exhibit P-8  4:20

### $

$490,000.00  11:19

### 0

023  90:12
04  42:4

### 1

1  11:22,24 13:23,25 14:4
100  69:25
10:20  5:3
11  11:9 40:8
11:01  40:12
11:17  54:7
11:39  54:11
12  88:15,21 89:15,20
129  92:18,21
12:30  87:3
12:37  87:7
12:57  100:22
12th  16:18 88:11 98:5
13th  78:22 88:8 98:5
15  49:17
15th  9:24 10:20 11:13
13:17

18  53:17 80:14
19085  11:16
1976  50:8
1st  30:2 56:4 84:13

### 2

20  5:4 41:2,3 42:7,14,22
44:15 75:9
2004  42:5
2005  35:8 42:3
2007  35:10
2022  11:9,13,22,24 13:15,
23,25 14:4 25:2 26:20
88:8,11,15,21 89:9,15,20
90:11 93:13 96:10 98:5
2022-004275  13:14
2024  41:9
2025  5:4
22  41:14 78:22 91:13 94:8
99:23
23  90:16
24  42:21 90:21
25  91:17
26  26:20 97:17
2:24-cv-04070  5:11

### 3

302  9:5 19:4,5,8,18,23,25
20:11,15 23:24 35:22 36:4,
6,14,15,23 37:6,11 47:23
60:25 64:18 67:1 71:17
86:1
302'd  36:15 38:8
302s  36:2
31  94:22
3304  80:14
3503  80:10
39282  5:23

### 4

4  5:13
416  11:15 13:21 69:17
71:24 76:13 88:16,22
89:17 92:4
45  99:22
49  97:17
4:00  16:8 56:17 94:1

### 7

72  38:9
72-hour  37:14,19
7201  50:8
7302  50:9

### 8

8:00  16:8 93:25

### 9

9  90:11
9/1/2022  92:11
9th  13:14 88:8 90:10

### A

a.m.  5:3 93:25
abandoned  11:24
abbreviation  91:18
ability  36:22 59:2
Absolutely  17:7
academy  35:7 40:15
42:6 43:3,6,9 44:8,24
acceptable  6:19 7:1,5,
21 8:11
access  11:20 13:21,25
14:2,3 16:5 27:24,25 34:16
37:4 56:4,8,9,15,16 93:24

94:3 98:10
accessing  94:10
accidents  60:4
accommodate  51:4
accommodation
80:12
accuracy  41:12
accurate  87:23
accurately  95:25
act  29:6,13 50:8
acting  56:21,22,24 57:2,
4
action  11:6 13:12 69:12,
13 87:16 100:8
actions  30:6 52:1 68:12,
15 69:3 75:3
activated  18:24
active  44:16 46:14,15,21,
23 88:12 89:17
actively  43:21 44:4 45:8
59:2
activity  59:9 69:8
actor  80:13
actual  8:8 18:25 80:12
82:9,23
adapted  80:11 81:1
add  24:23
added  63:17 77:17
additional  13:24 30:22,
23 35:16 38:17 56:3 62:9
65:5 87:9 99:13 100:13
address  89:13
advanced  11:10
advised  61:3 77:14,17
78:1 92:15
affected  84:3
affidavit  39:1,5 73:10
97:13,16,18,25 98:1
afraid  34:12,13
aggression  52:2 54:1

**agitated** 51:24

**agitation** 52:1 53:25

**agree** 7:23 8:12 47:3 51:21 83:2

**agreeable** 6:15

**agreeing** 69:3

**agreement** 52:24 56:25 57:2

**ahead** 55:10

**Alan** 5:16

**alert** 93:9

**allowed** 6:23 26:8 28:18 30:7,11 38:1 81:2

**ambulance** 33:25

**amount** 11:19

**ample** 33:14

**and/or** 14:1 56:7

**Andy** 76:18

**annoy** 7:17

**answering** 42:12 85:21

**answers** 87:9

**anymore** 34:17 95:17,21

**apologize** 72:24 94:20 97:10

**apparent** 27:20

**apparently** 33:22

**appearing** 11:12

**appears** 41:21

**applicable** 8:2,14 36:3 46:1,18 50:9

**applied** 57:10,16

**approximate** 11:19

**approximately** 32:24

**April** 25:1,11 26:20 33:23

**Aqua** 25:9

**arguments** 11:10

**arrest** 12:3 14:12,19 17:20,21 18:2 19:2 20:7 21:15,16 22:21 24:1 32:21 33:8 48:7 52:13,15,19

53:15 60:21 83:10 84:1,13 86:1

**arrested** 13:7 14:6 28:21 29:14 33:16 34:3,16 62:25 63:5 73:5

**arresting** 8:23

**arrests** 51:8

**arrival** 69:17

**arrive** 64:22

**arrived** 29:20 64:25 65:1 70:17 73:3,6

**aspects** 36:2 65:15

**asserted** 8:11

**assessments** 97:2

**assigned** 73:13

**assist** 43:20

**assistance** 56:11 77:14 92:16

**attached** 75:22

**attachments** 92:18,24

**Attanasi** 90:23 91:20,21 92:2,6,8,11,15

**attempted** 29:16,18 30:21 52:18 81:1 95:15

**attempting** 25:9 27:10 28:20 30:9,12

**attempts** 95:22

**attention** 49:7 59:12

**attorney** 31:3 32:2

**attorneys** 8:7

**August** 13:15 69:24 78:22 88:8,11,15,21 89:9, 15,20 90:10,11 91:13 93:13 94:8 96:10 98:5

**authenticity** 41:13

**authority** 31:7 84:12

**Avenue** 11:15 76:13 92:4

**aware** 9:6 16:24 21:12 22:9 36:12 67:21 72:19 78:8 83:18 92:15 96:11 99:7 100:3,5

## B

**bachelors** 35:5

**back** 10:12 25:6,7,23 28:23 29:17 30:12 32:12, 25 33:23,25 34:11 37:21 40:11 42:3,14 54:10 55:21 56:17 63:13,14,19 69:20, 21 87:6

