# EXHIBIT 20

# Deposition Transcript

Case Number: 2:24-cv-0470-GAW
Date: May 13, 2025

In the matter of:

# Ockley v Township of Radnor, Pennsylvania, et al.

# Lieutenant Joseph Pinto



Reported by:
Noelle R. Nevius

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1              IN THE UNITED STATES DISTRICT COURT FOR
 2                THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4   SIMONA OCKLEY,                    )   CIVIL ACTION NO:
 5                  Plaintiff,         )   2:24-cv-0470-GAW
 6                                     )
 7   -vs-                             )
 8                                     )
 9   TOWNSHIP OF RADNOR,              )
10   PENNSYLVANIA,  et al.,          )
11                  Defendants.       )
12
13              Videotape deposition of LIEUTENANT
14      JOSEPH PINTO, duly sworn, was taken on Tuesday,
15      May 13, 2025, between the times of 10:04 a.m. and
16      1:25 p.m., before Noelle R. Nevius, Professional
17      Stenographer, reported by machine shorthand,
18      after which time the deposition was reduced to
19      writing and set forth as follows:
20
21
22
23
24
25
```

LIEUTENANT JOSEPH PINTO                                      JOB NO. 1655053
MAY 13, 2025

---

**Page 2**

```
 1   A P P E A R A N C E S :
 2
 3
 4   FOR THE PLAINTIFF:
 5   SCHROM, SHAFFER & BOTEL, P.C.
 6   BY:  GERARD SCHROM, ESQUIRE
 7   ELIZABETH MALLOY, PARALEGAL
 8   4 West Front Street
 9   Media, Pennsylvania 19063
10   610-565-5050
11
12
13   FOR THE RADNOR DEFENDANTS:
14   MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
15   BY:  JOHN GONZALES, ESQUIRE
16   2000 Market Street
17   Suite 2300
18   Philadelphia, Pennsylvania 19103
19   215-575-2871
20
21
22
23
24
25
```

**Page 3**

```
 1   FOR DEFENDANTS BYRDZINSKI, ROCKWELL GLYNN, PRETE:
 2   SPRUCE LAW GROUP, LLC
 3   BY:  TODD BARTOS, ESQUIRE
 4   1622 Spruce Street
 5   Philadelphia, Pennsylvania 19103
 6   267-546-0600
 7
 8
 9   Also Present:  Alan Paller, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                I N D E X
 2
 3
 4   EXAMINATION OF LIEUTENANT JOSEPH PINTO      PAGE
 5   Mr. Schrom                               9,124
 6   Mr. Bartos                                 121
 7
 8
 9
10   Witness Read and Sign                      134
11   Stenographer's Certification               137
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                E X H I B I T S
 2
 3   EXHIBIT NO.    DESCRIPTION                    PAGE
 4
 5   Pinto 1    8/13/2022 Police Report            47
 6
 7   Pinto 2    Legal Notice Sign                  83
 8
 9   Pinto 3    Notice of Condemnation             85
10
11   Pinto 4    Notice of Violation                86
12
13   Pinto 5 Notice of Violation-Property Maintenance 88
14
15   Pinto 6    Exhibit A Order                    89
16
17   Pinto 7    August 5, 2022 E-mails            100
18
19   Pinto 8    August 9, 2022 Order              103
20
21   Pinto 9    RT-22-10670 Incident Report       106
22
23   Pinto 10   RT-22-10812 Incident Report       108
24
25
```

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

---

Page 6

1  Pinto 11  Application for Involuntary Emergency  113
2            Examination and Treatment
3
4  Pinto 12  Crozer-Chester Medical Center Report  114
5
6  Pinto 13  RT-22-10812 Incident Report  114
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 7

1              -  -  -
2            THE VIDEOGRAPHER:  Good morning.
3    We are going on the record at 10:04 a.m.
4    Eastern Time on May 13, 2025, to begin
5    the video recorded deposition of
6    Lieutenant Joseph Pinto taken in the
7    matter of Simona Ockley versus Township
8    of Radnor, Pennsylvania, et al.  This
9    case is venued in the United States
10   District for the Eastern District of
11   Pennsylvania, Case Number 2:24-CV-0470.
12            This deposition is taking
13   place at the law office of Schrom,
14   Shaffer & Botel located at 4 West Front
15   Street in Media, Pennsylvania.  The
16   legal videographer is Alan Paller and
17   the court reporter is Noelle Nevius.  We
18   are here on behalf of Steno Court
19   Reporting.
20            At this time, would counsel
21   please identified yourselves and state
22   whom you represent?
23            MR. SCHROM:  Good morning,
24   everyone, Gerard Schrom, S-C-H-R-O-M, on
25   behalf of Plaintiff Simona Ockley.

---

Page 8

1            MR. GONZALES:  John Gonzales on
2    behalf of the Radnor Defendants.
3            MR. BARTOS:  Todd Bartos with
4    Spruce Law Group on behalf of
5    Mr. Brydzinski, Mr. Prete, and Rockwell
6    and Glynn.
7            THE VIDEOGRAPHER:  The court
8    reporter will swear in the witness.
9              -  -  -
10           LIEUTENANT JOSEPH PINTO was called
11   as a witness, and after having been duly
12   sworn to tell the truth, testified as
13   follows:
14           (Witness sworn.)
15             -  -  -
16           THE STENOGRAPHER:  Counsel, usual
17   stips?
18           MR. GONZALES:  Yes, other than the
19   witness is going to read and sign.
20           THE STENOGRAPHER:  I'll send that
21   to you?
22           MR. GONZALES:  Yes.  All that means
23   is she'll create the transcript, she
24   sends it to me, I send it to you, you
25   review it for accuracy, sign off and

---

Page 9

1            then we return it.
2            MR. SCHROM:  The stipulation, does
3            that apply to all prior depositions will
4            apply here.
5            THE STENOGRAPHER:  All right.  We
6            can proceed.
7              -  -  -
8            DIRECT EXAMINATION
9              -  -  -
10   BY MR. SCHROM:
11   Q.   Good morning, Officer.
12   **A.   Good morning.**
13   Q.   So we are going to ask a number of questions and
14   kind of general areas.  But initially, it's kind of
15   educational background and then we'll get into more
16   specifics as we go regarding the incident.
17            So why don't you just tell us a little bit
18   about your educational background?
19   **A.   Okay.  I got a bachelor's of science degree from**
20   **Bloomsburg University.**
21   Q.   Okay.
22   **A.   I've had multiple trainings throughout my career**
23   **at the police department.  The most significant was I**
24   **graduated from the Northwestern School of Police**
25   **Staffing & Command, and the second most was I went to**

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 10

1  the far institute (ph) their version of the
2  Northwestern School.  I apologize, the exact titles
3  escapes me at this time.
4      Q.  And did you have any training other than the
5  bachelor's in those two institutes that you talked
6  about and the individual training?
7      A.  Yes.  I've had significant amounts of training.
8  I am a firearms instructor, I'm a patrol rifle
9  instructor.  I'm the field training office.  I went to
10 Inter-County Detective School.  I would be hard-pressed
11 to name all of them.  I apologize for all of that.
12     Q.  That's all right.  What did -- at the detective
13 school, that state specific or is that general
14 detective?
15     A.  It was a -- it's an entry-level detective school.
16 I believe if I remember correctly, it was sponsored by
17 the state police.  And it's ironic because I was never
18 a detective, but I did go to the Inter-County Detective
19 School.
20     Q.  Oh, okay.  The individual training that you
21 received, was that provided by different police
22 departments?
23     A.  No, sir.  Only ever worked for Radnor Township.
24     Q.  Oh, okay.  So what is that additional training?
25 Is it -- how does that go?  What's it called?

Page 11

1      A.  Well, okay -- I'm trying to answer the question.
2      Q.  Well, in other words lawyers have to go to a
3  continuing education --
4      A.  So we --
5              MR. GONZALES:  Let him finish
6              asking the question.
7  BY MR. SCHROM:
8      Q.  -- and in order to renew their credentials.  So
9  these are ongoing courses often produced by separate
10 entities for the Pennsylvania bar and so on.
11     A.  I understand.
12     Q.  So that sort of orientation.
13     A.  So the schools that I specifically reference are
14 different than our required annual training, which is
15 put on through MPOETC, Municipal Police Officers'
16 Educational Training Commission.  In order to keep your
17 certification you have to complete the MPOETC-required
18 courses every year.  There are usually legal updates.
19 There's one every year and then there's -- lately
20 there's been a big stress on de-escalation.  And then
21 there is two separate ones that they pick randomly
22 every year.
23              When I was a younger officer, we used to go
24 in person and do them.  Now they are done online.
25     Q.  Okay.

Page 12

1      A.  So that's the training that every officer who's a
2  municipal police officer has to take every year.  So
3  I've done that every year.
4              The trainings I referenced are usually
5  trainings that they push officers to based on their
6  interests or based on where they think officers are
7  going to go in their career.  And quite frankly,
8  schools that will best help the police department
9  having officers training.  So, like, I went to become a
10 firearms instructor because MPOETC requires officers to
11 be trained in the firearms every year.  So we need
12 instructions to be able to do that.  It was an interest
13 I show and I was lucky enough to go to that school.
14     Q.  Okay.  Through that experience and education, did
15 you have any particular training in condemnations as a
16 category?  Condemnation of property in particular?
17     A.  No, sir.
18     Q.  Did you ever have any particular training in all
19 of what you talked about regarding a category of
20 property being not fit for human habitation?
21     A.  No.
22     Q.  Okay.  In preparation for today's deposition, did
23 you review any documents, videos, or anything else?
24     A.  I did.
25     Q.  And what did you review?

Page 13

1      A.  I reviewed video footage of the incident, which I
2  believe -- I'll refer to as day 2.
3      Q.  Okay.
4      A.  I don't remember the exact dates.  I apologize
5  for that.
6      Q.  If I represented that day 2 was the 13th, does
7  that refresh your recollection?
8      A.  It does.  It was the day that Ms. Ockley was
9  taken into custody -- arrested, not transported to a
10 mental health facility.
11     Q.  Anything other than the video?
12     A.  I did review some police reports and I did see
13 the orders that were issued, I'm going to say, on
14 behalf of Ms. Ockley by judges.
15     Q.  Okay.
16     A.  I reviewed those.  No, I can't think of anything
17 else.
18     Q.  Regarding the orders, can you recall -- and I'll
19 ask you more about it later, but can you recall when
20 you saw those orders for the very first time?
21     A.  Saw them?  I would say the first time I saw them
22 was yesterday.  I was aware of them, but I didn't
23 physically see them.
24     Q.  And the awareness that you had, what was that
25 awareness and how did you gain that awareness?

LIEUTENANT JOSEPH PINTO                                      JOB NO. 1655053
MAY 13, 2025

Page 14

1  A.    Through the -- and I don't know who it was, but
2  it was a gentleman who came into the building.  I
3  believe he was the property owner at the time.  He came
4  to tell us that Ms. Ockley was back in the house.
5  Q.    If I represented to you that it was
6  Mr. Brydzinski, does that refresh your recollection?
7  A.    It does not.  I'm sorry.
8  Q.    If I represented that it was a representative
9  from Rockwell named Mr. Lingo, does that --
10  A.    It definitely was not Mr. Lingo.
11  Q.    Oh.
12  A.    I'm familiar with him from other circumstances.
13  Q.    Do you know if it was Luke Attanasi?
14  A.    I'm sorry, Counselor, I do not.
15  Q.    So you reviewed the video on day 2.  Was there
16  ever a video on day 1?
17  A.    There most likely was.  I can't say with all
18  certainty, but that also would have been expunged due
19  to the -- to the expungement and the nature of the
20  call.  We don't keep that video for very long.
21  Q.    You mean because it was a 302 call?
22  A.    Because it was a mental health call.  Yes.
23  Q.    Okay.  So what happens with a mental health call
24  in terms of the procedure or where they ultimately
25  determine that they are going to not keep that video?

Page 15

1  A.    There is an officer in charge of how long the
2  video is kept based upon our records management thing.
3  That is not something that I am involved in.
4  Q.    Okay.
5  A.    But they keep it as long as it's necessary to
6  keep it.
7  Q.    Is there a statute or is it just a township rule
8  or do you know?
9  A.    I believe there are guidelines that come from
10  other than the township.  I think there's rules and
11  regulations that oversee that type of information.
12  Q.    Okay.
13  A.    Again, I'm not familiar with them.
14  Q.    Who is that officer who makes the call?
15  A.    Prior to several weeks ago, it was a gentleman by
16  the name of Kevin Gallagher.  He has since left our
17  agency.  We are in the process of trying to replace him
18  as we speak.
19  Q.    What was his job?  Is he an officer?
20  A.    He's a retired officer.
21  Q.    Retired officer?
22  A.    But his position that I am referring to, he was
23  not a police officer any longer.
24  Q.    Oh, okay.
25  A.    He was our custodian, he was kind of like

Page 16

1  jack-of-all-trades.  He helped us order vehicles, he
2  dealt with our body cameras, and all kinds of stuff
3  like that.
4  Q.    So he was a township employee?
5  A.    He was.
6  Q.    Okay.  And how long did he work for the township?
7  A.    So I'm going to be hard-pressed to answer that.
8  He was a police officer for a significant amount of
9  time, he retired, came back.  I would say he was in the
10  that capacity that we were discussing a couple of
11  years.
12  Q.    Okay.
13  A.    But I couldn't be held to any exact date or time.
14  Q.    Before he retired, was he a Radnor police
15  officer?
16  A.    He was.
17  Q.    Do you know how long he was a Radnor police
18  officer approximately?
19  A.    He reached retirement.  He reached full
20  retirement.  So that would probably mean he was at
21  least 50 and at least 20 years of service.  To my
22  knowledge, he did not leave early.  So that would be my
23  guesstimate.
24  Q.    Okay.  Thanks.  And in that regard, you know,
25  it's okay to estimate.  It's not okay to guess during a

Page 17

1  deposition.
2  A.    I totally understand.
3  Q.    If for some reason you don't know, that's okay.
4  Have you ever given a deposition before?
5  A.    I have.
6  Q.    And do you recall approximately how many times
7  you've given depositions?
8  A.    I believe it was once.
9  Q.    Oh, okay.  And what was the matter?  Do you know?
10  A.    I was an issue over -- I was the sergeant of the
11  squad and my -- one of the my officers issued a
12  trespassing citation and we were being disposed [sic]
13  by the defendant in that case and his client.
14  Q.    Do you remember --
15  A.    I apologize, Counsel, there was another time I
16  was disposed [sic] in regards to a motor vehicle
17  accident one of my officers was in.
18  Q.    Okay.  Regarding the first one, do you know how
19  long ago that was?
20  A.    Has to be more than six years because I was a
21  sergeant then.  But, no, I don't know -- other than I
22  can't be more exact.
23  Q.    Do you recall anything else regarding that
24  incident in terms of a trespass?  What was going on
25  there?

Page 18

1   A.   I know that we won.  We were adjudicated not
2   liable for what they were saying.
3   Q.   Was it a civil case?
4   A.   It was.
5   Q.   Okay.  So it was a civil case involving a
6   trespass and do you recall anything else regarding
7   that?
8   A.   It was at the campus of Valley Forge Military
9   Academy In College.  There was a gentleman who for some
10  reason -- I can't recall -- was attempting to act as a
11  cadet.  He had been -- nope, I don't want to say that.
12  He was in the campus without going through the proper
13  procedures to get there.  He was wandering around the
14  dorm rooms looking for one of the cadets.  He was
15  located by my officer and he was cited for summary
16  trespass.
17  Q.   Were there any physical injuries to that
18  individual?
19  A.   No.
20  Q.   Oh, okay.  Do you know what attorney brought that
21  action?
22  A.   I do not.
23  Q.   Do you know what attorney defended that action?
24  A.   I do not.
25  Q.   Okay.  Other than those two that you mentioned,

Page 19

1   any other depositions?
2   A.   No, sir, not that I can recall.
3   Q.   I'd like to talk a little bit about your
4   experiential background.
5   A.   Sure.
6   Q.   If you could just give us a brief summary.
7   A.   So this July, I will be a police officer for 30
8   years.  I have held the rank of corporal, sergeant and
9   lieutenant, with the exception of superintendent.  It's
10  the only rank left for me to hold.  Like I said, I was
11  not a detective.  That's not a rank, it's an assigned
12  position.  I've been a field training officer, I've
13  been a firearms instructor.  I've been a patrol rifle
14  instructor.
15       I had the pleasure of working on the
16  Delaware County drug task force for several years.
17  Technically, I'm still a member of that unit, but I --
18  it's totally a pure supervisory role.  Because I've
19  been a lieutenant now for -- I always have a hard time
20  remembering when I got promoted, in '18 or '19.  So
21  figure six or seven years regardless.
22       I've had the opportunity to be in charge of
23  -- directly in charge of every aspect of the police
24  department from patrol, to special operations, to our
25  small civilian staff.  I don't know what else you are

Page 20

1   looking for, sir.
2   Q.   No.  That's fine.  Is there a police chief or is
3   that the superintendent as well?
4   A.   So it sounds like I'm being nitpicky with you,
5   but chief is a civil service rank.  We do not have a
6   chief.  Our chief is a superintendent, which means he
7   is appointed.  He's approved by the board -- picked by
8   the manager, approved by the board, serves at the
9   discretion of the township manager.  He is not civil
10  service.
11  Q.   Okay.  But he is --
12  A.   He is the boss.  He is what you would call the
13  chief.  Yes, sir.
14  Q.   And does he wear a uniform?
15  A.   He does.
16  Q.   And who is that?
17  A.   Christopher Flanagan.
18  Q.   F-L-A-N-A-G-A-N?
19  A.   Yes, sir.  All A's.  F-L-A-N-G-A-F-L --
20  Q.   F-L-A- --
21  A.   F--
22           THE STENOGRAPHER:  Let's do that
23       one more time for the record.
24           THE WITNESS:  F-L-A-N-A-G-A-N.
25  BY MR. SCHROM:

Page 21

1   Q.   Was he in that position in '22?
2   A.   Yes.  When this incident occurred, sir?
3   Q.   Yes.
4   A.   Yes, he was.
5   Q.   And he is there now?
6   A.   Yes, sir.
7   Q.   Okay.  So can you tell me a little bit about what
8   your responsibilities are or were regarding in charge
9   of every aspect of the police department involve --
10  A.   The --
11           MR. GONZALES:  She's going to kill
12       both of us.
13           THE STENOGRAPHER:  Thank you.
14           THE WITNESS:  I truly apologize.
15       I'm nervous.
16           THE STENOGRAPHER:  You're good.
17           THE WITNESS:  So the chief of
18       police is the head of the department.
19       He runs the department.  He has two
20       lieutenants, myself and another
21       lieutenant.  So we are the two ranking
22       officers below the chief.  The chief
23       sees fit to divide the department
24       roughly in half.
25           At one point, it's the patrol

LIEUTENANT JOSEPH PINTO                                          JOB NO. 1655053
MAY 13, 2025

Page 22

1  lieutenant which covers patrol.  It also
2  usually covers administrative staff,
3  which would be the chief secretary, the
4  police secretary, I usually keep the
5  narcotics officers no matter whatever
6  said the -- whatever side I move to, I
7  usually keep the narcotics unit because
8  it's what I am familiar with and what I
9  know.
10         The other side, the
11  administrative lieutenant, he is in
12  charge of detectives, the highway patrol
13  unit.  He usually gets our parking
14  enforcement people, which are also
15  civilians.  Then we divide other things,
16  like I have been in charge of the budget
17  pretty much since I've became a
18  lieutenant.  And saying in charge of the
19  budget may not be a proper way to put
20  it.  I'm charge of getting budget
21  requests, taking them to the township.
22  And then once the township approves or
23  denies certain aspects of the budget, it
24  falls onto me to spend within the
25  guidelines of what they told me we can

Page 23

1  spend, purchase orders, and writing
2  legislation, and resolutions for the
3  board to spend money and stuff like
4  that.
5          The other lieutenant, because
6  he's been so familiar with it, he runs
7  our scheduling app, he deals with all of
8  that as far as planning who works, who
9  doesn't work, and things of that nature.
10 BY MR. SCHROM:
11 Q.   So if I can just interrupt for a second.  So
12 Flanagan is the top, he divides the responsibilities,
13 and -- aside from his, into two categories, you assume
14 one role and who was the person --
15 A.   Christopher Four, F-O-U-R.  Now at the time of
16 this incident, it wasn't Christopher Four though.
17 Q.   And who was?
18 A.   It was Dietrich, D-I-E-T-R-I-C-H.
19 Q.   And first name?
20 A.   Shawn, S-H-A-W-N.
21 Q.   Okay.  So at the time of this incident, what were
22 your responsibilities and what was Shawn's
23 responsibilities?
24 A.   To the best of my recollection, I was the patrol
25 lieutenant.

Page 24

1  Q.   When does patrol lieutenant mean?
2  A.   So that means I was in charge of all patrol
3  operations.
4  Q.   And a patrol is basically leaving the police
5  station and then responding to an incident?
6  A.   Correct.  They are the people who show up when
7  you call 9-1-1.
8  Q.   And you were in charge of that.  Did you also
9  have the responsibility to determine whether or not an
10 individual is going to be charged with a crime?
11 A.   Can you ask me that again?
12 Q.   Sure.  Were you the decision-maker regarding
13 whether or not to charge someone with a crime?
14 A.   So I would have the authority to make that
15 decision, but it would not -- on a regular basis, the
16 officers don't call me and say, hey, Lieutenant, can I
17 arrest this guy?  They have the discretion from the
18 most juvenile officer up to the most senior office, up
19 to the sergeant, up to me.
20 Q.   Okay.
21 A.   They all usually call me and run things by me if
22 it it's not something that they're not comfortable with
23 or something out of the ordinary.
24 Q.   Was this circumstance regarding Ockley out of the
25 ordinary anywhere?

Page 25

1  A.   Yes, it was.
2  Q.   And did anybody call you?
3  A.   Yes, they did.
4  Q.   And who ultimately made the decision to have her
5  arrested?
6  A.   So prior to yesterday, I would have told you it
7  was me.  After it reviewing the body cam, it was
8  Sergeant Fischer.  He told her that she was under
9  arrest.  He then called me and I completely, 100
10 percent supported his decision.
11 Q.   So he made a decision at the site and then he
12 reported back to you?
13 A.   Correct.
14 Q.   But you were already familiar with the matter?
15 A.   Yes, because I was there the day before.
16 Q.   So you were on day 1 and he was on day 2?
17 A.   I believe he was both days.
18 Q.   He was both days?
19 A.   Yes, sir.
20 Q.   But you were only there on day 1?
21 A.   Correct.
22 Q.   Okay.  Regarding making the decision to 302 her
23 on that day, was that your decision or somebody else's
24 decision?
25 A.   The paperwork was filed by the -- let me get the

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 26

1  name right, the Delaware County Crisis Team.
2  Q.  Right.
3  A.  But they completed the paperwork, but at our
4  request, we were all in agreement that Ms. Ockley was
5  suffering and she needed the type of help that they
6  could offer.
7  Q.  Were you the ultimate decision-maker on day 1 or
8  was there somebody else?
9  A.  I was on scene.  So, therefore, I would have been
10  the officer in charge.
11  Q.  Okay.
12              MR. GONZALES:  When you said the
13              ultimate decision-maker, I just want to
14              clarify, do you mean the ultimate
15              decision-maker to process a 302?  Or
16              ultimate decision-maker for the police
17              officers that were there?  Because there
18              is a --
19              MR. SCHROM:  Well, let me think
20              here.  So we -- let's just go it this
21              way.
22  BY MR. SCHROM:
23  Q.  Were you the decision-maker on scene to determine
24  that Ms. Ockley should be 302'd?
25  A.  No.  I was the decision-maker on scene to ask and

Page 27

1  request that she be 302'd.
2  Q.  Okay.
3  A.  The decision-maker was ultimately the crisis
4  unit.
5  Q.  So did you contact the crisis unit?
6  A.  They were contacted on my behalf.
7  Q.  So you made the recommendation that crisis unit
8  came out?
9  A.  Yes.
10  Q.  And they made the determination?
11  A.  Well, let me rephrase that.  They filed the
12  paperwork and they filed the petition.
13  Q.  Filed the petition.  Right.
14  A.  So the petition has to be signed off on -- I
15  don't want to assume, but it's definitely someone at
16  the crisis unit.  I don't believe that the crisis unit
17  can say, this person is 302'd.
18  Q.  Right.  I understand.  Thank you.  We were
19  talking about your experience.  Do you have any other
20  comment regarding the experience that you have had over
21  the years?  I think you were just about finishing up.
22  A.  No.  Unless you have a specific question, I
23  really don't.
24  Q.  Okay.  So regarding that experience overall, how
25  would you characterize yourself in terms of experience?

Page 28

1  Very experienced?  Extremely experienced?  Experienced?
2  A.  I would say I'm very experienced.
3  Q.  In terms of -- have you always been with the
4  Radnor Police Department?
5  A.  I have.
6  Q.  Okay.  In terms of your experience with the
7  Radnor Police Department, how would you characterize
8  the Radnor Police Department as an entity?  Very
9  experienced?  Experienced?
10  A.  The police department as a whole?
11  Q.  Yeah.
12  A.  I would say they're extremely experienced.
13  Q.  And regarding the Radnor Township officers as
14  they would relate to police matters, how would you
15  characterize them regarding that same analysis?  Very
16  experience?  Experienced?
17              MR. GONZALES:  I'm just going to
18              object because, obviously, every officer
19              has a different level of experience.  So
20              I'm not sure how he can answer that, you
21              know, as a whole.  But I'll let him
22              answer.
23  BY MR. SCHROM:
24  Q.  Yes.
25  A.  Counsel took the words from my mouth.  We have a

Page 29

1  department that fluctuates from newer officers, to
2  older officers.  As you can imagine, experience goes
3  with time and incidents.  I think we do everything we
4  possibly can training-wise to give experience that they
5  are not going to get -- the time is going to take them
6  over time, but I couldn't say, you know, there is
7  people that have very experience, there is people that
8  have new experience.  Quite honestly, there may be
9  people at the time who have no experience at that time,
10  and that's why we have a training officer program and
11  that's what we are doing.
12  Q.  Okay.  What interaction do you typically have, if
13  any, regarding a Radnor Township officer?  Meaning
14  somebody who is in the board of directors or whoever is
15  running the township, whatever their role is?
16  A.  So we have a pretty strong chain of command.  So
17  I would say a majority of all interactions goes through
18  staff or nonpolice people would go through the chief.
19  For certain issues, such as -- says there's a hoarding
20  issue or there is a codes issue, or something like that
21  we would definitely -- what would happen is it's
22  referred in the reports by the officer, approved by the
23  sergeant, the patrol lieutenant on a daily basis goes
24  through the reports, pulls out the reports and say,
25  hey, look, we believe this is a hoarding situation.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 30

1  This goes to codes. There was an accident and a
2  traffic light got knocked down. We send that to
3  highway Ricky Foster (ph). He gets that. Something
4  occurred at one of our township parks, I'll send it to
5  my parks director.
