# EXHIBIT 29

**SPRUCE LAW GROUP, LLC**
Todd R. Bartos, Esq. (ID No. 84279)
1622 Spruce Street
Philadelphia, PA 19103
Phone: 267-546-0617
Facsimile: 267-546-0570
tb@sprucelaw.com                            *Attorneys for Jeffrey Brydzinski,*
                                                    *Tyler Prete, and Rockwell-Glynn, LP*

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
## CIVIL ACTION – LAW

| | | |
|---|---|---|
| SIMONA OCKLEY | : | |
| | : | CIVIL ACTION |
| | : | |
| *Plaintiff,* | : | No. 2:24-cv-04070-JS |
| | : | |
| vs. | : | FIRST SET OF RESPONSES TO |
| | : | REQUESTS FOR ADMISSION |
| TOWNSHIP OF RADNOR, JENNIFER | : | |
| COCCO, JOSEPH PINTO, BRADY MCHALE, | : | |
| BRIAN BROWN, JEFFREY BRYDZINSKI, | : | |
| TYLER PRETE and ROCKWELL-GLYNN, LP | : | |
| | : | |
| | : | |
| *Defendants.* | : | |
| | : | |
| | : | |

## FIRST SET OF RESPONSES TO REQUESTS FOR ADMISSION DIRECTED TO

## DEFENDANT, JEFFREY BRYDZINSKI

Defendant, Jeffrey Brydzinski ("Brydzinski" or "Defendant"), hereby responds to

Plaintiff's First Set of Requests for Admission served by Plaintiff, Simona Ockley ("Ockley"):

## GENERAL OBJECTIONS

Defendant sets forth the following general objections and expressly incorporates each

objection into their response to each request herein by reference.  Any specific objections to a

particular request is made in addition to, and does not waive the general objection.

1.    Defendant objects to Ockley's instructions and definitions to the extent they conflict with or purport to expand upon their obligations under the Rules governing the Courts of the Commonwealth of Pennsylvania.

2.    Defendant objects to the First Set of Requests for Admission to the extent that they seek information and/ or documents not in their possession, custody, or control.

3.    Defendant objects to the First Set of Requests for Admission to the extent that they seek documents and/ or information protected by the attorney-client privilege, the work-product doctrine and/ or any other applicable privilege or protection from disclosure.  Inadvertent production of any such information shall not constitute a waiver of any privilege or protection.

4.    Defendant objects to each and every request to the extent that they call for documents and/ or information already in Ockley's possession or available to Ockley from sources other than Defendant.

5.    Defendant objects to each and every request to the extent that they purport to seek documents and/or information outside the relevant timeframe.

The General Objections asserted above shall be deemed to be applicable to and continuing with respect to each of Ockley's First Set of Requests for Admission set forth below. The General Objections asserted above are incorporated into each and every one of Defendant's responses set forth herein.

Defendant hereby reserves the right to amend, supplement, or alter their responses to Ockley's First Set of Requests for Admission at any time.

## **REQUEST FOR ADMISSIONS**

**REQUEST NO 1:** Admit that Radnor Township police contacted you on August 12, 2022 concerning Plaintiff, Simona Ockley's, presence on the premises.

_____Admit ___X___Deny

If your response is a denial, please explain.

**REQUEST NO 2:** Admit that you contacted Radnor Township police or 911 Emergency on or before August 13, 2022 concerning Plaintiff, Simona Ockley's, presence on the premises.

_____Admit ___X___Deny

If your response is a denial, please explain.

**Admitted that the police and Defendant Brydzinski spoke on that day as Plaintiff had changed the name on the utilities servicing the residence and was living in the residence without water and with active condemnation.**

**REQUEST NO. 3:** Admit that on July 11, 2022, you attended a hearing before Judge John J. Whalen of the Delaware County Court of Common Pleas concerning Delaware County Common Pleas civil case number CV-2022-4275 captioned "Rockwell Glynn, LP vs. Simona Ockley".

___X___Admit _____Deny

If your response is a denial, please explain.

**REQUEST NO. 4:** Admit that at a hearing held on July 11, 2022 before the Delaware County Common Pleas civil case number CV-2022-4275 captioned "Rockwell Glynn, LP vs. Simona Ockley", you had personal knowledge that Judge John J. Whalen of the Delaware County Court of Common verbally granted Plaintiff an Order allowing her access and/or residency at the premises until September 1, 2022.

_____Admit ___X___Deny

If your response is a denial, please explain.

**Denied.  At the July 11, 2022 hearing, it was interpreted that Jude John J. Whalen granted Ockley permission to access the premises only to remove her belongings, which included reasonable packing and organization time, provided that this permission would not create a conflict with the condemnation of the property.  A copy of the issued Notice of Condemnation is attached hereto as Exhibit "A".**

**REQUEST NO. 5**: Admit that at the time Radnor Township Police contacted you on August 12, 2022 concerning Simona Ockley's presence on the premises, you had personal knowledge of an Order issued after a hearing on July 11, 2022 and dated July 15, 2022 by Judge John J. Whalen of the Delaware County Court of Common Pleas permitting Plaintiff, Simona Ockley, to have "unfettered access" to the premises until September 1, 2022.

_____Admit ___X___Deny

If your response is a denial, please explain.

**Admitted in part, denied in part.  Admitted that the Radnor Township police contacted Brydzinski, however, Brydzinski does not know the meaning of "unfettered access", so the remaining averments are denied.**

**REQUEST NO. 6**:  Admit that at any time you contacted the Radnor Township Police concerning Simona Ockley's presence on the premises, you had personal knowledge of an Order issued after a hearing on July 11, 2022 and dated July 15, 2022 by Judge John J. Whelan of the Delaware County Court of Common Pleas permitting Plaintiff, Simona Ockley,  to have "unfettered access" the premises until September 1, 2022.

_____Admit ___X___Deny

If your response is a denial, please explain.

**Admitted in part, denied in part.  Admitted that a claim was brought and the documents on the public record speak for themselves.  The remaining averments are denied.  The referenced Order is not attached to the served copy of these Requests for**

**Admission; therefore, Defendant has attached a copy of the referenced Order hereto as Exhibit "B", along with a copy of the transcript that was attached to Defendant's Answer with Affirmative Defenses as Exhibit "C".  The referenced Order must be read in its totality; the Court did not order any vacation of the condemnation.**

**REQUEST NO. 7**:  Admit that at the time the Radnor Township Police contacted you on August 12, 2022 concerning Simona Ockley's presence on the premises, you had personal knowledge of an Order issued on August 9, 2022 by Judge Barry C. Dozer of the Delaware County Court of Common Pleas permitting Plaintiff, Simona Ockley, to have "unfettered access" the premises until September 1, 2022.

_____Admit ___X___Deny

If your response is a denial, please explain.

**Admitted in part, denied in part.  Admitted that a claim was brought and the documents on the public record speak for themselves.  The remaining averments are denied as there was never an Order for "unfettered access".  The Order must be read in its totality.**

**REQUEST NO. 8**:  Admit that at any time you contacted the Radnor Township Police concerning Simona Ockley's presence on the premises, you had personal knowledge of an Order issued on August 9, 2022 by Judge Barry C. Dozer of the Delaware County Court of Common Pleas permitting Plaintiff, Simona Ockley, to have "unfettered access" the premises until September 1, 2022.

_____Admit ___X___Deny

If your response is a denial, please explain.

*[Remainder of Page Intentionally Blank]*

**Admitted in part, denied in part.  Admitted that the Radnor Township police were contacted, however, Brydzinski does not know the meaning of "unfettered access", so the remaining averments are denied.**

SPRUCE LAW GROUP, LLC

By: _____

Date: March 5, 2025
Todd R. Bartos, Esquire
Pa. Attorney I.D. No. 84279
Spruce Law Group, LLC
1622 Spruce Street
T: (267) 546-0617
F: (267) 564-0570
Philadelphia, PA 19103
tb@sprucelaw.com

*Attorneys for Defendants, Jeffrey Brydzinski, Tyler Prete, and Rockwell-Glynn, LP*

## VERIFICATION

    I, Jeffrey Brydzinski, hereby state that the facts set forth in the foregoing Plaintiff's First Set of Requests for Admission are true and correct to the best of my knowledge.  I understand that this Verification is made subject to the penalties relating to unsworn falsification to authorities.


Dated: March 5, 2025

DocuSigned by:

*Jeffrey Brydzinski*

B55F4DBB0E8E473...
_____

Jeffrey Brydzinski

## CERTIFICATE OF SERVICE

I, Todd R. Bartos, Esquire, certify that on March 5, 2025, I served the attached Responses

to Plaintiff's First Set of Requests for Admission, upon the following persons by electronic mail:

Neil E. Botel, Esquire
Law Office of Neil E. Botel
4 West Front Street
Media, PA 19063
Philadelphia, PA 19103
nbotelaw@gmail.com

John P. Gonzales, Esquire
Marshall Dennehey, P.C.
2000 Market Street, Suite
2300
Philadelphia, PA 19103
jpgonzales@mdwcg.com

Gerard K. Schrom, Esquire
Schrom and Shaffer
4 W. Front Street
Media, PA 19063
gschrom@schromandshaffer.com

**SPRUCE LAW GROUP, LLC**

By: _____

Date: March 5, 2025

Todd R. Bartos, Esquire
Pa. Attorney I.D. No. 84279
Spruce Law Group, LLC
1622 Spruce Street
T: (267) 546-0617
F: (267) 564-0570
Philadelphia, PA 19103
tb@sprucelaw.com

*Attorneys for Defendants, Jeffrey
Brydzinski, Tyler Prete, and
Rockwell-Glynn, LP*

# EXHIBIT "A"



**MOIRA MULRONEY, ESQ.** *Ward 5*
*President*
**JACK LARKIN, ESQ.** *Ward 1*
*Vice President*
**MAGGY MYERS** *Ward 2*
**ANNAMARIE JONES** *Ward 3*
**LISA BOROWSKI** *Ward 4*
**JAKE ABEL** *Ward 6*
**SEAN FARHY** *Ward 7*

**RADNOR TOWNSHIP**
**301 IVEN AVENUE**
**WAYNE, PENNSYLVANIA 19087-5297**

Phone **(610) 688-5600**
Fax **(610) 971-0450**
www.radnor.com

**WILLIAM M. WHITE**
*Township Manager*
*Township Secretary*

**JOHN B. RICE, ESQ.**
*Solicitor*

**KEN FROHLICH**
*Treasurer*

# NOTICE OF CONDEMNATION
## PROPERTY MAINTENANCE

**Person(s) Responsible
for Violation:**        Simona Ockley

**Mailing Address:**        416 Ithan Avenue, Villanova, PA  19085

**Date of Issuance:**        April 26, 2022

**Location of Condemned Property:**

416 Ithan Avenue, Villanova, PA  19085
(Delaware County Folio - 36040233600)

**Delivered:**        _____  In person to Owner of Record
        ____X____  By Regular Mail and Property Posting

In accordance with Section 108 of the 2009 edition of the International Property Maintenance Code, adopted as the Property Maintenance Code of Radnor Township (Code) under Chapters 222 of the Radnor Township Code, Radnor Township has found the Property located at 416 Ithan Avenue to be unfit for human occupancy and hereby **CONDEMNS** this Property.  Therefore, the dwelling shall be vacated immediately and shall be secured to prevent entry by unwanted individuals.  The Property may not be occupied except as follows:

- Adults may occupy this dwelling during the hours of 8:00am to 4:00pm only for the sole purpose of abating the violations.

