# Exhibit 17

## Hearing Transcript
## July 11, 2022

```
 1          IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY
 2                            PENNSYLVANIA
 3
 4                           CIVIL DIVISION
 5
 6     * * * * * * * * * * * * * *     No.   CV-2022-4275
 7                               *
 8     ROCKWELL GLYNN, LP        *
 9                               *
10              VS.              *
11                               *
12     SIMONA OCKLEY             *
13                               *
14     * * * * * * * * * * * * * *
15
16
17
18                     Media, PA, July 11, 2022
19
20                             ***
21
22                      Courtroom No. 8
23                             ***

24                   TRANSCRIPT OF PROCEEDINGS
25
26     BEFORE:   THE HONORABLE JOHN J. WHELAN
27
28               MR. LEE HERMAN, ESQUIRE
29               For the Plaintiff
30
31               MR. KENNETH RUSSELL, ESQUIRE
32               For the Defendant
33
34

35
```

Officemotive, Inc. DBA Capital Typing
PO Box 275, Williston, SC 29853 - (800) 785-9402

1                                INDEX

2


3                         DIRECT   CROSS   REDIRECT   RECROSS
4        ON BEHALF OF THE PLAINTIFF:
5        [none]
6
7        ON BEHALF OF THE DEFENDANT:
8        [none]
9
10
11                          EXHIBITS
12
13                                MARKED    ADMITTED
14        ON BEHALF OF THE PLAINTIFF:
15        [none]
16
17        ON BEHALF OF THE DEFENDANT:
18        [none]
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | July 11, 2022 |
| 3 | THE CLERK: All rise.  Courtroom 8 is now in |
| 4 | session, the Honorable John J. Whelan presiding.  Good |
| 5 | morning, Your Honor. |
| 6 | MS. OCKLEY: Good morning, Your Honor. |
| 7 | MR. HERMAN: Good morning, Your Honor. |
| 8 | THE COURT: Good morning.  Please be seated.  All |
| 9 | right.  Okay.  This is a matter of injunction, requested |
| 10 | injunction relief.  The name of the case is Rockwell |
| 11 | Glynn, LP versus Simona Ockley.  And it's under Docket |
| 12 | Number 4275 of '22.  Could the attorneys please identify |
| 13 | themselves and who they represent, the person or entity? |
| 14 | MR. HERMAN: May it please the Court.  Lee M. |
| 15 | Herman, Supreme Court ID 27570, for the |
| 16 | Plaintiff, Rockwell Glynn, LP. |
| 17 | THE COURT: Okay. |
| 18 | MS. OCKLEY: Hello.  My name is Simona Ockley |
| 19 | [inaudible 10:28:26].  I represent myself. |
| 20 | THE COURT: Okay.  You're going to represent |
| 21 | yourself, ma'am.  Have you had an opportunity to --- |
| 22 | MS. OCKLEY: I created yesterday a letter for |
| 23 | you. |
| 24 | THE COURT: You created what?  I'm sorry. |
| 25 | MS. OCKLEY: A letter for you to read. |

1          THE COURT: Okay.  Why don't we show the letter

2     to counsel and then I'll take a look at the letter.

3          MS. OCKLEY: Yes, please.

4          THE COURT: Ma'am, do you have an attorney on

5     other matters?

6          MS. OCKLEY: No, I do not.

7          THE COURT: Okay.  All right.  For some reason, I

8     believe there was an individual that was --represented

9     to the Court, that had emailed the Court -- I don't have

10    that part of the file here or maybe I do -- emailed to

11    the Court that he didn't believe he was going to

12    represent you.  I believe ---

13         MS. OCKLEY: Yeah, he's behind me.

14         THE COURT: Oh, Mr. Russell, correct?  Okay.

15         MR. RUSSELL: Yes, Your Honor.  It's Ken Russell,

16    Attorney ID number 57833.  I did represent Ms. Ockley in

17    the transaction that is at issue here today.  So I am

18    familiar with it.  Mr. Herman asked me to come, I

19    presume as a little bit of a witness, but more of a

20    courtesy to the Court, to provide background if you

21    needed it.

22         THE COURT: Okay.

23         MR. RUSSELL: But I have not entered my

24    representation for Ms. Ockley with regards to the

25    matter.

1          THE COURT: Okay.  Well, I appreciate that you're

2     here and I may have a question for you after I look at

3     the letter.  And then here, the -- I guess when we hear

4     from Counsel, Mr. Herman, in regard to his petition.

5          MR. HERMAN: Your Honor, I briefly looked at what

6     Ms. Ockley has -- intends to present to the Court.  I

7     think it's appropriate for the Court to see it.  Again,

8     I haven't read it in great detail.  But I get the ---

9          THE COURT: Well, whatever is in that letter

10    doesn't prevent the Defendant from commenting, anyway.

11          MR. HERMAN: That's correct.

12          THE COURT: So she's here and she can comment

13    anyway on what she wants the Court to know.

14          MR. HERMAN: If it ---

15          THE COURT: So why don't we proceed?  You can

16    hand that letter up and if you want me to make it part

17    of the record, I will.

18          But, ma'am, you can tell me when it -- I'll give

19    you an opportunity after I hear from Mr.  Herman to

20    address the Court and you can tell me anything you want

21    to tell me, in addition to or in repetition to this

22    letter.

23          So, Mr. Herman, tell me a little bit about this

24    case.  Why are we here?  I mean, I did read your

25    petition.  I do know that there is a -- there was a

1    pending real estate transaction between these parties.

2    What's the problem?  Why are we here today?

3        MR. HERMAN: Thank you, Your Honor.  May it

4    please the Court.  My client is a real estate developer

5    who entered into a real estate agreement of sale for a

6    property on Iven Avenue in Radnor.  That was in October

7    of 2021.  In preparing for closing, which the outside

8    date was the last day of January 2022, it became

9    apparent that the property was up for tax sale.  And it

10   appeared on the August initial tax sale list of the Tax

11   Claim Bureau.  And it was again appearing on the

12   December final list.

13       THE COURT: December of '21?  Okay.

14       MR. HERMAN: 2021.  Was -- December 16th was the

15   tax sale date.  Some discussions occurred between the

16   parties.  And the parties agreed that in return for

17   signing a deed, the Plaintiff, purchaser of the

18   agreement, would release the escrow so that the property

19   could be removed from the tax sale list.  A little bit

20   less than $18,000 was taken from the Plaintiff's

21   deposit, was taken by the Defendant, paid to the Tax

22   Claim Bureau, and the property was removed from the 2021

23   tax sale list.

24       THE COURT: So the escrow you're referring to was

25   the deposit money?

1          MR. HERMAN: Correct.

2          THE COURT: And is -- was there realtors involved

3      in this?

4          MR. HERMAN: There are no realtors involved in

5      this.

6          THE COURT: Well, who was holding the escrow?

7          MR. HERMAN: The escrow was being hold -- held by

8      a title company.

9          THE COURT: Okay.

10         MR. HERMAN: The original outside closing date

11     was December -- was January 31st, 2022.  There were two

12     subsequent extensions, one to mid-April and one to mid-

13     June.

14         THE COURT: Why?

15         MR. HERMAN: Because the Defendant had requested

16     that.

