<u>**Exhibit 35**</u>

***Sergeant Fischer Deposition Transcript
May 13, 2025***

# Deposition Transcript

Case Number: 2:24-cv-0470-GAW
Date: May 13, 2025

In the matter of:

## OCKLEY v TOWNSHIP OF RADNOR, PENNSYLVANIA, et al.

# Sergeant Michael Fischer

**CERTIFIED COPY**

Reported by:
Noelle R. Nevius



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

1          IN THE UNITED STATES DISTRICT COURT FOR

2            THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   SIMONA OCKLEY,                    )   CIVIL ACTION NO:

5                Plaintiff,           )   2:24-cv-0470-GAW

6                                     )

7   -vs-                             )

8                                     )

9   TOWNSHIP OF RADNOR,              )

10  PENNSYLVANIA, et al.,            )

11               Defendants.          )

12

13               Videotape deposition of SERGEANT

14    MICHAEL FISCHER, duly sworn, was taken on

15    Tuesday, May 13, 2025, between the times of

16    2:12 p.m. and 3:49 p.m., before Noelle R. Nevius,

17    Professional Stenographer, reported by machine

18    shorthand, after which time the deposition was

19    reduced to writing and set forth as follows:

20

21

22

23

24

25

**Page 2**

```
 1   A P P E A R A N C E S :

 2

 3

 4   FOR THE PLAINTIFF:

 5   SCHROM, SHAFFER & BOTEL, P.C.

 6   BY:  GERARD SCHROM, ESQUIRE

 7   ELIZABETH MALLOY, PARALEGAL

 8   4 West Front Street

 9   Media, Pennsylvania 19063

10   610-565-5050

11

12

13   FOR THE RADNOR DEFENDANTS:

14   MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

15   BY:  JOHN GONZALES, ESQUIRE

16   2000 Market Street

17   Suite 2300

18   Philadelphia, Pennsylvania 19103

19   215-575-2871

20

21

22

23

24

25
```

**Page 3**

```
 1   FOR DEFENDANTS BYRDZINSKI, ROCKWELL GLYNN, PRETE:

 2   SPRUCE LAW GROUP, LLC

 3   BY:  TODD BARTOS, ESQUIRE

 4   1622 Spruce Street

 5   Philadelphia, Pennsylvania 19103

 6   267-546-0600

 7

 8

 9   Also Present:  Alan Paller, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
 1                     I N D E X

 2

 3

 4   EXAMINATION OF SERGEANT MICHAEL FISCHER       PAGE

 5   Mr. Schrom                                       8

 6

 7

 8

 9

10   Witness Read and Sign                           62

11   Stenographer's Certification                    65

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 5**

```
 1                   E X H I B I T S

 2

 3   EXHIBIT NO.     DESCRIPTION                    PAGE

 4

 5   Fischer 1      8/13/2022 Police Report          18

 6

 7   Fischer 2      Legal Notice Sign                43

 8

 9   Fischer 3      Notice of Condemnation           44

10

11   Fischer 4      Notice of Violation              44

12

13   Fischer 5 Notice of Violation-Property Maintenance 45

14

15   Fischer 6      Exhibit A Order                  45

16

17   Fischer 7      August 5, 2022 E-mails           46

18

19   Fischer 9      RT-22-10812 Incident Report      47

20

21   Fischer 10     RT-22-10670 Incident Report      51

22

23   Fischer 11 Application for Involuntary Emergency 54

24              Examination and Treatment

25
```

Page 6

```
 1   Fischer 12 Crozer-Chester Medical Center Report    55
 2
 3   Fischer 13  RT-22-10812                             57
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1        - - -
 2        THE VIDEOGRAPHER:  Good afternoon.
 3   We are going on the record at 2:12 p.m.
 4   Eastern Time on May 13, 2025, to begin
 5   the video-recorded deposition of
 6   Sergeant Michael Fischer taken in the
 7   matter of Simona Ockley vs. The Township
 8   of Radnor, Pennsylvania, et al.  This
 9   case is venued in The United States
10   District Court for the Eastern District
11   of Pennsylvania, Case No. 2:24-CV-0470.
12        This deposition is taking place
13   at the law offices of Schrom, Shaffer &
14   Botel located at 4 West Front Street,
15   Media, Pennsylvania.  The legal
16   videographer is Alan Paller and the
17   court reporter is Noelle Nevius.  We are
18   here on behalf of Steno Court Reporting.
19        At this time, would counsel
20   please identify yourselves and state
21   whom you represent?
22        MR. SCHROM:  Gerard Schrom,
23   S-C-H-R-O-M, on behalf of the plaintiff,
24   Simona Ockley.
25        MR. GONZALES:  John Gonzales for
```

Page 8

```
 1   the Radnor defendants.
 2        MR. BARTOS:  Todd Bartos from
 3   Spruce Law Group and representing
 4   Mr. Brydzinski, Prete and Rockwell Glynn
 5   LP.
 6        THE VIDEOGRAPHER:  The court
 7   reporter will swear in the witness.
 8        - - -
 9        SERGEANT MICHAEL FISCHER was called
10   as a witness, and after having been duly
11   sworn to tell the truth, testified as
12   follows:
13        (Witness sworn.)
14        THE STENOGRAPHER:  Counsel, usual
15   stips or --
16        MR. GONZALES:  The witness is going
17   to read and sign.
18        THE STENOGRAPHER:  Okay.  Sure.
19        MR. SCHROM:  And the same
20   stipulations as all prior depositions in
21   this matter.
22        THE STENOGRAPHER:  Okay.  We can
23   proceed.
24        MR. BARTOS:  Agreed.
25        - - -
```

Page 9

```
 1        DIRECT EXAMINATION
 2        - - -
 3   BY MR. SCHROM:
 4   Q.  Good morning, Officer, or rather good afternoon.
 5   Please state your name and spell your last.
 6   A.  Michael Fischer, F-I-S-C-H-E-R.
 7   Q.  And I'm going to ask you some general questions
 8   and then more specific requests about the incident.
 9   Did you review any documents in preparation for today's
10   deposition?
11   A.  Yes.
12   Q.  And what did you review?
13   A.  The incident pertaining to the involuntary
14   committal, the 302 committed.
15   Q.  Okay.  Anything else?
16   A.  The orders that were referenced.
17   Q.  Okay.  Anything else?
18   A.  Not that I can recall.  No.
19   Q.  Did you look at any videos?
20   A.  Yes.
21   Q.  What did you look at?
22   A.  My body camera, Officer Cocco's body camera.
23   That's it.
24   Q.  Okay.  Have you ever given a deposition before?
25   A.  Yes.
```

Page 10

```
1    Q.   In what kind of a matter?
2    A.   Traffic, crashes typically.
3    Q.   How many have you given?
4    A.   Four or five in 23 years.
5    Q.   Okay.  Any depositions in other matters other
6    than traffic?
7    A.   Not that I can recall.
8    Q.   So why don't you tell us about your educational
9    background?
10   A.   Police academy.  I can't possibly recall every
11   training that I have been through over the last 23
12   years.  It's been numerous.  I'm also an emergency
13   medical technician.  So I have training in EMS and I do
14   our first aid and CPA instruction for the police
15   officers, mostly in charge of their fit training
16   program.
17   Q.   Okay.  Do you have a degree?
18   A.   No.
19   Q.   And where did you go to police academy?
20   A.   Delaware County.
21   Q.   Delaware County?
22   A.   Hmm-hmm.
23   Q.   Any other training that you received on an
24   ongoing basis?
25   A.   We have required to do Act 180 certifications
```

Page 11

```
1    over the year and all training updates.  So there is a
2    minimum hours that you have to have.
3    Q.   And how many hours is that in a year?
4    A.   I don't know the hours.  They just send us the
5    e-mail and tell us to do the classes.
6    Q.   So less than five?  More than five?
7    A.   Hours?
8    Q.   Yes.
9    A.   More than five.  It's usually in the teens or
10   20s.  I would have to check.
11   Q.   Okay.  Why don't you talk about your experience,
12   working experience?
13   A.   I've been a police officer for 23 and a half
14   years with Radnor Township.  Before that, I worked for
15   security at Villanova University for four and a half
16   years.
17   Q.   Villanova for 4 and a half years?
18   A.   Hmm-hmm.
19             MR. GONZALES:  You have to say yes
20        or no for the court reporter.
21             THE WITNESS:  Sorry.  Yes.
22   BY MR. SCHROM:
23   Q.   So if you could go through the 23 years with
24   Radnor Police Department, your experience over the
25   years?
```

Page 12

```
1              MR. GONZALES:  You mean his ranks?
2         Like how long --
3              THE WITNESS:  I was hired as a
4         police officer, served as a police
5         officer until about four years ago in
6         which case I was promoted to sergeant.
7         And I'm now the sergeant of the First
8         Squad.
9    BY MR. SCHROM:
10   Q.   And what are the duties that you have as an
11   officer?
12   A.   As an officer?
13   Q.   Yes.
14   A.   Responding to calls for service as needed
15   depending on what sergeant you are working and
16   additional duties and responsibilities as an officer
17   throughout the course of your shift, fulfilling those
18   duties as required.  But my primary responsibility is
19   answering calls and then typing that into data entry
20   and recording what occurred.
21   Q.   So those are patrols?
22   A.   Patrol.  Yep.  Yes.
23   Q.   And what additional responsibilities do you have
24   as a sergeant?
25   A.   Overseeing and making sure that the officers are
```

Page 13

