# Exhibit 37

# Luke Attansai Deposition Transcript
# March 21, 2025

# Deposition Transcript

Case Number: 2:24-cv-04070
Date: March 21, 2025

In the matter of:

## Simona Ockley v Township of Radnor, Pennsylvania, et al.

# Luke Attanasi

CERTIFIED COPY

Reported by:
KIMBERLY WENDT



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

1           IN THE UNITED STATES COURT

2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3              CIVIL ACTION - LAW

4                   -   -   -

5   SIMONA OCKLEY          :   Case 2:24-cv-04070-GAW
                           :
6              Plaintiff :
                           :
7           vs.            :
                           :
8   TOWNSHIP OF RADNOR,    :
    PENNSYLVANIA           :
9           and           :
    JENNIFER COCCO in her  :
10  individual capacity    :
            and           :
11  JOSEPH PINTO in his    :
    individual capacity    :
12          and           :
    BRADY MCHALE in his    :
13  individual capacity    :
            and           :
14  BRIAN BROWN in his     :
    individual capacity    :
15          and           :
    JEFFREY BRYDZINSKI     :
16          and           :
    TYLER PRETE            :
17          and           :
    ROCKWELL-GLYNN, LP     :
18                         :
              Defendants : 

19

20                  -   -   -

21           Friday, March 21, 2025

22                  -   -   -

23        Sworn videotaped deposition of LUKE

24  ATTANASI was held at the offices of Schrom, Shaffer

25  & Botel, P.C., 4 West Front Street, Media,

**Page 2**

```
 1  Pennsylvania commencing at 9:59 a.m. on the above
 2  date before Kimberly Wendt, RPR, a Certified
 3  Shorthand Reporter and Notary Public in and for the
 4  State of Pennsylvania.
 5                          -  -  -
 6                        STENO
                   Concierge@Steno.com
 7                   888-707-8366
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2
 3  FOR THE PLAINTIFF:
 4        SCHROM, SHAFFER & BOTEL, P.C.
          BY:  GERARD SCHROM, ESQUIRE
 5        4 West Front Street
          Media, PA 17543
 6        610-565-5050
          Gschrom@schromandshaffer.com
 7
 8  FOR THE DEFENDANTS:
 9        SPRUCE LAW GROUP
          BY:  TODD BARTOS, ESQUIRE
10        1622 Spruce Street
          Philadelphia, PA 19103
11        267-546-0600
          Tb@sprucelaw.com
12        Counsel for Jeffrey Brydzinski,
          Tyler Prete, Rockwell-Glynn, LP
13        and Luke Attanasi
14
          MARSHALL DENNEHEY
15        BY:  JOHN P. GONZALES, ESQUIRE
          2000 Market Street
16        Suite 3200
          Philadelphia, PA 19103
17        215-575-2871
          Jpgonzales@mdwcg.com
18        Counsel for Township of Radnor,
          Pennsylvania, Jennifer Cocco,
19        Joseph Pinto, Brady McHale and
          Brian Brown
20        (Attending via Zoom)
21
22  ALSO PRESENT:
23        Neil Botel, Esquire
24        Elizabeth Malloy
25        Alan Paller - Videographer
```

**Page 4**

```
 1                I N D E X
 2
 3  WITNESS                              PAGE
 4  LUKE ATTANASI
 5
 6     By:  Mr. Schrom                   6
 7
 8
 9             E X H I B I T S
10
    NUMBER           DESCRIPTION        PAGE
11
12  P-1 Attanasi  Deed Between Rockwell-Glynn,  19
                  Brydzinski and Prete
13
    P-2 Attanasi  Radnor Township PD    22
14                Incident Report
15  P-3 Attanasi  6/11/22 Transcript of  29
                  Proceedings
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                -  -  -
 2          VIDEOGRAPHER:  Good morning.  We
 3  are going on the record at 9:59 a.m.
 4  Eastern Time on March 21, 2025 to begin
 5  the deposition of Luke Attanasi in the
 6  matter of Simona Ockley versus the
 7  Township of Radnor, Pennsylvania, et al.
 8  This case is venued in the United States
 9  District Court for the Eastern District of
10  Pennsylvania, case number 2:24-cv-04070.
11  This deposition is taking place at the Law
12  Offices of Schrom, Shaffer and Botel
13  located at 4 West Front Street, Media,
14  Pennsylvania.
15          The legal videographer is
16  Alan Paller, and the court reporter is
17  Kim Wendt.  We are here on behalf of
18  Steno Court Reporting.  At this time
19  would counsel, please, identify
20  yourselves and state whom you represent.
21          MR. SCRHOM:  Good morning.
22  Gerard Schrom, S-C-H-R-O-M, on behalf of
23  plaintiff Simona Ockley.
24          MR. BARTOS:  Good morning.  Todd
25  Bartos, Spruce Law Group, on behalf of
```

Page 6

1  Misters Prete, Brydzinski and
2  Rockwell-Glynn, LP, also representing the
3  witness Luke Attanasi today.
4       MR. GONZALES:  John Gonzales
5  representing the Radnor Township
6  defendants.
7       VIDEOGRAPHER:  The court
8  reporter will swear in the witness.
9            -  -  -
10      LUKE ATTANASI, after having been
11 duly sworn, was examined and testified as
12 follows:
13           -  -  -
14 BY MR. SCRHOM:
15 Q.     Good morning.  Please, state your name and
16 spell your last?
17 **A.     Luke Attanasi, A-T-T-A-N-A-S-I.**
18 Q.     What's your date of birth?
19 **A.     8/23/82.**
20 Q.     And where do you currently reside?
21 **A.     Berwyn, Pennsylvania.**
22 Q.     Okay.  And what's your educational
23 background?
24 **A.     I -- high school, college, two degrees in**
25 **-- two bachelor's degrees in college.**

Page 7

1  Q.     Okay.  What are those degrees in?
2  **A.     Psychology and business.**
3  Q.     Okay.  And, briefly, your work experience?
4  **A.     Home builder for the past 17 years with**
5  **Rockwell and various companies.**
6  Q.     How long have you been working for
7  Rockwell?
8  **A.     12 years.**
9  Q.     12 years?
10 **A.     Yeah.**
11 Q.     Okay.
12 **A.     Yeah, 12 years.**
13 Q.     And what was your experience before
14 Rockwell?
15 **A.     I was a home builder with a different**
16 **company.  Cornell Homes was the name of the company.**
17 Q.     And what are your job responsibilities
18 with Rockwell?
19 **A.     I oversee our custom home and renovation**
20 **business.**
21 Q.     And what are the typical duties that are
22 involved?
23 **A.     Managing day-to-day operations, staffing,**
24 **new business development, so sales and, you know,**
25 **sort of daily operations.**

Page 8

1  Q.     Okay.  How would you characterize your
2  experience in that industry?  Very experienced,
3  experienced, not so experienced?
4  **A.     Very experienced.**
5       MR. BARTOS:  Objection.  You can
6  answer.
7       **THE WITNESS:  Okay.**
8       MR. BARTOS:  I'm just making a
9  formal objection.
10 BY MR. SCRHOM:
11 Q.     And how did you meet Mr. Lingo?
12 **A.     Mr. Lingo hired me out of -- he hired me**
13 **from college, and I worked with him for -- for many**
14 **years, you know, under various companies, but, you**
15 **know, currently Rockwell.**
16 Q.     Okay.  And so you've worked for Rockwell
17 for 12 years, or Lingo for 12 years?
18      MR. BARTOS:  Objection to form.
19      **THE WITNESS:  Both.**
20      MR. BARTOS:  You can answer.
21 BY MR. SCRHOM:
22 Q.     Go ahead?
23 **A.     It's the same.**
24 Q.     Okay.  So what were your responsibilities,
25 as they relate to 416 South Ithan Avenue?

Page 9

1  **A.     Responsible for developing and overseeing**
2  **the construction of the house and selling the house.**
3  Q.     Okay.  So would you say you're familiar
4  with the entire process from purchasing the land and
5  developing the property, and then ultimately selling
6  the property?
7  **A.     Yes.**
8  Q.     And you're familiar with all those
9  aspects?
10 **A.     Um-hum.**
11 Q.     Okay.
12 **A.     Yes.  Sorry.**
13 Q.     So why don't you take me from the
14 beginning of your particular involvement, when did
15 you first become involved with South 416 South Ithan
16 Avenue?
17 **A.     I was -- we looked at the house early on,**
18 **I don't know the date, to purchase it from**
19 **Mrs. Ockley, and I estimated construction costs, you**
20 **know, what it was going to take to build a new home,**
21 **and, you know, gave that information to Greg.  Greg**
22 **was dealing directly with Mrs. Ockley.  I did not**
23 **have any direct dealings with her.**
24 Q.     Okay.
25 **A.     And then, once we sold the home --**

Page 10

1  purchased the home from her, I was responsible for
2  permitting the new home on the property with the
3  township.  I was responsible then for building the
4  new home and so forth.
5  Q.      Okay.  Was the home ultimately built?
6  A.      It was.
7  Q.      And what was it sold for?
8  A.      The price?
9  Q.      Um-hum.
10  A.      I don't know the price off the top of my
11  head.
12  Q.      Okay.  Did you ever meet with Mrs. Ockley?
13  A.      I don't recall any direct -- I spoke to
14  her on the phone.  I don't recall any direct
15  meetings with her.  I do believe I saw her, but I
16  don't know how much communication we had.  It's a
17  little bit fuzzy, but I do think we -- I do know we
18  spoke on the phone, and I do think we spoke through
19  possibly a door in the house, when she was in the
20  house at one point, but I don't know that there was
21  a -- you know, an introduction, you know, like we
22  had earlier today.
23  Q.      Okay.  So relative to that development of
24  416, were there issues that you had with this
25  property, as they relate to Mrs. Ockley?

