## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SIMONA OCKLEY                       :
                                    :          **CIVIL ACTION**
     **v.**                            :
                                    :
RADNOR TOWNSHIP, et. al.            :          NO.  24-4070
                                    :

## <u>OPINION</u>

### I.    **Introduction**

Plaintiff Simona Ockley ("Plaintiff") has come upon difficult times over the past few years, which are hard to overstate. By all accounts, Plaintiff suffered serious physical injuries which required months of treatment, faced potential commitment pursuant to the Pennsylvania Mental Health Procedures Act ("MPHA"), and was unable to care for herself for extended periods, all while attempting to finalize the sale of her home and complete the retrieval of her voluminous personal possessions.

During these difficulties, Plaintiff has also encountered private individuals and government entities who have, in her view, frustrated her road to self-sufficiency and recovery. She now brings claims under 42 U.S.C. § 1983 for malicious prosecution, false arrest, and false imprisonment, as well as claims under common law, seeking recompense from these actors for their perceived role in this difficult time in her life. But Plaintiff's perception of the factual basis for those difficulties does not create a legal basis for recovery.

1

It is impossible not to feel great sympathy for Plaintiff. But this is a Court of law – and its charge is to apply the law, without sympathy or malice. For the reasons to be explained *infra*, applying the law neutrally requires this Court to grant summary judgment to all Defendants[1] on all counts.

## II.    Undisputed Factual Background

The facts which gave rise to this case began in late 2021, when Plaintiff and Rockwell-Glynn executed an agreement to sell her property, located at 416 South Ithan Avenue, Villanova, PA, in Radnor Township (the "Property"), for $550,000. (Dkt. #40 at ¶¶ 4, 8, 8.1). At Plaintiff's request, settlement was delayed from January 31, 2022 until April 17, 2022. (*Id.* at ¶ 12). All parties agree that, as of April 2022, the Property was in disarray. (*Id.* at ¶ 14).

On April 10, 2022, Plaintiff fell inside the Property and injured her left leg and back. (*Id.* at ¶ 16). On April 21, 2022, Plaintiff called 9-1-1 and reported she had not moved or eaten for eleven days. (*Id.*). Radnor police officers responded and found the Property to be obstructed by Plaintiff's belongings, akin to a hoarding situation. (*Id.* at ¶ 17). Plaintiff was transported to the hospital via ambulance. (*Id.*). During this incident, Plaintiff complained to Radnor that the responding officer, Mark Bates, remained alone at the Property, believing his presence compromised the Property's security. (*Id.* at ¶ 20). Medical examination at the hospital revealed a large fracture of her femur, which was treated by surgery with in-patient hospital recovery until

---

[1]    Radnor Township ("Radnor"), Jennifer Cocco, Joseph Pinto, Brady McHale, and Brian Brown are the "Radnor Defendants." The latter four are police officers and referred to as the "Individual Radnor Defendants." Rockwell Glynn, LP ("Rockwell-Glynn"), Jeffrey Brydzinski, and Tyler Prete are the "Rockwell Defendants."

May 7, 2022. (*Id.* at ¶ 19). Plaintiff was transferred to Broomall Manor for rehabilitation until August 8, 2022. (*Id.*).

On April 26, 2022, Radnor issued a Notice of Condemnation for the Property. (*Id.* at ¶ 22). This notice declared the Property unfit for human occupancy due to a hole in the kitchen floor and excessive clutter, and permitted occupancy from only 8:00 A.M. until 4:00 P.M. for abatement, with sleeping and cooking not permitted. (*Id.*). Radnor padlocked the Property in late April 2022. (*Id.* at ¶ 24).

On June 21, 2022, two months after the agreed April 17, 2022 settlement date, Rockwell-Glynn filed a complaint in the Delaware County Court of Common Pleas, which sought declaratory relief that it was permitted to record the deed to the Property in its name. (*Id.* at ¶ 29). Three days later, Rockwell-Glynn filed a petition for Special Injunctive Relief requesting the same relief it requested in its complaint. (*Id.* at ¶ 29.1). On July 11, 2022, after a hearing on the matter, Judge John J. Whelan issued an order which permitted Rockwell-Glynn to execute the deed upon payment to Plaintiff. (*Id.* at ¶ 20, hereinafter the "First Order"). The First Order crucially said:

> [Ockley] shall have unlimited and unfettered access to the Property at her own risk to remove her personal property until September 1, 2022. Any personal property remaining at the Property after September 1, 2022 shall be deemed abandoned and may be removed by Plaintiff as refuse.

(*Id.*). On July 19, 2022, Plaintiff received $484,000, the balance that Rockwell-Glynn owed for the sale of the Property. (*Id.* at ¶ 37).

On August 8, 2022, upon Plaintiff's release from Broomall Manor, she called a taxi and was driven to the Property around dinner time, where she found that the

entrances were sealed by two sets of locks, one belonging to Radnor and the other belonging to Rockwell-Glynn. (*Id.* at ¶ 42). Plaintiff also saw the condemnation notice. (*Id.*). After being told by Rockwell-Glynn that she was not permitted to enter the property, the taxi driver drove Plaintiff to the Red Roof Inn in Tinicum Township, still dressed in her hospital gown. (*Id.* at ¶ 44).

On August 9, 2022, after finding the locks were still on the Property and having not immediately been given access to the Property, Plaintiff made an emergency petition at the Delaware County Court of Common Pleas, requesting the locks be removed and her right of access reaffirmed. (*Id.* at ¶ 50). Judge Barry Dozor heard this petition and issued an order which stated, in relevant part:

> Simona Ockley shall have unlimited and unfettered access to the property located at 416 South Ithan Avenue, Villanova, PA 19085 at her own risk to remove her personal property until September 1, 2022. Plaintiff shall remove any additional locks so that Defendant may access the property until September 1, 2022. Plaintiff and/or the Radnor Police Department shall allow access by removing locks to provide Defendant access to the property to remove her personal property until September 1, 2022.

(*Id.* at Ex. 28, hereinafter the "Second Order," and with the First Order, the "Orders")). After obtaining the Second Order, Plaintiff returned to the Property and found Radnor's locks removed from the garage door. (*Id.* at ¶ 52). Plaintiff requested Rockwell-Glynn remove its locks but was unable to get full access to the Property. (*Id.* at ¶ 53). Plaintiff returned to the Red Roof Inn for another evening. (*Id.*). Plaintiff was still wearing her hospital gown. (*Id.*).

On August 10, 2022, Plaintiff returned to the Property and had a locksmith remove Rockwell-Glynn's locks on the garage and basement doors. (*Id.* at ¶ 54).