**backed** 60:3

**background** 35:2,3 73:8,9

**bad** 7:16

**badge** 92:21

**bag** 32:12 74:25 75:6

**bags** 31:10 70:1

**bandage** 70:9

**barely** 25:15

**barriers** 46:15,16,23

**Bartos** 6:1,2 28:3 30:4 68:8 81:14 87:12,14 89:24 90:3,9 95:4,6 99:16,18 100:11

**base** 24:14

**based** 7:25 18:25 20:4 56:15 96:9 98:4

**basic** 40:20 41:5 43:1,20 46:11

**basically** 24:25 36:24 50:19 51:6 83:25 91:19

**bathed** 70:8

**Bear** 94:19 97:10

**begged** 24:6

**begin** 5:4

**begins** 46:10

**behalf** 5:17,23,25

**behavior** 50:14

**belief** 83:23,24

**believes** 7:20

**believing** 84:8

**Bell** 73:7

**belonged** 58:23

**belongings** 34:17 95:20

**bench** 54:23 55:19

**benefits** 46:14

**bit** 18:17

**black** 74:25

**block** 43:18

**board** 77:15,16

**body** 20:22

**Botel** 5:13

**bottom** 41:9

**break** 29:18 54:4,8 87:4

**Brian** 78:21

**broke** 63:12

**broken** 33:22

**brought** 76:22 83:7

**Brown** 32:8,22 38:25 73:2,4,5 78:21 83:3 97:20 98:3

**Brydzinski** 6:4 25:3,4,5 30:8,21 61:2,11,21 62:21 63:9 66:13,20 72:3,7 74:18 77:11,14,17,19,21,25 78:4 87:15

**building** 56:13 75:25

**bunch** 58:4

**Burglary** 81:1

**business** 75:22 76:16

## C

**cable** 25:7

**cadet** 43:19

**call** 16:4 18:24,25 23:6,9 56:16,17 62:14 74:7,8 75:15

**called** 16:13 20:16 24:3 42:20 43:5 60:24 64:20 70:11,12,13,14,15 71:8,20 74:9

**calling** 64:20

**calls** 34:15

**calm** 51:2

**calming** 51:6

**calmly** 51:23

**cameras** 18:23

**cams** 20:22

**cane** 33:22

**capable** 81:20

**card** 75:22 76:15,16

**care** 37:1,8

**career** 54:13

**case** 5:8,10 8:2,14 21:12, 14,15 22:9

**category** 45:18

**causing** 83:3

**certified** 45:1

**chain** 96:23

**chance** 88:1

**chances** 25:20,22

**change** 99:10 100:6

**changed** 40:24 42:19

**changing** 66:11

**characteristics** 46:12, 18

**characterization** 47:4

**characterize** 50:13 59:1,2,8,10,12,13,15,16

**charged** 53:19 80:2 82:6

**check** 98:7,8

**checking** 39:24

**Chester** 35:4

**chronological** 10:1

**circumstance** 58:14 60:2 75:8

**circumstances** 45:14 92:16

**citizen** 89:12

**civil** 8:1,14 11:6 13:12 54:24 55:1 56:21 57:3 58:24 84:24

**claiming** 64:1

**clarification** 31:20 32:1

**clarify** 83:6 85:17

**class** 35:25 43:22

**clear** 67:8

**client** 8:16

**close** 95:24

**co-owner** 62:19

**Cocco** 5:5 6:8 8:21 87:13 88:5 90:4 94:24 97:12 98:15 99:2,19 100:19

**code** 16:4 75:17 76:18 93:9

**codes** 92:8 96:18

**collectively** 69:4

**colon** 91:17

**command** 96:23

**commenced** 87:17

**commit** 50:6

**committed** 50:11 80:1 83:24

**committing** 24:9

**Common** 11:3,5 13:11 27:1,5,8 30:16 54:15,19,24 55:3 58:15 92:10

**communicating** 51:23

**communication** 46:3, 13 80:13 82:9,24

**communications** 8:16

**Community** 92:12

**company** 11:17 30:9 71:20,23 85:6 86:4 92:3

**compel** 93:19

**complainant** 91:19

**complaint** 11:7 38:25 78:20 97:15

**complete** 44:24

**completely** 21:11

**computers** 93:6

**concern** 28:19

**concerned** 61:8 89:9

**concerns** 45:11 51:25 53:25 84:25 94:18

**concert** 69:3

**concludes** 100:17

**condemnation** 26:19, 21,22,24 27:1,5,21 33:23 48:5 52:24 56:12,14,24 57:8,15 58:1,4,15,17 60:21 75:21,25 88:12 89:17 93:17,24 99:8 100:8

**condemned** 39:13,21 47:15 53:9 57:7 61:23 65:18 66:8 77:20 89:2,10 94:11,13 95:16,20

**condition** 70:3

**conducted** 7:16

**confirm** 23:6

**conflict** 27:20

**conform** 50:7

**confused** 16:17

**confusion** 36:19

**consequence** 79:25

**consequences** 67:22 68:3

**consideration** 10:23 11:7 13:15

**considered** 8:9

**consistent** 50:15

**conspired** 97:22

**consternation** 68:19

**constructed** 95:8

**consultation** 8:6

**consulting** 8:5

**contact** 63:22 64:7,8 66:19 71:16,25 77:11 89:12 90:22

**contacted** 22:4 78:1

**continue** 86:17

**contractors** 77:15,16

**conversation** 78:9,10

**conversations** 75:17 76:20,23,24

**conveying** 56:25

**copies** 10:4

**copy** 10:8 40:1 41:4 75:23 79:17,22 92:9

**copyright** 41:8

**correct** 8:24 12:4 15:5 17:1,5,10 21:13 22:21 23:7 27:2 29:9 30:2 31:11,18 32:21 37:25 40:17 41:4 42:25 45:3,18 46:21,24 47:16 48:8 50:21,22 57:11, 16 58:7,10,17 60:17 79:16, 22 80:3,23 82:12 83:13 84:4,13

**correctly** 92:1,19 93:23

**couch** 25:8 61:6 70:5

**counsel** 5:19 6:23 7:8, 10,13,19 11:11 17:4 27:19 93:11 94:21 95:4,11 97:13 99:8,19 100:6

**County** 11:4,6 13:12 35:6 92:10

**couple** 39:20 60:4

**courses** 42:13

**court** 5:9,16,18 6:5 7:14 8:22 9:6,10 10:19 11:3,5 12:8,11 13:11 21:13 27:1 54:15,19,23 55:2,3,4 78:8 83:14,17 89:17 92:5,10,17, 25 93:10,14 95:12,18,19 96:12,15,19 99:21,22 100:7

**covered** 84:15

**cranes** 85:15 86:2

**crazy** 38:4 71:13

**create** 73:10

**created** 41:10

**crime** 24:8 83:25

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

crimes 80:1,5 84:7

criminal 35:5 38:25 50:1 51:5,12,13 53:17 78:20 80:10,13,17 82:15 83:4,7 97:15

crisis 35:24 36:9 37:10, 17 64:21 70:11 77:13

criteria 58:5

critical 44:18 46:7

critically 43:22 45:9,14

cuff 34:2

cuffed 34:10

current 92:5

curriculum 43:2

Custom 92:2

cut 88:25

cutting 85:3,12

CV-2022-004275 11:6

**D**

D.J. 21:13

damaged 82:15

damaging 80:14

danger 25:16 37:7

Darby 35:8 73:18

dark 77:18

dated 34:23

day 11:13 13:14 16:17 17:6 18:3,8,21 21:22 22:11 24:1 28:22 30:6 33:8 52:9, 10,15 63:2 64:17,18,19,21 66:24 67:1,3,10,24,25 69:3,18 71:17 72:11 73:4 74:24 83:15 85:17,19 86:1 93:6 97:22,24