6         But there is very limited face-to-face, not
7  because I don't know who they are, or I don't see them
8  in the hall and interact, but there is really no need
9  to. They just get their report and do their job. We
10 keep the reports and we do our job.
11 Q.   Okay. So the township personnel, such as Kevin
12 Kochanski?
13 A.   Kevin Kochanski. Yes, sir.
14 Q.   He's in the same building?
15 A.   Yes, he is.
16 Q.   And he know him?
17 A.   I do.
18 Q.   Did you review any of his notes regarding this
19 matter?
20 A.   Not that recall. No.
21 Q.   Okay. Did you ever talk with him regarding this
22 matter?
23 A.   No.
24 Q.   You did not?
25 A.   I did not.

Page 31

1  Q.   Do you know if you sent any e-mails to him
2  regarding this matter?
3  A.   Me personally?
4  Q.   You or any other --
5  A.   Oh. I know information was sent to the codes
6  department. Absolutely.
7  Q.   Do you know who did that?
8  A.   Without referring to my notes, I'm going to tell
9  you I'm very confident it was Officer Faust (ph) and/or
10 Officer Bates (ph) and that's -- but I would have to
11 refer to the reports.
12 Q.   Okay.
13 A.   And these were incidents prior to the dates we
14 are talking about.
15 Q.   Okay.
16 A.   This is all different.
17 Q.   Okay. What I mean -- focusing on the arrest and
18 around August of '22, do you know whether or not Faust
19 or Bates had any communication with Kochanski or any
20 members of that department regarding the
21 circumstances?
22 A.   I believe they were the officers who responded,
23 found the location to be uninhabitable, gave that
24 information to the codes department. And based on
25 their information, they went out and did a site visit

Page 32

1  and deemed it to be uninhabitable.
2  Q.   And if I represented that would be on or about
3  April 21, do you have any reason --
4  A.   I believe it was -- if you are saying that our
5  dates were -- no, I don't know the dates. I'm not
6  going to argue with you. Was it same year -- yeah, I
7  don't know the date. I'm sorry.
8  Q.   Okay. But would you agree that it was months
9  before the actual arrest?
10 A.   I couldn't tell you, sir.
11 Q.   Okay. That's fine. How would you characterize
12 your own conscientiousness and attention to detail
13 among the same parameters? Very conscientious?
14 Conscientious?
15 A.   In conscientious in details?
16 Q.   Yes.
17 A.   I would say I'm very conscientious to details
18 because I learned very quickly in my role as a
19 lieutenant that it's important. It's important. Yeah.
20 It's important.
21 Q.   Okay. And based on your 30 years of being with
22 the township police, how conscientious do you think the
23 Radnor Township police is regarding, again,
24 conscientiousness and attention to detail as an entity?
25         MR. GONZALES: Objection to the

Page 33

1         form, but you can answer.
2         THE WITNESS: I would say they are
3         very conscientious based on the
4         knowledge that I have with our agencies
5         versus what we do versus what they do on
6         a regular basis as far as service calls
7         and quality of life issues and stuff
8         like that. I would say we were
9         extremely conscientious.
10 BY MR. SCHROM:
11 Q.   So in the past with these depositions, we have
12 taken a break normally at about an hour. So I would
13 suggest we will probably do that around 11:05 or
14 something like that.
15 A.   I'm at your disposal, Counsel.
16 Q.   Okay. What are the typical matters that you as
17 an officer are involved in? I guess over the 30 years
18 it would change.
19 A.   It would change. It would dramatically.
20 Q.   Let's just take it for the last five years. What
21 have you principally been involved in?
22 A.   So I've been part of what the chief calls the
23 management team. I'm tasked with the daily, day-to-day
24 operations of the police department, whether I was in
25 charge of the patrol side or whether I was sergeant

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 34

1  special operations side. I am involved in the budget.
2  I would be involved in any issues with discipline that
3  would come up.
4  Q.  Discipline regarding officers?
5  A.  Correct. So anything that would fall under the
6  administrative operations of a police department, I
7  would fall to. I'm on call every other week. So if
8  questions or concerns arise, 24 hours a day they call
9  me and I'd be available for that.
10  Q.  That's a lot.
11  A.  Yeah. It's part of the job.
12  Q.  So in the past five years, how many of those
13  years have you been involved on the patrol side?
14  A.  So prior to --
15  Q.  And I'm going to ask you over the prior five
16  years.
17  A.  So prior to -- the past two years prior to this.
18  So January 1, I got moved back to patrol. The two
19  years prior to that, I was the administrative
20  lieutenant. Prior to that, we switched every other
21  year. So I would -- my first year as a lieutenant, I
22  got promoted in October. So I had patrol from October
23  all the way through.
24          I had those two months plus the year, then I
25  went to administration, then I went to patrol. And

Page 35

1  then Superintendent Flanagan two years ago decided to
2  make it a two-year post. So for the year prior to
3  this, I was in charge of investigations, I was moved
4  back to patrol January unless Chief Flanagan has
5  brought in the changes again, I would be in charge of
6  patrol this year and next year.
7  Q.  So I guess a short form would say that you spent
8  approximately in the last five years, maybe two years
9  in the patrol area, would that be right?
10  A.  No.
11  Q.  Okay. What would be the total time in the last
12  five?
13  A.  So the last five -- so this one, two, a year
14  there. Okay, five years. I stand corrected. Yeah, I
15  was probably in charge of patrol two years in the last
16  five because the two years was administrative.
17  Q.  And one of those years was '22?
18  A.  Correct.
19  Q.  Okay. And then in the 25 years before that, what
20  was your role relative to patrols?
21  A.  So working backwards?
22  Q.  Yeah. Not in giant detail, but just kind of --
23              (Simultaneous talking.)
24              THE WITNESS: I want to say close
25          to 10 years, which means I was in charge

Page 36

1              of a squad. The patrol division is
2              broken into four squads. So I worked
3              patrol my whole sergeant career. Prior
4              to that, I was corporal, which means I
5              was much in the way that I am the
6              ranking lieutenant under the chief now,
7              I was the ranking officer under the
8              sergeant on a squad. You know, 9 days
9              out of 10, I was assigned a beat, and I
10              worked the beat and I was patrol. When
11              the sergeant was off, I was the officer
12              in charge. Prior to that, I was a
13              patrolman, which I was assigned a beat
14              in a unit, and I just pushed the car,
15              and answered calls and did my job that
16              way.
17  BY MR. SCHROM:
18  Q.  Okay. All right. So it would seem as though you
19  are very familiar with patrol kinds of matters?
20  A.  Yes, sir.
21  Q.  How many times have you come across a
22  circumstance over the last five years regarding a
23  condemnation?
24  A.  Definitely more than once, I'll say several. I
25  can't of give you the exact numbers.

Page 37

1  Q.  Would it be less than five? More than five?
2  A.  I would say more than 5, less than 10.
3  Q.  More than 5, less than 10?
4  A.  Hmm-hmm.
5  Q.  And if there was a typical circumstance, what was
6  that if you could character those?
7  A.  Surprisingly we see a lot of hoarders.
8  Q.  Hoarders. Okay.
9  A.  I don't know if it's a societal thing or a Radnor
10  thing, but we see them more than I would've expected.
11  It could be the result of natural diaster, lightning
12  strikes, trees fall on houses, stuff like that. Could
13  be fires when the house is damaged by fire. It wasn't
14  within the last five years, so it's a waste of time.
15  We had one where a car drove through the front of the
16  house. The house was condemned. So I don't want to
17  make it sound like it's a common thing, but it does
18  happen.
19  Q.  Okay. It sounds as though there are physical
20  issues with the house and that's one kind of category
21  and then the hoarding category is a separate one; is
22  that correct? Or am I not right on that?
23  A.  I don't know how the codes people would classify
24  the difference. They just say that this house for A,
25  B, C and D reasons is inhabitable.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 38

1    Q.   Okay.  And in the past five years, how many
2    circumstances have you had where there has been a
3    determination that the house is unfit or not fit for
4    human occupation?  Is that the same number?
5    A.   Well, breaking down into separates, I would say
6    less than five.
7    Q.   Less than five.  Okay.  Can you recall any of
8    those circumstances?
9    A.   I can recall circumstances.  I'm now having a
10   hard time remembering if they were in the last five
11   years.
12   Q.   Okay.  You want to give us what you can recall?
13   A.   There was a specific one that was a hoarding
14   incident.  It was actually an instance where we had to
15   physically remove things to get the person out of the
16   house.  We have had apartment issues where neighbors
17   would call and -- because there to be a rodent or
18   infestation, or bug problem, odor problems or stuff
19   like that.
20   Q.   Okay.
21   A.   Yes.  But, yeah, those types of things.
22   Q.   I'm going to put a couple of categories together
23   and then ask you a question at the end.  So I'd like to
24   know how many times you had a condemnation or an unfit
25   for human occupation incident where the property was

Page 39

1    already sold?
2    A.   Was that the question?
3    Q.   Yes.
4    A.   I don't recall any.
5    Q.   Okay.  Do you recall how many times you had a
6    condemnation or unfit for human occupation where you
7    had property sold, but there was a court order talking
8    about the person being allowed on the property?
9    A.   So with the --
10   Q.   Other than my case.
11   A.   With the exception of the court order, we are
12   told regularly by our codes people that the building is
13   locked and secured.  If someone is going to allow
14   access to remove items or allow access to do cleaning
15   in some cases, that is fairly common.  I can't
16   articulate or tell you in good faith if they're doing
17   that because that's what they do as the codes
18   department or if it was because of a court order.  But
19   we have regularly, in these scenarios, allowed access
20   to these properties to remove items or to do some
21   cleaning if it's deemed that way.
22   Q.   Okay.  Same sort of premise, so how many
23   circumstances have you had in the past overall time
24   period where there was a condemnation and a declaration
25   of the property not being fit for human condition where

Page 40

1    the property was sold, there were court orders, and the
2    property was condemned?
3    A.   All of those things?
4    Q.   Yes.
5    A.   I can recall none.
6    Q.   So this circumstance that we are talking about
7    was pretty rare?
8    A.   I would say it was extremely rare.
9    Q.   Okay.  And then just going one more time, how
10   many circumstances -- and I can anticipate the
11   answer -- where there was a condemnation, a
12   determination of not fit for human occupation, the
13   property was sold, there was a court order allowing the
14   person access to the property, the property was
15   condemned and an arrest was made?
16   A.   I don't remember any.
17   Q.   So this would be the only circumstance?  This
18   case?
19   A.   Yeah.  I mean, it's the only one that I can
20   remember.  Yes, sir.
21   Q.   Okay.  Before you made the recommendation to
22   arrest in concert with the other officer, did you or
23   Officer Fischer ever speak to the district attorney or
24   the assistant district attorney?
25   A.   Speak to them in general or speak to them about

Page 41

1    this?
2    Q.   Speak to them about this.
3    A.   I did not.  I cannot speak for Sergeant Fischer.
4    Q.   Okay.  Did you ever -- same premise, before you
5    made the decision to arrest, did you ever contact the
6    -- either judge that created the court order?
7    A.   No, I did not.
8    Q.   Same premise, did you ever talk to the attorney
9    that was present at the initial hearing that created
10   the very first court order?
11   A.   No.
12   Q.   Did you ever speak with private counsel of any
13   type regarding these court orders?
14   A.   I'm going to say no, but I want to put an
15   asterisk next to it, the gentleman that I couldn't
16   remember early on who was there was first day to tell
17   us that Ms. Ockley was on the premise, I don't know who
18   that person was.  So I don't believe he was an
19   attorney, but I'm going to answer your question no with
20   a caveat I don't know who that person was.
21   Q.   So you don't know whether or not it was
22   Brydzinski?
23   A.   I don't know.
24   Q.   And it wasn't Lingo?
25   A.   It definitely was not Mr. Lingo.

Page 42

1    Q.    An you don't know whether it was --
2    A.    I do not, sir.
3    Q.    Did you ever -- same premise, did you ever speak
4    to township counsel prior to arresting --
5    A.    No.
6    Q.    -- Ms. Ockley?
7    A.    No.
8    Q.    Did you ever speak to the superintendant prior to
9    arresting Ockley?
10   A.    Prior to arresting her?
11   Q.    Yes. Regarding this incident.
12   A.    Yes.
13   Q.    And did he make the same recommendation?
14   A.    About arresting her?
15   Q.    Yes.
16   A.    No. I -- he was advised she was arrested after
17   she was arrested. We discussed the matter as it
18   occurred the day prior.
19        But ultimately, he was not involved in the
20   decision to arrest her?
21   A.    She was arrested before he was notified that she
22   was arrested.
23   Q.    And did he ever counter that saying -- you know,
24   that was improper or you shouldn't have arrested her or
25   anything like that?

Page 43

1    A.    No. In fact, he understood our conundrum.
2    Q.    And he supported that arrest; correct?
3    A.    Yes.
4    Q.    Okay. Prior to the arrest, did you ever have a
5    sit-down with the court orders in place, and other
6    officers or township persons discussing how to approach
7    this circumstance? This conundrum as you said?
8    A.    No.
9    Q.    Did you personally ever read up on anything that
10   was related to this matter, such as condemnations and
11   ordinances, orders, what would control, anything like
12   that? Have you had any conversations or sit-downs
13   regarding that prior to her arrest?
14   A.    So we understand that when the township deems a
15   property to be uninhabitable and they lock it, there's
16   locks. We have keys. We understand that we're
17   probably going to be the person to open the building to
18   let the people in to remove items, or clean, or
19   something like that within certain hours.
20        We understand and we relay to our officers that
21   if there's a contact scenario where a house is in a
22   state of deplorability or unsafe or to try to get codes
23   out there at the scene, prior to releasing the scene,
24   we understand that they're supposed to get -- if they
25   can't -- if they're not able to get codes out there,

Page 44

1    whether it's the time of day, a weekend, or something
2    like that, or whatever the reason, try to get as much
3    information on their body camera and in their notes and
4    reports and stuff like that.
5    Q.    Okay.
6    A.    But to sit down and discuss this? No.
7    Q.    Okay. So as I think you said initially, you had
8    an awareness of court orders, but you didn't see the
9    court order until yesterday; is that correct?
10   A.    That is correct.
11   Q.    And would that apply to Officer Fischer, too?
12   A.    I will not speak -- I don't know what Officer
13   Fischer knows. I don't know.
14   Q.    I understand. Did you or do you know of anyone
15   else did any Lexis or Westlaw searches regarding
16   whether an ordinance is over a common pleas order or
17   whether an order is over a municipal ordinance?
18   A.    No, because I don't really know what that means.
19   So I'm pretty sure I never did that.
20   Q.    It's just a search engines for lawyers.
21   A.    No.
22   Q.    And do you have access to Lexis or Westlaw at
23   your --
24   A.    You say Lexis, do you mean LexisNexis?
25   Q.    Yes.

Page 45

1    A.    I have people that have access to it that can do
2    that for me. I personally don't have access to
3    LexisNexis.
4    Q.    Before you arrested her, did you ask anybody to
5    do a Lexis search or regarding whether an ordinance is
6    over an order or whether an order is over an ordinance?
7    A.    No, sir.
8    Q.    Okay. You familiar with the term probable cause?
9    A.    I am.
10   Q.    And that's an important term?
11   A.    It's an extremely important term. Yes, sir.
12   Q.    Why is it an important term?
13   A.    It's what we based our actions on. If you have
14   probable cause to make an arrest, you make the arrest.
15   If you don't have probable cause to make the arrest,
16   you can't make an arrest.
17   Q.    So it's the key term would you say?
18   A.    Well, yes, it's a very, very important term.
19   Q.    Okay. How familiar are you would you say with
20   the requirements of probable cause?
21   A.    I think I am extremely familiar and qualified.
22   Q.    And would that apply to the other officers on the
23   scene?
24   A.    In my opinion?
25   Q.    Yes.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 46

1   A.   Yes.
2   Q.   And would it apply to the police department in
3   the general over your experience?
4   A.   Again, we talked about experience earlier.  There
5   is different experience levels.  It's something that
6   gets over time.  But as a whole, yes, I think we are
7   very good at probable cause.
8   Q.   So from a laymen's perspective, what does
9   probable cause mean?
10  A.   So it means that the likelihood that a crime is
11  committed -- not in the eyes of a police officer, but
12  in the eyes of a normal human being it's more likely
13  than not that it has occurred and it gives the ability
14  to take someone into custody as long as it's a M2 or
15  higher, it can happen.  If it's less than M2, it has to
16  happen in your presence.
17  Q.   And any other criteria?
18  A.   I'm sure there is.  Case law changes it every
19  day.  There's all kinds of innuendo in every crime and
20  you can't take -- every scenario is different.  So it
21  would be impossible for me to give you one definition
22  that answers every possible condition.
23  Q.   Okay.  Anything else regarding probable case?
24  A.   No, sir.
25  Q.   Okay.  In order to make an arrest, what percent

Page 47

1   of cases need probable cause?
2   A.   To make an arrest?
3   Q.   Yes.
4   A.   All of them.
5   Q.   So that would be 100 percent?
6   A.   Yes.
7   Q.   Regarding the crimes that Ockley was charged
8   with, are you familiar with those crimes?  I don't mean
9   the category.  I just mean that list of -- I think
10  there were four.
11  A.   That Ms. Ockley was charged with?
12  Q.   Yes.
13  A.   I think I am familiar with two or three of them.
14  I wouldn't say I know all of them.
15  Q.   Okay.  Let me just take a second here.
16  A.   Sure.
17           MR. SCHROM:  We are going to mark
18       this one.
19           THE STENOGRAPHER:  She has the
20       exhibit stickers.
21           (Exhibit Pinto 1 was marked for
22       identification.)
23  BY MR. SCHROM:
24  Q.   I'm showing you a document that's been previously
25  marked as Pinto 1.  Could you identify that, Officer?

Page 48

1   A.   This appears to be the criminal complaint filed
2   against Ms. Ockley.
3   Q.   And this is the one that you said you approved
4   with Fischer; is that right?
5   A.   So I approved the arrest.  I did not approve this
6   document.
7   Q.   Oh, okay.  But you have to get arrested for
8   something?
9           MR. GONZALES:  Objection, but you
10      can answer.
11          THE WITNESS:  Oh, absolutely.
12  BY MR. SCHROM:
13  Q.   So what did they say they were going to arrest
14  her for?
15  A.   They didn't.  It wasn't -- the conversation was
16  -- in our minds, it was extremely obvious why
17  Ms. Ockley was in violation of the law and what she
18  would be charged with.  So we never discussed charges
19  though.
20  Q.   So Fischer was on scene?
21  A.   He was.
22  Q.   On the second day.  You were not?
23  A.   Correct.
24  Q.   He said, I believe that she should be arrested
25  and you approved?

Page 49

1   A.   Yes.  Because a lot of -- I will not say all of,
2   but a lot of her arrest on day 2 was precipitated by
3   her actions and the results of our actions on day 1.
4   Q.   But on day 1, she wasn't arrested.  She was just
5   recommended for 302?
6   A.   That is correct.
7   Q.   Then she came out of that environment, was not
8   302'd or detained and now you are into day 2 and a
9   determination is made to have her arrested?
10          MR. GONZALES:  Objection to the
11      form, but you can answer.
12          THE WITNESS:  I'm sorry, ask the
13      question again.
14  BY MR. SCHROM:
15  Q.   Yes.  I mean, the decision to arrest was on
16  day 2?
17  A.   Because we felt as if we were out of options.
18  Q.   Okay.  But the document that you are looking at
19  was prepared after the fact?
20  A.   After day 2?
21  Q.   Yeah.  After she was arrested, this document was
22  --
23  A.   Yes.
24  Q.   So when you gave the okay to arrest her, do you
25  recall any of that conversation with --

A. I -- we --
THE STENOGRAPHER: Sir, sorry, can you please just wait for him to finish asking his question?
THE WITNESS: Sorry.
THE STENOGRAPHER: No. It's okay. Everybody does it. You're fine. Thank you.
THE WITNESS: Our primary conversation was we had no understanding whatsoever how this woman was released not only from a mental health facility, but in the condition they released her in. And the second concern was should we look into to see if she somehow absconded or escaped from the mental health facility.
BY MR. SCHROM:
Q. Okay.
A. But based on that fact that we had no reason to believe, no notice that she was an escapee, or anything like that, there was no 302 option available to us any longer because they basically told us no. So based on the options that we had available to us, that was the option that we took.

Q. So I guess you just said a moment ago that you felt like you were out of options and then moved to arrest status; is that correct?
A. Well, no, we explored other options.
Q. What were the other options?
A. Ms. Ockley, could you have someone come pick you up? Could you go stay with somebody? Do you want to go to a hotel? Do you want to go stay somewhere? Do you want to do this? Do you want to do that? You know, is there anybody we can call for you? And it was -- again, I was not there that day. So I don't want to say it was noncooperation or the answer was just no, but we've exhausted all of our options as a law enforcement agency.
Q. Okay. Did you participate on -- after she was arrested, in the creation of this document that's in front of you?
A. No.
Q. Who were the people who participated in the creation of that document?
A. So this is brought by Officer Brian Brown. He was in the FTO program at that time.
Q. What does that mean?
A. So he was a new officer to Radnor Township. FTO stands for field training officer program.

Q. Okay.
A. So he had a field training officer that was with him. I won't swear to it because I don't remember, but I think it might have been Officer Mccalia (ph), but I don't remember exactly. He was on the scene. I'm sure that officer Cocco assisted this because she was the first officer on the scene. And I'm sure -- but again, I can't say definitively, but I'm sure the document was reviewed by Sergeant Fischer because he was the sergeant on the squad at that time.
Q. Oh, okay. So at that point after -- I think you signed of -- looking for a signature -- that is Brian Brown; right?
A. It absolutely should be, but I can't read it.
Q. Okay.
A. Yes. Brian Brown is your affiant.
Q. Okay.
A. Yeah. I'm sorry.
Q. Okay. Do you know whether Brian Brown ever read the -- any of the court orders?
A. I do not.
Q. Do you know whether or not Officer Fischer ever read any of the orders?
A. I do not.
Q. But all you can say is that you did not?

A. Prior to this, I did not.
Q. Okay.
MR. SCHROM: Okay. Let's take a break. It's been about an hour and we will reconvene in 10 minutes.
Thank you.
THE VIDEOGRAPHER: Off the record at 11:04.
(At this time, off the record.)
(At this time, back on the record.)
THE VIDEOGRAPHER: We are back on the record at 11:23.
BY MR. SCHROM:
Q. I would like to go back to probable cause for a moment. Do you know whether you or any other officer had an analysis of each of the delineated crimes that Brian Brown is talking about as to the aspects of probable cause?
MR. GONZALES: Objection, but you can answer.
THE WITNESS: I'm not quite sure I understand what you mean.
BY MR. SCHROM:
Q. Okay. So we've talked before and you said that probable cause is very important and you need probable

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 54

1  cause in order to arrest somebody, probable cause in
2  order to charge them with a crime; right?
3  **A.   Yes.**
4  Q.   So there are four crimes that she was charged
5  with.  Could you go through and just read them because
6  --
7  **A.   So, unfortunately, a lot of them are blacked out.**
8  **So this is the burglary, this is the defiant trespass.**
9  **That's the criminal trespass and criminal mischief.**
10  Q.   Okay.  So there were four things.  Read them
11  again, please.
12  **A.   So we have criminal trespass.**
13  Q.   Criminal trespass.
14  **A.   Burglary.**
15  Q.   Wait a minute.  All right.
16  **A.   And it's specifically not adapted from an**
17  **overnight accomodation.**
18  Q.   Okay.
19  **A.   Defiant trespass, actual communication to --**
20  Q.   Wait a minute.  Defiant trespass.
21  **A.   Hmm-hmm.**
22  Q.   Okay.
23  **A.   And criminal mischief, damaged property, reckless**
24  **or negligent.**
25  Q.   So let's just take one at a time.  What's the

Page 55

1  crime of criminal trespassing?
2  **A.   Not being a lawyer, it basically means going**
3  **somewhere that you are not supposed to be.**
4  Q.   And what was the probable cause regarding that
5  particular crime as you understood it on that day or as
6  Officer Fischer understood it on that day?
7  **A.   Okay.  So, not that I was there.  I watched the**
8  **video.**
9  Q.   Right.
10  **A.   Ms. Ockley was sitting it the porched area of the**
11  **home.**
12  Q.   Okay.
13  **A.   So she was not only in the property, but she was**
14  **in the building.**
15  Q.   Okay.  Sitting on the porch?
16  **A.   I'm going to call it a porch.  I don't know what**
17  **you would call it.**
18  Q.   You mean on the back --
19  **A.   The back screened-in area.**
20  Q.   Yeah.  It was concrete patio?
21  **A.   I don't know.**
22  Q.   Okay.  Anyway, sitting in the outside porch area,
23  that's attached to the house?
24  **A.   Yes, it is.**
25  Q.   And it appears to be a screened-in porch; is that

Page 56

1  right?
2  **A.   It's definitely screened in.  I would say a**
3  **3-seasons room maybe.**
4  Q.   So sitting in the 3-seasons porched area.
5  Anything else?
6  **A.   Just being on the property itself.**
7  Q.   Being on the property.  Okay.  Anything else for
8  criminal trespass?
9  **A.   No, sir.**
10  Q.   Okay.  Regarding the burglary, what was the
11  probable cause regarding the burglary?
12  **A.   Because of the type of property that it was, it**
13  **was a residential home.  Not at the time specifically**
14  **numerated in the adapted accommodation, but just the**
15  **fact that she was there.**
16  Q.   Okay.
17  **A.   She entered the property.  So it wasn't enough to**
18  **be on the property.  So in other words, if she was in**
19  **the driveway and not in the residence area, that**
20  **would've been enough for the criminal trespass.**
21  Q.   Okay.
22  **A.   The fact that she entered the building, it's**
23  **criminal trespass, and then, therefore, burglary.**
24  Q.   So anything else other than what you just talked
25  about regarding the burglary charge?

Page 57

1  **A.   So burglary also -- you have to do with the**
2  **intent to commit another crime when you get in.  She**
3  **was planning on moving back in and staying there.  So**
4  **that is the two elements for the burglary.**
5  Q.   Okay.  Anything else?
6  **A.   No, sir.**
7  Q.   Let's go to the next, defiant trespass.
8  **A.   So defiant trespass refers to the fact that she's**
9  **already been advised by law enforcement and/or the**
10  **legal person to do so to tell her that she's not**
11  **welcome on the property or in the building.  So that's**
12  **-- as it says, it's by actual communication.**
13  Q.   And who was the person or persons that said you
14  can't be on the property?  Was that an officer?
15  **A.   Well, it was me the day before.**
16  Q.   And on that day, it was Officer Cocco?
17  **A.   There is going to be no telling her.  Officer**
18  **Cocco reminded her that she was told that she wasn't**
19  **allowed to be there, but at that point the crime was**
20  **already committed.**
21  Q.   Okay.  Anything else regarding defiant trespass?
22  **A.   No.**
23  Q.   And criminal mischief, what's the probable cause
24  of --
25  **A.   So --**

Page 58

1          MR. GONZALES:  Wait.  Wait.  Wait.
2     Wait.
3          THE WITNESS:  I'm sorry.
4          Speaking with the officers,
5     there was signs that were ripped down
6     off of the property advising that you
7     could not trespass and the property was
8     condemned.  There was a panel ripped off
9     of the garage door.