- There shall be no other activity on the Property, including cooking, sleeping, conducting other business etc., other than the activity of abating the violations.

- There shall be no children permitted in the dwelling until a Township Codes Official approves the re-occupancy of children.

This Notice of Condemnation is based upon all of the violations listed in the attached Notice of Violation issued against this Property.  The Property shall not be reoccupied until all of these violations have been corrected.  A compliance re-inspection shall be conducted by this office

before the dwelling is re-occupied.  Permission shall be obtained from this office before entry into the structure for repairs or cleaning.

You have the right to appeal this Notice to the Radnor Township Code Appeals Board.  YOU MUST FILE THIS APPEAL WITHIN TEN (10) DAYS OF THE DATE OF ISSUANCE OF THIS NOTICE.

Failure to comply with this Notice within the time limits specified above constitutes a violation and is subject to a fine of up to $1,000.00 per day, plus all court costs and reasonable attorney's fees, unless an appeal is filed with the Radnor Township Code Appeals Board within 10 days of the date of issuance of this Notice.  Each day that a violation continues shall be considered a separate offense punishable by the above-described fines and penalties.  In accordance with Section 106.3 of the Code, all costs incurred by the Township in enforcing this matter shall be charged against the Property and shall be a lien upon this property.

You should take the following action immediately:

> Respond to me in writing within five (5) days acknowledging receipt of this Notice and stating what actions you have taken or will take to bring your property into compliance with the Code.  This response should be directed to me at the Radnor Township Municipal Building, 301 Iven Avenue, Wayne, PA 19087-5297 or at kkochanski@radnor.org.  If you do not take appropriate corrective action, I shall recommend to the Township Board of Commissioners that a civil action be filed against you in Court.

Sincerely,

Kevin W. Kochanski, RLA, CZO
Director of Community Development / BCO

CC:    Commissioner Moira Mulroney
       William White, Township Manager
       Andy Pancoast, Code Official
       Chris Flanagan, Superintendent of Police
       John Rice, Township Solicitor
       Property File



**MOIRA MULRONEY, ESQ.** *Ward 5*
*President*
**JACK LARKIN, ESQ.** *Ward 1*
*Vice President*
**MAGGY MYERS** *Ward 2*
**ANNAMARIE JONES** *Ward 3*
**LISA BOROWSKI** *Ward 4*
**JAKE ABEL** *Ward 6*
**SEAN FARHY** *Ward 7*

**RADNOR TOWNSHIP**
**301 IVEN AVENUE**
**WAYNE, PENNSYLVANIA 19087-5297**

Phone (610) 688-5600
Fax (610) 971-0450
www.radnor.com

**WILLIAM M. WHITE**
*Township Manager*
*Township Secretary*

**JOHN B. RICE, ESQ.**
*Solicitor*

**KEN FROHLICH**
*Treasurer*

# NOTICE OF VIOLATION

## PROPERTY MAINTENANCE

**Person(s) Responsible
for Violation:**     Simona Ockley

**Mailing Address:**     416 Ithan Avenue, Villanova, PA  19085

**Date of Issuance:**     April 26, 2022

**Location of Condemned Property:**

416 Ithan Avenue, Villanova, PA  19085
(Delaware County Folio - 36040233600)

**Delivered:**     _____ In person to Owner of Record
     ____X____ By Regular Mail and Property Posting

In accordance with Sections 106 and 107 of the 2009 edition of the International Property Maintenance Code, adopted as the Property Maintenance Code of Radnor Township (Code) under Chapter 222 of the Radnor Township Code, Radnor Township is issuing this Notice of Violation and demanding that the following activities being conducted in violation of the Code immediately cease:

**Your property is declared "Unfit for Human Occupancy" and may not be occupied except as follows:**
- **Adults may occupy this dwelling during the hours of 8:00am to 4:00pm only for the sole purpose of abating the violations.**
- **There shall be no other activity on the Property in Violation, including cooking, sleeping, conducting other business etc., other than the activity of abating the violations.**
- **There shall be no children permitted in the dwelling until a Township Codes Official approves the re-occupancy of children.**

Specific Violations:

**UNSAFE STRUCTURES**

A.  Chapter 222, Section 108.1.3 Structure Unfit for Human Occupancy. A Structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin infested, contains filth and contamination, or lacks ventilation, illumination, sanitary or heating facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the occupants of the structure or to the public.

B.  Chapter 222, Section 108.1.5 Dangerous structure or premises. For the purpose of this code, any structure or premises that has any or all of the conditions or defects described below shall be considered dangerous:

1.  Any door, aisle, passageway, stairway, exit or other means of egress that does not conform to the approved building or fire code of the jurisdiction as related to the requirements for existing buildings.

2.  The walking surface of any aisle, passageway, stairway, exit or other means of egress is so warped, worn loose, torn or otherwise unsafe as to not provide safe and adequate means of egress.

6.  The building or structure, or any portion thereof, is clearly unsafe for its use and occupancy.

8.  Any building or structure has been constructed, exists or is maintained in violation of any specific requirement or prohibition applicable to such building or structure provided by the approved building or fire code of the jurisdiction, or of any law or ordinance to such an extent as to present either a substantial risk of fire, building collapse or any other threat to life and safety.

9.  A building or structure, used or intended to be used for dwelling purposes, because of inadequate maintenance, dilapidation, decay, damage, faulty construction or arrangement, inadequate light, ventilation, mechanical or plumbing system, or otherwise, is determined by the code official to be unsanitary, unfit for human habitation or in such a condition that is likely to cause sickness or disease.

10. Any building or structure, because of a lack of sufficient or proper fire-resistance-rated construction, fire protection systems, electrical system, fuel connections, mechanical system, plumbing system or other cause, is determined by the code official to be a threat to life or health.

**Due to the amount of clutter, filth, and rubbish throughout the house, the dwelling was found to be unsanitary, lacking maintenance, and in a general state of disrepair.**

## INTERIOR STRUCTURE

C. Chapter 222, Section 305.3 Interior Surfaces. All interior surfaces, including windows and doors shall be maintained in good, clean and sanitary condition.  Cracked or loose plaster, decayed wood and other defective surface conditions shall be corrected.

**Every room of the dwelling contained a significant amount of filth, clutter, debris, and rubbish.  These conditions constitute violations of this Code section.**

D. Chapter 222, Section 308.1 Accumulation of rubbish or garbage. All exterior property and premises, and the interior of every structure, shall be free from any accumulation of rubbish or garbage.

**Debris and rubbish were observed throughout the inside of the dwelling.  This constitutes a violation of this Code Section.**

E. Chapter 222, Section 404.5 Food preparation.  All spaces to be occupied for food preparation purposes shall contain suitable space and equipment to store, prepare and serve foods in a sanitary manner.  There shall be adequate facilities and services for the sanitary disposal of food wastes and refuse, including facilities for temporary storage.

**The kitchen area was observed with a significant amount of clutter and filth and is being kept in an unsanitary condition.  This constitutes a violation of this Code Section.**

F. Chapter 222, Section 704.2 Smoke Alarms.  Single or multi-station smoke alarms shall be installed as follows:

1. On the ceiling or wall outside of each separate sleeping area in the immediate vicinity of bedrooms.

2. In each room used for sleeping purposes.

3. In each story within a dwelling unit, including basements and cellars but not including crawl spaces and uninhabitable attics. In dwellings or dwelling units with split levels and without an intervening door between the adjacent levels, a smoke alarm installed on the upper level shall suffice for the adjacent lower level provided that the lower level is less than one full story below the upper level.

**Smoke alarms were not observed in the dwelling unit.**

Due to the enormous amount of clutter, debris, and other items limiting a complete visual inspection of the dwelling, there may be additional issues that are undetectable at the present time.  Before the Property is declared habitable, a re-inspection will be necessary to ensure no additional violations are present. This should take place once the cleanup is complete and before repair/restoration work begins to ensure all violations have been identified.  Please note that all work shall be done in accordance with Radnor Township applicable codes by licensed contractors with appropriate permits issued by the Community Development Department.

**Therefore, the dwelling shall be vacated immediately.  It shall be secured to prevent entry by unwanted individuals.  It shall not be reoccupied until the above listed violations have been corrected.**  A compliance re-inspection shall be conducted by this office before the dwelling is re-occupied.  Permission shall be obtained from this office before entry into the structure for repairs or cleaning.

You are to commence corrections of these violations immediately. You must either correct these violations or appeal this Notice as set forth below.

You have the right to appeal this Enforcement Notice to the Radnor Township Code Appeals Board. **YOU MUST FILE THIS APPEAL WITHIN TEN (10) DAYS OF THE DATE OF ISSUANCE OF THIS NOTICE.** Failure to file a timely appeal with the Board of Appeals results in the violation being conclusively determined against you and unassailable in subsequent court proceedings.

Failure to comply with this Notice within the time limits specified above constitutes a violation and is subject to a fine of up to $1,000.00 per day, plus all court costs and reasonable attorney's fees, unless an appeal is filed with the Radnor Township Code Appeals Board within 10 days of the date of issuance of this Notice. Each day that a violation continues shall be considered a separate offense punishable by the above-described fines and penalties. In accordance with Section 106.3 of the Code, all costs incurred by the Township in enforcing this matter shall be charged against the Property in Violation and shall be a lien upon this property.

You should take the following action immediately:

Respond to me in writing within five (5) days acknowledging receipt of this Notice of Violation and stating what actions you have taken or will take to bring your property into compliance with the Code. This response should be directed to me at the Radnor Township Municipal Building, 301 Iven Avenue, Wayne, PA 19087-5297 or at kkochanski@radnor.org. If, you do not take appropriate corrective action, I shall recommend to the Township Board of Commissioners that a civil action be filed against you in Court.