17         THE COURT: Okay.

18         MR. HERMAN: And my client was prepared to

19     accommodate, do whatever was necessary to understand the

20     situation and to move the property in a way that was

21     comfortable for both parties.  In the interim, my client

22     had in turn met with a buyer who signed an agreement

23     with my client, my -- Plaintiff's buyer.  The property

24     was to be demolished and a new home would be built from

25     the Plaintiff's buyer.

1          The Plaintiff's buyer was anxious to move that

2     process forward.  He had his own financing in place.

3     And subsequently, we have learned that the property has

4     been condemned by the Township of Radnor.  It is no

5     longer fit for human habitation.  And we are in a

6     position where -- essentially, I believe that as I

7     learned in law school -- perhaps I'm wrong -- but when

8     an agreement of sale is signed on real estate, the buyer

9     becomes an equitable owner.  But I believe ---

10          THE COURT: Well, that's my understanding of it,

11     Mr. Herman, is the law in the State of Pennsylvania is

12     once the title is transferred -- and it doesn't have to

13     be recorded, but once the title is transferred, they're

14     not actually an equitable owner.  They're an actual

15     owner.

16          MR. HERMAN: That was my point that I was about

17     to make, Judge.

18          THE COURT: They're an equitable owner when they

19     sign the agreement of sale.

20          MR. HERMAN: Correct.  We believe that we could

21     have filed the deed and become the legal owner and ---

22          THE COURT: Well, you're the legal owner once

23     it's signed.  The recording of that deed is just notice

24     to the world that your client is the record owner.

1          MR. HERMAN: Correct.  At this point, the

2      Township of Radnor will not let the Plaintiff move

3      forward with the demolition of the property and issue

4      building permits until the deed is recorded.  This real

5      estate, like other real estate, is unique.  It's not a

6      widget, and therefore the Court has to look at this

7      particular property as though there were no other

8      property like it in the world.  And what we're asking

9      for is to avoid a series of lawsuits, which would

10     transpire, is to give the judicial imprimatur to allow

11     my client to record that deed, move forward.

12          Now, there is an issue related to personal

13     property in the home.  My client has tried to make every

14     single accommodation to the seller as possible.  He was

15     willing to pay for a -- her to be brought from the home.

16          THE COURT: Pay for what?

17          MR. HERMAN: To be brought -- to pay for someone

18     to bring her from the nursing home ---

19          THE COURT: Okay.

20          MR. HERMAN: --- to her home.  Was willing to pay

21     for the moving and storage of those parts of the

22     personal property remaining in the home that the seller

23     wanted to keep.

24          THE COURT: For how long?

1          MR. HERMAN: A period of three months was the

2     offer.  Still on the table.  We prefer two months, but

3     we'd like to get things moving in that regard.  My

4     client, in fact, would testify if it were permitted,

5     that he has deposited the funds with the title property

6     to close.  I have a copy of that check here today.

7          THE COURT: How much are the funds?

8          MR. HERMAN: $545,130.01.

9          THE COURT: Okay.

10          MR. HERMAN: I have a settlement sheet here also.

11          THE COURT: And that's for a property that has

12     been condemned?

13          MR. HERMAN: That is correct.  It has value as a

14     building site for the new home that my client would

15     construct for his buyer.

16          THE COURT: What's the status?  Right now,

17     there's no issue with pending delinquency, correct?

18          MR. HERMAN: In fact, there is, Judge.

19          THE COURT: Okay.

20          MR. HERMAN: I was advised that the property will

21     go back on the August 2022 tax sale list because the

22     cycle has continued.  The taxes remain unpaid.  And

23     essentially ---

1          THE COURT: And that's for the -- you're talking

2     about for the, what, '22 taxes?  Or no, '21 taxes, it

3     would have to be, or before the ---

4          MR. HERMAN: I don't have the specific details,

5     but my experience with the Tax Claim Bureau is, is that

6     it's a three- or four-year run-up before they ---

7          THE COURT: Two years, I believe.

8          MR. HERMAN: Two years.

9          THE COURT: Okay.

10        MR. HERMAN: So an additional year has come, will

11    be added to the total.  Obviously, the earliest taxes we

12    paid.  So it's the -- it's -- another cycle is added.

13    But it will be listed for sale if the seller doesn't pay

14    the taxes.  So we just feel we're the best alternative

15    for everybody just to -- we're ready, willing, and able

16    to close.  We're ready, willing, and able to do whatever

17    is necessary to preserve the personal property.  But my

18    client is afraid of being sued by his buyer if this

19    matter does not move forward.  He's given every

20    accommodation.  We are six months past -- almost six

21    months past the original closing date.

22         THE COURT: Ma'am, what do you want to tell the

23    Court?  And then I'll hear from your attorney, knowing

24    that he's not part of this case and not -- and did not

25    enter his appearance, at least to clarify anything that

```
1       he believes should be clarified.  What do you want to
2       tell the Court?
3            MS. OCKLEY: Yes, Your Honor.  I just want to
4       tell you from the beginning what's going on because most
5       of the things that are in this letter that complain,
6       it's not true.  So I just don't let you know step by
7       step what have ---
8            THE COURT: Well, let me ask you a couple of
9       questions.  Did they pay the delinquency?
10           MS. OCKLEY: I just don't let you know that in
11      October, I talk with the Plaintiff regarding selling my
12      property.   And ---
13           THE COURT: Okay.  But now I was asking about the
14      taxes.
15           MS. OCKLEY: Ah, the taxes.
16           THE COURT: Did they pay the back taxes?
17           MS. OCKLEY: They pay the taxes that I own (sic)
18      in 2019, $17,304.56.
19           THE COURT: Okay.  Do you realize that if they
20      did not pay that, that the Tax Claim Bureau could have
21      advertised your house for sale and somebody could have
22      bid on that house for a substantially less amount, and
23      they would have -- you would have lost title to the
24      property?
```

1          MS. OCKLEY: I can say yes or no because if he

2     did not agree to buy my property, I have two other

3     offers a little bit higher.  But because we continue to

4     talk forth and back in October to sell the property and

5     I am a person to keep my word, I said to him, "All

6     right.  We'll decide when it will be the date."  So in

7     November -- in October we talked, but actually we sign

8     an agreement of sale on November 19, 2021.

9          THE COURT: Okay.

10         MS. OCKLEY: We set up the price and when it will

11    be the settlement date.

12         THE COURT: Okay.

13         MS. OCKLEY: The settlement date was for January

14    31st, 2022.

15         THE COURT: Okay.

16         MS. OCKLEY: Because it was winter, he was of

17    course not -- the Plaintiff cannot do any work in

18    winter, and plus I was in the house with all the

19    belongings in the house.  We said we'll do it in spring.

20    Now, on March 24, I received from the -- from his office

21    -- he has a building company -- I received an email that

22    the next settlement date, it will be set for May 2 --

23    excuse me -- for May 2nd ---

24         THE COURT: Okay.

1   MS. OCKLEY: --- without consulting me.  It was

2  just an email, a poor email.