```
1    doing what's expected of them, making sure calls are
2    handled appropriately, and that the documentation is
3    done appropriately, the enforcement actions that are
4    taken by the police officers are appropriate given the
5    circumstances.
6    Q.   Okay.  If you had to characterize your level of
7    experience as an officer, a patrol officer, how would
8    you characterize that?  Extremely experienced?  Very
9    experienced?  Experienced?
10   A.   Very experienced.
11   Q.   And if you had to qualify or quantify your level
12   of conscientiousness and attention to detail as an
13   officer, how would you characterize that, extremely
14   conscientious?  Very conscientious?  How would you --
15   A.   Very conscientious.
16   Q.   Okay.  Can you tell us the number of condemnation
17   -- property condemnations that you have been involved
18   in over the years?
19   A.   No, I cannot.  I don't know that off the top of
20   my head.
21   Q.   Would it be more than five?  Less than five?
22   A.   I don't remember.
23   Q.   Are you able to quantify the number of instances
24   that you were asked to respond where there was property
25   that was determined not to be fit for human occupation?
```

1  A.   You mean quantity, like give a number?

2  Q.   Yes.

3  A.   I don't.  I don't keep the statistics of how many

4  calls that I handle or I'm involved in or I show up on.

5  There is -- given the fact that we handle 30, 40, 50

6  calls a shift in the 23 and a half years, I possibly

7  can't keep that information in my head.

8  Q.   Okay.  I understand.  But, you know, so you don't

9  have any independent recollection of condemnations in

10  general, would that be correct?

11 A.   No.

12 Q.   Okay.  You may have already answered that, but

13 I'm going to ask you kind of a compound question; do

14 you know how many calls you've been involved in where

15 the property was condemned or determined not to be fit

16 for human occupation and it was previously sold?

17 A.   No.

18 Q.   Same predicate where it was -- the property was

19 previously sold, but the person had a court order

20 allowing them on the property?

21 A.   No.

22 Q.   Same question, same predicate where all of those

23 things are true, but the individual was subsequently

24 arrested?

25 A.   No.

1  Q.   In this particular circumstance regarding the

2  Ockley matter, did you -- prior to the arrest of

3  Ockley, did you or are you aware of anyone else that

4  spoke to the DA or district attorney?

5       MR. GONZALES:  About Ms. Ockley?

6  BY MR. SCHROM:

7  Q.   About this matter.

8  A.   Was I aware prior to us responding to that?

9  Q.   Yes.

10 A.   No.

11 Q.   At any point prior to her arrest, did you or

12 anyone else that you are aware of consult with the DA

13 or the assistant district attorney in any way?

14 A.   No.

15 Q.   Meaning, you did not and you didn't know or are

16 aware --

17 A.   I'm not aware of anyone.

18 Q.   Do you know whether or not anyone or do you

19 recall whether or not you consulted with either of the

20 judges that created the orders in question?

21 A.   No, either.

22 Q.   You didn't consult with the judge?

23 A.   Correct.

24 Q.   And nobody else did, to the best of your

25 knowledge?

1  A.   Right.  To the best of my knowledge.

2  Q.   Same predicate, did you or anyone that you were

3  aware of consult with the attorney who attended the

4  hearing in July regarding this matter?

5  A.   Can you repeat the question?

6  Q.   Yeah.  Did you consult with the attorney who

7  attended the hearing that created the first order?

8  A.   No.

9  Q.   Did you ever consult with him?

10 A.   No.

11 Q.   Did you ever consult with prior counsel, private

12 counsel rather, regarding the order or anything

13 relating to how to proceed with the Ockley matter?

14 A.   No.

15 Q.   Did you ever contact or speak with or are you

16 aware of anyone speaking with township counsel

17 regarding the Ockley matter prior to her arrest?

18 A.   No.

19 Q.   Meaning you did not?

20 A.   I did not.

21 Q.   And you are not aware of any?

22 A.   I'm not aware of any.

23 Q.   Okay.  Did you consult with the police chief or

24 rather the superintendant prior to her arrest?

25 A.   No.

1  Q.   Are you aware of anyone who did?

2  A.   I'm not aware.

3  Q.   My understanding is that there is LexisNexis

4  search capability available at the station; is that

5  correct?  Are you aware of that?

6  A.   For past, like, court notices and such?

7  Q.   Yeah.  It's a search engine for lawyers in

8  civil --

9  A.   It is available.

10 Q.   Do you know whether or not you or anyone else did

11 Lexis searchs relative to ordinances and common pleas

12 orders and how they interact?

13 A.   I didn't do a search and I'm not aware of anyone

14 who did.

15 Q.   You don't have Westlaw?

16 A.   Westlaw?

17 Q.   Westlaw.  It's another --

18 A.   No.

19 Q.   Are you familiar with the term probable cause?

20 A.   Yes.

21 Q.   What does that mean?

22 A.   That is the legal standard that police need to

23 obtain for combination of evidence and circumstances

24 that would meet the criteria for making an arrest.

25 Q.   And how familiar are you with the requirements of

1  probable cause if you had to characterize it as
2  extremely familiar?  Very familiar?  Familiar?
3  **A.   Extremely familiar.**
4  Q.   Okay.  So if you had to characterize it, what
5  percentage of arrests need probable cause to be in
6  place prior to the arrest?
7  **A.   All of them.**
8  Q.   So that would be 100 percent?
9  **A.   Yes.**
10  Q.   I'd like to direct your attention to the charges
11  that were brought against Ockley.  I'm showing you a
12  document that was previously marked as Fischer 1.
13              (Exhibit Fischer 1 was marked for
14              identification.)
15  BY MR. SCHROM:
16  Q.   Okay.  So are you able -- I'm showing you a
17  document that's previously marked as Fischer 1.  Are
18  you able to identify that document?
19  **A.   It appears to be a criminal complaint issued by**
20  **Officer Brown, Brian Brown.**
21  Q.   Okay.
22  **A.   On August 13th of 2022.**
23  Q.   And who does it involve?  Who is the defendant?
24  **A.   Simona Ockley.**
25  Q.   And what was your involvement in this matter?

1  **A.   I was present during this arrest.**
2  Q.   Were you present on 8/12?
3  **A.   On 8/12?**
4  Q.   Yeah, the day before.
5  **A.   Yes, for the involuntary committal.**
6  Q.   For the 302?
7  **A.   Yes.**
8  Q.   So you were there both days?
9  **A.   Correct.**
10  Q.   Okay.  Let's talk about the probable cause.  Do
11  you need probable cause for each charge?
12  **A.   Yes.**
13  Q.   So, let's just go through the charges if we can
14  and look at the first charge.  What is the first
15  charge?
16  **A.   I don't have my glasses, so --**
17              THE VIDEOGRAPHER:  Off the record
18         at 2:29.
19              (At this time, off the record.)
20              (At this time, back on the record.)
21              THE VIDEOGRAPHER:  Back on the
22         record 2:30.
23              MR. SCHROM:  Thank you.
24  BY MR. SCHROM:
25  Q.   The first one is what?

1  **A.   Criminal trespass.**
2              MR. GONZALES:  Can we just go off
3         the record video?
4              THE VIDEOGRAPHER:  Off the record
5         at 2:31.
6              (At this time, off the record.)
7              (At this time, back on the record.)
8              THE VIDEOGRAPHER:  On the record at
9         2:31.
10  BY MR. SCHROM:
11  Q.   Again, the first charge was what, Officer?
12  **A.   Criminal trespass.**
13  Q.   And what is criminal trespass?
14  **A.   When someone enters a property that they are not**
15  **permitted to be in, whether it's an area that's fenced**
16  **off or an occupied structure.  It depends on the**
17  **subsection.**
18  Q.   And what was the probable cause to arrest Ockley
19  in this matter?
20  **A.   Because she was on the porch of the property that**
21  **was formally owned by her.  She was told that she was**
22  **not supposed to be there prior to.  And the only time**
23  **that she was permitted to be there was to gather**
24  **belongings for the purpose of removing her personal**
25  **things.  And given the fact that she was sitting on the**

1  porch in a hospital gown making no effort to do so, I
2  believe it was probable cause to arrest her for
3  criminal trespassing purposely --
4  Q.   And anything else?
5  **A.   No.**
6  Q.   Okay.  Let's go to the next charge.
7  **A.   Burglary.**
8  Q.   Yes.  And so, what is burglary as it relates to
9  this matter?
10  **A.   Using force to enter an occupied structure or**
11  **property that's designed for residential and**
12  **nonresidential.  Again, it depends on the subsection**
13  **and to commit a criminal therein, the crime being the**
14  **criminal trespass.**
15  Q.   Okay.  And what was the probable cause in the
16  Ockley matter for the burglary charge?
17  **A.   The locks being removed, the boards that were**
18  **prior placed to prevent access being removed, in my**
19  **opinion -- (inaudible.)**
20              THE STENOGRAPHER:  I'm sorry.  In
21         my opinion...
22              **THE WITNESS:  Was enough.**
23              THE STENOGRAPHER:  Thanks.
24  BY MR. SCHROM:
25  Q.   Okay.  The next charge.

1  A.   Defiant trespass actual communication.  This
2  refers to someone being told that they are not to be on
3  a particular property, whether by direct communication
4  or by somebody who is authorized to give that
5  communication.
6  Q.   And in this circumstance, what was the probable
7  cause for the Ockley matter?
8  A.   She was told not to come back to the property
9  unless under those specific circumstances specified in
10 the order, in which case she was not.  So that would
11 constitute defiant trespass.  She was in defiance of
12 that.
13 Q.   Okay.  Anything else?
14 A.   No.
15 Q.   Let's go to the next one.
16 A.   Criminal mischief damage to property.
17 Q.   What is that crime?
18 A.   That has to do with property that belongs to
19 someone else and purposely someone intentionally
20 damaging that property or destroying that property.
21 Q.   And what is the probable cause as it relates to
22 Ockley in this matter?
23 A.   Again, removing the locks and the boards that
24 were placed.
25 Q.   Anything else?

1  A.   Not that I am aware of.
2  Q.   Okay.  Thank you.  Who made the decision to
3  arrest Ockley?
4  A.   I did.
5  Q.   You did?
6  A.   Yes.
7  Q.   Okay.  Was that made independently or in concert
8  with other officers?
9  A.   I didn't ask for permission.  Are you insinuating
10 I was asking for, like, a conference with other
11 officers to make that determination?
12 Q.   Yes.
13 A.   No.
14 Q.   So it was your independent decision to do that?
15 A.   Yes.
16 Q.   Okay.  And you were the officer in charge?
17 A.   I was.
18 Q.   At the --
19 A.   On the 13th?
20 Q.   Yes.
21 A.   Yes.
22 Q.   At the time that she was being arrested, was she
23 -- did you have all of these conditions in mind?
24 A.   Yes.
25 Q.   That you just read?

1  A.   Yes.
2  Q.   Were there any other conditions that you were
3  going to charge her with?
4  A.   Any other conditions?
5  Q.   Crimes.
6  A.   No, none at that time.
7  Q.   Did you read the ordinances that were out there
8  regarding the condemnation and the property not being
9  fit for human occupation?
10 A.   Did I read them?
11 Q.   Yes.
12 A.   I did not personally read them.  No.  I was told
13 about them.
14 Q.   You were told about them?
15 A.   Yes.
16 Q.   Who told you about the ordinances that were
17 broken?
18 A.   I believe there were prior incidents that were
19 included that I read.
20 Q.   Prior instances, meaning before --
21 A.   That the township --
22 Q.   8/12?
23 A.   Yes.
24 Q.   And where were they posted and where did you --
25 what did you read?

1  A.   Again, I read the incidents.  I didn't read the
2  actual postings.
3  Q.   And what incident are you referring to?
4  A.   I do not recall, but I had the information going
5  into the incident.  That's my point.
6  Q.   Okay.  If I represented to you that the house was
7  condemned on April 21st, is that what you are referring
8  to?
9  A.   That would make sense.  Yes.
10 Q.   So did you actually read that ordinance and the
11 violations of that ordinance before you arrested