Page 11

1  A.      Yes.
2  Q.      Okay.  What were the issues, as you recall
3  them?
4  A.      As I recall them, we purchased the
5  property from her.  She refused to vacate the
6  property, would not get her things out of the
7  property.  It was to a point of the township had
8  condemned the house as unlivable, she kept breaking
9  into the house, and it was a -- it was a dangerous
10  situation, being the condition of the home, and the
11  living conditions of the house, so, yeah, I mean,
12  that's pretty much the gist of it.
13  Q.      Have you been through that property?
14  A.      Yes.
15  Q.      When did you go through the property?
16  A.      It was that summer of -- I'm not sure the
17  year.
18  Q.      '22?
19  A.      '22, sure.
20  Q.      Would that be after she vacated?
21  A.      It would have been while -- no, it
22  would've been before she vacated.
23  Q.      So it would have been between April and
24  August?
25  A.      Yeah.

Page 12

1  Q.      Okay.
2  A.      Yeah, yep.  I was not in the house prior
3  to her vacating.
4  Q.      At some point the locks were put on the
5  property by Rockwell-Glynn; is that correct?
6  A.      It was, yeah.
7  Q.      Okay.  Do you know the dates when the
8  locks were put on?
9  A.      I do not.
10  Q.      Do you know approximately when they were
11  put on?
12  A.      It would have been that summer.  I don't
13  know the --
14  Q.      Would it have been --
15  A.      I don't know the date.
16  Q.      -- before August 8th?
17  A.      I don't recall.
18  Q.      Do you know who authorized locks being put
19  on the property?
20  A.      I mean, we --
21  Q.      Was it your decision or Greg Lingo's
22  decision?
23  A.      I don't recall whose decision it was.
24              MR. BARTOS:  Objection to form.
25  BY MR. SCRHOM:

Page 13

1  Q.      You don't recall whose decision?
2  A.      No.
3  Q.      It could have been yours, it could have
4  been his?
5  A.      Yeah.
6  Q.      Do you know who stopped the electricity?
7  A.      I don't recall.
8  Q.      Was the electricity stopped at some point?
9  A.      The electricity was stopped.  All
10  utilities were terminated.
11  Q.      Do you know when they were terminated?
12  A.      I don't.
13  Q.      If you had to estimate, would they be
14  terminated prior to August of '22?
15  A.      It would have been right around that
16  timeline.  I don't know if it was July or early
17  August.
18  Q.      Okay.  At some point was it decided that
19  trees would be cut?
20  A.      Yes.
21  Q.      Okay.  And was MG Tree the company that
22  was selected?
23  A.      Yes.
24  Q.      And who made the determination to cut the
25  trees?

1  A.        Who made the determination to --
2  Q.        Cut the trees?
3  A.        I don't understand the question.
4  Q.        To cut the trees down?
5  A.        Like when or --
6  Q.        Yeah.
7  A.        -- what trees to take down?
8  Q.        Who and when, yeah?
9  A.        It would have been part of the planning
10 process with the engineering team, Rockwell, but I
11 don't -- does that answer your question?
12 Q.        Sure, a little bit.  Were you involved in
13 selecting MG Tree?
14 A.        I was.
15 Q.        Okay.  And did you tell them to go to the
16 property on a certain date and cut certain trees?
17 A.        I did.
18 Q.        Okay.  You don't recall the date though?
19 A.        I do not.
20 Q.        Okay.  At some point was the property also
21 boarded up?
22 A.        It was.
23 Q.        And would that have been, again, in that
24 same summer?
25 A.        Yeah.

1  Q.        Do you know whether it was April, May,
2  June, July, August?
3  A.        I believe it was in -- I believe it was in
4  August.
5  Q.        Okay.  And what actually was boarded up?
6  What --
7  A.        The front door, the back doors, and the
8  garage door.  There was -- I believe there was
9  broken glass from her trying to break into the
10 house, so it was a -- they were boarded up for
11 safety.
12 Q.        Okay.  What actually did they do in that
13 boarding up?
14 A.        Screwed plywood over the openings for
15 access.
16 Q.        Okay.  And what were the -- what type of
17 plywood did you put up, the length, width,
18 dimension; do you recall?
19 A.        I don't.
20 Q.        Okay.  Would it be like a four by --
21 typical four-by-eight sheet?
22 A.        Yeah, but it likely was probably cut to
23 size.  I don't know the sizes.
24 Q.        Okay.  Was that an instruction by you or
25 by Mr. Lingo?

1  A.        I don't recall.
2  Q.        Could it have been you?
3  A.        It could have been me.
4  Q.        Okay.  Were windows also boarded up?
5  A.        I don't recall windows being boarded up.
6  It could have been, but I don't remember.
7  Q.        Okay.  Would that also have been under
8  your instruction?
9  A.        It would have been under my supervision.
10 Q.        Okay.  Without showing you pictures and
11 looking for them, if I showed you pictures that had
12 boards on them, would that refresh your memory at
13 all?
14 A.        Sure.
15           MR. BARTOS:  Objection to form.
16           THE WITNESS:  Yeah, possibly.
17           Yeah.
18 BY MR. SCRHOM:
19 Q.        Okay.  Did you follow the paper trail from
20 the agreement of sale, to the transfer of property
21 via deed, and then the retransfer to the
22 Brydzinski --
23           MR. BARTOS:  Objection.
24 BY MR. SCRHOM:
25 Q.        -- and Prete?

1            MR. BARTOS:  Objection to form.
2            MR. SCRHOM:  Let me restate
3       that.
4  BY MR. SCRHOM:
5  Q.        Did you follow the paperwork, in addition
6  to the construction side of this project?
7  A.        Did I follow the paperwork?
8  Q.        Yes.  In other words, did you ever look at
9  the agreement of sale?
10 A.        With Mrs. Ockley?  I do not believe so.  I
11 looked at Brydzinski's agreement of sale, but I
12 don't know that I saw Mrs. Ockley's agreement of
13 sale.
14 Q.        Okay.  So you didn't see the agreement of
15 sale from Ockley to Rockwell-Glynn; is that correct?
16           MR. BARTOS:  Objection to form.
17           THE WITNESS:  I don't believe
18       so.
19 BY MR. SCRHOM:
20 Q.        Okay.  Did you see an agreement of sale
21 from Rockwell-Glynn to Brydzinski and Prete?
22 A.        Yes.
23 Q.        Okay.  At some point did you become aware
24 that Rockwell-Glynn sold the property to Brydzinski
25 and Prete?

1 A.      Yes.
2 Q.      When was that?
3             MR. BARTOS:  When he became
4      aware, or when the sale was?
5 BY MR. SCRHOM:
6 Q.      When did you become aware of it?
7 **A.      I don't know the date.  It was -- I**
8 **believe it was that spring or summer.**
9             MR. SCRHOM:  Okay.  Do we have
10      that, the agreement of sale, the date July
11      19th?
12             MS. MALLOY:  July 19th?
13             MR. SCRHOM:  Yeah.
14 BY MR. SCRHOM:
15 Q.      Okay.  If I showed you a document that
16 indicated the property was transferred on or about
17 July 19th from Rockwell-Glynn to Brydzinski, would
18 that refresh your recollection?
19             MR. BARTOS:  Objection to form.
20             MR. SCRHOM:  Let me just have
21      this marked, if I may.
22             MS. MALLOY:  Do you have a copy
23      of this, Counsel?
24             MR. BARTOS:  I don't know that I
25      do.

1             MS. MALLOY:  Okay.  Let me go
2      get it.
3             MR. BARTOS:  Thank you.
4             (P-1 Attanasi was introduced and
5      marked for identification.)
6 BY MR. SCRHOM:
7 Q.      Okay.  I'm showing you a document
8 previously marked P-1 Attanasi.  Can you identify
9 that document?
10 **A.      Yeah.  It looks -- it's the deed for the**
11 **property.**
12 Q.      So is it correct to say that on or about
13 July 19th, the property changed hands from
14 Rockwell-Glynn to --
15 **A.      Yes.**
16 Q.      -- the present owners Prete and
17 Brydzinski?
18 **A.      It is.**
19 Q.      Okay.  So as of that date, Rockwell-Glynn
20 didn't have an interest in the property; is that
21 correct?
22 **A.      Correct.**
23             MR. BARTOS:  Objection to form.
24 BY MR. SCRHOM:
25 Q.      Did you have a construction contract in

1 place with Brydzinski and Prete prior to that?
2 **A.      I don't know when we entered the**
3 **construction agreement with them.**
4 Q.      Was there a construction agreement?
5 **A.      There was.**
6 Q.      Okay.  And who would have a copy of that
7 construction agreement?
8 **A.      We would have a copy, both Rockwell and**
9 **Prete and Brydzinski.**
10 Q.      Okay.  Did you ever supply that to Counsel
11 Todd Bartos?
12 **A.      No.**
13 Q.      Are you aware that that was ever supplied?
14             MR. SCRHOM:  Do you have a copy
15      of that?
16             MR. BARTOS:  I don't.
17             MR. SCRHOM:  Okay.
18             MR. BARTOS:  Is the construction
19      an issue?
20             MR. SCRHOM:  I just wanted to
21      know when that document was signed.  It
22      may be relevant to the overall picture.
23             MR. BARTOS:  Send me a letter,
24      please.
25             MR. SCRHOM:  Okay.