Despite having no power or water, Plaintiff stayed overnight at the Property. (*Id.* at ¶ 55). On August 11, 2022, Plaintiff had power restored to the Property without any coordination with Radnor or the Property's new ownership. (*Id.* at ¶ 56). That same day, Plaintiff barred a tree contractor from entering the Property to remove dead and hazardous trees and refused entry to a pest inspector sent by Radnor. (*Id.* at ¶ 58). Plaintiff stayed at the Property on August 11, as well, still wearing a soiled hospital gown and adult diaper from August 8, even though she had access to both a hotel room and a friend's home. (*Id.* at ¶ 59).

On August 12, 2022, Mr. Brydzinski went to the Radnor police station and reported Plaintiff's activity as a "possible squatting issue" and expressed concern for Plaintiff's safety due to the condition of the Property. (*Id.* at ¶ 60). Mr. Brydzinski also reported that Plaintiff removed the condemnation and no-trespassing signs, hindered construction, and restored utilities in her name. (*Id.* at ¶ 61). The Individual Radnor Defendants and Radnor Police Sgt. Fischer responded to the Property that day and found Plaintiff, still in her soiled hospital gown, laying on a couch with feces stains, in temperatures exceeding 100 degrees. (*Id.* at ¶ 62). The kitchen floor was damaged, there was no running water in the Property, and there was a stench of sewage present. (*Id.*). This led the officers to deem the conditions life-threatening. (*Id.*).

Defendant Officer Pinto followed protocols and contacted the Delaware County Mobile Crisis Team ("MCT"), which dispatched two mental health responders to the Property for a potential commitment pursuant to Section 302 of the MPHA (a "§ 302

Commitment"). (*Id.* at ¶ 64). The MCT evaluated Plaintiff and concluded Plaintiff was unable to care for herself and make sound decisions, and therefore supported a § 302 Commitment. (*Id.* at ¶ 66). Based on the foregoing circumstances, Plaintiff was transported to Crozer Hospital by ambulance for further evaluation. (*Id.* at ¶ 67).

Dr. Daniel Marotta conducted a psychiatric evaluation of Plaintiff at the hospital and found that she was not a danger to herself or to others, and therefore denied the § 302 Commitment. (*Id.* at ¶ 68). Plaintiff explained "her disheveled appearance and presence in urine and feces was due to limited mobility from recent leg surgery and lack of running water." (*Id.* at ¶ 69). "Plaintiff was able to verbalize a plan to perform activities of daily living with assistance from a friend and caretaker." (*Id.*).

On August 13, 2022, Plaintiff returned to the Property and found that it was boarded up with plywood and locked by Rockwell-Glynn. (*Id.* at ¶ 72). The Rockwell Defendants, knowing Plaintiff was released, asked the Radnor police to keep an eye on the Property to ensure nothing illegal occurred. (*Id.* at ¶¶ 73-74). Defendant Officer Cocco drove past the Property and observed Plaintiff on the Property, and saw plywood on the ground, which indicated that Plaintiff attempted to enter the Property. (*Id.* at ¶ 74). Plaintiff refused to leave the Property. (*Id.*). Defendant Cocco arrested Plaintiff for burglary, criminal trespass, defiant trespass, and criminal mischief. (*Id.* at ¶ 76). While arresting Plaintiff, Defendant Cocco said "I know what the court order says… [y]ou are not allowed to live here, there's no water, no PECO. We read it yesterday… You're not allowed to be here." (*Id.* at ¶ 77.1). Defendant Cocco

was assisted in this arrest by Defendant Brown, a new hire and trainee officer. (*Id.* at ¶ 78). Sgt. Fischer testified that probable cause existed for the arrest because Plaintiff was present after being told not to return and damaged the Property, while making no effort to remove belongings. (*Id.* at ¶ 79). Defendant Cocco testified in her deposition that she was unaware of the Second Order at the time of the arrest, but that its content would not have altered her actions, as it was her belief that Plaintiff was attempting to reside in the property, not remove belongings, which was not permitted under either the First or Second Order. (*Id.* at ¶ 97).

After arraignment, Plaintiff had bail set at one dollar, with conditions including providing a new address and undergoing a psychological evaluation. (*Id.* at ¶ 81). She was transported to George W. Hill Correctional Facility. (*Id.*). Plaintiff was held there until September 7, 2022, pending psychological evaluation. (*Id.* at ¶ 82). After a psychological evaluation, officials determined that she did not need further detention and released her. (*Id.*). The criminal charges against Plaintiff were ultimately dismissed. (*Id.* at ¶ 83.1).

The Orders permitted the Rockwell Defendants to dispose of Plaintiff's personal property as abandoned if not retrieved by September 1, 2025. (*Supra*). As of September 2, 2025, the Rockwell Defendants placed Plaintiff's personal belongings in PODS containers on the southwest corner of the Property. (Dkt. #40 at ¶ 86). The record contains no evidence which suggests that the Rockwell Defendants were required to do so; to the contrary, it appears that action was taken voluntarily.

On September 8, 2022, Judge Whelan held another hearing regarding Plaintiff's personal belongings and Plaintiff's ability to access the Property. (*Id.* at ¶ 84). In the hearing, Judge Whelan stated on the record that he did not know if an attempt to live on the Property violated the order because his order did not contemplate that issue, but that Radnor Township would be entitled to enforce its condemnation order. (*Id.* at ¶ 85.1). The issue of the first hearing was "to make sure [Plaintiff] had the ability to retrieve whatever personal property was in the [Property]. . . ." (*Id.*).

As a result of the hearing, Judge Whelan issued a new written order, which permitted Plaintiff to access only the southwest corner of the Property until September 18, 2022, "for the sole purpose of retrieving her personal property from the PODS and removing her personal property from the Property." (*Id.* at Ex. 36, hereinafter the "Third Order"). The Third Order said that after September 19, the PODS could be removed from the Property and placed in storage for retrieval until October 8, 2022. (*Id.*). After then, any remaining property could be disposed as refuse. (*Id.*). Finally, the order stated that Plaintiff's vehicle, also located in the southwest corner of the Property, must be removed by Plaintiff no later than September 18, 2022, and would be considered abandoned if not recovered by then. (*Id.*). Plaintiff retrieved her belongings in October 2022 after she obtained a court order extending the time she had to retrieve her property. (*Id.* at ¶ 93). Upon doing so, Plaintiff reported items missing from her car. (*Id.* at ¶ 94). Plaintiff has also alleged in her

brief that upon retrieving her possession from the PODS containers, some items were missing. (Dkt. #37 at 18).