days 16:20,21 18:12 22:13,14 70:8 74:23

deal 35:21 36:1

dealing 49:19 81:21 96:17

decide 7:3

decided 58:22

decision 19:12,23,24,25 20:2 21:4,7 59:9 83:25 84:4 96:24

decisions 37:9

decreed 11:14

deed 11:15

deemed 11:24 16:2 25:10 26:7 37:5,10 92:7

deescalate 52:19

deescalation 49:24 50:20,24,25 51:20,23 53:22

defendant 11:5,10,17, 19,20 13:19,24 14:2 56:3,9

defendant's 13:15,19 94:23

defendants 5:25 87:16 90:12,16,21

defer 94:21

defiant 53:17 80:12 82:9, 23

definition 51:20

degrees 69:25

Delaware 11:4,5 13:11 35:6 92:9

delegate 36:11 37:10,17

delegates 70:17

delusional 71:10

demolish 89:5

demolishing 77:21

department 14:1 16:10 35:8,10 37:16 49:14,22 50:5 53:24 54:20 55:4 56:8 59:21 73:19 86:22 91:12, 15,22 98:9

departmental 49:19

depending 7:4 93:5

deponent 7:13,18

deponent's 7:19

deponents 8:7

deposition 5:5,11 7:15 8:6,8,17 38:21 79:12 87:14

describe 69:16

detail 59:13

determination 29:5 33:11 36:5,7,8,11 65:19 71:7

determine 49:3 62:13

determined 36:13

determining 8:10 65:12

develop 44:24

developing 43:20

Development 92:12

dictate 58:9

dictated 95:8

differently 57:23

dignity 49:24 50:11,20

direct 7:8 49:6 96:5,8

directed 23:20 53:16 96:24

directing 54:19 82:19

direction 23:23 24:4

directly 74:8,9

Director 92:13

dirty 70:6

disciplinary 69:12

disclosures 97:18

discover 7:19

discoverable 7:20

discuss 46:11 71:2

discussed 90:18

discussion 38:7 40:9

dismissed 83:19

disperse 11:18

dispute 83:17

disputes 64:10,11 65:8

dissolve 93:16

dissolved 89:17

district 5:9,10 31:3 32:2

disturbances 49:21

disturbed 49:1,16,23

divert 49:25 51:11

division 91:4

docket 13:16

doctor 37:13 77:13

document 9:17 10:16, 18 12:23,25 13:3,5 26:17 41:10 48:21,22 58:10 65:20 76:10 77:4 78:18,24 90:11,17 92:17,25 94:20

documentation 60:22

documents 27:6 38:20 60:19 68:14 79:2 83:14,17

door 61:4 63:13,14 69:20, 21

Dozor 8:23 14:6,23 23:3, 4 26:3 27:16,17 58:13

due 94:17

duly 6:9

duty 23:16 67:10

**E**

E.R. 37:13

earlier 18:21 33:7 90:12, 18 94:24

easier 93:7

Eastern 5:4,10 100:22

educational 35:3,4

effect 90:15

effective 46:4,6,12

Elwyn 70:16

embarrass 7:17

emergency 13:16 30:10,15

emotional 49:20

**emotionally** 49:1,15,22

**employees** 72:17

**enforcement** 75:17
76:19

**engage** 89:13

**enter** 81:2

**entered** 63:15

**entering** 80:11,17

**entire** 53:7

**entrances** 77:16

**Esquire** 11:11

**essentially** 49:4 61:24
68:11

**et al** 5:8 100:21

**evaluated** 37:12,13,18

**evaluation** 36:25 37:12

**evening** 16:8

**evidence** 7:19

**exact** 21:8

**examined** 6:9

**excellent** 59:3

**exceptions** 34:7

**excuse** 90:10

**executed** 11:17

**exhibit** 76:25 94:20 95:2,
5

**exist** 30:19

**expect** 89:12

**experience** 35:3 97:8

**explain** 18:16 95:15

**extensively** 84:16

**extent** 49:25 50:21

**extra** 10:3,8

**extremely** 69:24

**eyesight** 90:8

## F

**fact** 24:15 57:4 90:16

**factual** 98:3

**fair** 27:23 32:23 52:3 59:3
88:3

**faith** 7:16

**fall** 22:7

**familiar** 22:19 78:23

**Faust** 39:23 40:3 72:14
90:13,17 92:18,21

**favor** 83:13

**fear** 94:15

**feel** 19:15 20:10 42:11

**fell** 61:10

**field** 73:6 93:1,3,7

**figure** 65:21

**filed** 11:8 78:20

**fill** 19:16 20:9 36:2

**find** 66:11 76:1

**fine** 48:15 88:2 100:1

**finished** 24:20

**Fischer** 24:3 32:7 67:4,5
91:5,7,8,10,12,15

**fit** 99:9

**fixes** 100:2

**focus** 44:4 46:4

**folder** 92:18,24

**follow** 54:14 64:16 97:13
98:17

**followup** 99:17

**foot** 32:24

**force** 50:2 51:3 73:17

**forget** 94:20

**forgetting** 72:24

**form** 6:18 9:1 28:3 36:20
68:9

**forward** 8:19

**found** 66:7 76:2 83:15

**fraudulently** 95:24
96:4

**Friday** 9:4 19:2 20:8
23:24 47:22 53:10 61:20
63:9 74:13

**front** 5:13 21:22 34:10
55:23 69:20

**fully** 45:10

**function** 44:19

**future** 52:2 54:1

## G

**gain** 46:13

**gaining** 98:10

**garage** 63:14 75:23 81:3

**gave** 23:22 24:4 25:22
33:14 82:25

**generally** 88:9

**Gerard** 5:22

**give** 9:15 10:8 71:5

**giving** 55:8

**Gonzales** 5:24 6:20 7:2,
22 8:12,25 10:3,6,10 12:5,
21 17:23 19:24 22:22
24:19 26:14 27:12 28:5
29:7,10 32:16 33:4 34:21
35:18 36:16 38:13 41:7,24
42:3,7,10 43:12 44:6 47:5
48:9,13,17 49:8 52:6 53:1
54:3 55:7 57:12,18 58:18
59:4 60:8 62:2 63:6 65:22
67:7 68:1,16,20 72:21,25
79:8,11,19 81:12,15 84:14,
19 85:16,20 90:7 95:2
98:20 99:14 100:16