10          I also believe there was -- I
11     won't say that.  I want to say I believe
12     there was tape as well, but I can't
13     swear to that.  So I don't know.
14 BY MR. SCHROM:
15 Q.   Okay.  Anything else?
16 A.   No.
17 Q.   I believe the testimony of Ms. Cocco was that she
18 said that this criminal complaint was a collaborative
19 effort.  Is that your understanding as well?
20 A.   No.  I would not know.  I can't -- I could
21 speculate.
22 Q.   Well, we don't want you to speculate.
23 A.   Okay.  Then I won't do that.
24 Q.   So you're not sure of the answer?
25 A.   I'm not sure.

Page 59

1 Q.   Okay.  It is my understanding that Officer Cocco
2 testified that she believed that the ordinance was
3 controlling and that she didn't have to review court
4 orders.  Is that also your understanding?
5          MR. GONZALES:  Objection to the
6          form, but you can answer.
7          THE WITNESS:  I'm not sure I
8          understand the question.
9 BY MR. SCHROM:
10 Q.   Well, it's just kind of boils down to ordinance
11 over order or court order over ordinance.  So in
12 speaking to Officer Cocco at her deposition, I'll
13 represent to you that she said that the ordinance was
14 controlling, and that she didn't have to pay attention
15 to pay court orders.  The ordinance saying that the
16 property was condemned.  And so that in combination
17 with Ockley transferring to the deed was sufficient for
18 Officer Cocco to make the determination that Simona
19 Ockley was not allowed on the property.
20 A.   I don't know what Officer Cocco was thinking.  I
21 can tell you what I was thinking.
22 Q.   Okay.  Why don't you tell us what you were
23 thinking regard doing --
24          (Simultaneous talking.)
25          MR. GONZALES:  Wait.  Wait.  Wait.

Page 60

1          Wait.
2          THE WITNESS:  Sorry.  She was told
3          that she was not allowed on the property
4          prior to the day before.  She was told
5          by me, and others that she was not
6          allowed on the property anymore, and she
7          came back and was on the property again.
8 BY MR. SCHROM:
9 Q.   Okay.  In terms of her not being allowed on the
10 property, did you have any -- I guess you don't
11 remember.  Did you ever have any communications with
12 the owner, Mr. Brydzinski?
13 A.   No, I did not.
14 Q.   And you already said that you didn't review the
15 court order.  Did you review the code ordinance
16 violations?
17 A.   I had knowledge that Ms. Ockley no longer owned
18 the property, and with specific access limitations was
19 allowed to remove items.  When I found her the day
20 before and when I watched the video again for the
21 second day, there was no intention of Ms. Ockley
22 removing items.  By her own words, she was moving back
23 in.  On the first day once she was in the home, she was
24 on the phone trying to reestablish utilities to the
25 home; okay?

Page 61

1 Q.   Hmm-hmm.
2 A.   On the video the second day, she is telling the
3 officers that it was her home and she's allowed to be
4 there; okay?  That, in my opinion and my belief, is not
5 correct.  That's why that's -- the thing that my
6 officers were acting under.
7 Q.   Okay.  So --
8 A.   And if you read the orders, they are correct in
9 believing that because the orders -- which again I read
10 afterwards, specifically say access permitted by the
11 owner, which is not Ms. Ockley, or the Radnor police,
12 which we did not let her in, to remove items.  She was
13 doing none of that.  She was trying to reestablish
14 utilities to the home.
15 Q.   Okay.  Did you ever physically review the
16 ordinances that sensibly were broken by Ockley?  Was it
17 created by code enforcement?  Did you ever review that
18 document, her being arrested?
19          MR. GONZALES:  I'm just going to
20          object.  That didn't make an sense --
21          the code --
22          MR. SCHROM:  I'll rephrase it.
23          MR. GONZALES:  Okay.
24 BY MR. SCHROM:
25 Q.   We have a document you can look at later, but

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 62

1  prior to making the arrest, did you ever review any
2  other document?
3  **A.   No.**
4  Q.   Do you know whether prior to the arrest Officer
5  Fischer reviewed any other document?
6  **A.   I would not testify to what Officer Fischer**
7  **noted.**
8  Q.   Do you know whether or not the superintendent
9  reviewed any other document --
10  **A.   I would have no --**
11            MR. GONZALES:  Wait.  Wait.
12            THE WITNESS:  Sorry.  Sorry.
13        Sorry.
14  BY MR. SCHROM:
15  Q.   Do you know whether or not the superintendent
16  reviewed any other documents before making the arrest?
17  **A.   I do not.**
18  Q.   What's the typical procedure in Radnor Township
19  regarding condemning a property?  And then if you could
20  take us through the police department involvement.  But
21  first, are you familiar with the condemnation
22  procedure?
23  **A.   I am not.**
24  Q.   Okay.  Do you know whether Officer Fischer was
25  familiar with the condemnation procedure?

Page 63

1  **A.   I would not answer that.  I wouldn't know.**
2  Q.   Do you know whether or not the superintendant is
3  familiar with the condemnation procedures?
4  **A.   I would not speculate on that either.**
5  Q.   Are you familiar with the requirements of the
6  ordinance talking about a property being unfit for
7  human occupancy?
8  **A.   Do you know there is an ordinance?  Yes.  Am I**
9  **familiar with what it says and what qualifies that?**
10  **No.**
11  Q.   And the same regarding answers regarding the
12  superintendant and Officer Fischer?
13  **A.   Yes, sir.  Yes, sir.**
14  Q.   When was the first time that you saw the
15  condemnation notice?
16  **A.   Saw it or knew of it?**
17  Q.   Well, let's do knew of it first.
18  **A.   I knew the day that Ms. Ockley was 302'd that she**
19  **was excluded from the house because of its condition**
20  **and that she was no longer the owner of the property.**
21  Q.   Okay.
22  **A.   I knew that she was given rights to retrieve**
23  **items if she was given access by the owner or the**
24  **police.  I never read those documents.  I never saw**
25  **those documents until yesterday.  We were advised by**

Page 64

1  **police that the house was condemned and the locks were**
2  **on it, and that was done through police reports and**
3  **stuff like that.**
4       **So I knew that she could ask police for**
5  **access and we would have to give her access to remove**
6  **items.  But those documents I did not see until -- and**
7  **I'm not even sure all of the documents that you are**
8  **talking about are the ones that I saw.  I saw two court**
9  **orders yesterday.  There may have been a correspondence**
10  **that passed in front of me, but I didn't pay a lot of**
11  **attention to it.**
12  Q.   Okay.  We have a number of those.  I will ask you
13  about them in a moment.
14  **A.   Sure.**
15  Q.   Maybe they will refresh your recollection.
16  **A.   Sure.**
17  Q.   Is there any on-call person to help police
18  officers interpret or understand or capture or review
19  common pleas court orders?
20  **A.   I mean, we can always call an on-call DA.  I**
21  **mean, there's an on-call DA.**
22  Q.   Okay.  Throughout this entire matter regarding
23  Ockley, did you ever contact -- did you or are you
24  aware of anyone who contacted a DA?
25  **A.   I did not.  I cannot speak for the officers after**

Page 65

1  **Ms. Ockley was taken into custody.**
2  Q.   I'm going to just ask you a series of questions
3  regarding court orders in general.  Over the course of
4  your career, you have looked at common pleas court
5  orders; correct?  Or is that not correct?
6  **A.   Yes.**
7  Q.   Okay.  How many times do you think that you have
8  looked at the pleas court orders over the course of
9  your career?
10  **A.   The overwhelming amount of orders that we see are**
11  **custody orders and things of that nature, PFA orders.**
12  **We've assisted sheriffs with eviction orders and stuff**
13  **like that.  It's not something that we commonly do.  I**
14  **mean, PFAs are fairly common.  Yeah.  That's but not**
15  **something we do all of the time.**
16  Q.   Okay.  But in this circumstance, there were two
17  court orders; correct?  I mean in this case there
18  were?
19  **A.   Yes.  I know that now.**
20  Q.   Okay.  And you say that if you need counseling
21  regarding a court order you could call a DA, but you
22  didn't personally call any DAs regarding this matter;
23  correct?
24  **A.   I did not.**
25  Q.   Are there any classes that's made available to

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 66

1  officers in order to read, understand, or interpret
2  court orders specifically?
3  **A.  I don't know.**
4  Q.  Is there any specific training regarding court
5  orders -- at that same kind of question -- to be
6  available to read, understand, and interpret court
7  orders?  Specifically just the court orders?
8  **A.  I don't know.**
9  Q.  Are there any resources, persons, or guides that
10  were made available to you regarding interpreting,
11  understanding, implementing court orders?
12  **A.  I don't know.**
13  Q.  Did you have any evaluation tools that may have
14  been given to you over the course of your time
15  regarding understanding, reviewing, implementing court
16  orders?
17          MR. GONZALES:  I'm just going to
18          put an objection.  You are using the
19          term court orders.  Are you specifically
20          including in that PFAs orders, like,
21          training for officers in PFAs orders?
22          Or are --
23          MR. SCHROM:  Any orders.
24          MR. GONZALES:  Okay.  Do you
25          understand what his question is?

Page 67

1          THE WITNESS:  I do.
2          MR. GONZALES:  Okay.
3          **THE WITNESS:  I'm not directly**
4          **aware of classes.  I could speculate and**
5          **be confident in my speculation, but I'm**
6          **not going to do that.  So I don't know**
7          **of any.**
8  BY MR. SCHROM:
9  Q.  Yeah.  I'm just asking generally, court orders,
10  specifically court of common pleas court orders.  So
11  did you ever take any seminars regarding the same
12  subject, court orders, understanding, interpreting
13  implementing?
14  **A.  I did not.**
15  Q.  Did you ever review any podcasts regarding the
16  same?
17  **A.  I did not.**
18  Q.  Magazine articles?
19  **A.  I did not.**
20  Q.  Law review articles?
21  **A.  I did not.**
22  Q.  Books, chapters on specifically that subject?
23  **A.  So I was fortunate enough to be promoted three**
24  **times and I've read numerous books that were involved**
25  **in the need to take promotional tests.  I don't recall**

Page 68

1  **them being in there, but yeah.  I don't know.**
2  Q.  Okay.  Any YouTube videos --
3  **A.  No.**
4  Q.  -- regarding the subject?
5  **A.  No.**
6  Q.  Any seminars devoted exclusively to that?
7  **A.  No.**
8  Q.  And you are not going to answer for the other
9  officers?
10  **A.  I cannot.**
11  Q.  Right.  Did you ever talk to Mr. Lingo prior to
12  this matter?  Mr. Lingo?
13  **A.  Yes.  I had conversations.**
14  Q.  How do you know him?
15  **A.  We actually sort of ran in the same circles in**
16  **high school.**
17  Q.  Did you go to the same high school?
18  **A.  No.**
19  Q.  So do you want to just -- so you've known him for
20  20 years?
21  **A.  Known of him.**
22  Q.  And how often have you interacted with him over
23  that 20-year period would you say?
24  **A.  I think I encountered him once on a softball**
25  **field.**

Page 69

1  Q.  Do you know Mr. Brydzinski at all?
2  **A.  I do not.**
3  Q.  Do you know Mr. Prete at all?
4  **A.  I do not.**
5  Q.  Do you know whether Mr. Brydzinski went to the
6  police department at some point?
7  **A.  There was someone at the police department the**
8  **day that Ms. Ockley was 302'd.  Again, I don't know who**
9  **that person was.**
10  Q.  Well, I'll show you a record in a minute
11  regarding that, but you can just confidently say there
12  was somebody, but you are not sure who?
13  **A.  Correct.**
14  Q.  Okay.  These court orders in particular, do you
15  know how they are kept?  Like in this particular
16  circumstance, is it -- you know, I'm using it as the
17  example.  If this is this court order, it's given to a
18  paralegal or a staff member who scans it in and then it
19  goes into a certain file and then it's available for
20  other officers to see.  Do you know what happens
21  typically to a court order regarding a matter?
22  **A.  When it comes to PFAs and custody orders and**
23  **stuff, they are presented to the police and they tell**
24  **us what a problem is or what the situation is.  And**
25  **then they hand us the order.**

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 70

1  Q.  Okay.
2  A.  Is that normal for all orders?  I don't know.
3  Q.  Do you know what happened with this circumstance
4  regarding those court orders?
5  A.  I do not.
6  Q.  You don't?
7  A.  No.
8  Q.  Do you know somebody who would know?  Is there a
9  person who would be responsible for that sort of thing?
10  A.  I don't want to speculate.  So, no, I don't know
11  who would.  No.
12  Q.  Would it have been the other officer --
13  A.  No.
14  Q.  -- at the time?  Meaning, the other equivalent
15  officer to you?
16  A.  No.
17  Q.  Do you know if there was ever a file kept on this
18  particular matter?
19  A.  Yes.
20  Q.  And who kept that file?
21  A.  The codes department, Kevin Kochanski or his
22  delegate.
23  Q.  So would it be fair to say that his office had
24  all of the relevant records other than the arrest part
25  you're looking at?

Page 71

1          MR. GONZALES:  Objection, but you
2      can answer.
3          THE WITNESS:  I wouldn't want to
4      speculate.  So my answer is I don't
5      know.
6  BY MR. SCHROM:
7  Q.  Okay.  The parts that you do know is that you are
8  familiar with a complaint part and the arrest part, but
9  regarding the ordinance part as to whether the
10  ordinance part migrated into the police file, you are
11  not certain?
12  A.  I was certain that Ms. Ockley did not own the
13  home, Ms. Ockley was excluded from the home and I knew
14  that the house was unfit for human habitation.
15  Q.  Let's just take the first part.  You knew that
16  Ockley wasn't the owner as of August 12?
17  A.  The day that she was 302'd is -- I knew as of
18  that day she did not own the house.
19  Q.  How did you have that information that she was
20  not the owner?
21  A.  When the information was relayed to me that this
22  incident was going on and they wanted me to go to the
23  call, it was relayed to me by Lieutenant Dietrich.
24  That's all I remember.  And it came from that gentleman
25  that was there.

Page 72

1  Q.  Oh, okay.  And the unfit for human habitation,
2  how did you have that information on 8/12?
3  A.  It was relayed to me.  One was verbatim, the way
4  I'm relaying it to you.  She didn't own the home
5  anymore, she is unfit for human habitation, and she's
6  not allowed to be there.
7  Q.  And that was from Lieutenant Dietrich?
8  A.  Yes.
9  Q.  Do you happen to know whether he was looking at
10  any documentation?
11  A.  I don't know.
12  Q.  Do you have any specific training regarding
13  dealing with people in a 302 status?
14  A.  We have policy for dealing with people who
15  suffer.  I've had specific de-escalation training and
16  ironically, why I remember this I don't know, the first
17  class training I ever got with the police department
18  was dealing with the mentally ill, and that was 29 and
19  a half years ago.
20  Q.  Okay.  What are the actual procedures regarding
21  summoning a mental health analysis for 302 purposes?
22  A.  Say your question again.
23  Q.  Yeah.  What the police procedures -- if you
24  suspect a 302 circumstance, what are you supposed to
25  do?

Page 73

1  A.  It's all about staying calm, it's all about not
2  trying to excite or exacerbate the situation.  It's
3  about trying to gather as much information indirectly
4  as you can directly.  Obviously, officer safety is
5  always going to be first and foremost, the safety of
6  ourselves, the safety of the person we are contacting,
7  the safety of the public.
8          We have resources that we can keep out
9  including the Delaware County mobile crisis team.  We
10  try to use them as much as possible.  We want use of
11  force and arrest to be one of our last options if
12  that's possible.
13  Q.  Okay.
14  A.  And just quite honestly, treat the person that's
15  in crisis with as much care and dignity as we can.
16  Q.  Okay.  We talked initially about gathering
17  information directly and indirectly.  Did Ockley on
18  8/12 tell you that she had two court orders?
19  A.  No.  Well, not that I can remember.  Ms. Ockley
20  was on the phone and just completely ignored all of us
21  that there were.
22  Q.  Because would you admit on day -- the second day,
23  on 8/13 when she was arrested, the body cam shows that
24  Ms. Ockley mentioned, I would say --
25  A.  Second day.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 74

1  Q.  -- said five to seven times that there was a
2  court order; correct?
3  A.  The second day.  Yes, sir, that is correct.
4  Q.  But your recollection is on 8/12 that she didn't
5  say that she had court orders or you can't remember?
6  A.  My saying is I don't recall her saying it.
7  Q.  Okay.
8  A.  Now I will tell you that I was in and out both
9  trying to deal with Ms. Ockley and talk with the crisis
10  team.
11  Q.  Okay.
12  A.  I was trying to get them to come into the house.
13  They wouldn't.  I can tell you they wouldn't come in
14  because of the condition of the home and the
15  deplorableness of it.  So I was tasked with coming back
16  and saying, this is what we are doing, this is what
17  she's saying, do you think it's this?  Okay.  Give us
18  some more -- I went back in.  I recognized that she's
19  still in a hospital gown that's covered with what
20  appears to be feces.  She was sitting in an adult
21  diaper in a sofa that was soaked from the smell, I can
22  only imagine, was urine.  So I would go back and I
23  would tell these crisis people what we were seeing.
24  This is this.  This is that.  You know, there is no
25  electricity in the house.  There's no water in the

Page 75

1  house.  There appeared to be a giant hole in the
2  kitchen.  There was stuff piled everywhere.
3        So I was going back and forth between
4  Ms. Ockley and the crisis team because, in my opinion,
5  while I knew she was not to be in the house, it's my
6  opinion that Ms. Ockley was struggling with some kind
7  of mental health issue.  I would never speculate what
8  that is.  They are not normal -- what I perceive to be
9  as normal action and activities of a person who is well
10  and my thought was to get her to help.
11        Eventually, they agreed with my assessment.
12  She agreed to do the 302 requests.  Somewhere they made
13  their phone call and found out that it was approved.
14  We were -- through much effort, and time and patience
15  we were finally able to coerce Ms. Ockley to get up and
16  leave.  I do specifically remember her telling me that
17  this was her home and that we had no right to be in her
18  home.  We escorted her out.  We put her into an
19  ambulance which is not something that our ambulance
20  company likes to do or we do normally, but because of
21  the situation we didn't -- you know, we didn't want to
22  take the risk of trying to force her into a police car
23  or anything of that nature.  And she was transferred to
24  the crisis unit that way.
25  Q.  Okay.  On day 2, you did look at that video;

Page 76

1  correct?
2  A.  I did.
3  Q.  And on that day, she mentions multiple times that
4  I have a court order; correct?
5  A.  Yes.
6  Q.  And I viewed that as well.  But at no point did
7  any officer ever review those court orders; is that
8  correct?
9  A.  I can't answer that.  I don't know.  I will tell
10  you that we knew that she was only to be let into the
11  property by police or the owner to remove items.  She
12  was not to be on the property to reestablish residency
13  in the home.
14  Q.  Okay.
15  A.  The video clearly shows her sitting, which I can
16  only believe, is the same diaper and hospital gown from
17  the day before sitting in the home.  There was no
18  vehicle to pack things with.  There was no effort to
19  pack things with.  There was no call to police or the
20  owner to let her into the property, which is required
21  by the order.  Nothing.
22  Q.  And you are saying the common pleas order, is
23  that what you are referencing?  Or are you referencing
24  the ordinance violation?
25  A.  I did not read the orders until afterwards.  I

Page 77

1  told you that.
2  Q.  Okay.
3  A.  This is the information we were given, she didn't
4  own the home.  She's not allowed in the home.  If she
5  is there to remove things, she would be let in by
6  police and is there to remove items.  That is it.
7  Q.  And that's all of the information that you had at
8  that time?
9  A.  Correct.
10  Q.  And that was all of the information that the
11  officers had the second day?
12  A.  I don't know what they had.  I don't know.
13  Q.  Do you have any reason to believe that any of the
14  officers on the 2nd day, August 13, reviewed those
15  orders?
16  A.  I wouldn't know.
17  Q.  Officer Cocco said that when she went through
18  Ockley's possessions, is that a typical police
19  procedure to look at what the person has when they are
20  brought into custody?
21  A.  Yes.
22  Q.  So consistent with that, she went through all of
23  them, I guess, to see whether there was any explosives
24  or weapons or contraband; correct?
25  A.  Yes.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 78

1  Q.  Okay.  I will represent to you that Officer Cocco
2  saw the orders, read the orders, and made the
3  determination that they didn't apply.  Did you ever
4  have a conversation with her regarding that?
5  A.  No.
6  Q.  Were you ever aware that she had those court
7  orders on her possession at the time of her arrest?
8  A.  No.
9  Q.  But you are aware that she talked about them
10  multiple times?
11  A.  Yes.
12  Q.  But you actually didn't know whether she had
13  them?
14  A.  Right.  But I read the orders.
15  Q.  Recently?
16  A.  Yesterday.
17  Q.  Yesterday.  Right.
18  A.  They didn't -- I'm assuming -- I can't assume.
19  Never mind.  Okay.
20  Q.  Okay.  There is some tape or video on day 2 with,
21  I believe, Officer Fischer and the other officers
22  including Officer Cocco apparently being upset that
23  they let Ockley go.  Was that kind of the general
24  impression that you had at the time?
25  A.  I was --

Page 79

1      MR. GONZALES:  Objection.  When you
2  say they, who are you referring to?
3  That they let her go?
4      MR. SCHROM:  The people making the
5  302 determination at the hospital.
6      MR. GONZALES:  Okay.
7      THE WITNESS:  I was appalled.  I
8  was heartsick.  In my opinion, here is a
9  woman who is clearly in some form of
10  distress.  I cannot speculate to what
11  that is.  I can only tell you it's
12  not -- in my experience, people don't
13  want to live the way she was trying to
14  live.  They don't want to walk around in
15  diapers that are soiled and filthy.
16  They don't want to walk around in
17  hospital gowns that are soiled and
18  filthy.
19      As a police office, I have a
20  tool chest and my tool chest only has so
21  many tools in it; okay?  The way I was
22  receiving the situation and to this day
23  sitting here in front of you, the way I
24  still perceive the situation, we wanted
25  to get this woman help.  The system that

Page 80

1      we have available to us, in my opinion,
2      failed her miserably.  Like I told you
3      before, we looked to see if she actually
4      escaped or if she absconded or something
5      happened.  We couldn't believe that less
6      than 24 hours later, this woman was back
7      in the same condition she was the day
8      before.
9          That being said, in going
10     through what I view as a list of options
11     that I had including taking her
12     somewhere, getting someone to come get
13     her, all of which she would not
14     cooperate with by giving us a place to
15     take her, someone to call for her or
16     anything, the only tools that I have in
17     my toolbox is to take her into custody
18     and use the court system to force her to
19     get the evaluations and the attention I
20     believed she needed.
21  BY MR. SCHROM:
22  Q.  Okay.  Would it be fair to say that you thought
23  she was crazy and needed to be committed?
24  A.  Well, clearly.  That's what happened on the day
25  before.

Page 81

1  Q.  But she was committed?
2  A.  Yeah.  So I was wrong.  The professionals told me
3  I was wrong.  So then based on that I had no other
4  assumption but to go on she's clearly, consciously
5  regarding a direct order to stay off the premises,
6  don't go into the house, don't do any of that.  Yes,
7  again, my toolbox is very limited.
8  Q.  Okay.  Based on what you previously testified to,
9  you consider her a trespasser, the property was
10  condemned and she had no rights because she sold the
11  property; correct?
12      MR. GONZALES:  Objection to the
13      form, but you can answer.
14      THE WITNESS:  Yes.  What I
15      testified to was she didn't own the
16      property, she was not allowed to be in
17      the residence -- I'm sorry.  She didn't
18      own the property, the house was unfit
19      for human habitation, and she was only
20      allowed there if she was given access by
21      the homeowner and to remove items.  None
22      of those were occurring the day that I
23      was there and on the video that I
24      watched.
25  BY MR. SCHROM:

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 82

1  Q.   And you base all of that on what you just
2  testified to before; correct?
3  A.   Yes.
4  Q.   Okay.  Do you know who put the locks on the
5  property and when?
6  A.   It was definitely prior to the 12th or the day
7  that I was there and it would either have been the
8  township or the new property owner.  I don't know
9  specifically who did it.
10 Q.   Okay.
11 A.   Based on the information that I had and we had
12 the key for them, I'll say it was the township.
13 Q.   Do you know if the property -- if the locks were
14 ever taken off and who took them off?
15 A.   I don't.
16 Q.   Who would know that?  Kochanski?
17 A.   He would know or the property owner.
18 Q.   You never saw a deed transfer, did you?
19 A.   No.
20 Q.   You never looked up the recorder of deeds as to
21 who owned the property, did you?
22 A.   I did not.
23 Q.   Do you know of anybody who did?
24 A.   I do not.
25 Q.   I'm going to walk you through some documents.

Page 83

1  A.   Okay.
2  Q.   I'm showing you a document marked as Pinto 2.
3  Can you identify that document?
4  A.   Yep.  This is a legal notice by Radnor Township
5  signed by code official Andy Pancoast advising that
6  416 South Ithan Avenue, Villanova, is declared unsafe
7  for human occupancy or use.  It is unlawful for any
8  person to use or occupy this building after 4/21/22.
9  Any authorized person removing this sign will be
10 prosecuted.  And then it talks about Chapter 1, Section
11 108, and it's 218 IPMC code.  I don't know what that is
12 and the date is 4/21/22.
13 Q.   Okay.
14              (Exhibit Pinto 2 was marked for
15                 identification.)
16 BY MR. SCHROM:
17 Q.   Was that notice on the building on 8/12 when you
18 arrived, to the best you can remember?
19 A.   I don't remember.
20 Q.   Okay.  Would it be your opinion that this was one
21 of the controlling documents that you referenced
22 previously?
23 A.   No.
24 Q.   That the property was unfit for human --
25 A.   I don't remember seeing this.  So, no.  This was

Page 84

1  information that I was given before going down to 416
2  South Ithan Avenue.
3  Q.   Okay.  And you believe that you saw this on 4/20
4  -- on 8/12.  Did you see it before 8/12/22?
5              MR. GONZALES:  Hold on.  Objection.
6              That's not that the witness said.  The
7              witness said he didn't recall seeing
8              that on 8/12; correct?
9              THE WITNESS:  Yes.  I don't
10             remember seeing this on the 12th.
11 BY MR. SCHROM:
12 Q.   Did you ever see it before the 12th?
13 A.   In regards to 416 Ithan Avenue?  No.  I've seen
14 this document multiple times, but not for 416 South
15 Ithan Avenue.
16 Q.   Oh, okay.  I'm showing you a document marked
17 Pinto 3.  Can you identify that?
18 A.   This is a letter signed by Kevin Kochanski
19 director of community development CC'ing the board of
20 commissioners and township manager -- I'm sorry, the
21 commissioned president, township manager, the codes
22 official Andy Pancoast, Superintendent of Police Chris
23 Flanagan, township solicitor John Rice.
24              It is a notice of condemnation.  According
25 to Section 108 international property maintenance code.