Sincerely,

Kevin W. Kochanski, RLA, CZO
Director of Community Development / BCO

CC:    Commissioner Moira Mulroney
       William White, Township Manager
       Andy Pancoast, Code Official
       Chris Flanagan, Superintendent of Police
       John Rice, Township Solicitor
       Property File

**MOIRA MULRONEY, ESQ.** *Ward 5*
*President*
**JACK LARKIN, ESQ.** *Ward 1*
*Vice President*
**MAGGY MYERS** *Ward 2*
**ANNAMARIE JONES** *Ward 3*
**LISA BOROWSKI** *Ward 4*
**JAKE ABEL** *Ward 6*
**SEAN FARHY** *Ward 7*



**RADNOR TOWNSHIP**
**301 IVEN AVENUE**
**WAYNE, PENNSYLVANIA 19087-5297**

Phone (610) 688-5600
Fax (610) 971-0450
www.radnor.com

**WILLIAM M. WHITE**
*Township Manager*
*Township Secretary*

**JOHN B. RICE, ESQ.**
*Solicitor*

**KEN FROHLICH**
*Treasurer*

# NOTICE OF CONDEMNATION
## PROPERTY MAINTENANCE

**Person(s) Responsible**
**for Violation:**            Simona Ockley

**Mailing Address:**        416 Ithan Avenue, Villanova, PA  19085

**Date of Issuance:**      April 26, 2022

**Location of Condemned Property:**

> 416 Ithan Avenue, Villanova, PA  19085
> (Delaware County Folio - 36040233600)

**Delivered:**        _____  In person to Owner of Record
                  ___X___  By Regular Mail and Property Posting

In accordance with Section 108 of the 2009 edition of the International Property Maintenance Code, adopted as the Property Maintenance Code of Radnor Township (Code) under Chapters 222 of the Radnor Township Code, Radnor Township has found the Property located at 416 Ithan Avenue to be unfit for human occupancy and hereby **CONDEMNS** this Property.  Therefore, the dwelling shall be vacated immediately and shall be secured to prevent entry by unwanted individuals.  The Property may not be occupied except as follows:

- Adults may occupy this dwelling during the hours of 8:00am to 4:00pm only for the sole purpose of abating the violations.

- There shall be no other activity on the Property, including cooking, sleeping, conducting other business etc., other than the activity of abating the violations.

- There shall be no children permitted in the dwelling until a Township Codes Official approves the re-occupancy of children.

This Notice of Condemnation is based upon all of the violations listed in the attached Notice of Violation issued against this Property.  The Property shall not be reoccupied until all of these violations have been corrected.  A compliance re-inspection shall be conducted by this office

before the dwelling is re-occupied.  Permission shall be obtained from this office before entry into the structure for repairs or cleaning.

You have the right to appeal this Notice to the Radnor Township Code Appeals Board.  YOU MUST FILE THIS APPEAL WITHIN TEN (10) DAYS OF THE DATE OF ISSUANCE OF THIS NOTICE.

Failure to comply with this Notice within the time limits specified above constitutes a violation and is subject to a fine of up to $1,000.00 per day, plus all court costs and reasonable attorney's fees, unless an appeal is filed with the Radnor Township Code Appeals Board within 10 days of the date of issuance of this Notice.  Each day that a violation continues shall be considered a separate offense punishable by the above-described fines and penalties.  In accordance with Section 106.3 of the Code, all costs incurred by the Township in enforcing this matter shall be charged against the Property and shall be a lien upon this property.

You should take the following action immediately:

> Respond to me in writing within five (5) days acknowledging receipt of this Notice and stating what actions you have taken or will take to bring your property into compliance with the Code.  This response should be directed to me at the Radnor Township Municipal Building, 301 Iven Avenue, Wayne, PA 19087-5297 or at kkochanski@radnor.org.  If you do not take appropriate corrective action, I shall recommend to the Township Board of Commissioners that a civil action be filed against you in Court.

Sincerely,

Kevin W. Kochanski, RLA, CZO
Director of Community Development / BCO

CC:    Commissioner Moira Mulroney
       William White, Township Manager
       Andy Pancoast, Code Official
       Chris Flanagan, Superintendent of Police
       John Rice, Township Solicitor
       Property File















# EXHIBIT "B"

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| ROCKWELL GLYNN, LP. | : | Court of Common Pleas of Delaware County |
| Plaintiff | : | |
| v. | : | No. CV-2022-004275 |
| | : | |
| SIMONA OCKLEY | : | CIVIL ACTION |
| Defendant | : | |

## ORDER

Upon consideration of the Complaint and Petition for Special Injunction filed by Plaintiff, Rockwell Glynn LP., and after a hearing on July 11, 2022 and having heard the arguments advanced by Defendant, Simona Ockley, and Lee M. Herman, Esquire, counsel for Plaintiff, and good cause appearing,

It is on this __15th__ day of July, 2022, hereby ORDERED and DECREED as follows:

1.      Plaintiff may immediately record the Deed to 416 South Ithan Avenue, Villanova, PA 19085 ("the Property") previously executed by Defendant.

2.      The title company shall disburse the proceeds it currently holds in the approximate amount of Four Hundred Ninety Thousand Dollars ($490,000.00) to Defendant.

3.      Defendant shall have unlimited and unfettered access to the Property at her own risk to remove her personal property until September 1, 2022. Any personal property remaining at the Property after September 1, 2022 shall be deemed abandoned and may be removed by Plaintiff as refuse.

BY THE COURT:

John J. Whelan, J.

Date: July 11, 2022

# EXHIBIT "C"

```
 1           IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY
 2                          PENNSYLVANIA
 3
 4                         CIVIL DIVISION
 5
 6      * * * * * * * * * * * * * * *    No.   CV-2022-4275
 7                                  *
 8      ROCKWELL GLYNN, LP            *
 9                                  *
10                 VS.               *
11                                  *
12      SIMONA OCKLEY                 *
13                                  *
14      * * * * * * * * * * * * * * *
15
16
17
18                   Media, PA, July 11, 2022
19
20                          ***
21
22                     Courtroom No. 8
23                          ***
24                 TRANSCRIPT OF PROCEEDINGS
25
26      BEFORE:   THE HONORABLE JOHN J. WHELAN
27
28                MR. LEE HERMAN, ESQUIRE
29                For the Plaintiff
30
31                MR. KENNETH RUSSELL, ESQUIRE
32                For the Defendant
33
34
35
```

Officemotive, Inc. DBA Capital Typing
PO Box 275, Williston, SC 29853 - (800) 785-9402

2

1                              <u>INDEX</u>

2

3                      DIRECT   CROSS   REDIRECT   RECROSS
4   <u>ON BEHALF OF THE PLAINTIFF:</u>
5   [none]
6

7   <u>ON BEHALF OF THE DEFENDANT:</u>
8   [none]
9

10                          <u>EXHIBITS</u>
11

12                              MARKED    ADMITTED
13  <u>ON BEHALF OF THE PLAINTIFF:</u>
14  [none]
15

16

17  <u>ON BEHALF OF THE DEFENDANT:</u>
18  [none]
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34

Officemotive, Inc. DBA Capital Typing
PO Box 275, Williston, SC 29853 - (800) 785-9402

3

```
1                    P R O C E E D I N G S
2                       July 11, 2022
3              THE CLERK: All rise.  Courtroom 8 is now in
4         session, the Honorable John J. Whelan presiding.  Good
5         morning, Your Honor.
6              MS. OCKLEY: Good morning, Your Honor.
7              MR. HERMAN: Good morning, Your Honor.
8              THE COURT: Good morning.  Please be seated.  All
9         right.  Okay.  This is a matter of injunction, requested
10        injunction relief.  The name of the case is Rockwell
11        Glynn, LP versus Simona Ockley.  And it's under Docket
12        Number 4275 of '22.  Could the attorneys please identify
13        themselves and who they represent, the person or entity?
14             MR. HERMAN: May it please the Court.  Lee M.
15        Herman, Supreme Court ID 27570, for the
16        Plaintiff, Rockwell Glynn, LP.
17             THE COURT: Okay.
18             MS. OCKLEY: Hello.  My name is Simona Ockley
19        [inaudible 10:28:26].  I represent myself.
20             THE COURT: Okay.  You're going to represent
21        yourself, ma'am.  Have you had an opportunity to ---
22             MS. OCKLEY: I created yesterday a letter for
23        you.
24             THE COURT: You created what?  I'm sorry.
25             MS. OCKLEY: A letter for you to read.
```

1            THE COURT: Okay.  Why don't we show the letter
2       to counsel and then I'll take a look at the letter.
3            MS. OCKLEY: Yes, please.
4            THE COURT: Ma'am, do you have an attorney on
5       other matters?
6            MS. OCKLEY: No, I do not.
7            THE COURT: Okay.  All right.  For some reason, I
8       believe there was an individual that was --represented
9       to the Court, that had emailed the Court -- I don't have
10      that part of the file here or maybe I do -- emailed to
11      the Court that he didn't believe he was going to
12      represent you.  I believe ---
13           MS. OCKLEY: Yeah, he's behind me.
14           THE COURT: Oh, Mr. Russell, correct?  Okay.
15           MR. RUSSELL: Yes, Your Honor.  It's Ken Russell,
16      Attorney ID number 57833.  I did represent Ms. Ockley in
17      the transaction that is at issue here today.  So I am
18      familiar with it.  Mr. Herman asked me to come, I
19      presume as a little bit of a witness, but more of a
20      courtesy to the Court, to provide background if you
21      needed it.
22           THE COURT: Okay.
23           MR. RUSSELL: But I have not entered my
24      representation for Ms. Ockley with regards to the
25      matter.

```
1                THE COURT: Okay.  Well, I appreciate that you're
2          here and I may have a question for you after I look at
3          the letter.  And then here, the -- I guess when we hear
4          from Counsel, Mr. Herman, in regard to his petition.
5                MR. HERMAN: Your Honor, I briefly looked at what
6          Ms. Ockley has -- intends to present to the Court.  I
7          think it's appropriate for the Court to see it.  Again,
8          I haven't read it in great detail.  But I get the ---
9                THE COURT: Well, whatever is in that letter
10         doesn't prevent the Defendant from commenting, anyway.
11               MR. HERMAN: That's correct.
12               THE COURT: So she's here and she can comment
13         anyway on what she wants the Court to know.
14               MR. HERMAN: If it ---
15               THE COURT: So why don't we proceed?  You can
16         hand that letter up and if you want me to make it part
17         of the record, I will.
18               But, ma'am, you can tell me when it -- I'll give
19         you an opportunity after I hear from Mr.  Herman to
20         address the Court and you can tell me anything you want
21         to tell me, in addition to or in repetition to this
22         letter.
23               So, Mr. Herman, tell me a little bit about this
24         case.  Why are we here?  I mean, I did read your
25         petition.  I do know that there is a -- there was a
```