3   Now, I had an injury to my leg on April 10th and

4  I was to the Bryn Mawr Hospital for surgery.  He came --

5  three days after I had surgery, he came in the hospital

6  with an addendum or amedlun (sic) -- I am not sure the

7  name of the paper -- to sign for next settlement date,

8  June 10th.  And I said to him, to the Plaintiff, "Why

9  you came here?  Can you wait till I get home or I can

10  get better?  Why you came to the hospital?  Why it's

11  such a rush?"  She -- he said to me, "Don't worry.  We

12  will have this signed right now." And if it will takes

13  three, four months to recover so you can go home and

14  sell your property -- because I move overseas.  So I

15  have no other place to live from home.  I have to take -

16  - to buy an airplane ticket and leave.  So I have no ---

17   THE COURT: I'm not following you.  So you were -

18  - you were -- you were -- you injured your leg, you were

19  rehabbing your leg, they wanted you to sign an addendum

20  moving up settlement into June.

21   MS. OCKLEY: Yeah.

22   THE COURT: What was the next thing that

23 happened?

24   MS. OCKLEY: And he said to me, "Don't worry."

25  The -- I was worried because when you sign a paper, it's

1  concern.  You know, this can affect you in some way.

2  And I said, "Greg, why I have to sign this paper?"  And

3  he said to me, "Don't worry.  This is for my office.  If

4  you need three, four months to" ---

5  THE COURT: Okay.  But the paper you're referring

6  to was just an addendum in regard to settlement.

7  MS. OCKLEY: An amendment to the settlement for

8  June 10th.

9  THE COURT: Okay.  All right.

10  MS. OCKLEY: So from this date, June 10th, now

11  I'm in Broomall Manor Rehab, and it will take me maybe

12  another month till I'll be able, maybe more, to recover,

13  to start working because I'm not able to stand up

14  myself.  And I said to him ---

15  THE COURT: So where are you located?  Where are

16  you now living?

17  MS. OCKLEY: At Broomall Manor to recover.

18  THE COURT: Okay.  Okay.

19  MS. OCKLEY: And the problem that he created --

20  and this is the biggest problem of all.  So on -- after

21  June 10th, he continued to call me another -- I have it

22  on the phone -- maybe till June 16.  But a woman from

23  his office -- and you have her name and also her

24  telephone number -- called me.  No, she called me and

25  she said that she called Broomall Manor.  And this is

1     the worst thing that he made for me.  So they

2     called Broomall Manor to ask for the arrangements for me

3     to be removed from Broomall Manor in a stretcher to go

4     home, to stay in the garage so his guys -- I am telling

5     the words that he said -- get through my belongings so I

6     can -- they can be sell or deposit in a storage unit.

7          And I said, "I cannot do that." And plus, I have

8     from the insurance that deny me few days after this

9     woman call my -- the Broomall Manor, the skilled nurse

10    facility.  And it's saying, the therapeutic absence, the

11    -- from the inpatient facility is accepted when such

12    absence is specifically included in a treatment plan.

13    And there is a code here that said that I cannot be

14    removed.  This woman told to the manage ---

15          THE COURT: You cannot be what?   I missed what

16    you said.

17          MS. OCKLEY: I cannot be removed from the

18    facility to go home when I am still doing therapy in

19    order to become better.  I go to a room where I do

20    therapy every single day except Sunday.  So what ---

21          THE COURT: When are you scheduled to be released

22    from Broomall ---

23          MS. OCKLEY: When I will get better.  Next

24    appointment with my surgeon, it is on July 27, I think

25    at 2:00.  I will give you exactly.  And this is the

1       whole file that I have made an appeal to the insurance

2       company because right now I am leaving July 27 -- I can

3       offer you these papers -- at 2:45 p.m.

4               THE COURT: You don't have to offer me any

5       papers.  You can just tell me.

6               MS. OCKLEY: Yes.

7               THE COURT: But I am trying to understand.  Now

8       this happened to you in May, correct?  Your ---

9               MS. OCKLEY: No, no.  In April.  In April.

10              THE COURT: Oh, in April.  Okay.  So when you

11      signed the agreement of sale -- you made reference to it

12      but I don't think I fully understood -- where were you

13      going to go when you sold your property?  Because you

14      can't -- let me say this much.  If I understand it

15      correctly, if all -- if everything that's been

16      represented to me is accurate, I also understand that

17      you can't return to the house anyway, because the

18      township's not going to let you return to the house

19      because it's unfit for human habitation, if I understand

20      it correctly.  So that means you need to make other

21      arrangements.  So my question to you is, what was your

22      intent?  Where were you going to go when you were

23      released from Broomall?

24              MS. OCKLEY: This is the problem because when

25      this woman from his office called Broomall Manor, they -

1    - she told to the management to Broomall Manor, to the

2    administrator, that my house was sold.  These people got

3    concerned and said, "Where -- what is your address where

4    you are going from here?" I said, "My house was not sold

5    yet.  I mean" ---

6    THE COURT: Well, forget being sold.  I

7    understand that you have a pending agreement of sale.

8    That wasn't my question.  My question was, if the

9    township has condemned the property, then you're not

10   allowed to return to the property, regardless.  So

11   putting the agreement of sale aside, even pretending

12   that there was no agreement of sale, what are you going

13   to do?  Where are you going to go if the township

14   doesn't let you back into the property because they've

15   condemned it?

16   MS. OCKLEY: The problem is, and I want to tell

17   you, on the day when I was -- I asked for an emergency

18   room to come -- excuse me -- emergency personnel to come

19   and pick me up from the house, this -- I have also

20   complained for the police officer that he was in my

21   house, and I want to tell you just few minutes, but

22   also, I can show to you this.  So what happened on the

23   day when I supposed to have -- to be removed to go to

24   Bryn Mawr Hospital, this police officer came in the

25   house.  He look around, he asked me for my driving

1   license and I asked him, "Why you need my driving

2   license?  I'm in my home." And he said, "I have to put

3   some -- I have to take some notes."

4     And he took my driving license and he want to go

5   outside from the house.  And I told him, "Why you need

6   my -- to go outside on the street with my driving

7   license?"  I said, "I can give you paper and pen and you

8   can write information from my driving license in front

9   of me."  So I gave him paper and pen, he wrote

10   information from my driving license, and the two members

11   of ambulance put me on a stretcher and took me out from

12   the house.

13     Now, I went to the back door, where is the

14   kitchen -- it was the easiest way to take me out because

15   of the steps.  This police officer remain.  I turn my

16   back a little bit to look.  I said, "Please, you have to

17   go out.  I have this gentleman that he will lock the

18   door and set up the alarm in the house."  The police

19   officer said to him, "No, you have to get out, too." So

20   he forced -- forced exactly -- him to take the car from

21   in front of the garage and leave the property.

22     THE COURT: Okay.  But I -- none of this is

23   really important to me.

24     MS. OCKLEY: No, no, but I just want to tell you

25   why they put this condemn that is not a condemn ---

1       THE COURT: Well, usually the township -- but I

2     don't know what happened in your particular case.