12 Ockley?
13 A.   Did I personally read the actual ordinance that
14 were posted on the property?
15 Q.   Yes.
16 A.   No.
17 Q.   When was the first time that you read the
18 ordinance from beginning to end, if ever?  The
19 ordinance violations rather, the condemnation, and not
20 fit for human occupation determination?
21 A.   The postings?
22 Q.   Yes.
23 A.   I just said I didn't read them.
24 Q.   So you didn't read them prior to the arrest or
25 subsequent to the arrest; is that right?

1   A.   No.
2   Q.   When was the first time that you read the orders
3   of the court of common pleas?
4   A.   I do not recall.
5   Q.   Could it be in preparation for today's hearing?
6   You said that you read the two orders.
7   A.   No.  It was prior to this.  Yes.  I do not recall
8   the exact time and date that I read them, but it was
9   prior to preparation --
10              THE STENOGRAPHER:  Sorry, Officer,
11              I'm going to have to ask you to speak up
12              a little bit.
13              THE WITNESS:  I do not recall the
14              exact time and date.  It was prior to
15              preparation of this.
16              THE STENOGRAPHER:  Thank you.
17  BY MR. SCHROM:
18  Q.   Would that be maybe a couple of days before or
19  weeks before?
20  A.   Preparation before this?
21  Q.   Yes.
22  A.   No.  It was at the time of the incident.  Nothing
23  since then.
24  Q.   At the time of the incident, did you actually
25  have a physical copy of those two orders to read?

1   A.   No.  Like I was looking at them when I read them,
2   that she had on her person?
3   Q.   Yeah.
4   A.   Yes.
5   Q.   Okay.  So when was the first time that you read
6   the orders that she had on her person?
7   A.   I don't recall that.
8   Q.   Do you recall reading it on the 12th?
9   A.   I don't recall which day it was.
10  Q.   Do you recall reading it on the 13th?
11  A.   I don't recall which day it was.
12  Q.   But you do recall reading it on the 12th or the
13  13th?
14  A.   One of those two days.
15  Q.   And so you read it and then you still arrested
16  her?
17  A.   Yes.
18  Q.   And what was the basis of that?
19  A.   Because she was not there to abide by that order.
20  Q.   What in particular was she not doing with that
21  order?
22  A.   Moving her stuff out.
23  Q.   Moving her stuff out.  Other than moving her
24  stuff out, is there anything else that you recall she
25  wasn't doing?

1   A.   The fact that she was present inside of the
2   property that no longer belonged to her and that she
3   had turned on utilities was enough that she had in her
4   mind she had ownership of that property -- (inaudible.)
5              THE STENOGRAPHER:  I'm sorry, that
6              she ---
7              THE WITNESS:  She believed she had
8              ownership of that property.
9              THE STENOGRAPHER:  Thank you.
10             THE WITNESS:  And a right to be
11             there.  And it was contrary to what we
12             were told and what the law said and what
13             the order said.
14  BY MR. SCHROM:
15  Q.   So you believe that -- just as you said, that her
16  actions were contrary to the order, the judicial orders
17  from the court of common pleas and the ordinances?  Or
18  --
19  A.   Again, I didn't read the specific --
20  Q.   Oh, you didn't read the orders.  Okay.  I
21  understand.  Did you ever have an independent review of
22  that Delaware County court order or court orders,
23  meaning somebody else would look at them?
24  A.   For me?
25  Q.   Other than you.  Yeah.

1   A.   And give me advice on them?
2   Q.   Yes.
3   A.   No.
4   Q.   So, as I understand it, on the 12th or the 13th,
5   you saw the order, you read each order, you gave the
6   orders back to her, and you made an independent
7   determination that she was not compliant with the law
8   overall, and those charges and then the rest?  Is that
9   the way it went?
10  A.   Correct.
11  Q.   Do you know whether or not a township ordinance
12  trumps a common pleas order?
13  A.   If the township trumps --
14             MR. BARTOS:  Objection.  Form.
15             THE STENOGRAPHER:  Did Todd just
16             object?
17             THE WITNESS:  Township order does
18             not trump it, no, but there could be
19             conflicting information.
20             MR. GONZALES:  Hold on for one
21             second.  Todd, were you trying to say
22             something?
23             MR. BARTOS:  Yes.  I was just
24             objecting to the form of the question.
25  BY MR. SCHROM:

1  Q.  So part of this case relates to a judicial order
2  court of common pleas, actually two of them.  And then
3  the ordinances which apparently were broken.  And so,
4  the order and the ordinances.
5  **A.  Okay.**
6  Q.  My understanding was you read the orders on the
7  12th and the 13th.  You didn't read the ordinances, but
8  you were generally aware that the ordinance said the
9  property was condemned?
10  **A.  Correct.**
11  Q.  And I asked you whether or not you had any
12  independent personal source or some other source of
13  information regarding ordinance and orders.  Let me
14  rephrase it.  Yeah.
15  Other than what you have testified already,
16  did you ever look up any case law regarding a matter
17  such as this where you have an ordinance and a common
18  pleas order relative to condemnation?
19  **A.  No.**
20  Q.  What is the standard police involvement with
21  condemnation of a property or is there one?
22  **A.  If the property is condemned?**
23  Q.  Yeah.
24  **A.  Deemed to be inhabitable?**
25  Q.  Hmm-hmm.

1  **A.  Then we can enforce that.  We can tell them and**
2  **make sure that they leave the property because it's**
3  **unsafe for them to be there.  Yes.**
4  Q.  Okay.  So what would the typical procedure be
5  once you are getting some notification that a property
6  is condemned and there is somebody there?
7  **A.  If there is someone there and they're not abiding**
8  **by what -- like we have had instances where property**
9  **owners are permitted to access the property and move**
10  **the stuff out.  As long as you are doing that, then**
11  **that's okay.**
12  Q.  But you don't believe that was going on here?
13  **A.  No.**
14  Q.  And that was one of the reasons that she was
15  arrested; correct?
16  **A.  One of them.  Yes.**
17  Q.  Is there a procedure in place in the department
18  once you are aware of a court order to review the
19  orders or to analyze the orders or to get other persons
20  regarding those orders?  Is there any procedure in
21  place in that circumstance?
22  **A.  We are expected to take in all of the information**
23  **and you apply that to our decision-making.  Yes.**
24  Q.  So on that particular day, you read the court
25  orders, you were aware of the ordinances.  And based on

1  that, you made your decision to arrest along with the
2  other information you testified to; correct?
3  **A.  Yes.**
4  Q.  Is there any person on call or police officers to
5  contact if there are issues regarding interpretation of
6  ordinances and court orders?
7  **A.  If I need assistance making a decision, I have an**
8  **on-call lieutenant.  Yes.**
9  Q.  And did you call that lieutenant in this matter?
10  **A.  Yes.  That Lieutenant Pinto.**
11  Q.  Anyone else?
12  **A.  I do not recall calling anyone else.  No.**
13  Q.  What was the nature of your conversation, your
14  interaction with Officer Pinto?
15  **A.  He was advised about what was happening and what**
16  **transpired and the fact that we were having to arrest**
17  **her and go from there.  He was surprised, clearly**
18  **surprised, that she was not getting her mandatory**
19  **72-hour evaluation at Crozer as were we, but that was**
20  **the information that we had in front of us.**
21  Q.  Did you read that court order to him word for
22  word?
23  **A.  No.**
24  Q.  Did you read that court order to anyone word for
25  word?

1  **A.  I don't recall.  I didn't read it to anybody.**
2  Q.  And you don't recall whether you read it to
3  anybody else?
4  **A.  I don't recall.**
5  Q.  Did you give a copy of that order to any of the
6  other officers?
7  **A.  I did not make a copy.**
8  Q.  You did not make a copy.  Did you pass along the
9  orders to the other officers?
10  **A.  I don't recall doing that.**
11  Q.  I'm going to ask you a bunch of questions
12  regarding court orders in general.  Did you ever take
13  any specific classes or courses in how to review,
14  interpret, and enforce court orders?
15  **A.  No.**
16  Q.  Did you ever have any specific training regarding
17  court orders in that same context?
18  **A.  With the exception of protection from abuse**
19  **orders, no.**
20  Q.  Okay.  Same question regarding any other
21  evaluation tools that may be available in evaluating
22  court orders that were given to you over time.
23  **A.  Same question have I received it -- kind of**
24  **training?**
25  Q.  Yes.

1    A.    No.
2    Q.    Did you ever go to any seminars that addressed
3    court orders in the same matter as the previous
4    questions?
5    A.    No.
6    Q.    Did you ever have podcasts that were presented to
7    you regarding the same issue?
8    A.    No.
9    Q.    Magazine articles?
10   A.    No.
11   Q.    Law review articles?
12   A.    No.
13   Q.    Books?
14   A.    No.
15   Q.    Videos?
16   A.    No.
17   Q.    Seminars of any type?
18   A.    Again, no.
19   Q.    Okay.  Did you talk with Lingo prior to the
20   arrest of Ockley?
21   A.    Who is Lingo?
22   Q.    You don't know who he is?
23   A.    No.
24   Q.    I will represent he was the prior owner.
25   A.    Okay.

1    Q.    It was Ockley who sold it to Lingo who sold it to
2    Brydzinski.
3    A.    Okay.  No, I did not.
4    Q.    Okay.  Did you ever meet with or talk to
5    Mr. Brydzinski?
6    A.    I did not.
7    Q.    Do you know of anybody who did?
8    A.    I believe Officer Cocco did, but I'm not sure of
9    that.
10   Q.    Did you ever meet Mr. Lingo?
11   A.    No.
12   Q.    Did you ever meet Mr. Brydzinski?
13   A.    I do not recall.
14   Q.    Did you ever meet Mr. Prete who also was on that
15   property?
16   A.    I do not recall.
17   Q.    Did you talk with Mr. Kochanski regarding this
18   matter prior to the arrest?
19   A.    Kevin Kochanski?  I do not recall.
20   Q.    You didn't talk to a district attorney?
21   A.    I did not.
22   Q.    After you reviewed the court order of Ockley on
23   the 12th or the 13th, did you just give it back to her?
24   What did you do with it?
25   A.    I don't remember what I did with it.

1    Q.    Did you take a picture of it?
2    A.    I don't believe so, but I don't remember.
3    Q.    Do you know whether or not you put it in the
4    police car?  Do you have any recollection of what you
5    did with it after you read it?
6    A.    I know I didn't take any pictures of it.
7    Q.    Oh, okay.  Are you aware that she had a large,
8    black bag with personal items in it and papers?  Do you
9    remember that?
10   A.    I don't remember that.
11   Q.    So why don't you just take us through these two
12   days?  So on the first day, which is the 12th, how did
13   you end up on that property and who gave you a call?
14   And how did it go?
15   A.    I don't remember.  I know I responded there.  I
16   don't remember how we were called there.  I believe
17   they were trying to do work on the property and she was
18   found inside of the property.  So we responded and
19   interacted with her in the living room.
20          I believe at that point, she had turned on
21   the electricity or was in the process of turning the
22   electricity on, obviously had the cable on because the
23   television was on and she had reached out to
24   Aqua to turn that equally on as well.
25   Q.    And you believe that was against the order?

1    A.    Yes, I do believe it was against the order.
2    Q.    So what did you do then?
3    A.    I contacted -- well, Lieutenant Pinto was there
4    for that one.  Myself and Officer McKale (ph) was
5    there.  We tried to convince her to get evaluated
6    medically because she did not seem like she was
7    understanding what we were trying to express and
8    explain to her.
9           So we contacted crisis, the crisis team to
10   come down and interact with her.  Based on the fact