1 BY MR. SCRHOM:
2 Q.      Did you create that agreement with Prete
3 and --
4 **A.      The construction agreement?**
5 Q.      Yes.
6 **A.      Yes, I would have.**
7 Q.      Okay.  Do you know whether or not there
8 were any specific time limitations regarding when
9 the property had to be completed?
10 **A.      I don't recall.**
11 Q.      Would it have been your custom and
12 practice to have a drop-dead date, meaning the
13 property would be completed by this date, or there
14 would be penalties assigned?
15 **A.      No, there generally is not in our**
16 **agreements.**
17 Q.      Okay.  Do you know if there were any such
18 terms and conditions in the agreement between
19 Rockwell-Glynn and Prete and Brydzinski?
20 **A.      No.  I already answered that question.**
21 Q.      What?
22 **A.      I already answered that.  No.**
23 Q.      Okay.
24 **A.      I don't know that.**
25             MR. SCRHOM:  I'd like to have

Page 22

1        this one marked.
2              (P-2 Attanasi was introduced and
3        marked for identification.)
4              MR. BARTOS:  Thank you.
5    BY MR. SCRHOM:
6    Q.      Okay.  You've had on opportunity to review
7    P-2 Attanasi?
8    A.      Yes.
9    Q.      And what is that document?
10   A.      It's an incident report form.
11   Q.      Okay.  From Radnor Township Police?
12   A.      Yes.
13   Q.      Okay.  And I direct your attention to page
14   three, can you, please, read that into the record?
15   A.      Luke Attanasi came into Radnor Township
16   Police Department to report police information.
17   Attanasi and Rockwell Custom Renovations states his
18   company is the new owner of the property at 416
19   South Ithan and has received a court order stating
20   that the current resident Simona Ockley must vacate
21   the property.  Attanasi also noted that the property
22   has been deemed uninhabitable by Radnor Township
23   Codes.  Attanasi provided a copy of the order from
24   the Delaware County Court of Common Pleas stating
25   that Ockley must remove her property by 9/1/22.

Page 23

1    Attanasi stated that he and Township Community
2    Development Director Kevin Kochanski would be
3    meeting at the -- meeting Ockley at the residence
4    shortly for the removal of the property -- time.
5    The court was uploaded to the attachments folder.
6    Faust.
7              MR. BARTOS:  I think you jumped
8        a line.
9              THE WITNESS:  Oh.
10             MR. BARTOS:  Attanasi advised.
11             THE WITNESS:  "That he wanted
12       the police to be aware of the
13       circumstances but did not need assistance
14       at this time.  The court document was
15       uploaded to the attachments folder."
16   BY MR. SCRHOM:
17   Q.      Okay.  Before I ask you questions about
18   that, I would like to show you what was previously
19   marked P-1 and P-2 in a prior deposition of Officer
20   Jennifer Cocco.  Can you identify P-1 and P-2?
21   A.      Yes.  Want me to read these?
22   Q.      No, but are those the orders that were
23   presented --
24             MR. BARTOS:  Objection to form.
25   BY MR. SCRHOM:

Page 24

1    Q.      -- on the day that you went to the police
2    department?
3    A.      Are these the orders that were presented?
4    Q.      To the police?
5              MR. BARTOS:  Objection.
6        Mischaracterization.
7              THE WITNESS:  I don't recall.  I
8        don't recall what documents --
9    BY MR. SCRHOM:
10   Q.      Okay.
11   A.      -- were presented.
12   Q.      In what you just read, it says Attanasi
13   provided a copy of the order from the Delaware
14   County Court of Common Pleas.  I'm asking you
15   whether one or both of the documents that you have
16   in your hand are what were presented?
17   A.      I don't -- I don't recall if these were
18   them or not.
19   Q.      Okay.
20   A.      There was clearly multiple, so I don't
21   know if there were others.  I'm not sure which one,
22   or one or both or --
23   Q.      Okay.
24   A.      I really don't know.
25   Q.      Did you take any other documents to the

Page 25

1    police --
2    A.      I don't recall.
3    Q.      -- at that time?
4    A.      I don't think so.  I don't know.
5    Q.      Let's just go through it more slowly.  The
6    first sentence is that Luke Attanasi came to report
7    police information.  Now, were you alone or by
8    yourself?
9    A.      I was alone.
10             MR. BARTOS:  Objection to form.
11   BY MR. SCRHOM:
12   Q.      Were you alone or with another?
13   A.      I don't recall.  I believe I was alone.  I
14   don't --
15   Q.      Okay.  Next is Attanasi of Rockwell Custom
16   Renovation states that his company is the new owner
17   of the property.  You were there on 8/9; is that
18   correct?
19   A.      That is correct.
20   Q.      And you stated to the police that
21   Rockwell-Glynn was the new owner?
22             MR. BARTOS:  Objection.
23   BY MR. SCRHOM:
24   Q.      Is that correct?
25             MR. BARTOS:  Objection to form.

Page 26

1         Foundation. Mischaracterization. This is
2         not -- this is not a sworn statement that
3         he made to the police. This is a police
4         record of a conversation written by
5         someone else.
6 BY MR. SCRHOM:
7  Q.     Did you tell the police that you were the
8 new -- that Rockwell-Glynn was the new owner of the
9 property?
10 A.     I don't remember what specifically I told
11 the police.
12 Q.     Because the deed was actually conveyed
13 from Rockwell-Glynn to Brydzinski and Prete on
14 July 19th, correct?
15 A.     That is correct.
16 Q.     So Rockwell-Glynn did not have an interest
17 in the property on 8/9, correct?
18 A.     Correct.
19 Q.     So this police notation is incorrect?
20         MR. BARTOS: Objection. Form.
21         Same basis as before. You can answer if
22         you're able.
23         THE WITNESS: Yes, that -- I
24         don't recall how that information was
25         given to the police --

Page 27

1 BY MR. SCRHOM:
2 Q.     Okay.
3 A.     -- in regards to the ownership of the
4 property. If they misunderstood it, or if I
5 misstated it, I do not recall, but clearly there is
6 an error.
7 Q.     You had in place a construction contract,
8 correct?
9 A.     We did.
10 Q.     But as of 8/9 you didn't have an ownership
11 interest?
12         MR. BARTOS: Objection. Asked
13         and answered several times. You can
14         answer again.
15         THE WITNESS: We had a
16         construction agreement. I do not recall
17         the dates of the construction agreement.
18 BY MR. SCRHOM:
19 Q.     Okay. So what happened on this day, after
20 you went to the police?
21 A.     That was the day that I believe Ms. Ockley
22 was supposed to remove her things.
23 Q.     Okay. And did you go to the site?
24 A.     I did.
25 Q.     Okay. And what transpired?

Page 28

1 A.     I don't recall the exact events of that
2 day.
3 Q.     Okay. So you drove up, you parked in the
4 driveway, got out?
5 A.     I don't recall.
6 Q.     Do you recall speaking with her outside,
7 inside?
8 A.     I don't recall. I don't recall speaking
9 with her on that day. I really don't recall that --
10 that time that -- you know, I don't recall exactly
11 what happened that morning in regards to Ms. Ockley.
12 Q.     Do you recall anything that happened
13 relative to that property that morning?
14 A.     I do not.
15 Q.     You just recall going to the police?
16 A.     I do recall going to the police.
17 Q.     And nothing else?
18 A.     That is correct.
19 Q.     Do you recall having any conversations
20 with Brydzinski or Prete during -- on that
21 particular day?
22 A.     I do not.
23 Q.     Do you recall having discussions with
24 Brydzinski or Prete in that week?
25 A.     I do not. Not specifically, no. There

Page 29

1 is -- this was several years ago.
2 Q.     Okay. When you were communicating with
3 Mr. Brydzinski, how would you normally communicate
4 with him?
5 A.     Phone calls, emails.
6 Q.     Text messages too?
7 A.     Text messages, sure.
8 Q.     Okay. What was the telephone number that
9 Mr. Brydzinski would be contacting you on during
10 that time?
11 A.     267-275-4971.
12 Q.     Were you aware that -- that there was a
13 hearing on July 11th in the Court of Common Pleas
14 where Rockwell-Glynn brought an action against
15 Simona Ockley? Were you aware of that?
16 A.     I was.
17 Q.     Okay.
18         MR. SCRHOM: Do you have that?
19         (P-3 Attanasi was introduced and
20         marked for identification.)
21 BY MR. SCRHOM:
22 Q.     Okay. What is your familiarity with
23 Rockwell-Glynn versus Simona Ockley?
24 A.     I would have to refresh. I don't -- I
25 don't recall exactly.