Plaintiff filed her complaint in this matter on August 8, 2024. (Dkt. #1). Count I, brought against Defendant Officers Cocco, Pinto, and McHale, alleges a violation of 42 U.S.C. § 1983 ("§ 1983") for false arrest/wrongful civil commitment regarding the aforementioned § 302 Commitment. Count II, brought against Defendant Officer Cocco, alleges a violation of § 1983 for false arrest in connection with Plaintiff's August 13, 2022 arrest. Count III, brought against Defendant Officers Cocco and Brown, alleges a violation of § 1983 for false imprisonment in connection with the filing of a criminal complaint against Plaintiff after her August 13, 2022 arrest. Count IV, brought against Defendant Officers Brown and Cocco alleges a violation of § 1983 for malicious prosecution after Plaintiff's August 13, 2022 arrest. Count V, brought against Defendant Radnor, alleges a violation of § 1983 for failure to train its officers. Count VI, brought against the Rockwell Defendants, alleges a common law malicious prosecution tort claim based upon their reports to the police department. Count VII, brought against the Rockwell Defendants, alleges conversion in connection with her personal property which was missing when Plaintiff finally retrieved her belongings. At the conclusion of fact discovery, both sets of Defendants moved for summary judgment as to all counts against them. Summary judgment briefing is now complete, and the motions are ripe for decision.

### III.    Legal Standards

Summary judgment is appropriate "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mann v. Palmerton Area School District*, 872 F.3d 165, 170 (3d Cir. 2017) (citation and internal quotation marks omitted). A fact is "material" if, under the applicable substantive law, it is essential to the proper disposition of the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The party moving under Rule 56 "bears the burden of demonstrating the absence of any genuine issues of material fact. When determining whether there is a triable dispute of material fact, the court draws all inferences in favor of the non-moving party." *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820-21 (3d Cir. 2006) (citations and internal quotation marks omitted).

The movant's initial burden does not relieve complainant's obligation of producing evidence that would support a jury verdict. *Anderson*, 477 U.S. at 256. Because a motion for summary judgment looks beyond the pleadings, the opposing party must advance specific facts showing that there is a genuine factual dispute. *See Marshall v. Sisters of Holy Family of Nazareth*, 399 F.Supp.2d 597, 598 (E.D. Pa. 2005). The non-movant may not rest on their pleadings but must point to probative evidence tending to support the complaint. *Anderson*, 477 U.S. at 256. "The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. If the "evidence presented by the non-movant is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

Section 1983 permits recovery against any person who, under color of state law, subjects or causes to be subjected another person to "the deprivation of any rights, privileges or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. Even if such a violation has occurred, government officials are protected from liability by qualified immunity as long as they do not "violate clearly established... constitutional rights of which a reasonable person would have known." *Gibbs v. City of Philadelphia*, No. CV 25-2810, 2025 WL 2608625, at *3 (E.D. Pa. Sept. 9, 2025) (Pappert, J.) (alterations in original) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

> To determine the doctrine's applicability, a court must ascertain whether the facts shown by the plaintiff make out a violation of a constitutional right and whether that right was clearly established at time of the defendant's alleged misconduct. A right is "clearly established" when its contours are sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate.

*Id.* (cleaned up)

While this Court has not found a decision in a pure civil litigation context, Pennsylvania's appellate courts in other contexts have deemphasized the force of a judge's oral reasoning at a hearing and placed emphasis back upon the need for a

clear, written order. *See, e.g.*: *R.L.P. v. R.F.M.*, 110 A.3d 201, 203 (Pa. Super. 2015) ("[I]n order to be sufficiently specific to be enforced, an order of custody must be entered as a separate written order, or as a separate section of a written opinion."); *Com. v. Isabell*, 467 A.2d 1287, 1292 (Pa. 1983) ("Generally, the signed sentencing order, if legal, controls over oral statements of the sentencing judge not incorporated into the signed judgment of sentence.").

## IV.   Analysis

### a. The First Order and Second Order permitted Plaintiff to access the Property only for purposes of removing her personal property, and attempts to reside therein or conduct any activity which was not the removal of her property exceeded the authority of the plain text of the Orders.

How this Court interprets the language of the Orders is central to this case and has the potential to be dispositive to many of Plaintiff's claims in her Complaint. For this reason, the Court will address this interpretive dispute first. The key language in the Second Order (which is the same as the First Order for all relevant purposes) is that Plaintiff "shall have unlimited and unfettered access to the property located at 416 South Ithan Avenue, Villanova, PA 19085 at her own risk to remove her personal property." (Second Order, *supra*).

Plaintiff urges this Court to give vigorous meaning to the phrase "unlimited and unfettered access to the Property" in the Orders, and in so doing rule that Plaintiff was permitted to do anything she liked on the Property. Plaintiff implicitly suggests to this Court that "unlimited" and "unfettered" carry the entirety of the interpretive weight of those provisions, and the Court need not look any further to

know if she was lawfully permitted to do everything she did on the Property, including staying overnight.

While Plaintiff's definition may well be what the words "unlimited and unfettered" mean absent a limiting principle, Plaintiff asks this Court to disregard the remainder of that sentence, which says "to remove her personal property." Defendants ask this Court to understand that the unlimited and unfettered access she was granted was provided only in the context of removing her personal property. So, they argue, while her access to the Property could not be limited to the extent she was removing her property, any access for a purpose other than removing property or in addition to removing property was not permitted by the Orders.

Giving meaning to every word in the Orders, this Court concludes that Plaintiff's unlimited and unfettered right to access the Property was only to do what she needed to do to effectuate the removal of her personal property. For example, Defendants could not limit the number of visits she made, could not prohibit her from bringing a moving truck, and could not force her to obtain insurance before removing her property. In that sense, her ability to remove her personal property from the Property was unfettered and unlimited. But that access was only permitted to remove her personal property from the Property.

In all other aspects, the Rockwell Defendants retained an absolute right to exclude Plaintiff from the Property. The Orders, by their own plain meaning, did not entitle Plaintiff to establish residency or do anything besides remove her property. If

Plaintiff accessed the Property for a purpose other than removing her personal property, she could be lawfully removed from it.

This interpretation is the only one reasonable under the circumstances. If your renovation contract grants the contractor unlimited access to your property to perform the contracted work, everyone would understand that to mean that you cannot refuse the contractor entry during working hours when they arrive with their toolbox. But everyone would also understand that the contractor would not be permitted to host Thanksgiving dinner in your dining room. So too, while your "unlimited" gym membership would grant you 24/7 access to the ellipticals, it would not permit you to set up a board game club in the sauna. Put simply: unlimited access for a limited purpose are concepts which can, and regularly do, comfortably work side-by-side.