**Gonzales's** 22:4

**good** 5:2,21 6:1 11:12
44:25 50:10 59:3,6,11,14,
18 88:1 90:8

**gown** 70:6

**grab** 10:11

**grabbing** 34:13

**grade** 19:11 55:13

**graduated** 42:15

**granted** 13:19

**Great** 10:6

**Greg** 71:16

**ground** 7:11,15

**group** 6:2 67:18

**grouping** 22:16

**guess** 37:13 40:19 68:11
73:7 74:4 76:12

**guidance** 49:18

**guided** 8:3,13

**gurney** 81:18

## H

**habitation** 99:9

**habits** 44:25

**half** 22:6

**hand** 24:9

**handle** 51:7 55:17

**handled** 64:19 70:14

**handling** 64:16 65:7
81:21

**happen** 94:15

**harm** 36:13

**harmed** 94:12

**head** 19:21

**health** 19:5 36:2 50:7
52:12 81:11

**heard** 11:10

**hearing** 11:9 13:18
21:22 79:5,9 96:21

**held** 40:10

**Herman** 11:11 99:23

**highest** 66:25

**hired** 35:7,9

**his/her** 51:25

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

**historian** 17:5

**hold** 37:15,19 38:9 41:24 57:12

**holds** 11:18

**hole** 69:23

**home** 15:11 24:17 25:10, 16 26:6,7,9,10 27:10 33:24 39:22 53:12 57:5,6 63:19 69:22,25 70:1,2 71:12 77:20,21,22 81:2 95:16,18, 20,21,24

**homeowner** 77:11 89:8 98:7

**honest** 13:5

**hope** 89:11

**hospital** 36:24 70:6 77:13

**hot** 69:24

**hotel** 25:19,23 37:4

**hour** 54:4

**hours** 38:9

**house** 15:11 16:2,7 23:20 25:21 26:1,4 29:23 37:2 39:13,21 61:4,5,8,10, 18,22 63:18 66:8 77:18 89:2

**human** 45:18,19 46:2,4,6

**hypothetical** 55:9

### I

**ID** 5:22

**idea** 71:18,19

**identification** 10:14 12:18 26:13 34:19 48:19 76:8 77:2 78:15 90:21 93:15

**identified** 26:12 61:14

**identify** 5:19 10:17 26:18 40:18 48:22 76:11 77:5 78:19

**illegal** 29:6

**illness** 49:20,23 50:6,19

**immediately** 11:14

**importance** 46:21

**important** 45:9

**improper** 8:9

**inappropriate** 68:23

**inaudible** 99:25

**incapable** 37:8

**incapacitated** 35:22

**incident** 9:5 21:18 22:3 38:24 39:12,14,19 43:24 45:10 50:13 51:17 60:1,15 63:25 69:11 71:17 72:2 74:18 76:21 77:7 86:1 88:7

**incidents** 39:20 96:6

**include** 32:7 63:4

**included** 47:20

**including** 34:14

**individual** 84:7

**individual's** 75:10

**individuals** 35:22

**infirmed** 34:8

**information** 7:12 43:19 62:9 66:23 91:23

**inhabitable** 25:10

**initial** 97:17

**initiated** 83:4

**Injunction** 11:8

**injury** 50:2

**inside** 24:17 25:16 53:9 70:1 95:18

**instance** 31:10 60:25 63:21 64:5 75:16

**instances** 62:14

**instruct** 7:24 41:16 68:21

**instructing** 84:21

**instruction** 7:7 23:11, 14 44:15

**instrumental** 83:3

**intends** 7:13

**interaction** 46:4,7 77:24

**interest** 75:2

**interpersonal** 46:12

**interpose** 36:17

**interpretation** 8:1 23:10

**intervention** 35:24

**intro** 43:2,9

**introduced** 10:13 12:17 34:18 48:18 76:7 77:1 78:14 87:14

**investigative** 97:1

**involuntary** 50:6

**involved** 39:24 62:10,13 70:24,25 90:22 94:10

**involvement** 14:23

**involving** 49:12 64:16

**irrelevance** 84:25

**irrelevant** 23:8 24:8,10 33:7 47:9 52:17 68:23

**issue** 19:6 55:1 57:3 58:21 61:9 89:13 100:3

**issues** 19:8 56:23

**item** 75:24

**items** 15:11 25:13,14,20, 25 26:9 27:10 34:14 58:24 70:2

**Ithan** 11:15 13:21 69:17 76:13 88:16,22 89:18 92:4

### J

**Jeff** 77:11

**Jennifer** 5:5 6:8 100:19

**job** 37:16,17 96:25

**John** 5:24 12:1 99:7

**judge** 8:22,23 12:1 13:17 14:6,18,22,23 21:23 23:6 26:2 27:16 99:7,24 100:1,3

**judge's** 27:20,24 47:14 80:21

**judges** 16:7

**judgment** 97:8

**judicial** 48:8 58:13 84:3, 12

**July** 10:20 11:9,13 13:17

**juncture** 33:3 52:25 72:5

**justice** 35:5 50:1 51:5, 12,13

### K

**Kevin** 92:13

**key** 56:15

**Kim** 5:17

**kind** 86:6

**kitchen** 69:23

**knew** 23:19 47:9,13,14 96:19

**knowledge** 30:18 39:9 69:9

**Kochanski** 92:13

### L

**label** 21:7

**lady** 38:4 61:22

**Lang** 21:23

**language** 26:2 99:22

**large** 69:23 70:8 85:14 86:3,4

**law** 5:12 6:2 8:2,14 13:12 33:12

**leads** 83:25

**learning** 43:17,18

**leave** 25:18,23 33:14,15 52:18,20 53:15 71:11 95:22

**leaving** 28:9

**led** 33:23

**Lee** 11:11

**leg** 33:23 70:9

**legal** 5:15 33:12 56:22 60:16 65:8,11 67:21 68:2 75:10 76:12

**legally** 95:17

**level** 51:3

**licensed** 80:19

**lieutenant** 19:14 20:16 23:16,17,18,25 24:4 36:9 55:14 61:3,17 64:19 65:4 66:20,23 70:14 71:5 72:11 76:23 96:17,21,24 97:1,6