Page 85

1  The property -- condemns this property.  Therefore, the
2  dwelling shall be vacated immediately and shall be
3  secured to prevent entry by unwanted individuals.  The
4  property may not be occupied except as following:
5  Adults may occupy the dwelling during the hours of 8:00
6  and 4:00 only for the sole purpose of abating the
7  violations.  There shall be no other activity on the
8  property, including cooking, sleeping, conducting other
9  business other than the activity of abating the
10 violations.
11              There shall be no children permitted -- so
12 without reading it word for word, this is the letter
13 there was reported to be given to Simona Ockley
14 advising her that her property was condemned, and all
15 of the things that -- her rights and whatever she can
16 do and not do.
17              (Exhibit Pinto 3 was marked for
18                 identification.)
19 BY MR. SCHROM:
20 Q.   Okay.  When was the first time you saw this
21 document?
22 A.   I believe this is one of the documents that I saw
23 yesterday.
24 Q.   Can you recall ever seeing it prior to that?
25 A.   I do.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 86

1  Q.  Do you know if anybody else did?
2  A.  Andy Pancoast and Kevin Kochanski and --
3  Q.  Other than the people from code enforcement.
4  A.  I do not.
5  Q.  Any other officers, are you not sure?
6  A.  I do not know.
7  Q.  Okay.  I'm showing you a document marked P4.  Can
8  you identify that document?
9         (Exhibit Pinto 4 was marked for
10        identification.)
11        THE WITNESS:  It is a notice of
12        violation.  This is dated April 26.
13        According to section violation -- your
14        property is -- and may not be --
15        MR. GONZALES:  Slow down.  If you
16        read it out loud, the court reporter is
17        going to type everything you are saying.
18        So if you are reading to yourself,
19        that's fine.  But if you are reading out
20        loud, just -- so she can take it down.
21        THE STENOGRAPHER:  Thank you.
22        THE WITNESS:  So this, in my
23        opinion, is a letter written by Kevin
24        Kochanski outlining all of the
25        deficiencies in the property, or at

Page 87

1         least some of the major deficiencies in
2         the property noting that it's a
3         violation of property maintenance, that
4         is specifically sent to Simona Ockley,
5         416 South Ithan Avenue, April 26, 2022,
6         and it's CC'd to Commissioner Mulroney,
7         again who was the president of board of
8         commissioners at the time, Township
9         Manager William White, code official
10        Andy Pancoast, Superintendent Chris
11        Flanagan, township solicitor John Rice,
12        and then property filed.
13 BY MR. SCHROM:
14 Q.  Okay.  Do you know whether or not Simona Ockley
15 was at that property on April 26, 2022?
16 A.  I do not.
17 Q.  When was the first time that you saw this notice
18 of violation document would you say?
19 A.  I don't recall seeing this one yesterday.  It is
20 possible, but I don't recall seeing it yesterday.  So
21 now might be the first time, but no sooner than
22 yesterday.
23 Q.  Okay.  I'm showing you a document marked Pinto 5.
24 Can you identify that document?
25 A.  So this appears to be a notice of violation for

Page 88

1  property maintenance issued on 27th of April 2022.  It
2  says it was both posted on the property and by regular
3  and certified mail.  It's specifically outlining
4  violations with the upkeep of the outside of the
5  property, specifically the lawn.  And this was signed
6  by community development code official William Brown.
7  Q.  Okay.
8         (Exhibit Pinto 5 was marked for
9         identification.)
10        THE WITNESS:  Also notes that they
11        had five days to correct the issues.
12 BY MR. SCHROM:
13 Q.  And this relates to grass and weeds; is that
14 right?
15 A.  Section says 302.4 weeds and all of the pictures
16 are of the lawn and weeds.
17 Q.  Okay.  When was the first time you saw this
18 document?
19 A.  So this was specifically referenced yesterday,
20 but I don't recall seeing it.  So I know it was
21 referenced.  I know we talked about, but I don't recall
22 seeing it until today.
23 Q.  Okay.  There was also a picture here, couple of
24 ones back in the right-hand corner.
25 A.  Is that in my packet, sir?

Page 89

1  Q.  016.
2  A.  Yes.
3  Q.  Do you know whether that notice was on the
4  property when you arrived on 8/12?
5  A.  I do not.
6  Q.  I'm showing you a document marked Pinto 6.  Are
7  you able to identify that document?
8  A.  This was the document that I saw yesterday signed
9  by Judge John Whelan -- well, by the court, John J.
10 Whelan.  I know him to be a judge just from my other
11 interactions.  This was issued the 15th day of July
12 2022.  And among other things, it talks about how the
13 deed was to be executed.  So the plaintiff, which I
14 believe is the Rockwell Glynn, was to file the title
15 and be the owners of the property.  It says that they
16 were to --
17        (Exhibit Pinto 6 was marked for
18        identification.)
19 BY MR. SCHROM:
20 Q.  Okay.  Wait a minute.  Let me just -- why don't
21 we just take it from the top?  It's not that long.
22 A.  Want me to read it?
23 Q.  Yeah.
24        THE STENOGRAPHER:  Slowly.
25        THE WITNESS:  So in the Court of

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 90

1  Common Pleas of Delaware County,
2  Pennsylvania, Rockwell Glynn LP,
3  plaintiff, versus Simona Ockley,
4  defendant, Court of Common Pleas of
5  Delaware County Number CV 2022 04275,
6  civil action.  Order, upon the
7  consideration of the complaint and
8  petition for special injunction filed by
9  the plaintiff, Rockwell Glynn LP, and
10 after a hearing on July 11, 2022, and
11 having heard the arguments advanced by
12 the defendant, Simona Ockley, and Lee M.
13 Herman, Esquire, counsel for plaintiff,
14 and good cause appearing, it is on this
15 15th day of July 2022, hereby ordered
16 and decreed as follows:  Number 1,
17 plaintiff may immediately record the
18 deed to 416 South Ithan Avenue,
19 Villanova, PA 19085 (the property)
20 previously executed by defendant.
21         Number 2, the title company
22 shall disburse the proceeds it currently
23 holds in the approximate amount of
24 $490,000 to defendant.  3, defendant
25 shall have unlimited and unfettered

Page 91

1  access to the property at her own risk
2  to remove her personal property until
3  September 1, 2022.  Any personal
4  property remaining at the property after
5  September 1, 2022, shall be deemed
6  abandoned and may be removed by the
7  plaintiff as refuse.
8          By the court, John J. Whelan,
9  signature John J. Whelan, J.  Date, July
10 11, 2022.
11 BY MR. SCHROM:
12 Q.   Okay.  I'd like to direct your attention, if I
13 could, to paragraph 3.
14 A.   Yes, hmm-hmm.
15 Q.   Defendant has unlimited and unfettered access.
16 What does that mean to you?
17 A.   It means if you read a little further, if she is
18 going to remove personal property she can go there and
19 remove her personal property.
20 Q.   Now you didn't see this document until yesterday;
21 is that correct?
22 A.   That's correct.
23 Q.   So you didn't have an opportunity to read it?
24 A.   That's correct.
25 Q.   Had you had an opportunity to read it, would you

Page 92

1  still have arrested her?
2  A.   Without a doubt.
3  Q.   Without a doubt.  Okay.  Why?
4  A.   Because she was not removing property.  She had
5  no intention of removing property.  She had no
6  intention of leaving the property.  She was -- when I
7  dealt with her, she was trying to reestablish services
8  to the property, which now I know, without question,
9  she no longer owned.  And if you believe that this
10 document was executed properly, she knew she no longer
11 owned.
12 Q.   Anything else?
13 A.   No.
14 Q.   Do you know what unfettered means?
15 A.   I do.
16 Q.   What does that mean?
17 A.   It means without any interference.
18 Q.   And unlimited, in your understanding, would mean
19 what?
20 A.   Much the same as unfettered.
21 Q.   Meaning no limitations; correct?
22 A.   Well, it says unlimited but it does talk about a
23 deadline date.  So it's kind of misleading, but yes I
24 understand.  No -- unfettered, unlimited access to
25 remove property.

Page 93

1  Q.   Until September 1?
2  A.   Correct.
3  Q.   So the unlimited part only relates to September
4  1; right?
5  A.   No.  The unlimited and unfettered to remove
6  property extends through September 1.
7  Q.   Right.  It doesn't apply to anything after that
8  date; correct?
9  A.   Well, it says anything after that date property
10 shall be deemed abandoned and may be removed by
11 plaintiff as refuse.  So I would assume anything left
12 in the house could be deemed as refuse or trash and
13 thrown out by the property owner.
14 Q.   Right.  But prior to that, there isn't a
15 limitation as to time; correct?
16 A.   Not in this document.  No.
17 Q.   And there isn't a reference to condition, is
18 there?  Conditions.
19 A.   Yeah.  To remove personal property.
20 Q.   Other than what it said there, are there any
21 other limitations as you see them?
22 A.   No.
23 Q.   So just thinking about this circumstance, don't
24 you think it would have been better to have a review of
25 this document before you arrested her?

Page 94

1  A.   I --
2                    MR. GONZALES:  Hold on.  Hold on.
3              Objection.  What do you mean better?
4                    MR. SCHROM:  Well, let me rephrase
5              that.
6                    MR. GONZALES:  Okay.
7  BY MR. SCHROM:
8  Q.   You made the determination that she was staying
9  in the property longer than she should; right?  Meaning
10 she was living there or trying to; isn't that right?
11 A.   I made the determination that she had no
12 intention of removing personal property and, therefore,
13 had no legal right to be there.  Whether I read this
14 the day of or I read it yesterday, my actions would
15 have been exactly the same.
16 Q.   Okay.  But she did have until September 1st to do
17 everything that she needed to do; correct?
18 A.   I --
19                   MR. GONZALES:  Hold on.  Wait.
20             Objection.  When you say everything she
21             needed to do, can you clarify that?
22                   MR. SCHROM:  Let me rephrase that.
23 BY MR. SCHROM:
24 Q.   She had until September 1st to have access to the
25 property; correct?

Page 95

1  A.   To remove personal property, not to go and hang
2  out, not to go and call services and try to have them
3  turned on, not try to watch television, not to live
4  there.  By her own words, she had been living there for
5  several days.  To remove personal property.
6  Q.   So if one day she is watching television and
7  eating, that's sufficient to be arrested?
8                    MR. GONZALES:  Objection.  You can
9              answer.
10 BY MR. SCHROM:
11 Q.   So why can't she eat and watch TV?
12 A.   Because it's not what the order tells her she's
13 allowed to do.  It's not safe.  Being in that home,
14 which she would do at her own accord, is to get in and
15 get out.  It's not to go in and hang out.
16 Q.   Would you agree that there wouldn't be this
17 action, this case, if you had just waited until
18 September 1st?
19                   MR. GONZALES:  Objection.  There
20             wouldn't be a case if Ms. Ockley
21             complied with the court order and with
22             the directives.  I mean, he can't answer
23             that.  I'm instructing him not to.  It's
24             argumentative and inappropriate.
25 BY MR. SCHROM:

Page 96

1  Q.   Did you understand the question?
2  A.   No.  You didn't finish it.
3  Q.   Okay.  Let me rephrase it.  She had access to the
4  property until September 1st; correct?
5  A.   She had access to the property with the
6  assistance of the property owner or the police.  They
7  were to allow her in because it was locked.  She did
8  not go to the police.  She did not go to the property
9  owner.  How she got in, if I was to speculate more on
10 that, that would be, in my opinion, worse for your
11 client, but we are not going to speculate on that.
12         If she was given access to the property, she
13 was allowed to remove the remaining personal property.
14 That is it.  Not to call and contact services, not to
15 sit on the sofa and watch TV.  To remove personal
16 property.
17 Q.   Okay.  So were you aware of her physical
18 condition before that?
19 A.   Not until the day I was down there.
20 Q.   Did she appear to have a physical impairment?
21 A.   Other than, like, sitting in a diaper?  No.  I
22 mean, she walked out well enough, she halfheartedly
23 resisted being escorted out of the property well
24 enough.  But, like, was she a professional athlete?
25 No.  She was an older woman, but that all to me made it

Page 97

1  more obvious.  She had no help to remove things.  She
2  had no car to remove anything.  She had no cart to
3  remove anything.  She had no bags to remove anything.
4  She had no options visible that I could see to help her
5  in the tasks of removing items.
6  Q.   Right.
7  A.   So if that's the case --
8                    MR. GONZALES:  Wait a minute.  Were
9              you finished?
10                   THE WITNESS:  No.  I was going to
11             say -- so based on that, if she was
12             going to remove one item at a time, two
13             items at a time she should've been out
14             of the house, according to the order,
15             long before we ever got there.
16 BY MR. SCHROM:
17 Q.   Do you recall anything regarding her physical
18 condition?  You said she walked out.  Do you recall
19 anything about her physical condition?
20 A.   I don't want to be overly derogatory to your
21 client --
22 Q.   No.  Other than to what you testified to?
23 A.   No.  She was just -- she was in a state of
24 dramatic unkemptness.
25 Q.   Okay.  Do you know whether she was in the

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 98

1  hospital for multiple months before that? Did you know
2  that at the time?
3  A.  We knew that she had been released from the
4  hospital. Yes.
5  Q.  Did you know how long she was in the hospital?
6  A.  I did not.
7  Q.  Okay. So on the day in question, which is on
8  8/13, she was not deemed to be a candidate for 302
9  because that was explored; correct?
10  A.  Correct.
11  Q.  And when you went to the home, you noticed that
12  she wasn't packing anything up; correct?
13                    MR. GONZALES: Objection. The
14             witness has already answered he wasn't
15             at the home on August --
16                    MR. SCHROM: Oh, I'm sorry.
17  BY MR. SCHROM:
18  Q.  But the other officers on the scene indicate that
19  she wasn't packing anything on that particular day;
20  right?
21  A.  Yes. And according to the video, that's what she
22  was telling us. She was telling us that this was her
23  home and she had every right to be there. No mention
24  of packing whatsoever.
25  Q.  So if she had packed up one item, would that be

Page 99

1  sufficient not to get the arrested?
2  A.  Not being there, it would be hard-pressed to say
3  yes that she wouldn't be arrested, but I -- I would
4  speculate. That's not what was happening. So I don't
5  know the answer to that. That's not what was
6  happening. She was not packing items. She told us she
7  was not packing items. She told us she was not going
8  to call someone to leave. She told us we could not
9  take her anywhere. All she wanted to tell us was, this
10  is my home, I am allowed to be there.
11  Q.  On that day that's what she said?
12  A.  I don't recall her saying that day at all, no,
13  just saying that she's allowed to be there.
14  Q.  Would the video show her physical condition
15  accurately do you think?
16  A.  I don't recall the video showing her walking out,
17  so I don't know the answer to that. If it showed her
18  walking out, it would show that she could walk and how
19  she could walk.
20  Q.  Okay. Did you watch the whole video or just
21  pieces of it?
22  A.  I did not. Chunks of it.
23  Q.  Okay. Do you know how long the video was? Which
24  video were you looking at? Cocco's? Was that the one
25  you looked at?

Page 100

1  A.  I believe we watched Sergeant Fischer's video.
2  Q.  Did you look at Cocco's?
3  A.  I don't know for sure. I don't. We would have
4  had to because Cocco was the first one there and I
5  remember seeing -- so, yes, I would say we watched some
6  of Cocco's and some of Fischer's.
7  Q.  Okay.
8                    MR. GONZALES: Can we just go off
9             the video record for a second?
10                    THE VIDEOGRAPHER: Off the video
11             record at 12:31.
12             (At this time, off the record.)
13             (At this time, back on the record.)
14                    THE VIDEOGRAPHER: We are back on
15             the record at 12:39.
16  BY MR. SCHROM:
17  Q.  I'm showing you a document that was previously
18  marked as Pinto 7. Are you able to identify this
19  document?
20  A.  (Witness reading document to self.)
21             (Exhibit Pinto 7 was marked for
22             identification.)
23                    THE WITNESS: This appears to be an
24             e-mail chain between Kevin Kochanski and
25             Greg Lingo. So if his e-mail address

Page 101

1             gives any indication, he is with
2             Rockwell Development Group. Says --
3             talks about how there's township locks
4             on the doors and they can switch locks
5             to the owner when invoices are paid. It
6             talks about how she is absolutely not
7             permitted to stay in the home, she's
8             only permitted to move her stuff out.
9             The property is locked. I will talk to
10             her attorney and make sure that this is
11             clear once again.
12  BY MR. SCHROM:
13  Q.  And that's from Greg Lingo? You were just
14  reading that section; is that correct?
15  A.  From Greg Lingo to Kevin Kochanski. Yes. And
16  then there's one from Kevin Kochanski back to Greg
17  Lingo. I received an out-of-office response from Luke,
18  I understand the prior owner is getting released from
19  rehab on Monday. And as indicated, she's allowed to
20  stay on the property until the beginning of September.
21  The house remains posted as unsafe for human occupancy,
22  Kevin --
23  Q.  Kochanski.
24  A.  Yes. Kevin Kochanski.
25  Q.  Okay.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 102

1  A.   There is another -- this one is from Kevin
2  Kochanski to Luke, which also is Rockwell Custom.  Last
3  invoice just came.  Here they are.  Per my voicemail,
4  we need to get these paid before we removed the locks.
5  That was from Kevin.
6          And this is from a woman by the name of Lisa
7  Currie -- looks like she's from Radnor as well, but I'm
8  not familiar with her -- to Kevin Kochanski.  We have
9  two 2022 invoices for 416 South Ithan Avenue, invoice
10 dated 6/15/22 for $2,060, dates of services 5/10, 5/17,
11 2/24, 6/9 all of 2022.  Number 2 invoice dated 6/17/22
12 for $230, date of service 6/3, 6/17/22.  Nothing from
13 the years 2020 and 2021.  Lisa Currie, community
14 development.  I don't -- it's not clear to me what
15 those invoices are for.
16 Q.   Let me just jump in for a second.  So you weren't
17 copied on this.  You weren't part of that e-mail
18 chain?
19 A.   Yes.
20 Q.   And did you have become of this e-mail chain on
21 --
22 A.   No.  I don't remember seeing this e-mail chain.
23 Q.   I'm showing you a document marked Pinto 8.  Are
24 you able to identify that document?
25 A.   This appears to be the second order that I

Page 103

1  reviewed yesterday.  I'm not going to try to read the
2  name at the bottom.  I can't.  I'm sorry.
3              (Exhibit Pinto 8 was marked for
4              identification.)
5  BY MR. SCHROM:
6  Q.   I'll represent to you it's Barry Dozer,
7  D-O-Z-E-R, judge of common pleas.  Yeah.  If you would
8  read that one into the record like the other one, that
9  would be helpful.
10 A.   Sure.  In the Court of Common Pleas of Delaware
11 County, Pennsylvania, Civil Action Law.  Rockwell Glynn
12 LP vs. Simona Ockley, Number 2022-004275.  Order, and
13 now this 9th day of August 2022, upon consideration of
14 defendant's emergency petition and upon review of the
15 docket and the July 15, 2022, order, signed by Judge
16 John J. Whelan after a prior hearing on the matter, it
17 is hereby ordered that defendant's petition is granted.
18 Defendant Simona Ockley shall have unlimited and
19 unfettered access to the property located at 416 South
20 Ithan Avenue, Villanova, PA 19085 at her own risk to
21 remove her personal property until September 1, 2022.
22 Plaintiff shall remove any additional locks so the
23 defendant may have access to the property until
24 September 1st, 2022.  Plaintiff and/or the Radnor
25 Police Department shall allow access by removing the

Page 104

1  locks to provide defendant access to the property to
2  remove her personal property until September 1st, 2022.
3  Order of Barry Dozer, J.
4  Q.   Okay.  My understanding is you had a general
5  understanding of this order, but just looked at it
6  yesterday?
7  A.   Yes, sir.
8  Q.   Okay.  Now that you have read the entire record,
9  would you have changed any of your behavior or
10 recommendations had you read all of that prior to
11 arresting her?
12 A.   Absolutely not.
13 Q.   Absolutely not.  Okay.  But again, this order
14 says she had unlimited and unfettered access, the same
15 wording as the prior?
16 A.   It does.
17 Q.   And it also says, plaintiff and/or Radnor Police
18 Department shall allow access by removing the locks.
19 Do you know whether those locks were removed by the
20 police department?
21 A.   We did not.
22 Q.   You did not?
23 A.   No.  Our belief is that her with the help of a
24 now-identified taxi driver broke them off.
25 Q.   Okay.

Page 105

1  A.   But I'd also like to point out it also says to
2  remove her personal property and it says access by the
3  plaintiff or Radnor police.  So she was not given
4  access by the plaintiff, she was not given access to
5  Radnor police, and she was not attempting to remove
6  personal property.  So, no, I would not have changed
7  anything other than I would have had the mental health
8  facility do their job.
9  Q.   Which would have been to 302 her?
10 A.   Properly.
11 Q.   Because she was -- well, you've already commented
12 on her condition.  But you believe the proper thing was
13 for her to be detained on a 302 basis; is that correct?
14 A.   That was my intention.  Yes.
15 Q.   Okay.  I'm showing you another document that's
16 marked Pinto 9.  Can you identify that one?
17 A.   This is a Radnor Township Incident Report Form,
18 Report Number 22 -- I'm sorry, RT-22-10670 dated
19 8/9/2022.  It is appeared to be filed by Officer Faust.
20 It appears to have been approved by -- I'm sorry, it's
21 not on here of why it was -- of who approved it.  Oh.
22 It was approved by Sergeant Fischer on 8/9/2022.  It's
23 coded as police information, which is a generic form
24 and kind of catchall of the reports that we use that
25 they don't pertain to specific crimes or violations or

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 106

1   specific happenings.
2           It says, Luke Attanasi came to RTPD to
3   report police information.  Attanasi of Rockwell Custom
4   Renovations states that his company is the new owner of
5   the property at 416 South Ithan Avenue --
6                   (Exhibit Pinto 9 was marked for
7                   identification.)
8   BY MR. SCHROM:
9   Q.  Let me stop you right there.  Do you know whether
10  that statement is true?
11  A.  Now?  I believe it is true.  I wouldn't have -- I
12  mean, prior to yesterday, I probably wouldn't have
13  known definitely.
14  Q.  But do you believe that's true?
15  A.  I believe that would be true.
16  Q.  Okay.  Continue.
17  A.  Has received a court order stating that current
18  resident, Simona Ockley, must vacate the property.
19  Attanasi also noted that the property has been deemed
20  uninhabitable by Radnor Township Codes.  Attanasi
21  provided a copy of the order from the Delaware County
22  Court of Common Pleas stating that Ockley must remove
23  her property by 9/1/2022.
24          Attanasi stated that he and the township
25  community development director, Kevin Kochanski, would

Page 107

1   be meeting Ockley at the residency shortly for the
2   removal of property.  Attanasi advised that he wanted
3   police to be aware of the circumstances, but not need
4   assistance at this time.  The court document was
5   uploaded to the attachments folder.  Erv Faust.
6   Q.  Do you know -- where is that attachments folder?
7   Where is that kept?  Do you know?
8   A.  So normally when you are in the program that
9   operates all of this, there is a screen.  You can hit
10  attachments and they come up.
11  Q.  Do you know whether or not that order was made
12  part of the record for this matter?
13  A.  No.  I don't know.
14  Q.  Who would know that?
15  A.  If was made part of this record for this matter?
16  Q.  Yes.  It says it was attached --
17  A.  I would imagine either yourself or by counsel or
18  counsel for the plaintiffs should know if it was in
19  there or not.
20              MR. SCHROM:  Okay.  Off the record
21          for one second.
22              THE VIDEOGRAPHER:  Off the record
23          at 12:49.
24                  (At this time, off the record.)
25                  (At this time, back on the record.)

Page 108

1               THE VIDEOGRAPHER:  Back on the
2           record, 12:50.
3   BY MR. SCHROM:
4   Q.  Okay.  Now that you have read this, does that
5   refresh your recollection regarding who may have come
6   on or about 9/8 to the police department, an employee
7   from Rockwell Glynn, with a court order?
8   A.  It says that it was Luke Attanasi.  I believe the
9   report, but I didn't see him.  I didn't --
10  Q.  So you don't have any reason to dispute the
11  report, but you are not just certain as to the --
12  A.  Correct.
13  Q.  -- you don't have any personal knowledge of that;
14  is that correct?
15  A.  That is correct.
16  Q.  Okay.  Thank you.  I'm showing you a document
17  marked Pinto 10.
18                  (Exhibit Pinto 10 was marked for
19                  identification.)
20              MR. SCHROM:  Do you have that
21          number right?  It's 10.  Okay.
22  BY MR. SCHROM:
23  Q.  I'm showing you a document previously marked
24  Pinto 10.  Can you identify that one?
25  A.  This is another Radnor Township Police Department

Page 109

1   incident report form dated RT-22-10812.  It's a mental
2   health 302.  It looks like the primary officer listed
3   is Sergeant Reardon for 416 South Ithan Avenue dated
4   8/12/2022.
5   Q.  And approved by --
6   A.  I approved it at least once and it looks like it
7   was approved by myself and Sergeant Reardon.  No.
8   That's responding officers.  That's not approval.  I
9   apologize.  It was approved by Sergeant Mike Fischer.
10  I was listed as a responding officer.  I apologize for
11  that.
12  Q.  Okay.  I would like to direct your attention to a
13  little further out on page 4.  Yeah.  That's it.  This
14  is RT-22-10812; correct?
15  A.  Yes.
16  Q.  Dated 8/12/202?
17  A.  Yes.
18  Q.  That was the date that you went to the property;
19  correct?
20  A.  Yes.
21  Q.  It talks about on 8/12 Jeff Brydzinski and I'll
22  represent that he is the owner as of 8/12 responded to
23  7690.  What is 7690?
24  A.  That's the numeric distinction for Radnor police.
25  Q.  And responded to, what does that mean?

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 110

1  A.  He came to the police station.
2  Q.  Oh.  He came to it?
3  A.  Right.
4  Q.  Meaning that --
5  A.  This might be the person that I could not
6  positively identify, but --
7  Q.  You are not certain?
8  A.  Because I did not see the person.
9  Q.  Do you have any reason to believe that this
10  report is inaccurate?
11  A.  I do not.
12  Q.  Okay.  So let's just take that from the top, if
13  you would, and read that into the record?  I'll stop
14  you where I need to.