6

1      pending real estate transaction between these parties.
2      What's the problem?  Why are we here today?
3            MR. HERMAN: Thank you, Your Honor.  May it
4      please the Court.  My client is a real estate developer
5      who entered into a real estate agreement of sale for a
6      property on Iven Avenue in Radnor.  That was in October
7      of 2021.  In preparing for closing, which the outside
8      date was the last day of January 2022, it became
9      apparent that the property was up for tax sale.  And it
10     appeared on the August initial tax sale list of the Tax
11     Claim Bureau.  And it was again appearing on the
12     December final list.
13           THE COURT: December of '21?  Okay.
14           MR. HERMAN: 2021.  Was -- December 16th was the
15     tax sale date.  Some discussions occurred between the
16     parties.  And the parties agreed that in return for
17     signing a deed, the Plaintiff, purchaser of the
18     agreement, would release the escrow so that the property
19     could be removed from the tax sale list.  A little bit
20     less than $18,000 was taken from the Plaintiff's
21     deposit, was taken by the Defendant, paid to the Tax
22     Claim Bureau, and the property was removed from the 2021
23     tax sale list.
24           THE COURT: So the escrow you're referring to was
25     the deposit money?

1          MR. HERMAN: Correct.

2          THE COURT: And is -- was there realtors involved

3     in this?

4          MR. HERMAN: There are no realtors involved in

5     this.

6          THE COURT: Well, who was holding the escrow?

7          MR. HERMAN: The escrow was being hold -- held by

8     a title company.

9          THE COURT: Okay.

10         MR. HERMAN: The original outside closing date

11    was December -- was January 31st, 2022.  There were two

12    subsequent extensions, one to mid-April and one to mid-

13    June.

14         THE COURT: Why?

15         MR. HERMAN: Because the Defendant had requested

16    that.

17         THE COURT: Okay.

18         MR. HERMAN: And my client was prepared to

19    accommodate, do whatever was necessary to understand the

20    situation and to move the property in a way that was

21    comfortable for both parties.  In the interim, my client

22    had in turn met with a buyer who signed an agreement

23    with my client, my -- Plaintiff's buyer.  The property

24    was to be demolished and a new home would be built from

25    the Plaintiff's buyer.

1          The Plaintiff's buyer was anxious to move that
2      process forward.  He had his own financing in place.
3      And subsequently, we have learned that the property has
4      been condemned by the Township of Radnor.  It is no
5      longer fit for human habitation.  And we are in a
6      position where -- essentially, I believe that as I
7      learned in law school -- perhaps I'm wrong -- but when
8      an agreement of sale is signed on real estate, the buyer
9      becomes an equitable owner.  But I believe ---
10          THE COURT: Well, that's my understanding of it,
11      Mr. Herman, is the law in the State of Pennsylvania is
12      once the title is transferred -- and it doesn't have to
13      be recorded, but once the title is transferred, they're
14      not actually an equitable owner.  They're an actual
15      owner.
16          MR. HERMAN: That was my point that I was about
17      to make, Judge.
18          THE COURT: They're an equitable owner when they
19      sign the agreement of sale.
20          MR. HERMAN: Correct.  We believe that we could
21      have filed the deed and become the legal owner and ---
22          THE COURT: Well, you're the legal owner once
23      it's signed.  The recording of that deed is just notice
24      to the world that your client is the record owner.

1          MR. HERMAN: Correct.  At this point, the

2     Township of Radnor will not let the Plaintiff move

3     forward with the demolition of the property and issue

4     building permits until the deed is recorded.  This real

5     estate, like other real estate, is unique.  It's not a

6     widget, and therefore the Court has to look at this

7     particular property as though there were no other

8     property like it in the world.  And what we're asking

9     for is to avoid a series of lawsuits, which would

10    transpire, is to give the judicial imprimatur to allow

11    my client to record that deed, move forward.

12          Now, there is an issue related to personal

13    property in the home.  My client has tried to make every

14    single accommodation to the seller as possible.  He was

15    willing to pay for a -- her to be brought from the home.

16          THE COURT: Pay for what?

17          MR. HERMAN: To be brought -- to pay for someone

18    to bring her from the nursing home ---

19          THE COURT: Okay.

20          MR. HERMAN: --- to her home.  Was willing to pay

21    for the moving and storage of those parts of the

22    personal property remaining in the home that the seller

23    wanted to keep.

24          THE COURT: For how long?

1          MR. HERMAN: A period of three months was the

2     offer.  Still on the table.  We prefer two months, but

3     we'd like to get things moving in that regard.  My

4     client, in fact, would testify if it were permitted,

5     that he has deposited the funds with the title property

6     to close.  I have a copy of that check here today.

7          THE COURT: How much are the funds?

8          MR. HERMAN: $545,130.01.

9          THE COURT: Okay.

10          MR. HERMAN: I have a settlement sheet here also.

11          THE COURT: And that's for a property that has

12     been condemned?

13          MR. HERMAN: That is correct.  It has value as a

14     building site for the new home that my client would

15     construct for his buyer.

16          THE COURT: What's the status?  Right now,

17     there's no issue with pending delinquency, correct?

18          MR. HERMAN: In fact, there is, Judge.

19          THE COURT: Okay.

20          MR. HERMAN: I was advised that the property will

21     go back on the August 2022 tax sale list because the

22     cycle has continued.  The taxes remain unpaid.  And

23     essentially ---

1          THE COURT: And that's for the -- you're talking

2     about for the, what, '22 taxes?  Or no, '21 taxes, it

3     would have to be, or before the ---

4          MR. HERMAN: I don't have the specific details,

5     but my experience with the Tax Claim Bureau is, is that

6     it's a three- or four-year run-up before they ---

7          THE COURT: Two years, I believe.

8          MR. HERMAN: Two years.

9          THE COURT: Okay.

10          MR. HERMAN: So an additional year has come, will

11     be added to the total.  Obviously, the earliest taxes we

12     paid.  So it's the -- it's -- another cycle is added.

13     But it will be listed for sale if the seller doesn't pay

14     the taxes.  So we just feel we're the best alternative

15     for everybody just to -- we're ready, willing, and able

16     to close.  We're ready, willing, and able to do whatever

17     is necessary to preserve the personal property.  But my

18     client is afraid of being sued by his buyer if this

19     matter does not move forward.  He's given every

20     accommodation.  We are six months past -- almost six

21     months past the original closing date.

22          THE COURT: Ma'am, what do you want to tell the

23     Court?  And then I'll hear from your attorney, knowing

24     that he's not part of this case and not -- and did not

25     enter his appearance, at least to clarify anything that

1    he believes should be clarified.  What do you want to

2    tell the Court?

3         MS. OCKLEY: Yes, Your Honor.  I just want to

4    tell you from the beginning what's going on because most

5    of the things that are in this letter that complain,

6    it's not true.  So I just don't let you know step by

7    step what have ---

8         THE COURT: Well, let me ask you a couple of

9    questions.  Did they pay the delinquency?

10        MS. OCKLEY: I just don't let you know that in

11   October, I talk with the Plaintiff regarding selling my

12   property.  And ---

13        THE COURT: Okay.  But now I was asking about the

14   taxes.

15        MS. OCKLEY: Ah, the taxes.

16        THE COURT: Did they pay the back taxes?

17        MS. OCKLEY: They pay the taxes that I own (sic)

18   in 2019, $17,304.56.

19        THE COURT: Okay.  Do you realize that if they

20   did not pay that, that the Tax Claim Bureau could have

21   advertised your house for sale and somebody could have

22   bid on that house for a substantially less amount, and

23   they would have -- you would have lost title to the

24   property?

1          MS. OCKLEY: I can say yes or no because if he
2     did not agree to buy my property, I have two other
3     offers a little bit higher.  But because we continue to
4     talk forth and back in October to sell the property and
5     I am a person to keep my word, I said to him, "All
6     right.  We'll decide when it will be the date."  So in
7     November -- in October we talked, but actually we sign
8     an agreement of sale on November 19, 2021.
9          THE COURT: Okay.
10          MS. OCKLEY: We set up the price and when it will
11    be the settlement date.
12          THE COURT: Okay.
13          MS. OCKLEY: The settlement date was for January
14    31st, 2022.
15          THE COURT: Okay.
16          MS. OCKLEY: Because it was winter, he was of
17    course not -- the Plaintiff cannot do any work in
18    winter, and plus I was in the house with all the
19    belongings in the house.  We said we'll do it in spring.
20    Now, on March 24, I received from the -- from his office
21    -- he has a building company -- I received an email that
22    the next settlement date, it will be set for May 2 --
23    excuse me -- for May 2nd ---
24          THE COURT: Okay.

1          MS. OCKLEY: --- without consulting me.  It was
2     just an email, a poor email.
3          Now, I had an injury to my leg on April 10th and
4     I was to the Bryn Mawr Hospital for surgery.  He came --
5     three days after I had surgery, he came in the hospital
6     with an addendum or amedlun (sic) -- I am not sure the
7     name of the paper -- to sign for next settlement date,
8     June 10th.  And I said to him, to the Plaintiff, "Why
9     you came here?  Can you wait till I get home or I can
10    get better?  Why you came to the hospital?  Why it's
11    such a rush?"  She -- he said to me, "Don't worry.  We
12    will have this signed right now." And if it will takes
13    three, four months to recover so you can go home and
14    sell your property -- because I move overseas.  So I
15    have no other place to live from home.  I have to take -
16    - to buy an airplane ticket and leave.  So I have no ---
17         THE COURT: I'm not following you.  So you were -
18    - you were -- you were -- you injured your leg, you were
19    rehabbing your leg, they wanted you to sign an addendum
20    moving up settlement into June.
21         MS. OCKLEY: Yeah.
22         THE COURT: What was the next thing that
23    happened?
24         MS. OCKLEY: And he said to me, "Don't worry."
25    The -- I was worried because when you sign a paper, it's

1    concern.  You know, this can affect you in some way.