3       MS. OCKLEY: Yeah.

4       THE COURT: But normally, the township and Code

5     Enforcement goes in and then they -- they're the ones

6     that usually condemn it.  But whether it was the police

7     or Code Enforcement, I'm not clear.  But it's a concern,

8     where if they don't let you back in the property ---

9       MS. OCKLEY: Yeah, because I'm sorry ---

10      THE COURT: Can you make arrangements for -- to

11    have -- you've heard their offer.  Their offer was to

12    put your -- all of your personal belongings into storage

13    for you.  And also, you could -- there are places -- and

14    you have the financial wherewithal, apparently, and I

15    don't know all the circumstances surrounding your

16    financial condition, but obviously this is a significant

17    amount of money coming out of settlement.  So my

18    question to you is, there are even apartments that would

19    rent -- even furnished apartments that would rent.  Have

20    you tried to make arrangements to locate a new address

21    since this property is already sold?   You already sold

22    this property?

23      MS. OCKLEY: No, Your Honor, because my intention

24    are not to be in United States and I told him so many

25    times.

1          THE COURT: Where are you going?

2          MS. OCKLEY: I am going overseas.  I will live

3     overseas.

4          THE COURT: Where are you going?

5          MS. OCKLEY: Romania.

6          THE COURT: Okay.

7          MS. OCKLEY: Bucharest, Romania.  So I told him

8     several times, "What is the purpose to put all my

9     belongings on a storage unit when I intend to sell?"

10     And this is the reason I come to your question mark, why

11     the house is condemned, because there is a lot of stuff

12     that I moved from the back of the house toward the

13     living room so I can moving to the garage so people will

14     buy it.  And already I made arrangements with some

15     people to buy furniture, art, everything that is in the

16     house.  I just will prepare whatever I need to ship

17     overseas and that's it.  So my idea of him telling me

18     that my guys will get in your house to storage of stuff,

19     I am not comfortable, Your Honor.  I don't think

20     nobody's comfortable to get through your private

21     belongings.  I mean, private.  So I just appreciate

22     [inaudible 10:50:28] ---

23          THE COURT: Well, how can you -- can you go to

24     the -- you've made it here to court today.

25          MS. OCKLEY: Yes.

1    THE COURT: Can you go to your house and see what

2    items you want preserved and what items you want

3    destroyed or thrown away?

4    MS. OCKLEY: Well, no.  I can do that.  But till

5    -- I will need a little bit more time to recover because

6    from this Broomall facility, they will let me go.  But

7    the problem is who is paying now because after this

8    phone call from this person from his office, my

9    insurance was denied?  I mean, every day to the Broomall

10   Manor, I have to pay $300 only for a bed in the room,

11   plus $160 for therapy.  Who is paying $460 a day?  Who

12   is affording that?  Causing me in a way that he said,

13   "Oh, I'll help you." Actually, he caused me more

14   problems than I suppose.  And now I filed a complaint to

15   the Defense department in order to see this.  I just

16   sent it last week with FedEx -- last Friday.  It's --

17   already has a number.

18   THE COURT: Yeah.

19   MS. OCKLEY: All this file for my insurance

20   company because was denied.  Why?  Because they called

21   and, of course, insurance -- excuse me -- Broomall Manor

22   will obtain more money from a private person paying

23   because my house was sold instead having insurance to

24   pay.  So ---

1          THE COURT: Yeah, I'm not sure what all that

2     means, but I can ask you another question.  What is your

3     intent in regard to this real estate transaction?  What

4     is your intent?  Well, what is your -- what are you ---

5          MS. OCKLEY: My real intended, he knows very

6     well.  I said, "Give me a little bit of time to recover

7     with my foot."

8          THE COURT: And how much is a little bit of time?

9          MS. OCKLEY: I said I will leave, I think, the

10     property because they said to me to -- I will need

11     three -- at least three months to recover or four.  But

12     in this case, I said if I will have the time maybe of

13     1st of September to leave the house empty and leave

14     because I will buy a air-flying ticket and I'm leaving.

15     What is the purpose to move in a storage unit?  And

16     after all -- have set up an apartment to stay when

17     actually I'm leaving from here?  My intention are to go

18     to my house.  It's my house still and I want to remove

19     everything from the house.  And after that, he can have

20     the key and he can do whatever he wants.  And he knows -

21     --

22          THE COURT: Let me hear from Mr. Russell.

23          MR. RUSSELL: Your Honor, Ms. Ockley came to me.

24     I took over Pete Rahana's (phonetic) practice.  He was

25     one of Pete's clients.  And I have done my best to try

1    and handle some of Pete's outstanding matters.  This was

2    one of them.

3         THE COURT: Okay.

4         MR. RUSSELL: I thought we did excellent legal

5    work with the help of Mr. Lingo.

6         THE COURT: Who's Mr. Lingo?

7         MR. HERMAN: Principal of the Plaintiff, Your

8    Honor.

9         MR. RUSSELL: I'm sorry.

10        THE COURT: Okay.

11        MR. HERMAN: He's sitting next to me.

12        MR. RUSSELL: And initially, Ms. Ockley had the

13   Sheriff's sale scheduled and it was absolutely no way

14   that we were getting that payment.  She didn't have the

15   payment.  That was -- that payment was coming from

16   nowhere.  So Mr. Lingo went above and beyond and we came

17   to an agreement that if we executed the deed and put it

18   in escrow, that he would release the escrow money

19   because we didn't have anything to sell if it went to

20   Sheriff's sale.  So Mr. Lingo then went above and

21   beyond.  He released the escrow money.  Ms. Ockley was

22   able to keep the home.  And then at that point, we did

23   sign the entire deed in order to secure the money to

24   keep the house.  So it did -- then went into escrow with

25   the title company and then it was just a matter of

1      closing.  So -- and we would never have put the deed and

2      signed the deed, but Mr. Lingo saved the house for us.

3      And so the house should close.

4      And it's been delayed and it's been delayed and

5      it's been delayed.  And I could provide -- at that

6      point, I couldn't provide effective representation for

7      Ms. Ockley in this place because I thought we did

8      excellent legal work for her to get the proceeds of the

9      sale.  And at this point, she's receiving over $400,000

10      from the sale.  I don't know what the nursing home did.

11      Obviously, the nursing home, if they would have known

12      the house was being sold, realized she was a private

13      pay, and had her pay privately.  That's their agreement.

14      With regard to Mr. Lingo, he had other arrangements with

15      buyers.  And that -- you know, it should be honored.

16      And so I could not effectively represent Ms. Ockley

17      because I believe we saved the property for her.  She's

18      pocketing over $400,000.  And that's the transaction

19      that was set up.

20      THE COURT: Anything ---

21      MR. HERMAN: And just to -- for the record, it's

22      $492,000 ---

23      THE COURT: Okay.

24      MR. HERMAN: --- would be her proceeds.

1          THE COURT: Obviously, a substantial amount, no

2     different than I previously commented on.  What about if

3     -- what about if the way we handle this ---

4          And, ma'am, you have a good attorney.  I'm not

5     sure why you don't have your attorney representing you

6     here today.  And I'm very gracious that he took the

7     opportunity to come to court today to inform the Court

8     and assist the Court in trying to reach a decision

9     that's fair and equitable to all the parties concerned.