11   that she was still in a hospital gown and smelled like
12   fecal matter and urine, that she admitted she was in
13   four days prior to us talking to her that day.  The
14   crisis team obtained a 302 committed involuntary
15   committal to get her evaluated for mental health
16   reasons.
17   Q.    And so, you then did what?  You transported her?
18   A.    Once we had the 302 commitment that was obtained
19   by the crisis team, we took her into custody and
20   transported her by ambulance to Crozer.
21   Q.    Where she was evaluated?
22   A.    Where she was evaluated.  The process was to go
23   to the ER first.  So she was taken into the ER.  Once
24   she was safely in the ER, the officers left.  The
25   typical process is once they get cleared medically to

1  make sure that there's no medical things that need to
2  be addressed physically, then they get transferred to
3  Crozer crisis unit for the 72-hour hold for a mental
4  health evaluation.  That is the process that's supposed
5  to happen.
6  Q.  But the 72-hour hold would be to determine if she
7  has -- whether she is in harm or danger to others or
8  herself?
9  A.  No.  My understanding was the 302 did that.  The
10  involuntary committal mandates that she's supposed to
11  be held for 72 hours to determine that.  That is my
12  understanding of a 302.
13  Q.  Did you ever have any special classes on 302
14  commitments and procedure?
15  A.  Not that I can recall of my training when I got
16  hired.
17  Q.  At some point, you became aware that she was
18  evaluated and released?
19  A.  I didn't know she was released until we found her
20  the next day.
21  Q.  So nobody communicated with you from the
22  hospital?
23  A.  No.
24  Q.  Do you know if anybody called the hospital to ask
25  what's going on?

1  A.  No.  And again, the procedure is -- like I
2  explained to you -- there would be no reason to call.
3  We don't usually follow up with EMS to find out if they
4  did their job.
5  Q.  Okay.  So that's the end of day 1?
6  A.  Yes.
7  Q.  So why don't you take us to day 2.  How do you
8  end up on the property?
9  A.  So the same thing, we were called -- Officer
10  Cocco -- we were told to do checks of the property.
11  Officer Cocco located her on the property where she was
12  not supposed to be.
13  Q.  Excuse me.  Do you know who asked to check on the
14  property?
15  A.  It was part of the (inaudible) to check it was
16  abandoned.  We needed to make sure nobody was on the
17  property.  It was unsafe.
18  Q.  Okay.
19  A.  So Officer Cocco checked the property at some
20  point during our shift and located Ms. Ockley in the
21  porch of the property.  And then she called me.  So I
22  responded, I think, at least another officer or two.
23  Yes, Officer Bell and Officer Brown.  They responded as
24  well.
25  Q.  And then what transpired?

1  A.  Once we showed up, I was asking Officer Cocco,
2  how did she get out?  She didn't know.  I didn't know,
3  but clearly she got out.  The concern was possibly she
4  was -- she escaped.  I never experienced that before,
5  but that was discussed.
6       But the fact that she was on the property
7  against the instructions and had damaged the locks and
8  damaged the boarding up process, and she was in the
9  abandoned property.  So she was arrested for those
10  charges that we just discussed.
11  Q.  Okay.
12  A.  Then I called Lieutenant Pinto.
13  Q.  He seemed very upset when we took his deposition.
14  I can represent that to you.  Were you also upset that
15  she was released?
16  A.  Yes.  Frustrated.  Yes.
17  Q.  And was it your thought that she was a crazy lady
18  that needed to be committed?
19  A.  I do believe that she was -- she needed to be
20  evaluated.  We were concerned for her safety.
21  Q.  Well, she was evaluated.  Did you ever --
22  A.  I would assume that, but the frustrating part is
23  that that process did not work.
24  Q.  Did not work in what respect?
25  A.  I believe the medical process of mental health

1  evaluation has failed her.  Our goal was to get her
2  help and that was the first step to try to get her
3  help.
4  Q.  Was it your understanding that she had no rights
5  to be on the property?
6  A.  No.  She had rights to be on the property to
7  remove her personal things.
8  Q.  So what would she have to have done?
9  A.  She would have had to contact us to let us know
10  that she was there and be making assertive efforts to
11  remove her personal things.
12  Q.  Okay.  So can you have an example?  Would she
13  have to pack one bag, would that have been sufficient
14  not to arrest her?
15  A.  I can't speculate.  I would have to make that
16  decision under the circumstance, but that was not the
17  case.
18  Q.  If she had -- were there other criteria that
19  would have moved you away from arresting her?  Is there
20  anything that you can think of now that would have
21  moved you away from arresting her as the thing to do?
22  A.  I made the decision based on the circumstances
23  that were in front of me.
24  Q.  Right.  But --
25  A.  So I'm not going to speculate of what could exist

1  or what could have happened, maybe could've been there,
2  what if this was here.  I don't live on what-ifs.  It's
3  very dangerous.
4  Q.  Okay.  Do you know who put the locks on the
5  property?
6  A.  No.
7  Q.  No?
8  A.  No.
9  Q.  Do you know who took the locks off of the
10 property?
11 A.  I don't know.  No.
12 Q.  Do you know why the body cam wasn't working on
13 8/12 or rather why they are not available?
14 A.  No, I don't.  I would assume because they are
15 purged because they're not saved.  It was a medical
16 call.  We don't typically save them.
17 Q.  You mean a 302?
18 A.  Yes.
19 Q.  But you don't know that, but that's what you
20 think?
21 A.  That's what I think.  Yes.  There is a duration
22 of how long we save each thing because there is not an
23 infinite amount of storage.
24 Q.  Who's the person that ultimately makes that
25 decision?

1  A.  Of what gets saved and how long it gets saved?
2  Q.  Yeah.
3  A.  I don't know.
4  Q.  I'm going to go through some documents with you.
5  This document is Fischer 2.  Are you able to identify
6  that?
7  A.  This appears to be a notice that our codes
8  department would typically place for making it unsafe
9  for anybody to occupy the structure that it's attached
10 to.  And it lists 416 South Ithan Avenue as the
11 property.
12          (Exhibit Fischer 2 was marked for
13           identification.)
14 BY MR. SCHROM:
15 Q.  Do you know whether or not that notice was on the
16 property on 8/12?
17 A.  I do not know if that was on the property on
18 8/12.
19 Q.  Do you know if it was on the property on 8/13?
20 A.  No.
21 Q.  And this relates to unsafe for human habitation.
22 So this is an ordinance issue that has been broken; is
23 that correct?
24 A.  Yes.
25 Q.  Okay.  I'm showing you a document marked

1  Fischer 3.  Can you identify that?
2  A.  This appears to be a letter that the codes
3  department would send to the property -- the resident
4  on the property who -- property owner that would advise
5  them of the conditions of the posting.
6          (Exhibit Fischer 3 was marked for
7           identification.)
8  BY MR. SCHROM:
9  Q.  Okay.  Did you see that?
10 A.  I did not see this.  This is the first time I'm
11 seeing this.
12 Q.  First time you're seeing it?
13 A.  Yes.
14 Q.  Okay.  So this is notice of condemnation of
15 property maintenance to Simona Ockley regarding her
16 address dated April 26.  Did I read that right?
17 A.  It appears to.
18 Q.  Okay.  You didn't see that notice up until today;
19 correct?
20 A.  Yes.
21 Q.  Okay.  I'm going to show you another document,
22 which has been marked Fischer 4.  Can you identify that
23 one?
24 A.  Another letter, it appears, from our codes
25 department dated April 26 for notice of violation for

1  property maintenance.
2          (Exhibit Fischer 4 was marked for
3           identification.)
4  BY MR. SCHROM:
5  Q.  Did you ever see that document before?
6  A.  No.
7  Q.  I'm showing you another document marked
8  Fischer 5.  Can you identify that one?
9  A.  It's a notice of violation for weeds, high weeds
10 it looks like dated April 27, 2022.
11          (Exhibit Fischer 5 was marked for
12           identification.)
13 BY MR. SCHROM:
14 Q.  Did you ever see that document before?
15 A.  No.
16 Q.  I'm showing you a document that was marked
17 previously as Fischer 6.  Can you identify that
18 document?
19 A.  Appears to be a civil action hearing notice for
20 an order for 15th of July 2022.
21          (Exhibit Fischer 6 was marked for
22           identification.)
23 BY MR. SCHROM:
24 Q.  Did you ever see that document before?
25 A.  No.

Page 46

1   Q.   Okay.  I'm showing you a document previously
2   marked Fischer 7.  I'll represent that it's an e-mail
3   trail.  I don't think your e-mail is on it, but did you
4   have an awareness of that e-mail trail prior or
5   subsequent to her arrest?
6   A.   I did not have any information on the e-mail
7   trail.  No.
8                (Exhibit Fischer 7 was marked for
9                identification.)
10  BY MR. SCHROM:
11  Q.   Okay.
12  A.   We were aware that there were locks on the door.
13  We were told that.
14  Q.   I'm showing you a document previously marked 8.
15  Can you identify that?
16  A.   That's an order from November 9.  I'm sorry,
17  August 9 of 2022.
18                (Exhibit Fischer 8 was marked for
19                identification.)
20  BY MR. SCHROM:
21  Q.   Did you ever see that document before?
22  A.   Nope.
23  Q.   Okay.
24                MR. SCHROM:  Okay.  We have been at
25           it for about an hour.  Just take a

Page 47

1   couple of minutes and we will be back at
2   it.
3                MR. GONZALES:  Okay.
4                THE VIDEOGRAPHER:  Off the record
5   at 3:11.
6                (At this time, off the record.)
7                (At this time, back on the record.)
8                THE VIDEOGRAPHER:  Back on the
9   record at 3:20.
10  BY MR. SCHROM:
11  Q.   I'm showing you a document previously marked
12  Fischer 9.  Can you identify that one?
13  A.   This is an incident number for the 302 committal
14  on the 12th.
15                (Exhibit Fischer 9 was marked for
16                identification.)
17  BY MR. SCHROM:
18  Q.   So RT-22-10670; is that right?
19  A.   22-10812.
20  Q.   Okay.  I'm looking at a different one.  This is
21  12th.  This one.
22  A.   You want this one back?
23  Q.   Yeah, for a minute.  If you don't have it, I'll
24  --
25  A.   It's RT-22-10812, the mental health 302 incident

Page 48

1   that occurred on the 12th of August 2022.
2   Q.   And you already testified that you were there?
3   A.   Yes.
4   Q.   And what is this report?
5   A.   This is the report from -- that was done by
6   Sergeant Reardon wrote this (witness reading to self)
7   -- possible squatting issue, responded 416 South Ithan.
8   Q.   And so, Jeffrey Brydzinski, do you know -- did he
9   present to Catherine Reardon at that time?  Is that how
10  it went?
11  A.   That's what I believe it reads.  I was not
12  present for this one.  It doesn't list me here.  I just
13  approved it.  So I reviewed the incident itself.  I
14  don't have to be present on every incident that I
15  approve.
16  Q.   Okay.
17  A.   But this was an initial incident that occurred.
18  So my assumption is that the incident that Officer
19  Cocco wrote is after this.
20  Q.   Yes.  This is the 12th and then Cocco was on the
21  13th.
22  A.   Okay.
23  Q.   But on the bottom it says Brydzinski completed a
24  written statement attesting to the above?
25  A.   Okay.

Page 49

1   Q.   Do you know where that statement is?
2   A.   I don't.
3   Q.   Do you know where it would be kept?
4   A.   If we still have it, it would be on the filing
5   cabinet on the second floor in administration.
6   Q.   Okay.  Well, we are getting a little closer.
7   Filing cabinet on the second floor of the
8   administration?
9   A.   Of the administration.
10  Q.   What's the full title?
11  A.   Administration section of the police department.
12  Q.   Administration section of the police department.
13  What filing cabinet?
14  A.   I don't know.  They're not numbered and I don't
15  file them.
16  Q.   Do you know of a person that is the filing clerk
17  or something like that?