Page 30

1  Q.        Did you -- were you the point person for
2  that, or was Mr. Lingo?
3                 MR. BARTOS:  I'm sorry, for the
4           hearing?
5  BY MR. SCRHOM:
6  Q.        Yeah.  And the creation of the complaint?
7  A.        I was not present at the hearing or
8  involved in the complaint.
9  Q.        Okay.  So you didn't attend the hearing?
10 A.        I did not.
11 Q.        Did you ever meet with Mr. Lingo to
12 discuss the -- what transpired in that hearing?
13 A.        We would've had discussions on it.
14 There's no specific meetings about it.
15 Q.        Okay.  Did you ever see a copy of the
16 transcript.
17 A.        Recently I did.
18 Q.        Recently you did?
19 A.        Yeah.
20 Q.        Did you read it recently?
21 A.        Briefly.
22 Q.        Okay.  What was your understanding of
23 Ms. Ockley's status as of August 2022?
24 A.        That she was --
25                MR. BARTOS:  Objection to form.

Page 31

1           You can answer.
2                 THE WITNESS:  Okay.  That she
3           was -- when you say her status, what do
4           you mean by that?
5  BY MR. SCRHOM:
6  Q.        Well, what was she allowed to do, not
7  allowed to do, according to your understanding?
8  A.        To my understanding was she was allowed to
9  remove her things and move out of the property, but
10 she was not allowed to occupy or live in the
11 property.
12 Q.        Okay.  Did Mr. Lingo attend that hearing,
13 to the best of your knowledge?
14 A.        I believe so.  I don't -- I don't know.
15 Q.        Did he ever say to you I attended the
16 hearing?
17 A.        I don't recall.
18 Q.        I'm just going to go through some
19 pieces on page 24, if you would look at that for a
20 minute.
21                MR. BARTOS:  Let me get there,
22           please.  Okay.
23 BY MR. SCRHOM:
24 Q.        If you look to the court, starting with
25 line six, if you would read that?

Page 32

1  A.        "The Court:  Who is Mr. Lingo?
2           Mr. Herman:  Principal of the plaintiff,
3  Your Honor."
4  Q.        Okay?
5  A.        "Mr. Russell:  I'm sorry.
6  The Court:  Okay.
7           Mr. Herman:  He's sitting next to me."
8  Q.        So according to that, Mr. Lingo attended
9  the hearing.  Do you have any reason to believe that
10 he didn't?
11 A.        I do not.
12 Q.        Okay.  Let's look to another page.
13 A.        What page?
14 Q.        Page 39.  Sorry.  Page 37.
15 A.        37.
16 Q.        If you start with line 16 and read through
17 21?
18 A.        "Your attorney will assist and there will
19 be an agreement, a court order, that'll make --
20 that'll incorporate an agreement between the parties
21 that says that although the property has been
22 officially sold, that you are allowed to live and/or
23 access the property until September 1st."
24 Q.        Was that ever conveyed to you by
25 Mr. Lingo?

Page 33

1  A.        Not that --
2                 MR. BARTOS:  Was what conveyed?
3                 MR. SCRHOM:  Was that
4           information that he just read ever
5           conveyed specifically to you.
6                 MR. BARTOS:  I'm just going to
7           ask you to clarify.  That quote from the
8           court?
9                 MR. SCRHOM:  Let me do it
10          differently.
11 BY MR. SCRHOM:
12 Q.        You just read from page 37 of a transcript
13 of a hearing that took place on July 11, '22, and
14 you read lines 37 (sic) through 21, correct?
15 A.        That's correct.
16 Q.        Were the contents of what you just read
17 ever related to you specifically by Mr. Lingo?
18 A.        I don't --
19                MR. BARTOS:  Objection to form.
20          You can answer.
21                THE WITNESS:  Yeah, I don't
22          recall.  I don't recall her being allowed
23          to live there.
24 BY MR. SCRHOM:
25 Q.        Okay.  So Mr. Lingo never conveyed that

Page 34

1  specific information to you; is that right?
2              MR. BARTOS: Objection. Asked
3         and answered.
4              THE WITNESS: I don't recall.
5  BY MR. SCRHOM:
6  Q.       Okay. Let's turn over to page 38. I'm
7  looking at line 23, and it continues to 39 --
8  A.       "I don't know what you're saying. We'll
9  have a court order" --
10 Q.       Wait a minute. It's a statement that
11 begins on page 38, ends on page 39, so you would be
12 reading 23, 24, and then line one and two on the
13 next page.
14 A.       "The Court: I don't know what you're
15 saying. We'll have a court order and you'll have
16 access and/or residency of the property up until
17 September 1st. So you'll have a court order in
18 your hand."
19 Q.       Okay. Was the information that you just
20 read in lines 23, 24 of 38, and lines one and two of
21 39 ever conveyed to you by Mr. Lingo?
22             MR. BARTOS: Same objection.
23        You can answer.
24             THE WITNESS: I don't recall.
25 BY MR. SCRHOM:

Page 35

1  Q.       Did you ever have any meetings regarding
2  that specific language?
3  A.       No.
4  Q.       I'd like to direct your attention to page
5  39 on the bottom, that would be lines 23 and 24
6  beginning with I'm. Would you please read that?
7  A.       "I'm giving you to September 1st to live
8  and/or access the property, but not -- but again it
9  has -- the transfer has to go through" --
10 Q.       Wait a minute. Just 23 and 24. Do you
11 want to do that again?
12 A.       "I'm giving you to September 1st to live
13 and/or access the property."
14             MR. BARTOS: Objection.
15 BY MR. SCRHOM:
16 Q.       Okay. Was what you just read ever --
17 those lines, 23 and 24 on page 35, the contents,
18 were they ever read to -- or were they ever
19 discussed?
20 A.       I don't recall. Primarily, I recall the
21 court orders and what's listed in there, but not --
22 not specifically this information.
23 Q.       Okay. I'd like to direct your attention
24 to page 44, lines 22 and 23?
25 A.       "The Court: You have free" --

Page 36

1              MR. BARTOS: Same objection.
2              THE WITNESS: -- "access to the
3         property" --
4              MR. SCRHOM: No, no --
5              MR. BARTOS: Same objection.
6         You can answer.
7              THE WITNESS: "To do whatever
8         you want from now until September 1st."
9  BY MR. SCRHOM:
10 Q.       Read it again, please. Sorry. That
11 was --
12 A.       "The Court: You have free access to this
13 property to do whatever you want from now until
14 September 1st."
15 Q.       Okay. Regarding that particular quote,
16 did you have -- do you recall any conversations that
17 you had with Mr. Lingo regarding that statement?
18 A.       I don't recall, no.
19 Q.       You don't recall. I'd like to direct your
20 attention to page 45 as well, line three and -- to
21 five. Can you read that into the record?
22 A.       "The Court: Okay. Just make sure the
23 order reflects that she has that complete and free
24 access until the 1st."
25 Q.       Okay. Do you recall ever having a

Page 37

1  conversation with Mr. Lingo regarding the contents
2  of that quote?
3  A.       I don't.
4              MR. BARTOS: Objection. Form.
5         Foundation. You can answer.
6              THE WITNESS: I don't recall.
7  BY MR. SCRHOM:
8  Q.       Would it be fair to say that based on your
9  review of this hearing, that Ms. Ockley was allowed
10 to live in the premises?
11             MR. BARTOS: Objection. Calls
12        for speculation.
13             THE WITNESS: I don't recall.
14             MR. BARTOS: Mischaracterizes
15        the transcript. You can answer.
16             THE WITNESS: I don't recall.
17             MR. SCRHOM: Okay. I don't have
18        anything more on that document.
19 BY MR. SCRHOM:
20 Q.       I don't know whether I asked you this, but
21 when you went to the police station on that
22 particular day, I believe it was the 9th, were you
23 asked to go by Brydzinski?
24 A.       On the 9th?
25 Q.       Yeah.

1  A.      I don't recall.

2  Q.      Were you asked to go by Lingo?

3  A.      I think I was asked to go by Simona, if I
4  recall correctly.  She called me at one point.

5  Q.      She called you, so you think she asked you
6  to go?

7  A.      I believe so, yeah.  I don't -- I don't
8  recall the -- it was years ago.  I don't exactly
9  recall the specifics of who or what and when.

10 Q.      Okay.  Would it be fair to say that Simona
11 had until at least September 1st to stay in that
12 property in whatever manner?

13              MR. BARTOS:  Objection to form.
14      Foundation.  You can answer.

15 BY MR. SCRHOM:

16 Q.      All of these documents refer to
17 September 1st, correct?

18 A.      They do.

19 Q.      Okay.  Is there any reason that
20 Rockwell-Glynn didn't just wait the two weeks until
21 September 1st to get more involved with the
22 property?

23              MR. BARTOS:  Objection to form.

24 BY MR. SCRHOM:

25 Q.      Meaning that, you know, cutting down trees

1  and boarding it up, and on and on?

2              MR. BARTOS:  Objection.

3  BY MR. SCRHOM:

4  Q.      Why didn't Rockwell-Glynn just wait until
5  September 1st?

6              MR. BARTOS:  Objection to form.
7      You can answer.

8              THE WITNESS:  My understanding,
9      the township condemned it as
10     uninhabitable, and it was a clear
11     dangerous place to be with the holes in
12     the floor, and the various issues from a
13     safety perspective in the property.

14 BY MR. SCRHOM:

15 Q.      And who made the ultimate decision
16 regarding moving ahead with construction prep,
17 knocking down trees and so on prior to
18 September 1st?

19 A.      I don't recall.

20 Q.      Would it have been Mr. Lingo?

21 A.      I don't know.

22 Q.      Would it have been you?

23 A.      I don't -- I don't -- no, I wouldn't have
24 made that decision, but I don't recall who made that
25 decision.