Plaintiff's best argument for her reading of the Orders is that Judge Whelan made comments during the hearing which suggests that he did not understand the Orders to have the limitation that the Court finds the Orders imposed. Plaintiff specifically points to Judge Whelan saying, "you're allowed to live and/or access the property up until September 1st."

These arguments are unpersuasive. As this Court mentioned above, it is the text of the Orders, rather than the commentary of the Judges who issued them, which controls the legal relationship between the Parties.[2] *See supra*. And as explained,

---

[2]     This is especially true as to the Individual Radnor Defendants, who also have the cloak of qualified immunity. Even if the commentary of the Judge controlled here, there is no evidence that the Individual Radnor Defendants had access to the hearing transcripts, and it would not have been

above, this Court finds the plain text of the Orders permits Plaintiff access to the Property only to remove her belongings, and not to establish residency.[3] While the cases cited above arose in family and criminal court contexts, the reasoning underpinning them is equally applicable in a civil context. Those decisions stand for the proposition that nailing down the exact legal force of one portion of a transcript as opposed to another is a self-defeating process which would lead to uncertainty in application and inevitably bring the litigants back to court for clarification. These holdings also make logical sense in terms of timing. A written order is typically second-in-time after the hearing and therefore could also represent a judge thinking longer and harder about something and reaching what they believe to be a better decision than the one alluded to off the cuff.

Finality demands clarity, and therefore the text of an order, when unambiguous, renders the oral statements of the court interpretively unnecessary. Because this Court finds the Orders to be unambiguous, Judge Whelan's statements do not impact this Court's analysis, and this Court holds that Plaintiff's access to the Property was limited to access for purposes of removing her personal property.

---

unreasonable to mistrust the recollection of Plaintiff, whose actions at the time of her encounters would lead any reasonable officer to, at the very least, take Plaintiff's assertions with a grain of salt.

[3]     Further, Judge Whelan said in a later hearing that "[w]e never addressed whether she moved in [sic], because I never even considered to move [sic] in because of the condemnation" and that it "would be up to the Radnor Township solicitor to enforce that condemnation order." (Dkt. #40 at ¶ 85.1). Clearly, Judge Whelan did not understand his order to address residency. Even if we did credit a judge's statements during the hearing over the text of his order, the judge's statements on this issue are, at best for Plaintiff, contradictory. When Judge Whelan had the entire factual situation placed in front of him, made it clear he did not issue an order which would permit residence. So even under Plaintiff's preferred analytical framework, she still cannot prevail.

### b. Count I for False Arrest and Wrongful Civil Commitment under 42 U.S.C. § 1983 fails because the Defendants had probable cause for the detention and commitment.

Pennsylvania law permits someone to be detained for involuntary commitment if "when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself . . . ." 50 Pa. Stat. Ann. § 7301(a). Clear and present danger to himself is proven by showing, *inter alia*, " the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act . . . ." 50 Pa. Stat. Ann. § 7301(b)(2)(i).

To prevail on a false arrest claim, the necessary elements of a cause of action for false arrest are: (1) the detention of another person, and (2) the unlawfulness of such detention. *Bryant v. Collins*, No. CV 15-00302, 2017 WL 1354941, at *7 (E.D. Pa. Apr. 13, 2017) (Pappert, J.) An arrest that is based upon probable cause is legally justified, regardless of the arrestee's ultimate guilt or innocence. *Borough of Coraopolis v. Papa*, 295 A.3d 742 (Pa. Cmwlth. 2023); see also: *Paszkowski v. Roxbury Twp. Police Dep't*, 581 Fed. Appx. 149, 152 (3d Cir. 2014).

"Probable cause… has been defined as: reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." *Velez v. Cessna*, No. 5:24-CV-00481, 2025 WL 606177, at *4 (E.D. Pa. Feb. 24, 2025) (Weilheimer, J.) (citing *Napier v. City of New Castle*, 407 Fed. Appx. 578, 583 (3d Cir. 2010)). The Third Circuit has instructed that probable cause exists where "reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude than an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). It must be more than just mere suspicion but does not require enough evidence to prove guilt beyond a reasonable doubt. *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984).

Synthesized together, there is probable cause for a § 302 commitment where, *inter alia*, an officer has "reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation" that the person they are encountering a person who "would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that… serious bodily injury would ensue within 30 days…" without commitment. *See Velez*, 2025 WL 606177, at *4; 50 Pa. Stat. Ann. § 7301(b)(2)(i).

Here, this Court concludes with little difficulty that the police officers against whom Count I is brought had probable cause to detain Plaintiff for a mental health §

17

302 evaluation. The stipulated facts upon which all parties agree are that the police arrived at the Property with temperatures in the triple digits, no power or running water, the home in disarray, the smell of sewage, and Plaintiff in soiled clothes and an adult diaper. While Plaintiff was ultimately cleared by the doctor at the hospital, those circumstances are "sufficient to warrant a person of reasonable caution to conclude" that Plaintiff was unable to satisfy her need for nourishment, personal care, and shelter, and that such inability might result in serious injury or debilitation within 30 days. *See Myers*, 308 F.3d at 255.

The judgment of the officers need not be correct to establish probable cause; reasonable mistakes of both fact and law can be used to establish probable cause and avoid individual liability. *See Heien v. North Carolina*, 574 U.S. 54, 63 (2014) (holding that probable cause "encompasse[s] suspicion based on reasonable mistakes of both fact and law."); *see also Anderson v. Creighton,* 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.").

Objectively, the undisputed evidence raised serious concerns about Plaintiff's ability to care for herself, as she had not eaten, was laying on a couch in dangerous temperatures, and had no access to running water. Even if she were permitted to reside on the Property (which she was not), the Individual Radnor Defendants against

whom Count I was brought would be well within their rights to detain her for a § 302 evaluation.[4]

### c. Counts II and III for False Arrest and False Imprisonment under 42 U.S.C. § 1983 fail because the Defendants had probable cause for Plaintiff's detention and imprisonment.

False arrest and false imprisonment claims are nearly identical, and courts tend to analyze them together. *Covington v. Plymouth Twp. Police Dep't*, 779 F. Supp. 3d 509, 523 (E.D. Pa. 2025) (Younge, J.). The same standards outlined above in a false arrest case apply in a false imprisonment context. *See Alleyne v. Pirrone,* 180 A.3d 524, 543 (Pa. Cmwlth. 2018) (stating same elements for each claim). "An arrest based on probable cause cannot become the source of a claim for false imprisonment." *Groman v. Twp. Of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (cleaned up).