**lifted** 100:7

**limitations** 34:9

**limiting** 7:7

**lines** 95:15

**Lingo** 71:16

**listen** 43:21 44:4 45:8 47:1 59:2

**listened** 45:10

**listening** 44:16 46:14, 15,21,24 47:3

**live** 15:10 26:6,8,9 28:20 48:3 57:6 88:21

**living** 24:17 25:11,19 37:2 57:5 61:22 89:10 94:15

**local** 40:15

**located** 5:13 13:21

**location** 85:9 86:5,14

**lock** 56:17

**locked** 16:4 56:14

**locks** 13:24 14:2 15:24 16:2 28:1 56:3,9,13 63:12

**long** 22:12 40:22,25 73:23,24

**longer** 18:7 28:18 29:24 30:7,10,13 58:23 65:17,19 88:17 99:9

**looked** 8:22 17:21 32:10, 11 33:2 39:5 70:7 75:5 93:11 94:23

**LP** 6:3 13:13 87:16

**Luke** 90:23

---

## M

**made** 19:23 21:4 36:10 96:24 99:11

**mail** 64:2

**maintain** 49:18

**maintaining** 50:10

**make** 6:24 7:4 34:15 51:2,8 63:18 65:19 67:16 69:22 71:6 87:23,24 88:2 90:1 92:1 94:16 97:2 98:9

**makes** 19:12 86:8

**making** 37:9 51:6 59:9 84:1,4

**MALLOY** 9:13,21,24 10:5 26:15

**manage** 51:24

**mandatory** 35:23 37:12

**manner** 7:17

**manual** 44:2

**March** 5:4

**mark** 9:19 10:1 76:5 78:13

**marked** 9:18 10:13,17 12:17,24 26:12,17 34:18 48:19,22 76:7,10,11 77:1,4 78:14,18

**matter** 5:6 13:18 15:1 45:21 62:15 69:14 72:6 75:16 100:19

**Mchale** 20:17 32:8 65:4

**meaning** 27:12,13 51:12

**means** 15:14 82:11 91:18

**Media** 5:14

**meet** 62:21

**meeting** 92:13

**mental** 19:5 36:2 49:20, 23 50:6,7,19 52:12

**mentioned** 56:19 66:7

**met** 36:25 62:23

**meter** 89:6

**Michael** 91:5

**middle** 95:13

**mind** 99:10

**mine** 20:24

**minute** 35:1

**minutes** 86:25

**miscellaneous** 20:8

**mischaracterized** 65:23

**mischaracterizes** 29:11 53:2 62:4 66:2

**mischief** 80:14 82:15

**mobile** 36:9 37:10,17 64:20 70:11

**moment** 39:15 42:23 49:2 55:21 57:25 79:24 94:19 97:10 98:16

**morning** 5:2,21 6:1

**motion** 7:14

**motivate** 75:2

**move** 30:12 99:24

**municipal** 35:6 40:19 41:5 43:1

---

## N

**narrative** 91:16 94:25 95:7,8 96:9,11

**nature** 64:8

**needed** 37:14 77:14

**neighbor** 64:10,11

**no-trespassing** 77:20

**nod** 87:20

**Note** 68:8

**noted** 74:24 78:4 92:7

**notes** 67:17

**notice** 26:19 27:1,5,21 41:8 52:24 57:14 58:16 75:21 76:12

**notices** 60:21

**notification** 21:19,21 22:2

**notified** 21:23 36:9

**notify** 15:25 56:10

**number** 5:11,22 11:6 13:13 49:17 74:8,10,12 80:25 92:22 94:20,21 95:12

**numerous** 85:9

---

## O

**object** 7:24 36:20 41:8, 15 44:7 55:8,10 62:3 65:23 68:17,20 85:17

**objected** 7:10

**objecting** 28:5 66:3

**objection** 7:3 8:25 12:5 22:22 28:3 29:7,10 30:4 33:4 36:17 47:5 48:9 53:1 57:18 58:18 59:4 63:6 68:1,8 81:14,15 84:14

**objections** 6:16,17,22, 23,24

**observations** 69:16 98:4

**observe** 70:4

**obvious** 41:22

**occasions** 67:18

**occur** 59:24

**occurred** 98:4

**Ockley** 5:6,23 8:23 11:5, 11 13:13,20 19:23 21:15 22:3 23:21 24:6,25 25:10, 13 27:9 31:9 39:21 45:11 50:12 51:17 52:4 53:5 56:3 57:4 58:21 61:5 62:15 63:22 64:17 67:18 69:13 70:21 73:5 75:16,24 77:12, 22 78:21 80:2 83:5,8 85:1 87:17 88:17 90:25 92:6,10, 13 93:11 95:16,17,19,22

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

96:5 99:4 100:9,20

**office** 22:4 64:1

**officer** 5:5 6:8 8:21 14:21 20:17,19 32:22 35:14 38:25 39:23 41:1,5 43:7 44:19 46:7 53:18 55:16,17 65:4 66:25 69:7 72:14 73:2,4,5,7 78:21 83:3 87:13 88:5 89:11 90:4 94:24 97:7,12,20 98:2,15 99:2,19 100:18

**officer's** 92:21

**officers** 20:5,14 28:22 32:8 35:7 38:8 40:20 45:1, 5 47:24 48:1 50:15 51:17 64:6 65:1,3 69:2 82:12 93:1,2

**Offices** 5:12

**online** 65:20

**opinion** 26:25 100:7

**opportunity** 41:20 99:3

**oppress** 7:18

**order** 9:7,11 10:1,19,21 11:7 12:9 13:14,17 14:5, 10,11,18,22 16:6,25 23:6, 7,11,14 24:6,16 26:5 27:16,18 28:24,25 30:10, 15,16 49:16 50:9 51:24 52:5 54:19 55:2,5 56:19, 20,21,24 57:9 58:1,4,7,9, 24 80:21 84:24 89:16 92:5, 9 93:10 95:12,18,19 96:20

**ordered** 11:13 13:18

**orders** 8:22 12:10,11 17:10,13 22:16 23:19 24:7 25:12,25 26:5,7 27:2,8,20, 24 30:19,22,23 31:1,4,7, 16,21,23 32:4,24 47:14 48:8 52:5,16 54:14,24 56:22 58:13,16 59:16 60:20 75:1 78:8 84:3,12 93:14,19 96:12,15,22 97:9 100:7