15  A.  Okay.  On 8/12/2022, Jeffrey Brydzinski responded
16  to 7690 in regards to a possible squatting issue at 416
17  South Ithan Avenue.  I made contact with Jeffrey
18  Brydzinski who advised Simona Ockley, previous property
19  owner of the above address, has been occupying 416
20  South Ithan Avenue since Wednesday 8/10/2022.  As of
21  today's date, Brydzinski is the current owner of 416
22  South Ithan Avenue.  Settlement on the property was
23  made on 7/21/2022 and Ockley received payment.  The
24  above property was deemed inhabitable by Radnor
25  Township Codes Department back in May of 2022.  Ockley

Page 111

1  only had permission to be inside of the property to
2  retrieve and clear out specific belongings.  Ockley has
3  yet to remove any belongings from the residence.  She
4  has removed any and all signage for legal notice and
5  condemnation and is refusing to leave.  Rockwell
6  Customer Construction, the company attempting to do
7  work on the property, observed Ockley arrived at 716
8  South Ithan Avenue with an unidentified b/m, which
9  stands for black male, in a yellow cab.  The
10  unidentified male was observed breaking the locks on
11  the garage door and the back kitchen doors with a
12  hammer on 8/10/2022.  Rockwell Custom advised
13  Brydzinski that Ockley has hindered construction for
14  several hours and inspector arrived for pest inspection
15  and she blocked his entry into the home.  Ockley also
16  contacted PECO and had the electric changed back into
17  her name, contacted Verizon to connect phone service
18  and contacted Aqua.  Brydzinski completed a written
19  statement attesting to the above.  Brydzinski also
20  provided proof the home is in the name and he purchased
21  it from Ockley.  Superintendent Flanagan, Lieutenant
22  Pinto, Radnor Township Codes were advised.  Sergeant
23  Reardon, Number 303, which is their badge number.
24  Q.  Okay.  Do you know where that written statement
25  is?

Page 112

1  A.  I do not.
2  Q.  Do you know who would have received that written
3  statement?  Would it have been Reardon?
4  A.  So the way things typically go, the officer who
5  is filing the report, Reardon, would take the
6  statement, he would submit it with her paperwork.  It
7  comes up, it gets completed, it gets filed into the bin
8  where the statements go.  And there it sits until
9  somebody needs it.  I cannot tell you if that's a
10  suppression issue or not.  I don't know.
11  Q.  Did you ever see Brydzinski's statement?
12  A.  I did not.
13  Q.  Okay.  I'll represent to you that it hasn't been
14  produced to us yet.  Do you know of another file or
15  another way that it would be retained digitally or
16  otherwise?
17  A.  I do not.
18  Q.  Would it normally be part of the township report?
19  A.  It would not be physically with this report, no.
20  It would be someplace in the filed room.  And then
21  after a year, they get packaged and moved down into the
22  basement.
23  Q.  So, are you saying it could be in physical form
24  now somewhere in the police department?
25  A.  I'm telling you I don't know where this statement

Page 113

1  is.
2  Q.  Do you know whether or not this would be a
3  document that would get scanned in kind of like the
4  other one you were talking about?
5  A.  No.  The statement would not get scanned in.  I
6  believe we were talking about paperwork specific to
7  whatever happened.
8  Q.  The court order?
9  A.  The court order would get scanned in.  The
10  statement would not get scanned into the report, and I
11  don't know why that is.  That's just the way we do it.
12  Q.  Okay.
13        MR. SCHROM:  I'm just making an
14        additional request, John, to look at
15        that and see if you can find it.
16        MR. GONZALES:  We will look again,
17        make the request again and then respond
18        appropriately.
19        MR. SCHROM:  Thank you.
20  BY MR. SCHROM:
21  Q.  I'm showing you a document marked Pinto 11.  Are
22  you able to identify that?
23  A.  This appears to be the application for
24  involuntary emergency examination and treatment or 302,
25  if you will, for Simona Ockley.

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 114

1      (Exhibit Pinto 11 was marked for
2           identification.)
3   BY MR. SCHROM:
4   Q.   Okay.  Did you ever see this prior to today?
5   A.   No, I have not.
6   Q.   Okay.  Thanks.  I'm showing you a document marked
7   Pinto 12.  Are you able to identify that?
8   A.   So this is Crozer-Chester Medical Center
9   Behavioral Health documentation signed by Marotta,
10  M.D., Daniel 8/13/2022.
11       (Exhibit Pinto 12 was marked for
12           identification.)
13  BY MR. SCHROM:
14  Q.   Okay.  Let me stop you there.  Did you ever see
15  this document before?
16  A.   I did not.
17  Q.   Okay.  Thank you.  I'm showing you a document
18  marked Pinto 13.  Can you identify that?
19  A.   This is a supplemental report for Incident Number
20  RT-22-10812 mental health emergency 302 dated
21  8/12/2022.  It looks like it was completed by Officer
22  Jennifer Cocco, approved by Mike Fischer.
23       (Exhibit Pinto 13 was marked for
24           identification.)
25  BY MR. SCHROM:

Page 115

1   Q.   Did you ever see this document before?
2   A.   Not that I recall.  No.  Did we see this
3   yesterday?  Hold on one second.  Not that I recall.
4   No.
5   Q.   Okay.  Do you have any reason to believe it's a
6   true and accurate copy of a Radnor Township Police
7   Department record?
8   A.   Do I have any reason to believe it's not?
9   Q.   Yeah.
10  A.   No.  I have no reason to believe that this is not
11  a --
12  Q.   Okay.
13            MR. SCHROM:  I'll just take one
14       second.
15            MR. GONZALES:  Sure.
16            THE VIDEOGRAPHER:  Off the record
17       at 1:01.
18       (At this time, off the record.)
19       (At this time, back on the record.)
20            THE VIDEOGRAPHER:  Back on the
21       record, 1:04.
22  BY MR. SCHROM:
23  Q.   I'd like you to look at Pinto 12 again.
24  A.   Sure.
25  Q.   And you read part of it into the record, which

Page 116

1   was it was a document of behavioral health
2   documentation; correct?
3   A.   Yes.
4   Q.   And that was on 8/12/2022; correct?
5   A.   It's a semantic issue.  Registration is 8/12 and
6   then there's an authorized verification date of 8/13.
7   So, whatever.
8   Q.   On 8/12, that was the day that you were there?
9   A.   Yes.  If that was the day she was 302'd, that's
10  the day I was there.
11  Q.   Okay.  So behavioral health was the entity that
12  you referred her to indirectly; correct?
13            MR. GONZALES:  Objection.
14       Mischaracterizes his testimony.
15            MR. SCHROM:  Okay.  Let me try it
16       differently.
17  BY MR. SCHROM:
18  Q.   On 8/12, you made the recommendation that you
19  thought that she should be 302'd, and you and some
20  other health professionals were brought in to make that
21  determination; correct?
22  A.   I don't believe they make the determination.
23  They suggest it.  These people ultimately make the
24  decision whether they are going to approve the 302 or
25  not.

Page 117

1   Q.   And that's the behavioral health documentation
2   form that you are looking at now from Crozer-Chester
3   Medical Center; correct?
4   A.   To my best understanding, yes, that's how it
5   works.
6   Q.   Okay.  And so, ultimately they made the
7   determination that she shouldn't be detained; correct?
8   A.   Obviously so, yes.
9   Q.   So the rationale is described here.  So why don't
10  we just read that into the record?
11  A.   Sure.  You want me to read -- on exam --
12            MR. GONZALES:  I'm just going to
13       object.  That's not the rationale.
14       That's the history of present illness
15       section.  So I'm just going to
16       correctly --
17  BY MR. SCHROM:
18  Q.   Under the history of present illness section,
19  yes, that's fine.  Go ahead?
20  A.   So read what you asked me to read?
21  Q.   Yes.
22  A.   Okay.  On exam, PT appears irritable due to the
23  situation.  PT states she was brought here by police --
24  I'm sorry, by force by police.  She denies any mental
25  illness.  She states she owns the house.  The builder

LIEUTENANT JOSEPH PINTO                                          JOB NO. 1655053
MAY 13, 2025

Page 118

1  had locked her out, but the court had mandated she
2  could go in and get her belongings up to September 1st,
3  2022, and no one else was allowed on the property.  PT
4  was able to show proof of these documents.  She states
5  she had urine and feces on her because she has no
6  running water in the house, even though she had
7  requested it be turned back on.  She mentions an issue
8  she has with her county being corrupt and that they
9  take the taxpayer's money for their own pockets.  PT
10  also states she has limited mobility due to having
11  surgery on her leg recently.  She expresses concern
12  that the police broke the mesh of her porch.  She
13  denies any psychiatric history, denies seeing a
14  psychiatrist, denies psychiatric hospitalizations,
15  denies S-I-H-I-A-V-H, denies taking medications, states
16  her mood/appetite/sleep have been fine.
17  Q.   And then the final assessment plan regarding the
18  recommendations, why don't we go through that section
19  which is the next section?
20  A.   Underneath the assessment and plan?
21  Q.   Yes.
22  A.   Psychiatric screening exam, reason for visit.
23  Q.   Meaning, that this was the reason for the visit
24  to have her psychologically analyzed; correct?
25                  MR. GONZALES:  Well, I'm going to

Page 120

1  A.   Okay.  Assessment/plan, the psychiatric screening
2  exam, reason for visit, PT was brought to ED for 302
3  evaluation as police believe she had the delusion of
4  owning her house and PT would not leave.
5  Q.   PT meaning patient; correct?
6  A.   If you say so.
7  Q.   Normally, it is, but okay.
8  A.   They were also concerned that she was in her own
9  urine and feces, but PT explained she had no running
10  water due to limited mobility due to a recent leg
11  surgery.  PT is able to communicate logically as normal
12  mental status exam given -- and has normal mental
13  status exam given in the situation, and does not have
14  any psychiatric illness from our standpoint.
15         Therefore, 302 will be denied, PT may be
16  discharged home.  PT was able to verbalize the plan to
17  perform her ADLs.  She has a friend who she can go to
18  for a shower and has a caretaker come to her home to
19  assist her.  She appears able to care for herself and
20  is not a danger to herself or others.  PT seen and
21  discussed with psychiatrist Dr. Marotta.
22  Q.   So a little while ago, you were upset at their
23  analysis, but that was the analysis by Crozer-Chester
24  Medical Center?
25  A.   I'm --

Page 119

1  object.  He didn't create this document.
2  You are asking his opinion as to what
3  Crozer-Chester Medical meant?
4                  MR. SCHROM:  No.  That you referred
5  her to a 302, which is essentially a
6  psychiatric analysis; correct?
7                  MR. GONZALES:  Objection.  That
8  mischaracterizes his testimony.  He
9  contacted the crisis workers from the
10  county.  They evaluated the plaintiff.
11  They made recommendations.  The county
12  delegate approved it.  Then she was
13  taken to Crozer-Chester where she was
14  evaluated by medical providers.  You
15  keep saying the witness, but you are
16  mischaracterizing his testimony.  So I'm
17  going to object.
18                  MR. SCHROM:  Well, I appreciate
19  that analysis.
20  BY MR. SCHROM:
21  Q.   You were the entity, that is the police
22  department, that started this entire procedure;
23  correct?
24  A.   Yes.
25  Q.   Okay.  So just continuing reading on.

Page 121

1                  MR. GONZALES:  I'm going to object.
2  The witness never said he was upset.
3  Well, anyway, he can answer.  Never
4  mind.  Go ahead.
5                  THE WITNESS:  I was upset that she
6  was discharged.  And reading that, I am
7  still upset.
8                  MR. SCHROM:  Okay.  Nothing
9  additional for this witness at this
10  time.
11                  MR. GONZALES:  Mr. Bartos may have
12  questions.  He's on the computer.
13                  -  -  -
14                  CROSS EXAMINATION
15                  -  -  -
16  BY MR. BARTOS:
17  Q.   Good afternoon, sir.  I only have a couple of
18  questions for you.  Lieutenant Pinto, I represent
19  Mr. Brydzinski, Mr. Prete, and Rockwell Glynn LP in
20  this matter.  I have a couple of questions for you,
21  sir.
22         When you were on-site on the 12th of August,
23  and I believe you testified that she indicated or said
24  things that she was moving back in.  Did she did ever
25  say to you or in your presence that you heard --

Page 122

1  Ms. Ockley, did she ever say anything, any words, that
2  suggested to you that she had a plan to pack and move
3  her things?
4  A.   Nothing.
5  Q.   Did she ever use the word movers to your
6  recollection?
7  A.   She did not.
8  Q.   Did she say that she had ordered supplies to
9  package things to move them?
10 A.   She did not.
11 Q.   The statement from Mr. Brydzinski that counsel
12 asked you about when he went to the police station to
13 make his report, did I understand your testimony
14 correctly, sir, that the officers doing the intake
15 would create the statement and that statement would
16 then be uploaded to the system somewhere in the police
17 department computer system?
18 A.   Just because I'm unsure of some your language,
19 the way it works is we have a form.  It's a statement
20 form.  It's basically fill in the blanks with space to
21 write, and on the back there is a place for a signature
22 and also a warning that says you are lying you could be
23 subject to criminal prosecution for making unsworn
24 statements to police.
25        The officer would present that form to the

Page 123

1  person in question, they would fill out their personal
2  information, they would document what they want to
3  document on the front and the back of the statement.
4  They would print their names, sign, date and time.  And
5  then it would be submitted along with a multitude of
6  other documents with the sergeant's paperwork at the
7  end of the shift.  It comes upstairs.  All of the
8  paperwork is sorted, statements go into a particular
9  file where they are stored.
10 Q.   Okay.  Thank you, sir.  That does clarify it.  I
11 appreciate that.
12        And generally speaking in August of 2022, if
13 a citizen homeowner in the township had a concern about
14 the safety or welfare of someone who was physically
15 living inside of a condemned residence, would you as a
16 public safety officer and lieutenant in the township
17 police department expect that citizen to contact the
18 police with any concerns they have regarding that
19 person's well-being?
20 A.   We would absolutely hope that they would, yes.
21 And, quite frankly, it happens fairly regularly.
22 Q.   Would it subject someone to possible criminal
23 charges if they were aware of danger to someone in a
24 condemned structure, did not say anything to the
25 police, and that structure collapsed, and killed the

Page 124

1  person?
2  A.   I don't feel comfortable speculating on the
3  possibility of criminal charges because there would
4  have to be a lot more to it than just knowing the
5  person was there, but I could see scenarios where that
6  could be a possibility, but not every single scenario
7  would rise to the level of prosecution.  I hope that
8  answers your question.
9  Q.   It does.  So effectively, sir, every instance
10 where you may charge someone it's going to be
11 fact-dependent on the facts that you have at the time
12 that you are making the charging assessment?
13 A.   Yes, sir.
14        MR. BARTOS:  Okay.  Those are all
15        of the questions that I have.  Thank
16        you.  I just reserve any follow-up.
17        MR. SCHROM:  Yeah.  I may have a
18        couple.
19             - - -
20        REDIRECT EXAMINATION
21             - - -
22 BY MR. SCHROM:
23 Q.   Did Ockley -- according to the orders as you read
24 them, did Ockley have any duty to tell the police of
25 her plans?

Page 125

1  A.   Yes, we had to let her into the building.  So she
2  had to come to us or the homeowner to let her into the
3  building.
4  Q.   Okay.  So you believe that because she didn't
5  tell you her plans, she was subject to arrest?
6  A.   No.  I'm telling you that because she didn't tell
7  us her plans, she was in violation of the order.
8  Q.   And that is the common pleas order that you are
9  referencing?
10 A.   It's the second order of the two that you showed
11 me today.
12 Q.   That is the order of --
13 A.   Not judge -- the other one.
14 Q.   Judge Barry Dozer?
15 A.   Yes, sir.
16 Q.   Do you believe that she was in the violation of
17 that?
18 A.   Yes.
19 Q.   If she had told you that she had a mover on call,
20 would that have prevented her from being arrested?
21 A.   I would probably need something more than her say
22 so.  I would've had to have some documentation of that.
23 But, yes, that could have swayed.
24 Q.   Okay.  So if she said, hey, I have a mover and
25 his name is Johnny Jones, you wouldn't arrest her?

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 126

1    MR. GONZALES: Objection. You can
2    answer. I mean, everything else being
3    equal putting all of the electricity and
4    calling the water company?
5        MR. SCHROM: Hmm-hmm.
6        MR. GONZALES: Okay. Go ahead.
7        THE WITNESS: Everything else, no,
8    I still wouldn't have arrested her. If she
9    didn't try to get the power turned on,
10   if she wasn't sitting in the state of
11   filth, if she -- like, called us and had
12   us and let us in and she said, hey,
13   here's the agreement I have with
14   Johnny's moving company, they'll be here
15   in an hour, no, I wouldn't have arrested
16   her.
17 BY MR. SCHROM:
18   Q.    But if -- well, let me say it this way: If you
19   turned the electricity on, isn't it easier to do the
20   things that you need to do while you would be trying to
21   move?
22       MR. GONZALES: Objection, but you
23   can answer.
24       THE WITNESS: Yeah, I don't know.
25   I don't know the answer to that. I

Page 127

1    mean, we were in the house. It was
2    daytime. It was very bright. You could
3    clearly see all of the filth that was
4    available to be seen. There was plenty
5    of light. So, I mean, if she was going
6    to do it at night which probably -- I
7    don't recall reading there was -- there
8    was time restrictions on it at night
9    maybe, but not during the day. No.
10 BY MR. SCHROM:
11   Q.   You thought there were --
12   A.   No. I said I don't recall seeing time
13   restrictions.
14   Q.   Okay. If she had supplies for moving that she
15   referenced, would that be sufficient not to get
16   arrested?
17   A.   I have concerns because she didn't. So I don't
18   know -- I don't want to speculate, but you are
19   speculating. I don't know. That's not what happened.
20   That's not what the situation was. I did what I did
21   based on the scenario that I had. Not -- I mean, we
22   could "what if" this forever, but -- so that didn't
23   happen. That wasn't the situation. So I don't know
24   what I would have done.
25   Q.   Just one minute. So on the 12th or rather on the

Page 128

1    13th -- let's go back to the 12th. On the 12th, you're
2    not certain whether she presented a court order to you;
3    correct?
4    A.   She did not present a court order to me. If she
5    showed it to the other officers, I don't know.
6    Q.   But on the 13th, she did reference those orders
7    several times with Officer Cocco; correct?
8    A.   On the video, yes.
9    Q.   Okay. Did you ever have a conversation with
10   Officer Cocco or any of the other officers if she had
11   done X or Y or Z, you wouldn't have arrested her?
12   A.   The only conversation of that nature we had was
13   that, in our opinion, if the mental health facility
14   would've done what we would have perceived to be an
15   adequate job, she wouldn't have been there on Friday
16   and we would not have had to arrest her. We didn't
17   make no determination other than if she did this, if
18   she did that. We dealt with what she did on the day in
19   question.
20   Q.   Right. But as a follow-up as to what counsel has
21   indicated, if she had -- there was no indication that
22   she had a mover in place. But if she had a mover in
23   place, that would be part of your evaluation; correct?
24   A.   That absolutely would have been part of our
25   evaluation.

Page 129

1    Q.   And if she had supplies there, that would've been
2    part of your evaluation; correct?
3    A.   We would have taken it into consideration. Yes.
4    Q.   And with those two things in place, she may not
5    have gotten arrested; is that correct?
6    A.   Is she still sitting in her diaper in her feces?
7    Is she still trying to turn on the electricity? Did
8    she still gain access to the house without approval of
9    the property owner and the police? That would have all
10   been in the consideration as well.
11   Q.   Yeah. But --
12   A.   So I can't -- yes, I would have considered them.
13   Would it have been enough to sway me? I don't know
14   because that did not happen.
15   Q.   Okay. Just finishing up. If she wanted to turn
16   the water on, that would certainly allow her to clean
17   up?
18   A.   She had no right to turn the water on.
19   Q.   Okay. Did she have any right to turn the
20   electric on?
21   A.   No.
22   Q.   Okay. I appreciate that. So your opinion, she
23   had no right to turn the electric on, no right to turn
24   the water on, no right to turn the TV on or get any
25   internet connection; correct?

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

Page 130

1  A.  That is correct.
2  Q.  And that was the principal factor in addition to
3  the condemnation as to why she was arrested?
4  A.  No.
5  Q.  No?
6          MR. GONZALES:  Objection.  Go ahead
7          and you can answer.
8          THE WITNESS:  No.  The reason why
9          she was arrested was she was told she
10         was not allowed to legally be on the
11         property unless she was there to remove
12         her personal property at the schedule of
13         the property owner and the police.  She
14         was in there without notifying the
15         police, without notifying the property
16         owner.
17                 It is our belief, but we
18         substantiate it, that she broke into the
19         facility with the help of a
20         now-identified taxi driver who we didn't
21         know at the time.  She had no intention
22         of removing items.  She had every
23         intention of reestablishing residency.
24                 Therefore, by trying to turn on
25         the television, turn on the electricity,

Page 131

1  turn on the cable or whatever else she
2  may or may not have done.  That's why --
3  and that was told the day before, you
4  can only do this and this.  You cannot
5  come here and just be here.  And that's
6  what she did.  And when we ran out of
7  our valuable (ph) options to help this
8  woman, which at the end of the day all
9  we wanted to do was help this woman, we
10 ran out of options.
11         Like, if you want to ask me
12 was I happy that we arrested her?  Did
13 it, like, make me excited?  Absolutely
14 not.  We wanted to help this woman.  The
15 only way we knew that we could help her
16 was try to get her into a mental health
17 facility because, in my layman opinion,
18 being as it is, and the Delaware County
19 Emergency Crisis Unit who -- I'm not
20 going to say are doctors, but are much
21 more trained and educated in this than I
22 am, the woman was suffering from some
23 kind of crisis.  We took her to the
24 place where she should get help.  You
25 just made me read the documents.  For

Page 132

1          some unknown reason, they said she was
2          not in any crisis.  So, therefore, under
3          the law, I can only assume that she was
4          consciously and subjectively violating
5          the law.  And therefore, she was
6          arrested.
7  BY MR. SCHROM:
8  Q.  But you made a comment -- and I don't want to
9  mischaracterize it, but you said her being there was
10 improper.  That was part of your analysis; correct?
11 A.  That is correct.
12 Q.  Okay.  Thank you.
13 A.  Yes, sir.
14         MR. GONZALES:  Mr. Bartos?
15         MR. BARTOS:  I have nothing
16         further.
17         MR. GONZALES:  I have no questions.
18         THE VIDEOGRAPHER:  This concludes
19         today's testimony given by Lieutenant
20         Joseph Pinto in the matter of Simona
21         Ockley vs. Township of Radnor,
22         Pennsylvania, et al.
23                 We are off the record at 1:25.
24         THE STENOGRAPHER:  And, Counsel,
25         regular delivery of the transcript?

Page 133

1          MR. SCHROM:  Yes.
2          MR. GONZALES:  Yes.
3          THE STENOGRAPHER:  And, John, I'll
4  send the read and signs to you?
5          MR. GONZALES:  Yes.  Thank you.
6          MR. BARTOS:  Yes.  Regular is fine.
7                 - - -
8          (Whereupon, videotape deposition of
9  LIEUTENANT JOSEPH PINTO concluded at
10 1:25 p.m.)

Page 134

```
 1        WITNESS CORRECTIONS AND SIGNATURE
 2
 3    Please indicate changes on this sheet of
 4    paper, giving the change, page number, line
 5    number and reason for the change.  Please sign
 6    each page of changes.
 7
 8    PAGE/LINE      CORRECTION    REASON FOR CHANGE
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

Page 135

```
 1    _____
 2    _____
 3    _____
 4
 5          _____
 6          LIEUTENANT JOSEPH PINTO
 7
 8    I, LIEUTENANT JOSEPH PINTO, have read the
 9    foregoing transcript and hereby affix my
10    signature that same is true and correct,
11    except as noted on the previous page(s), and
12    that I am signing this before a Notary Public.
13          _____
14          LIEUTENANT JOSEPH PINTO
15    State of Pennsylvania)
16    County of _____ )
17
18    Before me, _____, on this day
19    personally appeared LIEUTENANT JOSEPH PINTO,
20    known to me or proved to me under oath or
21    through _____
22    (description of identification card or other
23    document), to be the person whose name is
24    subscribed to the foregoing instrument and
25    acknowledged to me that they executed the same
```

Page 136

```
 1    for the purposes and consideration
 2    therein expressed.
 3        Given under my hand and seal of office on
 4    this, the _____ day of _____, 2025.
 5          _____
 6            Notary Public for and in
 7            The State of Pennsylvania
 8            Commission Expires _____
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 137

```
 1          STENOGRAPHER'S CERTIFICATION
            TO THE VIDEOTAPE DEPOSITION OF
 2             LIEUTENANT JOSEPH PINTO
              TAKEN ON MAY 13, 2025
 3
 4        I, Noelle R. Nevius, a Professional
      Stenographer, hereby certify that this
 5    deposition transcript is a true record of the
      testimony given by the witness named herein.
 6        I further certify that I am neither
      attorney nor counsel for, related to, nor
 7    employed by any of the parties to the action
      in which this testimony was taken.  Further, I
 8    am not a relative or employee of any attorney
      of record in this cause, nor do I have a
 9    financial interest in the action.
          The original deposition transcript was
10    delivered to the attorney party who asked the
      first question appearing in the transcript on
11    May 20th, 2025.  Mr. Gerard Schrom, Esquire, was
      the attorney present at the time of taking
12    this deposition.