2    And I said, "Greg, why I have to sign this paper?"  And

3    he said to me, "Don't worry.  This is for my office.  If

4    you need three, four months to" ---

5                THE COURT: Okay.  But the paper you're referring

6    to was just an addendum in regard to settlement.

7                MS. OCKLEY: An amendment to the settlement for

8    June 10th.

9                THE COURT: Okay.  All right.

10               MS. OCKLEY: So from this date, June 10th, now

11   I'm in Broomall Manor Rehab, and it will take me maybe

12   another month till I'll be able, maybe more, to recover,

13   to start working because I'm not able to stand up

14   myself.  And I said to him ---

15               THE COURT: So where are you located?   Where are

16   you now living?

17               MS. OCKLEY: At Broomall Manor to recover.

18               THE COURT: Okay.  Okay.

19               MS. OCKLEY: And the problem that he created --

20   and this is the biggest problem of all.  So on -- after

21   June 10th, he continued to call me another -- I have it

22   on the phone -- maybe till June 16.  But a woman from

23   his office -- and you have her name and also her

24   telephone number -- called me.  No, she called me and

25   she said that she called Broomall Manor.  And this is

1           the worst thing that he made for me.  So they

2           called Broomall Manor to ask for the arrangements for me

3           to be removed from Broomall Manor in a stretcher to go

4           home, to stay in the garage so his guys -- I am telling

5           the words that he said -- get through my belongings so I

6           can -- they can be sell or deposit in a storage unit.

7                And I said, "I cannot do that." And plus, I have

8           from the insurance that deny me few days after this

9           woman call my -- the Broomall Manor, the skilled nurse

10          facility.  And it's saying, the therapeutic absence, the

11          -- from the inpatient facility is accepted when such

12          absence is specifically included in a treatment plan.

13          And there is a code here that said that I cannot be

14          removed.  This woman told to the manage ---

15               THE COURT: You cannot be what?   I missed what

16          you said.

17               MS. OCKLEY: I cannot be removed from the

18          facility to go home when I am still doing therapy in

19          order to become better.  I go to a room where I do

20          therapy every single day except Sunday.  So what ---

21               THE COURT: When are you scheduled to be released

22          from Broomall ---

23               MS. OCKLEY: When I will get better.  Next

24          appointment with my surgeon, it is on July 27, I think

25          at 2:00.  I will give you exactly.  And this is the

1      whole file that I have made an appeal to the insurance

2      company because right now I am leaving July 27 -- I can

3      offer you these papers -- at 2:45 p.m.

4              THE COURT: You don't have to offer me any

5      papers.  You can just tell me.

6              MS. OCKLEY: Yes.

7              THE COURT: But I am trying to understand.  Now

8      this happened to you in May, correct?  Your ---

9              MS. OCKLEY: No, no.  In April.  In April.

10             THE COURT: Oh, in April.  Okay.  So when you

11     signed the agreement of sale -- you made reference to it

12     but I don't think I fully understood -- where were you

13     going to go when you sold your property?  Because you

14     can't -- let me say this much.  If I understand it

15     correctly, if all -- if everything that's been

16     represented to me is accurate, I also understand that

17     you can't return to the house anyway, because the

18     township's not going to let you return to the house

19     because it's unfit for human habitation, if I understand

20     it correctly.  So that means you need to make other

21     arrangements.  So my question to you is, what was your

22     intent?  Where were you going to go when you were

23     released from Broomall?

24             MS. OCKLEY: This is the problem because when

25     this woman from his office called Broomall Manor, they -

1          - she told to the management to Broomall Manor, to the
2          administrator, that my house was sold.  These people got
3          concerned and said, "Where -- what is your address where
4          you are going from here?" I said, "My house was not sold
5          yet.  I mean" ---
6               THE COURT: Well, forget being sold.  I
7          understand that you have a pending agreement of sale.
8          That wasn't my question.  My question was, if the
9          township has condemned the property, then you're not
10         allowed to return to the property, regardless.  So
11         putting the agreement of sale aside, even pretending
12         that there was no agreement of sale, what are you going
13         to do?  Where are you going to go if the township
14         doesn't let you back into the property because they've
15         condemned it?
16              MS. OCKLEY: The problem is, and I want to tell
17         you, on the day when I was -- I asked for an emergency
18         room to come -- excuse me -- emergency personnel to come
19         and pick me up from the house, this -- I have also
20         complained for the police officer that he was in my
21         house, and I want to tell you just few minutes, but
22         also, I can show to you this.  So what happened on the
23         day when I supposed to have -- to be removed to go to
24         Bryn Mawr Hospital, this police officer came in the
25         house.  He look around, he asked me for my driving

1      license and I asked him, "Why you need my driving

2      license?  I'm in my home." And he said, "I have to put

3      some -- I have to take some notes."

4           And he took my driving license and he want to go

5      outside from the house.  And I told him, "Why you need

6      my -- to go outside on the street with my driving

7      license?"  I said, "I can give you paper and pen and you

8      can write information from my driving license in front

9      of me."  So I gave him paper and pen, he wrote

10     information from my driving license, and the two members

11     of ambulance put me on a stretcher and took me out from

12     the house.

13          Now, I went to the back door, where is the

14     kitchen -- it was the easiest way to take me out because

15     of the steps.  This police officer remain.  I turn my

16     back a little bit to look.  I said, "Please, you have to

17     go out.  I have this gentleman that he will lock the

18     door and set up the alarm in the house."  The police

19     officer said to him, "No, you have to get out, too." So

20     he forced -- forced exactly -- him to take the car from

21     in front of the garage and leave the property.

22          THE COURT: Okay.  But I -- none of this is

23     really important to me.

24          MS. OCKLEY: No, no, but I just want to tell you

25     why they put this condemn that is not a condemn ---

1           THE COURT: Well, usually the township -- but I
2      don't know what happened in your particular case.
3           MS. OCKLEY: Yeah.
4           THE COURT: But normally, the township and Code
5      Enforcement goes in and then they -- they're the ones
6      that usually condemn it.  But whether it was the police
7      or Code Enforcement, I'm not clear.  But it's a concern,
8      where if they don't let you back in the property ---
9           MS. OCKLEY: Yeah, because I'm sorry ---
10          THE COURT: Can you make arrangements for -- to
11     have -- you've heard their offer.  Their offer was to
12     put your -- all of your personal belongings into storage
13     for you.  And also, you could -- there are places -- and
14     you have the financial wherewithal, apparently, and I
15     don't know all the circumstances surrounding your
16     financial condition, but obviously this is a significant
17     amount of money coming out of settlement.  So my
18     question to you is, there are even apartments that would
19     rent -- even furnished apartments that would rent.  Have
20     you tried to make arrangements to locate a new address
21     since this property is already sold?   You already sold
22     this property?
23          MS. OCKLEY: No, Your Honor, because my intention
24     are not to be in United States and I told him so many
25     times.

1           THE COURT: Where are you going?

2           MS. OCKLEY: I am going overseas.  I will live

3    overseas.

4           THE COURT: Where are you going?

5           MS. OCKLEY: Romania.

6           THE COURT: Okay.

7           MS. OCKLEY: Bucharest, Romania.  So I told him

8    several times, "What is the purpose to put all my

9    belongings on a storage unit when I intend to sell?"

10   And this is the reason I come to your question mark, why

11   the house is condemned, because there is a lot of stuff

12   that I moved from the back of the house toward the

13   living room so I can moving to the garage so people will

14   buy it.  And already I made arrangements with some

15   people to buy furniture, art, everything that is in the

16   house.  I just will prepare whatever I need to ship

17   overseas and that's it.  So my idea of him telling me

18   that my guys will get in your house to storage of stuff,

19   I am not comfortable, Your Honor.  I don't think

20   nobody's comfortable to get through your private

21   belongings.  I mean, private.  So I just appreciate

22   [inaudible 10:50:28] ---

23          THE COURT: Well, how can you -- can you go to

24   the -- you've made it here to court today.

25          MS. OCKLEY: Yes.

1          THE COURT: Can you go to your house and see what
2     items you want preserved and what items you want
3     destroyed or thrown away?
4          MS. OCKLEY: Well, no.  I can do that.  But till
5     -- I will need a little bit more time to recover because
6     from this Broomall facility, they will let me go.  But
7     the problem is who is paying now because after this
8     phone call from this person from his office, my
9     insurance was denied?  I mean, every day to the Broomall
10    Manor, I have to pay $300 only for a bed in the room,
11    plus $160 for therapy.  Who is paying $460 a day?  Who
12    is affording that?  Causing me in a way that he said,
13    "Oh, I'll help you." Actually, he caused me more
14    problems than I suppose.  And now I filed a complaint to
15    the Defense department in order to see this.  I just
16    sent it last week with FedEx -- last Friday.  It's --
17    already has a number.
18          THE COURT: Yeah.
19          MS. OCKLEY: All this file for my insurance
20    company because was denied.  Why?  Because they called
21    and, of course, insurance -- excuse me -- Broomall Manor
22    will obtain more money from a private person paying
23    because my house was sold instead having insurance to
24    pay.  So ---

1          THE COURT: Yeah, I'm not sure what all that
2     means, but I can ask you another question.  What is your
3     intent in regard to this real estate transaction?  What
4     is your intent?  Well, what is your -- what are you ---
5          MS. OCKLEY: My real intended, he knows very
6     well.  I said, "Give me a little bit of time to recover
7     with my foot."
8          THE COURT: And how much is a little bit of time?
9          MS. OCKLEY: I said I will leave, I think, the
10    property because they said to me to -- I will need
11    three -- at least three months to recover or four.  But
12    in this case, I said if I will have the time maybe of
13    1st of September to leave the house empty and leave
14    because I will buy a air-flying ticket and I'm leaving.
15    What is the purpose to move in a storage unit?  And
16    after all -- have set up an apartment to stay when
17    actually I'm leaving from here?  My intention are to go
18    to my house.  It's my house still and I want to remove
19    everything from the house.  And after that, he can have
20    the key and he can do whatever he wants.  And he knows -
21    --
22          THE COURT: Let me hear from Mr. Russell.
23          MR. RUSSELL: Your Honor, Ms. Ockley came to me.
24    I took over Pete Rahana's (phonetic) practice.  He was
25    one of Pete's clients.  And I have done my best to try