10    But you understand that it's completely unfair to the

11    Plaintiff to be delaying this for many different

12    reasons, including the fact that if you've watched the

13    news while you're in the nursing home, interest rates

14    are going up.  It makes it more difficult to move

15    property when buyers have to qualify for financing.  And

16    that's one of the concerns they pointed out in their

17    petition.  And that's one of the real concerns that

18    buyers are facing today because the interest rates were

19    so cheap, and now they're just inching up, inching up.

20    And they may go up again this month, even before it's

21    all said and done.  On the other hand, you've

22    represented to this court that you want till September

23    1st.  Why can't we reach an agreement by way of a court

24    order between the counsels to put a court order together

25    indicating that this property has to go to the

1      settlement owner before September 1st and whatever else

2      you want in that order to make sure that the property --

3      that it's funded and goes to -- goes to sale?

4            MR. HERMAN: Your Honor, my client ---

5            THE COURT: It's six weeks away.

6            MR. HERMAN: The buyer's -- the Plaintiff's

7      buyer's rate lock expired already.  He's able to extend

8      it through the end of July, but we will lose our buyer.

9      We will clearly lose our buyer if we have to wait till

10     September 1st.  We're willing to do whatever is

11     necessary so that the Defendant can sort through her

12     personal property.  But it -- she can't ---

13           THE COURT: Well, she's asking for -- like, she's

14     in a rehab.  She doesn't have access to her house.  It's

15     very unique circumstances.  This is not a typical

16     situation, obviously.  She's been in a nursing facility.

17     She appears to be -- attempting to be cooperative.  I

18     mean, July 31st is obviously two weeks away.  She's --

19     it's probably unreasonable to have her do it by July

20     31st.

21           MR. HERMAN: If I may, Your Honor?  As long as

22     Plaintiff can file the deed, the ability of the

23     Defendant to retain possession or access to her personal

24     property is something that can be arranged, either at

25     the location ---

1          THE COURT: Okay.

2          Ma'am, do you hear what's being offered?

3     What's being offered is if we -- if we have the -- if we

4     process the -- basically, if I'm understanding you

5     correctly, to allow the transfer to occur.  And the deed

6     being recorded, basically, is the transfer to occur and

7     the deal being funded, meaning that you're going to walk

8     away with a check, but there's going to be an agreement

9     that they will not access this property until on or

10    before September 1st, where you would have to get your

11    belongings out.  And you -- your attorney or whomever

12    can work out maybe a possible stipulation for the

13    additional two months in storage.  So there's some

14    solutions here that they're trying to work with, that

15    may assist them in coming to a resolution from their

16    concerns, based on the loss of their potential buyer

17    because the house is still going to take a while to

18    demolish and then, ultimately, to build a new house.

19    And the buyer's going to have to wait for that, but I

20    guess he can lock in a rate.  I don't -- is that the

21    idea?

22          MR. HERMAN: I'm advised by my client that as

23    long as the deed can be filed and the property moved

24    forward in the second transaction, September 1st is an

25    acceptable date for us to work with Ms. Ockley in terms

1     of getting her stuff out. Choosing it. She can sell

2     it. We'll give access. We'll work with her. This is a

3     situation with -- where I hope no good deed goes

4     unpunished. We really want to be the -- do the right

5     thing. And, so, I would ask ---

6     THE COURT: Oh, I know. And it's difficult for

7     this court because of the circumstances. It's obviously

8     -- the legal equities, to a great extent, are in your

9     favor. However, these are very unique factors where I

10    don't believe Ms. Ockley is intentionally trying to

11    prevent a settlement. If that was the case, then I

12    would have a different approach.

13    But, ma'am, what I'm suggesting to you

14    respectfully -- I can't order it, but what I'm

15    suggesting to you respectfully is that you retain Mr.

16    Russell to assist you in reviewing these legal documents

17    because you've retained him in this transaction.

18    Continue to utilize his services, continue to pay for

19    his services, because he's going to try to assist you in

20    achieving what's been represented here in court. And

21    then I'll wait to hear back from Counsel before the end

22    of this month to see if that stipulation and agreement,

23    and then they can send me an order, what was represented

24    here today in regard to processing everything, by the

1        end of the month, but allowing you to return to the

2        property for that period of time.  Okay?

3             MS. OCKLEY: I have -- I have several question,

4        Judge.  First of all, I want to ask you, now, if I will

5        transfer -- I don't want to transfer the deed of the

6        house yet.

7             THE COURT: It's already transferred, ma'am.

8             MS. OCKLEY: No, just to be -- to be on his name

9        or sign -- I have to sign the deed.  I ---

10            THE COURT: It's already signed.  It's all over.

11       That part -- that's very difficult for this court, by

12       the way, because in my -- in my opinion, and I didn't

13       look it up for this hearing today, I just remember doing

14       a case a few months back where I did look up because it

15       was a big issue as to when title transfers or when the -

16       - when does a person become from an equitable owner to

17       an actual owner?  And the -- as I just quoted the law

18       you may have heard when I was talking to Mr. Herman was

19       that an equitable owner under Pennsylvania law is when

20       you sign the agreement of sale.

21            If you didn't transfer the deed, I think what

22       we'd be doing here is there'd be some claim for specific

23       performance, as I've done in other cases, address the

24       issue of specific performance.  But because the deed has

25       already been signed, they're asking for a special --

1     this is a special hearing because the property,

2     technically -- and I know you may not fully appreciate

3     it and your attorney can explain it, but the property,

4     once it was signed to the new party, the new owner, that

5     is when the actual title, the legal ownership,

6     transferred.  You're not even the owner of that property

7     anymore, technically, because you voluntarily,

8     knowingly, and intelligently signed that deed over to

9     another person.  So you don't own the property, from my

10    perspective.

11         However, there's a lot of equities here that

12    we're trying to work through.  There was an agreement

13    that they would keep the title in escrow, meaning they

14    would not record it.  Recording it, just is notice to

15    the world that somebody else owns the property.  So if I

16    was to look up your property on the Internet in our

17    Recorder of Deeds office, it would have your name, not

18    the corporation that's developing the property.  So --

19    but when they record it, it'll have the corporation's

20    name.  But that's not ownership.  That's just notice to

21    the world as to who the owner is.

22         So title's transferred.  We're just trying to

23    work out a solution that is beneficial for you to

24    retrieve your items that are stored there and to move on

25    with your life to the best of your ability.  Okay?

1          MS. OCKLEY: Yes.  But I have -- I have a

2     question.

3          THE COURT: Okay.

4          MS. OCKLEY: This facility, because they steer

5     the -- my situation to this Broomall facility, calling

6     and asking and telling to administrator over there that

7     I sold my property.  Now, when they said, "When you

8     discharge, what is your address?  Where are you going?"

9     And I said, "I am going to my house."  The second thing

10    that I have, it's also the money.  Who is responsible of

11    this $460 a day that I am charged for ---

12         THE COURT: I have nothing to do, ma'am, with

13    that.  I don't know about your insurance.  You could

14    appeal your insurance.