18  A.   We put the paperwork in the bin down on our floor
19  and the administrative lieutenant at the time takes
20  them upstairs.
21  Q.   Oh, okay.  Did you ever have an opportunity to
22  look at this file prior to today?
23  A.   The statement?
24  Q.   Yes.
25  A.   No.

Page 50

1   Q.   Did you ever see the statement?
2   A.   I don't recall seeing the statement.  It might
3   have been turned in, but I don't always read every
4   statement.
5   Q.   Oh, okay.  And just take a moment to read that.
6   And do you believe that's a true and correct statement
7   of what transpired?
8   A.   I have no way of knowing that this is true.  My
9   assumption was it was true, but since I was not present
10  I can't.
11  Q.   Okay.  But my understanding is, and I may have
12  touched on it before, that on 8/12/2022, Jeff
13  Brydzinski, the owner as of that date, came into the
14  police station, told the officer Sergeant Catherine
15  Reardon all of that information, signed a statement
16  attesting to the above and provided proof that he is
17  the present owner; is that right?
18  A.   That is what it reads.  Yes.
19  Q.   Okay.  And so, additionally, the superintendant
20  which is the head or the police chief; right?
21  A.   Yes.
22  Q.   Chris Flanagan?
23  A.   Yes.
24  Q.   And Lieutenant Pinto, Radnor Township codes
25  department were advised and then you approved it?

Page 51

1   A.   Yes.
2   Q.   Okay.  I'm showing you a document that was marked
3   as Fischer 10.  Can you identify that one?
4   A.   It's an incident started on August 9th of 2022,
5   RT-22-10670 written by Officer Ervin Faust.
6   Q.   And how do you know Ervin Faust?
7   A.   It's an officer with our police department.  He's
8   actually -- (inaudible).
9                THE STENOGRAPHER:  I'm sorry?  He's
10               --
11               THE WITNESS:  He was currently on
12               my squad now.
13               THE STENOGRAPHER:  Thank you.
14  BY MR. SCHROM:
15  Q.   How long have you known him?
16  A.   For the duration of employment here.  I would
17  have to look it up, maybe seven years, eight years.
18  Q.   So if you would take a moment to read that.
19  A.   Okay.
20  Q.   Okay.  Luke Attanasi, do you know him at all?
21  A.   No.
22  Q.   Do you know anyone from Rockwell Glynn?
23  A.   Not that I am aware of.
24  Q.   Do you know Mr. Lingo, L-I-N-G-O?
25  A.   No.

Page 52

1   Q.   Did you ever speak to Officer Faust regarding
2   this paragraph?
3   A.   I don't recall, maybe three years ago.
4   Q.   It says essentially that someone from Rockwell
5   Glynn came in showing a court order and the court
6   document was uploaded to the attachment folders.  So do
7   you know where that document is?
8   A.   I would assume it would be attached to this
9   incident.  I have not pulled up this incident to see if
10  that was the case.
11  Q.   You were pretty good with where the Brydzinski
12  statement is.  Where do you think this might be?
13  A.   We don't typically retain them.  If a court
14  document is uploaded to the attachments folder, that
15  means it should be attached to this incident in our
16  computer.
17  Q.   So --
18  A.   So we don't retain it.  We don't retain a
19  physical copy.
20  Q.   So somewhere in the computer.  Do you know how to
21  pull it up or look for it or find it?
22  A.   It should be still attached to the --
23  Q.   What would you have to Google?
24  A.   I would have to look up the incident in our
25  database.

Page 53

1   Q.   So if somebody pulled the incident number, it
2   should be attached to it?
3   A.   It should be, if that was done appropriately.
4   Q.   Do you know who has the responsibility to do that
5   or someone who could do more easily than another?
6   A.   The officers do.  So this officer must've
7   attached it.
8   Q.   Okay.  So Ervin Faust?
9   A.   Yes.
10  Q.   Do you know how to do it?
11  A.   To attach incidents?
12  Q.   Yeah.
13  A.   Yes.
14  Q.   Do you know how to find it?
15  A.   Yes.
16  Q.   Well, then I would ask that if you can find it
17  and give it to counsel, that would just make everything
18  a lot easier for everybody?
19               THE WITNESS:  If you could follow
20               up --
21               MR. GONZALES:  Yes.  I'll follow up
22               with you.  We requested this early on
23               and were advised that because it was
24               expunged, that records were not
25               necessarily kept, but we will make

Page 54

1    another request and the township will
2    --
3           THE WITNESS:  I did not look up
4        this incident to see if it was in there
5        or not.
6  BY MR. SCHROM:
7    Q.   Okay.  I appreciate it.  Thank you.  I'm showing
8  you a document Fischer 11 involving emergency
9  examination treatment application for it.  Did you ever
10  see that document?
11   A.   Did I ever see this document?
12   Q.   Yes.
13   A.   I do not recall seeing this document.
14           (Exhibit Fischer 11 was marked for
15           identification.)
16  BY MR. SCHROM:
17   Q.   You've seen the forms, but you haven't seen
18  the --
19   A.   Yes.  Correct.
20   Q.   So what type of a --
21   A.   That's an application for a 302.
22   Q.   Who is it typically filled out by?
23   A.   The attending physician will sign it, but a
24  victim or a witness or family member or the police
25  could fill it out, but then it has to be read and

Page 55

1  reviewed by a physician and signed --
2    Q.   And this one --
3    A.   -- to make it servable.
4    Q.   And do you know who those people are?
5    A.   I do not know who they are.
6    Q.   But they were called in?  Did you call them in on
7  that --
8    A.   My presumption is that this is the crisis team,
9  but I don't know.
10   Q.   Okay.  I'm showing you a document marked
11  Fischer 12.  Are you able to identify that at all?
12   A.   It looks like paperwork from a hospital in --
13           (Exhibit Fischer 12 was marked for
14           identification.)
15  BY MR. SCHROM:
16   Q.   Was that -- that relates to Simona Ockley?
17   A.   It appears that it is dated August 12, 2022, at
18  11:31 in the evening.
19   Q.   And you indicated that you and Officer Pinto were
20  surprised that she was not kept; is that correct?
21   A.   Yes.
22   Q.   So if you can look to the assessment line on the
23  second page, it provides analysis.  You can just take a
24  moment to read it, that paragraph.
25   A.   Okay.

Page 56

1    Q.   So you made the referral to the crisis center,
2  ultimately she was seen, and then this was their
3  ultimate determination.  I'm just reading this one
4  paragraph or piece into the record starting with that
5  right there.  Patient is able -- do you see that?
6    A.   Yup.
7    Q.   Patient is able to communicate logically as
8  normal mental status exam given the situation and does
9  not have any psychiatric illness from our standpoint.
10  Therefore, 302 will be notified and patient may be
11  discharged home.  And patient was able to verbalize a
12  plan to perform her activities of daily living.  She
13  has a friend who she can go to for a shower and come to
14  her home to assist her.  She appears to be able to care
15  for herself and is not a danger to herself or others.
16  Was that ever made known to you --
17   A.   No --
18   Q.   -- prior to the arrest?
19   A.   No.
20   Q.   Would that have changed your decision to arrest?
21   A.   No.
22   Q.   Okay.
23           MR. GONZALES:  Could we just go off
24        the video while we are making a copy?
25           THE VIDEOGRAPHER:  Off the record

Page 57

1    at 3:38.
2           (At this time, off the record.)
3           (At this time, back on the record.)
4           THE VIDEOGRAPHER:  Back on the
5        record, 3:40.
6  BY MR. SCHROM:
7    Q.   I'm showing you a document previously marked
8  Fischer 13.  Are you able to identify that?
9    A.   Yes.  This is the narrative from Incident Number
10  22-10812 for the mental health 302 committal.
11  Lieutenant Pinto, Sergeant Fischer -- (witness reading
12  to self.)
13           (Exhibit Fischer 13 was marked for
14           identification.)
15           THE STENOGRAPHER:  I'm sorry, I
16        don't know if you're saying that to
17        yourself or not, but I didn't get that.
18        Were you reading that to yourself?
19           THE WITNESS:  Yes.
20  BY MR. SCHROM:
21   Q.   Okay.  Could you take a moment just to read that,
22  not out loud, just to yourself.
23   A.   Okay.
24   Q.   Okay.  So this relates to the 8/12 date; correct?
25   A.   Yes.

1  Q.   And you were there, Officer Pinto, Officer
2  McKale, and Officer Cocco, those were the four officers
3  on that date?
4  A.   Yes.
5  Q.   And there is a note in the center Ockley kept
6  stating that she has a court order and she can be
7  inside the house.  The court order states the home is
8  condemned and she is able to get belongings out of the
9  home as it was not owned by her anymore.  Ockley was
10 given several attempts to leave voluntarily.  She kept
11 shouting at the police.  They were in her home
12 fraudulently.  (Inaudible) speak behavior to have 302
13 and it goes on.
14            Officer Cocco continued, I did contact owner
15 Jeff Byrdzinski about the possibility of Ockley could
16 be released from the hospital, meaning released from
17 Crozer Medical Center; is that correct?
18 A.   That's what it says.
19 Q.   Okay.  Brydzinski advised he was having
20 contractors who were blocked from all entrances and
21 requested additional patrol at that residence.  Based
22 on those allegations, did you beef up the patrols on
23 the residence?
24 A.   My squad is on daywork.  I'm not privy to what
25 they did overnight.

1  Q.   Okay.  But in the next day, on the 13th, you were
2  -- and several officers visited that property;
3  correct?
4  A.   Officer Cocco checked the property and located
5  the --
6  Q.   She was the first one?
7  A.   Yes.
8  Q.   Brydzinski also put no trespassing signs
9  (inaudible) and condemned signs at the home.
10           THE STENOGRAPHER:  Sorry, sir, I'm
11           going to ask you to speak up just a
12           little bit more.  Thanks.
13           MR. SCHROM:  Brydzinski is also
14           putting up new no trespassing and
15           condemned the home.  Brydzinski is
16           demolishing the home in the next two
17           weeks and (inaudible) -- is deemed
18           unsafe.
19 BY MR. SCHROM:
20 Q.   Did I read that correctly?  Were you looking?
21 A.   I --
22           (Simultaneous talking.)
23           MS. MALLOY:  You are speaking very
24           low.
25           THE WITNESS:  I assume he did.  I

1            didn't read it.
2  BY MR. SCHROM:
3  Q.   You are the approving officer.  So on the 12th or
4  whereabouts, you read it, and reviewed it, and felt it
5  to be -- I don't know, true, correct, accurate?  What
6  does your review or approval process involve?
7  A.   My goal -- because I cannot physically be present
8  for every incident that occurs in the townships for 12
9  hours, my goal is to make sure that the important
10 content is in there.  So the material of the
11 information I need to verify is in there.  That's
12 really my only purpose.
13 Q.   So what was the key information that you wanted
14 to make sure it was in there?
15 A.   I'm not going to take it apart, but I believe
16 that was as accurate as Officer Cocco saw it.
17 Q.   I think that's it, but just a minute.
18           THE VIDEOGRAPHER:  Off the record
19           at 3:46.
20           (At this time, off the record.)
21           (At this time, back on the record.)
22           THE VIDEOGRAPHER:  Back on the
23           record at 3:48.
24           MR. SCHROM:  Nothing additional.
25           MR. GONZALES:  All right.  Todd?

1            MR. BARTOS:  Sergeant Fischer, I
2  have nothing further at this time either
3  and I thank you for your time, sir.
4            THE WITNESS:  Okay.  Thank you.
5            MR. GONZALES:  I have no questions.
6            THE VIDEOGRAPHER:  This concludes
7  today's testimony given by Sergeant
8  Michael Fischer taken in the matter of
9  Simoma Ockley vs. Township of Radnor,
10 Pennsylvania, et al.
11           We are off the record at 3:49.
12           - - -
13           (Whereupon, videotape deposition of
14 SERGEANT MICHAEL FISCHER concluded at
15 3:49 p.m.)
16
17
18
19
20
21
22
23
24
25

**Page 62**