1  Q.      Would it have been Mr. Brydzinski?

2  A.      I don't recall.

3  Q.      Would it have been Mr. Prete?

4  A.      I don't recall.

5  Q.      Do you know whether you or anyone else
6  sought legal advice relative to the status of Simona
7  Ockley prior to September 1st?

8              MR. BARTOS:  Objection to form.
9      You can answer.

10             THE WITNESS:  I don't recall.  I
11     don't know.

12 BY MR. SCRHOM:

13 Q.      So as I understand that, you moved ahead,
14 because you thought that the property was condemned;
15 is that correct?

16             MR. BARTOS:  Objection.  Form.
17     You can answer.

18             THE WITNESS:  That is correct,
19     yes.

20 BY MR. SCRHOM:

21 Q.      Were there any other reasons, other than
22 that?

23 A.      No.

24 Q.      Did you take any notes of interactions
25 between you and Simona Ockley?

1  A.      No.

2  Q.      Do you know whether Mr. Lingo had any
3  notes regarding his interactions with --

4  A.      I don't know.

5  Q.      -- Ockley?  Same question regarding your
6  interaction with Brydzinski or Prete?

7  A.      I don't know.

8  Q.      When did you find out that Simona Ockley
9  was attempting to turn the electric back on?

10 A.      When?

11 Q.      Yeah.

12 A.      I -- that summer.  I don't know the
13 specific day.

14 Q.      Were you aware at some point that she
15 tried to turn the electric back on?

16 A.      I was.

17 Q.      And what, if anything, did you do as a
18 consequence?

19 A.      I don't recall.

20 Q.      Did you become aware that she tried to
21 turn the water back on?

22 A.      I was.

23 Q.      And what, if anything, did you do in
24 response to that?

25 A.      I don't recall.  I don't know that I did

1 anything in response to that.
2 Q.      Do you know whether Mr. Brydzinski did
3 anything in response to her attempting to turn the
4 electric back on?
5 A.      I don't recall.
6 Q.      Do you know whether or not Greg Lingo did
7 anything in response to her trying to turn the
8 electric on?
9 A.      I don't recall.
10 Q.      Do you know whether Mr. Brydzinski did
11 anything in response to her attempting to turn the
12 water on?
13 A.      I don't recall.
14 Q.      Do you know whether or not Greg Lingo did
15 anything in response to her attempting to turn the
16 water on?
17 A.      I don't recall.
18 Q.      Do you recall the telephone number that
19 you used to communicate with Mr. Brydzinski, his
20 number that you communicated with?
21 A.      His number?
22 Q.      Yeah.
23 A.      I do not.
24 Q.      What?
25 A.      I don't -- I don't know his number.

1 Q.      Do you still have it in your phone?
2 A.      I do.
3 Q.      Can you provide it to counsel, and he can
4 provide it to me?
5           MR. BARTOS:  We can get that
6      afterwards.
7           THE WITNESS:  Yeah.
8 BY MR. SCRHOM:
9 Q.      Would it be fair to say that Brydzinski
10 was the primary contact for the job, that is the
11 demo and rebuilding of a new property?
12 A.      Yes.
13 Q.      Did you have interactions with Mr. Prete
14 during this period of time, or was he in the
15 background, and you didn't have many interactions
16 with him?
17 A.      He was in the background.  I didn't have
18 many interactions with him.
19 Q.      Okay.  So if you had to characterize the
20 percentage of interactions between Brydzinski and
21 Prete, how would you allocate that?  Meaning
22 95 percent of the time I was communicating with
23 Brydzinski, five percent of the time I was
24 communicating with Prete?
25 A.      Yeah, it was mostly Brydzinski, seldomly

1 Prete.
2 Q.      Okay.  And if you had to characterize it,
3 would you be able to do that or no?
4 A.      A percentage?
5 Q.      Meaning like nine out of ten times I'm
6 talking to --
7 A.      Yeah, nine out of ten is fair.
8 Q.      Okay.  And that relates to anything
9 regarding the property, that's the sale of the
10 property, any legal issues, anything that was coming
11 up, he was the point person?
12 A.      Jeff was the point of contact.
13 Q.      Okay.  If Simona Ockley was living in the
14 property during the period of time of August of
15 2022, you wouldn't have been able to move the
16 construction project ahead, correct?
17           MR. BARTOS:  Objection.  Form.
18      You can answer.
19           THE WITNESS:  If she had been
20      living there?
21 BY MR. SCRHOM:
22 Q.      Yeah?
23 A.      We would not have been able to build the
24 house.  We could have cut the trees down, I suppose,
25 but we couldn't have built the house, correct.

1 Q.      Okay.  At some point Ms. Ockley went to
2 the hospital, are you aware of that?
3 A.      I am aware that she went to the hospital.
4 Q.      Would it have been around April 21st?
5 A.      I don't know.
6 Q.      But she wasn't there in April, May, June,
7 July, all of that time, would that be fair?
8 A.      Wasn't where?
9 Q.      Wasn't living in the property?
10 A.      I believe that's accurate, I don't know
11 when she moved back into the property, but I thought
12 it was July that she moved back in.  I don't recall
13 exactly.
14 Q.      Anyway, did you have keys to the property
15 during that period of time?
16           MR. BARTOS:  You said keys?
17           MR. SCRHOM:  Keys.
18           THE WITNESS:  I don't remember.
19 BY MR. SCRHOM:
20 Q.      Were you able to enter the property, you
21 or others, during April, May, June, July?
22 A.      I don't remember when we first went in the
23 property, what date that was.
24 Q.      Are you aware that she had a lot of stuff
25 in that property?

Page 46

1  A.      I am.
2  Q.      Okay.  Are you aware of what happened to
3  all that stuff?
4  A.      Yes.
5  Q.      What happened?
6  A.      We packed it up, stored it in pods, I
7  think we had three pods that we packed her things,
8  her furniture, her belongings, and -- and left them
9  for her at a storage facility.
10  Q.      Okay.  Because one of the -- have you read
11  the complaint at all?
12  A.      Yes.
13  Q.      Okay.  It says that she's missing all this
14  stuff, right?
15  A.      Um-hum.
16              MR. BARTOS:  You have to give a
17          verbal.
18              THE WITNESS:  Yes.  Sorry.
19  BY MR. SCRHOM:
20  Q.      Okay.  Including a piano?
21  A.      A piano.
22  Q.      Do you know what happened to the piano?
23  A.      The piano, we were not able to move the
24  piano.  It was too large.
25  Q.      And that means that, what, you demo the

Page 47

1  house with the piano in it?
2  A.      I don't -- I don't know if we demoed the
3  house with the piano in it, I just -- I know that we
4  didn't move it out.  I don't know what happened.  I
5  don't know if she got it.  I don't know if it was
6  there when the house was demoed.  I'm not in the
7  house when it's demoed, so I don't know.
8  Q.      Did you take any final pictures of the
9  house before it got demoed?
10  A.      All the pictures that I have, no, there's
11  no final photos of the interior of the house before
12  it was demoed.
13  Q.      Was the house empty when it was demoed?
14  A.      From my understanding and recollection,
15  the house, when we left the house after unpacking
16  her things, the only things that I recall being
17  there were the piano and the couch that she had
18  soiled.
19  Q.      Okay.
20  A.      So we would -- our movers would not move
21  the soiled couch.
22  Q.      Okay.
23  A.      But between when I closed the door after
24  we moved her things out, and when the house was
25  demolished, I don't -- I don't know what happened

Page 48

1  between now and then.
2  Q.      Do you know whether anybody else had
3  access to the house and the piano, other than you?
4  A.      I don't know.
5  Q.      Did you lock the house --
6  A.      I don't recall.
7  Q.      -- when you left?
8  A.      I don't recall.
9  Q.      Would that have been your normal practice
10  to lock the door?
11  A.      Depending on timing and when demolition
12  was, it would have been, but I don't -- can't
13  guarantee it at this point.
14  Q.      So anyway, regarding the piano, the last
15  thing you remember is the piano was there, the
16  soiled couch, anything else?
17  A.      Not that I recall.
18  Q.      Okay.  She's saying a bunch of furniture,
19  personal belongings, medals of her husband from
20  Annapolis and on and on are missing.  Do you have
21  any idea as to --
22  A.      No.
23  Q.      -- what happened to that stuff?
24  A.      I don't recall seeing any of that stuff.
25  Q.      Who were the movers that moved her stuff

Page 49

1  into the pods?  Were they employees of you, or was
2  that a separate company?
3  A.      They were a separate -- we have a labor
4  company, like a general labor company that we use,
5  and they were -- they were --
6  Q.      What's the name of that company?
7  A.      That company was Prime Time.
8  Q.      Prime Time, and where are they located?
9  A.      I think they're out of Delaware.  I'm not
10  sure that they're still even in business.
11  Q.      Do you have a contact number for that?
12  A.      I'm sure I do, yeah.
13  Q.      Okay.  If you could get it and provide it
14  to counsel.
15  A.      Yeah.
16  Q.      Do you have -- do you recall a person that
17  you were dealing with?
18  A.      Yeah, that's the number I can give
19  counsel.
20  Q.      Okay.  So a telephone number and a person?
21  A.      Um-hum.
22  Q.      Do you recall a name right now?
23  A.      Justin, I think is his first name.
24  Q.      Justin?
25  A.      Yeah.