Counts II and III for false arrest and false imprisonment are brought against Defendant Cocco and both Defendants Cocco and Brown, respectively. The allegations in support of these counts surround Plaintiff's arrest on August 13, 2022. As explained, *supra*, this cause of action fails if there was probable cause to arrest Plaintiff. Importantly, even a single offense for which there was probable cause will defeat a false arrest claim. *See Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 302 (3d Cir. 2024). Defendant Cocco arrested Plaintiff for, *inter alia*, criminal mischief, based upon her observation that Plaintiff had removed plywood which was attached to the Property. Under Pennsylvania law, criminal mischief punishes

---

[4]    And even if there was not probable cause, as the above analysis shows, the case presented a close call. For that reason, the officers would be protected by qualified immunity.

someone who damages the tangible property of another intentionally or recklessly. 18 Pa.C.S. § 3304(a)(1).[5]

There was probable cause for that charge, as the evidence at the Property that day showed that Plaintiff removed plywood erected in front of the garage door by the Rockwell Defendants. (Dkt. #40 at Ex. 24, p. 2). While this would hardly be the criminal mischief case of the century, this Court cannot say that there was no probable cause to support that charge. As just one example, the Superior Court of Pennsylvania has found that a property's wall is "tangible property" under the statute and that placing graffiti on that wall constituted damage sufficient to support a criminal mischief conviction. *In Int. of Rodriquez*, 537 A.2d 854, 855 (Pa. Super. 1988). The Second Order, which was the effective court order at the time of the hearing, required Rockwell-Glynn to remove its locks to permit Plaintiff to access the Property. It did not permit Plaintiff to engage in self-help in removing the plywood. Plaintiff may well have prevailed if the criminal mischief matter had gone to trial. But that does not mean there was no probable cause at the time the arrest was made.

Plaintiff argues that criminal mischief cannot apply because all the personal belongings in the house were her own. But in so doing, she ignores the damage done to the Property itself, which she legally sold and, therefore, no longer owned. Plaintiff also attempts to defeat probable cause by citing to a provision of the statute which deals with fire, explosives, or dangerous means of damaging the property, and

---

[5]    The portions of the relevant criminal statutes cited throughout this opinion correspond to the sub-sections under which Plaintiff was charged according to the record evidence attached by the Parties to their joint statement of undisputed facts.

suggesting none of those was present here. But that provision only applies where the criminal mischief charge is brought for damage done negligently. Here, the allegations were that Plaintiff intentionally damaged the Property. The fire and explosives provision is entirely inapt.

Because there was probable cause for at least one of the offenses for which she was arrested, Counts II and III for false arrest and false imprisonment fail as a matter of law.[6]

> **d. Count IV for malicious prosecution against Defendants Brown and Cocco must be dismissed because there was no showing that they provided false information to charging authorities, there was probable cause to support all charges brought against her, there is no evidence of malicious intent, and they otherwise would be shielded by qualified immunity.**

To prevail on a malicious prosecution claim, a plaintiff must plead and prove that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Velez*, 2025 WL 606177, * 4 (*citing Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020)). When a malicious prosecution claim is brought against a private individual who is not a member of law enforcement, the plaintiff must additionally be able to prove and show either "[the individual's]

---

[6] Again, even if there were not probable cause, or even if such a claim could proceed, qualified immunity would shield the Individual Radnor Defendants, as there the Court finds no clearly established right which was violated here.

desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false." *Hess v. Lancaster Cnty*., 514 A.2d 681, 683 (Pa. Cmwlth. 1986). "The existence of probable cause is an absolute defense to a malicious prosecution claim*." Givens v. Wal-Mart Stores, Inc.,* No. 22-2989, 2023 WL 7144628, at *2 (3d Cir. Oct. 31, 2023) (cleaned up); *see also*: *Tomaskevitch v. Specialty Recs. Corp*., 717 A.2d 30, 33 (Pa. Cmwlth. 1998) ("The showing of probable cause is an absolute defense to a charge of malicious prosecution.").

"Probable cause for the purpose of malicious prosecution actions has been defined as: reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." *Napier*, 407 Fed. Appx. at 583 (3d Cir. 2010) (citation and internal quotation marks omitted). Probable cause is established if, at the moment of arrest, "the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id.* (internal citation and punctuation omitted) (*citing Beck v. Ohio*, 379 U.S. 89, 91 (1964)); see *also Harvard*, 973 F.3d at 199-200. At the summary judgment stage, the existence of probable cause is assessed based on the totality-of-the-circumstances available to the officer effectuating the arrest. *Harvard*, 973 F.3d at 200. The reviewing court must evaluate these circumstances in the light most favorable to the complainant. *Id.*

22

Importantly, probable cause does *not* require factual correctness. *Illinois v. Rodriguez,* 497 U.S. 177, 184 (1990).

As an initial matter, Defendants Cocco and Brown point to the *Hess* decision (*supra*) and its progeny which suggest that they are not considered the charging party in this case, and that they are therefore shielded from liability as long as they did not provide any false information in their police report. Plaintiff does not challenge this assertion.[7] Instead, Plaintiff asserts that the police report submitted to charging authorities was false or misleading in that it did not mention the Orders. But as this Court has explained, Plaintiff's interpretation of the Orders is incorrect, and therefore her assertion that the officers misled the authorities is as well. The Orders did not permit Plaintiff to behave as she was behaving. Therefore, omitting reference to the Orders, while perhaps rendering the police report less fulsome than it may otherwise have been, did nothing to mislead either the charging authorities or the tribunal which approved the charges with respect to a fact in consequence. There is nothing inaccurate or misleading in the police report.

Further, there is probable cause to justify each of the charges brought. As explained, *supra*, there is probable cause of criminal mischief. Plaintiff was also charged with criminal trespass under two provisions of the Pennsylvania Code. The first punishes someone who, knowing they are not licensed or privileged to do so, "enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof." 18 Pa.C.S. §

---

[7]     Because Plaintiff does not make argument regarding this standard and implicitly concedes its applicability by engaging it without rebuttal, this Court will not dive deeper into that issue.

3503(a)(1)(i). The second provision, labeled in the Pennsylvania Code as a "Defiant trespasser," punishes someone who, knowing they are not licensed or privileged to do so, "enters or remains in any place to which notice against trespass is given by actual communication to the actor. . . ." *Id.* at § 3503(b)(1)(i).