**orientation** 41:22,25

**outlier** 69:7

**overcome** 46:15

**overnight** 80:11 94:17

**overpower** 26:5

**overseen** 94:3

**overview** 42:24

**owned** 95:21

**owner** 66:12 71:19 72:9 74:7 88:17 92:3 93:20

**owners** 61:12

### P

**P-1** 10:13,17 14:22 22:16 26:2 31:18,21 32:11 93:14 96:13

**P-2** 12:16,17,23,24 14:5, 22 22:17,19 23:4,5 26:3 27:12,13 31:18,21 32:10, 11 55:21,22 57:8,10,16 96:13

**P-3** 26:12,14,17 57:14 93:23

**P-4** 34:18,20 40:18

**P-5** 48:17,18,22

**P-6** 76:7,11

**P-7** 77:1,4 79:16 95:2,5

**P-8** 78:14,18 79:19,20,22 84:7

**p.m.** 56:17 94:1

**PA** 11:16 13:22

**pages** 41:14 49:17

**Paller** 5:16

**Pancoast** 76:18

**papers** 31:11,14

**paperwork** 19:16 20:9, 12 73:16 89:16

**paragraph** 45:7 49:12 50:3 56:1 77:9 95:14

**paragraphs** 49:7

**part** 37:6 56:1 66:10 82:11

**participate** 43:21

**parts** 96:2

**party** 7:18 93:20

**passed** 42:15 43:7

**past** 75:9

**path** 69:22

**patrol** 55:16 63:18 77:17 91:5

**pay** 19:11 55:13

**PECO** 25:2,6 89:4

**Pennsylvania** 5:8,10, 14 13:12 65:13 100:21

**people** 15:4 34:8 35:22 47:19,20,22 75:17

**period** 88:7

**permissions** 90:1

**permit** 93:16

**permitted** 88:21 93:25

**person** 19:22 21:4 23:22 51:4,24 62:23 85:3 89:10 94:10

**person's** 21:7 52:1 75:21

**personal** 11:22,23 13:22 14:3 28:9,12 33:10 67:17 98:4

**personnel** 49:19

**persons** 32:5 49:1,16, 20,23 50:6,11,19 90:22

**petition** 11:8 13:16,19

**PFA** 55:19

**PFA's** 54:25

**ph** 73:7 93:9

**phone** 25:8 34:15 62:22 70:6 72:3

**phrase** 50:18

**physically** 28:13 29:1,4 67:9,11 81:6

**Pinto** 14:22 20:16 23:16, 19,25 24:4 36:9 61:3,17,21 64:19 65:4 66:20,24 67:1 70:14 71:5 72:10 76:23 96:21,24

**Pinto's** 97:1

**place** 5:12 47:14 57:9,15

58:1 61:18

**plaintiff** 5:23 11:4,8,12, 14,25 13:23 14:1 15:25 56:2,7 60:15 67:22 70:4 71:9

**Plaintiff's** 97:17

**Pleas** 11:3,5 13:11 27:1, 5,8 30:16 54:15,19,24 55:3 58:15 92:10

**plenty** 25:19,22

**plywood** 28:17 63:10, 12,13 81:3,7,21,23 82:18

**point** 9:2,6 63:15 86:16

**Pointing** 23:3

**pole** 60:3

**police** 14:1 16:1,10 28:22 31:15,17 33:25 35:6,8,10, 14 37:15 40:15,19 41:5 43:2,7,19 44:8,19 45:1,5 46:7 49:14,17,22 53:18,23 54:20 55:4,5 56:8,11 59:9, 21 60:24 61:2 62:10 72:5, 10,16,18 73:18 78:20 82:12 83:2 86:22 89:11,12 91:12,15,22 92:15 94:5,9 95:23 98:8

**Policies** 49:15

**policy** 19:17,19,20 21:9 34:6,8 48:25 49:18,21 50:4,16

**poor** 59:3

**porch** 32:25 69:21

**position** 60:14

**possibility** 77:12

**possibly** 31:19 54:22 82:18

**post** 64:1

**posting** 93:24

**potential** 52:2 53:25 67:21

**power** 51:1

**practice** 44:9

**preamble** 65:25

**preparation** 17:17 38:21

**present** 7:13 44:3 70:16, 22

**presented** 45:15 64:17 93:14

**presenting** 68:14

**preservation** 19:18

**preserve** 19:8,25 20:2,9 21:4,5

**preserved** 6:16 18:4,25 19:1,3,7,15 20:6,8 21:10

**Prete** 6:3 62:13,17 87:15

**pretty** 84:15

**prevent** 94:12

**previously** 10:17 11:16 12:2,24 48:21 76:11 84:2

**principal** 74:2

**prior** 13:18 14:23 18:3 22:20 63:21 64:20 71:17 76:24 79:1 84:13 87:14 99:11

**priority** 58:15

**private** 8:6

**privilege** 6:18 8:10

**privileged** 7:12 80:19

**probable** 39:3,5 73:11 83:20,22 84:9 97:14,16,18, 25 98:2

**procedural** 56:18

**procedure** 8:2,15 34:5 50:8 59:16

**procedures** 48:25 49:15 50:5 58:17 65:12

**Proceed** 6:12

**proceeded** 14:12,19 21:13 32:20

**proceeding** 83:4,8,12 99:3

**proceeds** 11:18

**process** 70:24 71:1 85:11

**processing** 32:20

**production** 90:17 94:23

**program** 40:20,21 41:5, 6

**promote** 46:3

**property** 11:16,21,22,23 13:21,23,25 14:3,4 16:5, 11,13,14,15 27:25 28:10, 12,18,25 29:2,5 30:8,11 33:13,14,15,16 37:22 38:18 39:18,24 52:19 53:6, 7,16 56:4,9,25 60:16 61:22,23 63:5 65:7,9,12, 17,18 67:21,23 71:24 75:11 76:22 80:14,20 81:18 82:10,11,16 86:2,9 88:12,16,18,22 89:11 92:4, 6,7,11,14 93:20

**protocols** 64:15

**provide** 14:2 50:10 56:9

**provided** 74:10 92:9

**provisions** 50:7

**psychologists** 36:1

**public** 50:10

**purpose** 8:10 19:10 49:12,17

**purposes** 73:16

**push** 51:12

**put** 25:6 32:11 63:13 74:13 96:7

**putting** 51:4 63:10,11 77:19

### Q

**question** 7:4,9,11 8:21 15:7,9 18:15 27:22 28:7,11 36:21 48:11 54:16 65:25 66:3 67:8 68:6,11,21 81:8, 13,23 83:6 87:24 96:3

**questions** 34:25 85:22 87:18,25 93:12 95:12 97:15 98:15,21 99:15

**quick** 99:16

**quote** 95:24 96:8

**quotes** 96:4,7

### R

**Radnor** 5:7,25 14:1 16:1, 3,10 26:20 35:9,24 41:11 49:14,21 53:23 54:20 55:4, 5 56:7,10,20 73:23 82:12 83:2 89:8 90:12,16 91:11, 12,15,21 92:8 94:23 99:24 100:20

**rank** 35:13

**ranking** 66:25

**read** 6:14 10:21 13:9 14:22 39:13 43:10 44:21 46:2,9 49:11 51:21 56:2,5 60:20 76:15 77:9 78:25 80:21 90:6,7 91:25 92:1,18 95:13,25

**reading** 55:25

**real** 22:2 44:9

**reason** 24:5 41:3 73:13 81:4 83:16 84:8 88:22 94:13,14

**reasonable** 83:24

**reasons** 66:1 82:24 86:15 98:11

**recall** 17:13 38:5,6,7 60:13,23 64:14 75:12 78:3 86:2 87:10 96:15,21

**receive** 65:5 69:11

**received** 44:15 54:18 55:2,4 92:4

**recitation** 98:3

**recognize** 12:24

**recognizing** 49:19

**recollection** 77:24 88:10,14,20

**record** 5:3 10:22 11:15 13:10 40:3,8,10,12 43:11 54:6,11 77:10 87:2,7,23 88:17 90:11 92:1 93:20 95:3,5 100:4,22

**redo** 96:25

**reduce** 52:1 53:25

**reemphasize** 46:20

**refer** 88:7 96:3

**referenced** 74:6

**referred** 88:6

**refresh** 77:23

**refuse** 7:9 11:25

**refused** 25:20,24 29:16 33:15 52:20 53:14

**rejected** 36:14,18

**related** 60:5

**relates** 59:9

**relations** 45:18,19 46:2

**released** 77:12

**relevant** 44:5,7,8,9,14

**remaining** 11:23

**remember** 9:3,7 12:7,9, 14 13:4,8 14:9 17:2,3 20:18 38:11 39:23 42:13 43:4,6 52:8 59:25 60:1 63:2 64:4,24 65:3 70:9,23 71:4 75:4,5,14 76:2 85:4, 13 86:4,5,11 93:4 96:16