13    _____
14    Noelle R. Nevius, Professional Stenographer
15
16
17
18
19
20
21
22
23
24
25
```

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

## $

**$2,060** 102:10
**$230** 102:12
**$490,000** 90:24

## 0

**016** 89:1
**04275** 90:5

## 1

**1** 14:16 25:16,20 26:7
34:18 47:21,25 49:3,4
83:10 90:16 91:3,5 93:1,4,
6 103:21
**10** 35:25 36:9 37:2,3 53:5
108:17,18,21,24
**100** 25:9 47:5
**108** 83:11 84:25
**10:04** 7:3
**11** 90:10 91:10 113:21
114:1
**11:04** 53:8
**11:05** 33:13
**11:23** 53:12
**12** 71:16 114:7,11 115:23
**12:31** 100:11
**12:39** 100:15
**12:49** 107:23
**12:50** 108:2
**12th** 82:6 84:10,12 121:22
127:25 128:1
**13** 7:4 77:14 114:18,23
**13th** 13:6 128:1,6
**15** 103:15
**15th** 89:11 90:15
**18** 19:20

**19** 19:20
**19085** 90:19 103:20
**1:01** 115:17
**1:04** 115:21
**1:25** 132:23 133:10
**1st** 94:16,24 95:18 96:4
103:24 104:2 118:2

## 2

**2** 13:2,6 14:15 25:16 49:2,
8,16,20 75:25 78:20 83:2,
14 90:21 102:11
**2/24** 102:11
**20** 16:21 68:20
**20-year** 68:23
**2020** 102:13
**2021** 102:13
**2022** 87:5,15 88:1 89:12
90:5,10,15 91:3,5,10
102:9,11 103:13,15,21,24
104:2 110:25 118:3 123:12
**2022-004275** 103:12
**2025** 7:4
**21** 32:3
**218** 83:11
**22** 21:1 31:18 35:17
105:18
**24** 34:8 80:6
**25** 35:19
**26** 86:12 87:5,15
**27th** 88:1
**29** 72:18
**2:24-CV-0470** 7:11
**2nd** 77:14

## 3

**3** 84:17 85:17 90:24 91:13
**3-seasons** 56:3,4

**30** 19:7 32:21 33:17
**302** 14:21 25:22 26:15
49:5 50:22 72:13,21,24
75:12 79:5 98:8 105:9,13
109:2 113:24 114:20
116:24 119:5 120:2,15
**302'd** 26:24 27:1,17 49:8
63:18 69:8 71:17 116:9,19
**302.4** 88:15
**303** 111:23

## 4

**4** 7:14 86:9 109:13
**4/20** 84:3
**4/21/22** 83:8,12
**416** 83:6 84:1,13,14 87:5
90:18 102:9 103:19 106:5
109:3 110:16,19,21
**4:00** 85:6

## 5

**5** 37:2,3 87:23 88:8
**5/10** 102:10
**5/17** 102:10
**50** 16:21

## 6

**6** 89:6,17
**6/15/22** 102:10
**6/17/22** 102:11,12
**6/3** 102:12
**6/9** 102:11

## 7

**7** 100:18,21
**7/21/2022** 110:23
**716** 111:7

**7690** 109:23 110:16

## 8

**8** 102:23 103:3
**8/10/2022** 110:20
111:12
**8/12** 72:2 73:18 74:4
83:17 84:4,8 89:4 109:21,
22 116:5,8,18
**8/12/202** 109:16
**8/12/2022** 109:4 110:15
114:21 116:4
**8/12/22** 84:4
**8/13** 73:23 98:8 116:6
**8/13/2022** 114:10
**8/9/2022** 105:19,22
**8:00** 85:5

## 9

**9** 36:8 105:16 106:6
**9-1-1** 24:7
**9/1/2022** 106:23
**9/8** 108:6
**9th** 103:13

## A

**A's** 20:19
**a.m.** 7:3
**abandoned** 91:6 93:10
**abating** 85:6,9
**ability** 46:13
**absconded** 50:16 80:4
**absolutely** 31:6 48:11
52:14 101:6 104:12,13
123:20 128:24 131:13
**Academy** 18:9
**access** 39:14,19 40:14
44:22 45:1,2 60:18 61:10

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

63:23 64:5 81:20 91:1,15
92:24 94:24 96:3,5,12
103:19,23,25 104:1,14,18
105:2,4 129:8

**accident** 17:17 30:1

**accommodation**
56:14

**accomodation** 54:17

**accord** 95:14

**accuracy** 8:25

**accurate** 115:6

**accurately** 99:15

**act** 18:10

**acting** 61:6

**action** 18:21,23 75:9
90:6 95:17 103:11

**actions** 45:13 49:3 94:14

**activities** 75:9

**activity** 85:7,9

**actual** 32:9 54:19 57:12
72:20

**adapted** 54:16 56:14

**addition** 130:2

**additional** 10:24 103:22
113:14 121:9

**address** 100:25 110:19

**adequate** 128:15

**adjudicated** 18:1

**ADLS** 120:17

**administration** 34:25

**administrative** 22:2,
11 34:6,19 35:16

**admit** 73:22

**adult** 74:20

**Adults** 85:5

**advanced** 90:11

**advised** 42:16 57:9
63:25 107:2 110:18
111:12,22

**advising** 58:6 83:5
85:14

**affiant** 52:16

**afternoon** 121:17

**agencies** 33:4

**agency** 15:17 51:14

**agree** 32:8 95:16

**agreed** 75:11,12

**agreement** 26:4 126:13

**ahead** 117:19 121:4
126:6 130:6

**Alan** 7:16

**allowed** 39:8,19 57:19
59:19 60:3,6,9,19 61:3
72:6 77:4 81:16,20 95:13
96:13 99:10,13 101:19
118:3 130:10

**allowing** 40:13

**ambulance** 75:19

**amount** 16:8 65:10
90:23

**amounts** 10:7

**analysis** 28:15 53:16
72:21 119:6,19 120:23
132:10

**analyzed** 118:24

**and/or** 31:9 57:9 103:24
104:17

**Andy** 83:5 84:22 86:2
87:10

**annual** 11:14

**answers** 46:22 63:11
124:8

**anticipate** 40:10

**anymore** 60:6 72:5

**apartment** 38:16

**apologize** 10:2,11 13:4
17:15 21:14 109:9,10

**app** 23:7

**appalled** 79:7

**apparently** 78:22

**appeared** 75:1 105:19

**appearing** 90:14

**appears** 48:1 55:25
74:20 87:25 100:23 102:25
105:20 113:23 117:22
120:19

**application** 113:23

**apply** 9:3,4 44:11 45:22
46:2 78:3 93:7

**appointed** 20:7

**approach** 43:6

**appropriately** 113:18

**approval** 109:8 129:8

**approve** 48:5 116:24

**approved** 20:7,8 29:22
48:3,5,25 75:13 105:20,21,
22 109:5,6,7,9 114:22
119:12

**approves** 22:22

**approximate** 90:23

**approximately** 16:18
17:6 35:8

**April** 32:3 86:12 87:5,15
88:1

**Aqua** 111:18

**area** 35:9 55:10,19,22
56:4,19

**areas** 9:14

**argue** 32:6

**argumentative** 95:24

**arguments** 90:11

**arise** 34:8

**arrest** 24:17 25:9 31:17
32:9 40:15,22 41:5 42:20
43:2,4,13 45:14,15,16
46:25 47:2 48:5,13 49:2,
15,24 51:3 54:1 62:1,4,16
70:24 71:8 73:11 78:7
125:5,25 128:16

**arrested** 13:9 25:5
42:16,17,21,22,24 45:4
48:7,24 49:4,9,21 51:16
61:18 73:23 92:1 93:25
95:7 99:1,3 125:20 126:8,
15 127:16 128:11 129:5
130:3,9 131:12 132:6

**arresting** 42:4,9,10,14
104:11

**arrived** 83:18 89:4 111:7,
14

**articles** 67:18,20

**articulate** 39:16

**aspect** 19:23 21:9

**aspects** 22:23 53:17

**assessment** 75:11
118:17,20 124:12

**Assessment/plan**
120:1

**assigned** 19:11 36:9,13

**assist** 120:19

**assistance** 96:6 107:4

**assistant** 40:24

**assisted** 52:6 65:12

**assume** 23:13 27:15
78:18 93:11 132:3

**assuming** 78:18

**assumption** 81:4

**asterisk** 41:15

**athlete** 96:24

**attached** 55:23 107:16

**attachments** 107:5,6,
10

**Attanasi** 14:13 106:2,3,
19,20,24 107:2 108:8

**attempting** 18:10 105:5
111:6

**attention** 32:12,24
59:14 64:11 80:19 91:12
109:12

**attesting** 111:19

**attorney** 18:20,23 40:23,
24 41:8,19 101:10

**August** 31:18 71:16
77:14 98:15 103:13 121:22
123:12

**authority** 24:14

**authorized** 83:9 116:6

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

**Avenue** 83:6 84:2,13,15 87:5 90:18 102:9 103:20 106:5 109:3 110:17,20,22 111:8

**aware** 13:22 64:24 67:4 78:6,9 96:17 107:3 123:23

**awareness** 13:24,25 44:8

### B

**b/m** 111:8

**bachelor's** 9:19 10:5

**back** 14:4 16:9 25:12 34:18 35:4 53:10,11,14 55:18,19 57:3 60:7,22 74:15,18,22 75:3 80:6 88:24 100:13,14 101:16 107:25 108:1 110:25 111:11,16 115:19,20 118:7 121:24 122:21 123:3 128:1

**background** 9:15,18 19:4

**backwards** 35:21

**badge** 111:23

**bags** 97:3

**bar** 11:10

**Barry** 103:6 104:3 125:14

**Bartos** 8:3 121:11,16 124:14 132:14,15 133:6

**base** 82:1

**based** 12:5,6 15:2 31:24 32:21 33:3 45:13 50:20,23 81:3,8 82:11 97:11 127:21

**basement** 112:22

**basically** 24:4 50:23 55:2 122:20

**basis** 24:15 29:23 33:6 105:13

**Bates** 31:10,19

**beat** 36:9,10,13

**begin** 7:4

**beginning** 101:20

**behalf** 7:18,25 8:2,4 13:14 27:6

**behavior** 104:9

**behavioral** 114:9 116:1, 11 117:1

**belief** 61:4 104:23 130:17

**believed** 59:2 80:20

**believing** 61:9

**belongings** 111:2,3 118:2

**big** 11:20

**bin** 112:7

**bit** 9:17 19:3 21:7

**black** 111:9

**blacked** 54:7

**blanks** 122:20

**blocked** 111:15

**Bloomsburg** 9:20

**board** 20:7,8 23:3 29:14 84:19 87:7

**body** 16:2 25:7 44:3 73:23

**boils** 59:10

**books** 67:22,24

**boss** 20:12

**Botel** 7:14

**bottom** 103:2

**break** 33:12 53:4

**breaking** 38:5 111:10

**Brian** 51:21 52:12,16,19 53:17

**bright** 127:2

**broke** 104:24 118:12 130:18

**broken** 36:2 61:16

**brought** 18:20 35:5 51:21 77:20 116:20 117:23 120:2

**Brown** 51:21 52:13,16,19 53:17 88:6

**Brydzinski** 8:5 14:6 41:22 60:12 69:1,5 109:21 110:15,18,21 111:13,18,19 121:19 122:11

**Brydzinski's** 112:11

**budget** 22:16,19,20,23 34:1

**bug** 38:18

**builder** 117:25

**building** 14:2 30:14 39:12 43:17 55:14 56:22 57:11 83:8,17 125:1,3

**burglary** 54:8,14 56:10, 11,23,25 57:1,4

**business** 85:9

### C

**cab** 111:9

**cable** 131:1

**cadet** 18:11

**cadets** 18:14

**call** 14:20,21,22,23 15:14 20:12 24:7,16,21 25:2 34:7,8 38:17 51:10 55:16, 17 64:20 65:21,22 71:23 75:13 76:19 80:15 95:2 96:14 99:8 125:19

**called** 8:10 10:25 25:9 126:11

**calling** 126:4

**calls** 33:6,22 36:15

**calm** 73:1

**cam** 25:7 73:23

**camera** 44:3

**cameras** 16:2

**campus** 18:8,12

**candidate** 98:8

**capacity** 16:10

**capture** 64:18

**car** 36:14 37:15 75:22 97:2

**care** 73:15 120:19

**career** 9:22 12:7 36:3 65:4,9

**caretaker** 120:18

**cart** 97:2

**case** 7:9,11 17:13 18:3,5 39:10 40:18 46:18,23 65:17 95:17,20 97:7

**cases** 39:15 47:1

**catchall** 105:24

**categories** 23:13 38:22

**category** 12:16,19 37:20,21 47:9

**caveat** 41:20

**CC'D** 87:6

**CC'ING** 84:19

**Center** 114:8 117:3 120:24

**certainty** 14:18

**certification** 11:17

**certified** 88:3

**chain** 29:16 100:24 102:18,20,22

**change** 33:18,19

**changed** 104:9 105:6 111:16

**Chapter** 83:10

**chapters** 67:22

**character** 37:6

**characterize** 27:25 28:7,15 32:11

**charge** 15:1 19:22,23 21:8 22:12,16,18,20 24:2, 8,13 26:10 33:25 35:3,5, 15,25 36:12 54:2 56:25 124:10

**charged** 24:10 47:7,11 48:18 54:4

**charges** 48:18 123:23 124:3

**charging** 124:12

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

chest 79:20

chief 20:2,5,6,13 21:17, 22 22:3 29:18 33:22 35:4 36:6

children 85:11

Chris 84:22 87:10

Christopher 20:17 23:15,16

Chunks 99:22

circles 68:15

circumstance 24:24 36:22 37:5 40:6,17 43:7 65:16 69:16 70:3 72:24 93:23

circumstances 14:12 31:21 38:2,8,9 39:23 40:10 107:3

citation 17:12

cited 18:15

citizen 123:13,17

civil 18:3,5 20:5,9 90:6 103:11

civilian 19:25

civilians 22:15

clarify 26:14 94:21 123:10

class 72:17

classes 65:25 67:4

classify 37:23

clean 43:18 129:16

cleaning 39:14,21

clear 101:11 102:14 111:2

client 17:13 96:11 97:21

close 35:24

Cocco 52:6 57:16,18 58:17 59:1,12,18,20 77:17 78:1,22 100:4 114:22 128:7,10

Cocco's 99:24 100:2,6

code 60:15 61:17,21 83:5,11 84:25 86:3 87:9

88:6

coded 105:23

codes 29:20 30:1 31:5,24 37:23 39:12,17 43:22,25 70:21 84:21 106:20 110:25 111:22

coerce 75:15

collaborative 58:18

collapsed 123:25

College 18:9

combination 59:16

comfortable 24:22 124:2

command 9:25 29:16

comment 27:20 132:8

commented 105:11

Commission 11:16

commissioned 84:21

Commissioner 87:6

commissioners 84:20 87:8

commit 57:2

committed 46:11 57:20 80:23 81:1

common 37:17 39:15 44:16 64:19 65:4,14 67:10 76:22 90:1,4 103:7,10 106:22 125:8

commonly 65:13

communicate 120:11

communication 31:19 54:19 57:12

communications 60:11

community 84:19 88:6 102:13 106:25

company 75:20 90:21 106:4 111:6 126:4,14

complaint 48:1 58:18 71:8 90:7

complete 11:17

completed 26:3 111:18 112:7 114:21

completely 25:9 73:20

complied 95:21

computer 121:12 122:17

concern 50:14 118:11 123:13

concerned 120:8

concerns 34:8 123:18 127:17

concert 40:22

concluded 133:9

concludes 132:18

concrete 55:20

condemnation 12:16 36:23 38:24 39:6,24 40:11 62:21,25 63:3,15 84:24 111:5 130:3

condemnations 12:15 43:10

condemned 37:16 40:2,15 58:8 59:16 64:1 81:10 85:14 123:15,24

condemning 62:19

condemns 85:1

condition 39:25 46:22 50:13 63:19 74:14 80:7 93:17 96:18 97:18,19 99:14 105:12

Conditions 93:18

conducting 85:8

confident 31:9 67:5

confidently 69:11

connect 111:17

connection 129:25

conscientious 32:13, 14,15,17,22 33:3,9

conscientiousness 32:12,24

consciously 81:4 132:4

consideration 90:7 103:13 129:3,10

considered 129:12

consistent 77:22

construction 111:6,13

contact 27:5 41:5 43:21 64:23 96:14 110:17 123:17

contacted 27:6 64:24 111:16,17,18 119:9

contacting 73:6

Continue 106:16

continuing 11:3 119:25

contraband 77:24

control 43:11

controlling 59:3,14 83:21

conundrum 43:1,7

conversation 48:15 49:25 50:10 78:4 128:9,12

conversations 43:12 68:13

cooking 85:8

cooperate 80:14

copied 102:17

copy 106:21 115:6

corner 88:24

corporal 19:8 36:4

correct 24:6 25:13,21 34:5 35:18 37:22 43:2 44:9,10 48:23 49:6 51:3 61:5,8 65:5,17,23 69:13 74:2,3 76:1,4,8 77:9,24 81:11 82:2 84:8 88:11 91:21,22,24 92:21 93:2,8, 15 94:17,25 96:4 98:9,10, 12 101:14 105:13 108:12, 14,15 109:14,19 116:2,4, 12,21 117:3,7 118:24 119:6,23 120:5 128:3,7,23 129:2,5,25 130:1 132:10, 11

corrected 35:14

correctly 10:16 117:16 122:14

**correspondence**
64:9

**corrupt** 118:8

**counsel** 7:20 8:16 17:15
28:25 33:15 41:12 42:4
90:13 107:17,18 122:11
128:20 132:24

**counseling** 65:20

**Counselor** 14:14

**counter** 42:23

**county** 19:16 26:1 73:9
90:1,5 103:11 106:21
118:8 119:10,11 131:18

**couple** 16:10 38:22
88:23 121:17,20 124:18

**courses** 11:9,18

**court** 7:17,18 8:7 39:7,11,
18 40:1,13 41:6,10,13 43:5
44:8,9 52:20 59:3,11,15
60:15 64:8,19 65:3,4,8,17,
21 66:2,4,6,7,11,15,19
67:9,10,12 69:14,17,21
70:4 73:18 74:2,5 76:4,7
78:6 80:18 86:16 89:9,25
90:4 91:8 95:21 103:10
106:17,22 107:4 108:7
113:8,9 118:1 128:2,4

**covered** 74:19

**covers** 22:1,2

**crazy** 80:23

**create** 8:23 119:1 122:15

**created** 41:6,9 61:17

**creation** 51:16,20

**credentials** 11:8

**crime** 24:10,13 46:10,19
54:2 55:1,5 57:2,19

**crimes** 47:7,8 53:16 54:4
105:25

**criminal** 48:1 54:9,12,
13,23 55:1 56:8,20,23
57:23 58:18 122:23 123:22
124:3

**crisis** 26:1 27:3,5,7,16
73:9,15 74:9,23 75:4,24
119:9 131:19,23 132:2

**criteria** 46:17

**CROSS** 121:14

**Crozer-chester** 114:8
117:2 119:3,13 120:23

**current** 106:17 110:21

**Currie** 102:7,13

**custodian** 15:25

**custody** 13:9 46:14
65:1,11 69:22 77:20 80:17

**Custom** 102:2 106:3
111:12

**Customer** 111:6

**CV** 90:5

---

**D**

**D-I-E-T-R-I-C-H** 23:18

**D-O-Z-E-R** 103:7

**DA** 64:20,21,24 65:21

**daily** 29:23 33:23

**damaged** 37:13 54:23

**danger** 120:20 123:23

**Daniel** 114:10

**DAS** 65:22

**date** 16:13 32:7 83:12
91:9 92:23 93:8,9 102:12
109:18 110:21 116:6 123:4

**dated** 86:12 102:10,11
105:18 109:1,3,16 114:20

**dates** 13:4 31:13 32:5
102:10

**day** 13:2,6,8 14:15,16
25:15,16,20,23 26:7 34:8
41:16 42:18 44:1 46:19
48:22 49:2,3,4,8,16,20
51:11 55:5,6 57:15,16
60:4,19,21,23 61:2 63:18
69:8 71:17,18 73:22,25
74:3 75:25 76:3,17 77:11,
14 78:20 79:22 80:7,24
81:22 82:6 89:11 90:15
94:14 95:6 96:19 98:7,19
99:11,12 103:13 116:8,9,
10 127:9 128:18 131:3,8

**day-to-day** 33:23

**days** 25:17,18 36:8 88:11
95:5

**daytime** 127:2

**de-escalation** 11:20
72:15

**deadline** 92:23

**deal** 74:9

**dealing** 72:13,14,18

**deals** 23:7

**dealt** 16:2 92:7 128:18

**decided** 35:1

**decision** 24:15 25:4,10,
11,22,23,24 41:5 42:20
49:15 116:24

**decision-maker**
24:12 26:7,13,15,16,23,25
27:3

**declaration** 39:24

**declared** 83:6

**decreed** 90:16

**deed** 59:17 82:18 89:13
90:18

**deeds** 82:20

**deemed** 32:1 39:21 91:5
93:10,12 98:8 106:19
110:24

**deems** 43:14

**defendant** 17:13 90:4,
12,20,24 91:15 103:18,23
104:1

**defendant's** 103:14,17

**Defendants** 8:2

**defended** 18:23

**defiant** 54:8,19,20 57:7,
8,21

**deficiencies** 86:25
87:1

**definition** 46:21

**definitively** 52:8

**degree** 9:19

**Delaware** 19:16 26:1
73:9 90:1,5 103:10 106:21
131:18

**delegate** 70:22 119:12

**delineated** 53:16

**delivery** 132:25

**delusion** 120:3

**denied** 120:15

**denies** 22:23 117:24
118:13,14,15

**department** 9:23 12:8
19:24 21:9,18,19,23 28:4,
7,8,10 29:1 31:6,20,24
33:24 34:6 39:18 46:2
62:20 69:6,7 70:21 72:17
103:25 104:18,20 108:6,25
110:25 112:24 115:7
119:22 122:17 123:17

**departments** 10:22

**deplorability** 43:22

**deplorableness**
74:15

**deposition** 7:5,12
12:22 17:1,4 59:12 133:8

**depositions** 9:3 17:7
19:1 33:11

**derogatory** 97:20

**detail** 32:12,24 35:22

**details** 32:15,17

**detained** 49:8 105:13
117:7

**detective** 10:10,12,14,
15,18 19:11

**detectives** 22:12

**determination** 27:10
38:3 40:12 49:9 59:18 78:3
79:5 94:8,11 116:21,22
117:7 128:17

**determine** 14:25 24:9
26:23

**development** 84:19
88:6 101:2 102:14 106:25

**devoted** 68:6

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

**diaper** 74:21 76:16 96:21 129:6

**diapers** 79:15

**diaster** 37:11

**Dietrich** 23:18 71:23 72:7

**difference** 37:24

**differently** 116:16

**digitally** 112:15

**dignity** 73:15

**direct** 9:8 81:5 91:12 109:12

**directives** 95:22

**directly** 19:23 67:3 73:4, 17

**director** 30:5 84:19 106:25

**directors** 29:14

**disburse** 90:22

**discharged** 120:16 121:6

**discipline** 34:2,4

**discretion** 20:9 24:17

**discuss** 44:6

**discussed** 42:17 48:18 120:21

**discussing** 16:10 43:6

**disposal** 33:15

**disposed** 17:12,16

**dispute** 108:10

**distinction** 109:24

**distress** 79:10

**district** 7:10 40:23,24

**divide** 21:23 22:15

**divides** 23:12

**division** 36:1

**docket** 103:15

**doctors** 131:20

**document** 47:24 48:6 49:18,21 51:16,20 52:8

61:18,25 62:2,5,9 83:2,3 84:14,16 85:21 86:7,8 87:18,23,24 88:18 89:6,7,8 91:20 92:10 93:16,25 100:17,19,20 102:23,24 105:15 107:4 108:16,23 113:3,21 114:6,15,17 115:1 116:1 119:1 123:2,3

**documentation** 72:10 114:9 116:2 117:1 125:22

**documents** 12:23 62:16 63:24,25 64:6,7 82:25 83:21 85:22 118:4 123:6 131:25

**door** 58:9 111:11

**doors** 101:4 111:11

**dorm** 18:14

**doubt** 92:2,3

**Dozer** 103:6 104:3 125:14

**dramatic** 97:24

**dramatically** 33:19

**driver** 104:24 130:20

**driveway** 56:19

**drove** 37:15

**drug** 19:16

**due** 14:18 117:22 118:10 120:10

**duly** 8:11

**duty** 124:24

**dwelling** 85:2,5

---

**E**

**e-mail** 100:24,25 102:17, 20,22

**e-mails** 31:1

**earlier** 46:4

**early** 16:22 41:16

**easier** 126:19

**Eastern** 7:4,10

**eat** 95:11

**eating** 95:7

**ED** 120:2

**educated** 131:21

**education** 11:3 12:14

**educational** 9:15,18 11:16

**effectively** 124:9

**effort** 58:19 75:14 76:18

**electric** 111:16 129:20, 23

**electricity** 74:25 126:3, 19 129:7 130:25

**elements** 57:4

**else's** 25:23

**emergency** 103:14 113:24 114:20 131:19

**employee** 16:4 108:6

**encountered** 68:24

**end** 38:23 123:7 131:8

**enforcement** 22:14 51:14 57:9 61:17 86:3

**engines** 44:20

**entered** 56:17,22

**entire** 64:22 104:8 119:22

**entities** 11:10

**entity** 28:8 32:24 116:11 119:21

**entry** 85:3 111:15

**entry-level** 10:15

**environment** 49:7

**equal** 126:3

**equivalent** 70:14

**Erv** 107:5

**escaped** 50:16 80:4

**escapee** 50:21

**escapes** 10:3

**escorted** 75:18 96:23

**Esquire** 90:13

**essentially** 119:5

**estimate** 16:25

**et al** 7:8 132:22

**evaluated** 119:10,14

**evaluation** 66:13 120:3 128:23,25 129:2

**evaluations** 80:19

**Eventually** 75:11

**eviction** 65:12

**exacerbate** 73:2

**exact** 10:2 13:4 16:13 17:22 36:25

**exam** 117:11,22 118:22 120:2,12,13

**examination** 9:8 113:24 121:14 124:20

**exception** 19:9 39:11

**excite** 73:2

**excited** 131:13

**excluded** 63:19 71:13

**exclusively** 68:6

**executed** 89:13 90:20 92:10

**exhausted** 51:13

**exhibit** 47:20,21 83:14 85:17 86:9 88:8 89:17 100:21 103:3 106:6 108:18 114:1,11,23

**expect** 123:17

**expected** 37:10

**experience** 12:14 27:19,20,24,25 28:6,16,19 29:2,4,7,8,9 46:3,4,5 79:12

**experienced** 28:1,2,9, 12,16

**experiential** 19:4

**explained** 120:9

**explored** 51:4 98:9

**explosives** 77:23

**expresses** 118:11

**expunged** 14:18

**expungement** 14:19

**extends** 93:6

**extremely** 28:1,12 33:9
40:8 45:11,21 48:16