1      and handle some of Pete's outstanding matters.  This was
2      one of them.
3                  THE COURT: Okay.
4                  MR. RUSSELL: I thought we did excellent legal
5      work with the help of Mr. Lingo.
6                  THE COURT: Who's Mr. Lingo?
7                  MR. HERMAN: Principal of the Plaintiff, Your
8      Honor.
9                  MR. RUSSELL: I'm sorry.
10                 THE COURT: Okay.
11                 MR. HERMAN: He's sitting next to me.
12                 MR. RUSSELL: And initially, Ms. Ockley had the
13     Sheriff's sale scheduled and it was absolutely no way
14     that we were getting that payment.  She didn't have the
15     payment.  That was -- that payment was coming from
16     nowhere.  So Mr. Lingo went above and beyond and we came
17     to an agreement that if we executed the deed and put it
18     in escrow, that he would release the escrow money
19     because we didn't have anything to sell if it went to
20     Sheriff's sale.  So Mr. Lingo then went above and
21     beyond.  He released the escrow money.  Ms. Ockley was
22     able to keep the home.  And then at that point, we did
23     sign the entire deed in order to secure the money to
24     keep the house.  So it did -- then went into escrow with
25     the title company and then it was just a matter of

```
1         closing.  So -- and we would never have put the deed and
2         signed the deed, but Mr. Lingo saved the house for us.
3         And so the house should close.
4              And it's been delayed and it's been delayed and
5         it's been delayed.  And I could provide -- at that
6         point, I couldn't provide effective representation for
7         Ms. Ockley in this place because I thought we did
8         excellent legal work for her to get the proceeds of the
9         sale.  And at this point, she's receiving over $400,000
10        from the sale.  I don't know what the nursing home did.
11        Obviously, the nursing home, if they would have known
12        the house was being sold, realized she was a private
13        pay, and had her pay privately.  That's their agreement.
14        With regard to Mr. Lingo, he had other arrangements with
15        buyers.  And that -- you know, it should be honored.
16        And so I could not effectively represent Ms. Ockley
17        because I believe we saved the property for her.  She's
18        pocketing over $400,000.  And that's the transaction
19        that was set up.
20             THE COURT: Anything ---
21             MR. HERMAN: And just to -- for the record, it's
22        $492,000 ---
23             THE COURT: Okay.
24             MR. HERMAN: --- would be her proceeds.
```

```
 1            THE COURT: Obviously, a substantial amount, no
 2       different than I previously commented on.  What about if
 3       -- what about if the way we handle this ---
 4            And, ma'am, you have a good attorney.  I'm not
 5       sure why you don't have your attorney representing you
 6       here today.  And I'm very gracious that he took the
 7       opportunity to come to court today to inform the Court
 8       and assist the Court in trying to reach a decision
 9       that's fair and equitable to all the parties concerned.
10       But you understand that it's completely unfair to the
11       Plaintiff to be delaying this for many different
12       reasons, including the fact that if you've watched the
13       news while you're in the nursing home, interest rates
14       are going up.  It makes it more difficult to move
15       property when buyers have to qualify for financing.  And
16       that's one of the concerns they pointed out in their
17       petition.  And that's one of the real concerns that
18       buyers are facing today because the interest rates were
19       so cheap, and now they're just inching up, inching up.
20       And they may go up again this month, even before it's
21       all said and done.  On the other hand, you've
22       represented to this court that you want till September
23       1st.  Why can't we reach an agreement by way of a court
24       order between the counsels to put a court order together
25       indicating that this property has to go to the
```

```
1        settlement owner before September 1st and whatever else

2        you want in that order to make sure that the property --

3        that it's funded and goes to -- goes to sale?

4               MR. HERMAN: Your Honor, my client ---

5               THE COURT: It's six weeks away.

6               MR. HERMAN: The buyer's -- the Plaintiff's

7        buyer's rate lock expired already.  He's able to extend

8        it through the end of July, but we will lose our buyer.

9        We will clearly lose our buyer if we have to wait till

10       September 1st.  We're willing to do whatever is

11       necessary so that the Defendant can sort through her

12       personal property.  But it -- she can't ---

13              THE COURT: Well, she's asking for -- like, she's

14       in a rehab.  She doesn't have access to her house.  It's

15       very unique circumstances.  This is not a typical

16       situation, obviously.  She's been in a nursing facility.

17       She appears to be -- attempting to be cooperative.  I

18       mean, July 31st is obviously two weeks away.  She's --

19       it's probably unreasonable to have her do it by July

20       31st.

21              MR. HERMAN: If I may, Your Honor?  As long as

22       Plaintiff can file the deed, the ability of the

23       Defendant to retain possession or access to her personal

24       property is something that can be arranged, either at

25       the location ---
```

1          THE COURT: Okay.

2          Ma'am, do you hear what's being offered?

3     What's being offered is if we -- if we have the -- if we

4     process the -- basically, if I'm understanding you

5     correctly, to allow the transfer to occur.  And the deed

6     being recorded, basically, is the transfer to occur and

7     the deal being funded, meaning that you're going to walk

8     away with a check, but there's going to be an agreement

9     that they will not access this property until on or

10    before September 1st, where you would have to get your

11    belongings out.  And you -- your attorney or whomever

12    can work out maybe a possible stipulation for the

13    additional two months in storage.  So there's some

14    solutions here that they're trying to work with, that

15    may assist them in coming to a resolution from their

16    concerns, based on the loss of their potential buyer

17    because the house is still going to take a while to

18    demolish and then, ultimately, to build a new house.

19    And the buyer's going to have to wait for that, but I

20    guess he can lock in a rate.  I don't -- is that the

21    idea?

22         MR. HERMAN: I'm advised by my client that as

23    long as the deed can be filed and the property moved

24    forward in the second transaction, September 1st is an

25    acceptable date for us to work with Ms. Ockley in terms

1    of getting her stuff out.  Choosing it.  She can sell

2    it.  We'll give access.  We'll work with her.  This is a

3    situation with -- where I hope no good deed goes

4    unpunished.  We really want to be the -- do the right

5    thing.  And, so, I would ask ---

6         THE COURT: Oh, I know.  And it's difficult for

7    this court because of the circumstances.  It's obviously

8    -- the legal equities, to a great extent, are in your

9    favor.  However, these are very unique factors where I

10   don't believe Ms. Ockley is intentionally trying to

11   prevent a settlement.  If that was the case, then I

12   would have a different approach.

13        But, ma'am, what I'm suggesting to you

14   respectfully -- I can't order it, but what I'm

15   suggesting to you respectfully is that you retain Mr.

16   Russell to assist you in reviewing these legal documents

17   because you've retained him in this transaction.

18   Continue to utilize his services, continue to pay for

19   his services, because he's going to try to assist you in

20   achieving what's been represented here in court.  And

21   then I'll wait to hear back from Counsel before the end

22   of this month to see if that stipulation and agreement,

23   and then they can send me an order, what was represented

24   here today in regard to processing everything, by the

1     end of the month, but allowing you to return to the

2     property for that period of time.  Okay?

3          MS. OCKLEY: I have -- I have several question,

4     Judge.  First of all, I want to ask you, now, if I will

5     transfer -- I don't want to transfer the deed of the

6     house yet.

7          THE COURT: It's already transferred, ma'am.

8          MS. OCKLEY: No, just to be -- to be on his name

9     or sign -- I have to sign the deed.  I ---

10         THE COURT: It's already signed.  It's all over.

11    That part -- that's very difficult for this court, by

12    the way, because in my -- in my opinion, and I didn't

13    look it up for this hearing today, I just remember doing

14    a case a few months back where I did look up because it

15    was a big issue as to when title transfers or when the -

16    - when does a person become from an equitable owner to

17    an actual owner?  And the -- as I just quoted the law

18    you may have heard when I was talking to Mr. Herman was

19    that an equitable owner under Pennsylvania law is when

20    you sign the agreement of sale.

21         If you didn't transfer the deed, I think what

22    we'd be doing here is there'd be some claim for specific

23    performance, as I've done in other cases, address the

24    issue of specific performance.  But because the deed has

25    already been signed, they're asking for a special --

1          this is a special hearing because the property,

2      technically -- and I know you may not fully appreciate

3      it and your attorney can explain it, but the property,

4      once it was signed to the new party, the new owner, that

5      is when the actual title, the legal ownership,

6      transferred.  You're not even the owner of that property

7      anymore, technically, because you voluntarily,

8      knowingly, and intelligently signed that deed over to

9      another person.  So you don't own the property, from my

10     perspective.

11          However, there's a lot of equities here that

12     we're trying to work through.  There was an agreement

13     that they would keep the title in escrow, meaning they

14     would not record it.  Recording it, just is notice to

15     the world that somebody else owns the property.  So if I

16     was to look up your property on the Internet in our

17     Recorder of Deeds office, it would have your name, not

18     the corporation that's developing the property.  So --

19     but when they record it, it'll have the corporation's

20     name.  But that's not ownership.  That's just notice to

21     the world as to who the owner is.

22          So title's transferred.  We're just trying to

23     work out a solution that is beneficial for you to

24     retrieve your items that are stored there and to move on

25     with your life to the best of your ability.  Okay?

1          MS. OCKLEY: Yes.  But I have -- I have a

2     question.

3          THE COURT: Okay.

4          MS. OCKLEY: This facility, because they steer

5     the -- my situation to this Broomall facility, calling

6     and asking and telling to administrator over there that

7     I sold my property.  Now, when they said, "When you

8     discharge, what is your address?  Where are you going?"

9     And I said, "I am going to my house."  The second thing

10    that I have, it's also the money.  Who is responsible of

11    this $460 a day that I am charged for ---

12         THE COURT: I have nothing to do, ma'am, with

13    that.  I don't know about your insurance.  You could

14    appeal your insurance.

15         MS. OCKLEY: Yeah.  But it's because -- it's

16    because of their phone call.  They just cause more

17    problem to me immediately on the June ---

18         THE COURT: Maybe -- again, I would -- this is

19    what I would recommend.  It's so important, and not just

20    in this transaction, but what you're describing me

21    between your relationship with the nursing facility,

22    it's so important to have an attorney assist you.  So --

23    and you could reach a fee agreement with that attorney,

24    whatever you deem appropriate, whatever they deem

25    appropriate.  But it's important.  They may be able to

1    straighten that out for you.  They may not.  I don't

2    know the answer to that.  But it's separate and apart

3    because you did technically transfer your property.  So

4    nothing they did, whether you agree with what they did

5    or don't agree with what they did, if they called the

6    facility and said that you're not the owner, technically

7    it was true.  You're technically not the owner of the

8    property once you transferred the title.  However, your

9    attorney may be able to straighten out the issue with

10   the nursing facility because I don't understand why

11   insurance -- I don't -- is denying -- if it's medical

12   care insurance, I don't understand why medical care

13   insurance is denying insurance over where you're living

14   when you're released from the facility.  I don't ---

15        MS. OCKLEY: No, no, no, it's not about this.

16   What happened when they call and they said that my house

17   was sold, that means for the administrator over there

18   that I had money so I can pay from my pocket $460 a day.