15         MS. OCKLEY: Yeah.  But it's because -- it's

16    because of their phone call.  They just cause more

17    problem to me immediately on the June ---

18         THE COURT: Maybe -- again, I would -- this is

19    what I would recommend.  It's so important, and not just

20    in this transaction, but what you're describing me

21    between your relationship with the nursing facility,

22    it's so important to have an attorney assist you.  So --

23    and you could reach a fee agreement with that attorney,

24    whatever you deem appropriate, whatever they deem

25    appropriate.  But it's important.  They may be able to

1     straighten that out for you.  They may not.  I don't

2     know the answer to that.  But it's separate and apart

3     because you did technically transfer your property.  So

4     nothing they did, whether you agree with what they did

5     or don't agree with what they did, if they called the

6     facility and said that you're not the owner, technically

7     it was true.  You're technically not the owner of the

8     property once you transferred the title.  However, your

9     attorney may be able to straighten out the issue with

10    the nursing facility because I don't understand why

11    insurance -- I don't -- is denying -- if it's medical

12    care insurance, I don't understand why medical care

13    insurance is denying insurance over where you're living

14    when you're released from the facility.  I don't ---

15         MS. OCKLEY: No, no, no, it's not about this.

16    What happened when they call and they said that my house

17    was sold, that means for the administrator over there

18    that I had money so I can pay from my pocket $460 a day.

19    The ---

20         THE COURT: Yeah, I don't know anything about

21    that but you may be obligated to pay whatever the law

22    requires you to pay.

23         MS. OCKLEY: Yeah, but I have an insurance.

24    Insurance was able to pay till June 17th.  Why they

25    stopped paying the insurance, because facility -- when

1       they called, they said that I can be removed from the

2       facility with a stretcher to go to my house.  So the

3       facility said, "Oh, she has money.  Now she will be able

4       to stand in the garage to remove the stuff.  So we are

5       not -- we are not able to do her therapy continuously."

6       And on this report from the insurance, it's just saying,

7       "Therapeutic absence."  So this is -- they cause me this

8       problem.  They should be responsible for the fact that

9       now I have to pay from the pocket ---

10              THE COURT: Ma'am, I can't order a third-party

11      entity to pay your -- to pay your hospital costs.  But -

12      --

13              MS. OCKLEY: Yeah.  But they caused ---

14              THE COURT: --- Mr. Russell wants to say

15      something.

16              MR. RUSSELL: Yeah.  Your Honor, in all

17      likelihood, sometimes when a nursing home on Medicaid,

18      if somebody owns a house, they don't look at it.

19              MS. OCKLEY: No.

20              MR. RUSSELL: If someone has money, they need to

21      pay the -- they need to pay their amount.  So I think

22      what's happening here is a recognition that she no

23      longer owns the house, which is accurate, and she'll

24      have the proceeds of the sale, which triggers her

25      requirement to privately pay, which really has nothing

1    to do with Mr. Lingo.  It really has to do with an

2    accurate understanding of where she is with the

3    transaction.

4         THE COURT: Yeah, ma'am.  I don't know if you

5    have any exceptions to that.  Like I said, you can

6    consult with an attorney.  It has nothing to do with

7    this deal.  If -- it may be a side effect of what has

8    occurred here, but it has nothing to do with what the

9    agreement was.

10        MR. RUSSELL: So I ---

11        MS. OCKLEY: The insurance ---

12        THE COURT: If you would have hit -- if you would

13   have hit the lottery, if you were a lottery player ---

14        MS. OCKLEY: Yes, it's written on the insurance.

15        THE COURT: --- and then you -- and for whatever

16   reason, because of your -- the insurance will say,

17   "Well, now you hit the lottery.  You have to contribute

18   to your medical costs," there's nothing I can do about

19   the fact that you're coming into money.

20        MS. OCKLEY: Your Honor, but even like that,

21   because I study a lot while I was over there.  If you

22   own a lottery ticket, you have to -- you have to pay a

23   little, not the full amount.  I am paying like a private

24   resident, $320 for a bed in a small room plus $160 for

25   the therapy because ---

1        THE COURT: I don't know what to tell you, ma'am.

2        I can't -- I can't address that.

3        MS. OCKLEY: Yeah, but because of their phone

4        call.  The phone call should not be to the

5        administrator.  Everybody now knows that I have a house

6        that is sold.

7        MR. RUSSELL: It's really not -- it's not because

8        of the phone call.  It's because of the transaction.

9        And -- so my issue with this, Your Honor, and

10       the reason I'm probably not sitting in this chair -- I'm

11       sitting back here -- is what really needs to happen is

12       the closing needs to occur almost as soon as possible.

13       Mr. Lingo had offered Ms. Ockley the ability to store

14       the property or that he wanted to touch the property

15       because her only concern now, at least from her

16       standpoint, is her personal property.  She's obviously

17       able to come here.  She's able to go there.  But if

18       she's leaving and she's -- that property's condemned,

19       the only other interest is her personal property.  The

20       property needs to close.  She needs to get her personal

21       property out.  But the problem is she won't do that.

22       THE COURT: Well, you have to because if not, it

23       will be disposed of and you won't have any rights to it

24       at some point.

1          MS. OCKLEY: Yeah.  But I just said I want by
2     September 1st.
3          THE COURT: Right.  That's what we agreed to.  We
4     agreed to September 1st.
5          MS. OCKLEY: Yeah.  1st, yes.
6          THE COURT: Okay.
7          MR. HERMAN: That's okay.  But the closing -- I
8     think if ---
9          THE COURT: The closing, though, you -- the
10    closing is going to have to occur before the end of --
11    but you're going to be able to retrieve and/or go back
12    to this property somehow if you get permission to do so.
13    But as of September 1st, you have to be out of the
14    property and everything has to be resolved.  But right
15    now, we're still going to allow the closing to occur but
16    you're going to still have a right.  Your attorney will
17    assist and there'll be an agreement, a court order,
18    that'll make -- that'll incorporate an agreement between
19    the parties that says that although the property has
20    been officially sold, that you're allowed to live and/or
21    access the property up until September 1st.
22         MS. OCKLEY: Your Honor, what I want because I
23    was trapped on this June 10th signature when he came --
24    the Plaintiff came to the hospital -- and I don't trust
25    him anymore -- under this pretention ---

```
1                THE COURT: That's why I'm asking you -- I'm
2        respectfully suggesting to you since you have dealt with
3        Mr. Russell, he's trying to protect your interest to ---
4                MS. OCKLEY: Oh, no, I'm not talking -- I'm sorry
5        that I interrupt you.  I'm not talking about
6        Mr. Russell.  I'm talking about the Plaintiff because --
7        -
8                THE COURT: I know you are.  But he -- if you
9        have an attorney protecting you, you don't have to worry
10       about anything -- any concerns that you have with
11       dealing directly with the other side, the other
12       attorneys, the other parties.  You won't be dealing
13       directly with them.  Your attorney will.
14               MS. OCKLEY: See, Judge, if he -- if he will
15       transfer -- the Plaintiff transfer property to --
16       immediately to this person that he won't -- he will have
17       a new house on my -- on my land, that means this -- it
18       will be the new owner.  What -- I need something in
19       written but very seriously, because he -- for example,
20       he can put a sign, "No Trespassing."  He can call Radnor
21       Township Police and say, "She's not allowed."  People to
22       ---
23               THE COURT: I don't know what you're saying.
24       We'll have a court order allowing you access and/or
```

```
1       residency at this property up until September 1st.  So
2       you'll have a court order in your hand.
3            MS. OCKLEY: Okay.  That, it will be all right
4       because I don't want -- I don't want, you know, asking
5       for police or somebody.  The Plaintiff has a lot of
6       properties building in this township.  He has a lot of
7       relation to the Radnor Township.  Of course, he said,
8       "Oh, I will help you.  I will help you with police issue
9       that I have regarding my house.  I will help with the
10      code officer."  He did not do anything.  Only promises
11      and nothing happened.  So I just trust myself with my
12      judgment.
13           MR. HERMAN: We won't be getting $492,000 in our
14      pocket.  That's -- that ---
15           MS. OCKLEY: For me, Judge, is more important
16      your character.  Your money means a little bit in my
17      case right now.  I want to be [inaudible 11:12:25].
18           THE COURT: Well, let's try to work through it.
19      Look, I'm asking you and you've agreed to allow your
20      attorney to handle some of the legal aspects.  You're
21      going to have to pay him, but there'll be money at
22      settlement to pay him.  So you need to make sure that
23      you feel comfortable, you're protected.  I'm giving you
24      to September 1st to live and/or access the property.
25      But not -- but, again, it has -- the transfer has to go
```