```
1        WITNESS CORRECTIONS AND SIGNATURE

2

3   Please indicate changes on this sheet of

4   paper, giving the change, page number, line

5   number and reason for the change.  Please sign

6   each page of changes.

7

8   PAGE/LINE      CORRECTION    REASON FOR CHANGE

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

**Page 63**

```
1   _____

2   _____

3   _____

4

5          _____

6          SERGEANT MICHAEL FISCHER

7

8   I, SERGEANT MICHAEL FISCHER, have read the

9   foregoing transcript and hereby affix my

10  signature that same is true and correct,

11  except as noted on the previous page(s), and

12  that I am signing this before a Notary Public.

13          _____

14          SERGEANT MICHAEL FISCHER

15  State of Pennsylvania)

16  County of _____  )

17

18  Before me, _____, on this day

19  personally appeared SERGEANT MICHAEL FISCHER,

20  known to me or proved to me under oath or

21  through _____

22  (description of identification card or other

23  document), to be the person whose name is

24  subscribed to the foregoing instrument and

25  acknowledged to me that they executed the same
```

**Page 64**

```
1   for the purposes and consideration

2   therein expressed.

3        Given under my hand and seal of office on

4   this, the ____ day of _____, 2025.

5        _____

6            Notary Public for and in

7            The State of Pennsylvania

8            Commission Expires _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 65**

```
1        STENOGRAPHER'S CERTIFICATION
            TO THE DEPOSITION OF
2          SERGEANT MICHAEL FISCHER
          TAKEN ON MAY 13, 2025
3
4        I, Noelle R. Nevius, a Professional
    Stenographer, hereby certify that this
5   deposition transcript is a true record of the
    testimony given by the witness named herein.
6        I further certify that I am neither
    attorney nor counsel for, related to, nor
7   employed by any of the parties to the action
    in which this testimony was taken.  Further, I
8   am not a relative or employee of any attorney
    of record in this cause, nor do I have a
9   financial interest in the action.
         The original deposition transcript was
10  delivered to the attorney party who asked the
    first question appearing in the transcript on
11  May 21st, 2025.  Mr. Gerard Schrom, Esquire, was
    the attorney present at the time of taking
12  this deposition.
13  _____