Page 50

1  Q.      How long have you been dealing with that
2  company?
3  **A.      We haven't dealt with them in many -- for**
4  **many years.  Like I said, I think they're out of**
5  **business.**
6  Q.      Okay.  Well, whatever information you can
7  provide.  Do you know if anybody went in the house
8  after you?  I may have asked you that.
9  **A.      Yeah, I don't know.**
10                MR. SCRHOM:  I'm going to take
11            just five, and I think that's about it for
12            me.
13                VIDEOGRAPHER:  Off the record at
14            10:58.
15            (At this time, a short break was
16        taken.)
17                VIDEOGRAPHER:  We're back on the
18            record at 11:10.
19  BY MR. SCRHOM:
20  Q.      Thank you.  I don't have any additional
21  questions.
22                MR. BARTOS:  May I just have
23            P-1, please?  Thank you.  John, do you
24            have anything?
25                MR. GONZALES:  I do not.  No

Page 51

1            questions.
2                MS. MALLOY:  Are you talking
3            about this P-1 or --
4                MR. BARTOS:  The Cocco.  Sorry.
5                MS. MALLOY:  Actually, this is
6            P-1 to be --
7  BY MR. BARTOS:
8  Q.      Mr. Attanasi, actually I have no
9  questions.  Thank you.
10                VIDEOGRAPHER:  Okay.  Let me go
11            off.  This concludes today's testimony
12            given by Luke Attanasi in the matter of
13            Simona Ockley versus Township of Radnor,
14            Pennsylvania, et al.  The time is 11:10
15            and we're off the record.
16                    -  -  -

Page 52

1          C E R T I F I C A T I O N
2
3        I, KIMBERLY WENDT, a Certified
4  Professional Reporter and Notary Public for the
5  Commonwealth of Pennsylvania, do hereby certify that
6  the foregoing is a true and accurate transcript of
7  the stenographic notes taken by me in the
8  aforementioned matter.
9  April 3, 2025
10                    -  -  -
11
12
13
14
15
16
17
18
19            *Kimberly Wendt*
20            KIMBERLY WENDT
              Notary Public
              My Commission Expires
21            On January 15, 2027
22
23
24
25

Page 53

1                    -  -  -
2          E R R A T A   S H E E T
3                    -  -  -
4
5  PAGE      LINE      CHANGE
6  _____    _____    _____
7  _____    _____    _____
8  _____    _____    _____
9  _____    _____    _____
10 _____    _____    _____
11 _____    _____    _____
12 _____    _____    _____
13 _____    _____    _____
14 _____    _____    _____
15 _____    _____    _____
16 _____    _____    _____
17 _____    _____    _____
18 _____    _____    _____
19 _____    _____    _____
20 _____    _____    _____
21 _____    _____    _____
22 _____    _____    _____
23 _____    _____    _____
24 _____    _____    _____
25

1                ACKNOWLEDGMENT OF DEPONENT

2

3        I,                        , do hereby certify

4  that I have read the foregoing pages and that the

5  same is a correct transcription of the answers given

6  by me to the questions therein propounded, except

7  for the corrections or changes in form or substance,

8  if any, noted in the attached Errata Sheet.

9

10

11

12

13

    _____            _____

14     Date                    Signature

15

16

17     Subscribed and sworn to before me this _____ day

    of       _____ 20___.

18

19     My commission expires: _____

20

21     _____

    Notary Public

22

23

24

25

## Exhibits

**Exhibit P-1** 4:12
**Exhibit P-2** 4:13
**Exhibit P-3** 4:15

---

### 1

**10:58** 50:14
**11** 33:13
**11:10** 50:18 51:14
**11th** 29:13
**12** 7:8,9,12 8:17
**16** 32:16
**17** 7:4
**19th** 18:11,12,17 19:13
26:14
**1st** 32:23 34:17 35:7,12
36:8,14,24 38:11,17,21
39:5,18 40:7

---

### 2

**2022** 30:23 44:15
**2025** 5:4
**21** 5:4 32:17 33:14
**21st** 45:4
**22** 11:18,19 13:14 33:13
35:24
**23** 34:7,12,20 35:5,10,17,
24
**24** 31:19 34:12,20 35:5,10,
17
**267-275-4971** 29:11
**2:24-cv-04070** 5:10

---

### 3

**35** 35:17
**37** 32:14,15 33:12,14

---

**38** 34:6,11,20
**39** 32:14 34:7,11,21 35:5

---

### 4

**4** 5:13
**416** 8:25 9:15 10:24 22:18
**44** 35:24
**45** 36:20

---

### 8

**8/23/82** 6:19
**8/9** 25:17 26:17 27:10
**8th** 12:16

---

### 9

**9/1/22** 22:25
**95** 43:22
**9:59** 5:3
**9th** 37:22,24

---

### A

**A-T-T-A-N-A-S-I** 6:17
**a.m.** 5:3
**access** 15:15 32:23
34:16 35:8,13 36:2,12,24
48:3
**accurate** 45:10
**action** 29:14
**addition** 17:5
**additional** 50:20
**advice** 40:6
**advised** 23:10
**agreement** 16:20 17:9,
11,12,14,20 18:10 20:3,4,7
21:2,4,18 27:16,17 32:19,
20

**agreements** 21:16
**ahead** 8:22 39:16 40:13
44:16
**Alan** 5:16
**allocate** 43:21
**allowed** 31:6,7,8,10
32:22 33:22 37:9
**allowing** 34:15
**and/or** 32:22 34:16 35:8,
13
**Annapolis** 48:20
**approximately** 12:10
**April** 11:23 15:1 45:4,6,21
**aspects** 9:9
**assigned** 21:14
**assist** 32:18
**assistance** 23:13
**attachments** 23:5,15
**Attanasi** 5:5 6:3,10,17
19:4,8 22:2,7,15,17,21,23
23:1,10 24:12 25:6,15
29:19 51:8,12
**attempting** 41:9 42:3,
11,15
**attend** 30:9 31:12
**attended** 31:15 32:8
**attention** 22:13 35:4,23
36:20
**attorney** 32:18
**August** 11:24 12:16
13:14,17 15:2,4 30:23
44:14
**authorized** 12:18
**Avenue** 8:25 9:16
**aware** 17:23 18:4,6 20:13
23:12 29:12,15 41:14,20
45:2,3,24 46:2

---

### B

**bachelor's** 6:25

**back** 15:7 41:9,15,21 42:4
45:11,12 50:17
**background** 6:23
43:15,17
**Bartos** 5:24,25 8:5,8,18,
20 12:24 16:15,23 17:1,16
18:3,19,24 19:3,23 20:11,
16,18,23 22:4 23:7,10,24
24:5 25:10,22,25 26:20
27:12 30:3,25 31:21 33:2,
6,19 34:2,22 35:14 36:1,5
37:4,11,14 38:13,23 39:2,6
40:8,16 43:5 44:17 45:16
46:16 50:22 51:4,7
**based** 37:8
**basis** 26:21
**begin** 5:4
**beginning** 9:14 35:6
**begins** 34:11
**behalf** 5:17,22,25
**belongings** 46:8 48:19
**Berwyn** 6:21
**birth** 6:18
**bit** 10:17 14:12
**boarded** 14:21 15:5,10
16:4,5
**boarding** 15:13 39:1
**boards** 16:12
**Botel** 5:12
**bottom** 35:5
**break** 15:9 50:15
**breaking** 11:8
**briefly** 7:3 30:21
**broken** 15:9
**brought** 29:14
**Brydzinski** 6:1 16:22
17:21,24 18:17 19:17 20:1,
9 21:19 26:13 28:20,24
29:3,9 37:23 40:1 41:6
42:2,10,19 43:9,20,23,25
**Brydzinski's** 17:11
**build** 9:20 44:23