As this Court has already addressed, Plaintiff's access to the Property was limited to access for purposes of removing her belongings. Any access beyond that was unlawful. Officers Cocco and Brown, aware of the First Order which had language basically identical to the Second Order for purposes of access to the Property, had probable cause to believe that Plaintiff gained entry to the Property by subterfuge (i.e., entering the Property intending to reside despite the Second Order's restriction and removing the plywood) and remained unlawfully. Further, before arresting Plaintiff, the undisputed facts show that the officers instructed Plaintiff to leave, and she refused to do so. For that reason, the elements for both trespass and defiant trespass were at least apparently met.[8] Therefore, there was probable cause for both of these charges.

Finally, according to the police report, the provision of Pennsylvania's burglary law under which Plaintiff was charged punishes a person who "enters a building or occupied structure, or separately secured or occupied portion thereof that is not adapted for overnight accommodations in which at the time of the offense no person

---

[8] Nor can Plaintiff defeat probable cause for trespass based upon an assertion that she subjectively understood the Orders to permit her to access the Property to reside there. Even if Plaintiff subjectively misunderstood the Orders (which would likely be a complete defense to the criminal charges at trial), it was understandable that the officers on the scene would enforce the law based upon the assumption that Plaintiff understood the objectively reasonable meaning of the Orders, rather than Plaintiff's self-interested idiosyncratic understanding.

is present" and has "the intent to commit a crime therein. . . ." 18 Pa.C.S. § 3502(a)(4). The Pennsylvania Superior Court has held that the underlying crime which one must intend to commit can include summary misdemeanors such as criminal mischief. *In Int. of Golden*, 365 A.2d 157, 158 (Pa. Super. 1976).

While this charge may have been a stretch, it was not without probable cause. Based on the responding officers' reasonable belief that Plaintiff intended to reside in a property which she no longer owned and which lacked running water, Plaintiff's residency at the Property was almost sure to result in further criminal mischief in the form of damage to the Property.[9] To the extent such an underlying crime was not an adequate intended crime pursuant to Pennsylvania's burglary law, it was certainly a reasonable mistake for which recovery is not permissible.[10]

As to the "malicious" nature of the prosecution, this Court finds that Plaintiff's evidence is sorely lacking. To prevail, Plaintiff must be able to show that the officers acted for a purpose other than bringing her to justice. But Plaintiff brings forth *no* evidence whatsoever of what that other motive might be.

The undisputed and stipulated facts make clear to this Court that the Individual Radnor Defendants, in contrast to Plaintiff's assertions, acted with the utmost professionalism when faced with a difficult series of boots-on-the-ground decisions to make. Faced with a woman wearing a soiled hospital gown and a diaper

---

[9]     Further, while ordinary trespass likely cannot be the underlying intended crime for burglary (as such a rule would turn every trespass into a burglary), defiant trespass, i.e., remaining after being told to leave, might well be. The Court was unable to find binding Pennsylvania case law on the issue.

[10]     This Court would find qualified immunity protects the officers even if there was not probable cause, given that such a mistake would have been a reasonable mistake based on a contested issue of law.

while she was residing on a condemned Property she no longer owned, the first instinct of the responding officers was to have concern for her mental health and to work to obtain care for her. It was not until she was cleared by a doctor and released, and then returned to the condemned Property for the purpose of residing there that the police officers ultimately had no choice but to arrest Plaintiff, as she was exceeding the permission granted to her to access the Property and exposing herself to living in dangerous conditions, such as the hole in the kitchen floor, hoarding condition, extreme heat and her prior leg injury, which in turn creates risks to first responders who might ultimately be called upon to assist her. This Court commends the police officers who acted in sound judgment and attempted to avoid criminal charges until they were inevitable.

Finally, even if there was some technical flaw in how the officers behaved with respect to Plaintiff's being prosecuted, such flaw would be technical in nature and entirely reasonable. For that reason, the officers would be entitled to qualified immunity, anyway.

### e. Count V for failure to train fails because Plaintiff has no evidence that Radnor failed to train its officers and cannot prove causation.

Next, this Court addresses Plaintiff's *Monell* claim that Radnor failed to train its officers. To prevail on a *Monell* claim, a plaintiff must show: (1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom.

*Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425, 436 (E.D. Pa. 2015). While a party must ordinarily show there is a pattern of mistakes to create an inference of a failure to train, such pattern is not required if the need to train officers is obvious and the inadequacy is very likely to result in a constitutional violation. *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

In her brief in opposition to summary judgment, Plaintiff summarily argues that Radnor failed to train its officers in "dealing with court orders or whether ordinances trumped orders or orders of a state court trumped ordinances of a township." (Dkt. #36 at 19). Further, Plaintiff argues, "this lack of training plays out as constitutional violations in the nature of exculpatory evidence being withheld intentionally and arrogantly by all of the officers of the Radnor Police Department." (*Id.*).

As an initial matter, Plaintiff's briefing on this issue is a mess and does not aid the Court in determining Plaintiff's position. The third full paragraph begins with a period, and the first sentence of that paragraph includes a long quote with an "*id*" citation which presumptively refers back to the decision in *Olender v. Twp. Of Bensalem*, the last case cited by Plaintiff. But a review of that case makes it clear that is not the case that quoted case, and this Court is left to guess what case Plaintiff wanted to cite. The next sentence has several quotations, but once again includes a missing citation, followed by a "see also" cite.

Technical briefing failings aside, Plaintiff's arguments fail on the merits. While this Court, as will be explained next, does not find any evidence of a failure to train,

even if there was a failure to train on how to balance a court order and a township condemnation ordinance, that failure would not have caused Plaintiff's injury. The Orders and the condemnation order do not contradict each other. Rather, they actually stand for the same basic proposition. The Property can be occupied only for the purposes of removing property. Therefore, the *Monell* claim fails.[11]

Further, Plaintiff has brought no evidence that there was even a failure to train at all. Plaintiff references no similar issues ever encountered by anyone detained by the Radnor police. Despite Plaintiff's broad and unsupported claims, this Court does not find it "obvious" that separate training is necessary on that issue where, as here, there is no evidence that anyone (including Plaintiff) has ever been harmed by Radnor police officers making mistakes on this issue. For these reasons, Plaintiff's *Monell* claim fails.