**remind** 87:21

**removal** 15:23 92:14

**remove** 11:21 13:22,24 14:3 15:11 16:2 23:21 25:14,20,25 26:9 27:10 28:9 29:1,5 56:2 84:12 92:11

**removed** 11:25 28:1,17 61:23 63:5 65:15 75:24 76:3 81:6,23

**removing** 14:2 25:13 28:11,25 56:8 58:23 67:20, 22 81:3

**Renovations** 92:2

**repeating** 47:8

**rephrase** 54:18 62:6

**report** 38:24 61:1 63:2 72:13 74:13,16,24 77:6 90:13,17 91:22 92:2 96:19

**reporter** 5:16 6:6

**reporting** 5:18 93:5

**represent** 5:20 6:3 87:15 99:6,20

**reprimanded** 59:20

**request** 7:8 56:11 98:7

**requested** 24:6 25:18 77:16

**required** 54:14 55:6

**requirements** 57:10, 16

**rescinded** 80:22

**reservations** 68:12,15, 17

**reserve** 7:2,23 87:10 98:16

**reserved** 6:18

**reside** 26:1,4 27:10 93:21

**residence** 24:15 25:1 29:2,18 30:13 58:22 77:17 92:14 93:21 98:8,10

**resident** 92:5

**residing** 24:25 25:15

**resolve** 51:25 53:24

**respect** 49:24 50:20

**responded** 36:10

**restored** 25:9

**resulted** 83:10

**return** 33:13 38:2 53:5, 10,19 82:10

**returned** 33:13 53:6,10

**returning** 29:14

**review** 13:16 24:7 38:20 60:21 63:1 69:12

**reviewed** 38:23 79:3

**reviewing** 61:1 97:25

**ride** 53:13

**rights** 38:18 50:10 65:8, 13

**rigorous** 43:23

**rise** 51:2

**risk** 11:21 13:22

**Rockwell** 11:4 92:2

**Rockwell-glynn** 6:3 11:9 13:13 71:20 72:4,18 87:16 99:4

**role** 46:7

**room** 25:19,23 37:5

**RTPD** 91:22

**rude** 87:22

**Rule** 97:17

**rules** 8:1,14

**rundown** 71:6

**running** 37:3 89:3

## S

**S-C-H-R-O-M** 5:22

**safety** 28:19 56:22 58:21 61:9 84:25 86:15 94:14,17

**sale** 52:24 56:25 57:3

**sanctioned** 59:19

**Saturday** 20:7 22:3

**Saturday's** 19:1

**scale** 59:10

**scene** 36:10 51:2,6,8 64:23,25 65:1 67:10,12 69:2,17 73:3

**Schrom** 5:12,21,22 6:13, 21 7:6 8:4,18,20 9:9,12,15, 16,19,23,25 10:7,11,15 12:12,19,22 18:1 20:1 23:2 24:21 26:16 27:15 29:3,8, 25 30:14 32:19 33:9 34:20, 24 35:20 37:20 38:16 40:1, 6,13 41:19 42:1,9,17 43:14 44:11,13 47:12 48:12,15, 20 49:9,10 52:7 53:21 54:5,12 55:20 57:13,22 58:25 59:7 60:11 62:6,7 63:20 66:9 67:11,13 68:4, 10,18 69:1 73:1 76:5,9 77:3 78:13,16,17 79:10,13, 20,21 81:16 84:17 85:2,19, 24 86:24 87:8 98:24 99:1,

13 100:13

**screen** 89:23

**scribner** 74:3

**section** 50:8,9 55:25

**seeks** 7:12

**self-explanatory** 78:2

**self-help** 89:13

**sense** 86:8 87:25 88:2

**sentence** 43:10 44:22 46:2,9

**separate** 27:19

**September** 11:22,24 13:23,25 14:4 30:2 56:4 84:13

**seq** 50:8,9

**sergeant** 19:13 23:16 24:3 55:14 67:4 91:5,7,10, 11,14

**set** 24:15

**Shaffer** 5:13

**sharing** 89:22

**short** 54:4,8 87:4

**shortly** 92:14

**shouting** 95:23

**show** 31:23 32:4 66:15 89:21

**showed** 39:15

**showering** 37:3

**showing** 9:17 10:16 26:17 48:21 76:10 77:4 78:18 90:4

**shrug** 87:21

**signed** 12:1 13:17

**signs** 77:20

**similar** 41:22,24

**Simona** 5:6 8:23 11:4,11 13:13,20 14:6 17:9 36:6 45:11 47:1,7 50:12 56:3 62:24 63:22 78:21 83:4,8 90:25 92:5 99:4 100:19