**eyes** 46:11,12

---

**F**

**F--** 20:21

**F-L-A-** 20:20

**F-L-A-N-A-G-A-N**
20:18,24

**F-L-A-N-G-A-F-L**
20:19

**F-O-U-R** 23:15

**face-to-face** 30:6

**facility** 13:10 50:12,17
105:8 128:13 130:19
131:17

**fact** 43:1 49:19 50:20
56:15,22 57:8

**fact-dependent**
124:11

**factor** 130:2

**facts** 124:11

**failed** 80:2

**fair** 70:23 80:22

**fairly** 39:15 65:14 123:21

**faith** 39:16

**fall** 34:5,7 37:12

**falls** 22:24

**familiar** 14:12 15:13 22:8
23:6 25:14 36:19 45:8,19,
21 47:8,13 62:21,25 63:3,
5,9 71:8 102:8

**Faust** 31:9,18 105:19
107:5

**feces** 74:20 118:5 120:9
129:6

**feel** 124:2

**felt** 49:17 51:2

**field** 10:9 19:12 51:25
52:2 68:25

**figure** 19:21

**file** 69:19 70:17,20 71:10
89:14 112:14 123:9

**filed** 25:25 27:11,12,13
48:1 87:12 90:8 105:19
112:7,20

**filing** 112:5

**fill** 122:20 123:1

**filth** 126:11 127:3

**filthy** 79:15,18

**final** 118:17

**finally** 75:15

**find** 113:15

**fine** 20:2 32:11 50:7 86:19
117:19 118:16 133:6

**finish** 11:5 50:3 96:2

**finished** 97:9

**finishing** 27:21 129:15

**fire** 37:13

**firearms** 10:8 12:10,11
19:13

**fires** 37:13

**Fischer** 25:8 40:23 41:3
44:11,13 48:4,20 52:9,22
55:6 62:5,6,24 63:12 78:21
105:22 109:9 114:22

**Fischer's** 100:1,6

**fit** 12:20 21:23 38:3 39:25
40:12

**Flanagan** 20:17 23:12
35:1,4 84:23 87:11 111:21

**fluctuates** 29:1

**focusing** 31:17

**folder** 107:5,6

**follow-up** 124:16
128:20

**footage** 13:1

**force** 19:16 73:11 75:22

80:18 117:24

**foremost** 73:5

**forever** 127:22

**Forge** 18:8

**form** 33:1 35:7 49:11 59:6
79:9 81:13 105:17,23
109:1 112:23 117:2
122:19,20,25

**fortunate** 67:23

**Foster** 30:3

**found** 31:23 60:19 75:13

**frankly** 12:7 123:21

**Friday** 128:15

**friend** 120:17

**front** 7:14 37:15 51:17
64:10 79:23 123:3

**FTO** 51:22,24

**full** 16:19

---

**G**

**gain** 13:25 129:8

**Gallagher** 15:16

**garage** 58:9 111:11

**gather** 73:3

**gathering** 73:16

**gave** 31:23 49:24

**general** 9:14 10:13 40:25
46:3 65:3 78:23 104:4

**generally** 67:9 123:12

**generic** 105:23

**gentleman** 14:2 15:15
18:9 41:15 71:24

**Gerard** 7:24

**giant** 35:22 75:1

**give** 19:6 29:4 36:25
38:12 46:21 64:5 74:17

**giving** 80:14

**Glynn** 8:6 89:14 90:2,9
103:11 108:7 121:19

**Gonzales** 8:1,18,22
11:5 21:11 26:12 28:17
32:25 48:9 49:10 53:19
58:1 59:5,25 61:19,23
62:11 66:17,24 67:2 71:1
79:1,6 81:12 84:5 86:15
94:2,6,19 95:8,19 97:8
98:13 100:8 113:16 115:15
116:13 117:12 118:25
119:7 121:1,11 126:1,6,22
130:6 132:14,17 133:2,5

**good** 7:2,23 9:11,12
21:16 39:16 46:7 90:14
121:17

**gown** 74:19 76:16

**gowns** 79:17

**graduated** 9:24

**granted** 103:17

**grass** 88:13

**Greg** 100:25 101:13,15,
16

**Group** 8:4 101:2

**guess** 16:25 33:17 35:7
51:1 60:10 77:23

**guesstimate** 16:23

**guidelines** 15:9 22:25

**guides** 66:9

**guy** 24:17

---

**H**

**habitation** 12:20 71:14
72:1,5 81:19

**half** 21:24 72:19

**halfheartedly** 96:22

**hall** 30:8

**hammer** 111:12

**hand** 69:25

**hang** 95:1,15

**happen** 29:21 37:18
46:15,16 72:9 127:23
129:14

**happened** 70:3 80:5,24
113:7 127:19

**happening** 99:4,6

**happenings** 106:1

**happy** 131:12

**hard** 19:19 38:10

**hard-pressed** 10:10
16:7 99:2

**head** 21:18

**health** 13:10 14:22,23
50:12,17 72:21 75:7 105:7
109:2 114:9,20 116:1,11,
20 117:1 128:13 131:16

**heard** 90:11 121:25

**hearing** 41:9 90:10
103:16

**heartsick** 79:8

**held** 16:13 19:8

**helped** 16:1

**helpful** 103:9

**Herman** 90:13

**hey** 24:16 29:25 125:24
126:12

**high** 68:16,17

**higher** 46:15

**highway** 22:12 30:3

**hindered** 111:13

**history** 117:14,18 118:13

**hit** 107:9

**hmm-hmm** 37:4 54:21
61:1 91:14 126:5

**hoarders** 37:7,8

**hoarding** 29:19,25
37:21 38:13

**hold** 19:10 84:5 94:2,19
115:3

**holds** 90:23

**hole** 75:1

**home** 55:11 56:13 60:23,
25 61:3,14 71:13 72:4
74:14 75:17,18 76:13,17
77:4 95:13 98:11,15,23
99:10 101:7 111:15,20
120:16,18

**homeowner** 81:21
123:13 125:2

**honestly** 29:8 73:14

**hope** 123:20 124:7

**hospital** 74:19 76:16
79:5,17 98:1,4,5

**hospitalizations**
118:14

**hotel** 51:8

**hour** 33:12 53:4 126:15

**hours** 34:8 43:19 80:6
85:5 111:14

**house** 14:4 37:13,16,20,
24 38:3,16 43:21 55:23
63:19 64:1 71:14,18 74:12,
25 75:1,5 81:6,18 93:12
97:14 101:21 117:25 118:6
120:4 127:1 129:8

**houses** 37:12

**human** 12:20 38:4,25
39:6,25 40:12 46:12 63:7
71:14 72:1,5 81:19 83:7,24
101:21

---

## I

**identification** 47:22
83:15 85:18 86:10 88:9
89:18 100:22 103:4 106:7
108:19 114:2,12,24

**identified** 7:21

**identify** 47:25 83:3 84:17
86:8 87:24 89:7 100:18
102:24 105:16 108:24
110:6 113:22 114:7,18

**ill** 72:18

**illness** 117:14,18,25
120:14

**imagine** 29:2 74:22
107:17

**immediately** 85:2
90:17

**impairment** 96:20

**implementing** 66:11,
15 67:13

**important** 32:19,20
45:10,11,12,18 53:25

**impossible** 46:21

**impression** 78:24

**improper** 42:24 132:10

**inaccurate** 110:10

**inappropriate** 95:24

**incident** 9:16 13:1 17:24
21:2 23:16,21 24:5 38:14,
25 42:11 71:22 105:17
109:1 114:19

**incidents** 29:3 31:13

**including** 66:20 73:9
78:22 80:11 85:8

**indication** 101:1 128:21

**indirectly** 73:3,17
116:12

**individual** 10:6,20
18:18 24:10

**individuals** 85:3

**infestation** 38:18

**information** 15:11
31:5,24,25 44:3 71:19,21
72:2 73:3,17 77:3,7,10
82:11 84:1 105:23 106:3
123:2

**inhabitable** 37:25
110:24

**initial** 41:9

**initially** 9:14 44:7 73:16

**injunction** 90:8

**injuries** 18:17

**innuendo** 46:19

**inside** 111:1 123:15

**inspection** 111:14

**inspector** 111:14

**instance** 38:14 124:9

**institute** 10:1

**institutes** 10:5

**instructing** 95:23

**instructions** 12:12

**instructor** 10:8,9 12:10
19:13,14

**intake** 122:14

**intent** 57:2

**intention** 60:21 92:5,6
94:12 105:14 130:21,23

**Inter-county** 10:10,18

**interact** 30:8

**interacted** 68:22

**interaction** 29:12

**interactions** 29:17
89:11

**interest** 12:12

**interests** 12:6

**interference** 92:17

**international** 84:25

**internet** 129:25

**interpret** 64:18 66:1,6

**interpreting** 66:10
67:12

**interrupt** 23:11

**investigations** 35:3

**invoice** 102:3,9,11

**invoices** 101:5 102:9,15

**involuntary** 113:24

**involve** 21:9

**involved** 15:3 33:17,21
34:1,2,13 42:19 67:24

**involvement** 62:20

**involving** 18:5

**IPMC** 83:11

**ironic** 10:17

**ironically** 72:16

**irritable** 117:22

**issue** 17:10 29:20 75:7
110:16 112:10 116:5 118:7

**issued** 13:13 17:11 88:1
89:11

**issues** 29:19 33:7 34:2
37:20 38:16 88:11

**item** 97:12 98:25

**items** 39:14,20 43:18
60:19,22 61:12 63:23 64:6
76:11 77:6 81:21 97:5,13
99:6,7 130:22

**Ithan** 83:6 84:2,13,15
87:5 90:18 102:9 103:20
106:5 109:3 110:17,20,22
111:8

---

**J**

**jack-of-all-trades**
16:1

**January** 34:18 35:4

**Jeff** 109:21

**Jeffrey** 110:15,17

**Jennifer** 114:22

**job** 15:19 30:9,10 34:11
36:15 105:8 128:15

**John** 8:1 84:23 87:11
89:9 91:8,9 103:16 113:14
133:3

**Johnny** 125:25

**Johnny's** 126:14

**Jones** 125:25

**Joseph** 7:6 8:10 132:20
133:9

**judge** 41:6 89:9,10 103:7,
15 125:13,14

**judges** 13:14

**July** 19:7 89:11 90:10,15
91:9 103:15

**jump** 102:16

**juvenile** 24:18

---

**K**

**Kevin** 15:16 30:11,13
70:21 84:18 86:2,23
100:24 101:15,16,22,24
102:1,5,8 106:25

**key** 45:17 82:12

**keys** 43:16

**kill** 21:11

**killed** 123:25

**kind** 9:14 15:25 35:22
37:20 59:10 66:5 75:6
78:23 92:23 105:24 113:3
131:23

**kinds** 16:2 36:19 46:19

**kitchen** 75:2 111:11

**knew** 63:16,17,18,22 64:4
71:13,15,17 75:5 76:10
92:10 98:3 131:15

**knocked** 30:2

**knowing** 124:4

**knowledge** 16:22 33:4
60:17 108:13

**Kochanski** 30:12,13
31:19 70:21 82:16 84:18
86:2,24 100:24 101:15,16,
23,24 102:2,8 106:25

---

**L**

**language** 122:18

**law** 7:13 8:4 46:18 48:17
51:13 57:9 67:20 103:11
132:3,5

**lawn** 88:5,16

**lawyer** 55:2

**lawyers** 11:2 44:20

**layman** 131:17

**laymen's** 46:8

**learned** 32:18

**leave** 16:22 75:16 99:8
111:5 120:4

**leaving** 24:4 92:6

**Lee** 90:12

**left** 15:16 19:10 93:11

**leg** 118:11 120:10

**legal** 7:16 11:18 57:10
83:4 94:13 111:4

**legally** 130:10

**legislation** 23:2

**letter** 84:18 85:12 86:23

**level** 28:19 124:7

**levels** 46:5

**Lexis** 44:15,22,24 45:5

**Lexisnexis** 44:24 45:3

**liable** 18:2

**lieutenant** 7:6 8:10
19:9,19 21:21 22:1,11,18
23:5,25 24:1,16 29:23
32:19 34:20,21 36:6 71:23
72:7 111:21 121:18 123:16
132:19 133:9

**lieutenants** 21:20

**life** 33:7

**light** 30:2 127:5

**lightning** 37:11

**likelihood** 46:10

**likes** 75:20

**limitation** 93:15

**limitations** 60:18 92:21
93:21

**limited** 30:6 81:7 118:10
120:10

**Lingo** 14:9,10 41:24,25
68:11,12 100:25 101:13,
15,17

**Lisa** 102:6,13

**list** 47:9 80:10

**listed** 109:2,10

**live** 79:13,14 95:3

**living** 94:10 95:4 123:15

**located** 7:14 18:15
103:19

**location** 31:23

**lock** 43:15

**locked** 39:13 96:7 101:9
118:1

**locks** 43:16 64:1 82:4,13
101:3,4 102:4 103:22

**legally** 130:10

104:1,18,19 111:10

**logically** 120:11

**long** 14:20 15:1,5 16:6,17
17:19 46:14 89:21 97:15
98:5 99:23

**longer** 15:23 50:23 60:17
63:20 92:9,10 94:9

**looked** 65:4,8 80:3 82:20
99:25 104:5

**lot** 34:10 37:7 49:1,2 54:7
64:10 124:4

**loud** 86:16,20

**LP** 90:2,9 103:12 121:19

**lucky** 12:13

**Luke** 14:13 101:17 102:2
106:2 108:8

**lying** 122:22

---

**M**

**M.D.** 114:10

**M2** 46:14,15

**made** 25:4,11 27:7,10
40:15,21 41:5 49:9 65:25
66:10 75:12 78:2 94:8,11
96:25 107:11,15 110:17,23
116:18 117:6 119:11
131:25 132:8

**Magazine** 67:18

**mail** 88:3

**maintenance** 84:25
87:3 88:1

**major** 87:1

**majority** 29:17

**make** 24:14 35:2 37:17
42:13 45:14,15,16 46:25
47:2 59:18 61:20 101:10
113:17 116:20,22,23
122:13 128:17 131:13

**makes** 15:14

**making** 25:22 62:1,16
79:4 113:13 122:23 124:12

**male** 111:9,10

**management** 15:2
33:23

**manager** 20:8,9 84:20,
21 87:9

**mandated** 118:1

**mark** 47:17

**marked** 47:21,25 83:2,14
84:16 85:17 86:7,9 87:23
88:8 89:6,17 100:18,21
102:23 103:3 105:16 106:6
108:17,18,23 113:21
114:1,6,11,18,23

**Marotta** 114:9 120:21

**matter** 7:7 17:9 22:5
25:14 30:19,22 31:2 42:17
43:10 64:22 65:22 68:12
69:21 70:18 103:16
107:12,15 121:20 132:20

**matters** 28:14 33:16
36:19

**Mccalia** 52:4

**meaning** 29:13 70:14
92:21 94:9 110:4 118:23
120:5

**means** 8:22 20:6 24:2
35:25 36:4 44:18 46:10
55:2 91:17 92:14,17

**meant** 119:3

**Media** 7:15

**medical** 114:8 117:3
119:3,14 120:24

**medications** 118:15

**meeting** 107:1

**member** 19:17 69:18

**members** 31:20

**mental** 13:10 14:22,23
50:12,16 72:21 75:7 105:7
109:1 114:20 117:24
120:12 128:13 131:16

**mentally** 72:18

**mention** 98:23

**mentioned** 18:25 73:24

**mentions** 76:3 118:7

**mesh** 118:12

**migrated** 71:10

**Mike** 109:9 114:22

**Military** 18:8

**mind** 78:19 121:4

**minds** 48:16

**minute** 54:15,20 69:10
89:20 97:8 127:25

**minutes** 53:5

**mischaracterize**
132:9

**mischaracterizes**
116:14 119:8

**mischaracterizing**
119:16

**mischief** 54:9,23 57:23

**miserably** 80:2

**misleading** 92:23

**mobile** 73:9

**mobility** 118:10 120:10

**moment** 51:1 53:15
64:13

**Monday** 101:19

**money** 23:3 118:9

**months** 32:8 34:24 98:1

**mood/appetite/sleep**
118:16

**morning** 7:2,23 9:11,12

**motor** 17:16

**mouth** 28:25

**move** 22:6 101:8 122:2,9
126:21

**moved** 34:18 35:3 51:2
112:21

**mover** 125:19,24 128:22

**movers** 122:5

**moving** 57:3 60:22
121:24 126:14 127:14

**MPOETC** 11:15 12:10

**MPOETC-
REQUIRED** 11:17

**Mulroney** 87:6

**multiple** 9:22 76:3 78:10
84:14 98:1

**multitude** 123:5

**municipal** 11:15 12:2
44:17

---

## N

**named** 14:9

**names** 123:4

**narcotics** 22:5,7

**natural** 37:11

**nature** 14:19 23:9 65:11
75:23 128:12

**needed** 26:5 80:20,23
94:17,21

**negligent** 54:24

**neighbors** 38:16

**nervous** 21:15

**Nevius** 7:17

**newer** 29:1

**night** 127:6,8

**nitpicky** 20:4

**Noelle** 7:17

**noncooperation**
51:12

**nonpolice** 29:18

**normal** 46:12 70:2 75:8,9
120:11,12

**Northwestern** 9:24
10:2

**noted** 62:7 106:19

**notes** 30:18 31:8 44:3
88:10

**notice** 50:21 63:15 83:4,
17 84:24 86:11 87:17,25
89:3 111:4

**noticed** 98:11

**notified** 42:21

**notifying** 130:14,15

**noting** 87:2

**now-identified** 104:24
130:20

**number** 7:11 9:13 38:4
64:12 90:5,16,21 102:11
103:12 105:18 108:21
111:23 114:19

**numbers** 36:25

**numerated** 56:14

**numeric** 109:24

**numerous** 67:24

---

## O

**object** 28:18 61:20
117:13 119:1,17 121:1

**objection** 32:25 48:9
49:10 53:19 59:5 66:18
71:1 79:1 81:12 84:5 94:3,
20 95:8,19 98:13 116:13
119:7 126:1,22 130:6

**observed** 111:7,10

**obvious** 48:16 97:1

**occupancy** 63:7 83:7
101:21

**occupation** 38:4,25
39:6 40:12

**occupied** 85:4

**occupy** 83:8 85:5

**occupying** 110:19

**occurred** 21:2 30:4
42:18 46:13

**occurring** 81:22

**Ockley** 7:7,25 13:8,14
14:4 24:24 26:4,24 41:17
42:6,9 47:7,11 48:2,17
51:6 55:10 59:17,19 60:17,
21 61:11,16 63:18 64:23
65:1 69:8 71:12,13,16
73:17,19,24 74:9 75:4,6,15
78:23 85:13 87:4,14 90:3,
12 95:20 103:12,18
106:18,22 107:1 110:18,

23,25 111:2,7,13,15,21
113:25 122:1 124:23,24
132:21

**Ockley's** 77:18

**October** 34:22

**odor** 38:18

**offer** 26:6

**office** 7:13 10:9 24:18
70:23 79:19

**officer** 9:11 11:23 12:1,2
15:1,14,19,20,21,23 16:8,
15,18 18:15 19:7,12 24:18
26:10 28:18 29:10,13,22
31:9,10 33:17 36:7,11
40:22,23 44:11,12 46:11
47:25 51:21,24,25 52:2,4,
6,7,22 53:15 55:6 57:14,
16,17 59:1,12,18,20 62:4,
6,24 63:12 70:12,15 73:4
76:7 77:17 78:1,21,22
105:19 109:2,10 112:4
114:21 122:25 123:16
128:7,10

**officers** 12:5,6,9,10
17:11,17 21:22 22:5 24:16
26:17 28:13 29:1,2 31:22
34:4 43:6,20 45:22 58:4
61:3,6 64:18,25 66:1,21
68:9 69:20 77:11,14 78:21
86:5 98:18 109:8 122:14
128:5,10

**Officers'** 11:15

**official** 83:5 84:22 87:9
88:6

**older** 29:2 96:25

**on-call** 64:17,20,21

**on-site** 121:22

**ongoing** 11:9

**online** 11:24

**open** 43:17

**operates** 107:9

**operations** 19:24 24:3
33:24 34:1,6

**opinion** 45:24 61:4 75:4,
6 79:8 80:1 83:20 86:23
96:10 119:2 128:13 129:22
131:17

**opportunity** 19:22
91:23,25

**option** 50:22,25

**options** 49:17 50:24
51:2,4,5,13 73:11 80:10
97:4 131:7,10

**order** 11:8,16 16:1 39:7,
11,18 40:13 41:6,10 44:9,
16,17 45:6 46:25 54:1,2
59:11 60:15 65:21 66:1
69:17,21,25 74:2 76:4,21,
22 81:5 90:6 95:12,21
97:14 102:25 103:12,15
104:3,5,13 106:17,21
107:11 108:7 113:8,9
125:7,8,10,12 128:2,4

**ordered** 90:15 103:17
122:8

**orders** 13:13,18,20 23:1
40:1 41:13 43:5,11 44:8
52:20,23 59:4,15 61:8,9
64:9,19 65:3,5,8,10,11,12,
17 66:2,5,7,11,16,19,20,
21,23 67:9,10,12 69:14,22
70:2,4 73:18 74:5 76:7,25
77:15 78:2,7,14 124:23
128:6

**ordinance** 44:16,17
45:5,6 59:2,10,11,13,15
60:15 63:6,8 71:9,10 76:24

**ordinances** 43:11
61:16

**ordinary** 24:23,25

**orientation** 11:12

**out-of-office** 101:17

**outlining** 86:24 88:3

**overly** 97:20

**overnight** 54:17

**oversee** 15:11

**overwhelming** 65:10

**owned** 60:17 82:21 92:9,
11

**owner** 14:3 60:12 61:11
63:20,23 71:16,20 76:11,
20 82:8,17 93:13 96:6,9
101:5,18 106:4 109:22
110:19,21 129:9 130:13,16

**owners** 89:15

**owning** 120:4

**owns** 117:25

---

**P**

**p.m.** 133:10

**P4** 86:7

**PA** 90:19 103:20

**pack** 76:18,19 122:2

**package** 122:9

**packaged** 112:21

**packed** 98:25

**packet** 88:25

**packing** 98:12,19,24
99:6,7

**paid** 101:5 102:4

**Paller** 7:16

**Pancoast** 83:5 84:22
86:2 87:10

**panel** 58:8

**paperwork** 25:25 26:3
27:12 112:6 113:6 123:6,8

**paragraph** 91:13

**paralegal** 69:18

**parameters** 32:13

**parking** 22:13

**parks** 30:4,5

**part** 33:22 34:11 70:24
71:8,9,10,15 93:3 102:17
107:12,15 112:18 115:25
128:23,24 129:2 132:10

**participate** 51:15

**participated** 51:19

**parts** 71:7

**passed** 64:10

**past** 33:11 34:12,17 38:1
39:23

**patience** 75:14

**patient** 120:5

**patio** 55:20

**patrol** 10:8 19:13,24
21:25 22:1,12 23:24 24:1,
2,4 29:23 33:25 34:13,18,
22,25 35:4,6,9,15 36:1,3,
10,19

**patrolman** 36:13

**patrols** 35:20

**pay** 59:14,15 64:10

**payment** 110:23

**PECO** 111:16

**Pennsylvania** 7:8,11,
15 11:10 90:2 103:11
132:22

**people** 22:14 24:6 29:7,
9,18 37:23 39:12 43:18
45:1 51:19 72:13,14 74:23
79:4,12 86:3 116:23

**perceive** 75:8 79:24

**perceived** 128:14

**percent** 25:10 46:25
47:5

**perform** 120:17

**period** 39:24 68:23

**permission** 111:1

**permitted** 61:10 85:11
101:7,8

**person** 11:24 23:14
27:17 38:15 39:8 40:14
41:18,20 43:17 57:10,13
64:17 69:9 70:9 73:6,14
75:9 77:19 83:8,9 110:5,8
123:1 124:1,5

**person's** 123:19

**personal** 91:2,3,18,19
93:19 94:12 95:1,5 96:13,
15 103:21 104:2 105:2,6
108:13 123:1 130:12

**personally** 31:3 43:9
45:2 65:22

**personnel** 30:11

**persons** 43:6 57:13 66:9

perspective 46:8

pertain 105:25

pest 111:14

petition 27:12,13,14
90:8 103:14,17

PFA 65:11

PFAS 65:14 66:20,21
69:22

ph 10:1 30:3 31:9,10 52:4
131:7

phone 60:24 73:20 75:13
111:17

physical 18:17 37:19
96:17,20 97:17,19 99:14
112:23

physically 13:23 38:15
61:15 112:19 123:14

pick 11:21 51:6

picked 20:7

picture 88:23

pictures 88:15

pieces 99:21

piled 75:2

Pinto 7:6 8:10 47:21,25
83:2,14 84:17 85:17 86:9
87:23 88:8 89:6,17 100:18,
21 102:23 103:3 105:16
106:6 108:17,18,24 111:22
113:21 114:1,7,11,18,23
115:23 121:18 132:20
133:9

place 7:13 43:5 80:14
122:21 128:22,23 129:4
131:24

plaintiff 7:25 89:13 90:3,
9,13,17 91:7 93:11 103:22,
24 104:17 105:3,4 119:10

plaintiffs 107:18

plan 118:17,20 120:16
122:2

planning 23:8 57:3

plans 124:25 125:5,7

pleas 44:16 64:19 65:4,8
67:10 76:22 90:1,4 103:7,

10 106:22 125:8

pleasure 19:15

plenty 127:4

pockets 118:9

podcasts 67:15

point 21:25 52:11 57:19
69:6 76:6 105:1

police 9:23,24 10:17,21
11:15 12:2,8 13:12 15:23
16:8,14,17 19:7,23 20:2
21:9,18 22:4 24:4 26:16
28:4,7,8,10,14 32:22,23
33:24 34:6 46:2,11 61:11
62:20 63:24 64:1,2,4,17
69:6,7,23 71:10 72:17,23
75:22 76:11,19 77:6,18
79:19 84:22 96:6,8 103:25
104:17,20 105:3,5,23
106:3 107:3 108:6,25
109:24 110:1 112:24 115:6