19   The ---

20        THE COURT: Yeah, I don't know anything about

21   that but you may be obligated to pay whatever the law

22   requires you to pay.

23        MS. OCKLEY: Yeah, but I have an insurance.

24   Insurance was able to pay till June 17th.  Why they

25   stopped paying the insurance, because facility -- when

1    they called, they said that I can be removed from the

2    facility with a stretcher to go to my house.  So the

3    facility said, "Oh, she has money.  Now she will be able

4    to stand in the garage to remove the stuff.  So we are

5    not -- we are not able to do her therapy continuously."

6    And on this report from the insurance, it's just saying,

7    "Therapeutic absence."  So this is -- they cause me this

8    problem.  They should be responsible for the fact that

9    now I have to pay from the pocket ---

10           THE COURT: Ma'am, I can't order a third-party

11    entity to pay your -- to pay your hospital costs.  But -

12    --

13           MS. OCKLEY: Yeah.  But they caused ---

14           THE COURT: --- Mr. Russell wants to say

15    something.

16           MR. RUSSELL: Yeah.  Your Honor, in all

17    likelihood, sometimes when a nursing home on Medicaid,

18    if somebody owns a house, they don't look at it.

19           MS. OCKLEY: No.

20           MR. RUSSELL: If someone has money, they need to

21    pay the -- they need to pay their amount.  So I think

22    what's happening here is a recognition that she no

23    longer owns the house, which is accurate, and she'll

24    have the proceeds of the sale, which triggers her

25    requirement to privately pay, which really has nothing

1    to do with Mr. Lingo.  It really has to do with an

2    accurate understanding of where she is with the

3    transaction.

4         THE COURT: Yeah, ma'am.  I don't know if you

5    have any exceptions to that.  Like I said, you can

6    consult with an attorney.  It has nothing to do with

7    this deal.  If -- it may be a side effect of what has

8    occurred here, but it has nothing to do with what the

9    agreement was.

10        MR. RUSSELL: So I ---

11        MS. OCKLEY: The insurance ---

12        THE COURT: If you would have hit -- if you would

13   have hit the lottery, if you were a lottery player ---

14        MS. OCKLEY: Yes, it's written on the insurance.

15        THE COURT: --- and then you -- and for whatever

16   reason, because of your -- the insurance will say,

17   "Well, now you hit the lottery.  You have to contribute

18   to your medical costs," there's nothing I can do about

19   the fact that you're coming into money.

20        MS. OCKLEY: Your Honor, but even like that,

21   because I study a lot while I was over there.  If you

22   own a lottery ticket, you have to -- you have to pay a

23   little, not the full amount.  I am paying like a private

24   resident, $320 for a bed in a small room plus $160 for

25   the therapy because ---

1      THE COURT: I don't know what to tell you, ma'am.

2   I can't -- I can't address that.

3      MS. OCKLEY: Yeah, but because of their phone

4   call.  The phone call should not be to the

5   administrator.  Everybody now knows that I have a house

6   that is sold.

7      MR. RUSSELL: It's really not -- it's not because

8   of the phone call.  It's because of the transaction.

9      And -- so my issue with this, Your Honor, and

10  the reason I'm probably not sitting in this chair -- I'm

11  sitting back here -- is what really needs to happen is

12  the closing needs to occur almost as soon as possible.

13  Mr. Lingo had offered Ms. Ockley the ability to store

14  the property or that he wanted to touch the property

15  because her only concern now, at least from her

16  standpoint, is her personal property.  She's obviously

17  able to come here.  She's able to go there.  But if

18  she's leaving and she's -- that property's condemned,

19  the only other interest is her personal property.  The

20  property needs to close.  She needs to get her personal

21  property out.  But the problem is she won't do that.

22      THE COURT: Well, you have to because if not, it

23  will be disposed of and you won't have any rights to it

24  at some point.

1           MS. OCKLEY: Yeah.  But I just said I want by

2      September 1st.

3           THE COURT: Right.  That's what we agreed to.  We

4      agreed to September 1st.

5           MS. OCKLEY: Yeah.  1st, yes.

6           THE COURT: Okay.

7           MR. HERMAN: That's okay.  But the closing -- I

8      think if ---

9           THE COURT: The closing, though, you -- the

10     closing is going to have to occur before the end of --

11     but you're going to be able to retrieve and/or go back

12     to this property somehow if you get permission to do so.

13     But as of September 1st, you have to be out of the

14     property and everything has to be resolved.  But right

15     now, we're still going to allow the closing to occur but

16     you're going to still have a right.  Your attorney will

17     assist and there'll be an agreement, a court order,

18     that'll make -- that'll incorporate an agreement between

19     the parties that says that although the property has

20     been officially sold, that you're allowed to live and/or

21     access the property up until September 1st.

22          MS. OCKLEY: Your Honor, what I want because I

23     was trapped on this June 10th signature when he came --

24     the Plaintiff came to the hospital -- and I don't trust

25     him anymore -- under this pretention ---

1           THE COURT: That's why I'm asking you -- I'm
2       respectfully suggesting to you since you have dealt with
3       Mr. Russell, he's trying to protect your interest to ---
4           MS. OCKLEY: Oh, no, I'm not talking -- I'm sorry
5       that I interrupt you.  I'm not talking about
6       Mr. Russell.  I'm talking about the Plaintiff because --
7       -
8           THE COURT: I know you are.  But he -- if you
9       have an attorney protecting you, you don't have to worry
10      about anything -- any concerns that you have with
11      dealing directly with the other side, the other
12      attorneys, the other parties.  You won't be dealing
13      directly with them.  Your attorney will.
14          MS. OCKLEY: See, Judge, if he -- if he will
15      transfer -- the Plaintiff transfer property to --
16      immediately to this person that he won't -- he will have
17      a new house on my -- on my land, that means this -- it
18      will be the new owner.  What -- I need something in
19      written but very seriously, because he -- for example,
20      he can put a sign, "No Trespassing."  He can call Radnor
21      Township Police and say, "She's not allowed."  People to
22      ---
23          THE COURT: I don't know what you're saying.
24      We'll have a court order allowing you access and/or

```
 1          residency at this property up until September 1st.  So
 2          you'll have a court order in your hand.
 3               MS. OCKLEY: Okay.  That, it will be all right
 4          because I don't want -- I don't want, you know, asking
 5          for police or somebody.  The Plaintiff has a lot of
 6          properties building in this township.  He has a lot of
 7          relation to the Radnor Township.  Of course, he said,
 8          "Oh, I will help you.  I will help you with police issue
 9          that I have regarding my house.  I will help with the
10          code officer."  He did not do anything.  Only promises
11          and nothing happened.  So I just trust myself with my
12          judgment.
13               MR. HERMAN: We won't be getting $492,000 in our
14          pocket.  That's -- that ---
15               MS. OCKLEY: For me, Judge, is more important
16          your character.  Your money means a little bit in my
17          case right now.  I want to be [inaudible 11:12:25].
18               THE COURT: Well, let's try to work through it.
19          Look, I'm asking you and you've agreed to allow your
20          attorney to handle some of the legal aspects.  You're
21          going to have to pay him, but there'll be money at
22          settlement to pay him.  So you need to make sure that
23          you feel comfortable, you're protected.  I'm giving you
24          to September 1st to live and/or access the property.
25          But not -- but, again, it has -- the transfer has to go
```

```
 1    through.  If you feel that a problem develops and you're
 2    unhappy, go to your attorney.  And if necessary, we'll
 3    have another hearing in court and I'll address your
 4    concerns.  But let's hope that that's not necessary and
 5    that by the end of the month, they'll have an order.
 6    I'll sign an order and you'll have access to this court
 7    order -- you'll get a copy of it -- that will preserve
 8    the rights that you're asking for in this courtroom and
 9    at the same time, allow settlement to go through.  Okay?
10         MS. OCKLEY: I -- in my judgment, I thought the
11    best way for me to be protected: it's this settlement
12    and everything else to be -- everything to be resolved
13    on the 1st of September.  One ---
14         THE COURT: We can't do that because of the fact
15    that the -- they're going to lose the deal that they had
16    set up all this time.
17         MS. OCKLEY: Yeah, but I have a question, Judge.
18    For example -- for example, if somebody -- he actually
19    did not have actually the deed in his hand without my
20    signature.  He had it ---
21         THE COURT: He doesn't have it in his hand.  He -
22    - I'm told, at least that's what I've read -- it's in
23    escrow, which means, I'm assuming, the title company is
24    holding it.
25         MR. HERMAN: Yes, Your Honor.
```

1          MS. OCKLEY: Yes.  But ---

2          THE COURT: And so the title company is sitting

3     on this and they're waiting for a court order probably

4     or they're waiting for some consent by the parties to

5     move this thing forward.

6          MS. OCKLEY: Yeah.  Yeah.  But this person that

7     is buying the property that he said that he has it, how

8     he signed a contract with somebody -- with a ghost deed,

9     or with not having ---

10          THE COURT: Well, I'm assuming he's put

11     contingencies into his agreement of sale.  There's

12     nothing stopping someone from entering into another

13     agreement.  It's not illegal to do that.  And if his

14     attorney was assisting him, they probably put certain

15     contingencies in there to protect the seller, in this

16     case, the Plaintiff here, if something went wrong.  But,

17     again, there's a financial interest here -- and that's

18     what drives a lot of this.  But there's a financial

19     interest here and there's a financial interest for the

20     buyers because of the way the rates are going.  So I

21     understand you have this mistrust, but I'm trying to

22     accommodate your concerns by structuring it this way

23     because you're already not the owner of the property, as

24     I mentioned a number of times during my comments today.

1          So rely on your attorney.  I think he's fighting

2      hard to try to resolve this issue for you.  And we'll

3      try to get it resolved in this way.  I'm not going to

4      allow everything to occur on the 1st because of what was

5      represented here during the course of this proceeding

6      over the jeopardy that may occur if I were to reach that

7      decision.  Okay?  Even though it's only six weeks away,

8      I would ask that you address any of those matters with

9      your attorney.  Okay?

10         MS. OCKLEY: These two matters I have.  First of

11     all, how I resolve this problem with -- to pay from my

12     pocket for this nursing home ---

13         THE COURT: I can't deal with that at all.  I

14     have nothing to do.  I can't even address it.