1      through.  If you feel that a problem develops and you're

2      unhappy, go to your attorney.  And if necessary, we'll

3      have another hearing in court and I'll address your

4      concerns.  But let's hope that that's not necessary and

5      that by the end of the month, they'll have an order.

6      I'll sign an order and you'll have access to this court

7      order -- you'll get a copy of it -- that will preserve

8      the rights that you're asking for in this courtroom and

9      at the same time, allow settlement to go through.  Okay?

10         MS. OCKLEY: I -- in my judgment, I thought the

11     best way for me to be protected: it's this settlement

12     and everything else to be -- everything to be resolved

13     on the 1st of September.  One ---

14         THE COURT: We can't do that because of the fact

15     that the -- they're going to lose the deal that they had

16     set up all this time.

17         MS. OCKLEY: Yeah, but I have a question, Judge.

18     For example -- for example, if somebody -- he actually

19     did not have actually the deed in his hand without my

20     signature.  He had it ---

21         THE COURT: He doesn't have it in his hand.  He -

22     - I'm told, at least that's what I've read -- it's in

23     escrow, which means, I'm assuming, the title company is

24     holding it.

25         MR. HERMAN: Yes, Your Honor.

1          MS. OCKLEY: Yes.  But ---

2          THE COURT: And so the title company is sitting

3     on this and they're waiting for a court order probably

4     or they're waiting for some consent by the parties to

5     move this thing forward.

6          MS. OCKLEY: Yeah.  Yeah.  But this person that

7     is buying the property that he said that he has it, how

8     he signed a contract with somebody -- with a ghost deed,

9     or with not having ---

10         THE COURT: Well, I'm assuming he's put

11    contingencies into his agreement of sale.  There's

12    nothing stopping someone from entering into another

13    agreement.  It's not illegal to do that.  And if his

14    attorney was assisting him, they probably put certain

15    contingencies in there to protect the seller, in this

16    case, the Plaintiff here, if something went wrong.  But,

17    again, there's a financial interest here -- and that's

18    what drives a lot of this.  But there's a financial

19    interest here and there's a financial interest for the

20    buyers because of the way the rates are going.  So I

21    understand you have this mistrust, but I'm trying to

22    accommodate your concerns by structuring it this way

23    because you're already not the owner of the property, as

24    I mentioned a number of times during my comments today.

1       So rely on your attorney.  I think he's fighting

2    hard to try to resolve this issue for you.  And we'll

3    try to get it resolved in this way.  I'm not going to

4    allow everything to occur on the 1st because of what was

5    represented here during the course of this proceeding

6    over the jeopardy that may occur if I were to reach that

7    decision.  Okay?  Even though it's only six weeks away,

8    I would ask that you address any of those matters with

9    your attorney.  Okay?

10       MS. OCKLEY: These two matters I have.  First of

11    all, how I resolve this problem with -- to pay from my

12    pocket for this nursing home ---

13       THE COURT: I can't deal with that at all.  I

14    have nothing to do.  I can't even address it.

15       MS. OCKLEY: And another thing that I have, on

16    the contract that I signed, he said that I should -- the

17    survey -- I'm responsible for the survey.  And I said to

18    the Plaintiff when we -- over the phone, not when I

19    signed this contract of sale, I said, "Listen, I have --

20    I can provide you.  We were the single owner of this

21    property from 1952.  So I have everything that you will

22    need." Why now I am responsible to pay for the survey

23    when already, even if you go here, and I have also the

24    plans of the house, of the property, we have fences all

25    around the property.  Why I'm responsible right now to

1　pay?  Because on the Pennsylvania law said that if you

2　have -- if you have already this surveyed, maybe you are

3　not responsible.

4　　　THE COURT: Well, Pennsylvania -- you're correct

5　that Pennsylvania doesn't -- it doesn't require a

6　survey.  But what you agreed to in your agreement of

7　sale controls in regard to Pennsylvania law as it

8　relates to breach of contract or contractual obligation.

9　So go ahead.

10　　　MR. RUSSELL: Your Honor, you -- Your Honor

11　framed, and I think all three -- myself, Mr. Herman, and

12　yourself know exactly how to resolve it.  I mean, the

13　closing has to occur by July.  Ms. Ockley can gain

14　access under Mr. -- under the supervision, to go in,

15　clean out her property, which is her only interest in

16　the property, and then therefore finish it by September

17　1st.  Those are the two elements that need to go in.  My

18　-- I will not be able to have Ms. Ockley voluntarily

19　agree to those two elements.  That's exactly what has to

20　happen here.

21　　　THE COURT: Well, that's why I'm asking that an

22　order be prepared, reflecting that so that I can order

23　it.

24　　　MR. HERMAN: Your Honor, I will -- I will send an

25　order to you by the end of tomorrow, perhaps today.

1          THE COURT: Okay.  So I'm going to order it,
2     ma'am.  You know what I mean?   I'm going to force the
3     issue.  I know what your request is and I am trying to
4     accommodate you.  That's why you have until September
5     2nd -- or 1st.  So -- and that's why I'm -- but there's
6     going to be an order that allows all this to occur.
7     Okay?
8          MS. OCKLEY: Yeah.  But right now, my attorney,
9     he just told me that I should go on my property under
10     their supervision.  I don't think it's right that I
11     should go ---
12          THE COURT: Well, it wasn't their supervision.
13     What they were saying to you is they were going to
14     assist you in -- if you go to the property, they were
15     going to move it for you, and they were going to store
16     it for you, and they were going to dispose of what you
17     want disposed of and save what you wanted saving.  It
18     wasn't their supervision.  It was their accommodation to
19     try to address some of your concerns.  It's my
20     understanding.
21          MS. OCKLEY: No, I -- yeah -- yeah ---
22          THE COURT: You have free access to this property
23     to do whatever you want from now until September 1st.
24          MS. OCKLEY: Yeah.  Yeah.  That ---
25          THE COURT: Okay?   You don't need them there.

1          MS. OCKLEY: Yeah.  I prefer to do things on my

2    own.  I don't think you or ---

3          THE COURT: Okay.  Just make sure the order

4    reflects that she has that complete and free access up

5    until the 1st.