14  Noelle R. Nevius, Professional Stenographer

15
16
17
18
19
20
21
22
23
24
25
```

**1**

**1** 18:12,13,17 39:5
**10** 51:3
**100** 18:8
**11** 54:8,14
**11:31** 55:18
**12** 55:11,13,17 60:8
**12th** 27:8,12 29:4 30:7
35:23 36:12 47:14,21 48:1,
20 60:3
**13** 7:4 57:8,13
**13th** 18:22 23:19 27:10,13
29:4 30:7 35:23 48:21 59:1
**15th** 45:20
**180** 10:25

**2**

**2** 39:7 43:5,12
**2022** 18:22 45:10,20
46:17 48:1 51:4 55:17
**2025** 7:4
**20s** 11:10
**21st** 25:7
**22-10812** 47:19 57:10
**23** 10:4,11 11:13,23 14:6
**26** 44:16,25
**27** 45:10
**2:12** 7:3
**2:24-CV-0470** 7:11
**2:29** 19:18
**2:30** 19:22
**2:31** 20:5,9

**3**

**3** 44:1,6

**30** 14:5
**302** 9:14 19:6 37:14,18
38:9,12,13 42:17 47:13,25
54:21 56:10 57:10 58:12
**3:11** 47:5
**3:20** 47:9
**3:38** 57:1
**3:40** 57:5
**3:46** 60:19
**3:48** 60:23
**3:49** 61:11,15

**4**

**4** 7:14 11:17 44:22 45:2
**40** 14:5
**416** 43:10 48:7

**5**

**5** 45:8,11
**50** 14:5

**6**

**6** 45:17,21

**7**

**7** 46:2,8
**72** 38:11
**72-hour** 32:19 38:3,6

**8**

**8** 46:14,18
**8/12** 19:2,3 24:22 42:13
43:16,18 57:24
**8/12/2022** 50:12
**8/13** 43:19

**9**

**9** 46:16,17 47:12,15
**9th** 51:4

**A**

**abandoned** 39:16 40:9
**abide** 27:19
**abiding** 31:7
**abuse** 33:18
**academy** 10:10,19
**access** 21:18 31:9
**accurate** 60:5,16
**Act** 10:25
**action** 45:19
**actions** 13:3 28:16
**activities** 56:12
**actual** 22:1 25:2,13
**additional** 12:16,23
58:21 60:24
**additionally** 50:19
**address** 44:16
**addressed** 34:2 38:2
**administration** 49:5,8,
9,11,12
**administrative** 49:19
**admitted** 37:12
**advice** 29:1
**advise** 44:4
**advised** 32:15 50:25
53:23 58:19
**afternoon** 7:2 9:4
**Agreed** 8:24
**aid** 10:14
**Alan** 7:16
**allegations** 58:22
**allowing** 14:20

**ambulance** 37:20
**amount** 42:23
**analysis** 55:23
**analyze** 31:19
**answering** 12:19
**anymore** 58:9
**apparently** 30:3
**appears** 18:19 43:7
44:2,17,24 45:19 55:17
56:14
**application** 54:9,21
**apply** 31:23
**appropriately** 13:2,3
53:3
**approval** 60:6
**approve** 48:15
**approved** 48:13 50:25
**approving** 60:3
**April** 25:7 44:16,25 45:10
**Aqua** 36:24
**area** 20:15
**arrest** 15:2,11 16:17,24
17:24 18:6 19:1 20:18 21:2
23:3 25:24,25 32:1,16
34:20 35:18 41:14 46:5
56:18,20
**arrested** 14:24 23:22
25:11 27:15 31:15 40:9
**arresting** 41:19,21
**arrests** 18:5
**articles** 34:9,11
**assertive** 41:10
**assessment** 55:22
**assist** 56:14
**assistance** 32:7
**assistant** 15:13
**assume** 40:22 42:14
52:8 59:25
**assumption** 48:18 50:9

**attach** 53:11

**attached** 43:9 52:8,15, 22 53:2,7

**attachment** 52:6

**attachments** 52:14

**Attanasi** 51:20

**attempts** 58:10

**attended** 16:3,7

**attending** 54:23

**attention** 13:12 18:10

**attesting** 48:24 50:16

**attorney** 15:4,13 16:3,6 35:20

**August** 18:22 46:17 48:1 51:4 55:17

**authorized** 22:4

**Avenue** 43:10

**aware** 15:3,8,12,16,17 16:3,16,21,22 17:1,2,5,13 23:1 30:8 31:18,25 36:7 38:17 46:12 51:23

**awareness** 46:4

___

## B

**back** 19:20,21 20:7 22:8 29:6 35:23 47:1,7,8,22 57:3,4 60:21,22

**background** 10:9

**bag** 36:8 41:13

**Bartos** 8:2,24 29:14,23 61:1

**based** 31:25 37:10 41:22 58:21

**basis** 10:24 27:18

**beef** 58:22

**begin** 7:4

**beginning** 25:18

**behalf** 7:18,23

**behavior** 58:12

**believed** 28:7

**Bell** 39:23

**belonged** 28:2

**belongings** 20:24 58:8

**belongs** 22:18

**bin** 49:18

**bit** 26:12 59:12

**black** 36:8

**blocked** 58:20

**boarding** 40:8

**boards** 21:17 22:23

**body** 9:22 42:12

**Books** 34:13

**Botel** 7:14

**bottom** 48:23

**Brian** 18:20

**broken** 24:17 30:3 43:22

**brought** 18:11

**Brown** 18:20 39:23

**Brydzinski** 8:4 35:2,5, 12 48:8,23 50:13 52:11 58:19 59:8,13,15

**bunch** 33:11

**burglary** 21:7,8,16

**Byrdzinski** 58:15

___

## C

**cabinet** 49:5,7,13

**cable** 36:22

**call** 32:4,9 36:13 39:2 42:16 55:6

**called** 8:9 36:16 38:24 39:9,21 40:12 55:6

**calling** 32:12

**calls** 12:14,19 13:1 14:4, 6,14

**cam** 42:12

**camera** 9:22

**capability** 17:4

**car** 36:4

**care** 56:14

**case** 7:9,11 12:6 22:10 30:1,16 41:17 52:10

**Catherine** 48:9 50:14

**center** 56:1 58:5,17

**certifications** 10:25

**changed** 56:20

**characterize** 13:6,8,13 18:1,4

**charge** 10:15 19:11,14, 15 20:11 21:6,16,25 23:16 24:3

**charges** 18:10 19:13 29:8 40:10

**check** 11:10 39:13,15

**checked** 39:19 59:4

**checks** 39:10

**chief** 16:23 50:20

**Chris** 50:22

**circumstance** 15:1 22:6 31:21 41:16

**circumstances** 13:5 17:23 22:9 41:22

**civil** 17:8 45:19

**classes** 11:5 33:13 38:13

**cleared** 37:25

**clerk** 49:16

**closer** 49:6

**Cocco** 35:8 39:10,11,19 40:1 48:19,20 58:2,14 59:4 60:16

**Cocco's** 9:22

**codes** 43:7 44:2,24 50:24

**combination** 17:23

**commit** 21:13

**commitment** 37:18

**commitments** 38:14

**committal** 9:14 19:5 37:15 38:10 47:13 57:10

**committed** 9:14 37:14 40:18

**common** 17:11 26:3 28:17 29:12 30:2,17

**communicate** 56:7

**communicated** 38:21

**communication** 22:1, 3,5

**complaint** 18:19

**completed** 48:23

**compliant** 29:7

**compound** 14:13

**computer** 52:16,20

**concern** 40:3

**concerned** 40:20

**concert** 23:7

**concluded** 61:14

**concludes** 61:6

**condemnation** 13:16 24:8 25:19 30:18,21 44:14

**condemnations** 13:17 14:9

**condemned** 14:15 25:7 30:9,22 31:6 58:8 59:9,15

**conditions** 23:23 24:2, 4 44:5

**conference** 23:10

**conflicting** 29:19

**conscientious** 13:14, 15

**conscientiousness** 13:12

**constitute** 22:11

**consult** 15:12,22 16:3,6, 9,11,23

**consulted** 15:19

**contact** 16:15 32:5 41:9 58:14

**contacted** 37:3,9

content 60:10

context 33:17

continued 58:14

contractors 58:20

contrary 28:11,16

conversation 32:13

convince 37:5

copy 26:25 33:5,7,8
52:19 56:24

correct 14:10 15:23 17:5
19:9 29:10 30:10 31:15
32:2 43:23 44:19 50:6
54:19 55:20 57:24 58:17
59:3 60:5

correctly 59:20

could've 42:1

counsel 7:19 8:14
16:11,12,16 53:17

County 10:20,21 28:22

couple 26:18 47:1

courses 33:13

court 7:10,17,18 8:6
11:20 14:19 17:6 26:3
28:17,22 30:2 31:18,24
32:6,21,24 33:12,14,17,22
34:3 35:22 52:5,13 58:6,7

CPA 10:14

crashes 10:2

crazy 40:17

created 15:20 16:7

crime 21:13 22:17

Crimes 24:5

criminal 18:19 20:1,12,
13 21:3,13,14 22:16

crisis 37:9,14,19 38:3
55:8 56:1

criteria 17:24 41:18

Crozer 32:19 37:20 38:3
58:17

custody 37:19

## D

DA 15:4,12

daily 56:12

damage 22:16

damaged 40:7,8

damaging 22:20

danger 38:7 56:15

dangerous 42:3

data 12:19

database 52:25

date 26:8,14 50:13 57:24
58:3

dated 44:16,25 45:10
55:17

day 19:4 27:9,11 31:24
36:12 37:13 38:20 39:5,7
59:1

days 19:8 26:18 27:14
36:12 37:13

daywork 58:24

decision 23:2,14 32:1,7
41:16,22 42:25 56:20

decision-making
31:23

deemed 30:24 59:17

defendant 18:23

defendants 8:1

defiance 22:11

defiant 22:1,11

degree 10:17

Delaware 10:20,21
28:22

demolishing 59:16

department 11:24
31:17 43:8 44:3,25 49:11,
12 50:25 51:7

depending 12:15

depends 20:16 21:12

deposition 7:5,12 9:10,
24 40:13 61:13

depositions 8:20 10:5

designed 21:11

destroying 22:20

detail 13:12

determination 23:11
25:20 29:7 56:3

determine 38:6,11

determined 13:25
14:15

direct 9:1 18:10 22:3

discharged 56:11

discussed 40:5,10

district 7:10 15:4,13
35:20

document 18:12,17,18
43:5,25 44:21 45:5,7,14,
16,18,24 46:1,14,21 47:11
51:2 52:6,7,14 54:8,10,11,
13 55:10 57:7

documentation 13:2

documents 9:9 43:4

door 46:12

duly 8:10

duration 42:21 51:16

duties 12:10,16,18

## E

e-mail 11:5 46:2,3,4,6

early 53:22

easier 53:18

easily 53:5

Eastern 7:4,10

educational 10:8

effort 21:1

efforts 41:10

electricity 36:21,22

emergency 10:12 54:8

employment 51:16

EMS 10:13 39:3

end 25:18 36:13 39:5,8

enforce 31:1 33:14

enforcement 13:3

engine 17:7

enter 21:10

enters 20:14

entrances 58:20

entry 12:19

equally 36:24

ER 37:23,24

Ervin 51:5,6 53:8

escaped 40:4

essentially 52:4

et al 7:8 61:10

evaluated 37:5,15,21,
22 38:18 40:20,21

evaluating 33:21

evaluation 32:19 33:21
38:4 41:1

evening 55:18

evidence 17:23

exact 26:8,14

exam 56:8

examination 9:1 54:9

exception 33:18

Excuse 39:13

exhibit 18:13 43:12 44:6
45:2,11,21 46:8,18 47:15
54:14 55:13 57:13

exist 41:25

expected 13:1 31:22

experience 11:11,12,24
13:7

experienced 13:8,9,10
40:4

explain 37:8

explained 39:2

express 37:7

expunged 53:24

extremely 13:8,13 18:2, 3

## F

F-I-S-C-H-E-R 9:6

fact 14:5 20:25 28:1 32:16 37:10 40:6

failed 41:1

familiar 17:19,25 18:2,3

family 54:24

Faust 51:5,6 52:1 53:8

fecal 37:12

felt 60:4

fenced 20:15

file 49:15,22

filing 49:4,7,13,16

fill 54:25

filled 54:22

find 39:3 52:21 53:14,16

Fischer 7:6 8:9 9:6 18:12,13,17 43:5,12 44:1, 6,22 45:2,8,11,17,21 46:2, 8,18 47:12,15 51:3 54:8,14 55:11,13 57:8,11,13 61:1, 8,14

fit 10:15 13:25 14:15 24:9 25:20

Flanagan 50:22

floor 49:5,7,18

folder 52:14

folders 52:6

follow 39:3 53:19,21

force 21:10

form 29:14,24

formally 20:21

forms 54:17

found 36:18 38:19

fraudulently 58:12

friend 56:13

front 7:14 32:20 41:23

Frustrated 40:16

frustrating 40:22

fulfilling 12:17

full 49:10

## G

gather 20:23

gave 29:5 36:13

general 9:7 14:10 33:12

generally 30:8

Gerard 7:22

give 14:1 22:4 29:1 33:5 35:23 53:17

glasses 19:16

Glynn 8:4 51:22 52:5

goal 41:1 60:7,9

Gonzales 7:25 8:16 11:19 12:1 15:5 20:2 29:20 47:3 53:21 56:23 60:25 61:5

good 7:2 9:4 52:11

Google 52:23

gown 21:1 37:11

Group 8:3

## H

habitation 43:21

half 11:13,15,17 14:6

handle 14:4,5

handled 13:2

happen 38:5

happened 42:1

happening 32:15

harm 38:7

head 13:20 14:7 50:20

health 37:15 38:4 40:25 47:25 57:10

hearing 16:4,7 26:5 45:19

held 38:11

high 45:9

hired 12:3 38:16

Hmm-hmm 10:22 11:18 30:25

hold 29:20 38:3,6

home 56:11,14 58:7,9,11 59:9,15,16

hospital 21:1 37:11 38:22,24 55:12 58:16

hour 46:25

hours 11:2,3,4,7 38:11 60:9

house 25:6 58:7

human 13:25 14:16 24:9 25:20 43:21

## I

identification 18:14 43:13 44:7 45:3,12,22 46:9,19 47:16 54:15 55:14 57:14

identify 7:20 18:18 43:5 44:1,22 45:8,17 46:15 47:12 51:3 55:11 57:8

illness 56:9

important 60:9

inaudible 21:19 28:4 39:15 51:8 58:12 59:9,17

incident 9:8,13 25:3,5 26:22,24 47:13,25 48:13, 14,17,18 51:4 52:9,15,24 53:1 54:4 57:9 60:8

incidents 24:18 25:1 53:11

included 24:19

independent 14:9 23:14 28:21 29:6 30:12

independently 23:7

individual 14:23

infinite 42:23

information 14:7 25:4 29:19 30:13 31:22 32:2,20 46:6 50:15 60:11,13

inhabitable 30:24

initial 48:17

inside 28:1 36:18 58:7

insinuating 23:9

instances 13:23 24:20 31:8

instruction 10:14

instructions 40:7

intentionally 22:19

interact 17:12 37:10

interacted 36:19

interaction 32:14

interpret 33:14

interpretation 32:5

involuntary 9:13 19:5 37:14 38:10

involve 18:23 60:6

involved 13:17 14:4,14

involvement 18:25 30:20

involving 54:8

issue 34:7 43:22 48:7

issued 18:19

issues 32:5

items 36:8

Ithan 43:10 48:7

## J

Jeff 50:12 58:15

Jeffrey 48:8

job 39:4
John 7:25
judge 15:22
judges 15:20
judicial 28:16 30:1
July 16:4 45:20

## K

Kevin 35:19
key 60:13
kind 10:1 14:13 33:23
knowing 50:8