**builder** 7:4,15

**building** 10:3

**built** 10:5 44:25

**bunch** 48:18

**business** 7:2,20,24
49:10 50:5

---

**C**

**called** 38:4,5

**calls** 29:5 37:11

**case** 5:8,10

**changed** 19:13

**characterize** 8:1 43:19
44:2

**circumstances** 23:13

**clarify** 33:7

**clear** 39:10

**closed** 47:23

**Cocco** 23:20 51:4

**Codes** 22:23

**college** 6:24,25 8:13

**Common** 22:24 24:14
29:13

**communicate** 29:3
42:19

**communicated** 42:20

**communicating** 29:2
43:22,24

**communication**
10:16

**Community** 23:1

**companies** 7:5 8:14

**company** 7:16 13:21
22:18 25:16 49:2,4,6,7
50:2

**complaint** 30:6,8 46:11

**complete** 36:23

**completed** 21:9,13

**concludes** 51:11

**condemned** 11:8 39:9
40:14

**condition** 11:10

**conditions** 11:11 21:18

**consequence** 41:18

**construction** 9:2,19
17:6 19:25 20:3,4,7,18
21:4 27:7,16,17 39:16
44:16

**contact** 43:10 44:12
49:11

**contacting** 29:9

**contents** 33:16 35:17
37:1

**continues** 34:7

**contract** 19:25 27:7

**conversation** 26:4
37:1

**conversations** 28:19
36:16

**conveyed** 26:12 32:24
33:2,5,25 34:21

**copy** 18:22 20:6,8,14
22:23 24:13 30:15

**Cornell** 7:16

**correct** 12:5 17:15
19:12,21,22 25:18,19,24
26:14,15,17,18 27:8 28:18
33:14,15 38:17 40:15,18
44:16,25

**correctly** 38:4

**costs** 9:19

**couch** 47:17,21 48:16

**counsel** 5:19 18:23
20:10 43:3 49:14,19

**County** 22:24 24:14

**court** 5:9,16,18 6:7 22:19,
24 23:5,14 24:14 29:13
31:24 32:1,6,19 33:8 34:9,
14,15,17 35:21,25 36:12,
22

**create** 21:2

**creation** 30:6

**current** 22:20

**custom** 7:19 21:11 22:17
25:15

**cut** 13:19,24 14:2,4,16
15:22 44:24

**cutting** 38:25

---

**D**

**daily** 7:25

**dangerous** 11:9 39:11

**date** 6:18 9:18 12:15
14:16,18 18:7,10 19:19
21:12,13 45:23

**dates** 12:7 27:17

**day** 24:1 27:19,21 28:2,9,
21 37:22 41:13

**day-to-day** 7:23

**dealing** 9:22 49:17 50:1

**dealings** 9:23

**dealt** 50:3

**decided** 13:18

**decision** 12:21,22,23
13:1 39:15,24,25

**deed** 16:21 19:10 26:12

**deemed** 22:22

**defendants** 6:6

**degrees** 6:24,25 7:1

**Delaware** 22:24 24:13
49:9

**demo** 43:11 46:25

**demoed** 47:2,6,7,9,12,
13

**demolished** 47:25

**demolition** 48:11

**department** 22:16 24:2

**Depending** 48:11

**deposition** 5:5,11
23:19

**determination** 13:24
14:1

**developing** 9:1,5

**development** 7:24
10:23 23:2

**differently** 33:10

**dimension** 15:18

**direct** 9:23 10:13,14
22:13 35:4,23 36:19

**directly** 9:22

**Director** 23:2

**discuss** 30:12

**discussed** 35:19

**discussions** 28:23
30:13

**District** 5:9

**document** 18:15 19:7,9
20:21 22:9 23:14 37:18

**documents** 24:8,15,25
38:16

**door** 10:19 15:7,8 47:23
48:10

**doors** 15:7

**driveway** 28:4

**drop-dead** 21:12

**drove** 28:3

**duly** 6:11

**duties** 7:21

---

**E**

**earlier** 10:22

**early** 9:17 13:16

**Eastern** 5:4,9

**educational** 6:22

**electric** 41:9,15 42:4,8

**electricity** 13:6,8,9

**emails** 29:5

**employees** 49:1

**empty** 47:13

**ends** 34:11

engineering 14:10

enter 45:20

entered 20:2

entire 9:4

error 27:6

estimate 13:13

estimated 9:19

et al 5:7 51:14

events 28:1

exact 28:1

examined 6:11

experience 7:3,13 8:2

experienced 8:2,3,4

**F**

facility 46:9

fair 37:8 38:10 43:9 44:7
45:7

familiar 9:3,8

familiarity 29:22

Faust 23:6

final 47:8,11

find 41:8

floor 39:12

folder 23:5,15

follow 16:19 17:5,7

form 8:18 12:24 16:15
17:1,16 18:19 19:23 22:10
23:24 25:10,25 26:20
30:25 33:19 37:4 38:13,23
39:6 40:8,16 44:17

formal 8:9

Foundation 26:1 37:5
38:14

four-by-eight 15:21

free 35:25 36:12,23

front 5:13 15:7

furniture 46:8 48:18

fuzzy 10:17

**G**

garage 15:8

gave 9:21

general 49:4

generally 21:15

Gerard 5:22

gist 11:12

give 46:16 49:18

giving 35:7,12

glass 15:9

Gonzales 6:4 50:25

Good 5:2,21,24 6:15

Greg 9:21 12:21 42:6,14

Group 5:25

guarantee 48:13

**H**

hand 24:16 34:18

hands 19:13

happened 27:19 28:11,
12 46:2,5,22 47:4,25 48:23

head 10:11

hearing 29:13 30:4,7,9,
12 31:12,16 32:9 33:13
37:9

Herman 32:2,7

high 6:24

hired 8:12

holes 39:11

home 7:4,15,19 9:20,25
10:1,2,4,5 11:10

Homes 7:16

Honor 32:3

hospital 45:2,3

house 9:2,17 10:19,20
11:8,9,11 12:2 15:10

44:24,25 47:1,3,6,7,9,11,
13,15,24 48:3,5 50:7

husband 48:19

**I**

idea 48:21

identification 19:5
22:3 29:20

identify 5:19 19:8 23:20

incident 22:10

Including 46:20

incorporate 32:20

incorrect 26:19

industry 8:2

information 9:21 22:16
25:7 26:24 33:4 34:1,19
35:22 50:6

inside 28:7

instruction 15:24 16:8

interaction 41:6

interactions 40:24
41:3 43:13,15,18,20

interest 19:20 26:16
27:11

interior 47:11

introduced 19:4 22:2
29:19

introduction 10:21

involved 7:22 9:15
14:12 30:8 38:21

involvement 9:14

issue 20:19

issues 10:24 11:2 39:12
44:10

Ithan 8:25 9:15 22:19

**J**

Jeff 44:12

Jennifer 23:20

job 7:17 43:10

John 6:4 50:23

July 13:16 15:2 18:10,12,
17 19:13 26:14 29:13
33:13 45:7,12,21

jumped 23:7

June 15:2 45:6,21

Justin 49:23,24

**K**

Kevin 23:2

keys 45:14,16,17

Kim 5:17

knocking 39:17

knowledge 31:13

Kochanski 23:2

**L**

labor 49:3,4

land 9:4

language 35:2

large 46:24

Law 5:11,25

left 46:8 47:15 48:7

legal 5:15 40:6 44:10

length 15:17

letter 20:23

limitations 21:8

lines 33:14 34:20 35:5,17,
24

Lingo 8:11,12,17 15:25
30:2,11 31:12 32:1,8,25
33:17,25 34:21 36:17 37:1
38:2 39:20 41:2 42:6,14

Lingo's 12:21

listed 35:21

live 31:10 32:22 33:23
35:7,12 37:10

**living** 11:11 44:13,20 45:9

**located** 5:13 49:8

**lock** 48:5,10

**locks** 12:4,8,18

**long** 7:6 50:1

**looked** 9:17 17:11

**lot** 45:24

**LP** 6:2

**Luke** 5:5 6:3,10,17 22:15 25:6 51:12

**M**

**made** 13:24 14:1 26:3 39:15,24

**make** 32:19 36:22

**making** 8:8

**MALLOY** 18:12,22 19:1 51:2,5

**Managing** 7:23

**manner** 38:12

**March** 5:4

**marked** 18:21 19:5,8 22:1,3 23:19 29:20

**matter** 5:6 51:12

**meaning** 21:12 38:25 43:21 44:5

**means** 46:25

**medals** 48:19

**Media** 5:13

**meet** 8:11 10:12 30:11

**meeting** 23:3

**meetings** 10:15 30:14 35:1

**memory** 16:12

**messages** 29:6,7

**MG** 13:21 14:13

**minute** 31:20 34:10 35:10

**Mischaracterization** 24:6 26:1

**Mischaracterizes** 37:14

**missing** 46:13 48:20

**misstated** 27:5

**Misters** 6:1

**misunderstood** 27:4

**morning** 5:2,21,24 6:15 28:11,13

**move** 31:9 44:15 46:23 47:4,20

**moved** 40:13 45:11,12 47:24 48:25

**movers** 47:20 48:25

**moving** 39:16

**multiple** 24:20

**N**

**normal** 48:9

**notation** 26:19

**noted** 22:21

**notes** 40:24 41:3

**number** 5:10 29:8 42:18, 20,21,25 49:11,18,20

**O**

**objection** 8:5,9,18 12:24 16:15,23 17:1,16 18:19 19:23 23:24 24:5 25:10,22,25 26:20 27:12 30:25 33:19 34:2,22 35:14 36:1,5 37:4,11 38:13,23 39:2,6 40:8,16 44:17