> **f. Count VI against the Rockwell Defendants for malicious prosecution fails because there is no showing that the prosecution was done as a result of their desire, request, or pressure, or that they furnished false information to the prosecuting authorities.**

As explained, *supra*, a cause of action for malicious prosecution fails if there is probable cause for the charges filed. As this Court has already explained, there was probable cause for the charges filed against Plaintiff, and for that reason her claim fails.

---

[11] Plaintiff's opposition brief intemperately refers to the officers' actions as "ignorant[]" and "arrogant[]." Such aspersions are rarely - if ever – appropriate. They are particularly inappropriate where, as here, it is the party casting the aspersions who is wrong.

Further, a malicious prosecution case against a private defendant can only proceed if "[the individual's] desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false." *Hess*, 514 A.2d at 683. The stipulated undisputed facts in this case indicate that prior to Plaintiff's § 302 detention, the Rockwell Defendants alerted the police to a "possible squatting issue" and that Plaintiff was exceeding her permitted occupancy, which limited her only to retrieving her property. (Dkt. #40 at ¶¶ 60, 60.1). Defendant Brydzinski further reported that "Plaintiff removed condemnation and no-trespassing signs, hindered construction, blocked a pest inspector, and restored utilities (PECO, Verizon, and attempted Aqua) in her name." (*Id.* at ¶ 61). As to Plaintiff's later arrest, the undisputed facts regarding the Rockwell Defendants state that all they did was ask the police to keep an eye on the Property. (*Id.* at ¶¶ 73-74).

Plaintiff's brief on this issue is rife with histrionics and attempted catchphrases, but noticeably light on analysis. Plaintiff essentially seems to be arguing that because the Orders permitted her to occupy the Property for any purpose (which they do not), the Rockwell Defendants' efforts to exclude her were malicious and therefore support a malicious prosecution claim. But, as was explained *supra*, that is not what the Orders permitted, and therefore Plaintiff's argument lacks merit.

Examining the contents of the Rockwell Defendants' actual comments to the police, this Court can identify no dishonesty or misstatement on behalf of the

Rockwell Defendants. There is also no evidence that the Rockwell Defendants expressed a desire that she be arrested or that such desire (if any) was passed along to the charging authorities and therefore had even the *possibility* to actually motivate the prosecution of Plaintiff, rather than legitimate efforts to enforce the law. For that reason, too, the malicious prosecution claim against the Rockwell Defendants fails.

### g. Count VII against the Rockwell Defendants fails because Plaintiff has no competent evidence that the Rockwell Defendants converted her personal property.

Turning to Plaintiff's final claim, Plaintiff asserts that the Rockwell Defendants converted her personal property. In support of that claim, Plaintiff essentially argues that some of her personal property was left within the Property, but by the time she opened the PODS containers, it was no longer there.[12] In her deposition, Plaintiff testified as to specific missing items that were previously in her car. (Dkt. #40 at § 94). Having searched Plaintiff's briefing, this Court has not found any record evidence of what other items, if any, Plaintiff maintains were converted. Plaintiff's briefing mentions that "significant items were missing[]" without any record support at all. (Dkt. #37 at 18).[13]

---

[12] Plaintiff's briefing on this issue is once again haphazard, as one paragraph includes what appears to be a Westlaw or Lexis "star cite" within text which purports to be original content that is absent a citation. (Dkt. #37 at 19, second full paragraph). That same sentence refers to "plaintiffs" in the plural rather than the singular, further raising questions as to whether this sentence is an original thought or take from another pleading or decision without citation.

[13] It is not the Court's job to scour the voluminous record to find Plaintiff's evidence of which items were missing from storage. It is Plaintiff's job, rather, to support her claim for conversion which was challenged at summary judgment by pointing in her briefing or in the Parties' joint statement of undisputed facts to competent record evidence that there were items of Plaintiff's that were converted, and what they were. Because the Rockwell Defendants do not seem to dispute that certain items are missing, this Court will not dwell on or rule based upon this apparent deficiency.

The elements of a claim for conversion under Pennsylvania law are: (1) the deprivation of another's right in, or use or possession of, property, (2) without the owner's consent, and (3) without lawful justification." *Rapid Cirs., Inc. v. Sun Nat. Bank*, No. CIV.A. 10-6401, 2011 WL 1666919, at *8 (E.D. Pa. May 3, 2011). In Pennsylvania, conversion is a willful tort. *Baram v. Farugia*, 606 F.2d 42, 43 (3d Cir. 1979). A claim for conversion, therefore, does not sound in negligence. *See Ickes v. Grassmeyer*, 30 F. Supp. 3d 375, 402 (W.D. Pa. 2014); *see also Burke v. Dep't of Corr.*, No. 452 M.D. 2019, 2020 WL 2187768, at *6 (Pa. Commw. Ct. May 6, 2020).

"Conversion may be committed by: (a) Acquiring possession of the goods, with an intent to assert a right to them which is in fact adverse to that of the owner[;] (b) Transferring the goods in a manner which deprives the owner of control[;] (c) Unreasonably withholding possession from one who has the right to it[; or] (d) Seriously damaging or misusing the chattel in defiance of the owner's rights." *Pizza Zone, LLC v. Catalina Partners, L.P.,* 304 A.3d 753 (Pa. Super. Ct. 2023) (McCaffrey, J.) (citing *Norriton E. Realty Corp. v. Cent.-Penn Nat'l Bank*, 254 A.2d 637, 638 (Pa. 1969)). Importantly, "the exercise of control over the chattel must be intentional. . . ." *Id.* (citing *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n.3 (Pa. Super. 2000)). Put another way: "[t]here is no such thing as a reckless, negligent or accidental conversion." *Spickler v. Lombardo,* 3 Pa. D. & C.3d 591, 603 (Pa. Com. Pl. 1977).

In reviewing this case in response to the motions, this Court considered whether a bailment analysis would be proper in this context. "A bailment is a delivery

of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it[.]" *Smalich v. Westfall*, A.2d 476, 480 (Pa. 1970) (citations omitted). "To constitute bailment, there must be a delivery of personal property to another, who accepts possession of the property, and exercises custody and control over it." *Riggs v. Com., Dept. of Transp.*, 463 A.2d 1219, 1220–21 (Pa. Cmwlth. 1983). "A constructive bailment arises where the person having the possession of a chattel holds it under such circumstances that the law imposes upon him the obligation to deliver it to another." *Maher v. Chapins Lunch Co.,* 180 A. 739, 740 (Pa. Super. 1935).