**single** 75:24

**sir** 21:24 51:18 90:19

**site** 15:4 70:12 88:10

**sitting** 25:7 31:9 32:25 61:5 70:5

**situation** 47:10 52:20 64:16

**skills** 43:17,18,20 44:23

**slightly** 84:17

**smelled** 69:25 70:7

**social** 35:25

**sold** 47:15

**solicitor** 23:9,10 30:25

**sought** 27:19

**sound** 37:9

**South** 11:15 13:21 76:13 88:16,22 89:18 92:4

**speak** 20:24 36:6 61:15

**speaking** 6:22 71:7 95:19

**Special** 11:8

**specific** 35:19

**specifically** 9:11 53:24 94:22

**speculate** 15:3 81:24

**speculating** 81:9

**spoke** 61:3 62:22 63:1,2, 16 70:21 71:4 96:17

**spoken** 74:18

**Spruce** 6:2

**squat** 58:22

**squatting** 28:20

**standard** 34:5

**standards** 36:25 65:12

**standing** 73:8,9

**start** 10:24 16:23 49:12 80:9

**starting** 77:10 90:16

**Starts** 43:17

**state** 5:20 46:17

OFFICER JENNIFER COCCO
MARCH 20, 2025

JOB NO. 1501917

**stated** 21:8 33:7 52:16
58:24 92:12 100:4

**statement** 81:13 99:8

**statements** 6:24 99:11

**states** 5:9 15:12 92:3
95:19 99:21,22

**stating** 92:5,10 95:17

**station** 31:15,17 34:1
61:2 72:5,10,16,18 93:2,8

**stay** 73:23 86:9 94:17

**Steno** 5:18

**sticker** 39:17

**stipulations** 6:14

**stole** 64:2

**stop** 86:12,13

**street** 5:14 44:10

**strewn** 70:2

**strike** 43:25

**structure** 76:13 80:11,
17 89:10 94:11

**study** 43:17,18,22 65:11

**stuff** 29:22 47:8 70:1

**subject** 45:21 49:15 71:7

**subpoena** 22:1

**subsequently** 33:16
35:7

**successfully** 44:24

**suggest** 6:25

**superintendent** 49:16

**superior** 23:13 55:17
97:7

**supervisor** 31:24

**supplemental** 77:6
94:24

**supposed** 24:16 25:11,
12

**surrounding** 62:14

**swear** 6:6

**switched** 73:20

**sworn** 6:9

**system** 18:6 19:2,7 20:4
21:11 50:1 51:5,12,13 93:5

---

**T**

**tactic** 50:24,25

**tactics** 49:25 50:20

**tag** 20:5,6

**tagged** 19:1,6 21:9

**taking** 5:12 8:8 37:8 43:1
82:18

**talked** 16:6 56:10 60:19
72:11 77:8 90:12 95:11

**talking** 9:10 16:17,18
40:2 47:2,10 52:11,12 67:9
72:3 85:18 88:9 91:8

**talks** 42:24

**taped** 75:23

**team** 35:24

**telephone** 74:8

**telling** 28:15

**ten** 16:25 17:9 52:4

**term** 36:18

**terminated** 83:13

**termination** 7:14

**terms** 88:5 92:24 93:10
96:23 97:16

**terrible** 69:25

**testified** 6:10 62:8 79:25
82:23 84:6

**testimony** 29:11 53:2
62:5 65:24 66:2 100:18

**tests** 43:23

**text** 96:12

**thing** 56:18 97:11 98:6

**things** 20:6 40:23 44:1
52:23

**thinking** 44:18 45:9,13

**thought** 36:6 71:11

**thoughts** 68:18

**three-day** 35:25

**threshold** 8:21

**thrown** 22:9

**time** 5:4,18 6:17 12:3 15:7
20:14,22 22:17 24:7 28:10,
16 31:9 33:14 40:8,9,22
43:24 44:3 45:10,15,22
47:13 48:7 53:4 54:8 60:14
67:20 70:4 74:21 80:6
81:21,23 85:4 86:10 87:4,9
88:7 92:17 94:6 98:18
100:22

**timeframe** 88:9

**times** 16:25 17:10 48:14
52:4,21

**title** 11:17 53:17 66:10
80:14

**today** 17:17 44:5,7 45:3
46:1,18 49:4,5 87:15 90:18
91:8 93:11,15 96:13 98:1,
18

**today's** 38:21 100:18

**Todd** 6:1 87:13 99:14

**told** 28:17,22 29:15 30:6
33:12 38:1 47:17,18,19
48:1 53:5,9,12,18 57:6
63:11 78:4 81:2 82:10
86:12,13,16,19 96:15,16
98:8

**tools** 81:21

**top** 10:24 19:21 49:11,12
90:22

**totality** 45:14

**township** 5:7,25 16:4
19:17 23:10 26:20 31:6
35:8,9,24 41:11 48:3
49:14,22 56:15,20 58:7,9
89:8,16 91:11,12,21 92:8,
12 94:4,5,9 99:24 100:20

**trained** 35:25 97:6

**training** 35:16 38:17
40:14,20 41:5,6 42:2 43:2
65:5 73:6,15,16

**trainings** 35:23

**transcript** 99:3,20,21,
23

**transpired** 17:6 18:17
67:17

**transport** 33:25

**transporting** 33:17

**treat** 49:22

**treating** 50:19

**tree** 61:7,10 85:3 86:3

**trees** 85:12 86:7

**trespass** 53:17 80:10,
12,17 82:9,23

**trespassing** 29:15

**trial** 6:17,19

**trouble** 25:5 33:17

**trucks** 85:8,9,15 86:3,5,6

**true** 23:7 41:4 45:2 79:16,
22

**trumps** 27:1,5,18

**trust** 97:8

**turn** 42:23 89:6

**turned** 25:2 89:4,6

**TV** 25:8 61:6

**type** 7:3 29:17 95:8,10

**typed** 97:19,20

**types** 96:6

**typically** 64:16

**typing** 97:21

---

**U**

**uh-huh** 87:20

**uh-uh** 87:20

**ultimately** 51:25 53:14
83:12

**Um-hum** 17:22 24:11
32:15 60:6 79:6

**Um-um** 38:12 72:20

**unable** 25:14 29:1,4
33:21

**uncomfortable** 42:12

**underneath** 90:25

**understand** 15:21,23
18:18 22:17 27:22 30:3
42:18,22 51:24 52:14,23
85:21 88:3

**understanding** 7:25
15:14 18:23 20:13 27:4
46:13 54:16 57:21 65:16
74:17 84:11 88:15 93:13
94:8

**understandings** 8:19

**understands** 68:5

**understood** 61:11
93:23

**undertaken** 100:9

**unfettered** 11:20 13:20
15:14 27:25

**uninhabitable** 16:3
26:7 92:8

**unit** 70:11

**United** 5:9

**unlimited** 11:20 13:20
27:24

**unlivable** 89:3

**unlock** 16:9,12

**unlocked** 61:4

**unnecessary** 50:2

**unreasonable** 7:17

**unrestricted** 15:21

**unsafe** 25:22,24 53:7,8
57:5 77:22

**unusual** 15:19

**update** 63:4

**updated** 63:3

**uploaded** 92:17,25

**Upper** 73:18

**upset** 37:24

**usual** 6:14

## V

**vacate** 92:6

**valuable** 43:19

**vehicles** 60:5

**venued** 5:8

**verbal** 87:21

**verbally** 17:24

**verification** 65:8

**verify** 41:12 55:15 75:10

**versus** 5:7 11:4 13:13
100:20

**video** 17:4,8,11,14,21
18:2,6,9,20,21,23 19:2
20:3 37:25 38:3,10 39:6
40:7 73:9 74:6 98:23
100:15

**videos** 17:16,19 18:3
19:14,18

**viewed** 58:14

**Villanova** 11:16 13:22
64:1

**violence** 52:2

**visit** 18:21,22

**visual** 17:5

**visually** 57:25

**volume** 42:25 43:10 45:8
46:5

**voluntarily** 95:23

## W

**waiting** 29:21,22

**walk** 25:15 33:21

**walked** 69:19

**walker** 33:22

**wanted** 52:5 92:15

**warrant** 20:11 37:11
54:22 55:19

**warranted** 36:3

**warrants** 54:23

**watch** 38:10

**watching** 25:8 61:6 73:8

**water** 37:3 89:3

**weapon** 34:12

**weekend** 77:19

**weekends** 94:5,6

**weeks** 77:22

**Wendt** 5:17

**West** 5:13 35:4

**Whelan** 8:22 12:1 13:17
14:22 26:3 58:13 99:7

**Whelan's** 14:18

**woman** 68:13

**word** 15:13,15,19 71:14,
15 96:5

**words** 90:15 100:4

**work** 35:3 53:8 61:6,7
76:17 89:21 97:1

**worked** 35:9

**workers** 36:1

**working** 20:23 86:14
93:6

**world** 44:9

**worthy** 36:6

**Wow** 90:8

**wrong** 98:3

**wrote** 38:24 96:10

## Y

**year** 22:6 73:25

**years** 17:15 21:10 35:17
41:2,3 42:8,14,22 44:15
75:9