117:23,24 118:12 119:21
120:3 122:12,16,24
123:17,18,25 124:24 129:9
130:13,15

policy 72:14

porch 55:15,16,22,25
118:12

porched 55:10 56:4

position 15:22 19:12
21:1

positively 110:6

possession 78:7

possessions 77:18

possibility 124:3,6

possibly 29:4

post 35:2

posted 88:2 101:21

power 126:9

precipitated 49:2

premise 39:22 41:4,8,17
42:3

premises 81:5

preparation 12:22

prepared 49:19

presence 46:16 121:25

present 41:9 117:14,18
122:25 128:4

presented 69:23 128:2

president 84:21 87:7

Prete 8:5 69:3 121:19

pretty 22:17 29:16 40:7
44:19

prevent 85:3

prevented 125:20

previous 110:18

previously 47:24 81:8
83:22 90:20 100:17 108:23

primary 50:9 109:2

principal 130:2

principally 33:21

print 123:4

prior 9:3 15:15 25:6 31:13
34:14,15,17,19,20 35:2
36:3,12 42:4,8,10,18 43:4,
13,23 53:1 60:4 62:1,4
68:11 82:6 85:24 93:14
101:18 103:16 104:10,15
106:12 114:4

private 41:12

probable 45:8,14,15,20
46:7,9,23 47:1 53:14,18,25
54:1 55:4 56:11 57:23

problem 38:18 69:24

problems 38:18

procedure 14:24 62:18,
22,25 77:19 119:22

procedures 18:13 63:3
72:20,23

proceed 9:6

proceeds 90:22

process 15:17 26:15

produced 11:9 112:14

professional 96:24

professionals 81:2
116:20

program 29:10 51:22,25
107:8

promoted 19:20 34:22
67:23

promotional 67:25

proof 111:20 118:4

proper 18:12 22:19
105:12

properly 92:10 105:10

properties 39:20

property 12:16,20 14:3
38:25 39:7,8,25 40:1,2,13,
14 43:15 54:23 55:13 56:6,
7,12,17,18 57:11,14 58:6,7
59:16,19 60:3,6,7,10,18
62:19 63:6,20 76:11,12,20
81:9,11,16,18 82:5,8,13,
17,21 83:24 84:25 85:1,4,
8,14 86:14,25 87:2,3,12,15
88:1,2,5 89:4,15 90:19
91:1,2,4,18,19 92:4,5,6,8,
25 93:6,9,13,19 94:9,12,25
95:1,5 96:4,5,6,8,12,13,16,
23 101:9,20 103:19,21,23
104:1,2 105:2,6 106:5,18,
19,23 107:2 109:18
110:18,22,24 111:1,7
118:3 129:9 130:11,12,13,
15

prosecuted 83:10

prosecution 122:23
124:7

provide 104:1

provided 10:21 106:21
111:20

providers 119:14

psychiatric 118:13,14,
22 119:6 120:1,14

psychiatrist 118:14
120:21

psychologically
118:24

PT 117:22,23 118:3,9
120:2,4,5,9,11,15,16,20

public 73:7 123:16

pulls 29:24

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

**purchase** 23:1

**purchased** 111:20

**pure** 19:18

**purpose** 85:6

**purposes** 72:21

**push** 12:5

**pushed** 36:14

**put** 11:15 22:19 38:22
41:14 66:18 75:18 82:4

**putting** 126:3

---

**Q**

**qualified** 45:21

**qualifies** 63:9

**quality** 33:7

**question** 11:1,6 27:22
38:23 39:2 41:19 49:13
50:4 59:8 66:5,25 72:22
92:8 96:1 98:7 123:1 124:8
128:19

**questions** 9:13 34:8
65:2 121:12,18,20 124:15
132:17

**quickly** 32:18

---

**R**

**Radnor** 7:8 8:2 10:23
16:14,17 28:4,7,8,13 29:13
32:23 37:9 51:24 61:11
62:18 83:4 102:7 103:24
104:17 105:3,5,17 106:20
108:25 109:24 110:24
111:22 115:6 132:21

**ran** 68:15 131:6,10

**randomly** 11:21

**rank** 19:8,10,11 20:5

**ranking** 21:21 36:6,7

**rare** 40:7,8

**rationale** 117:9,13

**reached** 16:19

**read** 8:19 43:9 52:14,19,
23 54:5,10 61:8,9 63:24
66:1,6 67:24 76:25 78:2,14
86:16 89:22 91:17,23,25
94:13,14 103:1,8 104:8,10
108:4 110:13 115:25
117:10,11,20 124:23
131:25 133:4

**reading** 85:12 86:18,19
100:20 101:14 119:25
121:6 127:7

**Reardon** 109:3,7 111:23
112:3,5

**reason** 17:3 18:10 32:3
44:2 50:20 77:13 108:10
110:9 115:5,8,10 118:22,
23 120:2 130:8 132:1

**reasons** 37:25

**recall** 13:18,19 17:6,23
18:6,10 19:2 30:20 38:7,9,
12 39:4,5 40:5 49:25 67:25
74:6 84:7 85:24 87:19,20
88:20,21 97:17,18 99:12,
16 115:2,3 127:7,12

**received** 10:21 101:17
106:17 110:23 112:2

**receiving** 79:22

**recent** 120:10

**recently** 78:15 118:11

**reckless** 54:23

**recognized** 74:18

**recollection** 13:7 14:6
23:24 64:15 74:4 108:5
122:6

**recommendation**
27:7 40:21 42:13 116:18

**recommendations**
104:10 118:18 119:11

**recommended** 49:5

**reconvene** 53:5

**record** 7:3 20:23 53:7,9,
10,12 69:10 90:17 100:9,
11,12,13,15 103:8 104:8
107:12,15,20,22,24,25
108:2 110:13 115:7,16,18,
19,21,25 117:10 132:23

**recorded** 7:5

**recorder** 82:20

**records** 15:2 70:24

**REDIRECT** 124:20

**reestablish** 60:24
61:13 76:12 92:7

**reestablishing** 130:23

**refer** 13:2 31:11

**reference** 11:13 93:17
128:6

**referenced** 12:4 83:21
88:19,21 127:15

**referencing** 76:23
125:9

**referred** 29:22 116:12
119:4

**referring** 15:22 31:8
79:2

**refers** 57:8

**refresh** 13:7 14:6 64:15
108:5

**refuse** 91:7 93:11,12

**refusing** 111:5

**regard** 16:24 59:23

**Registration** 116:5

**regular** 24:15 33:6 88:2
132:25 133:6

**regularly** 39:12,19
123:21

**regulations** 15:11

**rehab** 101:19

**relate** 28:14

**related** 43:10

**relates** 88:13 93:3

**relative** 35:20

**relay** 43:20

**relayed** 71:21,23 72:3

**relaying** 72:4

**released** 50:11,13 98:3
101:18

**releasing** 43:23

**relevant** 70:24

**remaining** 91:4 96:13

**remains** 101:21

**remember** 10:16 13:4
17:14 40:16,20 41:16 52:3,
5 60:11 71:24 72:16 73:19
74:5 75:16 83:18,19,25
84:10 100:5 102:22

**remembering** 19:20
38:10

**reminded** 57:18

**removal** 107:2

**remove** 38:15 39:14,20
43:18 60:19 61:12 64:5
76:11 77:5,6 81:21 91:2,
18,19 92:25 93:5,19 95:1,5
96:13,15 97:1,2,3,12
103:21,22 104:2 105:2,5
106:22 111:3 130:11

**removed** 91:6 93:10
102:4 104:19 111:4

**removing** 60:22 83:9
92:4,5 94:12 97:5 103:25
104:18 130:22

**renew** 11:8

**Renovations** 106:4

**rephrase** 27:11 61:22
94:4,22 96:3

**replace** 15:17

**report** 30:9 105:17,18
106:3 108:9,11 109:1
110:10 112:5,18,19 113:10
114:19 122:13

**reported** 25:12 85:13

**reporter** 7:17 8:8 86:16

**Reporting** 7:19

**reports** 13:12 29:22,24
30:10 31:11 44:4 64:2
105:24

**represent** 7:22 59:13
78:1 103:6 109:22 112:13
121:18

**representative** 14:8

**represented** 13:6 14:5, 8 32:2

**request** 26:4 27:1 113:14,17

**requested** 118:7

**requests** 22:21 75:12

**required** 11:14 76:20

**requirements** 45:20 63:5

**requires** 12:10

**reserve** 124:16

**residence** 56:19 81:17 111:3 123:15

**residency** 76:12 107:1 130:23

**resident** 106:18

**residential** 56:13

**resisted** 96:23

**resolutions** 23:2

**resources** 66:9 73:8

**respond** 113:17

**responded** 31:22 109:22,25 110:15

**responding** 24:5 109:8,10

**response** 101:17

**responsibilities** 21:8 23:12,22,23

**responsibility** 24:9

**responsible** 70:9

**restrictions** 127:8,13

**result** 37:11

**results** 49:3

**retained** 112:15

**retired** 15:20,21 16:9,14

**retirement** 16:19,20

**retrieve** 63:22 111:2

**return** 9:1

**review** 8:25 12:23,25 13:12 30:18 59:3 60:14,15

**reviewed** 13:1,16 14:15 52:9 62:5,9,16 77:14 103:1

**reviewing** 25:7 66:15

**Rice** 84:23 87:11

**Ricky** 30:3

**rifle** 10:8 19:13

**right-hand** 88:24

**rights** 63:22 81:10 85:15

**ripped** 58:5,8

**rise** 124:7

**risk** 75:22 91:1 103:20

**Rockwell** 8:5 14:9 89:14 90:2,9 101:2 102:2 103:11 106:3 108:7 111:5,12 121:19

**rodent** 38:17

**role** 19:18 23:14 29:15 32:18 35:20

**room** 56:3 112:20

**rooms** 18:14

**roughly** 21:24

**RT-22-10670** 105:18

**RT-22-10812** 109:1,14 114:20

**RTPD** 106:2

**rule** 15:7

**rules** 15:10

**run** 24:21

**running** 29:15 118:6 120:9

**runs** 21:19 23:6

---

## S

**S-C-H-R-O-M** 7:24

**S-H-A-W-N** 23:20

**S-I-H-I-A-V-H** 118:15

**safe** 95:13

**safety** 73:4,5,6,7 123:14, 16

**scanned** 113:3,5,9,10

**scans** 69:18

**scenario** 43:21 46:20 124:6 127:21

**scenarios** 39:19 124:5

**scene** 26:9,23,25 43:23 45:23 48:20 52:5,7 98:18

**schedule** 130:12

**scheduling** 23:7

**school** 9:24 10:2,10,13, 15,19 12:13 68:16,17

**schools** 11:13 12:8

**Schrom** 7:13,23,24 9:2, 10 11:7 20:25 23:10 26:19, 22 28:23 33:10 36:17 47:17,23 48:12 49:14 50:18 53:3,13,23 58:14 59:9 60:8 61:22,24 62:14 66:23 67:8 71:6 79:4 80:21 81:25 83:16 84:11 85:19 87:13 88:12 89:19 91:11 94:4,7,22,23 95:10,25 97:16 98:16,17 100:16 101:12 103:5 106:8 107:20 108:3,20,22 113:13,19,20 114:3,13,25 115:13,22 116:15,17 117:17 119:4, 18,20 121:8 124:17,22 126:5,17 127:10 132:7 133:1

**science** 9:19

**screen** 107:9

**screened** 56:2

**screened-in** 55:19,25

**screening** 118:22 120:1

**search** 44:20 45:5

**searches** 44:15

**secretary** 22:3,4

**section** 83:10 84:25 86:13 88:15 101:14 117:15,18 118:18,19

**secured** 39:13 85:3

**sees** 21:23

**semantic** 116:5

**seminars** 67:11 68:6

**send** 8:20,24 30:2,4 133:4

**sends** 8:24

**senior** 24:18

**sense** 61:20

**sensibly** 61:16

**separate** 11:9,21 37:21

**separates** 38:5

**September** 91:3,5 93:1, 3,6 94:16,24 95:18 96:4 101:20 103:21,24 104:2 118:2

**sergeant** 17:10,21 19:8 24:19 25:8 29:23 33:25 36:3,8,11 41:3 52:9,10 100:1 105:22 109:3,7,9 111:22

**sergeant's** 123:6

**series** 65:2

**serves** 20:8

**service** 16:21 20:5,10 33:6 102:12 111:17

**services** 92:7 95:2 96:14 102:10

**Settlement** 110:22

**Shaffer** 7:14

**Shawn** 23:20

**Shawn's** 23:22

**she'll** 8:23

**sheriffs** 65:12

**shift** 123:7

**short** 35:7

**shortly** 107:1

**should've** 97:13

**show** 12:13 24:6 69:10 99:14,18 118:4

**showed** 99:17 125:10 128:5

**shower** 120:18

**showing** 47:24 83:2 84:16 86:7 87:23 89:6 99:16 100:17 102:23 105:15 108:16,23 113:21 114:6,17

**shows** 73:23 76:15

**sic** 17:12,16

**side** 22:6,10 33:25 34:1, 13

**sign** 8:19,25 83:9 123:4

**signage** 111:4

**signature** 52:12 91:9 122:21

**signed** 27:14 52:12 83:5 84:18 88:5 89:8 103:15 114:9

**significant** 9:23 10:7 16:8

**signs** 58:5 133:4

**Simona** 7:7,25 59:18 85:13 87:4,14 90:3,12 103:12,18 106:18 110:18 113:25 132:20

**simultaneous** 35:23 59:24

**single** 124:6

**sir** 10:23 12:17 19:2 20:1, 13,19 21:2,6 25:19 30:13 32:10 36:20 40:20 42:2 45:7,11 46:24 50:2 56:9 57:6 63:13 74:3 88:25 104:7 121:17,21 122:14 123:10 124:9,13 125:15 132:13

**sit** 44:6 96:15

**sit-down** 43:5

**sit-downs** 43:12

**site** 25:11 31:25

**sits** 112:8

**sitting** 55:10,15,22 56:4 74:20 76:15,17 79:23 96:21 126:10 129:6

**situation** 29:25 69:24 73:2 75:21 79:22,24

117:23 120:13 127:20,23

**sleeping** 85:8

**Slow** 86:15

**Slowly** 89:24

**small** 19:25

**smell** 74:21

**soaked** 74:21

**societal** 37:9

**sofa** 74:21 96:15

**softball** 68:24

**soiled** 79:15,17

**sold** 39:1,7 40:1,13 81:10

**sole** 85:6

**solicitor** 84:23 87:11

**someplace** 112:20

**sooner** 87:21

**sort** 11:12 39:22 68:15 70:9

**sorted** 123:8

**sound** 37:17

**sounds** 20:4 37:19

**South** 83:6 84:2,14 87:5 90:18 102:9 103:19 106:5 109:3 110:17,20,22 111:8

**space** 122:20

**speak** 15:18 40:23,25 41:2,3,12 42:3,8 44:12 64:25

**speaking** 58:4 59:12 123:12

**special** 19:24 34:1 90:8

**specific** 10:13 27:22 38:13 60:18 66:4 72:12,15 105:25 106:1 111:2 113:6

**specifically** 11:13 54:16 56:13 61:10 66:2,7, 19 67:10,22 75:16 82:9 87:4 88:3,5,19

**specifics** 9:16

**speculate** 58:21,22 63:4 67:4 70:10 71:4 75:7

79:10 96:9,11 99:4 127:18

**speculating** 124:2 127:19

**speculation** 67:5

**spend** 22:24 23:1,3

**spent** 35:7

**sponsored** 10:16

**Spruce** 8:4

**squad** 17:11 36:1,8 52:10

**squads** 36:2

**squatting** 110:16

**staff** 19:25 22:2 29:18 69:18

**Staffing** 9:25

**stand** 35:14

**standpoint** 120:14

**stands** 51:25 111:9

**started** 119:22

**state** 7:21 10:13,17 43:22 97:23 126:10

**stated** 106:24

**statement** 106:10 111:19,24 112:3,6,11,25 113:5,10 122:11,15,19 123:3

**statements** 112:8 122:24 123:8

**states** 7:9 106:4 117:23, 25 118:4,10,15

**stating** 106:17,22

**station** 24:5 110:1 122:12

**status** 51:3 72:13 120:12,13

**statute** 15:7

**stay** 51:7,8 81:5 101:7,20

**staying** 57:3 73:1 94:8

**Steno** 7:18

**STENOGRAPHER** 8:16,20 9:5 20:22 21:13,16

47:19 50:2,6 86:21 89:24 132:24 133:3

**stickers** 47:20

**stips** 8:17

**stipulation** 9:2

**stop** 106:9 110:13 114:14

**stored** 123:9

**Street** 7:15

**stress** 11:20

**strikes** 37:12

**strong** 29:16

**structure** 123:24,25

**struggling** 75:6

**stuff** 16:2 23:3 33:7 37:12 38:18 44:4 64:3 65:12 69:23 75:2 101:8

**subject** 67:12,22 68:4 122:23 123:22 125:5

**subjectively** 132:4

**submit** 112:6

**submitted** 123:5

**substantiate** 130:18

**suffer** 72:15

**suffering** 26:5 131:22

**sufficient** 59:17 95:7 99:1 127:15

**suggest** 33:13 116:23

**suggested** 122:2

**summary** 18:15 19:6

**summoning** 72:21

**superintendant** 20:3 42:8 62:15 63:2,12

**superintendent** 19:9 20:6 35:1 62:8 84:22 87:10 111:21

**supervisory** 19:18

**supplemental** 114:19

**supplies** 122:8 127:14 129:1

**supported** 25:10 43:2

**supposed** 43:24 55:3 72:24

**suppression** 112:10

**surgery** 118:11 120:11

**Surprisingly** 37:7

**suspect** 72:24

**sway** 129:13

**swayed** 125:23

**swear** 8:8 52:3 58:13

**switch** 101:4

**switched** 34:20

**sworn** 8:12,14

**system** 79:25 80:18 122:16,17

### T

**taking** 7:12 22:21 80:11 118:15

**talk** 19:3 30:21 41:8 68:11 74:9 92:22 101:9

**talked** 10:5 12:19 46:4 53:24 56:24 73:16 78:9 88:21

**talking** 27:19 31:14 35:23 39:7 40:6 53:17 59:24 63:6 64:8 113:4,6

**talks** 83:10 89:12 101:3,6 109:21

**tape** 58:12 78:20

**task** 19:16

**tasked** 33:23 74:15

**tasks** 97:5

**taxi** 104:24 130:20

**taxpayer's** 118:9

**team** 26:1 33:23 73:9 74:10 75:4

**Technically** 19:17

**television** 95:3,6 130:25

**telling** 57:17 61:2 75:16 98:22 112:25 125:6

**tells** 95:12

**term** 45:8,10,11,12,17,18 66:19

**terms** 14:24 17:24 27:25 28:3,6 60:9

**testified** 8:12 59:2 81:8, 15 82:2 97:22 121:23

**testify** 62:6

**testimony** 58:17 116:14 119:8,16 122:13 132:19

**tests** 67:25

**thing** 15:2 37:9,10,17 61:5 70:9 105:12

**things** 22:15 23:9 24:21 38:15,21 40:3 54:10 65:11 76:18,19 77:5 85:15 89:12 97:1 112:4 121:24 122:3,9 126:20 129:4

**thinking** 59:20,21,23 93:23

**thought** 75:10 80:22 116:19 127:11

**thrown** 93:13

**time** 7:4,20 10:3 13:20,21 14:3 16:9,13 17:15 19:19 20:23 23:15,21 29:3,5,6,9 35:11 37:14 38:10 39:23 40:9 44:1 46:6 51:22 52:10 53:9,10 54:25 56:13 63:14 65:15 66:14 70:14 75:14 77:8 78:7,24 85:20 87:8, 17,21 88:17 93:15 97:12, 13 98:2 100:12,13 107:4, 24,25 115:18,19 121:10 123:4 124:11 127:8,12 130:21

**times** 17:6 36:21 38:24 39:5 65:7 67:24 74:1 76:3 78:10 84:14 128:7

**title** 89:14 90:21

**titles** 10:2

**today** 88:22 114:4 125:11

**today's** 12:22 110:21 132:19

**Todd** 8:3

**told** 22:25 25:6,8 39:12 50:23 57:18 60:2,4 77:1 80:2 81:2 99:6,7,8 125:19 130:9 131:3

**tool** 79:20

**toolbox** 80:17 81:7

**tools** 66:13 79:21 80:16

**top** 23:12 89:21 110:12

**total** 35:11

**totally** 17:2 19:18

**township** 7:7 10:23 15:7,10 16:4,6 20:9 22:21, 22 28:13 29:13,15 30:4,11 32:22,23 42:4 43:6,14 51:24 62:18 82:8,12 83:4 84:20,21,23 87:8,11 101:3 105:17 106:20,24 108:25 110:25 111:22 112:18 115:6 123:13,16 132:21

**traffic** 30:2

**trained** 12:11 131:21

**training** 10:4,6,7,9,20,24 11:14,16 12:1,9,15,18 19:12 29:10 51:25 52:2 66:4,21 72:12,15,17

**training-wise** 29:4

**trainings** 9:22 12:4,5

**transcript** 8:23 132:25

**transfer** 82:18

**transferred** 75:23

**transferring** 59:17

**transported** 13:9

**trash** 93:12

**treat** 73:14

**treatment** 113:24

**trees** 37:12

**trespass** 17:24 18:6,16 54:8,9,12,13,19,20 56:8, 20,23 57:7,8,21 58:7

**trespasser** 81:9

**trespassing** 17:12 55:1

**true** 106:10,11,14,15 115:6

**truth** 8:12

**turn** 129:7,15,18,19,23,24 130:24,25 131:1

**turned** 95:3 118:7 126:9, 19

**TV** 95:11 96:15 129:24

**two-year** 35:2

**type** 15:11 26:5 41:13 56:12 86:17

**types** 38:21

**typical** 33:16 37:5 62:18 77:18

**typically** 29:12 69:21 112:4

### U

**ultimate** 26:7,13,14,16

**ultimately** 14:24 25:4 27:3 42:19 116:23 117:6

**Underneath** 118:20

**understand** 11:11 17:2 27:18 43:14,16,20,24 44:14 53:22 59:8 64:18 66:1,6,25 92:24 96:1 101:18 122:13

**understanding** 50:10 58:19 59:1,4 66:11,15 67:12 92:18 104:4,5 117:4

**understood** 43:1 55:5, 6

**unfettered** 90:25 91:15 92:14,20,24 93:5 103:19 104:14

**unfit** 38:3,24 39:6 63:6 71:14 72:1,5 81:18 83:24

**unidentified** 111:8,10

**uniform** 20:14

**uninhabitable** 31:23 32:1 43:15 106:20

**unit** 19:17 22:7,13 27:4,5, 7,16 36:14 75:24 131:19

LIEUTENANT JOSEPH PINTO
MAY 13, 2025

JOB NO. 1655053

**United** 7:9

**University** 9:20

**unkemptness** 97:24

**unknown** 132:1

**unlawful** 83:7

**unlimited** 90:25 91:15 92:18,22,24 93:3,5 103:18 104:14

**unsafe** 43:22 83:6 101:21

**unsure** 122:18

**unsworn** 122:23

**unwanted** 85:3

**updates** 11:18

**upkeep** 88:4

**uploaded** 107:5 122:16

**upset** 78:22 120:22 121:2,5,7

**upstairs** 123:7

**urine** 74:22 118:5 120:9

**usual** 8:16

**utilities** 60:24 61:14

### V

**vacate** 106:18

**vacated** 85:2

**Valley** 18:8

**valuable** 131:7

**vehicle** 17:16 76:18

**vehicles** 16:1

**venued** 7:9

**verbalize** 120:16

**verbatim** 72:3

**verification** 116:6

**Verizon** 111:17

**version** 10:1

**versus** 7:7 33:5 90:3

**video** 7:5 13:1,11 14:15, 16,20,25 15:2 55:8 60:20 61:2 75:25 76:15 78:20 81:23 98:21 99:14,16,20, 23,24 100:1,9,10 128:8

**videos** 12:23 68:2

**videotape** 133:8

**view** 80:10

**viewed** 76:6

**Villanova** 83:6 90:19 103:20

**violating** 132:4

**violation** 48:17 76:24 86:12,13 87:3,18,25 125:7, 16

**violations** 60:16 85:7, 10 88:4 105:25

**visible** 97:4

**visit** 31:25 118:22,23 120:2

**voicemail** 102:3

### W

**wait** 50:3 54:15,20 58:1,2 59:25 60:1 62:11 89:20 94:19 97:8

**waited** 95:17

**walk** 79:14,16 82:25 99:18,19

**walked** 96:22 97:18

**walking** 99:16,18

**wandering** 18:13

**wanted** 71:22 79:24 99:9 107:2 129:15 131:9,14

**warning** 122:22

**waste** 37:14

**watch** 95:3,11 96:15 99:20

**watched** 55:7 60:20 81:24 100:1,5

**watching** 95:6

**water** 74:25 118:6 120:10 126:4 129:16,18,24

**weapons** 77:24

**wear** 20:14

**Wednesday** 110:20

**weeds** 88:13,15,16

**week** 34:7

**weekend** 44:1

**weeks** 15:15

**welfare** 123:14

**well-being** 123:19

**West** 7:14

**Westlaw** 44:15,22

**whatsoever** 50:11 98:24

**Whelan** 89:9,10 91:8,9 103:16

**White** 87:9

**William** 87:9 88:6

**woman** 50:11 79:9,25 80:6 96:25 102:6 131:8,9, 14,22

**won** 18:1

**word** 85:12 122:5

**wording** 104:15

**words** 11:2 28:25 56:18 60:22 95:4 122:1

**work** 16:6 23:9 111:7

**worked** 10:23 36:2,10

**workers** 119:9

**working** 19:15 35:21

**works** 23:8 117:5 122:19

**worse** 96:10

**would've** 37:10 56:20 125:22 126:8 128:14 129:1

**write** 122:21

**writing** 23:1

**written** 86:23 111:18,24 112:2

**wrong** 81:2,3

**ws** 60:3

### Y

**year** 11:18,19,22 12:2,3, 11 32:6 34:21,24 35:2,6,13 112:21

**years** 16:11,21 17:20 19:8,16,21 27:21 32:21 33:17,20 34:12,13,16,17, 19 35:1,8,14,15,16,17,19, 25 36:22 37:14 38:1,11 68:20 72:19 102:13

**yellow** 111:9

**yesterday** 13:22 25:6 44:9 63:25 64:9 78:16,17 85:23 87:19,20,22 88:19 89:8 91:20 94:14 103:1 104:6 106:12 115:3

**younger** 11:23

**Youtube** 68:2