15         MS. OCKLEY: And another thing that I have, on

16     the contract that I signed, he said that I should -- the

17     survey -- I'm responsible for the survey.  And I said to

18     the Plaintiff when we -- over the phone, not when I

19     signed this contract of sale, I said, "Listen, I have --

20     I can provide you.  We were the single owner of this

21     property from 1952.  So I have everything that you will

22     need." Why now I am responsible to pay for the survey

23     when already, even if you go here, and I have also the

24     plans of the house, of the property, we have fences all

25     around the property.  Why I'm responsible right now to

1        pay?  Because on the Pennsylvania law said that if you

2        have -- if you have already this surveyed, maybe you are

3        not responsible.

4                THE COURT: Well, Pennsylvania -- you're correct

5        that Pennsylvania doesn't -- it doesn't require a

6        survey.  But what you agreed to in your agreement of

7        sale controls in regard to Pennsylvania law as it

8        relates to breach of contract or contractual obligation.

9        So go ahead.

10               MR. RUSSELL: Your Honor, you -- Your Honor

11       framed, and I think all three -- myself, Mr. Herman, and

12       yourself know exactly how to resolve it.  I mean, the

13       closing has to occur by July.  Ms. Ockley can gain

14       access under Mr. -- under the supervision, to go in,

15       clean out her property, which is her only interest in

16       the property, and then therefore finish it by September

17       1st.  Those are the two elements that need to go in.  My

18       -- I will not be able to have Ms. Ockley voluntarily

19       agree to those two elements.  That's exactly what has to

20       happen here.

21               THE COURT: Well, that's why I'm asking that an

22       order be prepared, reflecting that so that I can order

23       it.

24               MR. HERMAN: Your Honor, I will -- I will send an

25       order to you by the end of tomorrow, perhaps today.

1          THE COURT: Okay.  So I'm going to order it,

2     ma'am.  You know what I mean?   I'm going to force the

3     issue.  I know what your request is and I am trying to

4     accommodate you.  That's why you have until September

5     2nd -- or 1st.  So -- and that's why I'm -- but there's

6     going to be an order that allows all this to occur.

7     Okay?

8          MS. OCKLEY: Yeah.  But right now, my attorney,

9     he just told me that I should go on my property under

10    their supervision.  I don't think it's right that I

11    should go ---

12         THE COURT: Well, it wasn't their supervision.

13    What they were saying to you is they were going to

14    assist you in -- if you go to the property, they were

15    going to move it for you, and they were going to store

16    it for you, and they were going to dispose of what you

17    want disposed of and save what you wanted saving.  It

18    wasn't their supervision.  It was their accommodation to

19    try to address some of your concerns.  It's my

20    understanding.

21         MS. OCKLEY: No, I -- yeah -- yeah ---

22         THE COURT: You have free access to this property

23    to do whatever you want from now until September 1st.

24         MS. OCKLEY: Yeah.  Yeah.  That ---

25         THE COURT: Okay?   You don't need them there.

1          MS. OCKLEY: Yeah.  I prefer to do things on my

2     own.  I don't think you or ---

3          THE COURT: Okay.  Just make sure the order

4     reflects that she has that complete and free access up

5     until the 1st.

6          MR. HERMAN: She'll have access.  But she'll have

7     to gain access in a particular moment by giving us

8     notice, and we have the keys, and we'll unlock it.

9     [Inaudible 11:18:51] ---

10          THE COURT: Well, you know, no, no, no, no.

11          MS. OCKLEY: No.

12          THE COURT: You've got to let her -- I mean,

13     almost like she's going to become a tenant at this

14     point, if that's what you mean.  You can't -- you can't

15     have her -- if you're going to say she has complete

16     access and can stay in the property, even, you can't

17     say, "I'm -- I want to -- I'm going to let her in today

18     but not tomorrow.  I'm going to" -- she may even move

19     there.  I don't know.  I don't know what her ---

20          MR. HERMAN: Judge, she can't move in there.

21     Radnor Township will not allow [inaudible 11:19:12] ---

22          THE COURT: Well, that's fine, but I don't know

23     if she goes in and fixes up -- if -- that's a different

24     issue.  I called Resident Center Access for a very

25     specific reasons.  I don't know if she can correct what

1    was preventing her from -- or removing, I guess, the

2    condemnation.  I don't know what the issues are.

3             MR. HERMAN: Well, it raises issues of liability

4    if ---

5             THE COURT: Sure, it does.

6             MR. HERMAN: --- if the -- if the Defendant says

7    something is here and it's not here anymore and you took

8    it, well, we ---

9             THE COURT: What's stopping that right now from

10   happening because your client's now the owner of that

11   property?

12            MR. HERMAN: I suppose that's correct, Your

13   Honor.

14            THE COURT: Okay.

15            MR. HERMAN: I just want to avoid future

16   problems.

17            THE COURT: So do I, but I don't know.  This is a

18   very difficult situation.

19            MR. HERMAN: The tree can only bend so far and I

20   appreciate that, Judge.  [Inaudible 11:19:57].

21            THE COURT: But I mean, it's either -- it either

22   is or it isn't.  I mean, it's -- in other words, it's

23   either allow her to have this unfettered access to the

24   property or you don't.  And so that's the issue.  And if

1     you don't, then I think we need to wait till September

2     1st and allow her ---

3          MS. OCKLEY: That it will be [inaudible

4     11:20:14].

5          THE COURT: --- the same status as she's doing

6     now.  So come up -- talk to Mr. Russell.  See if you can

7     come up with some language that you can both agree to.

8          MR. HERMAN: My client advises that the

9     unfettered access is not an issue.

10         THE COURT: Okay.

11         MR. HERMAN: So we'll abide by the Court's

12    suggestion.

13         THE COURT: All right.

14         MS. OCKLEY: See, Judge, that it was the reason

15    that I wanted till September 1st because I don't want

16    them to get -- gain access to my house till I am not

17    leaving from over there [inaudible 11:20:37] ---

18         THE COURT: Well, they just agreed to -- even

19    though the deed is transferred and even though they're

20    going to go through settlement, they've just agreed and

21    it'll be part of the court order that's going to allow

22    you to ---

23         MS. OCKLEY: Yes.  Please, I want you to specify

24    clear over there because they can put ---

25         THE COURT: It'll be in the court order.

```
 1                    MS. OCKLEY: Yeah.

 2                    THE COURT: And I'm respectfully requesting again

 3           -- I know I said it three times now, but I'm going to

 4           say it four -- that you have Mr. Russell look over

 5           everything for you.  Okay?

 6                    MS. OCKLEY: Yeah.

 7                    THE COURT: Okay.

 8                    MS. OCKLEY: Yeah.

 9                    THE COURT: All right.  Anything else?

10                    MS. OCKLEY: Thank you very much, Judge.

11                    THE COURT: You're welcome, ma'am.  Good luck to

12           you.  I hope your health is better.  I hope you're

13           feeling better.

14                    MS. OCKLEY: Yeah.  The paper that I gave to you.

15           Can I have a copy?  Do you need this?  I ---

16                    THE COURT: I can give it back to you because

17           everything you said is on the record.  It's not really

18           marked as an exhibit.  Everything you wanted to tell me

19           ---

20                    MS. OCKLEY: Yeah.  Yeah.

21                    THE COURT: Okay.  I can give it back to you.

22           Return it.

23                    MR. RUSSELL: Thank you, Your Honor.

24                    MS. OCKLEY: Yeah.  If you want, I -- we can make

25           the copy.
```

1          THE COURT: You can mail a copy to me if you want
2     to.
3          MR. HERMAN: And I prefer a copy also, Judge, if
4     the copy's being ---
5          THE COURT:  Okay.  Can you bring -- can you send
6     me either two copies or send one copy to Counsel?
7          MS. OCKLEY: I will ---
8          THE CLERK: [Inaudible 11:21:35] copies.
9          THE COURT: Okay.  You know what?  We were just -
10    - we can make copies here, I'm just told.
11         MS. OCKLEY: Okay.  That's fine.
12         THE COURT: So let's make two copies.  And you
13    can have the original back.
14         And then, Mr. Russell, do you want a copy?
15         MS. OCKLEY: This is the same notes.  These are
16    the same notes.  That it ---
17         MR. RUSSELL: Yeah.  You should -- you should
18    give him everything.  Just give her everything.
19         THE COURT: All right, let's make three copies.
20         MS. OCKLEY: Okay.  Okay, that's fine.
21         THE COURT: Three copies, please.
22         MS. OCKLEY: Yeah.
23         MR. HERMAN: Your Honor, I believe that would
24    conclude my business before the Court today.  May I be
25    excused?

1                    THE COURT: Okay.  Well, you got -- what you can
2          do is you can remain in the courtroom.  They'll bring
3          you a copy.  That ends the case.
4                    MS. OCKLEY: Sure.  Thank you, Judge.
5                    THE COURT: And, ma'am, again, I wish you the
6          best.
7                    MS. OCKLEY: Thank you.
8                    THE COURT: I think they're trying to accommodate
9          you.  I wish you the best.  And if you end up in the
10         very near future, what it sounds like you are going back
11         to Romania, then I wish you safe travel.
12                   MS. OCKLEY: Thank you so much, Judge.
13                   THE COURT: And I wish you the best.  Okay?
14                   MS. OCKLEY: I really appreciate.  I really
15         appreciate Your Honor ---
16                   THE COURT: All right.  You take care.
17                   [Proceedings Concluded at 11:29 a.m.]
18

```
1                    C E R T I F I C A T E
2         I, Richard Coogan, hereby certify that the
3    proceedings and evidence are contained fully and
4    accurately on digital multi-track recording; that the
5    recording was reduced to typewriting by my direction;
6    and that this is a correct transcript of the same.
7
8                    _____
9                    Richard Coogan, Director
10                   Electronic Recording Center
11
12        Officemotive, Inc. DBA Capital Typing., hereby
13   certifies that the attached pages represent an accurate
14   transcript of the multi-track digital sound recording of
15   the proceedings in the Court of Common Pleas of Delaware
16   County, Pennsylvania, in the matter of:
17
18
19                   ROCKWELL GLYNN, LP
20
21                        VS.
22
23                   SIMONA OCKLEY
24
25                   CV-2022-4275
26
27
28                   BY:
29
30                   _____
31                   John H. Hingson IV, CET-1938
32                   Transcriber for
33                   Officemotive, Inc. DBA Capital Typing
34
35
36
37        The foregoing record of the proceedings upon the
38   hearing of the above cause is hereby approved and
39   directed to be filed.
40
41                   _____
42                                     Judge
43
```