6          MR. HERMAN: She'll have access.  But she'll have

7    to gain access in a particular moment by giving us

8    notice, and we have the keys, and we'll unlock it.

9    [Inaudible 11:18:51] ---

10         THE COURT: Well, you know, no, no, no, no.

11         MS. OCKLEY: No.

12         THE COURT: You've got to let her -- I mean,

13    almost like she's going to become a tenant at this

14    point, if that's what you mean.  You can't -- you can't

15    have her -- if you're going to say she has complete

16    access and can stay in the property, even, you can't

17    say, "I'm -- I want to -- I'm going to let her in today

18    but not tomorrow.  I'm going to" -- she may even move

19    there.  I don't know.  I don't know what her ---

20         MR. HERMAN: Judge, she can't move in there.

21    Radnor Township will not allow [inaudible 11:19:12] ---

22         THE COURT: Well, that's fine, but I don't know

23    if she goes in and fixes up -- if -- that's a different

24    issue.  I called Resident Center Access for a very

25    specific reasons.  I don't know if she can correct what

1      was preventing her from -- or removing, I guess, the

2      condemnation.  I don't know what the issues are.

3             MR. HERMAN: Well, it raises issues of liability

4      if ---

5             THE COURT: Sure, it does.

6             MR. HERMAN: --- if the -- if the Defendant says

7      something is here and it's not here anymore and you took

8      it, well, we ---

9             THE COURT: What's stopping that right now from

10     happening because your client's now the owner of that

11     property?

12            MR. HERMAN: I suppose that's correct, Your

13     Honor.

14            THE COURT: Okay.

15            MR. HERMAN: I just want to avoid future

16     problems.

17            THE COURT: So do I, but I don't know.  This is a

18     very difficult situation.

19            MR. HERMAN: The tree can only bend so far and I

20     appreciate that, Judge.  [Inaudible 11:19:57].

21            THE COURT: But I mean, it's either -- it either

22     is or it isn't.  I mean, it's -- in other words, it's

23     either allow her to have this unfettered access to the

24     property or you don't.  And so that's the issue.  And if

1    you don't, then I think we need to wait till September

2    1st and allow her ---

3        MS. OCKLEY: That it will be [inaudible

4    11:20:14].

5        THE COURT: --- the same status as she's doing

6    now.  So come up -- talk to Mr. Russell.  See if you can

7    come up with some language that you can both agree to.

8        MR. HERMAN: My client advises that the

9    unfettered access is not an issue.

10       THE COURT: Okay.

11       MR. HERMAN: So we'll abide by the Court's

12   suggestion.

13       THE COURT: All right.

14       MS. OCKLEY: See, Judge, that it was the reason

15   that I wanted till September 1st because I don't want

16   them to get -- gain access to my house till I am not

17   leaving from over there [inaudible 11:20:37] ---

18       THE COURT: Well, they just agreed to -- even

19   though the deed is transferred and even though they're

20   going to go through settlement, they've just agreed and

21   it'll be part of the court order that's going to allow

22   you to ---

23       MS. OCKLEY: Yes.  Please, I want you to specify

24   clear over there because they can put ---

25       THE COURT: It'll be in the court order.

1      MS. OCKLEY: Yeah.

2      THE COURT: And I'm respectfully requesting again

3      -- I know I said it three times now, but I'm going to

4      say it four -- that you have Mr. Russell look over

5      everything for you.  Okay?

6      MS. OCKLEY: Yeah.

7      THE COURT: Okay.

8      MS. OCKLEY: Yeah.

9      THE COURT: All right.  Anything else?

10     MS. OCKLEY: Thank you very much, Judge.

11     THE COURT: You're welcome, ma'am.  Good luck to

12     you.  I hope your health is better.  I hope you're

13     feeling better.

14     MS. OCKLEY: Yeah.  The paper that I gave to you.

15     Can I have a copy?  Do you need this?  I ---

16     THE COURT: I can give it back to you because

17     everything you said is on the record.  It's not really

18     marked as an exhibit.  Everything you wanted to tell me

19     ---

20     MS. OCKLEY: Yeah.  Yeah.

21     THE COURT: Okay.  I can give it back to you.

22     Return it.

23     MR. RUSSELL: Thank you, Your Honor.

24     MS. OCKLEY: Yeah.  If you want, I -- we can make

25     the copy.

1        THE COURT: You can mail a copy to me if you want

2    to.

3        MR. HERMAN: And I prefer a copy also, Judge, if

4    the copy's being ---

5        THE COURT:  Okay.  Can you bring -- can you send

6    me either two copies or send one copy to Counsel?

7        MS. OCKLEY: I will ---

8        THE CLERK: [Inaudible 11:21:35] copies.

9        THE COURT: Okay.  You know what?  We were just -

10    - we can make copies here, I'm just told.

11        MS. OCKLEY: Okay.  That's fine.

12        THE COURT: So let's make two copies.  And you

13    can have the original back.

14        And then, Mr. Russell, do you want a copy?

15        MS. OCKLEY: This is the same notes.  These are

16    the same notes.  That it ---

17        MR. RUSSELL: Yeah.  You should -- you should

18    give him everything.  Just give her everything.

19        THE COURT: All right, let's make three copies.

20        MS. OCKLEY: Okay.  Okay, that's fine.

21        THE COURT: Three copies, please.

22        MS. OCKLEY: Yeah.

23        MR. HERMAN: Your Honor, I believe that would

24    conclude my business before the Court today.  May I be

25    excused?

1          THE COURT: Okay.  Well, you got -- what you can

2      do is you can remain in the courtroom.  They'll bring

3      you a copy.  That ends the case.

4          MS. OCKLEY: Sure.  Thank you, Judge.

5          THE COURT: And, ma'am, again, I wish you the

6      best.

7          MS. OCKLEY: Thank you.

8          THE COURT: I think they're trying to accommodate

9      you.  I wish you the best.  And if you end up in the

10      very near future, what it sounds like you are going back

11      to Romania, then I wish you safe travel.

12          MS. OCKLEY: Thank you so much, Judge.

13          THE COURT: And I wish you the best.  Okay?

14          MS. OCKLEY: I really appreciate.  I really

15      appreciate Your Honor ---

16          THE COURT: All right.  You take care.

17          [Proceedings Concluded at 11:29 a.m.]

18

C E R T I F I C A T E

I, Richard Coogan, hereby certify that the proceedings and evidence are contained fully and accurately on digital multi-track recording; that the recording was reduced to typewriting by my direction; and that this is a correct transcript of the same.

_____

Richard Coogan, Director
Electronic Recording Center

Officemotive, Inc. DBA Capital Typing., hereby certifies that the attached pages represent an accurate transcript of the multi-track digital sound recording of the proceedings in the Court of Common Pleas of Delaware County, Pennsylvania, in the matter of:


ROCKWELL GLYNN, LP

VS.

SIMONA OCKLEY

CV-2022-4275


BY:


_____
John H. Hingson IV, CET-1938
Transcriber for
Officemotive, Inc. DBA Capital Typing




The foregoing record of the proceedings upon the hearing of the above cause is hereby approved and directed to be filed.


_____
Judge