knowledge 15:25 16:1
Kochanski 35:17,19

## L

L-I-N-G-O 51:24
lady 40:17
large 36:7
law 7:13 8:3 28:12 29:7 30:16 34:11
lawyers 17:7
leave 31:2 58:10
left 37:24
legal 7:15 17:22
letter 44:2,24
level 13:6,11
Lexis 17:11
Lexisnexis 17:3
lieutenant 32:8,9,10 37:3 40:12 49:19 50:24 57:11
Lingo 34:19,21 35:1,10 51:24
list 48:12
lists 43:10
live 42:2

living 36:19 56:12
located 7:14 39:11,20 59:4
locks 21:17 22:23 40:7 42:4,9 46:12
logically 56:7
long 12:2 31:10 42:22 43:1 51:15
longer 28:2
lot 53:18
loud 57:22
low 59:24
LP 8:5
Luke 51:20

## M

made 23:2,7 29:6 32:1 41:22 56:1,16
Magazine 34:9
maintenance 44:15 45:1
make 23:11 25:9 31:2 33:7,8 38:1 39:16 41:15 53:17,25 55:3 60:9,14
makes 42:24
making 12:25 13:1 17:24 21:1 32:7 41:10 43:8 56:24
MALLOY 59:23
mandates 38:10
mandatory 32:18
marked 18:12,13,17 43:12,25 44:6,22 45:2,7, 11,16,21 46:2,8,14,18 47:11,15 51:2 54:14 55:10, 13 57:7,13
material 60:10
matter 7:7 8:21 10:1 15:2,7 16:4,13,17 18:25 20:19 21:9,16 22:7,22 30:16 32:9 34:3 35:18 37:12 61:8

matters 10:5
Mckale 37:4 58:2
meaning 15:15 16:19 24:20 28:23 58:16
means 52:15
Media 7:15
medical 10:13 38:1 40:25 42:15 58:17
medically 37:6,25
meet 17:24 35:4,10,12,14
member 54:24
mental 37:15 38:3 40:25 47:25 56:8 57:10
Michael 7:6 8:9 9:6 61:8, 14
mind 23:23 28:4
minimum 11:2
minute 47:23 60:17
minutes 47:1
mischief 22:16
moment 50:5 51:18 55:24 57:21
morning 9:4
move 31:9
moved 41:19,21
moving 27:22,23
must've 53:6

## N

narrative 57:9
nature 32:13
necessarily 53:25
needed 12:14 39:16 40:18,19
Nevius 7:17
Noelle 7:17
nonresidential 21:12
normal 56:8

note 58:5
notice 43:7,15 44:14,18, 25 45:9,19
notices 17:6
notification 31:5
notified 56:10
November 46:16
number 13:16,23 14:1 47:13 53:1 57:9
numbered 49:14
numerous 10:12

## O

object 29:16
objecting 29:24
Objection 29:14
obtain 17:23
obtained 37:14,18
occupation 13:25 14:16 24:9 25:20
occupied 20:16 21:10
occupy 43:9
occurred 12:20 48:1,17
occurs 60:8
Ockley 7:7,24 15:2,3,5 16:13,17 18:11,24 20:18 21:16 22:7,22 23:3 25:12 34:20 35:1,22 39:20 44:15 55:16 58:5,9,15 61:9
officer 9:4,22 11:13 12:4, 5,11,12,16 13:7,13 18:20 20:11 23:16 26:10 32:14 35:8 37:4 39:9,11,19,22,23 40:1 48:18 50:14 51:5,7 52:1 53:6 55:19 58:1,2,14 59:4 60:3,16
officers 10:15 12:25 13:4 23:8,11 32:4 33:6,9 37:24 53:6 58:2 59:2
offices 7:13
on-call 32:8

ongoing 10:24

opinion 21:19,21

opportunity 49:21

order 14:19 16:7,12 22:10 27:19,21 28:13,16, 22 29:5,12,17 30:1,4,18 31:18 32:21,24 33:5 35:22 36:25 37:1 45:20 46:16 52:5 58:6,7

orders 9:16 15:20 17:12 26:2,6,25 27:6 28:16,20,22 29:6 30:6,13 31:19,20,25 32:6 33:9,12,14,17,19,22 34:3

ordinance 25:10,11,13, 18,19 29:11 30:8,13,17 43:22

ordinances 17:11 24:7, 16 28:17 30:3,4,7 31:25 32:6

overnight 58:25

Overseeing 12:25

owned 20:21 58:9

owner 34:24 44:4 50:13, 17 58:14

owners 31:9

ownership 28:4,8

---

**P**

p.m. 7:3 61:15

pack 41:13

Paller 7:16

papers 36:8

paperwork 49:18 55:12

paragraph 52:2 55:24 56:4

part 30:1 39:15 40:22

pass 33:8

past 17:6

patient 56:5,7,10,11

patrol 12:22 13:7 58:21

patrols 12:21 58:22

Pennsylvania 7:8,11, 15 61:10

people 55:4

percent 18:8

percentage 18:5

perform 56:12

permission 23:9

permitted 20:15,23 31:9

person 14:19 27:2,6 32:4 42:24 49:16

personal 20:24 30:12 36:8 41:7,11

personally 24:12 25:13

persons 31:19

pertaining 9:13

ph 37:4

physical 26:25 52:19

physically 38:2 60:7

physician 54:23 55:1

picture 36:1

pictures 36:6

piece 56:4

Pinto 32:10,14 37:3 40:12 50:24 55:19 57:11 58:1

place 7:12 18:6 31:17,21 43:8

plaintiff 7:23

plan 56:12

pleas 17:11 26:3 28:17 29:12 30:2,18

podcasts 34:6

point 15:11 25:5 36:20 38:17 39:20

police 10:10,14,19 11:13, 24 12:4 13:4 16:23 17:22 30:20 32:4 36:4 49:11,12 50:14,20 51:7 54:24 58:11

porch 20:20 21:1 39:21

possibility 58:15

possibly 10:10 14:6 40:3

posted 24:24 25:14

posting 44:5

postings 25:2,21

predicate 14:18,22 16:2

preparation 9:9 26:5,9, 15,20

present 19:1,2 28:1 48:9,12,14 50:9,17 60:7

presented 34:6

presumption 55:8

Prete 8:4 35:14

pretty 52:11

prevent 21:18

previous 34:3

previously 14:16,19 18:12,17 45:17 46:1,14 47:11 57:7

primary 12:18

prior 8:20 15:2,8,11 16:11,17,24 18:6 20:22 21:18 24:18,20 25:24 26:7, 9,14 34:19,24 35:18 37:13 46:4 49:22 56:18

private 16:11

privy 58:24

probable 17:19 18:1,5 19:10,11 20:18 21:2,15 22:6,21

procedure 31:4,17,20 38:14 39:1

proceed 8:23 16:13

process 36:21 37:22,25 38:4 40:8,23,25 60:6

program 10:16

promoted 12:6

proof 50:16

property 13:17,24 14:15,18,20 20:14,20 21:11 22:3,8,16,18,20 24:8 25:14 28:2,4,8 30:9,21,22 31:2,5,8,9 35:15 36:13,17,

18 39:8,10,11,14,17,19,21 40:6,9 41:5,6 42:5,10 43:11,16,17,19 44:3,4,15 45:1 59:2,4

protection 33:18

provided 50:16

psychiatric 56:9

pull 52:21

pulled 52:9 53:1

purged 42:15

purpose 20:24 60:12

purposely 21:3 22:19

put 36:3 42:4 49:18 59:8

putting 59:14

---

**Q**

qualify 13:11

quantify 13:11,23

quantity 14:1

question 14:13,22 15:20 16:5 29:24 33:20,23

questions 9:7 33:11 34:4 61:5

---

**R**

Radnor 7:8 8:1 11:14,24 50:24 61:9

ranks 12:1

reached 36:23

read 8:17 23:25 24:7,10, 12,19,25 25:1,10,13,17,23, 24 26:2,6,8,25 27:1,5,15 28:19,20 29:5 30:6,7 31:24 32:21,24 33:1,2 36:5 44:16 50:3,5 51:18 54:25 55:24 57:21 59:20 60:1,4

reading 27:8,10,12 48:6 56:3 57:11,18

reads 48:11 50:18

Reardon 48:6,9 50:15

**reason** 39:2

**reasons** 31:14 37:16

**recall** 9:18 10:7,10 15:19 25:4 26:4,7,13 27:7,8,9,10, 11,12,24 32:12 33:1,2,4,10 35:13,16,19 38:15 50:2 52:3 54:13

**received** 10:23 33:23

**recollection** 14:9 36:4

**record** 7:3 19:17,19,20, 22 20:3,4,6,7,8 47:4,6,7,9 56:4,25 57:2,3,5 60:18,20, 21,23 61:11

**recording** 12:20

**records** 53:24

**referenced** 9:16

**referral** 56:1

**referring** 25:3,7

**refers** 22:2

**relates** 21:8 22:21 30:1 43:21 55:16 57:24

**relating** 16:13

**relative** 17:11 30:18

**released** 38:18,19 40:15 58:16

**remember** 13:22 35:25 36:2,9,10,15,16

**remove** 41:7,11

**removed** 21:17,18

**removing** 20:24 22:23

**repeat** 16:5

**rephrase** 30:14

**report** 48:4,5

**reporter** 7:17 8:7 11:20

**Reporting** 7:18

**represent** 7:21 34:24 40:14 46:2

**represented** 25:6

**representing** 8:3

**request** 54:1

**requested** 53:22 58:21

**requests** 9:8

**required** 10:25 12:18

**requirements** 17:25

**residence** 58:21,23

**resident** 44:3

**residential** 21:11

**respect** 40:24

**respond** 13:24

**responded** 36:15,18 39:22,23 48:7

**responding** 12:14 15:8

**responsibilities** 12:16,23

**responsibility** 12:18 53:4

**rest** 29:8

**retain** 52:13,18

**review** 9:9,12 28:21 31:18 33:13 34:11 60:6

**reviewed** 35:22 48:13 55:1 60:4

**rights** 41:4,6

**Rockwell** 8:4 51:22 52:4

**room** 36:19

**RT-22-10670** 47:18 51:5

**RT-22-10812** 47:25

## S

**S-C-H-R-O-M** 7:23

**safely** 37:24

**safety** 40:20

**save** 42:16,22

**saved** 42:15 43:1

**Schrom** 7:13,22 8:19 9:3 11:22 12:9 15:6 18:15 19:23,24 20:10 21:24 26:17 28:14 29:25 43:14 44:8 45:4,13,23 46:10,20,

24 47:10,17 51:14 54:6,16 55:15 57:6,20 59:13,19 60:2,24

**search** 17:4,7,13

**searchs** 17:11

**section** 49:11,12

**security** 11:15

**seminars** 34:2,17

**send** 11:4 44:3

**sense** 25:9

**sergeant** 7:6 8:9 12:6,7, 15,24 48:6 50:14 57:11 61:1,7,14

**servable** 55:3

**served** 12:4

**service** 12:14

**Shaffer** 7:13

**shift** 12:17 14:6 39:20

**shouting** 58:11

**show** 14:4 44:21

**showed** 40:1

**shower** 56:13

**showing** 18:11,16 43:25 45:7,16 46:1,14 47:11 51:2 52:5 54:7 55:10 57:7

**sign** 8:17 54:23

**signed** 50:15 55:1

**signs** 59:8,9

**Simoma** 61:9

**Simona** 7:7,24 18:24 44:15 55:16

**simultaneous** 59:22

**sir** 59:10 61:3

**sitting** 20:25

**situation** 56:8

**smelled** 37:11

**sold** 14:16,19 35:1

**source** 30:12

**South** 43:10 48:7

**speak** 16:15 26:11 52:1 58:12 59:11

**speaking** 16:16 59:23

**special** 38:13

**specific** 9:8 22:9 28:19 33:13,16

**speculate** 41:15,25

**spell** 9:5

**spoke** 15:4

**Spruce** 8:3

**squad** 12:8 51:12 58:24

**squatting** 48:7

**standard** 17:22 30:20

**standpoint** 56:9

**started** 51:4

**starting** 56:4

**state** 7:20 9:5

**statement** 48:24 49:1, 23 50:1,2,4,6,15 52:12

**states** 7:9 58:7

**stating** 58:6

**station** 17:4 50:14

**statistics** 14:3

**status** 56:8

**Steno** 7:18

**STENOGRAPHER** 8:14,18,22 21:20,23 26:10, 16 28:5,9 29:15 51:9,13 57:15 59:10

**step** 41:2

**stips** 8:15

**stipulations** 8:20

**storage** 42:23

**Street** 7:14

**structure** 20:16 21:10 43:9

**stuff** 27:22,23,24 31:10

**subsection** 20:17 21:12

**subsequent** 25:25 46:5

**subsequently** 14:23

**sufficient** 41:13

**superintendant** 16:24 50:19

**supposed** 20:22 38:4, 10 39:12

**surprised** 32:17,18 55:20

**swear** 8:7

**sworn** 8:11,13

---

**T**

**takes** 49:19

**taking** 7:12

**talk** 11:11 19:10 34:19 35:4,17,20

**talking** 37:13 59:22

**team** 37:9,14,19 55:8

**technician** 10:13

**teens** 11:9

**television** 36:23

**term** 17:19

**testified** 8:11 30:15 32:2 48:2

**testimony** 61:7

**thing** 39:9 41:21 42:22

**things** 14:23 20:25 38:1 41:7,11

**thought** 40:17

**time** 7:4,19 19:19,20 20:6, 7,22 23:22 24:6 25:17 26:2,8,14,22,24 27:5 33:22 44:10,12 47:6,7 48:9 49:19 57:2,3 60:20,21 61:2,3

**title** 49:10

**today** 44:18 49:22

**today's** 9:9 26:5 61:7

**Todd** 8:2 29:15,21 60:25

**told** 20:21 22:2,8 24:12, 14,16 28:12 39:10 46:13 50:14

**tools** 33:21

**top** 13:19

**touched** 50:12

**township** 7:7 11:14 16:16 24:21 29:11,13,17 50:24 54:1 61:9

**townships** 60:8

**traffic** 10:2,6

**trail** 46:3,4,7

**training** 10:11,13,15,23 11:1 33:16,24 38:15

**transferred** 38:2

**transpired** 32:16 39:25 50:7

**transported** 37:17,20

**treatment** 54:9

**trespass** 20:1,12,13 21:14 22:1,11

**trespassing** 21:3 59:8, 14

**true** 14:23 50:6,8,9 60:5

**trump** 29:18

**trumps** 29:12,13

**truth** 8:11

**turn** 36:24

**turned** 28:3 36:20 50:3

**turning** 36:21

**type** 34:17 54:20

**typical** 31:4 37:25

**typically** 10:2 42:16 43:8 52:13 54:22

**typing** 12:19

---

**U**

**ultimate** 56:3

**ultimately** 42:24 56:2

**understand** 14:8 28:21 29:4

**understanding** 17:3 30:6 37:7 38:9,12 41:4 50:11

**unit** 38:3

**United** 7:9

**University** 11:15

**unsafe** 31:3 39:17 43:8, 21 59:18

**updates** 11:1

**uploaded** 52:6,14

**upset** 40:13,14

**upstairs** 49:20

**urine** 37:12

**usual** 8:14

**utilities** 28:3

---

**V**

**venued** 7:9

**verbalize** 56:11

**verify** 60:11

**victim** 54:24

**video** 20:3 56:24

**video-recorded** 7:5

**videos** 9:19 34:15

**videotape** 61:13

**Villanova** 11:15,17

**violation** 44:25 45:9

**violations** 25:11,19

**visited** 59:2

**voluntarily** 58:10

---

**W**

**wanted** 60:13

**weeds** 45:9

**weeks** 26:19 59:17

**West** 7:14

**Westlaw** 17:15,16,17

**what-ifs** 42:2

**whereabouts** 60:4

**word** 32:21,22,24,25

**work** 36:17 40:23,24

**worked** 11:14

**working** 11:12 12:15 42:12

**written** 48:24 51:5

**wrote** 48:6,19

---

**Y**

**year** 11:1,3

**years** 10:4,12 11:14,16, 17,23,25 12:5 13:18 14:6 51:17 52:3

**Yup** 56:6