**occupy** 31:10

**Ockley** 5:6,23 9:19,22 10:12,25 17:10,15 22:20, 25 23:3 27:21 28:11 29:15, 23 37:9 40:7,25 41:5,8 44:13 45:1 51:13

**Ockley's** 17:12 30:23

**Officer** 23:19

**Offices** 5:12

**officially** 32:22

**openings** 15:14

**operations** 7:23,25

**opportunity** 22:6

**order** 22:19,23 24:13 32:19 34:9,15,17 36:23

**orders** 23:22 24:3 35:21

**oversee** 7:19

**overseeing** 9:1

**owner** 22:18 25:16,21 26:8

**owners** 19:16

**ownership** 27:3,10

**P**

**P-1** 19:4,8 23:19,20 50:23 51:3,6

**P-2** 22:2,7 23:19,20

**P-3** 29:19

**packed** 46:6,7

**Paller** 5:16

**paper** 16:19

**paperwork** 17:5,7

**parked** 28:3

**part** 14:9

**parties** 32:20

**past** 7:4

**penalties** 21:14

**Pennsylvania** 5:7,10, 14 6:21 51:14

**percent** 43:22,23

**percentage** 43:20 44:4

**period** 43:14 44:14 45:15

**permitting** 10:2

**person** 30:1 44:11 49:16, 20

**personal** 48:19

**perspective** 39:13

**phone** 10:14,18 29:5 43:1

**photos** 47:11

**piano** 46:20,21,22,23,24 47:1,3,17 48:3,14,15

**picture** 20:22

**pictures** 16:10,11 47:8, 10

**pieces** 31:19

**place** 5:11 20:1 27:7 33:13 39:11

**plaintiff** 5:23 32:2

**planning** 14:9

**Pleas** 22:24 24:14 29:13

**plywood** 15:14,17

**pods** 46:6,7 49:1

**point** 10:20 11:7 12:4 13:8,18 14:20 17:23 30:1 38:4 41:14 44:11,12 45:1 48:13

**police** 22:11,16 23:12 24:1,4 25:1,7,20 26:3,7,11, 19,25 27:20 28:15,16 37:21

**possibly** 10:19 16:16

**practice** 21:12 48:9

**premises** 37:10

**prep** 39:16

**present** 19:16 30:7

**presented** 23:23 24:3, 11,16

**Prete** 6:1 16:25 17:21,25 19:16 20:1,9 21:2,19 26:13 28:20,24 40:3 41:6 43:13, 21,24 44:1

**pretty** 11:12

**previously** 19:8 23:18

**price** 10:8,10

**Primarily** 35:20

**primary** 43:10

**Prime** 49:7,8

**Principal** 32:2

**prior** 12:2 13:14 20:1 23:19 39:17 40:7

**process** 9:4 14:10

**project** 17:6 44:16

**property** 9:5,6 10:2,25 11:5,6,7,13,15 12:5,19 14:16,20 16:20 17:24 18:16 19:11,13,20 21:9,13 22:18,21,25 23:4 25:17 26:9,17 27:4 28:13 31:9,11 32:21,23 34:16 35:8,13 36:3,13 38:12,22 39:13 40:14 43:11 44:9,10,14 45:9,11,14,20,23,25

**provide** 43:3,4 49:13 50:7

**provided** 22:23 24:13

**Psychology** 7:2

**purchase** 9:18

**purchased** 10:1 11:4

**purchasing** 9:4

**put** 12:4,8,11,18 15:17

---

**Q**

**question** 14:3,11 21:20 41:5

**questions** 23:17 50:21 51:1,9

**quote** 33:7 36:15 37:2

---

**R**

**Radnor** 5:7 6:5 22:11,15, 22 51:13

**read** 22:14 23:21 24:12 30:20 31:25 32:16 33:4,12, 14,16 34:20 35:6,16,18 36:10,21 46:10

**reading** 34:12

**reason** 32:9 38:19

**reasons** 40:21

**rebuilding** 43:11

**recall** 10:13,14 11:2,4 12:17,23 13:1,7 14:18 15:18 16:1,5 21:10 24:7,8, 17 25:2,13 26:24 27:5,16 28:1,5,6,8,9,10,12,15,16, 19,23 29:25 31:17 33:22 34:4,24 35:20 36:16,18,19, 25 37:6,13,16 38:1,4,8,9 39:19,24 40:2,4,10 41:19, 25 42:5,9,13,17,18 45:12 47:16 48:6,8,17,24 49:16, 22

**received** 22:19

**recently** 30:17,18,20

**recollection** 18:18 47:14

**record** 5:3 22:14 26:4 36:21 50:13,18 51:15

**refer** 38:16

**reflects** 36:23

**refresh** 16:12 18:18 29:24

**refused** 11:5

**relate** 8:25 10:25

**related** 33:17

**relates** 44:8

**relative** 10:23 28:13 40:6

**relevant** 20:22

**remember** 16:6 26:10 45:18,22 48:15

**removal** 23:4

**remove** 22:25 27:22 31:9

**renovation** 7:19 25:16

**Renovations** 22:17

**report** 22:10,16 25:6

**reporter** 5:16 6:8

**Reporting** 5:18

**represent** 5:20

**representing** 6:2,5

**reside** 6:20

**residence** 23:3

**residency** 34:16

**resident** 22:20

**response** 41:24 42:1,3, 7,11,15

**responsibilities** 7:17 8:24

**responsible** 9:1 10:1,3

**restate** 17:2

**retransfer** 16:21

**review** 22:6 37:9

**Rockwell** 7:5,7,14,18 8:15,16 14:10 20:8 22:17 25:15

**Rockwell-glynn** 6:2 12:5 17:15,21,24 18:17 19:14,19 21:19 25:21 26:8, 13,16 29:14,23 38:20 39:4

**Russell** 32:5

---

**S**

**S-C-H-R-O-M** 5:22

**safety** 15:11 39:13

**sale** 16:20 17:9,11,13,15, 20 18:4,10 44:9

**sales** 7:24

**school** 6:24

**Schrom** 5:12,22

**Screwed** 15:14

**SCRHOM** 5:21 6:14 8:10,21 12:25 16:18,24 17:2,4,19 18:5,9,13,14,20 19:6,24 20:14,17,20,25 21:1,25 22:5 23:16,25 24:9 25:11,23 26:6 27:1,18 29:18,21 30:5 31:5,23 33:3,9,11,24 34:5,25 35:15 36:4,9 37:7,17,19 38:15,24 39:3,14 40:12,20 43:8 44:21 45:17,19 46:19 50:10,19

**seldomly** 43:25

**selected** 13:22

**selecting** 14:13

**selling** 9:2,5

**Send** 20:23

**sentence** 25:6

**separate** 49:2,3

**September** 32:23 34:17 35:7,12 36:8,14 38:11,17, 21 39:5,18 40:7

**Shaffer** 5:12

**sheet** 15:21

**short** 50:15

**shortly** 23:4

**show** 23:18

**showed** 16:11 18:15

**showing** 16:10 19:7

**sic** 33:14

**side** 17:6

**signed** 20:21

**Simona** 5:6,23 22:20 29:15,23 38:3,10 40:6,25 41:8 44:13 51:13

**site** 27:23

**sitting** 32:7

**situation** 11:10

**size** 15:23

**sizes** 15:23

**slowly** 25:5

**soiled** 47:18,21 48:16

**sold** 9:25 10:7 17:24 32:22

**sort** 7:25

**sought** 40:6

**South** 8:25 9:15 22:19

**speaking** 28:6,8

**specific** 21:8 30:14 34:1 35:2 41:13

**specifically** 26:10 28:25 33:5,17 35:22

**specifics** 38:9

**speculation** 37:12

**spell** 6:16

**spoke** 10:13,18

**spring** 18:8

**Spruce** 5:25

**staffing** 7:23

**start** 32:16

**starting** 31:24

**state** 5:20 6:15

**stated** 23:1 25:20

**statement** 26:2 34:10 36:17

**states** 5:8 22:17 25:16

**stating** 22:19,24

**station** 37:21

**status** 30:23 31:3 40:6

**stay** 38:11

**Steno** 5:18

**stopped** 13:6,8,9

**storage** 46:9

**stored** 46:6

**Street** 5:13

**stuff** 45:24 46:3,14 48:23, 24,25

**summer** 11:16 12:12 14:24 18:8 41:12

**supervision** 16:9

**supplied** 20:13

**supply** 20:10

**suppose** 44:24

**supposed** 27:22

**swear** 6:8

**sworn** 6:11 26:2

## T

**taking** 5:11

**talking** 44:6 51:2

**team** 14:10

**telephone** 29:8 42:18 49:20

**ten** 44:5,7

**terminated** 13:10,11,14

**terms** 21:18

**testified** 6:11

**testimony** 51:11

**Text** 29:6,7

**that'll** 32:19,20

**thing** 48:15

**things** 11:6 27:22 31:9 46:7 47:16,24

**thought** 40:14 45:11

**time** 5:4,18 21:8 23:4,14 25:3 28:10 29:10 43:14,22, 23 44:14 45:7,15 49:7,8 50:15 51:14

**timeline** 13:16

**times** 27:13 44:5

**timing** 48:11

**today** 6:3 10:22

**today's** 51:11

**Todd** 5:24 20:11

**told** 26:10

**top** 10:10

**township** 5:7 6:5 10:3 11:7 22:11,15,22 23:1 39:9 51:13

**trail** 16:19

**transcript** 30:16 33:12 37:15

**transfer** 16:20 35:9

**transferred** 18:16

**transpired** 27:25 30:12

**Tree** 13:21 14:13

**trees** 13:19,25 14:2,4,7, 16 38:25 39:17 44:24

**turn** 34:6 41:9,15,21 42:3, 7,11,15

**type** 15:16

**typical** 7:21 15:21

## U

**ultimate** 39:15

**ultimately** 9:5 10:5

**Um-hum** 9:10 10:9 46:15 49:21

**understand** 14:3 40:13

**understanding** 30:22 31:7,8 39:8 47:14

**uninhabitable** 22:22 39:10

**United** 5:8

**unlivable** 11:8

**unpacking** 47:15

**uploaded** 23:5,15

**utilities** 13:10

## V

**vacate** 11:5 22:20

**vacated** 11:20,22

**vacating** 12:3

**venued** 5:8

**verbal** 46:17

**versus** 5:6 29:23 51:13

## W

**wait** 34:10 35:10 38:20 39:4

**wanted** 20:20 23:11

**water** 41:21 42:12,16

**week** 28:24

**weeks** 38:20

**Wendt** 5:17

**West** 5:13

**width** 15:17

**windows** 16:4,5

**words** 17:8

**work** 7:3

**worked** 8:13,16

**working** 7:6

**would've** 11:22 30:13

**written** 26:4

## Y

**year** 11:17

**years** 7:4,8,9,12 8:14,17 29:1 38:8 50:4