Pennsylvania law regarding whether a court could presume conversion based solely on the loss of bailed property was addressed in *Adams v. Ryan & Christie Storage.* 563 F.Supp. 409 (E.D.Pa. 1983). In *Adams*, the plaintiff deposited various items of value in a warehouse for storage. *Id.* at 410. When the plaintiff came back to retrieve the goods, they were missing, and none of the warehouse's staff or officers were able to supply any information as to where the items ended up. *Id.* Faced with determining whether that fact pattern stated a claim for conversion or for negligence, the Court noted a lack of Pennsylvania authority on the matter but concluded Pennsylvania courts would hold  "that where the record is silent as to the actual disposition of the bailed goods, and that silence includes not even an attempt by the bailee to offer an explanation, the permissible inference is one of negligence but not one of conversion. . . ." *Id.* at 414. To find a bailee has converted the property, a

plaintiff must show a "positive wrongful act." *See W. Min. Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847, 851 (W.D. Pa. 1984), *aff'd*, 745 F.2d 49 (3d Cir. 1984). Another court in our Circuit has described the presumption of negligence, rather than conversion, to be the majority view among states. *In re Stone & Webster, Inc.*, 335 B.R. 300, 308 (Bankr. D. Del. 2005). Other courts in other circuits have held similarly. *See Int'l Nickel Co. v. Trammel Crow Distribution Corp.*, 803 F.2d 150, 154 (5th Cir. 1986) (collecting cases). This Court has not found any Pennsylvania decisions contrary to this prevailing view of the law.

This Court finds that, by virtue of the three Court of Common Pleas orders discussed *supra*, the Rockwell Defendants became constructive or involuntary bailees of Plaintiff's personal property.[14] Upon taking ownership and possession of the Property, Plaintiff's personal property was now in their possession and protection, but they were required to hold onto and safeguard it until she could retrieve it, by a later date fixed by the court. Put differently: despite being in physical custody of those possessions, the Rockwell Defendants had no legal title to them. For that reason, this Court finds the above cases establishing the presumption of negligence in the context of a bailed object which has gone missing to apply.

With that background principle in place, Plaintiff's conversion claim could only prevail based upon some additional evidence that upsets this presumption. Facts

---

[14]    While no Party brought this bailment framework to the Court's attention, the issue of summary judgment on the conversion Count *is* before this Court, and "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties. . . . " *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 446 (1993) (cleaned up).

such as an eyewitness who saw the Rockwell Defendants with the items. Or perhaps saw them leaving a pawn shop. Or perhaps financial records showing payments from a pawn shop or some other secondhand store. It may even be enough to introduce evidence of a comment by one of the Rockwell Defendants about how much they needed an iPad or the other items which were allegedly converted. *Something* which could just barely inch Plaintiff past the presumption of negligence. But Plaintiff brings no such evidence, meaning the presumption of negligence survives and therefore her conversion claim fails.[15]

Even without application of this constructive bailment analysis, this Court would have reached the same conclusion on much the same logic as underpins the decisions in the bailment context. The undisputed facts show that various people, not just the Rockwell Defendants, had access to the Property during the timeframe when the property went missing, including police officers, paramedics, township health inspectors, pest control workers, contractors, and movers.[16] Plaintiff has absolutely no evidence from which a jury could conclude the Rockwell Defendants committed that intentional tort rather than any of those others who had access.

Further, given the undisputed facts show that the Property was in a hoarding condition, the items of personal property which Plaintiff claims were converted could

---

[15]    Plaintiff brings no claim for negligence and therefore cannot recover under that theory. She may well have survived summary judgment on that count had she brought it. That claim is now time-barred, as her cause of action accrued in October 2022 (see: Dkt. #40 at ¶ 93) and the statute of limitations in Pennsylvania for negligence is two years. 42 Pa.C.S. § 5524(2).

[16]    Plaintiff herself was insistent that non-defendant Officer Bates of the Radnor Police Department was not to be trusted alone in her home when Plaintiff was hospitalized with her broken femur. (*Supra*).

just have well been broken or negligently lost. As then-Judge McCaffrey's decision in *Pizza Zone* makes clear, while there are various ways a conversion can take place, they all involve some form of affirmative intentional wrongdoing. Plaintiff has no evidence which could rule out that theory such that a reasonable jury could be sure on a preponderance of the evidence that a wrongful act of conversion occurred, as opposed to basic negligence.

Finally, setting aside this interesting discussion on the exact contours of Pennsylvnia's conversion tort in various contexts, Plaintiff has a timeline problem. The Second Order permitted the Rockwell Defendants to dispose of Plaintiff's personal property in any way they saw fit as of September 1. The Second Order was still the controlling order as of September 1. On September 2, the Rockwell Defendants, whether out of kindness or in anticipation of further litigation, voluntarily chose to put at least some of Plaintiff's personal items in PODS containers. They had no obligation to do so. Per the Orders, they were free to do anything they wanted to with Plaintiff's personal possessions, including destroy them. The Third Order merely required the Rockwell Defendants to hold onto the items already in the PODS for a period of time. It did not require the Rockwell Defendants to preserve any other possessions or return items they hypothetically took for themselves or destroyed in the time between September 1 and September 9. Anything which Plaintiff claims is converted could have been lawfully taken during that period. For that reason, even if this Court were to grant an inference that the missing items were taken or destroyed intentionally, Plaintiff has no evidence at all

that they did so in a time in which it was unlawful to do so. For all these reasons, Plaintiff's conversion claim fails as a matter of law.[17]

## V.    Conclusion

This very complicated case turns on a very simple concept: Plaintiff was entitled to access the Property, but only for purposes of removing her personal property from it. Any other purpose was impermissible. The Rockwell Defendants had every right to exclude Plaintiff from the Property if she was doing anything besides that. The Radnor Defendants had every right to detain, arrest, and charge her with criminal offenses related to the same. Despite Plaintiff's effusive arguments to the contrary, all defendants are entitled to judgment with prejudice as to all counts. An appropriate order will follow.

DATED: September 29, 2025          BY THE COURT:


_____

GAIL WEILHEIMER          J.

---

[17]    Plaintiff additionally emphasizes that the sales contract between Rockwell-Glynn and Jeffrey Brydzinski required indemnification with relation to damages occurring prior to demolition. This is plainly irrelevant. The cause of action before the Court is conversion, not breach of contract. Further, the provision cited by Plaintiff deals with an assignment of liability from Mr. Brydzinski to Rockwell-Glynn. It does not *create* any liability or responsibilities with respect to Plaintiff. Rather, it just says that if there *were* a responsibility owed by Mr. Brydzinski to Plaintiff which was breached, Rockwell-Glynn would bear the costs of defense and liability. Plaintiff's references to this very standard and easily understood provision are confounding.